with air-to-ground rockets and missiles, or the McDonnell-Douglas/Boeing Apache attack helicopter, armed with chain-feeding rapid cannon fire, Hydra rockets, Hellfire missiles and heavy machine guns, for population control and retaliatory strikes violates international and U.S. law.

214. For example, on 18 May 2001, an F-16 strike on Palestinian Authority buildings in Ramallah and Nablus left twelve dead, forty-seven wounded, including five children, and leveled a police facility in Nablus, leaving many victims homeless.

215. The IDF claims it launched the F-16 strike—the first such aerial attack inside the Occupied Territories since 1967—in order to kill Mahmoud Abu Hanoud, a Hamas militant being detained there by the Palestinian Authority. Major-General Giora Eiland, head of strategic planning for the Israeli army, justified such disproportionate force targeted at one individual thusly: "When we bomb a target we are trying to show the Palestinian leadership that there are costs on both sides. In the long run, this will create problems for the Palestinian regime and that will help persuade them to stop the violence." This policy, intended to sow fear through a civilian population in order to undermine its leaders, constitutes a form of terror-attack condemned by international law.

216. That same day in Gaza, an attack on the Ansar police station in Gaza City left nineteen injured and completely destroyed the facility. Israeli F-16's

attacking P.A. buildings in the city of Tulkarem on 18 January of this year killed two persons and wounded over 100; more than seventy shops were destroyed or damaged in the attack on the busy downtown district; on 6 March 2002, an Israeli attack on the main security headquarters in Gaza City killed a dozen and leveled a city block; and Apache helicopters attacked two cars in the Rafah camp in Gaza on 23 June of this year, killing six Palestinians and wounding nine.

## Violations of the Arms Export Control Act (AECA)

217.   Nearly all of this weaponry is purchased by means of funds supplied by the taxpayers of the United States, including the Plaintiffs themselves, to Israel, pursuant to the Arms Export Control Act and the Foreign Assistance Act.

218.   Direct U.S. military aid and foreign assistance to Israel used for military purchases has totaled approximately $91 billion in the last fifty years.

219.   Since 1976, Israel has ranked first among recipients of US military aid and economic assistance, typically averaging in recent years about $3 billion annually, including $1.8 billion in Foreign Military Financing (FMF) grants from the Department of Defense and $1.2 billion in Economic Support Funds (ESF) from the Department of State.  Since 1992, FMF grants to Israel have totaled $18.2 billion.  Currently, 17% of all US foreign aid is disbursed to Israel.

220.   United States law authorizes the Congress and the President, under the Arms Export Control Act of 1976, 22 U.S.C. 2751 et seq., to sell or lease "defense articles and services" to foreign governments, and sets the terms by which such sales may be legally undertaken.

221.   The Act defines the term "defense article" as including any weapon or material used for the purpose of furnishing military assistance; while a "defense service" includes, among other things, technical assistance or defense information.

222.   The AECA provides that U.S. military assistance to a foreign country must "strengthen the security of the United States and promote world peace."

223.   The military assistance provided to Israel has violated the AECA (22U.S.C.§2753(a)(1)) as it has not "strengthened the security of the United States", nor "promoted world peace", nor furthered the "purposes and principles of the United Nations Charter.

224.   The military assistance provided to Israel by the United States has not been used for internal security or legitimate self defense, but instead  for offensive military purposes against a civilian Palestinian population in violation of the AECA (22U.S.C.§2754).

225. Israel's use of American military assistance against a civilian Palestinian population is in substantial violation of the AECA and all military assistance to Israel must be terminated pursuant to the AECA (22 U.S.C. §2753(c)).

226. Defendants George W. Bush and Colin Powell are in receipt of information that a substantial violation of the AECA may have occurred by Israel's use of U.S. military assistance against the civilian Palestinian population and are therefore required to promptly report the same in writing to Congress. Defendant Bush has not so reported and has deprived the Congress of information necessary for Congress to fulfill its constitutional role.

227. Defendant Powell, as Secretary of State, is charged with the continuous supervision of arms exports under the AECA. His authority includes the power to cancel or suspend arms contracts under compelling circumstances if the national interest requires. Defendant Powell has allowed Israel to violate the AECA with impunity and has failed to exercise his authority under the AECA.

228. Defendant Bush's failure to suspend American arms sales to Israel or at least report to Congress that Israel is in substantial violation of the AECA has allowed Israel to use United States financed and manufactured weapons to terrorize and collectively punish an entire civilian population based on their ethnicity. Defendant's failure to comply with the AECA is the direct and proximate cause of the injuries to persons and property suffered by plaintiffs.

## Violation of the Foreign Assistance Act (FAA)

229. The FAA prohibits the provision of development assistance to countries that have a consistent pattern of gross violation of internationally recognized human rights (22U.S.C.§2151n(a)).

230. Israel has engaged in a consistent pattern of gross violations of internationally recognized human rights.

231. The FAA specifically directs defendant Bush to "avoid identification of the United States… with governments which deny to their people internationally recognized human rights and fundamental freedoms."

232. Defendant Powell, as Secretary of State, is charged with preparing a full and complete report to Congress which must include, among other things, information regarding Israel's commission of war crimes and crimes against humanity. Moreover, findings of appropriate international organizations must be included in the report, as well as information regarding Israel's failure to cooperate with and active impeding of the legitimate investigation of the conditions of the Palestinians by international organizations.

233. Defendant Powell's failure to report to Congress as required by the FAA has resulted in the continuous flow of foreign assistance from the United States to Israel and is the direct and proximate cause of the injuries to person and property complained of by the plaintiffs.

# SPECIFIC ALLEGATIONS OF PLAINTIFFS

## John Doe I

234. On March 30, 2002, John Doe I's daughter, Jill Doe I, a twenty-two year old American citizen, was shot dead by soldiers of the Israeli Defense Forces during the early stages of the Israeli invasion of Ramallah. She was sitting in her car holding her 9 month old baby, Baby Doe I.

235. The soldiers were close enough to her car to discern that she and her child and husband were not armed. They opened fire with machine guns at a distance of approximately 5 meters. There was no gunfire in the immediate vicinity prior to this, nor any return fire.

236. Jill Doe I suffered multiple bullet wounds to the head.

237. On the Thursday following the attack, the hospital informed John Doe I that his daughter was dead on arrival and had been buried in a mass grave along with 24 men and two women.

238. John Doe I and his family have been unable to perform the religious rites of mourning and burial.

239. Due to the military siege, John Doe I and his family have been shuttered in his apartment. His family there includes his wife; his son-in-law who was seriously wounded- including gunshots to his head- in the same attack that

killed his daughter; his grandson; and 5 of his children, several of whom were born in the United States.

240.  John Doe I's annual income from an apartment building he owns in Ramallah was $15,000. Since the beginning of September, 2000, his income is less than half that due to the constant closures and military incursions by Israel.

241.  John Doe I suffers from emotional distress and sees his daughter's face constantly.  His other children are afraid to exit the apartment during the occasions when curfew is lifted due to mortal dread of the IDF snipers on many nearby rooftops, as well as their tanks and sandbags.

242.  On April 10, 2002, John Doe I's apartment was searched by IDF soldiers. He was taken out to the street where guns were pointed at him and he was threatened.  He said he was an American citizen and showed his passport.  The soldiers continued to brandish their weapons in front of him, his wife and his children.

### John Doe II

243.  John Doe II is an American citizen who also holds a Jordanian passport.

244.  John Doe II and his extended family have owned fifteen acres of farmland in the Deir Nitham area of the West Bank for approximately 1600 years.  The

71

family not only possesses Ottoman Empire and Jordanian ownership documents, but documents from the British Mandatory period as well.

245. In 1978, the Israeli government, working in conjunction with the World Zionist Organization and the Jewish National Fund, began construction of the settlement now known as Halamish/Neve Tzuf.

246. Palestinian farmers living on the site were forcibly removed and John Doe II watched as the settlement grew right to the property line of this own land.

247. John Doe II was given assurances by the American Consulate that the settlement would not take his land.

248. In 1995, settlers from the Halamish, aided and encouraged by Israeli policy and/or the government's willful ignorance, moved their perimeter fence so that it cut across John Doe II's land, taking approximately one-fourth of his farm.

249. John Doe II's formal complaints to the Israeli Committee for the Defense of Land and the Israeli police were ignored, as were his complaints to the U.S. government.

250. For seven years, men and women have enjoyed the use of John Doe II's family's land without permission, colorable title or recompense.

251. John Doe II's life has been threatened twice by armed settlers. In 1996, he stood "too close" to the settlers' fence (that illegally bisects his own land) and a settler aimed his rifle at John Doe II and said, while standing on John Doe's

property, "If you don't move I'm going to shoot you. This is my land." On a second occasion while walking on the remaining portion of his land with his five year old son, John Doe II was confronted by an armed security officer from the settlement who demanded that he leave the area.

252. Threats became reality in October 2000, when a group of approximately 20 armed settlers staged a nighttime raid on John Doe II's land, crossing over the perimeter fence to burn down his orchard and shooting at the doors and windows of his house.

253. As the settlers were about to torch his house, IDF troops arrived and dispersed them. No charges were ever filed against the Halamish settlers.

254. On June 13, 2002, John Doe II received word from relatives that the Halamish settlers began bulldozing the remains of his orchard, initiating the first steps of yet another expansion of the settlement at John Doe II and his family's expense.

255. On another nearby parcel of land owned by John Doe II and his cousin, Halamish settlers have destroyed a grove of 108 olive trees. Olive trees take a generation to become fruitful and can live for hundreds of years.

256. As a result of the attacks, John Doe II and his family have been severely traumatized. His ten year old son suffers from nightmares and psychological

disturbances and has become non-responsive in school.  He is obsessed with televised news accounts of the troubles in the mideast.

