UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

John Doe I, et al,                )

         Plaintiffs,        )
                               )

        vs.                      )

State of Israel, et al,          )
                               )

         and                    )

The Boeing Company
P.O. Box 516
MC S100-3340
St. Louis, MO  63166-0516

McDonnell Douglas Helicopter Corp.
P.O. Box 516
MC S100-3340
St. Louis, MO  63166-0516

Textron Inc.
40 Westminster Street
Providence, RI 02903

Bell Helicopter Textron Inc.
P.O. Box 482
Fort Worth, TX  76101

Colt's Manufacturing Company, Inc.
P.O. Box 1868
Hartford, CT  06144-1868

Glen E. Hess
P.O. Box 482
Fort Worth, TX  76101

John R. Murphy
P.O. Box 482
Fort Worth, TX  76101

C.A. No. 1:02CV01431 (JDB)

ECF

Lewis B. Campbell                    )
40 Westminster Street                )
Providence, RI  02903                )
                                     )
Phillip Condit                       )
P.O. Box 516                         )
MC S100-3340                         )
St. Louis, MO  63166-0516            )
                                     )
William M. Keys                      )
P.O. Box 1868                        )
Hartford, CT  06144-1868             )
                                     )
            Defendants.              )
                                     )

## DEFENSE CONTRACTORS' MOTION TO DISMISS PURSUANT TO RULE 12(B)(1) AND MEMORANDUM IN SUPPORT THEREOF

Defendants The Boeing Company, McDonnell Douglas Helicopter Corporation (named in

the Complaint as McDonnell Douglas Helicopter Systems), Textron Inc., Bell Helicopter Textron

Inc. (named in the Complaint as Bell Helicopter), Colt's Manufacturing Company, Inc., Glen E.

Hess, John R. Murphy, Lewis B. Campbell, Phillip Condit, and Lt. General (Ret.) William M.

Keys (collectively, the "Defense Contractors"), through undersigned counsel, move the Court

pursuant to Rule 12 of the Federal Rules of Civil Procedure to dismiss the underlying complaint

based on the "political question" doctrine, Baker v. Carr, 369 U.S. 186 (1962), and the "act of

state" doctrine, Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398 (1964).  Under the political

question doctrine, courts lack jurisdiction over inherently "political" questions, particularly those

involving foreign policy and military decision-making.  Under the act of state doctrine, the public

acts of a recognized sovereign state within its jurisdiction are deemed to be valid, and U.S. courts

should avoid sitting in judgment over such acts.

## **INTRODUCTION**

Plaintiffs' 140-page Complaint requests this Court to conduct a direct, frontal assault on decades-old United States foreign policy; overturn the determination of national security interests made by the political branches of the United States government to supply military and financial support to Israel; and interdict the military strategy and security decisions made by the state of Israel within the boundaries of territory over which it exercises control. In their 19 causes of action, Plaintiffs ask this Court to render inherently political findings, namely that the military assistance provided to Israel by the United States "has not strengthened the security of the United States, nor promoted world peace, nor furthered the purposes and principles of the United Nations Charter" (Complaint, ¶ 223); that Israel has used this assistance not "for internal security or legitimate self defense, but instead for offensive military purposes" (Complaint, ¶ 224); and that in consequence "all military assistance to Israel must be terminated." Complaint, ¶ 225. These unbridled requests, if granted in whole or in part, will undermine constitutional principles of separation of power, as well as international comity with a close U.S. ally.[1]

Regarding the Defense Contractors, Plaintiffs' Complaint raises six causes of action for compensatory relief, together with a claim for injunctive relief against Defendants Boeing and McDonnell Douglas. These allegations include RICO violations and common law tort claims such as infliction of emotional distress, personal injury, and wrongful death. The essence of these claims is that the Defense Contractors "provided Israel weapons which were designed for urban assault and which the manufacturers knew or reasonably should have known were being

---

[1] Of the 19 causes of action asserted in the Complaint, 18 causes of action are raised against Israel and Israeli officials.

- 3 -

used in offensive actions against civilian populations . . . in violation of international and U.S. law." Complaint, ¶ 82.

Assuming for purposes of this motion that these allegations are true, the Court nonetheless should reject the Plaintiffs' call to enter the political arena and, instead, dismiss these claims against the Defense Contractors under the political question and act of state doctrines. First, in assessing the claims against the Defense Contractors, the Court will need to make a threshold determination of whether the Israeli actions were "proper," i.e., taken in furtherance of "legitimate self-defense," or "internal security." Under the political question doctrine, however, no judicially discoverable and manageable standards exist with which the Court can make this determination. As the United States aptly points out in its Motion, this determination is a quintessential political assessment. Memorandum of Points and Authorities in Support of Federal Defendants' Motion to Dismiss Official Capacity Claims ("U.S. Motion"), at 38-39. Similarly, this threshold determination of the legitimacy of the arms transfers to Israel will require the Court to overturn Israel's decisions to acquire such weapon systems and the Israeli military's "Rules of Engagement," i.e., the circumstances under which Israel has decided to deploy such systems. The act of state doctrine precludes this inquiry, preventing U.S. courts from overturning such sovereign acts of a foreign country.

Second, because the Plaintiffs challenge the transfer to Israel of arms manufactured by the Defense Contractors, this Court would be required to undo political decisions made by the Executive and Legislative Branches. These branches made the initial determination to place these weapons systems on the official "United States Munitions List," thus permitting sales of such arms to foreign countries like Israel. By statute, the placement of goods and services on the Munitions List is exempt from judicial review. See 22 U.S.C. sec. 2778(h) (2000); see also

- 4 -

United States v. Martinez, 904 F.2d 601 (11th Cir. 1990) (political question doctrine bars judicial review of designations to Munitions List); Karn v. U.S. Department of State, 925 F. Supp. 1, 2 (D.D.C. 1996) (complaint questioning designation of an item as a "defense article" dismissed on political question grounds as "a classic example of how courts . . . can become needlessly invoked . . . in litigation involving policy decisions made within the power of the President or another branch of government"); United States v. Helmy, 712 F. Supp. 1423, 1429 (E.D. Cal. 1989) (decision to place items on U.S. Munitions List non-reviewable; "the court is of the view that it is singularly ill-equipped to delve into pure foreign policy determinations"). The suit calls into question the United States' sale or approval of specific arms sales to Israel. What arms to transfer to Israel, in what quantity, with what configuration and with what lethality, are all questions committed to the political branches of the U.S. government.