**John Doe III**

257.   On or about April 10, 2002, John Doe III suffered a stroke and experienced headaches, chest pain and slurring of speech.  He was unable to move his left hand.

258.   Despite the obvious emergency, and the fact that his son, a physician, was anxious to treat him at a nearby hospital, no medical personnel were permitted to treat him for two days.

259.   By the time his son was able to examine him, his symptoms were profound and he could not recognize his own children.

260.   Prompt treatment would have created a reasonable likelihood of preventing the stroke or minimizing its effects.

261.   He continues to experience short-term memory loss, disorientation walking, and speech difficulty.

## John Doe IV

262. John Doe IV is an American-trained physician. On or about April 10, 2002, while attending to patients at the hospital in Ramallah, he learned that his father was experiencing symptoms usually associated with a stroke.

263. His father lives only a few miles from the hospital, but John Doe IV was advised that Israeli forces would not permit medical transport of any kind. Neither he nor other medical personnel were permitted to see his father for two days.

264. By the time he got to his father, his father had already suffered irreparable injury that can generally be averted by introducing a blood thinner at an earlier stage.

265. On April 8, 2002, six soldiers came to John Doe IV's house while he was working at the hospital, demanded entry and searched the premises after ordering his wife and six daughters into the kitchen.

266. On June 24, 2002, while he was working at the hospital, 50-60 IDF soldiers surrounded his house again.

267. Eight soldiers demanded entry and ordered his wife and small children to wait on the verandah under armed guard, while the house and his medical clinic downstairs were searched.

268. His daughter's computer was rendered irreparable due to damage to the hard drive.

269. John Doe IV, his wife and daughters remain terrified after six months of near-constant siege.


**John Doe V**

270. On January 30, 2000 John Doe V flew into the Ben-Gurion airport in Tel Aviv. While his luggage was being checked, the Israeli security officer asked if he had any electronic equipment. Thinking that he was referring to computers, radios or recorders, John Doe V said that he did not. The security officer opened his bag and, finding a Nintendo game that John Doe V had brought for his nephew, he accused John Doe V of lying. He also insisted that John Doe V would have to pay two hundred dollars ($200.00) as a duty. John Doe V explained that he was not lying, but that he had not thought the game was the type of equipment the officer was concerned with. John Doe V also stated that the game had only cost fifty dollars ($50.00) at WalMart, and that such an unreasonable duty was absurd.

271. The security officer slapped John Doe V in the face, causing a red mark and intense pain. Dozens of other American travelers were watching this event, and John Doe V felt acute humiliation.

272.   Soon after, John Doe V went to the United States consulate in East Jerusalem to complain of such treatment of a United States citizen. The person he spoke with there said that there was nothing they could do about it and stated that if he did not like it, he didn't have to travel in this part of the world.

273.   On May 5, 2002, John Doe V's fifty-second birthday, he was traveling from Jerusalem to Ramallah. He was wearing an American flag lapel when he arrived at approximately 11:30am at the Kalendia checkpoint located about ten miles from Jerusalem, near the old Jerusalem airport. John Doe V presented his American passport to the Israeli soldiers guarding the checkpoint.

274.   At least one of the soldiers pointed a gun at his head and another shoved him. John Doe V stated that he was an American citizen, not a terrorist, and that he was there as a tourist. The soldier that had pushed him stated "I am an Israeli guard and I can do anything I want. If you don't like it you can go back to the United States." He then pushed John Doe V to the ground and kicked him twice: once in his back, once in the back of his head. The soldier's blows knocked the breath out of him, and caused him to black out momentarily.

275.   Afterward, his head throbbed for hours with pain, and his back was bruised, tender and in so much pain he could not move normally.  Walking and sitting were extremely painful.

276.  The soldier then ordered John Doe V to sit on a rock next to the checkpoint. When he had been pushed to the ground his suit was torn and dirtied. He felt that he looked like a bum. After sitting there for no apparent reason for approximately one hour, he got up and asked if he could speak with the supervisor. The soldier hit him on the right side of his face with his rifle butt. He ordered John Doe V to go back and sit on the rock. He did so.

277.  At approximately 2:00 pm there was a change of soldiers. The one that had hit John Doe V and kicked him, and the one that had pointed his gun at his head and struck him with the rifle butt both left. Another soldier, who had just come reviewed John Doe V's passport and said he could continue on his way. John Doe V complained to him of the treatment he had just been subjected to and he said that each checkpoint is different, as each soldier is.

278.  John Doe V promptly went to a doctor in Ramallah. The doctor could see a large bruise on John Doe V's face and was able to determine that he had damage to his right eardrum and a 50% loss of hearing in that ear. The doctor could also see a bruise on his back from being kicked, and correctly stated that it would hurt for a few days. He gave John Doe V medication for pain.

279.  John Doe V has never been accused of having committed any crime. Like the vast majority of Americans, he is not affiliated with any organization that conducts violence against anyone.

78

**John Doe VI**

280. On October 28 John Doe VI went to visit his sister in Amman, Jordan. He went to the Sheik Hussein/Allenby Crossing border post. At the border he paid his exit taxes and fees, and presented his United States passport. He was told to wait. All of the officials in the area were Israeli police or soldiers. He was made to wait for two hours without explanation, then two officers escorted him to a room and searched all his luggage and reviewed all his papers. They left him in that room for another two hours.

281. A woman officer came in and stated that John Doe VI was under arrest. When asked what the charge was, she said that he was a member of a terrorist organization. She would not provide any information from which he could understand this accusation. She would not say what organization, what he was supposed to have done with any organization, nor when he was supposed to have done it.

282. Two officers pointed guns at John Doe VI. He stated that he was a United States citizen and asked to call the embassy or consulate. She said that he could not. He asked if he could at least call his family. She said that he could not. Instead, one of the officers put papers in front of him and said that he should sign them. They were in Hebrew. Unable to read Hebrew, he asked what these papers were. They told him that it just says that he was under arrest. He refused

to sign the papers. The officers then spoke to each other in Hebrew and took the papers away.

283. Officers then came in and shackled his legs, and handcuffed him. They put him in a jeep. They pointed their guns at him and drove him to a jail, which John Doe VI believes was in the City of Jericho.

284. John Doe VI again asked if he could call the United States embassy or consulate or if he could call his family. The officers laughed at him. They then put him in a small, dirty cell where he was held for about two hours.

285. The officers then came in and again shackled his legs, and this time blindfolded him. He was taken out to a small car and could sense that they were traveling at a high rate of speed. They drove him for about two hours. At times during this trip he again stated that he was a United States citizen and asked to call the embassy or consulate. These requests were refused.

286. Finally, the car ride stopped and his blindfold was removed. He asked where they were and was told Jerusalem. They took him inside of a jail where they videotaped him. He objected to this. An officer that spoke Arabic said to him "You just have to do what you are told. You are now in the Makobiya Prison."

287. John Doe VI was taken to a holding room where a guard ordered him to strip. He was then shackled again. The guard placed a hood on John Doe VI's

head. The hood was rank. The smell was very strong and it was very foul. John Doe VI suspected the odor was of vomit and urine.

288.    The officer was able to grip the hood and pull John Doe VI around by it. Between the foul odor and being pulled around this way, the experience was deeply humiliating for John Doe VI. After jerking him around for several minutes, the guard removed the hood and John Doe VI could see other prisoners that he later learned were being held for non-political offenses.

289.    John Doe VI was taken to a doctor. The doctor asked if he had any medical problems. John Doe VI told him that he had chronic ear pain from an injury while working. John Doe VI explained that he needs a special pillow which he always takes with him when he travels in order to sleep. The doctor and the officer laughed at him.

290.    An officer then placed the hood back on John Doe VI's head and led him to another room. There was a chair in this room. He had to sit in the chair. The officer took one of his hands, behind his back, and placed his hand through the slats in the chair. He took his other hand and, behind his back, placed it over the back of the chair. The officer then cuffed his hands in this position very tightly. He then shackled his legs together and anchored then to a hook in the floor. This made any movement impossible. The hood made breathing difficult and offensive.

291.   John Doe VI was forced to remain in this position for three days. The only relief was that at one time during the three days he was taken to a bathroom.

292.   During the first day that he was held in this position a man came in and removed the hood from his head. John Doe VI saw that there was a desk with a computer in the room. The man introduced himself as Shouki. Based on conversations John Doe VI has had since then,  he believes that his real name is Cohen and that he has worked in the prison for twenty years.

293.   John Doe VI asked him what he was doing there. He said "No. You are going to tell us what you are doing here." John Doe VI told him that he had done nothing to merit being here and asked that he be permitted to make a call. Shouki refused his request and asked if he had heard about a law called "Emergency Law." John Doe VI told him that he had read about it in the newspaper. Shouki told him that he should know that his being an American citizen meant nothing.  He said: "We can do anything we want with you." He then held up John Doe VI's passport and said "This passport doesn't mean anything to us. We are America. You are going to die in here."

294.   John Doe VI asked him what he wanted from him. He stated that he wanted information about fund raising at his restaurant. The only thing John Doe VI could think of was that when he was a manager at Lum's an African American Muslim group wanted to raise funds to build a mosque. That had occurred in

1996 or 1997. The restaurant was given ten dollars per plate and the organization, Waladeen Mohammed, was able to charge more per plate in order to raise the funds. John Doe VI explained this occasion to the man and he seemed satisfied with his statement.

295.   The officer then asked about a contribution John Doe VI had made to the Holy Land Foundation. John Doe VI stated that he had sponsored a disabled child overseas, that he considered it his responsibility to help children, and so had provided $25.00 a month to help the child. The child and John Doe VI had exchanged letters. John Doe VI told him that he has no reason to believe that his contributions were ever used for anything other than to aid the child. The officer asked several questions about the Foundation, like how was he contacted by them. John Doe VI told him they had sent a fund raising letter to him. The officer asked if John Doe VI knew the president of the Foundation and was told that he did not.