Finally, given the fact that, as a matter of United States foreign policy, the Executive and Legislative Branches strongly support Israel and military assistance for that nation, a judicial decision interdicting that support would be a profound embarrassment to the political branches of our government. Perhaps most importantly, judicial intervention at this time could well be a positive hindrance to the United States' war against terrorism. In the aftermath of September 11 and in light of the real potential for war against Iraq and other sponsors of terrorism in the Middle East, there is an acute need for the United States to speak with one voice in foreign matters, and there is "an unusual need for unquestioning adherence to a political decision [i.e., the decision to support Israel and provide defense articles and services] already made." Baker, 369 U.S. at 217.

Less than two months ago, the Honorable Reggie Walton of this court considered and rejected on constitutional grounds an attempt similarly to preclude military aid to Israel. See

Mahorner v. Bush, No. Civ. A. 02-1530 (RBW), 2002 WL 31084938 (D.D.C. September 16, 2002). Judge Walton noted that:

> Both the Congress and the President have determined that military and economic assistance to the State of Israel is necessary . . . [and] a determination of whether foreign aid to Israel is necessary . . . is a question uniquely demanding of a single-voiced statement of the government's views . . . a decision of a kind for which the Judiciary has neither aptitude, facilities, nor responsibility.

Id. at *4. Judge Walton held that "the plaintiff's claims concerning the Executive Branch's ability to conduct both military and foreign affairs are non-justiciable political questions," id., and that "plaintiff's attempt to obtain relief from the courts is futile and it would be a waste of the Court's and the Executive Branch's time to further entertain plaintiff's claims." Id. at *5. Accordingly, Judge Walton sua sponte dismissed with prejudice the case against the United States on the grounds that, inter alia, the court lacked subject matter jurisdiction under the political question doctrine. The same reasoning applies to the Defense Contractors in this case.

Indeed, the political question doctrine applies to damage claims against defense contractors for wrongful death and personal injuries. See Nejad v. United States, 724 F. Supp. 753 (C.D. Cal. 1989) (wrongful death action brought by families of Iranians killed in shoot down of Airbus by U.S.S. Vincennes in Persian Gulf dismissed against military contractors under political question doctrine); Bentzlin v. Hughes Aircraft, 833 F. Supp. 1486 (C.D. Cal. 1993) (wrongful death action brought by families of military personnel killed in "friendly fire" accident during Operation Desert Storm dismissed against defense contractor under political question doctrine); Zuckerbraun v. General Dynamics Corp., 755 F. Supp. 1134 (D. Conn. 1990) (wrongful death action on behalf of Navy sailors killed from Iraqi attack on U.S.S. Stark dismissed against military contractors under political question doctrine), aff'd on other grounds,

- 6 -

935 F.2d 544 (2d Cir. 1991). Further, there is no rational basis to exempt Plaintiffs' RICO claim

from the political question doctrine, given that the same inappropriate "second-guessing" of

political decisions would be required of the Court.

For the reasons set forth below and those set forth in the United States' Motion to

Dismiss, the Court should dismiss the Defense Contractors from this matter for lack of subject-

matter jurisdiction.[2]

---

[2] In addition to the political question and act of state doctrines, the Defense Contractors expressly reserve the right to assert other bases for dismissal should the Court decline to dismiss this suit for the reasons asserted herein. For example, a complete lack of proximate causation exists here, given that the harm alleged was caused by the direct and independent acts and decisions of Israel to use the military hardware in the manner it did. As the United States points out in its Motion to Dismiss, the "causal link between the provision of military assistance to Israel and the harms about which Plaintiffs complain is too attenuated . . . ." U.S. Motion, at 30. There is no basis to suggest that Israel, an independent third party, would have acted any differently in the absence of such assistance. Id. at 29. Cf. Committee of United States Citizens Living in Nicaragua v. Reagan, 859 F.2d 929, 946 (D.C. Cir. 1988) (United States government cannot be held responsible for independent actions – i.e., military conduct – of Nicaraguan Contras). In this case, many events and actors and multiple layers of political decisions by Israel and the United States regarding the sale and use of this equipment sever the lines of causation between the conduct of the Defense Contractors and the harms of which Plaintiffs complain. See, e.g., McKethean v. Washington Metropolitan Area Transit Auth., 588 A.2d 708, 716-17 (D.C. 1991) (defendant cannot be held liable for subsequent independent conduct of third party).

Further, the corporate officers named as Defendants are improperly named, insofar as the Complaint fails to allege any independent tortious conduct on their part. See Lawlor v. District of Columbia, 758 A.2d 964, 974-75 (D.C. 2000). Additionally, Plaintiffs' Complaint names as defendants both Textron Inc. and its wholly-owned subsidiary, Bell Helicopter Textron Inc., and The Boeing Company and its wholly-owned subsidiary, McDonnell Douglas Helicopter Corporation. It appears as though Plaintiffs are attempting to hold the parent corporations liable for the sales made by the subsidiaries. We reserve the right to contest this issue at a later point in the litigation, if necessary. Also, it appears likely that some of Plaintiffs' claims are barred by the statute of limitations.

In addition, the Plaintiffs' Complaint appears to assert claims against the Defense Contractors based upon the Alien Tort Claims Act, 28 U.S.C. § 1350 (2000), and the Torture Victims Protection Act, 28 U.S.C. § 1350 (2000). The Defense Contractors reserve the right to move to dismiss these allegations for failure to state a claim.