296.   The man also asked him many questions about whether he belonged to a terrorist organization, and asked if he was hiding anything. John Doe VI told him that he did not belong to any terrorist organization and that he was not hiding anything. He also told the man that his life is an open book. At the end of his questioning the man said that if John Doe VI would not talk tomorrow, he would get someone who will make him talk.

297.  Before he left the room the man put the foul hood back on John Doe VI's head and turned the air conditioner on at full blast. In only a short while, not even hours, with the air conditioner on full, unable to move at all, John Doe VI felt like he was in a snowstorm with almost no clothes.

298.  After three days, John Doe VI began screaming at the top of his lungs. He was finally released from the chair but kept in the room, the air conditioner still running at full blast. His hands were badly swollen, he had no feeling in his hands and knew that he had not had any feeling in them for a long time. He was afraid that he might totally lose the use of his hands.

299.  Food was brought to him in the form of a plastic bag that contained one tomato, one cooked egg, and four slices of bread. He was not given anything to drink.

300.  The fourth day of his captivity another interrogator came to the room, and asked "what are you doing here?" He was then taken to a cell. It was approximately six feet by six feet. There was a dirty mattress on the floor and a hole in the floor in the corner for a toilet. He was given some water.

301.  The next day John Doe VI was taken to another room. It seemed to be a kind of courtroom. A woman was there who appeared to be a judge. No one identified themselves to him or announced any official proceedings. John Doe VI told her how he had been detained. He told her that he was a United States

84

citizen. She spoke through a translator and said that he would be held 15 days. He asked her why but she did not answer. There was no attorney there for him.

302.   John Doe VI was brought back to the cell and a few hours later taken to a room with two people from the United States consulate. One was named Abdel Noor and John Doe VI was told the other was Majed. They told him that they had been notified that day of his detention. He explained his situation. They commented that they could see the effects of the torture he had been through. He assumed they would take him out of there but they said they could not. He asked them to get the torture to stop or take him to another facility. They told him that if he signed a "privacy waiver" they could visit him. John Doe VI was angry. He said to them that "My government can't help even though there are no charges against me?" They replied that there was nothing they could do.

303.   John Doe VI was taken back to the cell and held in isolation for the next ten days. There were no windows in the room. He was fed for the next ten days the same way he had been before- a plastic bag with bread, vegetable and an egg. It was from these bags that he could mark the passage of time. The bags were bags used for bread. They had the ingredients printed on them and he read over and over and over again the ingredients in the bread.

304.   After ten days in isolation a guard came and said that he was free to go. That was a lie though, told just to torment him. Instead, he had a visit by a woman

85

from the Red Cross. John Doe VI believes that her name was Mary Lourdes. She said that she did not understand what was happening to him.

305.   It is difficult to describe how terrifying this isolation was. The portions of food were small. There was only just enough room to stand. The walls were dirty. The overhead light was on for 24 hours a day. There was an air vent in the ceiling. It had 249 holes in it.

306.   After fifteen days in isolation he was taken to the interrogation room. A man who said his name was Ahed was there. John Doe VI later learned that he was a Shin Bet agent for the area around Silwad. He showed John Doe VI an aerial view photograph of Silwad. John Doe VI showed him where his house was. He asked John Doe VI questions about other people that live in the area. John Doe VI explained that he didn't know them since he has not lived there for ten years. The man said that John Doe VI looks like his brother. He said that he knew his brother. John Doe VI said, "Then you know I am okay."

307.   Some days later John Doe VI was interrogated by a man who said that his name was Uri.  He had a paper and a pen. He asked  questions about people John Doe VI did not know.

308.   Some days later a Palestinian lawyer, Basam Alarouri, came and told him he had done an appeal for him, that the appeal might help him. He said that the Government was "fishing."

309.    For the trip to the appeal hearing his legs were tightly shackled. He was forced to run to the truck that would take him. The shackles cut into his legs. In the truck the hood was placed on his head again, and he was shackled in the back of the truck to a pipe. They then drove fast and with sharp turns. Shackled and hooded, he was thrown about wildly, and the chains hurt his legs, and his head knocked against the van.

310.    He was taken to a court at Betil. John Doe VI's family was there and when they saw him they started crying. When his case was called his attorney said that there had been a fund raising dinner at the restaurant he worked at and that John Doe VI had contributed to a disabled child. The prosecutor said they had secret evidence. They showed something to the judge. The judge looked at it and John Doe VI was taken back to the cell.

311.    John Doe VI had not been given any food that day. He began talking to himself. He thought he was going crazy. He yelled. He begged for water. They finally put some water in a bucket at his cell, but no cup. He used one of the bread bags to dunk in the water to drink from that.

312.    Some days later his lawyer put in another appeal. There was another hearing. The judge said that he would probably have to stay another thirty days. The judge said that on the other hand, "I could bargain with you and if you agree

then one week." Then, he said, if there were no new information after a week I would be released. John Doe VI agreed.

313.   By this time John Doe VI was seriously ill. He had a fever, had lost considerable weight, and had serious trouble standing. He also had a tightness in his chest. A guard came and gave him some cough medicine. He was glad to have something to drink.

314.   On or about the twenty-third day that he was held, the man called Uri and two other men interrogated him. They talked among themselves then they said they had explosives, they have Hamas and if he doesn't confess he will get three months of administrative detention. He asked them about the agreement with the judge. Uri said they didn't care and shouted at him. Then two policemen came in with papers and a picture they had taken of him a few weeks before. Uri held up the papers and told him it was his file and "the order." It was written in Hebrew. He told him to sign it. John Doe VI told him that he couldn't read it and would not sign. They insisted. They said that he would have to go to jail for three months. John Doe VI knew that he could not bear three months of this but he refused to sign the papers.

315.   John Doe VI was taken to a cell with other prisoners. A Palestinian man told him that he would next meet the "Prince of Jail". When he met the man called the "Prince of Jail," the Prince implied that he was a leader of other prisoners.

He said that he could move freely in the prisons because the Israelis were afraid of him since he could call for a hunger strike. John Doe VI had the sense that he was implying that the "Prince" was with Hamas. The "Prince" stated that he believed that John Doe VI was an informer of Shin Bet, sent here to spy on the other prisoners. The "Prince" said that John Doe VI better tell him who he was, and show that he was not a Shin Bet informer, and that if he didn't they would kill him. John Doe VI was appalled. Imagine—tortured by the Israelis, ignored by the United States, and killed by Hamas. He requested John Doe VI's name. He wanted to know if John Doe VI was with Hamas, if he was with Jihad. John Doe VI told him he was not. He said he did not believe me. Other prisoners said that if he did not tell what they wanted to know, they would kill him. Eventually John Doe VI wrote down his name, the pizzeria he worked at in Florida. The man called the "Prince" was not satisfied and said that he would pay for that.

316.  John Doe VI has since learned that these men worked with the Israelis and were trying to get him to say things to link him to Hamas.

317.  Later that day a guard came and put the hood on John Doe VI and tugged him by the hood down a hallway. John Doe VI stumbled down some steps, injuring his leg, and seriously cutting his arm. He felt that his arm was broken. The guard cursed him and took him to a room. There was a loudspeaker in the room. He put it on at full blast right in John Doe VI's face, playing the same

song over and over for hours. It was the Paul Simon song "You Can Call Me Al." The guard said that most of the prisoners would not understand the song but that he would. At first John Doe VI was shackled in a small chair, to a pipe behind him, and with the air conditioner on.

318. After a few hours he was taken to the interrogation room, shouting about the pain he was in, that he needed to see a doctor. A man there asked what was the matter. John Doe VI told him his elbow was broken. He came over and pressed it. It sent a shooting pain up John Doe VI's arm. He asked if that hurt. John Doe VI said that it did, and he said "good."

319. A day or two later John Doe VI was taken back to the interrogation room and placed again in the position with his hands cuffed behind my back and his legs shackled and anchored to the floor. Uri was there and said "Now we've got you." He had the paper that John Doe VI had written his name on and what he did at the pizzeria in Florida. He told John Doe VI that he could give him life for this. He came over to John Doe VI and said, "If you aren't going to confess, I will still go home, sleep with my wife, and come back tomorrow and you will confess." John Doe VI was given no food that day.

320. John Doe VI spent two days in the chair. He could only think of his son. Thinking of how desperately he wanted to see him again: thinking of how he

90

needed him, and how he needed to see him, was the only way he was able to survive.

321.  On or about the twenty-sixth day of his being held he was taken to the woman judge again. She was wearing a military uniform. John Doe VI begged her to release him. He told her he was dying, that he was fevered, that he had little to eat. She looked at him and said that he had to stay 15 more days.

322.  For the next few days John Doe VI was held in various cells with other prisoners. He could see how badly they had been tortured. One looked like he would have to lose his leg from being kicked in the shin repeatedly over several days. Another made noises like an animal In some cells John Doe VI was able to hear men screaming. He assumed they were being tortured. One day he was placed in a cell alone that was filled with roaches. They were all over they place. He became ill.

323.  John Doe VI had one more interrogation with Uri. He told him that he knew that he would die in there and that he would meet Uri on Judgment Day.

324.  Three or four days before he was released the two men from the United States consulate visited again. John Doe VI was upset that they had done nothing for him. He was upset that they were never at the court when he had to go. He told them that they might as well come back in a few days and pick up his dead body. They wrote that down and left.