Finally, any further prosecution or defense of this case likely will trigger the protections of the state secrets privilege because classified information may be implicated regarding the weapons systems, the U.S. approval of the arms transfers, the U.S. evaluation of Israel's security needs and military

*(Footnote cont'd on next page)*

## BACKGROUND

I.    **SINCE 1948, THE POLITICAL BRANCHES OF GOVERNMENT HAVE
      DETERMINED THAT IT IS U.S. FOREIGN POLICY AND IN THE NATIONAL
      SECURITY INTEREST TO SUPPORT ISRAEL THROUGH MILITARY AID**

For more than 50 years, the political branches of the United States government have

consistently and repeatedly expressed their unwavering support for the state of Israel, both as a

matter of public policy and national security.  On May 14, 1948, the United States recognized the

state of Israel within minutes after it declared its independence.  Over the next several decades,

the Congress and the White House issued many pronouncements of support.  See, e.g., Pub. L.

91-672, 84 Stat. 2053, sec. 5 (Jan. 12, 1971) (expressing Congress' view that "arms will be made

available and credits provided to Israel and other friendly states, to the extent that the President

determines such assistance to be needed in order to meet threats to the security and independence

of such states"); Pub. L. 95-92, 91 Stat. 625, sec. 26 (Aug. 4, 1977) (acknowledging the "historic

special relationship between the United States and Israel" and joining with the President in

pledging that any limitations generally on arms sales "shall not impair Israel's deterrent strength

or undermine the military balance in the Middle East").  Such support extended through the

Reagan, Bush, and Clinton administrations.

In the current atmosphere of Middle East strife and terrorist attacks, the political branches

of the federal government continue to express their unabated support for Israel.  For example, on

February 13, 2001, the House of Representatives reaffirmed "the close bonds of friendship that

have bound the people of the United States and the people of Israel together through turbulent

---

*(Footnote cont'd from previous page.)*

capabilities, and the Israeli Rules of Engagement.  See United States v. Reynolds, 345 U.S. 1 (1953);
Zuckerbraun v. General Dynamics Corp., 935 F.2d 544 (2d Cir. 1991).

times for more than half a century" and restated "the commitment of the United States to a secure

peace for Israel." The Resolution overwhelmingly passed the House by a vote of 410-1.

H.R Res. 34, 107th Cong. (2001) (enacted).

Only a few months ago, on May 2, 2002, the House of Representatives passed House

Resolution 392 which, in relevant part, recognized that "the United States and Israel are now

engaged in a common struggle against terrorism," explicitly defending Israel's military

operations as "an effort to defend itself against the unspeakable horrors of ongoing terrorism and

are aimed only at dismantling the terrorist infrastructure in the Palestinian areas" and expressing

support for additional U.S. military aid to help Israel defend itself. H.R. Res. 392, 107th Cong.

(2002) (enacted). Such expressions of support also have found their way into public laws passed

by both Houses of Congress and signed into law by the President. See, e.g., Pub. L. 107-228,

sec. 215 (Sept. 30, 2002) ("Israel is a friend and ally of the United States whose security is vital

to regional stability and United States interests."). See also U.S. Motion, at 24 n.20.

Military aid is a key element of the United States' support of Israel. This aid is crucial to

the United States' relations with Israel and its foreign policy generally:

> It is in the U.S. national interest to promote a stable, democratic
> and militarily strong Israel that is at peace with its neighbors.
> President Bush has reiterated the steadfast U.S. commitment to
> Israel's security, to the maintenance of its qualitative military edge
> and to strengthen Israel's ability to deter potential aggressors and
> defend itself. Maintaining Israel's qualitative military edge in the
> regional balance of power enhances Israel's security, helps prevent
> regional conflict. Israel remains one of the USG's most important
> allies in countering the threat of weapons of mass destruction in the
> region.

Foreign Military Training and DoD Engagement Activities of Interest: Joint Report to Congress

by the Secretaries of Defense and State (March 2002).

As explained below, and as it relates to the Defense Contractors, military aid, in the form of arms transfers, involves inherently political decisions by our Executive and Legislative Branches of government.

## II.    MILITARY SUPPORT FOR ISRAEL IS IMPLEMENTED BY THE POLITICAL BRANCHES THROUGH A DETAILED STATUTORY AND REGULATORY SCHEME

### A.    The Role of the Political Branches in Arms Transfers to Foreign Governments

Federal law describes in detail the political goals to be pursued through arms transfers as well as the review that must precede the sale of any defense articles or services to a foreign government.  In 1968, the Foreign Military Sales Act became law.  Pub. L. No. 90-629, 82 Stat. 1320.  This was followed in 1976 by the passage of the Arms Export Control Act.  Pub. L. No. 94-329, 90 Stat. 734.  These statutes, as codified in Title 22 of the United States Code and as implemented through federal regulation, have governed arms transfers for the past several decades, including those at issue in this case.  Through these laws, Congress has mandated that defense articles and services may be furnished only for:

- internal security, including anti-terrorism efforts;

- legitimate self-defense;

- regional or collective security arrangements used to maintain or restore international peace and security; and

- foreign military forces in less developed friendly countries to construct public works and promote economic and social development.

22 U.S.C. sec. 2302 (2000); 22 U.S.C. sec. 2754 (2000).

- 10 -

Under federal law, arms transfers involve evaluation of a host of inherently political factors. No defense article or defense service may be sold or leased by the United States to a foreign nation unless, among other conditions, "the President finds that the furnishing of defense articles and defense services to such country or international organization will strengthen the security of the United States and promote world peace." 22 U.S.C. sec. 2753(a)(1) (2000). See also 22 U.S.C. sec. 2751 (2000) (Arms sales shall "be approved only when they are consistent with the foreign policy interests of the United States," and relevant considerations include military requirements, economic and financial status of the foreign country, and the impact of the sales on social and economic development.).

The Executive Branch consistently has issued its own guidance on the sale of conventional arms to foreign nations. Presidential Decision Directive (PDD-34)[3] states that "sales of conventional weapons are a legitimate instrument of U.S. foreign policy, enabling allies and friends to better defend themselves, as well as help support [the United States'] industrial base." To accomplish this goal, and recognizing the "complexities of arms transfer decisions" and the multiple interests involved in each arms transfer decision, the federal government reviews all proposed arms transfers on a case-by-case basis in order to "draw the appropriate balance between legitimate arms sales to support the national security of friends and allies, and the need for multilateral restraint against the transfer of arms that would enhance the military capabilities of hostile states or that would undermine stability." Id.