325.   On the fortieth day a guard came. He put the hood on John Doe VI's head. He led him down a hall and took the hood off. He saw his suitcases. He said "You can go. You better not cause us any trouble." John Doe VI requested his passport and his money, which they gave though they wrote in his passport that he needed a Palestinian travel document to travel. A cab came and took him to his family in Silwad.

326.   He could not walk well. The first night he could not sleep for fear that they were just playing a trick on him and would come and take him back. He stayed with his family a few days.

327.   Then he called the United States consulate to ask what the travel requirement was they put in his American passport. He was told that he better comply with what they required. He asked how that could be, when he had a United States passport. He was told "You have to listen to the Israelis."

328.   That restriction meant that he could not leave for another month or month and a half. He finally got back home in late January, 1999.

329.   When John Doe VI went to Palestine he weighed 182 lbs. When he returned he weighed 140 lbs. He now has chronic, sometimes disabling back pain, he suffers from depression, especially when he talks about the episode. He has stomach problems. He feels bloated even though he has only eaten a little. His

stomach also feels like it is burning, he has chest pains and a sense of being congested much of the time. He has also lost much of his hair.

330.   John Doe VI was never charged with anything. He was never convicted of anything. He never did anything. He has contacted numerous United States officials about this horror. He has never been given any explanation as why he was tortured this way. He has never been compensated in any way.

331.   It is now impossible for John Doe VI to visit his family members that live in Silwad. The land his parents owned had been left to he and his brothers.  In fact, the house was specifically left to him. It is impossible for him to go there; he could not ever run the risk that he would be taken for no reason and subjected to the disgusting conditions, the torture and the grinding humiliation he was subjected to.

**John Doe VII**

332.   On April 26, 1999, John Doe VII and his wife, who was not yet an American citizen, attempted to visit his mother and father in the town of Maithalon.

333.   He proceeded to the Israeli checkpoint and was detained at the border.  He was given no reason.  He was held in handcuffs in a detention room for 14 hours and was unable to learn what happened to his wife.

334.   He was taken in handcuffs to the Jalemeh prison near Haifa.  He was thrown into a 4 foot x 8 foot filthy, smelly cell.  Bright overhead lights were on 24

hours a day. The toilet was dirty and smelly as were the blankets. The food was rancid and made him sick.

335. He was held for 36 days without being charged with any crime or wrongdoing. He was interrogated for several hours each day. During many of those days, he was taken to the interrogation room and handcuffed behind his back while seated. His feet were tied to the chair. A putrid, small hood was placed over his head making it hard to breathe. Music was played at an intolerably high volume. He was kept in this position for 3 hours at a time.

336. He was frequently awakened at odd hours for interrogation or just to wake him up.

337. After the period of interrogation, he was kept in isolation for days.

338. After a few weeks, he felt severe back pain. After repeated requests, he was permitted to see a doctor. Despite what appeared to be a prescription written by the doctor, no medicine was received.

339. An attorney hired by his family was permitted two visits but there was no court appearance.

340. In late May, he was taken to another place known as the waiting place and held with 10 other men. On June 1, he was transported by truck while chained to another prisoner to the Moscobiya prison in Jerusalem. On June 2, he was again transported by truck while his feet were chained to another prisoner, and

driven to his original point of arrest, where his American and Jordanian passports were given to the Jordanian authorities.

John Doe VIII

341.   John Doe VIII, an American citizen, currently resides in a suburb of Jerusalem and has his own law office in Ramallah.

342.   He has been injured substantially by Israeli forces on at least three occasions.  These injuries have been to his person, his property and his family members.

343.   In September 1997, between 5-10 Israeli soldiers armed with M-16's came to John Doe VIII's home in Ramallah and demanded that he, his wife and two daughter, ages 3 and 1, come out into the hallway.

344.   Upon inquiring as to why they were being ordered to do this, an Israeli soldier struck John Doe VIII in the shoulder, causing him to fall to the ground. During this altercation John Doe VIII was holding his 3 year old daughter.  His family was terrified.

345.   His injuries required medical attention.

346.   John Doe VIII's family was denied permission to re-enter their apartment. They remained in the hallway until the next day when they were permitted to leave to stay with friends.

347. The soldiers stayed in the apartment for 4-5 days, firing guns from the windows and ruining many of the family's possessions.

348. In February 2002, although no gunfire was heard in the area at the time, Israeli forces, using rocket fire, destroyed John Doe VIII's car while firing at a nearby building. It was worth several thousand dollars.

349. During the Israeli incursion in April 2002, John Doe VIII was unable to go to his law office due to the closure of Ramallah.

350. Israeli soldiers destroyed all of the furnishings, including a computer, printer and copy machine. A janitor and another attorney saw the Israeli forces enter John Doe VII's law office, and heard loud crashing noises.

351. John Doe VIII practiced in the area of commercial contracts and was an advisor to the Palestinian trade ministry. He has suffered significant loss of income because of the destruction of his law offices.

352. The effects on John Doe VII's children of seeing their father struck by soldiers in 1997 is still manifest. They are in constant fear, suffering nightmares, and are reluctant to go outside.

**John Doe X/John Doe XI**

353. Plaintiffs John Doe X and XI are among several owners of a supermarket located in the Almsure area of Ramallah.

354. On March 29, 2002, the Israeli army invaded Ramallah. For the next three days, nobody was able to enter the store. On April 2, 2002, one of several tanks of the Israeli Army stationed outside the store fired at the door blowing a large hole in the entrance. There had been no firing from inside the store or in the immediate vicinity of the store. Several soldiers entered and used an explosive device to break the locked door leading to the basement.

355. In addition to the damage and interruption to the electrical service, substantial amounts of dry goods, food stuffs, cigarettes and office computer equipment were taken or destroyed. The electrical system was destroyed, all perishables were ruined.

356. On April 13th, Plaintiff John Doe X was attempting to clean up the damage caused by the Israeli soldiers to the store, when he exited the store to join a conversation among several soldiers and a store employee.

357. Plaintiff John Doe X was pushed back into the store. An Israeli soldier then struck him in the face with the butt of his rifle causing a black eye, pain and swelling, and a headache, sharp pain and soreness for more than a week.

**John Doe XII**

358. In 1976 John Doe XII bought land on Al Mobadeen Street in the Al-Bireh section of Ramallah where he had a two-story apartment building constructed.

359.   In 1993, his wife and he moved into the building, and in 1998 they had two stories added to the building.

360.   In July 2001 his daughter lived in the apartment building with her was her husband and their five children. The children at that time ranged in age from eleven to three. Her family, along with his wife and John Doe XII, were living on the second floor. Tenants in the building included a woman who was in her sixties and her teenaged daughter.

361.   In July 2001, two Apache helicopters of the Israeli Defense Force hovered outside the apartment building on opposite sides and fired at least two rockets into the fourth story. The rocket fire killed a guest of the tenant in the fourth floor apartment. The rocket fire destroyed the interior walls of the third and fourth floor, the doors, and windows. The rockets also damaged an exterior gas line for the building and thereby caused a fire to break out. Luckily, neighbors in the area were able to put out the fire before the entire building was burned up.

362.   John Doe XII's daughter and her children were in the apartment on the second floor at the time of the fire. There was substantial damage to the apartment including: shrapnel entered into the apartments and damaged walls; some of the doors were blown off their hinges; all of the windows were destroyed.

363.  The sixty year old woman tenant was hit with shrapnel, and her daughter suffered a broken arm.

364.  The grandchildren's trauma is still manifest. They are all frequently prey to the most terrifying nightmares, often of soldiers suddenly appearing and firing at them. They also suffer from a chronic need to go to the bathroom. This happens several times during the day in which they have to use the bathroom immediately. They have been to the doctor several times to treat this but it is his diagnosis that there is no physiological explanation for this. He believes it is directly related to their trauma.

365.  There are more than 1000 holes throughout the building from shrapnel from the rocket fire. All windows in the building were destroyed, the sewer line was destroyed as was the water line. The repairs that have been made, largely superficial so far, have already cost approximately fifty thousand dollars ($50,000.00). In addition, many of the units are not yet habitable.

**John Doe XIII**

366.  On the morning of March 30, 2002 the IDF attacked Ramallah and its environs.

367.  John Doe XIII's tire distribution company in Ramallah was completely destroyed by an Apache helicopter rocket attack after noon on March 31

99

368. He has lost approximately $100,000 per month in gross sales, several hundred thousand dollars in standing orders, $150,000 in stock-on-hand at a nearby supplier, and is stuck with $100,000 in debt that had been secured by the stock-on-hand. He has lost $25,000 in office equipment as well.

369. He also lost $8000 per year on rental income.


**John Doe XIV**

370. After feeding chickens on his father, John Doe XIV's farm in the Deir-Debwan section of Ramallah on the evening of April 20, 2002, Baby Doe II and a friend drove in a van on the road from Deir-Debwan to Ramallah.

371. After driving for approximately 10 minutes, Baby Doe II heard shouting and saw IDF troops on the shoulder of the road. There was no road block in the area. Baby Doe II did not attempt to flee.

372. IDF soldiers fired at Baby Doe II 's van. A bullet entered Baby Doe II's back and passed through into his stomach area. Baby Doe II's friend was shot twice in the shoulder. The van was riddled with approximately 20 bullet holes.

373. Although wounded, Baby Doe II was able to drive to his uncle's house. Both he and his friend were bleeding severely. When a local doctor was unable to treat his wound, the uncle called an ambulance to take him to a hospital.

374. The ambulance was detained for an hour by Israeli soldiers.  Soldiers rode in the ambulance to the doctor's office where Baby Doe II 's emergency treatment was again delayed by the soldiers pointing their weapons and demanding all people in the office to raise their hands and lay on the floor.

375. The soldiers interfered with the doctor, requiring him to stop attending to Baby Doe II while they searched his office and questioned the doctor.