---

[3] PDD 34 superceded similar guidance by the Executive Branch. See Presidential Directive/NSC-13 (May 13, 1977); Presidential Directive on Conventional Arms Transfer Policy (July 8, 1981). Although originally issued by President Clinton in February 1995, PDD 34 has not been modified, repealed, or replaced by President George W. Bush, and it remains Executive Branch policy.

- 11 -

Executive Branch approval of an arms transfer depends, among other factors, upon:

- Consistency with international agreements and arms control initiatives;

- Appropriateness of the transfer in responding to legitimate United States and recipient security needs;

- Consistency with United States regional stability interests;

- The degree to which the transfer supports United States strategic and foreign policy interests through increased access and influence, allied burden-sharing, and interoperability;

- The risk of adverse economic, political, or social impact within the recipient nations and the degree to which security needs can be addressed by other means; and

- The human rights, terrorism, and proliferation record of the recipient, and the potential for misuse of the export in question.

Id. These factors, as well as those set forth by federal statute, are inherently political, requiring the examination and balancing of many intangible considerations.

Against this political backdrop, Congress has provided the President with various methods of arms transfer. First, a "foreign military sale" can occur in which the United States, on its own volition, sells products from existing surplus military stock. 22 U.S.C. sec. 2761 (2000). A foreign military sale also can occur through a procurement contract between the U.S. and its contractors. 22 U.S.C. sec. 2762 (2000). Arms transfers also can occur through the "export licensing program," through which the United States reviews and approves sales of defense articles or services by its contractors to a foreign government. 22 U.S.C. sec. 2778 (2000).

Each of these methods for arms transfers is discussed below. Each requires the intimate involvement and coordination of various governmental entities, including but not limited to the Department of Defense ("DoD"), the Department of State, the Defense Security Assistance Agency ("DSAA"), military entities such as the United States Army Security Assistance Command ("USASAC"), and the United States Embassy in the foreign country to which the transfer is proposed. Every step of the process requires an evaluation of foreign policy goals, political, economic, and social factors, foreign intelligence, and other myriad intangible elements. Finally, as the United States points out in its motion, federal law gives to the political branches not only the power to authorize arms sales to a foreign country, but also the power to continue such arms transfers, or, if appropriate, to terminate such sales. U.S. Motion, at 6, 9-10, 16.[4]

### 1.   Arms Transfers Through Surplus Military Stock and Procurement Contracts

Under the Foreign Military Sales (FMS) program, the United States may sell defense articles and services directly to eligible foreign countries. Security Assistance Management Manual (SAMM), DOD 5105.38-M, September 28, 1998, § 70002(B)(1), p. 700-2. There are two types of FMS transfers relevant to this matter, "FMS Stock" transfers and "FMS Procurement" transfers.

### a.   FMS Stock Transfers

In an "FMS Stock" transfer, DoD sells eligible foreign governments military equipment or other goods already in DoD inventory. 22 U.S.C. § 2761 (a)(1) (2000). All contracts for such

---

[4] As described thoroughly in the United States' motion, the United States government may assist in the financing of sales of defense articles and services through the Foreign Military Funding ("FMF") program. Even greater political overview occurs when FMF funding is involved in FMS or export licensing of arms. U.S. Motion, at 4-11.

- 13 -

sales are directly between DoD and the eligible foreign government – there is absolutely no involvement by the original manufacturer of the military equipment in the FMS Stock transfer process. Discretion to make these transfers rests solely with the United States.

### b.   FMS Procurement Transfers

FMS material also may be supplied from DoD procurements. The procurements are the responsibility of DoD acquisition personnel. FMS requirements may be procured separately, or may be consolidated with other United States government requirements. SAMM, ch. 8, § 80102. DoD procurements of FMS requirements are conducted in accordance with the same rules and procedures governing other United States government procurements for domestic requirements. SAMM, § 80101(A), p. 801-1.

The Executive Branch reviews and approves both FMS Stock transfers and FMS Procurement transfers on a case-by-case basis in accordance with the foreign policy and national security objectives described above. A foreign government's request for an FMS transfer is directed to the relevant DoD component with copies to the State Department, the DSAA, and the Unified Command responsible for the relevant foreign country making the request. SAMM, § 70003(A)(2)(b), p. 700-5. Requests often must be coordinated with and approved by the U.S. Embassy in the country making the request. SAMM, § 70003(A)(2)(a), p. 700-5. The Embassy provides information regarding the proposed sale, including why the articles or services are desired, the impact the sale would have on the purchaser's force structure, the probable reaction of neighboring countries, the ability of the purchaser to support the article, the source of financing and economic impact of the proposed acquisition, the applicable human rights considerations, and, finally, recommendations on whether the United States should approve the transfer. Id. Requests also may require coordination among the Joint Chiefs of Staff, the Under

- 14 -

Secretary of Defense for Acquisition, Technology, and Logistics, and the DSAA. SAMM, § 70003(C), p. 700-8.

If the request is approved, the United States will issue a Letter of Offer and Acceptance (LOA). SAMM, § 70102(A), p. 701-1. After preparation of the LOA, further review by DoD and the State Department may be required before DSAA approval. DoD coordination is accomplished for all LOAs by the comptroller and legal counsel of the appropriate DoD component. All FMS transfers exceeding certain dollar thresholds require notification to Congress of the proposed sale. 22 U.S.C. sec. 2776(b) (2000). Following such notification, Congress may require the President to submit a report specifying additional information regarding the sale. 22 U.S.C. sec. 2776(a)(11) (2000).

### 2. Export Licensing Program

The export licensing program is a means by which the United States authorizes defense contractors to transfer arms and related services to foreign nations directly. Through this program, a private contractor – not the United States – is a party to the sale to a foreign country. Nevertheless, because the contractor must apply for and receive an export license from the United States before it can conclude a sale for such articles and services, the United States government plays a substantial role in these sales.