376. After further delay of approximately an hour, Baby Doe II was permitted to go to the hospital in Ramallah.  The ambulance was stopped repeatedly at Israeli checkpoints.  At one checkpoint, Baby Doe II and his friend were removed from the ambulance, stripped naked and left on the ground for an additional two and one half hours.

377. In all, it took seven hours from the time Baby Doe II was shot to finally arrive at the Ramallah hospital; a trip that would ordinarily take fifteen minutes.

378. Four-hour emergency surgery on Baby Doe II was unable to save his gallbladder.  Doctors also removed 15 centimeters of his large and small intestines.

379. Baby Doe II suffered injuries to his back, liver, colon, and intestines and now wears a colostomy bag for excreting solid wastes through a two-inch diameter hole in his abdomen.

380.   Baby Doe II lives with terrible pain in his abdomen; he suffers extreme fatigue; he cannot stand for any length of time without becoming dizzy. His abdomen wound reopens causing him additional pain.

381.   Before the incident, neither Baby Doe II nor his friend had ever been arrested, detained or charged with any crime. Neither was armed or made any hostile act toward the Israeli troops. They had been in the area for two hours and had heard no gunfire.

382.   Three days before he was shot, Baby Doe II had purchased 4,000 chicks with feed and supplies on contract to raise them for a chicken company. After he was shot no one dared go near the farm and as a result the chicks all died. Baby Doe II owes the chicken company $2500.


**John Doe XV**

383.   On May 10, 2002 John Doe XV's ten year old son, Baby Doe III, was gravely wounded while just outside the family's apartment building in Tulkarm, West Bank, Palestine.

384.   John Doe XV and his family own a five story apartment building in Tulkarm where his parents and three of his brothers reside with their families.

102

385.  The building has a central courtyard and on the day of the shooting John Doe XV's brothers had sent Baby Doe III just outside the courtyard to get some coffee.

386.  As Baby Doe III returned, IDF tanks appeared on the street some fifty meters away and opened fire on the boy, just as he reached the courtyard gate.

387.  As his son lay immobile screaming in agony from a leg wound, John Doe XV watched as the IDF tanks kept firing.  He finally managed to cover Baby Doe III with his own body as the firing continued.

388.  The IDF never ceased firing, although no return fire ever came from the building or courtyard; there were no combatants in the vicinity and the ten year old boy was obviously unarmed.

389.  Finally John Doe XV and his brothers were able to drag his son to safety. Baby Doe III had lost considerable blood.  An ambulance was called and although located only a minute away, was unable to reach Baby Doe III for half an hour.

390.  Two days later, Baby Doe III was finally transferred to Nazareth Hospital in Israel where he has undergone three operations on his leg.

391.  Because of Israeli travel restrictions, Baby Doe III, shot by a tank and severely traumatized, lays in a hospital alone in a strange town where the

people speak Hebrew, a foreign language to him. No one from his family has been allowed to visit.

392. Baby Doe III has suffered severe nerve damage from the gun shot and it is unclear whether he will walk again.

393. No member of John Doe XV's family, including Baby Doe III has been charged or arrested for any crime of violence. No one in the IDF has given the slightest reason for shooting at John Doe XV and Baby Doe III or detaining the ambulance. After the shooting no one was detained or questioned.

394. In fact, just days before, all members of John Doe XV's family were subjected to an identity check in their homes. No one was wanted by the Israeli government.

395. John Doe XV filed a formal complaint about his son's shooting to local police and the District Coordinating Office. He has also informed the U.S. State Department, Consulate and Embassy. The U.S. representatives have told him that they cannot control the Israeli army.

396. Since he has filed complaints, John Doe XV's apartment building has been fired on at least two occasions. The two adjacent buildings stand untouched.

397. John Doe XV and his brothers own a successful business as suppliers of wheat flour, seeds, animal feed and basic foodstuffs. His stores provide roughly 50% of the town's needs.

398. Over the course of several weeks beginning in either November or December, 2000, four of John Doe's seven stores were shelled by Israeli tank fire and the area around those stores declared a closed military zone. To date, neither John Doe XV nor any other civilian has reached his four stores. John Doe XV and his brothers have suffered a 75% loss in their business and over 1.5 million dollars in net profit.

**John Doe XVI**

399. John Doe XVI is a United States citizen. His son, Baby Doe IV, was a United States citizen.

400. On Friday, December 8, 2000, during Ramadan, the most important time of the year in the Muslim religion, on his way to the Mosque in Jerusalem, John Doe XVI's 16 year old son, Baby Doe IV, was shot in the head by Israeli soldiers who were firing live ammunition indiscriminately into a group of demonstrators and other people in the vicinity.

401. An ambulance arrived virtually immediately, but Israeli soldiers delayed the ambulance with Baby Doe IV in it for forty minutes. During the delay, the boy bled to death. He was pronounced dead on arrival at the hospital.

402. Baby Doe IV was not political; he was not a member of any political group; he had never been arrested or detained. The boy was not even part of the

demonstration into which the Israeli troops fired. He was an innocent child allowed to bleed to death by the same Israeli soldiers who shot him in the head without cause.

403. John Doe XVI and his family have suffered severe trauma due to the death of his eldest son. No one has yet to offer an explanation as to why he was shot.

**John Doe XVII**

404. Plaintiff John Doe XVII, who currently lives in New York City, was 21 years old at the time of the 1982 massacre at the Sabra and Shatila refugee camps in Southern Lebanon. He had been living in the Sabra camp for a short time.

405. While watching a helicopter from the second floor window with his two cousins and a fifteen year old neighbor, John Doe XVII witnessed an explosion that tore the head off his neighbor and wounded one of his cousins very seriously with extensive abdomen wounds. John Doe XVII suffered shrapnel wounds to his limbs and feet.

406. While in the street trying to run to safety, John Doe XVII witnessed the indiscriminate slaughter of Palestinians by militia men.

407.   While hiding in the camp dump he witnessed the carnage as Phalange militia killed everyone in their path.  Twenty years later, he is haunted with the specific memory of pregnant women being slaughtered like animals.

408.   John Doe XVII also remembers that the marauding militia wore Israeli uniforms and spoke Hebrew, a language he is familiar with from his childhood days in Jerusalem.

**Jane Doe I**

409.   Jane Doe I lives in Birmingham, Alabama and relays this information based on discussions with witnesses.

410.   On April 2, 2002, the Israeli army began its invasion of Bethlehem.  At approximately 8:00 a.m., IDF forces were firing weapons in and near the street where Jane Doe I's family lives.

411.   Several soldiers demanded to enter the house.  A neighbor informed them that only an old woman and her children lived there.  They set off an explosion that caused damage but did not open the door.  The family was terrified and took cover on the first floor.  Although there was no provocation and no shots were fired from the house, the soldiers began firing indiscriminately into the house.

412.   Jane Doe I's aunt, Jill Doe II, and one cousin, Baby Doe V, were killed from gunshot wounds to the head.

413.   Jill Doe II and Baby Doe V had never been charged with any crime, nor were they associated with any political organization involved in any illegal acts.

**Jane Doe II**

414.   Jane Doe II lives in South Carolina and relays this information based upon discussions with witnesses.

415.   On April 3, Israeli forces began the invasion of Nablus.  Residents were not directed to leave, in fact residents were prevented from leaving the city.

416.   A rocket fired by Israeli military forces- either an F-16 or an Apache helicopter- destroyed the house where Jane Doe II was raised.

417.   Her two sisters, Jill Doe III and Jill Doe IV, were killed in the attack.  It is unclear whether they died upon impact, suffocation under the rubble, or from injuries sustained in the attack.

418.   Medical personnel were not allowed by Israeli soldiers to approach the injured.

419.   Jane Doe II's niece, Jill Doe V, 26, suffered a crushed spine in the attack.  She underwent an operation and cannot move her neck.   Jill Doe V is hospitalized at Allmadeenah Medical Center in Jordan.

420.   Jane Doe II's nephew, Charles Doe I, 23, had his face burned and suffered bodily injuries in the attack.  He is unable to see from one eye.  Charles Doe I is being treated at a hospital in Nablus.

421.   Jane Doe II witnessed the destruction of her childhood home and learned of her sisters' deaths while watching television on April 3.

## GENERAL ALLEGATIONS

422.   The acts described herein were inflicted under color of law and under color of official authority and/or in conspiracy with or on behalf of those acting under color of official authority, and were inflicted deliberately and intentionally.

423.   The acts and injuries to plaintiffs and their next-of-kin described herein were part of a pattern and practice of systematic human rights violations designed, ordered, implemented and directed by defendants and their agents.

424.   As a direct and proximate result of defendants' unlawful conduct, plaintiffs have suffered and will continue to suffer physical injuries, pain and suffering, and extreme and severe mental anguish and emotional distress; plaintiffs have incurred and will continue to incur medical expenses; and plaintiffs have suffered and will continue to suffer property damage and a loss of their means of economic support. Plaintiffs are thereby entitled to general and compensatory damages in amounts to be proven at trial.

425. The conduct of defendants and each of them, including Moes 1-100, and/or their agents/employees, as described herein, was malicious, and/or oppressive and done with a willful and conscious disregard for plaintiffs' rights and for the deleterious consequences of defendants' actions. Consequently, plaintiffs are entitled to punitive damages from each of the defendants.