Central to this process is the U.S. Munitions List. The U.S. Munitions List is a comprehensive listing of item categories such as firearms, aircraft, ammunition, and other hardware. The Department of State, with the concurrence of DoD, designates items deemed to be defense articles and services and places them on the U.S. Munitions List. 22 C.F.R. sec. 120.2. Every manufacturer and exporter of such defense articles and services

must register with the State Department's Office of Defense Trade Controls ("DTC").

22 C.F.R. sec. 122.1(a).

The State Department reviews and approves requests for export licenses for all direct

sales of items on the U.S. Munitions List. 22 C.F.R. sec. 123.1. Contractors also must obtain the

approval of the DTC before furnishing any defense services. 22 C.F.R. sec. 124.1(a). In all

instances, the State Department can reject, amend, suspend, or cancel any export authorization.

As a result, export authorization is never "final" – it may always be rescinded depending upon

changes in foreign policy goals and objectives. 22 C.F.R. sec. 126.7(a).

Yet more oversight is required for proposed sales of "major defense equipment" of $14

million or more, or for "defense articles and services" valued at $50 million or more. Such sales

require the President to submit a report to Congress at least thirty days before issuing an export

license. 22 U.S.C. sec. 2776(c)(1) & (2)(A). Congress has the authority to block the proposed

export of these high dollar commercial sales by passing a joint resolution within thirty days after

receipt of notification.

**B.      Israel Has Acquired Goods and Services Manufactured or Provided by the Defense Contractors Using the Foreign Military Sales and Export Licensing Programs**

As alleged in Plaintiffs' Complaint, Israel currently possesses Apache helicopters and

Cobra helicopters originally manufactured by some of the Defense Contractors. In addition,

some of the Defense Contractors provided training and other services for the helicopters. Israel

acquired these helicopters over the last twenty years through both FMS procurement sales and

the export licensing program. Approval of the precise configuration of the weaponry and

avionics included on these helicopters, and in fact, approval of the transfer of the helicopters

themselves to Israel, rested wholly and exclusively with Executive Branch officials at the DoD and the State Department.

The M 250 grenade launchers referenced in Plaintiffs' Complaint have been acquired by Israel directly from the United States Army through the FMS surplus stock program as well as through the export licensing program. The particular launchers that allegedly caused damages may or may not have been manufactured by the Defense Contractor, Colt, because other companies also produce the M 250 grenade launchers for the United States Army. In any event, approval of the precise configuration of the M 250 and approval of the transfer of these weapons to Israel rested wholly and exclusively with Executive Branch officials at DoD and the Department of State.

Thus, in each and every instance that Israel acquired weapons manufactured by the Defense Contractors, those acquisitions involved compliance with the rigorous and detailed political regulatory scheme outlined above.

## ARGUMENT

Plaintiffs' Complaint contains many allegations and raises numerous causes of action, but woven throughout are two basic threads: (1) a claim that the United States and its contractors improperly and illegally support the state of Israel through arms transfers and military aid; and (2) a challenge to actions taken by Israel as a sovereign within the geographical borders of the territory it controls. Two independent grounds exist for dismissal of the complaint: the political question doctrine and the act of state doctrine. Both doctrines reflect the reality that courts should refrain from involving themselves in matters that are inherently political and outside the realm of judicial resolution.

## I.   THE COURT SHOULD DISMISS PLAINTIFFS' CLAIMS AGAINST THE DEFENSE CONTRACTORS BECAUSE THEY RAISE NON-JUSTICIABLE POLITICAL QUESTIONS

In Plaintiffs' Complaint, there are no allegations that any product or service produced, manufactured, designed, or used by any Defense Contractor was defective in any way. To the contrary, the helicopters and grenade launchers are alleged to have functioned precisely as intended. Instead, Plaintiffs call upon the Court to hold liable the Defense Contractors based solely upon their contribution to the implementation of United States foreign policy and national security determinations.

As demonstrated below, the political question doctrine applies to this case and the Court should dismiss the Complaint with prejudice. No judicially manageable standards exist to evaluate the propriety of the Israeli conduct of which the Defense Contractors are alleged to have known. Further, by challenging foreign policy and national security decisions, the Complaint seeks to disrupt the balance of power among the three branches of government. In these particular times, there is a heightened need to maintain that balance. Finally, there is an acute need at this time for the federal government to speak with one voice in its conduct of foreign policy and the related war on terrorism. [5]

### A.   Courts Lack Jurisdiction to Decide Cases Which Raise Political Questions

Article III of the United States Constitution limits judicial power to "cases" and "controversies." Courts lack the constitutional jurisdiction or competence to decide political issues or questions because they do not present cases or controversies within the meaning of

---

[5] In its brief, the United States raises the political question doctrine as part of its defense to the Plaintiffs' claims for injunctive relief. See U.S. Motion, at 33-41. The Defense Contractors adopt by reference those arguments as to the injunctive relief sought against Boeing.

Article III of the Constitution. See Animal Defense Legal Defense Fund, Inc. v. Glickman, 154

F.3d 426, 446 (D.C. Cir. 1998); Industria Panificadora, S.A. v. United States, 763 F. Supp 1154,

1159 (D.D.C. 1991). Occidental of UMM al Qaywayn, Inc. v. A Certain Cargo of Petroleum,

577 F. 2d 1196, 1203 (5th Cir. 1978).

In Baker v. Carr, 369 U.S. 186 (1962), the Supreme Court set forth six factors indicative

of a political question outside the proper scope of review of the federal judiciary:

> Prominent on the surface of any case held to involve a political
> question is found
>
> (1) a textually demonstrable constitutional commitment of the
> issue to a coordinate political department; or
>
> (2) a lack of judicially discoverable and manageable standards for
> resolving it; or
>
> (3) the impossibility of deciding without an initial policy
> determination of a kind clearly for nonjudicial discretion; or
>
> (4) the impossibility of a court's undertaking independent
> resolution without expressing lack of the respect due coordinate
> branches of government; or
>
> (5) an unusual need for unquestioning adherence to a political
> decision already made; or
>
> (6) the potentiality of embarrassment from multifarious
> pronouncements by various departments on one question.