426. Plaintiff's causes of action arise under and violate the following laws, agreements, conventions, resolutions and treaties:

    a. Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. 1961-68;

    b. Alien Tort Claims Act, 28 U.S.C. § 1350;

    c. Torture Victim Protection Act, 28 U.S.C. § 1350

    d. Customary international law;

    e. United Nations Charter, 59 Stat. 1031, 3 Bevans 1153 (1945);

    f. Universal Declaration of Human Rights, G.A. Res. 217A(iii), U.N. Doc. A/810 (1948);

    g. International Covenant on Civil and Political Rights, G.A. Res. 2220A(xxi), 21 U.N. Doc., GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966);

    h. Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. res. 39/46, 39 U.N. Doc., GAOR Supp. (No. 51) at 197, U.N. Doc. A/39/51 (1984);

i.  Declaration on the Protection of All Persons From Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 3452, 30 U.N. Doc., GAOR Supp. (No. 34) at 91, U.N. Doc. A/10034 (1976);

j.  The Convention on the Prevention and Punishment of the Crime of Genocide adopted by General Assembly on 9 December, 1948;

k.  The Charter of the International Military Tribunal, of 8 August 1945 (Nuremberg Charter), confirmed by G.A. Re.3, U.N. Doc A/50 (1946) and G.A. Res. 95, U.N. Doc. A/236 (1946);

l.  The Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287 (Fourth Geneva Convention);

m. Protocol Additional to the Geneva Conventions of 12 August 1949 and Relating to the Protection of Victims of Non-International Armed Conflicts (Protocol II), opened for signature Dec. 12, 1977, reprinted in 16 I.L.M. 1442 (1977);

n.  The Rome Statute of the International Criminal Court, United Nations Diplomatic Conference of Plenipotentiaries on the Establishment of an International Criminal Court, U.N. Doc. A/CONF. 1183/9 (1998), reprinted in 37 I.L.M. 999 (1998);

o.  Common law of the United States of America;

p.  Statutes and common law of the States of New York, Ohio, Florida, Alabama, South Carolina and Nevada, including but not limited to wrongful death, assault and battery, false imprisonment, kidnapping, negligence, recklessness, intentional infliction of emotional distress, negligent infliction of emotional distress, trespass and conversion; and

q.  Laws of Israel.

## FIRST CLAIM FOR RELIEF
### (Genocide)
[All Plaintiffs Against All Israeli Defendants and Moes 1-100]

427.  The acts described herein were committed with the intent to destroy, in whole or in part, a national, ethnic racial and/or religious group as such and constitute genocide in violation of the laws described in paragraph 424.

428.  As a result of the acts described herein, plaintiffs have been damaged in an amount to be proven at trial.

429.  Defendants' acts were deliberate, willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages for plaintiffs.

## SECOND CLAIM FOR RELIEF
(Crimes Against Humanity)
[All Plaintiffs Against All Israeli Defendants and Moes 1-100]

430.   The allegations set forth in paragraphs 1 through 427 of this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

431.   Defendants' collective punishment of and accompanying human rights abuses against plaintiffs –including killing, torture, beatings, and other assaults—was neither random nor occasional but widespread and systematic. These acts occurred under the direction, encouragement or acquiescence of the Israeli government and military high command.

432.   The acts described herein constitute crimes against humanity, in violation of the laws described in paragraph 424. Customary international law prohibits inhumane acts of a very serious nature such as willful killing, torture, and other inhumane acts committed as part of a widespread or systematic attack against any civilian population. These acts are doubly condemned by international law because they are a part of an ethnic cleansing process asserted against a single ethnic group.

433.   As a result of the acts described herein, plaintiffs have been damaged in an amount to be proven at trial.

434.   Defendants' acts were deliberate, willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages for plaintiffs.

## THIRD CLAIM FOR RELIEF
(War Crimes)
[All Plaintiffs Against Israeli Defendants and Moes 1-100]

435.   The allegations set forth in paragraphs 1 through 432 of this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

436.   As civilian, noncombatants, plaintiffs are protected persons as defined in the Fourth Geneva Convention and customary international law, and pursuant to the laws described in paragraph 424, as an occupation force, the IDF has a clear responsibility towards protected persons.

437.   The acts described herein, most notably, intentional killing, torture, other inhumane treatment, and the destruction of property without military necessity are all war crimes in violation of the laws and treaties cited in paragraph 424.

438.   As a result of the acts described herein, plaintiffs have been damaged in an amount to be proven at trial.

439.   Defendants' acts were deliberate, willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages for plaintiffs.

114

## FOURTH CLAIM FOR RELIEF
(Racketeer Influenced and Corrupt Organizations Act)
[John Doe I, VIII, X, XI, XII, XIII, XIV, XV against Israeli
Defendants, Bush/Powell and Arms Defendants and Moes 1-100]

440.   The allegations set forth in paragraphs 1 through 437 of this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

441.   From not later than 2000 to present, the Israeli Defendants, the Arms Defendants, and Defendants Bush and Powell, and their agents and coconspirators participated in a RICO "enterprise" within the meaning of 18 U.S.C. § 1961 (4) engaged in foreign and interstate commerce.

442.   Alternatively, the above named Defendants and their agents and coconspirators constituted an association in fact for a common purpose with a continuous existence separate and apart from the pattern of racketeering activity in which they engaged.  This association if fact constituted an enterprise within the meaning of 18 U.S.C. § 1961(4).

443.   Each Defendant named above is an "individual or entity capable of holding a legal or beneficial interest in property" and, as such, each constitutes a "person" within the meaning of 18 U.S.C. § 1961(3).

444.   The Defendants are engaged in foreign and interstate acts of commerce and the acts alleged herein have a potential effect on commerce.

445.  Over a period of years and continuing to the present, the above name Defendants with their coconspirators or agents, in violation of 18 U.S.C. § 1962(c), through a pattern of racketeering activity have terrorized and intimidated Plaintiffs into removing and leaving from their property thus allowing Defendant Israel to expand its borders and commercial influence in the region.

446.  At all times relevant to this Complaint, the above named Defendants, and their agents and coconspirators conducted, or participated directly or indirectly in the conduct of the affairs of the enterprise through a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1961(1) (5), in violation of 18 U.S.C. § 1962 (c).

447.  At all times relevant to this Complaint, the above named Defendants, in violation of 18 U.S.C. § 1962(d) combined and conspired together and with their agents and coconspirators to conduct the affairs of the enterprise through a pattern of racketeering activity.

448.  In furtherance of the conspiracy, and to effect the objects thereof, the Defendants committed overt acts as set forth more fully in paragraphs 1 through 424.

449.  The pattern of the racketeering activity alleged in paragraphs 1 through 424 included the following specific acts, all of which constituted and are defined as

116

racketeering activity by 18 U.S.C. § 1961(1) and all of which are set forth in the specific numbered paragraphs herein which are re-alleged and incorporated here by reference as if fully set forth, as follows:

> murder
> attempted murder
> threat of murder
> kidnapping
> arson

450. It was the object of the racketeering activity to force Plaintiffs to surrender their property.

451. Defendants' acts alleged herein have substantial effect within the United States.

452. As a direct and proximate result of the Defendants' violation of 18 U.S.C. §§1962 (c) and (d) Plaintiffs have suffered injury to their business and/or property.

453. The injuries suffered by each Plaintiff were reasonably foreseeable or anticipated by the Defendants as the natural consequence of Defendants' acts.

454. As a result of the acts described herein, plaintiffs have been damaged in an amount to be proven at trial.

455. Defendants' acts were deliberate, willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages for plaintiffs.

117

## FIFTH CLAIM FOR RELIEF
(Racketeering Influenced and Corrupt Organizations Act)
[John Doe II against Israeli Defendants; Settler Defendants and Moes 1-100]

456. The allegations set forth in paragraphs 1 through 453 of this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

457. From not later than 2000 to present, the Israeli Defendants and the Settler Defendants, and their agents and coconspirators participated in a RICO "enterprise" within the meaning of 18 U.S.C. § 1961 (4) engaged in foreign and interstate commerce.

458. Alternatively, the above named Defendants and their agents and coconspirators constituted an association in fact for a common purpose with a continuous existence separate and apart from the pattern of racketeering activity in which they engaged. This association if fact constituted an enterprise within the meaning of 18 U.S.C. § 1961(4).

459. Each Defendant named above is an "individual or entity capable of holding a legal or beneficial interest in property" and, as such, each constitutes a "person" within the meaning of 18 U.S.C. § 1961(3).

460. The above named Defendants are engaged in foreign and interstate acts of commerce and the acts alleged herein have a potential effect on commerce.

461.  Over a period of years and continuing to the present, the above named Defendants with their coconspirators or agents, in violation of 18 U.S.C. § 1962(b) through a pattern of racketeering activity have acquired and maintained an interest in Plaintiff, John Doe II's land.

462.  At all times relevant to this Complaint, the above named Defendants, and their agents and coconspirators conducted, or participated directly or indirectly in the conduct of the affairs of the enterprise through a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1961(1) (5), in violation of 18 U.S.C. § 1962 (c).

463.  At all times relevant to this Complaint, the above named Defendants, in violation of 18 U.S.C. § 1962(d) combined and conspired together and with their agents and coconspirators to conduct the affairs of the enterprise through a pattern of racketeering activity.

464.  In furtherance of the conspiracy, and to effect the objects thereof, the Defendants committed overt acts as set forth more fully in paragraphs 1 through 424.

465.  The pattern of the racketeering activity alleged in paragraphs 1 through 424 above included the following specific acts, all of which constituted and are defined as racketeering activity by 18 U.S.C. § 1961(1) and all of which are set

119

forth in the specific numbered paragraphs herein which are re-alleged and incorporated here by reference as if fully set forth, as follows:

> attempted murder
> threat of murder
> arson
> extortion

466. It was the object of the racketeering activity to force Plaintiff John Doe II to surrender his property.

467. Defendants' acts alleged herein have substantial effect within the United States.

468. As a direct and proximate result of the Defendants' violation of 18 U.S.C. §§1962 (b), (c) and (d) Plaintiffs have suffered injury to their business and/or property.