369 U.S. at 217. The presence of any single factor is sufficient to render the issue a non-

judiciable political question. Id.; see also Occidental of UMM, 577 F. 2d at 1203. Antolok v.

United States, 873 F.2d 369, 381 (D.C. Cir. 1981); see also Hwang Geum Joo v. Japan, 172

F. Supp.2d 52, 65-66 (D.D.C. 2001). The present case implicates several of the Baker factors.

**B.    Several Distinct Bases Exist for Dismissal of The Defense Contractors On Political Question Grounds**

**1.    The Issues Raised in Plaintiffs' Complaint Are Not Susceptible of Resolution by Judicially Manageable Standards**

The essence of Plaintiffs' allegations against the Defense Contractors is that they continued to provide weapon systems to Israel even though Israel allegedly had violated international and U.S. law in its use of such weapons. Plaintiffs' core allegation against the Defense Contractors implicates several political questions, including whether Israel's conduct was, in fact, illegal under U.S. or international law. No judicially discoverable or management standards exist to make this determination.

No other conclusion is possible. Israel's decisions to deploy and use military force to counter suicide bombings and other possible terrorist activity necessarily involve a consideration of security issues, military strategy, and political implications, both foreign and domestic. There simply are no standards by which the Court could examine these issues or determine whether they justified Israel's conduct. Consequently, there can be no basis to hold the Defense Contractors liable where arms were otherwise transferred to Israel in compliance with federal law and foreign policy decisions.

Courts consistently have recognized that they cannot establish meaningful standards for the review of foreign policy decisions:

> [T]he very nature of executive decisions as to foreign policy is political, not judicial. Such decisions are wholly confided by our Constitution to the political departments of the government, Executive and Legislative. They are delicate, complex, and involve large elements of prophecy. They are and should be undertaken only by those directly responsible to the people whose welfare they advance or imperil. They are decisions of a kind for which the judiciary has neither aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion or inquiry.

- 20 -

Chicago & Southern Airlines v. Waterman Steamship Corp., 333 U.S. 103, 111 (1948) (citations omitted); see also Antolok, 873 F.2d at 381.

Adjudication of the questions raised in this case effectively would require the court to make policy decisions in the realm of foreign relations without knowledge or expertise regarding the formulation, implementation, and ramifications of those policies. See Baker, 369 U.S. at 211, 217. For instance, the Court would be required to determine standards for whether the foreign policy and military decisions related to the United States' alliance with Israel were appropriate; whether United States intelligence justified the approval and funding for the providing of arms and related services at issue to Israel; whether the products and services provided by the Defense Contractors should have been placed on the U.S. Munitions List; whether the defense products transferred to Israel were inappropriately "lethal"; and, finally, whether such products were deployed appropriately by the state of Israel. In short, this case will present the Court with a host of issues for which it is simply not equipped to discern or apply appropriate standards.

### 2. The Foreign Policy Determinations and National Security Issues in This Case Are Constitutionally Committed to the Political Branches

The political question doctrine "excludes from judicial review those controversies which revolve around policy choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch." Japan Whaling Ass'n v. American Cetacean Society, 478 U.S. 221, 230 (1986); see also Hwang Geum Joo, 172 F. Supp.2d at 64-67.

By challenging the transfer of arms to Israel, this suit requires the Court to second-guess the conduct of foreign policy and issues of national security, both of which are committed by the

- 21 -

Constitution to the Executive Branch of our government. Article II, § 2, grants to the President authority over the conduct of foreign affairs and over the armed forces to protect the national security of the United States as Commander-In-Chief. See also United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 319-20 (1936). As the Supreme Court explained in Baker, questions touching on foreign affairs often implicate the political question doctrine, as they "frequently turn on standards that defy judicial applications, or involve the exercise of a discretion demonstrably committed to the executive or legislature." Baker at 211.

Many other courts concur that foreign policy and national security are political matters not subject to judicial review. "Matters intimately related to foreign policy and national security are rarely proper subjects for judicial intervention," Haig v. Agee, 453 U.S 280, 292 (1981), inasmuch as they are "so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference." Harisiades v. Shaughnessy, 342 U.S. 580, 589 (1952); see also Antolok, 873 F.2d at 380-81; Kelberine v. Societe Internationale, 363 F.2d 989, 995 (D.C. Cir. 1966). "The conduct of the foreign relations of our government is committed by the Constitution to the Executive and Legislative – 'the political' – departments of the government, and the propriety of what may be done in the exercise of this political power is not subject to judicial inquiry or decision." First National City Bank v. Banco Nacional de Cuba, 406 U.S. 759 (1972)(citations omitted).

The deployment and use of military equipment similarly raises non-judiciable political questions constitutionally committed to the political branches. See, e.g., Dickson v. Ford, 521 F.2d 234 (5th Cir. 1975) (a challenge to foreign military sales involved a political question and was "[a]mong the areas which the courts have traditionally deemed to involve political questions is the conduct of foreign relations, which 'is committed by the Constitution to the executive and

legislative 'the political' departments of the government.'" Id. at 236 (quoting Oetjen v. Central Leather Co., 246 U.S. 297, 302 (1918))); Greenham Women Against Cruise Missiles v. Reagan, 755 F.2d 34 (2d Cir. 1985) (decisions regarding deployment of cruise missiles are political questions); Holtzman v. Schlesinger, 484 F.2d 1307 (2d Cir. 1973) (legality of military activities in Cambodia is political question); DaCosta v. Laird, 471 F.2d 1146 (2d Cir. 1973) (propriety of mining of North Vietnamese harbors is a political question); Chaser Shipping Corp. v. United States, 649 F. Supp. 736 (S.D.N.Y. 1986) (plaintiff's claim for damages caused to vessel when it allegedly hit a CIA mine planted in Nicaraguan harbor is a non-judiciable political question), aff'd, 819 F.2d 1129 (2d 1987); In re Korean Airlines Disaster, 597 F. Supp. 613 (D.D.C. 1984) (whether military had a duty to warn airliner of proximity to Soviet Union presented a political question); Crockett v. Reagan, 558 F. Supp. 893 (D.D.C. 1982) (court will not decide whether President has ordered troops into area of foreign hostilities), aff'd, 720 F. 2d 1355 (D.C. Cir. 1983).