469. The injuries suffered by each Plaintiff were reasonably foreseeable or anticipated by the Defendants as the natural consequence of Defendants' acts.

470. The injuries to Plaintiff's property were the direct and intended result of, and the natural and foreseeable consequence of Defendant's pattern of racketeering activity.

471. As a result of the acts described herein, plaintiffs have been damaged in an amount to be proven at trial.

472.   Defendants' acts were deliberate, willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages for plaintiffs.

## SIXTH CLAIM FOR RELIEF
(Extra-Judicial Killing)
[Plaintiffs John Doe I and XVI; Jane Doe I and II against Israeli Defendants, Arms Defendants and Moes 1-100]

473.   The allegations set forth in paragraphs 1 through 470 of this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

474.   The killings of Jill Does I, III and IV and Baby Doe II were extra-judicial and deliberate.   As set forth above, they were carried out under actual or apparent official authority or color of law by the government of Israel under the direction and control of Defendants.

475.   The killing of Jill Does I, III and IV and Baby Doe II were committed for purposes other than as lawful punishment and were not authorized by a previous judgment pronounced by a regularly constituted court affording all of the judicial guarantees which are recognized as indispensable by civilized people.

476.   These acts of extra-judicial killings were committed in violation of the Torture Victim Protection Act, (28 U.S.C. § 1350 note) and international law as described in paragraph 424.

121

477.   The killing of Jill Does I, III and IV and Baby Doe II described herein were committed at the instigation and under the authority of the Israeli Defendants as public officials acting in their official capacity.   Because of their authority and office as members of the Israeli Military High Command, the Defendants knew or should have known of the extensive and notorious pattern and practice of violent unlawful murders and other abuses committed by troops under their command against noncombatants, and of the likelihood that, in the absence of serious measures to prevent future violations and punish wrongdoers, the IDF and other Israeli military, security and police personnel would unlawfully kill Jill Does I, III and IV and Baby Doe II and/or other noncombatants.

478.   Notwithstanding such knowledge, Defendants failed to prevent abuses or punish perpetrators.

479.   The Israeli Defendants ordered, instigated, permitted, encouraged, authorized, covered up and/or ratified the killing of Jill Does I, III, IV and Baby Doe II by subordinates and agents under the Defendants' command. Defendants have acted to conceal and cover up the conduct alleged herein so that the Defendants and their subordinates and agents could commit such acts with impunity.

480.   As a result of the extra-judicial killings of Jill Does I, III and IV and Baby Doe II, their family members also have suffered pecuniary losses, as well as the

122

loss of the society, comfort, attention, services and/or support of their family members.

481.   As a result of the acts described herein, plaintiffs have been damaged in an amount to be proven at trial.

482.   Defendants' acts were deliberate, willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages for plaintiffs.

## SEVENTH CLAIM FOR RELIEF
(Torture)
[John Doe VI and VII Against Israeli Defendants and Moes 1-100]

483.   The allegations set forth in paragraphs 1 through 480 of this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

484.   The acts described herein placed plaintiffs John Doe VI and VII in great fear for their lives and caused them to suffer severe physical and mental pain and suffering and humiliation.

485.   The acts described herein were inflicted deliberately and intentionally for purposes which included, among others, punishing the victim or intimidating the victim or third persons, and constitute torture in violation of the laws described in paragraph 424.

486.   As a result of the acts described herein, plaintiffs have been damaged in an amount to be proven at trial.

487.   Defendants' acts were deliberate, willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages for plaintiffs.

## EIGHTH CLAIM FOR RELIEF
### (Arbitrary Arrest and Detention)
[Plaintiffs John Does V, VI, VII Against All Israeli Defendants and Moes 1-100]

488.   The allegations set forth in paragraphs 1 through 485 of this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

489.   The arrest and detention of plaintiffs John Does V, VI, and VII described herein was illegal and unjust, carried out without a warrant, probable cause, articulable suspicion or notice of charges.

490.   The plaintiffs were placed in fear for their lives, were deprived of their freedom, separated from their families and forced to suffer severe physical and mental abuse.

491.   The acts described herein constitute arbitrary arrest and detention in violation of the laws described in paragraph 424.

492.   As a result of the acts described herein, plaintiffs have been damaged in an amount to be proven at trial.

493.  Defendants' acts were deliberate, willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages for plaintiffs.

## NINTH CLAIM FOR RELIEF
(Cruel, Inhuman, or Degrading Treatment)
[All Plaintiffs Against All Israeli Defendants and Moes 1-100]

494.  The allegations set forth in paragraphs 1 through 491 of this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

495.  The acts described herein had the intent and the effect of grossly humiliating and debasing all plaintiffs forcing them to act against their will and conscience, inciting fear and anguish, and breaking their physical and/or moral resistance.

496.  Plaintiffs were placed in great fear for their lives and forced to suffer severe physical and psychological abuse and agony. The acts described herein constitute cruel, inhuman or degrading treatment in violation of the laws described in paragraph 424.

497.  As a result of the acts described herein, plaintiffs have been damaged in an amount to be proven at trial.

498.  Defendants' acts were deliberate, willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages for plaintiffs

## TENTH CLAIM FOR RELIEF
### (Wrongful Death)

[Plaintiffs John Doe I, individually and on behalf of his daughter, Jill Doe I; John Doe XVI, individually and on behalf of his son, Baby Doe IV; Jane Doe I, individually and on behalf of her aunt, Jill Doe II and cousin, Baby Doe V; Jane Doe II, individually and on behalf of her sisters,   Jill Doe III and IV Against Israeli Defendants, Arms Defendants and Moes 1-100]

499.   The allegations set forth in paragraphs 1 through 496 of this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

500.   Plaintiff John Doe I was the father of his deceased daughter, Jill Doe I.

501.   Plaintiff John Doe XVI was the father of deceased child, Baby Doe IV.

502.   Plaintiff Jane Doe I was the niece of the deceased adult, Jill Doe II and the cousin of a deceased child, Baby Doe V.

503.   Plaintiff Jane Doe II is the sister to deceased adults Jill Doe III and Jill Doe IV.

504.   Defendants' actions and omissions were a direct and substantial cause of the deaths of Baby Doe IV, Baby Doe V, Jill Doe I, Jill Doe III and Jill Doe IV. Defendants failed to use due care to protect Baby Doe IV, Baby Doe V, Jill Doe I, Jill Doe III and Jill Doe IV from injury and harm, thereby proximately causing the wrongful deaths of Baby Doe IV, Baby Doe V, Jill Doe I, Jill Doe III and Jill Doe IV.

505. Defendant's acts and omissions are actionable under the laws of Washington, D.C., Alabama and South Carolina and the laws of the United States.

506. As a direct result of the defendants' acts and omissions and as a result of the death of their children, Jill Doe I and Baby Doe IV, plaintiffs John Doe I and John Doe XVI have sustained pecuniary loss resulting from loss of society, comfort, attention, services and support of decedent.

507. As a direct result of defendants' acts and omissions and as a result of the death of their sisters, aunt and cousins, Jill Doe III and IV and Jill Doe II and Baby Doe V, respectively in plaintiffs Jane Doe I and Jane Doe II have sustained pecuniary loss resulting from loss of society, comfort, attention, services and support of decedent.

508. As a result of the acts described herein, plaintiffs have been damaged in an amount to be proven at trial.

509. Defendants' acts were deliberate, willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages for plaintiffs.

## ELEVENTH CLAIM FOR RELIEF
### (Battery)
[Plaintiffs John Does I, II, V, VI, VII, VIII, X, XIV, XV, XVII; Jane Doe II Against All Israeli Defendants, Settlement Defendants and Moes 1-100]

510.   The allegations set forth in paragraphs 1 through 507 of this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

511.   Above named Defendants intentionally committed acts which resulted in harmful or offensive contact with plaintiffs' persons. Plaintiffs did not consent to the contact, which caused injury, damage, loss or harm to plaintiffs John Does I, II, V, VI, VII, VIII, X, XIV, XV, XVII and Jane Doe II on behalf of Charles Doe I and Jill Doe V.

512.   The acts described herein constitute battery, actionable under the laws of the United States and the laws of Washington D.C., New York, Florida, South Carolina, Ohio and Nevada.

513.   As a result of the acts described herein, plaintiffs have been damaged in an amount to be proven at trial.

514.   Defendants' acts were deliberate, willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages for plaintiffs.

## TWELFTH CLAIM FOR RELIEF
(False Imprisonment)
[Plaintiffs Against Israeli Defendants and Moes 1-100]

515. The allegations set forth in paragraphs 1 through 512 of this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

516. Defendants intentionally and unlawfully exercised force or the express or implied threat of force to restrain, detain or confine plaintiffs John Doe V, VI, VII. The restraint, detention or confinement compelled the plaintiffs to stay or go somewhere against their will for some appreciable time. Plaintiffs did not consent to this restraint, detention or confinement.

517. Defendants' actions constituted false imprisonment, actionable under the laws of Washington D.C., Nevada and Florida and the laws of the United States.

518. As a result of the acts described herein, plaintiffs have been damaged in an amount to be proven at trial.

519. Defendants' acts were deliberate, willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages for plaintiffs.

## THIRTEENTH CLAIM FOR RELIEF
(Assault)
[Plaintiffs John Doe I, II, V, VI, VII, VIII, X, XIV, XV, XVII and Jane Doe II
Against Israeli Defendants, Settlement Defendants and Moes 1-100]

520.   The allegations set forth in paragraphs 1 through 517 of this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

521.   The conduct of the above named defendants, and each of them, caused plaintiffs John Doe I, II, V, VI, VII, VIII, X, XIV, XV, XVII and Jane Doe II to be apprehensive that defendants would subject them to imminent batteries and/or intentional invasions of their rights to be free from offensive and harmful contact, and said conduct demonstrated that defendants had a present ability to subject plaintiffs to an immediate, intentional, offensive and harmful touching.