In the area of arms exports, the decision to list an item as a "defense article" or an activity as a "defense service" on the U.S Munitions List is committed by law to the Executive Branch is and is not subject to judicial review. See 22 U.S.C. sec. 2778(h) (2000). Even prior to the enactment of section 2778(h) in 1989, courts nevertheless declined to review such designations. For example, in United States v. Martinez, 904 F.2d 601 (11th Cir. 1990), the Eleventh Circuit declined to conduct such a review, realizing the stark dangers of judicial intervention in foreign policy decisions:

> The consequences of uninformed judicial action could be grave. Questions concerning what perils our nation might face at some future time and how best to guard against those perils "are delicate, complex, and involve large elements of prophecy. They are and should be undertaken only by those directly responsible to the

- 23 -

people whose welfare they advance or imperil. They are decisions
of a kind for which the Judiciary has neither aptitude, facilities nor
responsibility and which has long been held to belong in the
domain of political power not subject to judicial intrusion or
inquiry."

Id. at 602 (quoting Chicago & Southern Airlines, 333 U.S. at 111); see also Karn v. U.S.

Department of State, 925 F. Supp. 1, 2 (D.D.C. 1996) (complaint questioning designation of an

item as a "defense article" dismissed on political question grounds); Helmy, 712 F. Supp. at

1429.

Dismissal under this prong of the Baker test is compelling in the instant case. The

political branches of the government made the initial foreign policy and national security

determinations to transfer the arms to Israel and, as the United States has pointed out in its brief,

have not terminated or reversed those decisions, notwithstanding their power to do so. U.S.

Motion, at 6, 9-10, 16.

In the instant case, these political decisions include:

- The United States' decision to ally itself with Israel for the last half-century;

- Congress' authorization and appropriation of funds to finance the sale of weapons
  to Israel;

- The United States' evaluation and determination of the precise weapon and
  precise configuration of the weapon systems to be exported to Israel;

- The Executive Branch's decision to place the military hardware manufactured by
  the Defense Contractors on the U.S. Munitions List;

- The United States' approval of the sale and export of Apache helicopters to Israel;

- The United States' approval of the sale and export of Cobra helicopters to Israel;

- The United States' approval of the transfer and shipment of M205 Grenade launchers to Israel from surplus U.S. Army stock; and

- The intelligence and other information used by the United States to assist in making these evaluations and determinations.

Clearly, these determinations are political questions, constitutionally committed to the other branches of government for resolution. The Court should refrain from second-guessing the Defense Contractors' implementation of these political decisions and the political branches' continued support for military aid to Israel.

### 3. The Court Should Dismiss This Case to Avoid Expressing a Lack of Respect for the Executive, and to Avoid Rendering "Multifarious Pronouncements"

Baker also warns courts to avoid interfering with political questions when there exists the potential for embarrassment from multifarious pronouncements by different branches of government on one question, when the court's involvement would express a lack of respect due coordinate branches of government, and when there exists an unusual need for unquestioning adherence to a political decision already made. 369 U.S. at 217. All of these factors are particularly applicable, given the ongoing unrest in the Middle East and the United States' war on terrorism. Through its Executive Branch leaders, including the President and the Secretary of State, and its elected representatives in Congress, the United States already has spoken regarding this nation's policy toward, and alliance with, Israel. Both the President and Congress have spoken repeatedly, with precision and clarity, regarding the United States policy of assisting Israel with its self-defense. See supra at 7-8.

It is crucial that the United States, through the political branches of government, speak with a singular, unified voice in conducting foreign affairs -- particularly as the nation sits on the

brink of war in the very region implicated in the Plaintiffs' Complaint. Foreign affairs is "an area

in which . . . the Executive receives its greatest deference, and in which we must recognize the

necessity for the nation to speak with a single voice." <u>DKT Memorial Fund Ltd. v. AID</u>, 887

F.2d 275, 291 (D.C. Cir. 1989).

As then-District of Columbia Circuit Judge Antonin Scalia noted in <u>Sanchez- Espinoza v.</u>

<u>Reagan</u>:

> The foreign affairs implications of suits such as this cannot be
> ignored – their ability to produce what the Supreme Court has
> called in another context "embarrassment of our government
> abroad through multifarious pronouncements by various
> departments on one question." [citations omitted] Whether or not
> the present litigation is motivated by considerations of geopolitics
> rather than personal harm, we think that as a general matter the
> danger of foreign citizens' using the courts in situations such as
> this is sufficiently acute that we must leave to Congress the
> judgment whether a damage remedy should exist.

770 F.2d 202, 209 (D.C. Cir. 1985).  <u>See also</u> <u>Lowry v. Reagan</u>, 676 F. Supp. 333 (D.D.C. 1987).

Given the present unrest in the Middle East, the possibility of war with Iraq, and the

United States' continuing struggle against terrorism, an "unusual need" exists for unquestioning

adherence to the United States' long-standing foreign policy, and military and financial support

of Israel.  It is crucial that this Court refrain from substituting its judgment for these political

decisions, thus maintaining the United States' singular, unified voice in this arena.

## II.    THE COURT SHOULD DISMISS PLAINTIFFS' CLAIMS AGAINST THE DEFENSE CONTRACTORS BECAUSE THEY ARE PRECLUDED BY THE ACT OF STATE DOCTRINE

Not only do Plaintiffs challenge political decisions by the United States Executive and

Legislative Branches, but also they contest the political decisions, including the Rules of

Engagement, of a sovereign country, Israel.  The "act of state" doctrine bars such challenges:

- 26 -

> Courts in the United States have the power, and ordinarily the
> obligation, to decide cases and controversies properly presented to
> them. The act of state doctrine . . . requires that, in the process of
> deciding, the acts of foreign sovereign taken within their
> jurisdiction are deemed valid.