522.   The acts described herein constitute assault, actionable under the laws of Washington D.C., Florida, South Carolina, Ohio and Nevada, and the laws of the United States.

523.   As a result of the acts described herein, plaintiffs have been damaged in an amount to be proven at trial.

524.   Defendants' acts were deliberate, willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages for plaintiffs.

## FOURTEENTH CLAIM FOR RELIEF
(Intentional Infliction of Emotional Distress)
[All Plaintiffs Against All Defendants]

525.   The allegations set forth in paragraphs 1 through 522 of this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

526.   The acts described herein constitute outrageous conduct against all plaintiffs, and were without privilege.

527.   Defendants intended to cause plaintiffs to suffer emotional distress, or, in the alternative, (a) defendants engaged in conduct with reckless disregard of the probability of causing plaintiffs to suffer emotional distress, (b) the plaintiffs were present at the time the outrageous conduct occurred and (c) the defendant knew that the plaintiffs were present.

528.   Plaintiffs suffered severe emotional distress and the outrageous conduct of the defendants was a cause of the emotional distress suffered by plaintiffs.

529.   Defendants' outrageous conduct constitutes the intentional infliction of emotional distress and is actionable under the laws of Washington D.C., New York, Florida, South Carolina, Ohio, Nevada, and Alabama, and the laws of the United States.

530.   As a result of the acts described herein, plaintiffs have been damaged in an amount to be proven at trial.

131

531.   Defendants' acts were deliberate, willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages for plaintiffs.

### FIFTEENTH CLAIM FOR RELIEF
(Negligent Infliction of Emotional Distress)
[All Plaintiffs Against All Defendants]

532.   The allegations set forth in paragraphs 1 through 529 of this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

533.   At all relevant times, defendants, and each of them, owed plaintiffs a duty to act with reasonable care, and/or injury to the plaintiffs was reasonably foreseeable.

534.   At all relevant times, defendants, and each of them, had the power, ability, authority and duty to stop engaging in the conduct described herein and to intervene to prevent or prohibit such conduct.

535.   At all relevant times, defendants, and each of them, knew, or reasonably should have known, that the conduct described herein would and did proximately result in physical and emotional distress to plaintiffs.

536.   Despite said knowledge, power, and duty, defendants, and each of them, breached their duty to plaintiffs, and thereby negligently failed to act so as to stop engaging in the conduct described herein and to prevent or to prohibit such

conduct or to otherwise protect plaintiffs. To the extent that said negligent conduct was perpetrated by certain defendants, and each of them, the remaining defendants confirmed and ratified said conduct with the knowledge that plaintiffs' emotional and physical distress would thereby increase and with a wanton and reckless disregard for the deleterious consequences to plaintiffs.

537.   Plaintiffs were bystanders and immediately observed the circumstances of the killing, maiming and other assaults on family members and friends and the destruction of their property.

538.   As a direct and proximate result of defendants' wrongful acts, plaintiffs have suffered and will continue to suffer significant physical injury, pain and suffering and extreme and severe mental anguish and emotional distress.

539.   Defendants' conduct constitutes the negligent infliction of emotional distress and is actionable under the laws of Washington D.C., New York, Florida, South Carolina, Ohio, Nevada and Alabama, and the laws of the United States.

540.   As a result of the acts described herein, plaintiffs have been damaged in an amount to be proven at trial.

541.   Defendants' acts were deliberate, willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages for plaintiffs.

133

## SIXTEENTH CLAIM FOR RELIEF
(Negligence Per Se)
[All Plaintiffs Against All Defendants]

542. The allegations set forth in paragraphs 1 through 539 of this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

543. Defendants failed to use ordinary or reasonable care in order to avoid injury to plaintiffs. Defendants' negligence was a cause of injury, damage, loss or harm to plaintiffs.

544. As a result of these acts, plaintiffs suffered harm including, but not limited to, death, serious personal injury and severe emotional distress. Defendants' conduct constitutes negligence and is actionable under the laws of Washington D.C., New York, Florida, South Carolina, Ohio, Nevada and Alabama, and the laws of the United States.

545. As a result of the acts described herein, plaintiffs have been damaged in an amount to be proven at trial.

546. Defendants' acts were deliberate, willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages for plaintiffs.

## SEVENTEETH CLAIM FOR RELIEF
(Trespass)
[Plaintiffs John Doe II, IV, VIII, X, XI, XII, XIII and XV against Israeli
Defendants, Settler Defendants and Moes 1-100]

547.  The allegations set forth in paragraphs 1 through 544 of this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

548.  Defendants' intentional, reckless and unprivileged conduct as described herein has had the direct, foreseeable and proximate result, and continues to result, in the intrusion on to and damage to the property of Plaintiff John Doe II, IV, VIII, X, XI, XII, XIII and XV.

549.  Defendants' acts and omissions are actionable under laws of Washington D.C. and the laws of the United States.

550.  As a result of the acts described herein, plaintiffs have been damaged in an amount to be proven at trial.

551.  Defendants' acts were deliberate, willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages for plaintiffs.

## EIGHTEENTH CLAIM FOR RELIEF
(Conversion)
[Plaintiffs John Doe II, VII, X, XI, XIV against Israeli Defendants,
Settler Defendants and Moes 1-100]

552.   The allegations set forth in paragraphs 1 through 549 of this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

553.   Part of the overall objective of Defendants acting together and in concert with their agents was and is to drive Palestinian civilian noncombatants from their homes, businesses and land.

554.   Defendants have appropriated and converted to their own use, without claim of right, the property and land owned and possessed by Plaintiffs John Doe II, VIII, X, XI and XIV.

555.   Defendants' conduct constitutes conversion and is actionable under the laws of Washington D.C. and the laws of the United States.

556.   As a result of the acts described herein, plaintiffs have been damaged in an amount to be proven at trial.

557.   Defendants' acts were deliberate, willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages for plaintiffs.

## NINETEENTH CLAIM FOR RELIEF
(Injunctive Relief)
[All Plaintiffs Against Defendants George W. Bush, Colin
Powell, Boeing/McDonnell Douglas and Moes 1-100]

558.  The allegations set forth in paragraphs 1 through 555 of this Complaint are
re-alleged and incorporated by reference as if fully set forth herein.

559.  As a result of defendants' conduct, plaintiffs have been injured, and in the
absence of injunctive relief, will be irreparably harmed. Plaintiffs have no
adequate remedy at law. Plaintiffs therefore seek injunctive relief under the
laws of equity to remedy their injuries and prevent any future injury to their
persons and property.

560.  Plaintiff have been injured as the direct and proximate result of Defendants
George W. Bush and Colin Powell's failure to report to Congress pursuant to
the Arms Export Control Act and Foreign Assistance Act, Israel's systematic
and continuous misuse of military assistance provided by the United States to
cause death, serious personal injury and significant property damage to
plaintiffs and all other civilian, noncombatants in Palestine.

561.  Plaintiffs seek to enjoin Defendants Bush and Powell and their agents from
providing any further military assistance to Israel until such time as defendants
Bush and Powell have provided Congress a written report detailing Israel's

misuse of American military assistance in its offensive against Palestinian

civilian, noncombatants, many of whom are American citizens.

562.   Plaintiffs further seek to enjoin Defendant Boeing/McDonnell Douglas and

its agents, officers and employees from providing weapons systems, including

the Apache and Apache Longbow helicopters, to Israel pursuant to a contract

executed in February 2001 until such time as Defendants Bush and Powell have

reported to Congress pursuant to the Arms Export Control Act and the Foreign

Assistance Act and Israel has publicly committed not to use such weapons

systems directly or indirectly against the Palestinian civilian noncombatant

population, many of whom are American citizens.


563.   **PRAYER FOR RELIEF** WHEREFORE, each and every plaintiff prays for

judgment against each and every defendant in excess of $50,000, as follows:

    a.  for compensatory damages, the amount to be fixed at trial;

    b.  for punitive damages, the amount to be fixed at trial;

    c.  for treble damages, the amount to be fixed at trial;

    d.  for injunctive relief, including, but not limited to, an order directing

        Defendants George W. Bush and Colin Powell to cease providing

        military assistance to Israel until they have reported to Congress the

        misuse of American military assistance by Israel, and an order directing

Defendants Boeing/McDonnell Douglas, its officers, employees and agents, to cease delivery of any and all weapons systems, including but not limited to Apache helicopters, called for in a contract between Boeing and Israel executed in February 2001 until Defendant George W. Bush has reported to Congress, and such other injunctive relief as this Court deems appropriate;

e.  for costs of suit, attorneys fees and such other relief as the Court deems just and proper.

## JURY TRIAL DEMAND

564.  Plaintiffs hereby demand a jury trial on all issues so triable.

**STANLEY L. COHEN**, Esq., an attorney admitted to practice as such, hereby affirms under pain and penalty of perjury and pursuant to the Federal Rules of Civil Procedure that the herein information is true based upon personal knowledge or upon information and belief, the sources being investigation of the facts and circumstances related to the instant complaint and discussions had with plaintiffs and witnesses to the events complained of.

Dated: New York, New York
on this 16th day of July, 2002

Stanley L. Cohen, Esq.
Attorney for Plaintiffs
*Pro Hac Vice* (pending)
Robert Jones, Esq. Of Counsel
Elizabeth Johnston
351 Broadway, Suite 300
New York, New York 10013
(212) 979-7572

Mahar Hanania, Esq.
Local Counsel
1510 H Street NW, Suite 20
Washington, DC 20005
Washington, DC Bar No. 464 766

140