W. S. Kirkpatrick & Co. v. Environmental Tectonics Corp., 493 U.S. 400 (1990). As a practical

matter, the act of state doctrine "precludes the courts of [the United States] from inquiring into

the validity of the public acts of a recognized foreign sovereign power committed within its own

territory." Dayton v. Czechoslovak Socialist Republic, 672 F.Supp. 7, 11 (D.D.C. 1986)

(quoting Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 401 (1964)), aff'd, 834 F.2d 203

(D.C. Cir. 1987).

The act of state doctrine reflects the reality that the courts are but one branch of the

United States government, which must respect the sovereignty of other nations of the world. As

the Supreme Court long ago recognized:

> Every sovereign state is bound to respect the independence of
> every other sovereign state, and the courts of one country will not
> sit in judgment on the acts of the government of another, done
> within its own territory. Redress of grievances by reason of such
> acts must be obtained through the means open to be availed of by
> sovereign powers as between themselves.

Underhill v. Hernandez, 168 U.S. 250, 252 (1897). In addition to preserving international

comity, the doctrine also seeks to minimize the disruption by the judiciary of foreign policy

matters committed to the discretion other branches of government, which is in keeping with the

notion of separation of powers. See Kirkpatrick, 493 U.S. at 404. See also World Wide

Minerals, Ltd. v. Republic of Kazakhstan, 296 F.3d 1154, 1165 (D.C. Cir. 2002) (act of state

doctrine applied where "questioning the export control policies of a foreign state would both

disrupt international comity and interfere with the conduct of foreign relations by the Executive

Branch"); Daliberti v. Republic of Iraq, 97 F. Supp.2d 38, 55 (D.D.C. 2000) (declining to apply

- 27 -

act of state doctrine in action against Iraq because that country had been designated by the

Executive Branch as a state sponsor of terrorism and the Legislative Branch had explicitly

authorized suits against countries so designated).

The act of state doctrine applies not only in cases brought against a sovereign nation, but

also to the adjudication of claims asserted against private entities, including corporations like the

Defense Contractors, if the official actions of a foreign sovereign are at issue in the litigation.

The Fifth Circuit recognized this principle in Callejo v. Bancomer, S.A. when it stated that:

> In the act of state context, even if the defendant is a private party,
> not an instrumentality of a foreign state, and even if the suit is not
> based specifically on a sovereign act, we nevertheless decline to
> decide the merits of the case if in doing so we would need to judge
> the validity of the public acts of a sovereign state performed within
> its own territory.

764 F. 2d 1101, 1113 (5th Cir. 1985); see also Credit Suisse v. District Court, 130 F.3d 1342,

1347 (9th Cir. 1997) (claim for property dismissed because requested relief would compel

violation of order of Swiss government authorities in contravention of act of state doctrine); West

v. Multibanco Comermex, S.A., 807 F.2d 820, 828 (9th Cir. 1987).

Even if Israel were not named as a defendant, the act of state doctrine still would apply to

the claims raised against the Defense Contractors. Those claims allege that the Defense

Contractors provided Israel weapons with the knowledge that the weapons were being used in

"violation of international and U.S. law," Complaint, ¶ 82. Thus, Plaintiffs' claims against the

Defense Contractors necessarily challenge the legality and validity of the conduct of Israel. If

this Court deems valid the sovereign actions of Israel, as the act of state doctrine requires, then

any alleged "knowledge" of those actions on the part of the Defense Contractors cannot result in

liability. See Compania de Gas de Nuevo Laredo, S.A., v. Entex, Inc., 686 F.2d 322, 325-26 (5th

Cir. 1982) (dismissing tort claim by natural gas supplier against United States natural gas exporter based upon an alleged conspiracy with the Mexican government to take control of supplier's assets; adjudication of claim would require determination of legality of Mexican government's actions, which is precluded by the act of state doctrine).

In this case, the act of state doctrine clearly applies. Israel and a number of Israeli officials are named as defendants, and the vast majority of the allegations in Plaintiffs' 140-page Complaint deal with <u>Israel's</u> allegedly improper conduct. The claims directly challenge official acts that took place on Israeli soil, unavoidably requiring the Court to "sit in judgment" of numerous sovereign acts:

- Israel's decision to acquire the weapons at issue, either through foreign military sales or the export licensing program;

- Israel's specification of the configuration and scope of the weapons and services procured;

- the Israeli Defense Force's decisions on how to utilize those weapons and services through Israel's Rules of Engagement; and

- Israel's continuing foreign policy and military decision-making as to its response, including the use of the defense articles from the Defense Contractors, to the ongoing threat of terrorism in the territories it occupies and controls.

All of these decisions are inherently political, made by a sovereign state within the boundaries of its territory. They relate to Israel's national security and defense, the cornerstone of Israel's – or any nation's – sovereignty.

## CONCLUSION

For the foregoing reasons, and for the reasons set forth in the United States' Motion to

Dismiss, Plaintiffs' Complaint should be dismissed with prejudice as to the Defense Contractors.


Respectfully submitted,
MCKENNA LONG & ALDRIDGE LLP


By: _____

Raymond B. Biagini (D.C. Bar #320838)
Kurt J. Hamrock (D.C. Bar #442619)

1900 K Street, N.W.
Washington, D.C. 20006
(202) 496-7500

Attorneys for Defendants
The Boeing Company
McDonnell Douglas Helicopter Corporation
Textron Inc.
Bell Helicopter Textron Inc.
Colt's Manufacturing Company, Inc.
Glen E. Hess
John R. Murphy
Lewis B. Campbell
Phillip Condit
William M. Keys

Dated:   November 12, 2002

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Defense Contractors' Motion to Dismiss Pursuant to Rule 12(B)(1) and Memorandum in Support Thereof was served on November 12, 2002, via first-class mail, on:

Stanley L. Cohen, Esq.
351 Broadway
Suite 300
New York, NY 10013

Maher Hanania, Esq.
1510 H Street NW
Suite 20
Washington, DC 20005

Ori Lev, Esq.
United States Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883
Washington, DC 20044

David O. Bickart, Esq.
Kaye Scholer LLP
901 15th Street, NW
Suite 1100
Washington, DC 20005

Kurt J. Hamrock