

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**FILED**

**JUL 1 8 2002**



JOHN DOE I on behalf of himself and his grandson, BABY DOE I and as next of kin for his deceased daughter, JILL DOE I, JOHN DOE II, JOHN DOE III, JOHN DOE IV, JOHN DOE V, JOHN DOE VI, JOHN DOE VII, JOHN DOE VIII, JOHN DOE IX, JOHN DOE X, JOHN DOE XI, JOHN DOE XII and JOHN DOE XIII on behalf of themselves; JOHN DOE XIV on behalf of himself and his son, BABY DOE II, JOHN DOE XV on behalf of himself and his son, BABY DOE III, JOHN DOE XVI on behalf of himself and his deceased son, BABY DOE IV, JOHN DOE XVII on behalf of himself, JANE DOE I on behalf of herself and the estate of her aunt, JILL DOE II and cousin, BABY DOE V, and JANE DOE II on behalf of herself and the estates of her two deceased sisters, JILL DOE III and JILL DOE IV and as next of kin for her nephew, CHARLES DOE I and niece JILL DOE V,

      Plaintiffs,

v.

STATE OF ISRAEL, ARIEL SHARON in his individual capacity and as former Israeli Minister of Defense, NATAN SHARANSKI individually and in his capacity as Israeli Minister of Construction and Housing, BINYAMIN BEN ELIEZER individually and in his capacity as Israeli Minister of Defense, SHIMON PERES individually and in his capacity as Israeli Minister of Foreign Affairs, UZI LANDAU individually and in his capacity as Israeli Minister of Internal Security, MEIR SHEETRIT individually and as Israeli Minister of Justice, THE ISRAELI GENERAL SECURITY SERVICE (the "Shin Bet"), AVI DICHTER, the head of the Shin Bet, ISRAELI DEFENSE FORCES (IDF), LT. GENERAL SHAUL MOFAZ individually and as Chief of the General Staff, MAJOR GENERAL AMOS GILAD individually and as the IDF Coordinator of Government Activities in Judea, Samaria and the Gaza, MAJOR GENERAL AHARON ZE'EVI FARKASH individually and as IDF Director of Military Intelligence, AMOS YARON individually and in his capacity as Secretary General of the Defense Ministry and as former Brigadier General and Commandant of IDF forces in Beirut, Lebanon (collectively the "Israeli Defendants"),

GEORGE W. BUSH, in his individual capacity and as President of the United States,
COLIN POWELL, in his individual capacity and as Secretary of State,

THE BOEING COMPANY, MCDONNELL DOUGLAS HELICOPTER SYSTEMS, TEXTRON, BELL HELLICOPTER, COLT'S MANUFACTURING COMPANY, INC., GLEN E. HESS, as former Vice-President of the Boeing Company and current President and Chief Operating Officer of BELL HELLICOPTER, JOHN R. MURPHY, Chairman and Chief Executive Officer of BELL HELLICOPTER, LEWIS B. CAMPBELL, Chairman and Chief Executive Officer of TEXTRON, PHILLIP CONDIT, Chief Executive Officer of BOEING COMPANY, LT. GENERAL (Ret.) WILLIAM M. KEYS, President and Chief Executive Officer of COLT'S MANUFACTURING COMPANY (collectively the "Arms Defendants"),

HALAMISH/NEVE TZUF SETTLEMENT, NEVE TZUF FOUDATION (KEREN NEVE TZUF), CHRIST LUTHERAN CHURCH, CENTRAL FUND FOR ISRAEL, ONE ISRAEL FUND, CONGREAGATION RINAT YISRAEL, RABBI YOSEF ADLER, ARNON HILLER, JOAV MERRICK, RUTH KOHN, JAY MARCUS (collectively the "Settler Defendants"),

-MOES –I-100,

      Defendants,

CASE NUMBER  1:02CV01431

JUDGE: John D. Bates

DECK TYPE: Civil Rights (non-employmen

DATE STAMP: 07/18/2002

# COMPLAINT FOR COMPENSATORY AND PUNITIVE DAMAGES AND INJUNCTIVE RELIEF FOR:

1.  GENOCIDE

2.  CRIMES AGAINST HUMANITY

3.  WAR CRIMES

4.  RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT (RICO)

5.  EXTRA JUDICIAL KILLING

6.  TORTURE

7.  ARBITRARY ARREST AND DETENTION

8.  CRUEL, INHUMAN, OR DEGRADING TREATMENT

9.  WRONGFUL DEATH

10. BATTERY

11. ASSAULT

12. FALSE IMPRISONMENT

13. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

14. NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

15. NEGLIGENCE PER SE

16. TRESPASS

17. CONVERSION

18. INJUNCTIVE RELIEF

DEMAND FOR JURY TRIAL

# PRELIMINARY STATEMENT

1.      This is an action for compensatory and punitive damages for wrongful death, personal injuries including psychological trauma, and property damage inflicted directly by the State of Israel; Ariel Sharon and other senior members of the Israeli military, security and police hierarchy; and financed, facilitated, aided and abetted by George W. Bush, Colin Powell; several international arms manufacturers including Boeing and Colt, and Halamish/Neve-Tzuf, a Jewish settlement which has terrorized its Palestinian neighbors and illegally confiscated their lands, all the while being funded by American religious and charitable groups.

2.      Plaintiffs, most of whom are U.S. citizens, seek damages for a decades-long pattern of extra-judicial killing; torture; cruel, inhuman and degrading treatment, arbitrary arrest, illegal detention and other violations of customary international law and the laws of the United States.    The               defendants, individually and collectively have entered into an enterprise and civil conspiracy to violate the rights of Plaintiffs protected by international law and the laws of the United States.

## JURISDICTION and VENUE

3.      This Court has jurisdiction over plaintiffs' claims under 28 U.S.C. §1331

(federal question jurisdiction), 28 U.S.C. § 1350 (Alien Tort Claims Act and

Torture Victim Protection Act), 28 U.S.C. § 1605 (a)(1),(2) and (5) (Foreign

Sovereign Immunity Act), 18 U.S.C. § 1964 (Racketeer Influenced and Corrupt

Organizations Act) and 28 U.S.C. § 1367 (supplemental jurisdiction).

4.      28 U.S.C.§1331 provides jurisdiction in all matters involving any question

of federal law including federal common law.  The Alien Tort Claims Act

provides federal jurisdiction for "any civil action by an alien for a tort only,

committed in violation of the law of nations or a treaty of the United States."

The Torture Victim Protection Act provides federal jurisdiction for acts of

torture and extra-judicial killing.  The Racketeer Influenced and Corrupt

Organizations Act (RICO) provides federal jurisdiction for acts of a

racketeering enterprise and conspiracy that have injured plaintiffs' business

and/or property.  The Foreign Sovereign Immunity Act (FSIA) provides for

federal jurisdiction over foreign states which have waived, either explicitly or

implicitly their immunity, or are in engaged in commercial activity outside of

the United States which has an effect within the United States, or commit

tortuous acts that cause injury within the United States.

5.    In addition, plaintiffs invoke the supplemental jurisdiction of this Court

over claims based upon laws of the States of New York, Nevada, Ohio, Florida,

Alabama, and South Carolina and the laws of Washington D.C.

6.    The United States District Court for the District of Columbia is the proper

venue of this action pursuant to 28 U.S.C. § 1391.


## PARTIES

## PLAINTIFFS

7.    Plaintiff John Doe I files this action on behalf of himself, his grandson,

Baby Doe I, and as next of kin for his deceased daughter, Jill Doe I. John Doe I

witnessed his daughter Jill Doe I shot dead by Israeli Defense Forces soldiers

from point blank range as she held her nine-month old baby, Baby Doe I, while

sitting in a car. John Doe I's daughter's husband was critically wounded in the

same attack.  Jill Doe I was buried in a mass grave in the parking lot of the

hospital where her body was taken.   Her family was unable to perform

customary Muslim mourning and burial rites.

8.    Plaintiff John Doe II is a U.S. citizen and holds a valid Jordanian passport.

He, along with several family members, all of whom are U.S. citizens, own

approximately fifteen acres in Deirnitham, Palestine. The land has been in John

Doe II's family for about 1,600 years. Since 1995, the Doe land holdings have

been diminished by the expansion and encroachment of the Halamish/Neve Tzuf settlement. Since 1995 John Doe II and his family have been harassed and threatened by Jewish settlers and Israeli security officers. In October, 2000, between 15 and 20 settlers from the Halamish settlement set fire to the trees on John Doe II's property and riddled his home with gunfire. As late as June 13, 2002, Halamish settlers began bulldozing trees on John Doe II's property in an effort to expand the settlement's boundaries. John Doe II also owns a tract of land near Ramallah where he grows olive trees. In October 2000, Halamish settlers destroyed over 100 of John Doe II's olive trees in preparation of another settlement expansion.

9.      Plaintiff John Doe III is a U.S. citizen currently residing in El Bireh, Palestine. On April 10, 2002, John Doe III suffered a stroke at his home. John Doe III was prevented from going to the hospital by Israeli soldiers and although his son is a doctor anxious to treat him, he was denied medical attention for two days, thus compounding his injuries.

10.     Plaintiff John Doe IV is a U.S. citizen currently living and practicing medicine in Ramallah, Palestine. In addition to being prevented by Israeli soldiers from providing timely medical treatment to his father, John Doe IV's residence and clinic have been subjected to numerous searches by Israeli soldiers and security forces. John Doe IV and his family have suffered almost

routine invasions of their privacy and property damage to computers in their home.

11.     Plaintiff John Doe V is a 52 year old U.S. citizen who currently resides in Winnemucca, Nevada. His wife and three children live in Deir Debwan, a town located outside of Ramallah Palestine. On May 5, 2002 while attempting to pass through the Kalendia checkpoint near the old Jerusalem airport, John Doe V was assaulted, unlawfully detained and threatened at gunpoint by Israeli soldiers. Earlier in January 2000, John Doe V was assaulted and humiliated by an Israeli security officer at the Ben Gurion Airport in Tel Aviv. Joe Doe V travels extensively in the Occupied Territories and his family resides there.

12.     Plaintiff John Doe VI is a 31 year old U.S. citizen who currently resides in Orlando, Florida with his wife and son. While attempting to visit his sister in Amman, Jordan, John Doe VI was detained by Israeli soldiers and police at the Sheik Hussein/Allenby Crossing border point. He was held for a total of 40 days without charge and subjected to systematic torture including sensory deprivation and overload, strip searches, immobilization ("shabeth") isolation and intensive interrogation.

13.     Plaintiff John Doe VII is a 47 year old U.S. citizen. On April 26, 1999, intending to visit his parents in Maithalum, near Jenin, Palestine, John Doe VII was detained at the border by Israeli authorities, handcuffed for 14 hours in a

detention room.  Thereafter, he was transferred to the Jalameh prison outside the city of Haifa.  In all, John Doe VII was held for 36 days in two Israeli prisons where he was tortured continuously, kept in a tiny filthy cell, fed rancid food, and kept hooded.  John Doe VII was never charged and he was ultimately expelled back to Jordan.

14.     Plaintiff John Doe VIII is a 43 year old U.S. citizen currently residing in Beit Hanina, a suburb of Jerusalem,.  He has law offices in Ramallah, Palestine. In September, 1997, while residing in Ramallah with his wife and two young children, John Doe VIII and his family were forced from their home by Israeli soldiers.  John Doe VIII was assaulted and humiliated by the soldiers when he questioned why he was being removed from his home.  The soldiers remained in his home for four or five days where they fired guns from the windows. Many of John Doe VIII's possessions, including his automobile, were destroyed by Israeli soldiers.  In April 2002, Israeli soldiers entered John Doe VIII's Ramallah law office without permission and looted and ransacked its contents.

15.     Plaintiff John Doe IX is a 49 year old U.S. citizen currently residing in Ramallah, Palestine with his wife and five children. John Doe IX owns and operates a jewelry store in Ramallah. As a result of Israeli forces shelling the area, John Doe IX's business, residence and automobile have been damaged.

16.     Plaintiffs John Doe X and John Doe XI are two of several owners of a supermarket located in Ramallah. John Doe XI is a U.S. citizen; John Doe X is not. The supermarket was locked on March 29, 2002 when the Israeli army invaded Ramallah and imposed a curfew. On April 2, 2002, the Israeli army stationed several tanks outside the supermarket. One tank fired on the store and blew a large hole in the entrance. Several soldiers entered the store without permission and looted its contents, destroying several computers and taking cigarettes, food and money from a locked safe. John Doe X was assaulted by an Israeli soldier on April 11, 2002 as he was attempting to clean up the destruction left by the Israeli soldiers.

17.     Plaintiff John Doe XII is a 61 year old U.S. citizen who resides part time in Youngstown, Ohio and part time in the Al-Birch section of Ramallah, Palestine. John Doe XII with his wife and children own and reside in an apartment building in Ramallah. In July 2001, two Apache helicopters of the Israeli Defense Force fired rockets into the building – killing one guest, injuring

several others and terrorizing John Doe XII and his family. The apartment building was severely damaged, making many of the units uninhabitable.

18.     Plaintiff John Doe XIII is a U.S. citizen currently residing in East Jerusalem in the occupied West Bank of Palestine. John Doe XIII owns and operates a tire distribution company in Ramallah. On March 31, 2002, John Doe XIII's business was completely destroyed by Israeli soldiers in an Apache helicopter rocket attack.

19.     Plaintiff John Doe XIV is the father of a sixteen year old U.S. citizen Baby Doe II who resides part of the time in the Bronx, New York and part of the time in the Deir Debwan area of Ramallah, Palestine. While driving away from his father's farm in Ramallah on April 20, 2002 several Israeli soldiers fired on Baby Doe II's vehicle. Baby Doe II suffered serious injuries when a dum-dum bullet entered through his back and exited through his stomach. He remained in the hospital for three weeks. His gall bladder and 15 centimeters of his large and small intestine were removed. Baby Doe II must now wear a colostomy bag due to his injuries. John Doe XIV lives in constant pain and fear.

20.     Plaintiff John Doe XV files the action on behalf of himself and his 10 year old son, Baby Doe III. John Doe XV resides in Tulkarem, Palestine where he owns an apartment building. He also does business with his three brothers in the wholesale wheat flour and animal feed business in several stores. On May

25, 2002, 10 year old Baby Doe III was shot and seriously wounded by an Israeli soldier. When John Doe XV attempted to help his son, the soldier again opened fire on both of them. Baby Doe III is hospitalized in Nazareth, Israeli, where he is currently paralyzed. Four of John Doe XV's stores have been destroyed by Israeli tank fire.

21.   Plaintiff John Doe XVI is a 43 year old United States citizen currently residing with his wife and four children in the Israeli administered Shuffat camp near Jerusalem. John Doe XVI brings this action on behalf of himself and his family and deceased son, Baby Doe IV, who was shot in the head by Israeli soldiers indiscriminately firing into a crowd on December 8, 2000. Baby Doe IV was allowed to bleed to death in an ambulance which was detained by Israeli soldiers.

22.   Plaintiff John Doe XVII is 41 years old, a resident alien currently residing in New York City who was a victim of the 1982 massacre at the Sabra refugee camp in Southern Lebanon. John Doe XVII was shot and severely wounded by soldiers in Israeli uniforms; he also witnessed his family, friends and neighbors slaughtered at the hands of the same soldiers.

23.   Plaintiff Jane Doe I, a U.S. citizen currently residing in Birmingham, Alabama, files this action on behalf of herself and the estate of her aunt, Jill Doe II and her cousin Baby Doe V, both deceased. On April 2, 2002 Israeli

11

soldiers dynamited the door of Jill Doe II's house in Bethlehem. When the door would not open, the Israeli soldiers fired into the house through windows and doors. Jill Doe II and Baby Doe V were both shot in the head and killed.

24.     Plaintiff Jane Doe II is a 46 year old U.S. citizen currently residing in Greenville, South Carolina who files this action on behalf of herself and as next of kin for her two sisters, Jill Doe III and IV, her nephew, Charles Doe I, and her niece, Jill Doe V. While watching television on April 3rd, Jane Doe II learned that rockets fired by either an F-16 or an Apache helicopter destroyed the house where she was raised killing both of her sisters, Jill Doe III and IV, crushing the spine of Jill Doe V and severely burning the face of Charles Doe I.

## DEFENDANTS

25.     Defendant, State of Israel, whose decades long territorial expansion at the expense of plaintiffs and all other Palestinian civilian noncombatants and in violation of international law lies at the core of damages alleged in the Complaint.

26.     Defendant, Arial Sharon, former Minister of Defense and current Prime Minister of Israel, whose public statements leave no doubt that the acts committed by the Israeli military, security and police and their agents beginning in Lebanon, in the Sabra-Shatila Refugee Camps and continuing through today

in Palestine were committed with his knowledge and approval. Sharon has individual culpability and command responsibility for the actions of Israeli military, security and police personnel.

27.     Defendant, Natan Sharanski individually and in his capacity as Israeli Minister of Construction and Housing has individual culpability and command responsibility for the creation and expansion of Jewish settlements in the Occupied Territories in violation of international law and the Geneva Convention.

28.     Defendant, Binyamin Ben Eliezer individually and in his capacity as Israeli Minister of Defense has individual culpability and command responsibility for the actions of the Israeli military and security services.

29.     Defendant, Shimon Peres individually and in his capacity as Israeli Minister of Foreign Affairs has individual culpability and command responsibility for the actions of the Israeli military, security and police.

30.     Defendant, Uzi Landau individually and in his capacity as Israeli Minister of Internal Security has individual culpability and command responsibility for the actions of the Israeli military, security and police, specifically the acts of illegal detention and torture of American citizens.

31.     Defendant, Meir Sheetrit individually and as Israeli Minister of Justice has individual culpability and command responsibility for the actions of the Israeli

military, security and police, specifically the acts of illegal detention and torture of American citizens.

32.     Defendant, The Israeli General Security Service (the "Shin Bet") is the Israeli counter –intelligence and internal security service whose Arab Affairs Department is responsible for antiterrorist operations, political subversion and maintenance of an index of Arab terrorists. The Shin Bet's interrogation tactics have long been criticized by respected international organizations as torture that violates the Geneva Convention.

33.     Defendant, Avi Dichter, is the head of the Shin Bet and has individual culpability and command responsibility for the actions of Shin Bet personnel.

34.     Defendant, Israeli Defense Forces (IDF) is the Israeli military responsible for, among other things, the occupation of Palestine and the expansion of Jewish settlements into the Occupied Territory.

35.     Defendant, Lt. General Shaul Mofaz individually and as Chief of the General Staff has individual culpability and command responsibility for the actions of the Israeli Defense Forces (IDF) personnel.

36.     Defendant, Major General Amos Gilad individually and as the IDF Coordinator of Government Activities in Judea, Samaria and the Gaza Strip has individual culpability and command responsibility for the actions of IDF personnel particularly those actions in the Occupied Territories.

37.     Defendant, Major General Aharon Ze'evi Farkash individually and as IDF
Director of Military Intelligence has individual culpability and command
responsibility for the actions of IDF personnel.

38.     Defendant, Amos Yaron individually and as Secretary General of the
Defense Ministry and as former Brigadier General and Commandant of IDF
forces in Beirut has individual culpability and command responsibility for the
actions of IDF and other military personnel in Beirut and in Palestine.

39.     Defendant, George W. Bush, is sued as President of the United States and
in his individual capacity.  George W. Bush has failed to fulfill his statutory
responsibilities under the Arms Export Control Act and the Foreign Assistance
Act by refusing, in the face of overwhelming evidence, to make a written report
to Congress that arms supplied by the United States to Israel have been used by
Israel to attack and impose collective punishment on Palestinian civilian, non-
combatants, many of whom are American citizens.  George W. Bush has
continued to provide Israel weapons, training and other military support to carry
out its goal of territorial expansion through a program of killing, torture, terror
and outright theft.

40.     Defendant Colin Powell, Secretary of State of the United States, is sued in
his official and individual capacities.  Colin Powell has failed to fulfill his
statutory responsibilities of monitoring and reporting any misuse of arms

provided to foreign states by the United States. Colin Powell continues to provide Israel weapons, training and other military support to carry out its goal of territorial expansion through a program of killing, torture, terror and outright theft.

41.    Defendant, Bell Helicopter, a subsidiary of defendant Textron, is a U.S. corporation with headquarters in Forth Worth, Texas.

42.    Defendant, Textron is also a U.S. corporation with headquarters in Providence, Rhode Island.

43.    Defendant, Lewis B. Campbell is the Chairman and Chief Executive Officer of Textron and in that capacity responsible for the company's compliance with international and U.S. law.

44.    Defendant, John R. Murphy is Chairman and Chief Executive Officer of Bell Helicopter and Defendant Glen E. Hess is President and Chief Operating Officer of Bell Helicopter and in their respective capacities they are responsible for the company's compliance with international and U.S. law.

45.    Defendants, Textron and Bell Helicopter have sold complex weapons systems, specifically Huey Cobra helicopter gun-ships to the State of Israel when they knew or should have known that such weapons systems were being used by Israel routinely to kill, terrorize and punish Palestinian civilian, non-combatants, many of whom are American citizens.

46.     Defendants, Textron and Bell Helicopter have modified their weapons systems to provide Israel with greater urban assault capabilities.

47.     Defendants Textron and Bell Helicopter have provided Israel and particularly the IDF training in the use of its weapons systems.

48.     In deliberate disregard of the injury to Plaintiffs and all other Palestinian civilians, defendants actively participated in Israel's illegal use of the Huey Cobra helicopter and other weapons by modifying their weapons system and training Israel personnel. Defendants took their profits from such activities and did not question the illegal uses to which their weapon system would be put.

49.     Defendants, Boeing Company McDonnell Douglas Helicopter Systems is a U.S. corporation with headquarters in Mesa, Arizona.

50.     Defendant, Phillip Condit is Chief Executive Officer of Boeing and Glen E. Hess is former Vice President of Boeing and in those capacities are responsible for the company's compliance with international and U.S. law.

51.     Defendant, Boeing/McDonnell Douglas Helicopter Systems has since 1990 sold dozens of AH-64 Apache helicopters to Israel. In 1990, Boeing sold 18 Apache helicopters to Israel for an estimated 285 million dollars.

52.     In 1992, 24 additional Apache helicopters were transferred to Israel from surplus Army stock.

53.   In February 2001, eight AH-64 and 10 Longbow Apache helicopters were sold to Israel for an estimated 509 million dollars.

54.   The AH-64 Apache helicopter is a tandem seat, twin engine, fully integrated, anti-armor weapon system with night attack capabilities. The Apache is armed with AGM-114 Hellfire anti-tank missiles, Hydra 70 rockets, and a 30 mm chain gun.

55.   The Longbow is an upgraded Apache with a fire control system and Hellfire missiles with radio frequency seekers.

56.   Defendant, Boeing has sold the Apache helicopter weapons system to Israel knowing that it is used extensively against the civilian noncombatant Palestinian population, many of whom are American citizens.

57.   Boeing has modified its Apache helicopter to provide Israel with greater urban assault capabilities.

58.   Boeing has provided training to IDF personnel in the use of its weapons systems; specifically, the Apache helicopter.

59.   In deliberate disregard of the injuries to Plaintiffs and all other Palestinian civilians, Boeing actively participated in Israel's illegal use of the Apache helicopter by modifying their weapons system and training Israeli personnel in their use.

60.    Defendant, Boeing has taken millions of dollars in profit without questioning the illegal uses to which its weapon system would be put.

61.    Colt's Manufacturing Company, Inc. is a U.S. corporation with headquarters in Hartford, Connecticut.

62.    Lt. General (Ret.) William M. Keys is the President and CEO of Colt's Manufacturing Company and in that capacity is responsible for the company's compliance with international and U.S. law.

63.    Colt has sold to Israel thousands of Colt M203 Grenade Launchers with the knowledge that the weapon and other weapons would be used against a civilian, noncombatant Palestinian population, many of whom are American citizens targeted solely by their ethnicity.

64.    The Colt M203 Grenade Launcher is a lightweight single shot breech loaded 40 mm weapon designed especially for attachment to the M16A2 Rifle, also manufactured by Colt.

65.    Although the M203 Grenade Launcher is designed to use non-lethal projectile ammunition, Colt has modified its weapon to provide Israel with a weapon that can fire lethal grenades and other ammunition.

66.    Colt has provided training to Israeli military, security and police personnel in the use of its M203 Grenade Launcher and other weapons.

67.   In deliberate disregard of the injury to Plaintiffs and all other Palestinian civilians, defendant Colt has actively participated in Israel's illegal use of the M203 Grenade Launcher and other weapons by modifying their weapons and training Israeli personnel in their use.

68.   Colt has profited from sales of this weapon without questioning the illegal uses to which it would be put.

69.   Defendant, Halamish Neve Tzuf Settlement ("Settlement") is a Jewish settlement illegally established in Palestine by the Israeli government in 1978. The Settlement has continuously expanded its borders and through violence, threats of violence, coercion, extortion and outright theft, has confiscated land owned by John Doe II and his family. The Settlement, through defendant Neve Tzuf Foundation ("Foundation") actively solicits funds in the United States, specifically earmarked for materials that are used in the illegal terrorizing of the neighboring property owners and the confiscation of their land. The Settlement and Foundation are members of a civil conspiracy and racketeering enterprise which effects foreign and interstate commerce.

70.   Defendant, Joav Merrick is the Chairman of the Neve Tzuf Foundation and is a coconspirator in the illegal acts of the enterprise.

71.   Defendant, Christ Lutheran Church is located in Jacksonville, Florida. The Church has 'adopted' the Settlement and has knowingly provided funds

20

specifically earmarked for materials that are used by the Settlement to illegally terrorize neighboring property owners and confiscate their land and is a coconspirator in the illegal acts of the enterprise.

72.     Defendant, Central Fund for Israel located in New York, New York, and its Director defendant Jay Marcus have knowingly provided funds specifically earmarked for materials that are used by the Settlement to illegally terrorize neighboring property owners and confiscate their land and are coconspirators in the illegal acts of the enterprise.

73.     Defendant, One Israel Fund, located in New York, New York, and its Director Ruth Kohn have knowingly provided funds specifically earmarked for materials that are used by the Settlement to illegally terrorize neighboring property owners and confiscate their land and are coconspirators in the illegal acts of the enterprise.

74.     Defendant, Congregation Rinat Yisrael, located in Teaneck, New Jersey and its leaders, defendants Rabbi Yosef Adler and President Arnon Hiller have knowingly provided funds specifically earmarked for materials that are used by the Settlement to illegally terrorize neighboring property owners and confiscate their land and are coconspirators in the illegal acts of the enterprise.

75.     Plaintiffs are ignorant of the true names and capacities of the Defendants sued herein as Moes 1-100 and Plaintiffs sue these Defendants by such

fictitious names and capacities. Plaintiffs will amend this Complaint to allege the Moes true names and capacities when ascertained. Plaintiffs are informed and believe, and on that basis allege, that each fictitiously named Defendant is responsible in some manner for the actions herein alleged and that Plaintiffs' injuries were proximately caused by the conduct of such Defendants.

## STATEMENT OF FACTS
## OVERVIEW

76.     Israel is a terrorist state. Israel provides material support to Jewish settlements which can only be described as non or quasi governmental terrorist organizations.

77.     For decades, Israel has engaged in the systematic and routine extra-judicial killing, torture and collective punishment of American citizen, noncombatants living in Palestine, singled out because of their ethnicity.

78.     For decades, Israel has engaged in directly and aided and abetted the systematic and continuous confiscation of private property belonging to American citizens in Palestine, based solely on the true owner's ethnicity.

79.     For decades, Israel has used offensive military weapons such as tanks, Apache helicopters, rockets and missiles against a civilian, non-combatant population, thousands of whom are American citizens, based on the population's ethnicity.

22

80.    For decades, the United States government has been complicit in and indeed has underwritten with taxpayer funds, Israel's torture, killing and maiming of civilian, non-combatant American citizens in Palestine.

81.    For decades, the United States government, on the ground in Israel and in Washington D.C., has turned a blind eye to the outrages perpetrated by Israel and its agents against American citizens because the victims were of Palestinian descent. No country in the world other than Israel has been or would be allowed to torture and kill American citizens with impunity.

82.    For decades, multinational arms manufacturers, many headquartered in the United States, have provided Israel weapons which were designed for urban assault and which the manufacturers knew or reasonably should have known were being used in offensive actions against civilian populations, many of whom are American citizens, in violation of international and U.S. law.

83.    For decades, Israel has fostered and encouraged the development of Israeli settlements on Palestinian land confiscated in violation of international law.

84.    For decades, Israel has provided material support to Israeli settlements engaged in violent, terrorist acts against surrounding Palestinian landowners.

85.    For decades, United States religious and charitable organizations have provided material support for the terrorist activity of Israeli settlements.

86.     All of these entities have participated in and facilitated the acts which have injured the plaintiffs and countless other Palestinians. All of the entities have engaged in a common enterprise to kill, maim, and torture Palestinians and Palestinian-Americans, based solely on their ethnicity.

87.     The Plaintiffs are a cross-section of those who have suffered a wide range of victimization and violation, solely because of their ethnicity. Some have been killed, or have witnessed their loved ones die before their eyes; some have lost their children; some have been gravely, permanently injured, or have witnessed the same fate befall their families; some have lost their personal property, their homes, or their automobiles; some have lost their businesses and their life's work and investment; some have lost their land and their olive trees; still others, especially the many children involved in the incident actions, have lost forever their innocence and emotional well-being.

88.     By current estimates, tens of thousands of American citizens presently reside in the West Bank, with a particular concentration in the cities of Ramallah and Nablus. Many Palestinian-American families returned to the West Bank in the wake of the Oslo process of 1993 to establish businesses, re-unite with their families, continue their education, and a variety of other reasons. These families were often coming out of the experience of twenty years or more of residency in the United States. They pursued their university

education and professional training at American institutions, married here, and their children were often born on U.S. soil.

89.   They are Americans in every sense of the word: citizenship, family ties, property owners. Yet the unfinished business of Palestine—its halting progress towards statehood and autonomy, its refugee culture of dislocation—remains in the hearts and on the minds of every Palestinian-American.

90.   When a kind of détente settled in between the Israelis and the Palestinians in the mid-1990's, the temptation to return and create a new Palestinian business and market culture was very strong among these many immigrants. Based on their experiences in America—where they learned English, worked in all manner of jobs from dishwashers to investment bankers, started their own businesses and thrived—the impulse to bring this American style and know-how back to what then appeared to be a nascent country-in-the-making, seemed only to hold great promise.

91.   Yet many of these Palestinian-Americans have suffered total and cataclysmic loss due to the recent direct and indirect actions of the Israeli government, the IDF, groups of illegal settlers, and even the government of the United States. They have been wrongfully detained and imprisoned; they have been arbitrarily subjected to interrogation and intimidation; they have been beaten; they have been shot; they have been killed. Their businesses have been

destroyed by tanks and helicopters in a capricious, cynical strategy employed by the IDF for no discernible military or security objective, but rather simply to terrorize, to intimidate and to destroy the fabric of stable civilian life. Their property has likewise been destroyed or confiscated by the Israeli military. Their homes and apartments have been confiscated at gunpoint by Israeli soldiers for use as bivouacs and sniper-posts, then left ruined in their wake.

92.     In all this, as a matter of law, policy and practice, these Americans have been left unprotected by any mechanism of Israeli civil law, as residents of the occupied territories. Any claim against Israel or its military, security and police forces is met with an "act of war" immunity precluding redress of even the most egregious violations of international and U.S. law. In addition, their own quasi-governmental institutions of the Palestinian Authority have been destroyed by Israeli military actions, including courts, police infrastructure, and governmental ministerial offices. There is no public means by which those injured might redress their wrongs or get a fair hearing. Indeed, much of the recent Israeli military campaign in the occupied territories was deliberately directed at destroying those aspects of Palestinian civil polity that might have provided justice to the Plaintiffs.

## THE ISRAELI TERRITORIAL IMPERATIVE:
## JEWISH SETTLEMENTS IN THE OCCUPIED TERRITORY

93.     The specter of a rampaging army bent on terror, humiliation, looting, and

cold-blooded murder of men, women and children recalls the darker eras of

European history, when inter-communal violence and the absence of modern

states to regulate it was the norm.  Or alternatively, such an image recalls the

spasms of inter-tribal ethnic hatreds in present-day central Africa.  But in this

case such actions instead describe those of a modern, enlightened, "democratic"

state like Israel, which enjoys the international prestige of its cultural

achievement in the arts and sciences, its long-term membership in the United

Nations, and its status as the most favored ally of the United States.

94.     To better understand Israel's otherwise puzzling motivation—as it ignites

and ignores international opprobrium in its pursuit of ever-elusive "security"

goals while brutally occupying as an invader the West Bank and Gaza—one

need look no further than the tragic, misguided and illegal policy of settling

hundreds of thousands of Israeli citizens in hundreds of fortified hamlets since

1967 throughout the Occupied Territories.

95.     Virtually all of Israel's perceived security threats today, and the brutal,

illegal means to which that state will go to combat them, can be traced to

27

Israel's efforts to protect settlements, extend their boundaries, and effectively annex the lands on which settlers live.

96.     The Israeli campaign of terror against the Palestinians under occupation is only explicable as a campaign of territorial expansion. In this regard, Israel's continuing illegal occupation and the ever-escalating war to extend it can be viewed alongside every other war of ethnic cleansing, including Serbian efforts in the Balkans, the Hutu attempts to drive Tutsis from their midst in Rwanda, the Turks in Armenia, and other similar events of the not-so-distant past.

97.     Israel's intent—to remove Palestinians from their lands by means of terror, violence and oppression, driving them into "refugee" camps or neighboring states such as Jordan, Syria or Lebanon, while settling its population on the land as a precursor to annexation—is fundamentally the same.

98.     Although mythologized in popular culture, the thirty year history of the settlements in the Occupied Territories has evolved amid violence, illegality and terror from the very beginning.   Acts of violence by settlers against local Arabs are recorded as early as 1970, and by the end of that decade, the influence of messianic, extremist Orthodox religious groups connected to communities in the United States had risen to the forefront of the settler campaign, and would increasingly come to shape its ideology and tactics.

99.   Today, there are more than 400,000 Israelis settled in more than 200

"purposely built towns, suburbs and villages" in the Occupied Territories, with

approximately 200,650 settlers residing in 145 settlements in the West Bank

alone, exclusive of East Jerusalem.

100.  The settlement campaign in the Occupied Territories is illegal by several

established standards of international law, including the Fourth Geneva

Convention and its prohibitions against an occupying force displacing the

occupied population from its land, or acting to permanently change the

occupied land by force of occupation.

101.  Official U.S. government opposition to the settlements has been clear at least

since the administration of President Jimmy Carter and the Camp David summit

talks in the 1970's; indeed, President Ronald Reagan identified settlements and

settlers as key in 1981, stating that "the immediate adoption of a settlement

freeze by Israel, more than any other action, could create the confidence

needed." Ten years later, President George Bush's administration re-iterated

this centrality when Secretary of State James A. Baker III said on 22 May 1991:

> Every time I have gone to Israel in connection with the peace
> process, on each of my four trips, I have been met with the
> announcement of new settlement activity.  This does violate
> United States policy.  It's the first thing the Arabs—Arab
> governments, the first thing that the Palestinians in the
> territories—whose situation is really quite desperate—the first
> thing they raise when we talk to them.  I don't think there is any

bigger obstacle to peace than the settlement activity that continues not only unabated but at an enhanced pace.

102. B'Tselem, the Israeli human rights organization, writes,

> Violence by settlers and other Israeli civilians against Palestinians has occurred in the Occupied Territories practically since the occupation began. Major acts of violence that occurred prior to the first intifada include the attempted assassination of three West Bank mayors in 1980, the raid on the Islamic College in Hebron in July 1983, in which three students were killed and many others wounded, and the "Jewish Underground," which planned to bomb a number of Arab buses, and was apprehended by the General Security Service in 1984.

103. Since the first intifada in 1987, settlers have killed at least 119 Palestinians, of whom twenty-three were under the age of eighteen. Hundreds of Palestinians have been wounded by settlers, and countless incidents of destruction of property have been reported—house burnings, destruction of crops, razing of orchards, looting of Palestinian-owned shops and businesses, destruction of cars and other vehicles, and perhaps most seriously, various attacks on mosques and study centers, ranging from vandalism and spray-painting of offensive slogans to the deadly attack by Kiriat Arba settler Baruch Goldstein on worshippers at the Ibrahimi Mosque in Hebron in 1994, which killed twenty-nine Palestinians as they prayed.

104. Since the 1980's settlers have become increasingly militarized as a force, and a large part of the settler population carries weapons given them by the

Israeli Defense Force. The armed settlers fall into three broad categories. Chief among them are army regional defense units, organized by the IDF as a reservist army in the Occupied Territories. These units theoretically operate with IDF oversight, though reservists with IDF-issued weapons have been known to take part often in violence or acts of intimidation (roadblocks, land confiscations, provocative parades), when not on actual reserve duty.

105. The second force consists of the settlements' own security forces—each settlement maintains a coordinator of security and a security office where ammunition and weapons, provided by the IDF, are stored for use by the settlement's residents. Though the security coordinator, in theory, reports to IDF commanders and is not authorized to initiate any actions outside the perimeter of his or her settlement, numerous acts have been recorded in which armed settlers have made forays with their weapons into Palestinian areas outside the settlements proper.

106. Last, a third group of armed civilians active in the Occupied Territory includes IDF reservists not on active duty and not part of the regional defense units who reside in the Territories, and have permission to carry their weapons at all times. In addition, under current Israeli civil statutes, any citizen residing or working permanently in the Territories may apply for a pistol permit from the Ministry of the Interior.

31

107.  Killings are only the ultimate form of settler violence, and must be considered within the context of the general campaign of terror that surrounds them. The Israeli Attorney General's office has identified three general areas of settler violence, in an investigative report it commissioned on the lack of prosecutions of settlers in the Occupied Territories:

> gunfire and stone-throwing intended to cause bodily harm;

> rioting in Palestinian communities, including breaking windows, damaging motor vehicles, overturning stands in the market, and the like;

> blocking roads and initiating disturbances on roadways and intersections.

108.  To these categories must be added assaults on individual houses, calculated to make the occupants move away; assaults on farms and agricultural projects, including destruction of orchards, irrigation systems, killing of livestock; and confiscation of land by settlers to create "security zones" around their settlements, then patrolled by armed settlers to intimidate the rightful owners from returning.

109.  Israel's illegal territorial expansion has not only been aided and abetted by decades of government subsidies and policy, it has been materially supported by groups here in the United States.

110.  The settlement that took Plaintiff John Doe II's land, Halamish/Neve Tzuf, is supported financially by various groups located in the United States, including Christ Lutheran Church, of Jacksonville, Florida, and the Jerusalem USA Assistance Fund of Charleston, South Carolina.   In addition, American Jewish organizations send money to Halamish/Neve Tzuf, including Congregation Rinat Yisrael of Teaneck, New Jersey; the One Israel Fund of New York, New York; and the Central Fund for Israel, also of New York, New York.   All of these groups are tax-exempt charitable organizations doing business under §§501(a) and (c) of the Internal Revenue Code.

111.  In their various on-line presences, and corroborated in the website of Neve Tzuf itself, these are not merely general contributions of funds, but rather are earmarked specifically for various military purposes, including dozens of bullet proof vests and body armor, night-vision goggles, armored jeeps and ambulances, floodlights, ballistic helmets, communications equipment, gun cabinets, generators, and even security fence repairs.

112.  All of these materials have been used to terrorize Palestinians such as John Doe II and drive them from their land.

113.  The descriptions that follow of Israeli occupation of Palestine, its use of killing, torture and terror against a civilian population; its purposeful attempts to extinguish refugee Palestinians at the Sabra/Shatila camps all must be viewed

through the prism of the economic and political imperative of territorial expansion by Israel. Although fueled by Zionist, ultra-nationalist political rhetoric, the motivation for Israel's unending quest for evermore Palestinian land is economic at its core. Like most other racketeering enterprises, Israel seeks to dominate its market area through force and violence and has thereby driven off or destroyed any nascent Palestinian economic competitor.

## ETHNIC CLEANSING OF PALESTINIAN POPULATION: THE MASSACRE AT SABRA AND SHATILA REFUGEE CAMPS

114. As more fully developed in the affidavit of Stanley L. Cohen and its appendix of statements by witnesses to the events of September 16-18, 1982, all of which are incorporated into this complaint, the following is a brief summary of the massacre at Sabra/Shatila.

115. On June 6,1982, the Israeli army invaded Lebanon, in reaction to the attempted assassination of the Israeli ambassador Argov in London on the 4th of June. On the same day, the Israeli secret services attributed the attempted assassination to a dissident Palestinian organization commandeered by the Iraqi government, which was then concerned with deflecting attention from its recent setback in the Iran-Iraq war. The long-prepared Israeli operation was christened "Peace in the Galilee".

116. After having occupied the south of the country and destroying Palestinian and Lebanese residences there, simultaneously committing a series of violations against the civilian population, the Israeli troops, under orders prepared months earlier by Defense Minister Ariel Sharon, penetrated as far as Beirut, and by June 18,1982 they had surrounded the Palestine Liberation Organization's armed forces in the west side of the town.

117. According to Lebanese statistics, the Israeli offensive, particularly the intensive shelling against Beirut, caused 18,000 deaths and 30,000 injuries, mostly among civilians.

118. After two months of fighting, a ceasefire was negotiated through the intermediary of United States Envoy Philip Habib. It was agreed that the PLO would evacuate Beirut, under the supervision of a multinational force deployed in the evacuated part of the town.

119. The Habib Accords envisaged that West Beirut would subsequently be invested by the Lebanese army, and the Palestinian leadership were given American guarantees for the security of civilians in the camps after their departure. The evacuation of the PLO ended on September 1,1982.

120. On September 10,1982, the multinational forces left Beirut. The next day, Mr. Sharon --uttering the all too familiar refrain which today continues to be his call to arms --announced that "2,000 terrorists" had remained inside the

Palestinian refugee camps around Beirut. On Wednesday September 15, after the previous day's assassination of Phalangist President-elect Basher Gemayel, the Israeli army occupied West Beirut, "surrounding and sealing" the camps of Sabra and Shatila, which were inhabited by an entirely civilian Lebanese and Palestinian population, the entirety of armed resistors (more than 14,000 people) having evacuated Beirut and its suburbs.

121.    The intention to send the Phalangist forces into West Beirut had already been announced by Mr. Sharon on July 9,1982 and in his biography he confirms having negotiated the operation during his meeting with Bikfaya.

122.    According to Ariel Sharon's declarations in the Knesset on September 22,1982, the entry of the Phalangists into the refugee camps of Beirut was decided on Wednesday September 15,1982. Also according to General Sharon, the Israeli commandant had received the following instruction: "The Tsaha forces are forbidden to enter the refugee camps. The "mopping-up" of the camps will be carried out by the Phalanges or the Lebanese army." Having been advised by Sharon that the Phalanges were preparing to enter the camps, his chief of staff Lt. General Rafael Eitan responded "They're thirsty for revenge. There could be torrents of blood." Yet Sharon ignored this and subsequent warnings, clearly preferring that Israel's allies clean out the camps.

123. From dawn on September 15, 1982, Israeli fighter-bombers were flying low over West Beirut and Israeli troops had secured their entry. From 9am, General Sharon was present to personally direct the Israeli penetration, installing himself in the general army area at the Kuwait embassy junction situated at the edge of Shatila. From the roof of this six-story building, it was possible to clearly observe the town and the camps of Sabra and Shatila.

124. From midday, the camps of Sabra and Shatila - in reality a single zone of refugee camps in the south of West Beirut - were surrounded by Israeli tanks and soldiers, who had installed checkpoints all around the camps permitting the surveillance of the entrances and exits. During the late afternoon and evening, the camps were bombarded with shells.

125. By Thursday September 16,1982, the Israeli army controlled West Beirut. In a release, the military spokesperson declared, "Tsahal controls all the strategic points of Beirut. The refugee camps, including the concentrations of terrorists, are surrounded and closed." In the morning of September 16, the following order was issued by the army high command: "The searching and mopping up of the camps will be done by the Phalangists/Lebanese army."

126. During the morning, shells were fired down towards the camps from high locations and Israeli snipers were shooting down at people in the streets. At about midday, the Israeli military command under the direct control of Defense

Minister Sharon and commanded by General Amos Yaron, field commander for

West Beirut, in concert with forces under the command of Major Sa'ad Haddad,

the commander of Christian forces in Lebanon, gave the Phalangist militia a

green light to enter the refugee camps. As evening fell, the IDF forces allowed a

unit of approximately 150 heavily armed Phalangists to pass through their lines

and to enter the camps from the south and southwest- while the IDF provided

air and ground support--all of this battle preparation for the camps thousands of

unarmed inhabitants.

127.   At that point, General Drori telephoned Ariel Sharon and announced, "Our

friends are advancing into the camps. We have coordinated their entry." Sharon

replied, "Congratulations! Our friends' operation is approved."

128.   For the next 40 hours inside the surrounded and sealed camps, the Phalangist

militia raped, killed and injured a large number of unarmed civilians, mostly

children, women and old people. These actions were accompanied or followed

by systematic roundups, backed or reinforced by the Israeli army, resulting in

dozens of disappearances.

129.   Throughout the course of the massacre the Israeli army knew perfectly well

what was going on in the camps as its leaders were in constant contact with the

militia leaders. As noted, the IDF not only took up positions surrounding the

two neighboring camps thereby preventing civilians from escaping a certain

38

death, but ensured that the dark alleys and streets of the crowded refugee camps remained illuminated throughout the night of the attack by shooting flares into the sky from helicopters and mortars. General Yaron's command staff, having been informed of the killings while they were in progress, even allowed the Phalange to re-enter the camps with a bulldozer, presumably to dispose of the mass of corpses.  No resistance was ever made by the camp's inhabitants; indeed, the PLO had long since retreated from the area, and there were no weapons found among the residents.

130.  During the long night and part of a day, Phalangists had separated the men left in the camp and summarily executed many of them against walls; others were taken to a nearby sports stadium and kept in "cells" for interrogation by Shin Bet and militia men, or simply executed.  But the bodies of murdered women, children and the elderly provided the images that seared people's minds with the horror of mass murder.

131.  The massacre of between 700 (the official Israeli figure) and 3,500 (notably in the inquiry launched by the Israeli journalist Kapeliouk) shocked the world in its savage barbarity, as millions of people saw televised images of the carnage. The camps themselves were already devastated by weeks of fighting, and were a "scarcely inhabitable" ruin of huts to which many homeless Palestinians had returned over the summer out of desperation. The exact figure will never be

determined because in addition to the approximately 1,000 people who were buried in communal graves or in the cemeteries of Beirut by members of their families, a large number of corpses were buried under bulldozed buildings by the militia themselves. Also, particularly on the 17th and 18th of September, hundreds of people were carried away alive in trucks towards unknown destinations, never to return.

132.   On September 19,1982 the United Nations Security Council condemned the massacre with Resolution 521. This condemnation was followed by a General Assembly resolution on December 16, 1982 qualifying the massacre as an "act of genocide."

133.   After 400,000 people took to the streets in protest over the massacre, the Israeli parliament (Knesset) named a commission of inquiry presided over by Mr. Yitzhak Kahan in September 1983. Israel's role in the massacre has never been in doubt, and was demonstrated by abundant evidence at the Kahan Commission when the Israeli judiciary examined the IDF's complicity in the atrocities at Sabra and Shatila.

134.   In spite of the limitations of the Kahan commission's mandate (it was a political and not a judicial mandate) and the total absence of the voices and demands of the victims, the Commission concluded that the Minster of Defense, Ariel Sharon was personally responsible for the massacre at Sabra and Shatila.

Upon the insistence of the Commission, Mr. Sharon resigned from his post of Minister of Defense.

## OPERATION DEFENSIVE SHIELD

135.   The present uprising has been popularly called "the Al Aqsa Intifada," in reference to the mosque that sits atop the Temple Mount in the old city of Jerusalem, and is the center of Islamic life for Palestinians, and one of the holiest shrines in the Muslim world. On 29 September 2000, during his campaign for the Prime Minister, candidate General Ariel Sharon, in what many have described as a grand political gesture, visited the sanctuary of the mosque, accompanied by more than 1,000 Israeli armed security police.  The preceding weeks had been tense, and the gesture was taken by the Palestinian community to be a clear act of intimidation and a violation of their religion, thus sparking riots and the present spiral of violence.

136.   In the last days of March of this year, the Israeli Defense Forces (IDF), under the command, orders and direction of their Prime Minister, General Ariel Sharon, launched "Operation Defensive Shield."  This operation took the form of a multiple-pronged military assault on the Palestinian cities of the West Bank—Ramallah, Nablus, Jenin, Bethlehem, Tulkarm and Qalqilya—and

incursions of armored divisions for containment and control of all roads and rural and agricultural areas.

137.   The operation continued throughout the month of April and concluded after approximately seven weeks, with partial or complete withdrawals from select urban areas, while further re-deployment to other areas was carried out.  After some three weeks of slightly decreased tensions, the Israeli Defense Forces renewed operations and re-invaded most of these areas on June 19th purportedly in retaliation for several bombing attacks in Jerusalem and elsewhere.

138.   On June 21st the Israeli cabinet announced a plan "for all-out seizure of the West Bank," and began implementing a new full-scale deployment immediately, sending columns of armor and thousands of troops into seven out of eight West Bank urban areas.

139.   During the re-invasion on the night of the 21st of June, ten Palestinian civilian non-combatants were killed by IDF troops, including three children in the marketplace of Jenin, where Israeli tanks opened fire on a crowd of shoppers attempting to buy food during what they thought was a break in the 'round-the-clock military curfew.  In a rare admission of guilt, an IDF spokesperson said the army had made a mistake.

140.   Then, on June 27th in operations in Qalqiliya, IDF forces fired on school children again after a curfew break had been arranged so that students could

take final exams. Israel admitted for the second time in a week that its forces had "acted improperly;" as a result, three children were wounded, one with brain damage.

141. The government vows to take all Palestinian lands and institute total closure until all armed resistance stops.

142. Simultaneously, the government of Ariel Sharon has announced the commencement of a vast construction project to build a security fence, which may eventually stretch to some 1,400 miles around Palestinian areas, despite the absence of any final-status negotiations on what may legally constitute that border.

143. Finally, Israel appears to be in the final stages of implementing a policy of mass deportations, as the IDF's highest legal counsel formulates a theory by means of which Israel can justify forcibly relocating thousands of Palestinians from the West Bank to Gaza.

144. These latest operations, while only the most recent phase in thirty-five years of occupation, have heralded a quantum increase in the level of Israeli violence, illegality, and wholesale violation of human rights against a subjugated population.

145. The widespread, continuing use of indiscriminate military force against civilians, the use of comprehensive and systematic collective punishment

against an occupied civilian population, the use of its military for extra-judicial

assassinations of political and militant Palestinian activists, and the deliberate

rampant destruction of economic, social and political viability—all place the

state of Israel in clear violation of many international standards and covenants

of legal behavior to which Israel is a signatory, including the United Nations

Charter, the Fourth Geneva Convention of 1949, and the Hague Regulations of

1907.

146.   For many years, Israel has been declared a gross violator of the human rights

of those millions of Palestinians subject to occupation by such august

monitoring and research bodies as: the United Nations High Commission on

Human Rights, Amnesty International, Human Rights Watch, the Palestine

Human Rights Monitoring Group, the International Committee of the Red

Cross, B'Tselem, and the United States Department of State.

147.   In many of the recent operations undertaken by Israel in the Occupied

Territories, the IDF has acted as though the main aim was to punish all

Palestinians. Actions have been taken by the IDF which have had no clear or

obvious military necessity; many of these, such as unlawful killings, destruction

of property and arbitrary detention, and torture and ill-treatment, violate

international human rights and humanitarian law.

44

148. The IDF has continually instituted closures and strict curfews in most Palestinian cities, and has killed and wounded unarmed Palestinians. But they also have killed and targeted medical personnel and journalists, and have fired randomly at houses and people in the streets.

149. Mass arbitrary arrests have been carried out in a manner designed to degrade those detained, and even individual encounters by Palestinian-Americans with the IDF in both Israel and the Occupied Territories are characterized by this impulse to humiliate.

150. While precise casualty figures will not be known for some time, it is estimated that at least six hundred, and perhaps as many as one thousand Palestinian civilians have been killed, with as many as four thousand injured or seriously wounded in the six weeks of military operations conducted in the Defensive Shield campaign.

### Systematic Economic Devastation

151. Physical damage in the cities of the West Bank from the IDF invasion is currently estimated by international donors—including the World Bank, the United States Agency for International Development, the European Union and the United Nations—at $361 million. This figure extends the already substantial physical damage estimates of $305 million resulting from the

seventeen months of conflict preceding Operation Defensive Shield, a period now referred to as "the second intifada," or uprising.

152. United Nations and European Union sources have recently estimated economic losses since September 2000 in the billions of dollars.

153. Since the beginning of the current intifada, the occupied territories of the West Bank and Gaza have been under near constant closure—a practice by which the Israeli government cuts off access to areas by means of controlling all the roads, blocking all external trade and economic activity.

154. Access to food, fuel, trade goods and supplies are widely disrupted across entire areas as the Israeli Defense Forces pursue their perceived security imperatives in the occupied territories: securing the highways against all traffic, protecting the illegal settlements and their closed system of settler-only roads, and controlling the high ground of the terrain.

155. In most cases, only goods and material that originate from Israeli manufacturers are allowed to pass into the controlled areas—food, gasoline, supplies and equipment—with substantial added tariffs and costs, thus making the Palestinian residents of the occupied areas de facto economic captives of their occupiers.

156. Thousands of Palestinian businesses founded and developed in the calmer, more hopeful days of the Oslo peace process have withered and died in the twenty months since September, 2000.

157. Markets cannot get goods cheaply, mechanics cannot buy parts, medical clinics cannot get equipment, laborers are not free to travel for work from one part of the West Bank to another. Tractor-trailers full of perishables lose entire loads while waiting in the sun at checkpoints that take days before clearance is denied; restaurants cannot dependably get supplies, construction companies cannot purchase materials. Water tankers, delivering drinking water to outlying towns cut off from the network, are unable to enter closed areas.

158. Unemployment in the West Bank has been estimated between sixty and seventy percent.

159. All movement of Palestinians, has been tightly controlled by means of a type of pass system, whereby a citizen from the Ramallah area may not travel to East Jerusalem, nor to Nablus, without special authorization from the Israeli military. In many respects, the IDF system for population control now in place resembles most closely the Bantu/pass system employed by white South Africa to control the movements of blacks and Asians within the country.

160. The Palestinian economy is almost entirely dependent on its foreign trade. In the economy in the Occupied Territories, foreign trade comprises 80.4 percent

of GDP, whereas that figure is 22.4 percent in Egypt, 60 percent in Syria, and 52.4 percent in Israel. Furthermore, the Palestinian economy is more dependent than any other economy on imports, which comprise 58.4 percent of Gross Domestic Product, compared to 17.2 percent in Egypt, 32.6 in Syria, and 30.6 percent in Israel. Of all imports into the Occupied Territories, an enormous segment - some two-thirds - are raw materials and industrial inputs.

161.   The economy in the Occupied Territories is similarly dependent on access to the Israeli economy—its jobs, its ports, its roads and its markets. Some 80 percent of the foreign trade of the Occupied Territories takes place with Israel, whereas only 2.4 percent is with Jordan and one percent with Egypt.   It should be noted that though the West Bank shares a nominal boundary with Jordan, as Gaza does with Egypt, neither of these borders are accessible to the Palestinian residents therein, and indeed, Israel continues to maintain wide security buffer zones that cut off the Occupied Territories from their foreign neighbors, "containing" them within Israel's greater security perimeter.

162.   Also, the Occupied Territories' foreign trade with the rest of the world, some 17 percent, is almost entirely handled via the Israeli container ports of Haifa and Ashdod, with attendant fees, duties and tariffs which all make Palestinian goods less competitive in the global marketplace.

163.   During the current intifada, the dependence on transportation of goods from Israel to the Gaza Strip and to the West Bank has resulted in a severe shortage of raw materials and industrial goods, which has paralyzed many businesses and factories throughout the Occupied Territories.

164.   These restrictions also hampered the export of goods from the Gaza Strip and the West Bank to Israel and elsewhere, resulting in heavy losses to the Palestinian economy.   A fruit grower in Gaza, for example, dependent upon transporting his figs or oranges to the West Bank for market, cannot get his trucks out of Gaza due to military closure.   The Erez military checkpoint at the north end of Gaza was a sixteen-lane wide, once a bustling trans-shipment point of all manner of goods with tractor trailers lined up for nearly two miles, waiting to clear Israeli security and customs.   In April of this year Erez Crossing was completely deserted of all trucks, cars, and any indication of commerce whatsoever. Similarly, at the Qalandiyah checkpoint near Ramallah in the West Bank, on days when the curfew was rumored to lift, no trucks bearing supplies were allowed to move through any of the IDF military crossings in the area.

165.   Beyond the paralyzing effect of closures, the use of other forms of collective punishment by IDF forces also contributes to the overall economic crisis.

166. Selective IDF targeting of particular buildings or districts for military reprisals, demolition or bulldozing has cut a broad swath through the physical terrain of the Palestinian economy and its gradual development, virtually wiping out the very same small industries and manufacturing sectors that are vital to maintaining a stable society.

167. In 1991 Israel ratified the Covenant on Economic, Social and Cultural Rights. "The CESCR is customarily understood to define a state's duty regarding all rights, such as the right to work, right to health, right to education. The Covenant examines these rights on three different levels: the duty to take proactive measures to ensure enjoyment of the right, the duty to prevent third parties from violating the right, and the duty of the state itself to refrain from violating the right."

168. Israel, as the occupying power in the West Bank and Gaza, explicitly bears responsibility for the welfare of the population it occupies.

169. Israel's closure and siege policies violate the Palestinians' right to work, right to health, and right to education.

170. In addition to the violation of these basic rights, it is clear after examination of Israel's policy of imposing and lifting sieges that the goal of these policies is not Israel's security. Rather, sieges and closures serve as a means of collective

punishment aimed at subduing a civilian population which understandably chafes at the continued realities of occupation after thirty-five years.

171. The IDF adamantly denies all such claims, stating that the sieges are absolutely necessary in order to protect Israeli citizens and settlers, and that the sieges are implemented in as humane a manner as possible. However, once one looks at the specific reasons for tightening a siege (generally immediately following an attack against Israelis) and for lifting a siege (generally done for diplomatic or political reasons) it is obvious that the siege's intent is not to prevent attacks. There is also a flagrant policy of discrimination in play based on nationality, since settlers living in the West Bank are not subject to sieges, curfews and closures. In fact, closures have been justified by the IDF on the basis of insuring the free movement of settlers.

## Official Violence Against Palestinian Civilians

### *Collective Punishment*

172. In the nearly two years since the start of the current intifada, Israel has continually escalated its level of violence, using regular uniformed military forces, armed with the latest in U.S.-provided armaments, tanks, and helicopters, with overwhelming force against a largely unarmed civilian population.

173.   During the period of September 2000 until the end of 2001, the IDF wounded more than 10,000 persons and killed at least 357, most of this violence occurring in the context of IDF raids and attacks on refugee camps.   Eighty-nine percent of the casualties were civilians, and one-third of these were children below the age of eighteen. Many of the dead and wounded during this period were civilian demonstrators, completely unarmed and vulnerable to attack.

174.   The injuries sustained by Palestinians have been predominantly to the head and upper body.   According to a published report, 146 Palestinians (43.8%) died from head and neck injuries, 109 (32.7%) suffered chest injuries, 30 (9%) were shot in the abdomen, 42 (13%) suffered injuries to multiple parts of their body, and four (1%) died from lower limb injuries.

175.   Open Fire Regulations governing IDF soldiers in the field specify that soldiers may only shoot under two conditions: when a human life is in jeopardy; or when attempting to apprehend a fleeing suspect, and then only by shooting at their legs.

176.   These rules govern all ammunition; in the case of rubber bullets, restrictions are even more specific.   Rubber bullets may be used only when there is a clear threat to life, at distances of no less than 40 meters, and they may be aimed only at the lower body, and never used against children.

177.  The history of the current intifada, as well as the earlier uprising in the 1980's is replete with hundreds of examples that establish a pattern of deliberate misuse by the IDF of both live rounds and rubber bullets.

178.  The alarmingly high rates of casualty among Palestinians in the past two years has uniformly led those in the human rights community to conclude that Israel has engaged in a systematic pattern of terror against civilians as a form of collective punishment for the acts of a few Palestinians.

179.  This murderous determination is confirmed at the highest levels, as when Prime Minister Ariel Sharon said on 5 March 2002, "The Palestinians must be hit and it must be very painful. We must cause them losses, victims, so that they feel the heavy price".

### *Extra-judicial killing*

180.  Shocking examples of IDF use of indiscriminate force are those involving civilians killed or wounded during IDF missile, bomb and rocket attacks aimed at assassinating particular Palestinian individuals, often militants or activists. These deliberate extra-judicial executions of persons against whom no charges or legal proceedings have been brought are in violation of the standards of all decent, law-abiding societies, and have been widely condemned by international opinion.

181.   Israel's military intelligence has admitted on a number of occasions that they employ this practice, and that they will continue to do so.  Indeed, as recently as June 24th 2002, an Israeli missile strike in Gaza killed a carload of what IDF spokespersons described as Palestinian militants; as noted in the news reports, "a passenger in a nearby vehicle was also killed."

182.   Similarly, on 30 April of this year, an explosion destroyed a two-story building in Ramallah, some three hundred yards from Yasir Arafat's compound there.  According to PA intelligence chief Amin Al-Hindi, the powerful blast struck the building, killing Fatah activist Hasa Al-Qadi, three-year-old Malak Barakat and seven-year-old Shahid Barakat.   In addition, a woman and her two-year-old child were injured in the blast. The Israeli army initially issued a routine disclaimer, denying any involvement in the two explosions, but later tacitly admitted responsibility, saying it "felt sorry for the death of the civilians."

183.   Amnesty International, investigating cases of state assassination in Gaza and the West Bank found that in nearly all of the cases, the arrest of the suspected individuals could have been accomplished or at least attempted by Israeli forces in superior numbers, but was never even attempted in any of the cases.

184.   In a recent report on Israel's practice of "liquidating" individuals without trial or charges, B'Tselem reviews nine such deliberate assassinations in the

past two years and notes that six innocent civilian bystanders were also killed as a result of those operations. The assassinations policy not only deprives the intended targets of their lives without judicial sanction, but it too frequently deprives unintended targets—bystanders whose only "crime" is one of being in their homes or streets—of their lives without any means to seek redress whatsoever.

185. That this practice is official policy at the highest levels is not in dispute. In a meeting of the Foreign Affairs and Defense Committee on 9 January 2001, Chief of Staff Shaul Mofaz explicitly admitted that the policy exists. He claimed that his policy is supported by the legal opinion of the Military Advocate General, Brigadier-General Menachem Finklestein, who determined that, "The IDF has the legal right to fight 'hostile elements' in the Occupied Territories in exceptional and extraordinary cases, when the purpose is to save lives and in the absence of any other alternative."

186. This cynical justification not only sacrifices the rule of law to the occupying military's god-like purview, but implicitly values some lives—the Israeli citizens the IDF would nominally defend—above those of others, namely the unfortunate Palestinians caught in harm's way when F-16's fire missiles at targeted suspects.

187.   By all accounts, the "collateral damage" inflicted on innocents is intentional, as affirmed by a high ranking official in the security forces who told reporters that "the liquidation of persons is proving useful . . . this activity paralyzes and frightens entire villages and as a result there are areas where people are afraid to carry out hostile activities."   In other words, extra-judicial assassination has become a tool of terror and collective punishment against innocent civilians.

### *Torture*

188.   Israel's use of torture against suspects in detention has been extensively documented in the last thirty years by many human rights groups, non-governmental organizations, and in U.S. governmental reports. In 1970, both the United Nations and Amnesty International issued reports charging Israeli authorities with practicing torture in the occupied territories.   The International Committee of the Red Cross and Israeli lawyers also reported the use of torture in Israeli prisons in the early and mid-1970s.

189.   Israeli torture of Palestinian detainees became headline news in June 1977, when the London Sunday Times printed a detailed report which concluded that "torture of Arab prisoners is so widespread and systematic that it cannot be dismissed as 'rough cops' exceeding orders. It appears to be sanctioned as deliberate policy."

190.  In 1982, it became clear that widespread use of torture by the IDF was common following the Israeli invasion and occupation of Lebanon, especially at the notorious Ansar detention camp.

191.  During the first intifada of the late 1980's, Israel detained thousands of Palestinians, many of them under the age of eighteen, for such actions as throwing stones or demonstrating against the Occupation. According to an IDF report in February 1991, some 75,000 Palestinians had been arrested during the first three years of the Intifada, of whom a yearly average of 15,000 were actually charged each year.

192.  B'Tselem researchers have concluded that some 1,600 detainees per year underwent interrogation during that period, and that it is likely most of them experienced some form of physical or psychological pressure.

193.  Typically, interrogations are conducted by officers of the General Security Service.. Methods employed include overt beatings and "shabah," or general practices of humiliation and dehumanization. Typically, a detainee subjected to "shabah" is handcuffed with their feet chained, forced to sit in a tilted, small chair tied to the ground, leaving them totally unable to move, while seated in an unnatural and painful position. They are then hooded with a filthy, small bag of a rough, thick fabric that is very hard to breathe through. Many detainees have reported that the bag was foul with urine or vomit. A prisoner may be left in this

state while very loud music blasts overhead, for days at a time. Detainees are denied the use of a toilet for long periods.   Some of the interrogation practices used by the security services involve psychological methods.  For example, detainees are deprived of sleep for days at a time, kept in cells with bright overhead lighting and loud music; they are routinely threatened with death or the death or harming of their family members if they do not sign prepared confessions; they are stripped naked.

194.   The General Security Services used and continues to use these methods pursuant to secret procedures that were based on the recommendations of the 1987 judicial commission of inquiry headed by retired Supreme Court Justice Moshe Landau. The Commission found that not only were methods of physical abuse and torture used extensively in interrogation, but that the Shin Bet then routinely lied about the practice in open court whenever asked about the confessions they had extracted by prosecutors.

195.   Then, in a stunning development that left many in the human rights and international law communities astonished, the Commission explicitly endorsed the use of physical abuse as part of an interrogation, stating, "The Commission agrees that . . . clearly delineated psychological [and] physical pressures may legitimately be exerted in the interrogation of one suspected of terrorism and has proposed precise guidelines for the Shin Bet adopt."

196. According to the Landau Commission recommendations, the GSS interrogation methods may combine "non-violent psychological pressure of an intense and prolonged interrogation .... with a moderate measure of physical pressure." While these procedures are revised periodically by a special ministerial committee, the official guidelines to this day have never been published, and Shin Bet has continued to use many of the practices otherwise banned by the High Court by simply declaring a detainee a terrorist suspect.

197. The Convention against Torture and other Cruel, Inhuman, or Degrading Treatment or Punishment, to which Israel is party, defines torture as intentionally inflicted "severe pain or suffering, whether physical or mental" on a person to obtain, among other purposes, "information from him or a third person." The convention unequivocally prohibits torture under any circumstances (art. 2(2)). Other conventions, such as the Covenant on Civil and Political Rights (in art. 7), and conventions dealing with the laws of war, prohibit torture and other forms of cruel, inhuman, or degrading treatment and punishment (hereafter: ill- treatment) in all circumstances. The prohibition on torture and ill- treatment is, therefore, absolute, and no "exceptional" circumstances may justify derogating from it.

198. The institutionalization of torture practices by the Israeli government has been thoroughly documented by many international human rights

groups. B'Tselem (the Israeli Information Center for Human Rights in the Occupied Territories) reports the following:

a. Since 1987, the General Security Service (GSS) interrogators have tortured thousands of detainees, intentionally inflicting severe pain and suffering. The torture was neither extraordinary nor limited to 'ticking bombs.' Quite the opposite: torture was a bureaucratic routine; there was standard equipment for inflicting torture, and careful recording of the times the pain and suffering were inflicted. Even the state's response in petitions against torture repeated, paragraph after paragraph, the routine justification for what were supposedly extraordinary acts. Supervision of the GSS did not succeed in preventing torture in Israel from becoming routine, systematic, and institutionalized.

### Inhuman Treatment

199.  The deliberate delaying of emergency medical treatment by the IDF has been well- documented in hundreds of cases from this Spring's invasion. Furthermore, human rights and international medical aid groups have documented many dozens of cases of medical personnel and ambulances not only delayed in their duties, but shot at, killed, wounded, arrested and detained.

200.  In a B'Tselem report from March of this year, covering only two weeks of Operation Defensive Shield, they detailed five Palestinian medical personnel killed while on ambulance duty, ten Red Crescent Society personnel wounded, twelve ambulances damaged by gunfire, and two ambulances destroyed.

201.  Since the beginning of the current intifada, the Red Crescent notes that three of its personnel have been killed, 134 wounded, and 174 ambulances damaged.

202. The Geneva Convention relative to the Protection of Civilian Persons in Time of War, Part II, Article 16 (Fourth Geneva Convention) explicitly forbids attacks of this kind, stating that "the wounded and sick, as well as the infirm, and expectant mothers, shall be the object of particular protection and respect.

203. The Convention further states that "the Parties to the conflict shall endeavor to conclude local agreements for the removal from besieged or encircled areas, of wounded, sick, infirm, and aged persons, children and maternity cases, and for the passage of ministers of all religions, medical personnel and medical equipment on their way to such areas."

204. For their part, the IDF routinely denigrate the work of ambulance crews and hospitals serving at great risk in the Occupied Territories by claiming that these services are used in a clandestine fashion to transport combatants and materiel through military lines. This cynical claim has never been documented in a single case, though the IDF has been pressured for evidence of their irresponsible claims many times by representatives of the International Committee of the Red Cross/Red Crescent, Amnesty International, Doctors without Borders, and other groups.

61

## UNITED STATES COMPLICITY IN ILLEGAL ISRAELI ACTS

205. For more than thirty years, Israel has repeatedly detained, tortured and incarcerated Americans of Arab origin, without suffering any sanctions or even a single public reprimand from Washington.

206. A State Department spokesman confirmed on 2 April of this year that Israel was holding at least eighteen American citizens on "security" charges, and that the State Department has "no way of knowing for certain the numbers of American citizens who may have been detained for short periods and released."

207. The report dated Nov. 30, 1978, approved by both the Consul General and his deputy, aptly sums up official U.S. policy: "The post fully understands Israel's legitimate concern over security on the West Bank and accepts the premise that a military occupation regime may necessarily supercede the basic civil and human rights which are expected in a free democratic state living in a state of peace."

208. There is clear evidence that the United States government has known for at least 24 years that Israel uses torture during interrogations of Palestinians and that the practice was widespread. Furthermore, the U.S. had evidence that American children were also subjected to this abuse.

209. Yet, over more than two decades, no effective action has been taken by the United States to halt this practice. Furthermore, the United States has taken great care to avoid any public admission that Americans have been tortured.

210. The U.S. Department of State noted in its 2001 annual state-by-state review of human rights records that:

> There also were many reports that Israeli authorities treat Palestinians in an abusive manner at checkpoints, subjecting them to verbal and physical harassment. Each day, hundreds of thousands of Palestinians who wish to travel between Palestinian towns and villages must pass through one or more of the approximately 130 Israeli checkpoints across the occupied territories. Credible anecdotal stories of checkpoint abuses recounted by international humanitarian aid groups, and by hundreds of Palestinian citizens throughout the year, suggest that abuse is common and that as many as several thousand Palestinians have encountered some form of abuse from soldiers at checkpoints. In extreme cases, there were numerous reports of soldiers forcing Palestinians to hit or spit on other Palestinians in line, to strip off their own clothing, or to eat or drink during the Ramadan fast before being allowed to pass through the checkpoints. In a case reported by local and international press, and videotaped by an Israeli settler, in February in central Hebron, 50-year-old Palestinian pedestrian Jadilallah al-Jabri was stopped at an IDF checkpoint near an entrance to the H-2, Israeli-controlled section. Although al-Jabri provided all the correct documentation, and reportedly was not acting in a threatening manner, a soldier shot him in his ankle, severely injuring him. The soldiers neglected to provide any medical care to the man for several minutes, despite profuse bleeding. Finally, Palestinian bystanders called for an ambulance.

### U.S. Arms Sales to Israel

211. A partial list of the specific military means by which Israel has imposed its will on the civilian population of the Occupied Territories reads like the pages

of Jane's Defense Equipment guidebooks: Apache attack helicopters firing 30

mm chain guns (675 rounds per minute) and Hell-Fire air-to-ground missiles;

Huey Cobra helicopters firing 20mm chain guns; naval ship artillery including

Reshef patrol boats firing 76mm high explosive rounds off the coast of Gaza;

M-1A1 Abrams and Merkava Mk2 tanks firing 105mm and 120mm Tungsten

carbide DFDS Sabo rounds or high explosive rounds; M203 grenade launchers

firing 40mm M406 HE grenades; MK19 Automatic Grenade Launcher firing 40

mm M383 grenades fed with a grenade belt carrying 48 grenades with a

shooting range of 2200 meters; light anti-tank weapons (LAW): shoulder-fired,

anti-armor weapons with 84mm or 90mm rockets; 5.56 mm bullets fired from

M-16 machine guns; 7.62 mm high velocity bullets fired from general purpose

machine guns and Galil Sniper rifles; 12.7 mm bullets fired from Browning

machine guns and Barret sniper rifles; M114 TOW rockets; 40-90 mm mortar

fire; Air Burst grenades; Rapid Detonating Explosives; rubber and plastic

coated metal bullets; blank rounds to scare crowds; and CS gas.

212. Nearly all the weaponry used in the attacks against the plaintiffs and other

unarmed, civilian noncombatants, is manufactured in the United States.

213. The extensive use by the IDF of sophisticated, tactical combat systems in

densely-populated, urban areas against civilians is nothing short of criminal.

The IDF's increasing willingness to rely on the Lockheed-Martin F-16 armed

with air-to-ground rockets and missiles, or the McDonnell-Douglas/Boeing Apache attack helicopter, armed with chain-feeding rapid cannon fire, Hydra rockets, Hellfire missiles and heavy machine guns, for population control and retaliatory strikes violates international and U.S. law.

214.  For example, on 18 May 2001, an F-16 strike on Palestinian Authority buildings in Ramallah and Nablus left twelve dead, forty-seven wounded, including five children, and leveled a police facility in Nablus, leaving many victims homeless.

215.  The IDF claims it launched the F-16 strike—the first such aerial attack inside the Occupied Territories since 1967—in order to kill Mahmoud Abu Hanoud, a Hamas militant being detained there by the Palestinian Authority. Major-General Giora Eiland, head of strategic planning for the Israeli army, justified such disproportionate force targeted at one individual thusly: "When we bomb a target we are trying to show the Palestinian leadership that there are costs on both sides. In the long run, this will create problems for the Palestinian regime and that will help persuade them to stop the violence." This policy, intended to sow fear through a civilian population in order to undermine its leaders, constitutes a form of terror-attack condemned by international law.

216.  That same day in Gaza, an attack on the Ansar police station in Gaza City left nineteen injured and completely destroyed the facility. Israeli F-16's

attacking P.A. buildings in the city of Tulkarem on 18 January of this year killed two persons and wounded over 100; more than seventy shops were destroyed or damaged in the attack on the busy downtown district; on 6 March 2002, an Israeli attack on the main security headquarters in Gaza City killed a dozen and leveled a city block; and Apache helicopters attacked two cars in the Rafah camp in Gaza on 23 June of this year, killing six Palestinians and wounding nine.

## Violations of the Arms Export Control Act (AECA)

217. Nearly all of this weaponry is purchased by means of funds supplied by the taxpayers of the United States, including the Plaintiffs themselves, to Israel, pursuant to the Arms Export Control Act and the Foreign Assistance Act.

218. Direct U.S. military aid and foreign assistance to Israel used for military purchases has totaled approximately $91 billion in the last fifty years.

219. Since 1976, Israel has ranked first among recipients of US military aid and economic assistance, typically averaging in recent years about $3 billion annually, including $1.8 billion in Foreign Military Financing (FMF) grants from the Department of Defense and $1.2 billion in Economic Support Funds (ESF) from the Department of State. Since 1992, FMF grants to Israel have totaled $18.2 billion. Currently, 17% of all US foreign aid is disbursed to Israel.

220. United States law authorizes the Congress and the President, under the Arms Export Control Act of 1976, 22 U.S.C. 2751 et seq., to sell or lease "defense articles and services" to foreign governments, and sets the terms by which such sales may be legally undertaken.

221. The Act defines the term "defense article" as including any weapon or material used for the purpose of furnishing military assistance; while a "defense service" includes, among other things, technical assistance or defense information.

222. The AECA provides that U.S. military assistance to a foreign country must "strengthen the security of the United States and promote world peace."

223. The military assistance provided to Israel has violated the AECA (22U.S.C.§2753(a)(1)) as it has not "strengthened the security of the United States", nor "promoted world peace", nor furthered the "purposes and principles of the United Nations Charter.

224. The military assistance provided to Israel by the United States has not been used for internal security or legitimate self defense, but instead for offensive military purposes against a civilian Palestinian population in violation of the AECA (22U.S.C.§2754).

225. Israel's use of American military assistance against a civilian Palestinian population is in substantial violation of the AECA and all military assistance to Israel must be terminated pursuant to the AECA (22U.S.C.§2753(c)).

226. Defendants George W. Bush and Colin Powell are in receipt of information that a substantial violation of the AECA may have occurred by Israel's use of U.S. military assistance against the civilian Palestinian population and are therefore required to promptly report the same in writing to Congress. Defendant Bush has not so reported and has deprived the Congress of information necessary for Congress to fulfill its constitutional role.

227. Defendant Powell, as Secretary of State, is charged with the continuous supervision of arms exports under the AECA. His authority includes the power to cancel or suspend arms contracts under compelling circumstances if the national interest requires. Defendant Powell has allowed Israel to violate the AECA with impunity and has failed to exercise his authority under the AECA.

228. Defendant Bush's failure to suspend American arms sales to Israel or at least report to Congress that Israel is in substantial violation of the AECA has allowed Israel to use United States financed and manufactured weapons to terrorize and collectively punish an entire civilian population based on their ethnicity. Defendant's failure to comply with the AECA is the direct and proximate cause of the injuries to persons and property suffered by plaintiffs.

## Violation of the Foreign Assistance Act (FAA)

229. The FAA prohibits the provision of development assistance to countries that have a consistent pattern of gross violation of internationally recognized human rights (22 U.S.C. §2151n(a)).

230. Israel has engaged in a consistent pattern of gross violations of internationally recognized human rights.

231. The FAA specifically directs defendant Bush to "avoid identification of the United States... with governments which deny to their people internationally recognized human rights and fundamental freedoms."

232. Defendant Powell, as Secretary of State, is charged with preparing a full and complete report to Congress which must include, among other things, information regarding Israel's commission of war crimes and crimes against humanity. Moreover, findings of appropriate international organizations must be included in the report, as well as information regarding Israel's failure to cooperate with and active impeding of the legitimate investigation of the conditions of the Palestinians by international organizations.

233. Defendant Powell's failure to report to Congress as required by the FAA has resulted in the continuous flow of foreign assistance from the United States to Israel and is the direct and proximate cause of the injuries to person and property complained of by the plaintiffs.

## SPECIFIC ALLEGATIONS OF PLAINTIFFS

### John Doe I

234. On March 30, 2002, John Doe I's daughter, Jill Doe I, a twenty-two year old American citizen, was shot dead by soldiers of the Israeli Defense Forces during the early stages of the Israeli invasion of Ramallah. She was sitting in her car holding her 9 month old baby, Baby Doe I.

235. The soldiers were close enough to her car to discern that she and her child and husband were not armed. They opened fire with machine guns at a distance of approximately 5 meters. There was no gunfire in the immediate vicinity prior to this, nor any return fire.

236. Jill Doe I suffered multiple bullet wounds to the head.

237. On the Thursday following the attack, the hospital informed John Doe I that his daughter was dead on arrival and had been buried in a mass grave along with 24 men and two women.

238. John Doe I and his family have been unable to perform the religious rites of mourning and burial.

239. Due to the military siege, John Doe I and his family have been shuttered in his apartment. His family there includes his wife; his son-in-law who was seriously wounded- including gunshots to his head- in the same attack that

killed his daughter; his grandson; and 5 of his children, several of whom were born in the United States.

240. John Doe I's annual income from an apartment building he owns in Ramallah was $15,000. Since the beginning of September, 2000, his income is less than half that due to the constant closures and military incursions by Israel.

241. John Doe I suffers from emotional distress and sees his daughter's face constantly. His other children are afraid to exit the apartment during the occasions when curfew is lifted due to mortal dread of the IDF snipers on many nearby rooftops, as well as their tanks and sandbags.

242. On April 10, 2002, John Doe I's apartment was searched by IDF soldiers. He was taken out to the street where guns were pointed at him and he was threatened. He said he was an American citizen and showed his passport. The soldiers continued to brandish their weapons in front of him, his wife and his children.


**John Doe II**

243. John Doe II is an American citizen who also holds a Jordanian passport.

244. John Doe II and his extended family have owned fifteen acres of farmland in the Deir Nitham area of the West Bank for approximately 1600 years. The

71

family not only possesses Ottoman Empire and Jordanian ownership documents, but documents from the British Mandatory period as well.

245. In 1978, the Israeli government, working in conjunction with the World Zionist Organization and the Jewish National Fund, began construction of the settlement now known as Halamish/Neve Tzuf.

246. Palestinian farmers living on the site were forcibly removed and John Doe II watched as the settlement grew right to the property line of this own land.

247. John Doe II was given assurances by the American Consulate that the settlement would not take his land.

248. In 1995, settlers from the Halamish, aided and encouraged by Israeli policy and/or the government's willful ignorance, moved their perimeter fence so that it cut across John Doe II's land, taking approximately one-fourth of his farm.

249. John Doe II's formal complaints to the Israeli Committee for the Defense of Land and the Israeli police were ignored, as were his complaints to the U.S. government.

250. For seven years, men and women have enjoyed the use of John Doe II's family's land without permission, colorable title or recompense.

251. John Doe II's life has been threatened twice by armed settlers. In 1996, he stood "too close" to the settlers' fence (that illegally bisects his own land) and a settler aimed his rifle at John Doe II and said, while standing on John Doe's

property, "If you don't move I'm going to shoot you. This is my land." On a second occasion while walking on the remaining portion of his land with his five year old son, John Doe II was confronted by an armed security officer from the settlement who demanded that he leave the area.

252. Threats became reality in October 2000, when a group of approximately 20 armed settlers staged a nighttime raid on John Doe II's land, crossing over the perimeter fence to burn down his orchard and shooting at the doors and windows of his house.

253. As the settlers were about to torch his house, IDF troops arrived and dispersed them. No charges were ever filed against the Halamish settlers.

254. On June 13, 2002, John Doe II received word from relatives that the Halamish settlers began bulldozing the remains of his orchard, initiating the first steps of yet another expansion of the settlement at John Doe II and his family's expense.

255. On another nearby parcel of land owned by John Doe II and his cousin, Halamish settlers have destroyed a grove of 108 olive trees. Olive trees take a generation to become fruitful and can live for hundreds of years.

256. As a result of the attacks, John Doe II and his family have been severely traumatized. His ten year old son suffers from nightmares and psychological

disturbances and has become non-responsive in school.  He is obsessed with televised news accounts of the troubles in the mideast.

### John Doe III

257.  On or about April 10, 2002, John Doe III suffered a stroke and experienced headaches, chest pain and slurring of speech.  He was unable to move his left hand.

258.  Despite the obvious emergency, and the fact that his son, a physician, was anxious to treat him at a nearby hospital, no medical personnel were permitted to treat him for two days.

259.  By the time his son was able to examine him, his symptoms were profound and he could not recognize his own children.

260.  Prompt treatment would have created a reasonable likelihood of preventing the stroke or minimizing its effects.

261.  He continues to experience short-term memory loss, disorientation walking, and speech difficulty.

**John Doe IV**

262.  John Doe IV is an American-trained physician. On or about April 10, 2002, while attending to patients at the hospital in Ramallah, he learned that his father was experiencing symptoms usually associated with a stroke.

263.  His father lives only a few miles from the hospital, but John Doe IV was advised that Israeli forces would not permit medical transport of any kind. Neither he nor other medical personnel were permitted to see his father for two days.

264.  By the time he got to his father, his father had already suffered irreparable injury that can generally be averted by introducing a blood thinner at an earlier stage.

265.  On April 8, 2002, six soldiers came to John Doe IV's house while he was working at the hospital, demanded entry and searched the premises after ordering his wife and six daughters into the kitchen.

266.  On June 24, 2002, while he was working at the hospital, 50-60 IDF soldiers surrounded his house again.

267.  Eight soldiers demanded entry and ordered his wife and small children to wait on the verandah under armed guard, while the house and his medical clinic downstairs were searched.

268.   His daughter's computer was rendered irreparable due to damage to the hard drive.

269.   John Doe IV, his wife and daughters remain terrified after six months of near-constant siege.

**John Doe V**

270.   On January 30, 2000 John Doe V flew into the Ben-Gurion airport in Tel Aviv. While his luggage was being checked, the Israeli security officer asked if he had any electronic equipment. Thinking that he was referring to computers, radios or recorders, John Doe V said that he did not. The security officer opened his bag and, finding a Nintendo game that John Doe V had brought for his nephew, he accused John Doe V of lying. He also insisted that John Doe V would have to pay two hundred dollars ($200.00) as a duty. John Doe V explained that he was not lying, but that he had not thought the game was the type of equipment the officer was concerned with. John Doe V also stated that the game had only cost fifty dollars ($50.00) at WalMart, and that such an unreasonable duty was absurd.

271.   The security officer slapped John Doe V in the face, causing a red mark and intense pain. Dozens of other American travelers were watching this event, and John Doe V felt acute humiliation.

272. Soon after, John Doe V went to the United States consulate in East Jerusalem to complain of such treatment of a United States citizen. The person he spoke with there said that there was nothing they could do about it and stated that if he did not like it, he didn't have to travel in this part of the world.

273. On May 5, 2002, John Doe V's fifty-second birthday, he was traveling from Jerusalem to Ramallah. He was wearing an American flag lapel when he arrived at approximately 11:30am at the Kalendia checkpoint located about ten miles from Jerusalem, near the old Jerusalem airport. John Doe V presented his American passport to the Israeli soldiers guarding the checkpoint.

274. At least one of the soldiers pointed a gun at his head and another shoved him. John Doe V stated that he was an American citizen, not a terrorist, and that he was there as a tourist. The soldier that had pushed him stated "I am an Israeli guard and I can do anything I want. If you don't like it you can go back to the United States." He then pushed John Doe V to the ground and kicked him twice: once in his back, once in the back of his head. The soldier's blows knocked the breath out of him, and caused him to black out momentarily.

275. Afterward, his head throbbed for hours with pain, and his back was bruised, tender and in so much pain he could not move normally. Walking and sitting were extremely painful.

276.   The soldier then ordered John Doe V to sit on a rock next to the checkpoint. When he had been pushed to the ground his suit was torn and dirtied. He felt that he looked like a bum. After sitting there for no apparent reason for approximately one hour, he got up and asked if he could speak with the supervisor. The soldier hit him on the right side of his face with his rifle butt. He ordered John Doe V to go back and sit on the rock. He did so.

277.   At approximately 2:00 pm there was a change of soldiers. The one that had hit John Doe V and kicked him, and the one that had pointed his gun at his head and struck him with the rifle butt both left. Another soldier, who had just come reviewed John Doe V's passport and said he could continue on his way. John Doe V complained to him of the treatment he had just been subjected to and he said that each checkpoint is different, as each soldier is.

278.   John Doe V promptly went to a doctor in Ramallah. The doctor could see a large bruise on John Doe V's face and was able to determine that he had damage to his right eardrum and a 50% loss of hearing in that ear. The doctor could also see a bruise on his back from being kicked, and correctly stated that it would hurt for a few days. He gave John Doe V medication for pain.

279.   John Doe V has never been accused of having committed any crime. Like the vast majority of Americans, he is not affiliated with any organization that conducts violence against anyone.

### John Doe VI

280.   On October 28 John Doe VI went to visit his sister in Amman, Jordan. He

went to the Sheik Hussein/Allenby Crossing border post. At the border he paid

his exit taxes and fees, and presented his United States passport. He was told to

wait. All of the officials in the area were Israeli police or soldiers. He was

made to wait for two hours without explanation, then two officers escorted him

to a room and searched all his luggage and reviewed all his papers. They left

him in that room for another two hours.

281.   A woman officer came in and stated that John Doe VI was under arrest.

When asked what the charge was, she said that he was a member of a terrorist

organization. She would not provide any information from which he could

understand this accusation. She would not say what organization, what he was

supposed to have done with any organization, nor when he was supposed to

have done it.

282.   Two officers pointed guns at John Doe VI. He stated that he was a United

States citizen and asked to call the embassy or consulate. She said that he could

not. He asked if he could at least call his family. She said that he could not.

Instead, one of the officers put papers in front of him and said that he should

sign them. They were in Hebrew. Unable to read Hebrew, he asked what these

papers were. They told him that it just says that he was under arrest. He refused

79

to sign the papers. The officers then spoke to each other in Hebrew and took the papers away.

283.   Officers then came in and shackled his legs, and handcuffed him. They put him in a jeep. They pointed their guns at him and drove him to a jail, which John Doe VI believes was in the City of Jericho.

284.   John Doe VI again asked if he could call the United States embassy or consulate or if he could call his family. The officers laughed at him. They then put him in a small, dirty cell where he was held for about two hours.

285.   The officers then came in and again shackled his legs, and this time blindfolded him. He was taken out to a small car and could sense that they were traveling at a high rate of speed. They drove him for about two hours. At times during this trip he again stated that he was a United States citizen and asked to call the embassy or consulate. These requests were refused.

286.   Finally, the car ride stopped and his blindfold was removed. He asked where they were and was told Jerusalem. They took him inside of a jail where they videotaped him. He objected to this. An officer that spoke Arabic said to him "You just have to do what you are told. You are now in the Makobiya Prison."

287.   John Doe VI was taken to a holding room where a guard ordered him to strip. He was then shackled again. The guard placed a hood on John Doe VI's

head. The hood was rank. The smell was very strong and it was very foul. John Doe VI suspected the odor was of vomit and urine.

288.   The officer was able to grip the hood and pull John Doe VI around by it. Between the foul odor and being pulled around this way, the experience was deeply humiliating for John Doe VI. After jerking him around for several minutes, the guard removed the hood and John Doe VI could see other prisoners that he later learned were being held for non-political offenses.

289.   John Doe VI was taken to a doctor. The doctor asked if he had any medical problems. John Doe VI told him that he had chronic ear pain from an injury while working. John Doe VI explained that he needs a special pillow which he always takes with him when he travels in order to sleep. The doctor and the officer laughed at him.

290.   An officer then placed the hood back on John Doe VI's head and led him to another room. There was a chair in this room. He had to sit in the chair. The officer took one of his hands, behind his back, and placed his hand through the slats in the chair. He took his other hand and, behind his back, placed it over the back of the chair. The officer then cuffed his hands in this position very tightly. He then shackled his legs together and anchored then to a hook in the floor. This made any movement impossible. The hood made breathing difficult and offensive.

291.   John Doe VI was forced to remain in this position for three days. The only relief was that at one time during the three days he was taken to a bathroom.

292.   During the first day that he was held in this position a man came in and removed the hood from his head. John Doe VI saw that there was a desk with a computer in the room. The man introduced himself as Shouki. Based on conversations John Doe VI has had since then, he believes that his real name is Cohen and that he has worked in the prison for twenty years.

293.   John Doe VI asked him what he was doing there. He said "No. You are going to tell us what you are doing here." John Doe VI told him that he had done nothing to merit being here and asked that he be permitted to make a call. Shouki refused his request and asked if he had heard about a law called "Emergency Law." John Doe VI told him that he had read about it in the newspaper. Shouki told him that he should know that his being an American citizen meant nothing. He said: "We can do anything we want with you." He then held up John Doe VI's passport and said "This passport doesn't mean anything to us. We are America. You are going to die in here."

294.   John Doe VI asked him what he wanted from him. He stated that he wanted information about fund raising at his restaurant. The only thing John Doe VI could think of was that when he was a manager at Lum's an African American Muslim group wanted to raise funds to build a mosque. That had occurred in

1996 or 1997. The restaurant was given ten dollars per plate and the organization, Waladeen Mohammed, was able to charge more per plate in order to raise the funds. John Doe VI explained this occasion to the man and he seemed satisfied with his statement.

295. The officer then asked about a contribution John Doe VI had made to the Holy Land Foundation. John Doe VI stated that he had sponsored a disabled child overseas, that he considered it his responsibility to help children, and so had provided $25.00 a month to help the child. The child and John Doe VI had exchanged letters. John Doe VI told him that he has no reason to believe that his contributions were ever used for anything other than to aid the child. The officer asked several questions about the Foundation, like how was he contacted by them. John Doe VI told him they had sent a fund raising letter to him. The officer asked if John Doe VI knew the president of the Foundation and was told that he did not.

296. The man also asked him many questions about whether he belonged to a terrorist organization, and asked if he was hiding anything. John Doe VI told him that he did not belong to any terrorist organization and that he was not hiding anything. He also told the man that his life is an open book. At the end of his questioning the man said that if John Doe VI would not talk tomorrow, he would get someone who will make him talk.

297. Before he left the room the man put the foul hood back on John Doe VI's head and turned the air conditioner on at full blast. In only a short while, not even hours, with the air conditioner on full, unable to move at all, John Doe VI felt like he was in a snowstorm with almost no clothes.

298. After three days, John Doe VI began screaming at the top of his lungs. He was finally released from the chair but kept in the room, the air conditioner still running at full blast. His hands were badly swollen, he had no feeling in his hands and knew that he had not had any feeling in them for a long time. He was afraid that he might totally lose the use of his hands.

299. Food was brought to him in the form of a plastic bag that contained one tomato, one cooked egg, and four slices of bread. He was not given anything to drink.

300. The fourth day of his captivity another interrogator came to the room, and asked "what are you doing here?" He was then taken to a cell. It was approximately six feet by six feet. There was a dirty mattress on the floor and a hole in the floor in the corner for a toilet. He was given some water.

301. The next day John Doe VI was taken to another room. It seemed to be a kind of courtroom. A woman was there who appeared to be a judge. No one identified themselves to him or announced any official proceedings. John Doe VI told her how he had been detained. He told her that he was a United States

citizen. She spoke through a translator and said that he would be held 15 days.

He asked her why but she did not answer. There was no attorney there for him.

302.   John Doe VI was brought back to the cell and a few hours later taken to a

room with two people from the United States consulate. One was named Abdel

Noor and John Doe VI was told the other was Majed. They told him that they

had been notified that day of his detention. He explained his situation. They

commented that they could see the effects of the torture he had been through.

He assumed they would take him out of there but they said they could not. He

asked them to get the torture to stop or take him to another facility. They told

him that if he signed a "privacy waiver" they could visit him. John Doe VI was

angry. He said to them that "My government can't help even though there are

no charges against me?" They replied that there was nothing they could do.

303.   John Doe VI was taken back to the cell and held in isolation for the next ten

days. There were no windows in the room. He was fed for the next ten days the

same way he had been before- a plastic bag with bread, vegetable and an egg. It

was from these bags that he could mark the passage of time. The bags were

bags used for bread. They had the ingredients printed on them and he read over

and over and over again the ingredients in the bread.

304.   After ten days in isolation a guard came and said that he was free to go. That

was a lie though, told just to torment him. Instead, he had a visit by a woman

from the Red Cross. John Doe VI believes that her name was Mary Lourdes. She said that she did not understand what was happening to him.

305.   It is difficult to describe how terrifying this isolation was. The portions of food were small. There was only just enough room to stand. The walls were dirty. The overhead light was on for 24 hours a day. There was an air vent in the ceiling. It had 249 holes in it.

306.   After fifteen days in isolation he was taken to the interrogation room. A man who said his name was Ahed was there. John Doe VI later learned that he was a Shin Bet agent for the area around Silwad. He showed John Doe VI an aerial view photograph of Silwad. John Doe VI showed him where his house was. He asked John Doe VI questions about other people that live in the area. John Doe VI explained that he didn't know them since he has not lived there for ten years. The man said that John Doe VI looks like his brother. He said that he knew his brother. John Doe VI said, "Then you know I am okay."

307.   Some days later John Doe VI was interrogated by a man who said that his name was Uri. He had a paper and a pen. He asked  questions about people John Doe VI did not know.

308.   Some days later a Palestinian lawyer, Basam Alarouri, came and told him he had done an appeal for him, that the appeal might help him. He said that the Government was "fishing."

309.  For the trip to the appeal hearing his legs were tightly shackled. He was

forced to run to the truck that would take him. The shackles cut into his legs. In

the truck the hood was placed on his head again, and he was shackled in the

back of the truck to a pipe. They then drove fast and with sharp turns. Shackled

and hooded, he was thrown about wildly, and the chains hurt his legs, and his

head knocked against the van.

310.  He was taken to a court at Betil. John Doe VI's family was there and when

they saw him they started crying. When his case was called his attorney said

that there had been a fund raising dinner at the restaurant he worked at and that

John Doe VI had contributed to a disabled child. The prosecutor said they had

secret evidence. They showed something to the judge. The judge looked at it

and John Doe VI was taken back to the cell.

311.  John Doe VI had not been given any food that day. He began talking to

himself. He thought he was going crazy. He yelled. He begged for water. They

finally put some water in a bucket at his cell, but no cup. He used one of the

bread bags to dunk in the water to drink from that.

312.  Some days later his lawyer put in another appeal. There was another hearing.

The judge said that he would probably have to stay another thirty days. The

judge said that on the other hand, "I could bargain with you and if you agree

then one week." Then, he said, if there were no new information after a week I would be released. John Doe VI agreed.

313. By this time John Doe VI was seriously ill. He had a fever, had lost considerable weight, and had serious trouble standing. He also had a tightness in his chest. A guard came and gave him some cough medicine. He was glad to have something to drink.

314. On or about the twenty-third day that he was held, the man called Uri and two other men interrogated him. They talked among themselves then they said they had explosives, they have Hamas and if he doesn't confess he will get three months of administrative detention. He asked them about the agreement with the judge. Uri said they didn't care and shouted at him. Then two policemen came in with papers and a picture they had taken of him a few weeks before. Uri held up the papers and told him it was his file and "the order." It was written in Hebrew. He told him to sign it. John Doe VI told him that he couldn't read it and would not sign. They insisted. They said that he would have to go to jail for three months. John Doe VI knew that he could not bear three months of this but he refused to sign the papers.

315. John Doe VI was taken to a cell with other prisoners. A Palestinian man told him that he would next meet the "Prince of Jail". When he met the man called the "Prince of Jail," the Prince implied that he was a leader of other prisoners.

He said that he could move freely in the prisons because the Israelis were afraid of him since he could call for a hunger strike. John Doe VI had the sense that he was implying that the "Prince" was with Hamas.   The "Prince" stated that he believed that John Doe VI was an informer of Shin Bet, sent here to spy on the other prisoners. The "Prince" said that John Doe VI better tell him who he was, and show that he was not a Shin Bet informer, and that if he didn't they would kill him. John Doe VI was appalled. Imagine—tortured by the Israelis, ignored by the United States, and killed by Hamas. He requested John Doe VI's name. He wanted to know if John Doe VI was with Hamas, if he was with Jihad. John Doe VI told him he was not. He said he did not believe me. Other prisoners said that if he did not tell what they wanted to know, they would kill him. Eventually John Doe VI wrote down his name, the pizzeria he worked at in Florida. The man called the "Prince" was not satisfied and said that he would pay for that.

316.   John Doe VI has since learned that these men worked with the Israelis and were trying to get him to say things to link him to Hamas.

317.   Later that day a guard came and put the hood on John Doe VI and tugged him by the hood down a hallway. John Doe VI stumbled down some steps, injuring his leg, and seriously cutting his arm. He felt that his arm was broken. The guard cursed him and took him to a room. There was a loudspeaker in the room. He put it on at full blast right in John Doe VI's face, playing the same

song over and over for hours. It was the Paul Simon song "You Can Call Me Al." The guard said that most of the prisoners would not understand the song but that he would. At first John Doe VI was shackled in a small chair, to a pipe behind him, and with the air conditioner on.

318.   After a few hours he was taken to the interrogation room, shouting about the pain he was in, that he needed to see a doctor. A man there asked what was the matter. John Doe VI told him his elbow was broken. He came over and pressed it. It sent a shooting pain up John Doe VI's arm. He asked if that hurt. John Doe VI said that it did, and he said "good."

319.   A day or two later John Doe VI was taken back to the interrogation room and placed again in the position with his hands cuffed behind my back and his legs shackled and anchored to the floor. Uri was there and said "Now we've got you." He had the paper that John Doe VI had written his name on and what he did at the pizzeria in Florida. He told John Doe VI that he could give him life for this. He came over to John Doe VI and said, "If you aren't going to confess, I will still go home, sleep with my wife, and come back tomorrow and you will confess." John Doe VI was given no food that day.

320.   John Doe VI spent two days in the chair. He could only think of his son. Thinking of how desperately he wanted to see him again; thinking of how he

needed him, and how he needed to see him, was the only way he was able to survive.

321.   On or about the twenty-sixth day of his being held he was taken to the woman judge again. She was wearing a military uniform. John Doe VI begged her to release him. He told her he was dying, that he was fevered, that he had little to eat. She looked at him and said that he had to stay 15 more days.

322.   For the next few days John Doe VI was held in various cells with other prisoners. He could see how badly they had been tortured. One looked like he would have to lose his leg from being kicked in the shin repeatedly over several days. Another made noises like an animal In some cells John Doe VI was able to hear men screaming. He assumed they were being tortured. One day he was placed in a cell alone that was filled with roaches. They were all over they place. He became ill.

323.   John Doe VI had one more interrogation with Uri. He told him that he knew that he would die in there and that he would meet Uri on Judgment Day.

324.   Three or four days before he was released the two men from the United States consulate visited again. John Doe VI was upset that they had done nothing for him. He was upset that they were never at the court when he had to go. He told them that they might as well come back in a few days and pick up his dead body. They wrote that down and left.

325.  On the fortieth day a guard came. He put the hood on John Doe VI's head. He led him down a hall and took the hood off. He saw his suitcases. He said "You can go. You better not cause us any trouble." John Doe VI requested his passport and his money, which they gave though they wrote in his passport that he needed a Palestinian travel document to travel. A cab came and took him to his family in Silwad.

326.  He could not walk well. The first night he could not sleep for fear that they were just playing a trick on him and would come and take him back. He stayed with his family a few days.

327.  Then he called the United States consulate to ask what the travel requirement was they put in his American passport. He was told that he better comply with what they required. He asked how that could be, when he had a United States passport. He was told "You have to listen to the Israelis."

328.  That restriction meant that he could not leave for another month or month and a half. He finally got back home in late January, 1999.

329.  When John Doe VI went to Palestine he weighed 182 lbs. When he returned he weighed 140 lbs. He now has chronic, sometimes disabling back pain, he suffers from depression, especially when he talks about the episode. He has stomach problems. He feels bloated even though he has only eaten a little. His

stomach also feels like it is burning, he has chest pains and a sense of being congested much of the time. He has also lost much of his hair.

330. John Doe VI was never charged with anything. He was never convicted of anything. He never did anything. He has contacted numerous United States officials about this horror. He has never been given any explanation as why he was tortured this way. He has never been compensated in any way.

331. It is now impossible for John Doe VI to visit his family members that live in Silwad. The land his parents owned had been left to he and his brothers. In fact, the house was specifically left to him. It is impossible for him to go there; he could not ever run the risk that he would be taken for no reason and subjected to the disgusting conditions, the torture and the grinding humiliation he was subjected to.

### John Doe VII

332. On April 26, 1999, John Doe VII and his wife, who was not yet an American citizen, attempted to visit his mother and father in the town of Maithalon.

333. He proceeded to the Israeli checkpoint and was detained at the border. He was given no reason. He was held in handcuffs in a detention room for 14 hours and was unable to learn what happened to his wife.

334. He was taken in handcuffs to the Jalemeh prison near Haifa. He was thrown into a 4 foot x 8 foot filthy, smelly cell. Bright overhead lights were on 24

93

hours a day.  The toilet was dirty and smelly as were the blankets.  The food was rancid and made him sick.

335.  He was held for 36 days without being charged with any crime or wrongdoing.  He was interrogated for several hours each day.  During many of those days, he was taken to the interrogation room and handcuffed behind his back while seated.  His feet were tied to the chair.  A putrid, small hood was placed over his head making it hard to breathe.  Music was played at an intolerably high volume.  He was kept in this position for 3 hours at a time.

336.  He was frequently awakened at odd hours for interrogation or just to wake him up.

337.  After the period of interrogation, he was kept in isolation for days.

338.  After a few weeks, he felt severe back pain.  After repeated requests, he was permitted to see a doctor.  Despite what appeared to be a prescription written by the doctor, no medicine was received.

339.  An attorney hired by his family was permitted two visits but there was no court appearance.

340.  In late May, he was taken to another place known as the waiting place and held with 10 other men.  On June 1, he was transported by truck while chained to another prisoner to the Moscobiya prison in Jerusalem.  On June 2, he was again transported by truck while his feet were chained to another prisoner, and

driven to his original point of arrest, where his American and Jordanian passports were given to the Jordanian authorities.

John Doe VIII

341. John Doe VIII, an American citizen, currently resides in a suburb of Jerusalem and has his own law office in Ramallah.

342. He has been injured substantially by Israeli forces on at least three occasions. These injuries have been to his person, his property and his family members.

343. In September 1997, between 5-10 Israeli soldiers armed with M-16's came to John Doe VIII's home in Ramallah and demanded that he, his wife and two daughter, ages 3 and 1, come out into the hallway.

344. Upon inquiring as to why they were being ordered to do this, an Israeli soldier struck John Doe VIII in the shoulder, causing him to fall to the ground. During this altercation John Doe VIII was holding his 3 year old daughter. His family was terrified.

345. His injuries required medical attention.

346. John Doe VIII's family was denied permission to re-enter their apartment. They remained in the hallway until the next day when they were permitted to leave to stay with friends.

347. The soldiers stayed in the apartment for 4-5 days, firing guns from the windows and ruining many of the family's possessions.

348. In February 2002, although no gunfire was heard in the area at the time, Israeli forces, using rocket fire, destroyed John Doe VIII's car while firing at a nearby building. It was worth several thousand dollars.

349. During the Israeli incursion in April 2002, John Doe VIII was unable to go to his law office due to the closure of Ramallah.

350. Israeli soldiers destroyed all of the furnishings, including a computer, printer and copy machine. A janitor and another attorney saw the Israeli forces enter John Doe VII's law office, and heard loud crashing noises.

351. John Doe VIII practiced in the area of commercial contracts and was an advisor to the Palestinian trade ministry. He has suffered significant loss of income because of the destruction of his law offices.

352. The effects on John Doe VII's children of seeing their father struck by soldiers in 1997 is still manifest. They are in constant fear, suffering nightmares, and are reluctant to go outside.

**John Doe X/John Doe XI**

353. Plaintiffs John Doe X and XI are among several owners of a supermarket located in the Almsure area of Ramallah.

354. On March 29, 2002, the Israeli army invaded Ramallah. For the next three days, nobody was able to enter the store. On April 2, 2002, one of several tanks of the Israeli Army stationed outside the store fired at the door blowing a large hole in the entrance. There had been no firing from inside the store or in the immediate vicinity of the store. Several soldiers entered and used an explosive device to break the locked door leading to the basement.

355. In addition to the damage and interruption to the electrical service, substantial amounts of dry goods, food stuffs, cigarettes and office computer equipment were taken or destroyed. The electrical system was destroyed, all perishables were ruined.

356. On April 13th, Plaintiff John Doe X was attempting to clean up the damage caused by the Israeli soldiers to the store, when he exited the store to join a conversation among several soldiers and a store employee.

357. Plaintiff John Doe X was pushed back into the store. An Israeli soldier then struck him in the face with the butt of his rifle causing a black eye, pain and swelling, and a headache, sharp pain and soreness for more than a week.

**John Doe XII**

358. In 1976 John Doe XII bought land on Al Mobadeen Street in the Al-Bireh section of Ramallah where he had a two-story apartment building constructed.

97

359.  In 1993, his wife and he moved into the building, and in 1998 they had two stories added to the building.

360.  In July 2001 his daughter lived in the apartment building with her was her husband and their five children. The children at that time ranged in age from eleven to three. Her family, along with his wife and John Doe XII, were living on the second floor. Tenants in the building included a woman who was in her sixties and her teenaged daughter.

361.  In July 2001, two Apache helicopters of the Israeli Defense Force hovered outside the apartment building on opposite sides and fired at least two rockets into the fourth story. The rocket fire killed a guest of the tenant in the fourth floor apartment. The rocket fire destroyed the interior walls of the third and fourth floor, the doors, and windows. The rockets also damaged an exterior gas line for the building and thereby caused a fire to break out. Luckily, neighbors in the area were able to put out the fire before the entire building was burned up.

362.  John Doe XII's daughter and her children were in the apartment on the second floor at the time of the fire. There was substantial damage to the apartment including: shrapnel entered into the apartments and damaged walls; some of the doors were blown off their hinges; all of the windows were destroyed.

363. The sixty year old woman tenant was hit with shrapnel, and her daughter suffered a broken arm.

364. The grandchildren's trauma is still manifest. They are all frequently prey to the most terrifying nightmares, often of soldiers suddenly appearing and firing at them. They also suffer from a chronic need to go to the bathroom. This happens several times during the day in which they have to use the bathroom immediately. They have been to the doctor several times to treat this but it is his diagnosis that there is no physiological explanation for this. He believes it is directly related to their trauma.

365. There are more than 1000 holes throughout the building from shrapnel from the rocket fire. All windows in the building were destroyed, the sewer line was destroyed as was the water line. The repairs that have been made, largely superficial so far, have already cost approximately fifty thousand dollars ($50,000.00). In addition, many of the units are not yet habitable.

**John Doe XIII**

366. On the morning of March 30, 2002 the IDF attacked Ramallah and its environs.

367. John Doe XIII's tire distribution company in Ramallah was completely destroyed by an Apache helicopter rocket attack after noon on March 31

368. He has lost approximately $100,000 per month in gross sales, several hundred thousand dollars in standing orders, $150,000 in stock-on-hand at a nearby supplier, and is stuck with $100,000 in debt that had been secured by the stock-on-hand. He has lost $25,000 in office equipment as well.

369. He also lost $8000 per year on rental income.

**John Doe XIV**

370. After feeding chickens on his father, John Doe XIV's farm in the Deir-Debwan section of Ramallah on the evening of April 20, 2002, Baby Doe II and a friend drove in a van on the road from Deir-Debwan to Ramallah.

371. After driving for approximately 10 minutes, Baby Doe II heard shouting and saw IDF troops on the shoulder of the road. There was no road block in the area. Baby Doe II did not attempt to flee.

372. IDF soldiers fired at Baby Doe II 's van. A bullet entered Baby Doe II's back and passed through into his stomach area. Baby Doe II's friend was shot twice in the shoulder. The van was riddled with approximately 20 bullet holes.

373. Although wounded, Baby Doe II was able to drive to his uncle's house. Both he and his friend were bleeding severely. When a local doctor was unable to treat his wound, the uncle called an ambulance to take him to a hospital.

374. The ambulance was detained for an hour by Israeli soldiers. Soldiers rode in the ambulance to the doctor's office where Baby Doe II 's emergency treatment was again delayed by the soldiers pointing their weapons and demanding all people in the office to raise their hands and lay on the floor.

375. The soldiers interfered with the doctor, requiring him to stop attending to Baby Doe II while they searched his office and questioned the doctor.

376. After further delay of approximately an hour, Baby Doe II was permitted to go to the hospital in Ramallah. The ambulance was stopped repeatedly at Israeli checkpoints. At one checkpoint, Baby Doe II and his friend were removed from the ambulance, stripped naked and left on the ground for an additional two and one half hours.

377. In all, it took seven hours from the time Baby Doe II was shot to finally arrive at the Ramallah hospital; a trip that would ordinarily take fifteen minutes.

378. Four-hour emergency surgery on Baby Doe II was unable to save his gallbladder. Doctors also removed 15 centimeters of his large and small intestines.

379. Baby Doe II suffered injuries to his back, liver, colon, and intestines and now wears a colostomy bag for excreting solid wastes through a two-inch diameter hole in his abdomen.

101

380.   Baby Doe II lives with terrible pain in his abdomen; he suffers extreme fatigue; he cannot stand for any length of time without becoming dizzy. His abdomen wound reopens causing him additional pain.

381.   Before the incident, neither Baby Doe II nor his friend had ever been arrested, detained or charged with any crime. Neither was armed or made any hostile act toward the Israeli troops. They had been in the area for two hours and had heard no gunfire.

382.   Three days before he was shot, Baby Doe II had purchased 4,000 chicks with feed and supplies on contract to raise them for a chicken company. After he was shot no one dared go near the farm and as a result the chicks all died. Baby Doe II owes the chicken company $2500.


**John Doe XV**

383.   On May 10, 2002 John Doe XV's ten year old son, Baby Doe III, was gravely wounded while just outside the family's apartment building in Tulkarm, West Bank, Palestine.

384.   John Doe XV and his family own a five story apartment building in Tulkarm where his parents and three of his brothers reside with their families.

385.   The building has a central courtyard and on the day of the shooting John Doe XV's brothers had sent Baby Doe III just outside the courtyard to get some coffee.

386.   As Baby Doe III returned, IDF tanks appeared on the street some fifty meters away and opened fire on the boy, just as he reached the courtyard gate.

387.   As his son lay immobile screaming in agony from a leg wound, John Doe XV watched as the IDF tanks kept firing.  He finally managed to cover Baby Doe III with his own body as the firing continued.

388.   The IDF never ceased firing, although no return fire ever came from the building or courtyard; there were no combatants in the vicinity and the ten year old boy was obviously unarmed.

389.   Finally John Doe XV and his brothers were able to drag his son to safety. Baby Doe III had lost considerable blood.  An ambulance was called and although located only a minute away, was unable to reach Baby Doe III for half an hour.

390.   Two days later, Baby Doe III was finally transferred to Nazareth Hospital in Israel where he has undergone three operations on his leg.

391.   Because of Israeli travel restrictions, Baby Doe III, shot by a tank and severely traumatized, lays in a hospital alone in a strange town where the

people speak Hebrew, a foreign language to him.  No one from his family has been allowed to visit.

392.  Baby Doe III has suffered severe nerve damage from the gun shot and it is unclear whether he will walk again.

393.  No member of John Doe XV's family, including Baby Doe III has been charged or arrested for any crime of violence.  No one in the IDF has given the slightest reason for shooting at John Doe XV and Baby Doe III or detaining the ambulance.  After the shooting no one was detained or questioned.

394.  In fact, just days before, all members of John Doe XV's family were subjected to an identity check in their homes.  No one was wanted by the Israeli government.

395.  John Doe XV filed a formal complaint about his son's shooting to local police and the District Coordinating Office. He has also informed the U.S. State Department, Consulate and Embassy.  The U.S. representatives have told him that they cannot control the Israeli army.

396.  Since he has filed complaints, John Doe XV's apartment building has been fired on at least two occasions.  The two adjacent buildings stand untouched.

397.  John Doe XV and his brothers own a successful business as suppliers of wheat flour, seeds, animal feed and basic foodstuffs.  His stores provide roughly 50% of the town's needs.

398. Over the course of several weeks beginning in either November or December, 2000, four of John Doe's seven stores were shelled by Israeli tank fire and the area around those stores declared a closed military zone. To date, neither John Doe XV nor any other civilian has reached his four stores. John Doe XV and his brothers have suffered a 75% loss in their business and over 1.5 million dollars in net profit.

**John Doe XVI**

399. John Doe XVI is a United States citizen. His son, Baby Doe IV, was a United States citizen.

400. On Friday, December 8, 2000, during Ramadan, the most important time of the year in the Muslim religion, on his way to the Mosque in Jerusalem, John Doe XVI's 16 year old son, Baby Doe IV, was shot in the head by Israeli soldiers who were firing live ammunition indiscriminately into a group of demonstrators and other people in the vicinity.

401. An ambulance arrived virtually immediately, but Israeli soldiers delayed the ambulance with Baby Doe IV in it for forty minutes. During the delay, the boy bled to death. He was pronounced dead on arrival at the hospital.

402. Baby Doe IV was not political; he was not a member of any political group; he had never been arrested or detained. The boy was not even part of the

105

demonstration into which the Israeli troops fired. He was an innocent child allowed to bleed to death by the same Israeli soldiers who shot him in the head without cause.

403. John Doe XVI and his family have suffered severe trauma due to the death of his eldest son. No one has yet to offer an explanation as to why he was shot.

**John Doe XVII**

404. Plaintiff John Doe XVII, who currently lives in New York City, was 21 years old at the time of the 1982 massacre at the Sabra and Shatila refugee camps in Southern Lebanon. He had been living in the Sabra camp for a short time.

405. While watching a helicopter from the second floor window with his two cousins and a fifteen year old neighbor, John Doe XVII witnessed an explosion that tore the head off his neighbor and wounded one of his cousins very seriously with extensive abdomen wounds. John Doe XVII suffered shrapnel wounds to his limbs and feet.

406. While in the street trying to run to safety, John Doe XVII witnessed the indiscriminate slaughter of Palestinians by militia men.

407.  While hiding in the camp dump he witnessed the carnage as Phalange militia killed everyone in their path.  Twenty years later, he is haunted with the specific memory of pregnant women being slaughtered like animals.

408.  John Doe XVII also remembers that the marauding militia wore Israeli uniforms and spoke Hebrew, a language he is familiar with from his childhood days in Jerusalem.

**Jane Doe I**

409.  Jane Doe I lives in Birmingham, Alabama and relays this information based on discussions with witnesses.

410.  On April 2, 2002, the Israeli army began its invasion of Bethlehem.  At approximately 8:00 a.m., IDF forces were firing weapons in and near the street where Jane Doe I's family lives.

411.  Several soldiers demanded to enter the house.  A neighbor informed them that only an old woman and her children lived there.  They set off an explosion that caused damage but did not open the door.  The family was terrified and took cover on the first floor.  Although there was no provocation and no shots were fired from the house, the soldiers began firing indiscriminately into the house.

412.   Jane Doe I's aunt, Jill Doe II, and one cousin, Baby Doe V, were killed from gunshot wounds to the head.

413.   Jill Doe II and Baby Doe V had never been charged with any crime, nor were they associated with any political organization involved in any illegal acts.

**Jane Doe II**

414.   Jane Doe II lives in South Carolina and relays this information based upon discussions with witnesses.

415.   On April 3, Israeli forces began the invasion of Nablus. Residents were not directed to leave, in fact residents were prevented from leaving the city.

416.   A rocket fired by Israeli military forces- either an F-16 or an Apache helicopter- destroyed the house where Jane Doe II was raised.

417.   Her two sisters, Jill Doe III and Jill Doe IV, were killed in the attack. It is unclear whether they died upon impact, suffocation under the rubble, or from injuries sustained in the attack.

418.   Medical personnel were not allowed by Israeli soldiers to approach the injured.

419.   Jane Doe II's niece, Jill Doe V, 26, suffered a crushed spine in the attack. She underwent an operation and cannot move her neck. Jill Doe V is hospitalized at Allmadeenah Medical Center in Jordan.

420.  Jane Doe II's nephew, Charles Doe I, 23, had his face burned and suffered bodily injuries in the attack.  He is unable to see from one eye.  Charles Doe I is being treated at a hospital in Nablus.

421.  Jane Doe II witnessed the destruction of her childhood home and learned of her sisters' deaths while watching television on April 3.

## GENERAL ALLEGATIONS

422.  The acts described herein were inflicted under color of law and under color of official authority and/or in conspiracy with or on behalf of those acting under color of official authority, and were inflicted deliberately and intentionally.

423.  The acts and injuries to plaintiffs and their next-of-kin described herein were part of a pattern and practice of systematic human rights violations designed, ordered, implemented and directed by defendants and their agents.

424.  As a direct and proximate result of defendants' unlawful conduct, plaintiffs have suffered and will continue to suffer physical injuries, pain and suffering, and extreme and severe mental anguish and emotional distress; plaintiffs have incurred and will continue to incur medical expenses; and plaintiffs have suffered and will continue to suffer property damage and a loss of their means of economic support. Plaintiffs are thereby entitled to general and compensatory damages in amounts to be proven at trial.

425.   The conduct of defendants and each of them, including Moes 1-100, and/or their agents/employees, as described herein, was malicious, and/or oppressive and done with a willful and conscious disregard for plaintiffs' rights and for the deleterious consequences of defendants' actions. Consequently, plaintiffs are entitled to punitive damages from each of the defendants.

426.   Plaintiff's causes of action arise under and violate the following laws, agreements, conventions, resolutions and treaties:

    a.  Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. 1961-68;

    b.  Alien Tort Claims Act, 28 U.S.C. § 1350;

    c.  Torture Victim Protection Act, 28 U.S.C. § 1350

    d.  Customary international law;

    e.  United Nations Charter, 59 Stat. 1031, 3 Bevans 1153 (1945);

    f.  Universal Declaration of Human Rights, G.A. Res. 217A(iii), U.N. Doc. A/810 (1948);

    g.  International Covenant on Civil and Political Rights, G.A. Res. 2220A(xxi), 21 U.N. Doc., GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966);

    h.  Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. res. 39/46, 39 U.N. Doc., GAOR Supp. (No. 51) at 197, U.N. Doc. A/39/51 (1984);

i. Declaration on the Protection of All Persons From Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 3452, 30 U.N. Doc., GAOR Supp. (No. 34) at 91, U.N. Doc. A/10034 (1976);

j. The Convention on the Prevention and Punishment of the Crime of Genocide adopted by General Assembly on 9 December, 1948;

k. The Charter of the International Military Tribunal, of 8 August 1945 (Nuremberg Charter), confirmed by G.A. Re.3, U.N. Doc A/50 (1946) and G.A. Res. 95, U.N. Doc. A/236 (1946);

l. The Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949, 6 U.S.T. 3516, 75 U.N.T.S. 287 (Fourth Geneva Convention);

m. Protocol Additional to the Geneva Conventions of 12 August 1949 and Relating to the Protection of Victims of Non-International Armed Conflicts (Protocol II), opened for signature Dec. 12, 1977, reprinted in 16 I.L.M. 1442 (1977);

n. The Rome Statute of the International Criminal Court, United Nations Diplomatic Conference of Plenipotentiaries on the Establishment of an International Criminal Court, U.N. Doc. A/CONF. 1183/9 (1998), reprinted in 37 I.L.M. 999 (1998);

o.  Common law of the United States of America;

p.  Statutes and common law of the States of New York, Ohio, Florida, Alabama, South Carolina and Nevada, including but not limited to wrongful death, assault and battery, false imprisonment, kidnapping, negligence, recklessness, intentional infliction of emotional distress, negligent infliction of emotional distress, trespass and conversion; and

q.  Laws of Israel.

## FIRST CLAIM FOR RELIEF
(Genocide)
[All Plaintiffs Against All Israeli Defendants and Moes 1-100]

427.  The acts described herein were committed with the intent to destroy, in whole or in part, a national, ethnic racial and/or religious group as such and constitute genocide in violation of the laws described in paragraph 424.

428.  As a result of the acts described herein, plaintiffs have been damaged in an amount to be proven at trial.

429.  Defendants' acts were deliberate, willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages for plaintiffs.

## SECOND CLAIM FOR RELIEF
(Crimes Against Humanity)
[All Plaintiffs Against All Israeli Defendants and Moes 1-100]

430. The allegations set forth in paragraphs 1 through 427 of this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

431. Defendants' collective punishment of and accompanying human rights abuses against plaintiffs —including killing, torture, beatings, and other assaults—was neither random nor occasional but widespread and systematic. These acts occurred under the direction, encouragement or acquiescence of the Israeli government and military high command.

432. The acts described herein constitute crimes against humanity, in violation of the laws described in paragraph 424. Customary international law prohibits inhumane acts of a very serious nature such as willful killing, torture, and other inhumane acts committed as part of a widespread or systematic attack against any civilian population. These acts are doubly condemned by international law because they are a part of an ethnic cleansing process asserted against a single ethnic group.

433. As a result of the acts described herein, plaintiffs have been damaged in an amount to be proven at trial.

434.   Defendants' acts were deliberate, willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages for plaintiffs.

### THIRD CLAIM FOR RELIEF
(War Crimes)
[All Plaintiffs Against Israeli Defendants and Moes 1-100]

435.   The allegations set forth in paragraphs 1 through 432 of this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

436.   As civilian, noncombatants, plaintiffs are protected persons as defined in the Fourth Geneva Convention and customary international law, and pursuant to the laws described in paragraph 424, as an occupation force, the IDF has a clear responsibility towards protected persons.

437.   The acts described herein, most notably, intentional killing, torture, other inhumane treatment, and the destruction of property without military necessity are all war crimes in violation of the laws and treaties cited in paragraph 424.

438.   As a result of the acts described herein, plaintiffs have been damaged in an amount to be proven at trial.

439.   Defendants' acts were deliberate, willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages for plaintiffs.

## FOURTH CLAIM FOR RELIEF
(Racketeer Influenced and Corrupt Organizations Act)
[John Doe I, VIII, X, XI, XII, XIII, XIV, XV against Israeli Defendants, Bush/Powell and Arms Defendants and Moes 1-100]

440. The allegations set forth in paragraphs 1 through 437 of this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

441. From not later than 2000 to present, the Israeli Defendants, the Arms Defendants, and Defendants Bush and Powell, and their agents and coconspirators participated in a RICO "enterprise" within the meaning of 18 U.S.C. § 1961 (4) engaged in foreign and interstate commerce.

442. Alternatively, the above named Defendants and their agents and coconspirators constituted an association in fact for a common purpose with a continuous existence separate and apart from the pattern of racketeering activity in which they engaged. This association if fact constituted an enterprise within the meaning of 18 U.S.C. § 1961(4).

443. Each Defendant named above is an "individual or entity capable of holding a legal or beneficial interest in property" and, as such, each constitutes a "person" within the meaning of 18 U.S.C. § 1961(3).

444. The Defendants are engaged in foreign and interstate acts of commerce and the acts alleged herein have a potential effect on commerce.

115

445. Over a period of years and continuing to the present, the above name Defendants with their coconspirators or agents, in violation of 18 U.S.C. § 1962(c), through a pattern of racketeering activity have terrorized and intimidated Plaintiffs into removing and leaving from their property thus allowing Defendant Israel to expand its borders and commercial influence in the region.

446. At all times relevant to this Complaint, the above named Defendants, and their agents and coconspirators conducted, or participated directly or indirectly in the conduct of the affairs of the enterprise through a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1961(1) (5), in violation of 18 U.S.C. § 1962 (c).

447. At all times relevant to this Complaint, the above named Defendants, in violation of 18 U.S.C. § 1962(d) combined and conspired together and with their agents and coconspirators to conduct the affairs of the enterprise through a pattern of racketeering activity.

448. In furtherance of the conspiracy, and to effect the objects thereof, the Defendants committed overt acts as set forth more fully in paragraphs 1 through 424.

449. The pattern of the racketeering activity alleged in paragraphs 1 through 424 included the following specific acts, all of which constituted and are defined as

racketeering activity by 18 U.S.C. § 1961(1) and all of which are set forth in the specific numbered paragraphs herein which are re-alleged and incorporated here by reference as if fully set forth, as follows:

> murder
> attempted murder
> threat of murder
> kidnapping
> arson

450. It was the object of the racketeering activity to force Plaintiffs to surrender their property.

451. Defendants' acts alleged herein have substantial effect within the United States.

452. As a direct and proximate result of the Defendants' violation of 18 U.S.C. §§1962 (c) and (d) Plaintiffs have suffered injury to their business and/or property.

453. The injuries suffered by each Plaintiff were reasonably foreseeable or anticipated by the Defendants as the natural consequence of Defendants' acts.

454. As a result of the acts described herein, plaintiffs have been damaged in an amount to be proven at trial.

455. Defendants' acts were deliberate, willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages for plaintiffs.

## FIFTH CLAIM FOR RELIEF
(Racketeering Influenced and Corrupt Organizations Act)
[John Doe II against Israeli Defendants; Settler Defendants and Moes 1-100]

456. The allegations set forth in paragraphs 1 through 453 of this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

457. From not later than 2000 to present, the Israeli Defendants and the Settler Defendants, and their agents and coconspirators participated in a RICO "enterprise" within the meaning of 18 U.S.C. § 1961 (4) engaged in foreign and interstate commerce.

458. Alternatively, the above named Defendants and their agents and coconspirators constituted an association in fact for a common purpose with a continuous existence separate and apart from the pattern of racketeering activity in which they engaged. This association if fact constituted an enterprise within the meaning of 18 U.S.C. § 1961(4).

459. Each Defendant named above is an "individual or entity capable of holding a legal or beneficial interest in property" and, as such, each constitutes a "person" within the meaning of 18 U.S.C. § 1961(3).

460. The above named Defendants are engaged in foreign and interstate acts of commerce and the acts alleged herein have a potential effect on commerce.

461. Over a period of years and continuing to the present, the above named Defendants with their coconspirators or agents, in violation of 18 U.S.C. § 1962(b) through a pattern of racketeering activity have acquired and maintained an interest in Plaintiff, John Doe II's land.

462. At all times relevant to this Complaint, the above named Defendants, and their agents and coconspirators conducted, or participated directly or indirectly in the conduct of the affairs of the enterprise through a pattern of racketeering activity, within the meaning of 18 U.S.C. § 1961(1) (5), in violation of 18 U.S.C. § 1962 (c).

463. At all times relevant to this Complaint, the above named Defendants, in violation of 18 U.S.C. § 1962(d) combined and conspired together and with their agents and coconspirators to conduct the affairs of the enterprise through a pattern of racketeering activity.

464. In furtherance of the conspiracy, and to effect the objects thereof, the Defendants committed overt acts as set forth more fully in paragraphs 1 through 424.

465. The pattern of the racketeering activity alleged in paragraphs 1 through 424 above included the following specific acts, all of which constituted and are defined as racketeering activity by 18 U.S.C. § 1961(1) and all of which are set

forth in the specific numbered paragraphs herein which are re-alleged and incorporated here by reference as if fully set forth, as follows:

> attempted murder
> threat of murder
> arson
> extortion

466. It was the object of the racketeering activity to force Plaintiff John Doe II to surrender his property.

467. Defendants' acts alleged herein have substantial effect within the United States.

468. As a direct and proximate result of the Defendants' violation of 18 U.S.C. §§1962 (b), (c) and (d) Plaintiffs have suffered injury to their business and/or property.

469. The injuries suffered by each Plaintiff were reasonably foreseeable or anticipated by the Defendants as the natural consequence of Defendants' acts.

470. The injuries to Plaintiff's property were the direct and intended result of, and the natural and foreseeable consequence of Defendant's pattern of racketeering activity.

471. As a result of the acts described herein, plaintiffs have been damaged in an amount to be proven at trial.

472.   Defendants' acts were deliberate, willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages for plaintiffs.

### SIXTH CLAIM FOR RELIEF
(Extra-Judicial Killing)
[Plaintiffs John Doe I and XVI; Jane Doe I and II against Israeli Defendants, Arms Defendants and Moes 1-100]

473.   The allegations set forth in paragraphs 1 through 470 of this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

474.   The killings of Jill Does I, III and IV and Baby Doe II were extra-judicial and deliberate.   As set forth above, they were carried out under actual or apparent official authority or color of law by the government of Israel under the direction and control of Defendants.

475.   The killing of Jill Does I, III and IV and Baby Doe II were committed for purposes other than as lawful punishment and were not authorized by a previous judgment pronounced by a regularly constituted court affording all of the judicial guarantees which are recognized as indispensable by civilized people.

476.   These acts of extra-judicial killings were committed in violation of the Torture Victim Protection Act, (28 U.S.C. § 1350 note) and international law as described in paragraph 424.

477.    The killing of Jill Does I, III and IV and Baby Doe II described herein were

committed at the instigation and under the authority of the Israeli Defendants as

public officials acting in their official capacity.  Because of their authority and

office as members of the Israeli Military High Command, the Defendants knew

or should have known of the extensive and notorious pattern and practice of

violent unlawful murders and other abuses committed by troops under their

command against noncombatants, and of the likelihood that, in the absence of

serious measures to prevent future violations and punish wrongdoers, the IDF

and other Israeli military, security and police personnel would unlawfully kill

Jill Does I, III and IV and Baby Doe II and/or other noncombatants.

478.    Notwithstanding such knowledge, Defendants failed to prevent abuses or

punish perpetrators.

479.    The Israeli Defendants ordered, instigated, permitted, encouraged,

authorized, covered up and/or ratified the killing of Jill Does I, III, IV and Baby

Doe II by subordinates and agents under the Defendants' command.

Defendants have acted to conceal and cover up the conduct alleged herein so

that the Defendants and their subordinates and agents could commit such acts

with impunity.

480.    As a result of the extra-judicial killings of Jill Does I, III and IV and Baby

Doe II, their family members also have suffered pecuniary losses, as well as the

loss of the society, comfort, attention, services and/or support of their family members.

481.   As a result of the acts described herein, plaintiffs have been damaged in an amount to be proven at trial.

482.   Defendants' acts were deliberate, willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages for plaintiffs.

## SEVENTH CLAIM FOR RELIEF
(Torture)
[John Doe VI and VII Against Israeli Defendants and Moes 1-100]

483.   The allegations set forth in paragraphs 1 through 480 of this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

484.   The acts described herein placed plaintiffs John Doe VI and VII in great fear for their lives and caused them to suffer severe physical and mental pain and suffering and humiliation.

485.   The acts described herein were inflicted deliberately and intentionally for purposes which included, among others, punishing the victim or intimidating the victim or third persons, and constitute torture in violation of the laws described in paragraph 424.

486. As a result of the acts described herein, plaintiffs have been damaged in an amount to be proven at trial.

487. Defendants' acts were deliberate, willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages for plaintiffs.

## EIGHTH CLAIM FOR RELIEF
### (Arbitrary Arrest and Detention)
[Plaintiffs John Does V, VI, VII Against All Israeli Defendants and Moes 1-100]

488. The allegations set forth in paragraphs 1 through 485 of this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

489. The arrest and detention of plaintiffs John Does V, VI, and VII described herein was illegal and unjust, carried out without a warrant, probable cause, articulable suspicion or notice of charges.

490. The plaintiffs were placed in fear for their lives, were deprived of their freedom, separated from their families and forced to suffer severe physical and mental abuse.

491. The acts described herein constitute arbitrary arrest and detention in violation of the laws described in paragraph 424.

492. As a result of the acts described herein, plaintiffs have been damaged in an amount to be proven at trial.

493. Defendants' acts were deliberate, willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages for plaintiffs.

## NINTH CLAIM FOR RELIEF
(Cruel, Inhuman, or Degrading Treatment)
[All Plaintiffs Against All Israeli Defendants and Moes 1-100]

494. The allegations set forth in paragraphs 1 through 491 of this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

495. The acts described herein had the intent and the effect of grossly humiliating and debasing all plaintiffs forcing them to act against their will and conscience, inciting fear and anguish, and breaking their physical and/or moral resistance.

496. Plaintiffs were placed in great fear for their lives and forced to suffer severe physical and psychological abuse and agony. The acts described herein constitute cruel, inhuman or degrading treatment in violation of the laws described in paragraph 424.

497. As a result of the acts described herein, plaintiffs have been damaged in an amount to be proven at trial.

498. Defendants' acts were deliberate, willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages for plaintiffs

## TENTH CLAIM FOR RELIEF
### (Wrongful Death)

[Plaintiffs John Doe I, individually and on behalf of his daughter, Jill Doe I;
John Doe XVI, individually and on behalf of his son, Baby Doe IV; Jane Doe I,
individually and on behalf of her aunt, Jill Doe II and cousin, Baby Doe V;
Jane Doe II, individually and on behalf of her sisters,  Jill Doe III and IV
Against Israeli Defendants, Arms Defendants and Moes 1-100]

499.   The allegations set forth in paragraphs 1 through 496 of this Complaint are

re-alleged and incorporated by reference as if fully set forth herein.

500.   Plaintiff John Doe I was the father of his deceased daughter, Jill Doe I.

501.   Plaintiff John Doe XVI was the father of deceased child, Baby Doe IV.

502.   Plaintiff Jane Doe I was the niece of the deceased adult, Jill Doe II and the

cousin of a deceased child, Baby Doe V.

503.   Plaintiff Jane Doe II is the sister to deceased adults Jill Doe III and Jill Doe

IV.

504.   Defendants' actions and omissions were a direct and substantial cause of the

deaths of Baby Doe IV, Baby Doe V, Jill Doe I, Jill Doe III and Jill Doe IV.

Defendants failed to use due care to protect Baby Doe IV, Baby Doe V, Jill Doe

I, Jill Doe III and Jill Doe IV from injury and harm, thereby proximately

causing the wrongful deaths of Baby Doe IV, Baby Doe V, Jill Doe I, Jill Doe

III and Jill Doe IV.

505. Defendant's acts and omissions are actionable under the laws of Washington, D.C., Alabama and South Carolina and the laws of the United States.

506. As a direct result of the defendants' acts and omissions and as a result of the death of their children, Jill Doe I and Baby Doe IV, plaintiffs John Doe I and John Doe XVI have sustained pecuniary loss resulting from loss of society, comfort, attention, services and support of decedent.

507. As a direct result of defendants' acts and omissions and as a result of the death of their sisters, aunt and cousins, Jill Doe III and IV and Jill Doe II and Baby Doe V, respectively in plaintiffs Jane Doe I and Jane Doe II have sustained pecuniary loss resulting from loss of society, comfort, attention, services and support of decedent.

508. As a result of the acts described herein, plaintiffs have been damaged in an amount to be proven at trial.

509. Defendants' acts were deliberate, willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages for plaintiffs.

## ELEVENTH CLAIM FOR RELIEF
(Battery)
[Plaintiffs John Does I, II, V, VI, VII, VIII, X, XIV, XV, XVII; Jane Doe II Against All Israeli Defendants, Settlement Defendants and Moes 1-100]

510.   The allegations set forth in paragraphs 1 through 507 of this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

511.   Above named Defendants intentionally committed acts which resulted in harmful or offensive contact with plaintiffs' persons. Plaintiffs did not consent to the contact, which caused injury, damage, loss or harm to plaintiffs John Does I, II, V, VI, VII, VIII, X, XIV, XV, XVII and Jane Doe II on behalf of Charles Doe I and Jill Doe V.

512.   The acts described herein constitute battery, actionable under the laws of the United States and the laws of Washington D.C., New York, Florida, South Carolina, Ohio and Nevada.

513.   As a result of the acts described herein, plaintiffs have been damaged in an amount to be proven at trial.

514.   Defendants' acts were deliberate, willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages for plaintiffs.

## TWELFTH CLAIM FOR RELIEF
(False Imprisonment)
[Plaintiffs Against Israeli Defendants and Moes 1-100]

515.   The allegations set forth in paragraphs 1 through 512 of this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

516.   Defendants intentionally and unlawfully exercised force or the express or implied threat of force to restrain, detain or confine plaintiffs John Doe V, VI, VII. The restraint, detention or confinement compelled the plaintiffs to stay or go somewhere against their will for some appreciable time. Plaintiffs did not consent to this restraint, detention or confinement.

517.   Defendants' actions constituted false imprisonment, actionable under the laws of Washington D.C., Nevada and Florida and the laws of the United States.

518.   As a result of the acts described herein, plaintiffs have been damaged in an amount to be proven at trial.

519.   Defendants' acts were deliberate, willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages for plaintiffs.

## THIRTEENTH CLAIM FOR RELIEF
(Assault)
[Plaintiffs John Doe I, II, V, VI, VII, VIII, X, XIV, XV, XVII and Jane Doe II
Against Israeli Defendants, Settlement Defendants and Moes 1-100]

520.   The allegations set forth in paragraphs 1 through 517 of this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

521.   The conduct of the above named defendants, and each of them, caused plaintiffs John Doe I, II, V, VI, VII, VIII, X, XIV, XV, XVII and Jane Doe II to be apprehensive that defendants would subject them to imminent batteries and/or intentional invasions of their rights to be free from offensive and harmful contact, and said conduct demonstrated that defendants had a present ability to subject plaintiffs to an immediate, intentional, offensive and harmful touching.

522.   The acts described herein constitute assault, actionable under the laws of Washington D.C., Florida, South Carolina, Ohio and Nevada, and the laws of the United States.

523.   As a result of the acts described herein, plaintiffs have been damaged in an amount to be proven at trial.

524.   Defendants' acts were deliberate, willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages for plaintiffs.

130

## FOURTEENTH CLAIM FOR RELIEF
(Intentional Infliction of Emotional Distress)
[All Plaintiffs Against All Defendants]

525. The allegations set forth in paragraphs 1 through 522 of this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

526. The acts described herein constitute outrageous conduct against all plaintiffs, and were without privilege.

527. Defendants intended to cause plaintiffs to suffer emotional distress, or, in the alternative, (a) defendants engaged in conduct with reckless disregard of the probability of causing plaintiffs to suffer emotional distress, (b) the plaintiffs were present at the time the outrageous conduct occurred and (c) the defendant knew that the plaintiffs were present.

528. Plaintiffs suffered severe emotional distress and the outrageous conduct of the defendants was a cause of the emotional distress suffered by plaintiffs.

529. Defendants' outrageous conduct constitutes the intentional infliction of emotional distress and is actionable under the laws of Washington D.C., New York, Florida, South Carolina, Ohio, Nevada, and Alabama, and the laws of the United States.

530. As a result of the acts described herein, plaintiffs have been damaged in an amount to be proven at trial.

531.   Defendants' acts were deliberate, willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages for plaintiffs.

## FIFTEENTH CLAIM FOR RELIEF
(Negligent Infliction of Emotional Distress)
[All Plaintiffs Against All Defendants]

532.   The allegations set forth in paragraphs 1 through 529 of this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

533.   At all relevant times, defendants, and each of them, owed plaintiffs a duty to act with reasonable care, and/or injury to the plaintiffs was reasonably foreseeable.

534.   At all relevant times, defendants, and each of them, had the power, ability, authority and duty to stop engaging in the conduct described herein and to intervene to prevent or prohibit such conduct.

535.   At all relevant times, defendants, and each of them, knew, or reasonably should have known, that the conduct described herein would and did proximately result in physical and emotional distress to plaintiffs.

536.   Despite said knowledge, power, and duty, defendants, and each of them, breached their duty to plaintiffs, and thereby negligently failed to act so as to stop engaging in the conduct described herein and to prevent or to prohibit such

conduct or to otherwise protect plaintiffs. To the extent that said negligent conduct was perpetrated by certain defendants, and each of them, the remaining defendants confirmed and ratified said conduct with the knowledge that plaintiffs' emotional and physical distress would thereby increase and with a wanton and reckless disregard for the deleterious consequences to plaintiffs.

537.  Plaintiffs were bystanders and immediately observed the circumstances of the killing, maiming and other assaults on family members and friends and the destruction of their property.

538.  As a direct and proximate result of defendants' wrongful acts, plaintiffs have suffered and will continue to suffer significant physical injury, pain and suffering and extreme and severe mental anguish and emotional distress.

539.  Defendants' conduct constitutes the negligent infliction of emotional distress and is actionable under the laws of Washington D.C., New York, Florida, South Carolina, Ohio, Nevada and Alabama, and the laws of the United States.

540.  As a result of the acts described herein, plaintiffs have been damaged in an amount to be proven at trial.

541.  Defendants' acts were deliberate, willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages for plaintiffs.

## SIXTEENTH CLAIM FOR RELIEF
(Negligence Per Se)
[All Plaintiffs Against All Defendants]

542. The allegations set forth in paragraphs 1 through 539 of this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

543. Defendants failed to use ordinary or reasonable care in order to avoid injury to plaintiffs. Defendants' negligence was a cause of injury, damage, loss or harm to plaintiffs.

544. As a result of these acts, plaintiffs suffered harm including, but not limited to, death, serious personal injury and severe emotional distress. Defendants' conduct constitutes negligence and is actionable under the laws of Washington D.C., New York, Florida, South Carolina, Ohio, Nevada and Alabama, and the laws of the United States.

545. As a result of the acts described herein, plaintiffs have been damaged in an amount to be proven at trial.

546. Defendants' acts were deliberate, willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages for plaintiffs.

## SEVENTEETH CLAIM FOR RELIEF
(Trespass)
[Plaintiffs John Doe II, IV, VIII, X, XI, XII, XIII and XV against Israeli
Defendants, Settler Defendants and Moes 1-100]

547.   The allegations set forth in paragraphs 1 through 544 of this Complaint are
re-alleged and incorporated by reference as if fully set forth herein.

548.   Defendants' intentional, reckless and unprivileged conduct as described
herein has had the direct, foreseeable and proximate result, and continues to
result, in the intrusion on to and damage to the property of Plaintiff John Doe II,
IV, VIII, X, XI, XII, XIII and XV.

549.   Defendants' acts and omissions are actionable under laws of Washington
D.C. and the laws of the United States.

550.   As a result of the acts described herein, plaintiffs have been damaged in an
amount to be proven at trial.

551.   Defendants' acts were deliberate, willful, intentional, wanton, malicious and
oppressive and should be punished by an award of punitive damages for
plaintiffs.

## EIGHTEENTH CLAIM FOR RELIEF
(Conversion)
[Plaintiffs John Doe II, VII, X, XI, XIV against Israeli Defendants,
Settler Defendants and Moes 1-100]

552.   The allegations set forth in paragraphs 1 through 549 of this Complaint are
re-alleged and incorporated by reference as if fully set forth herein.

553.   Part of the overall objective of Defendants acting together and in concert
with their agents was and is to drive Palestinian civilian noncombatants from
their homes, businesses and land.

554.   Defendants have appropriated and converted to their own use, without claim
of right, the property and land owned and possessed by Plaintiffs John Doe II,
VIII, X, XI and XIV.

555.   Defendants' conduct constitutes conversion and is actionable under the laws
of Washington D.C. and the laws of the United States.

556.   As a result of the acts described herein, plaintiffs have been damaged in an
amount to be proven at trial.

557.   Defendants' acts were deliberate, willful, intentional, wanton, malicious and
oppressive and should be punished by an award of punitive damages for
plaintiffs.

## NINETEENTH CLAIM FOR RELIEF
(Injunctive Relief)
[All Plaintiffs Against Defendants George W. Bush, Colin Powell, Boeing/McDonnell Douglas and Moes 1-100]

558.   The allegations set forth in paragraphs 1 through 555 of this Complaint are re-alleged and incorporated by reference as if fully set forth herein.

559.   As a result of defendants' conduct, plaintiffs have been injured, and in the absence of injunctive relief, will be irreparably harmed. Plaintiffs have no adequate remedy at law. Plaintiffs therefore seek injunctive relief under the laws of equity to remedy their injuries and prevent any future injury to their persons and property.

560.   Plaintiff have been injured as the direct and proximate result of Defendants George W. Bush and Colin Powell's failure to report to Congress pursuant to the Arms Export Control Act and Foreign Assistance Act, Israel's systematic and continuous misuse of military assistance provided by the United States to cause death, serious personal injury and significant property damage to plaintiffs and all other civilian, noncombatants in Palestine.

561.   Plaintiffs seek to enjoin Defendants Bush and Powell and their agents from providing any further military assistance to Israel until such time as defendants Bush and Powell have provided Congress a written report detailing Israel's

misuse of American military assistance in its offensive against Palestinian civilian, noncombatants, many of whom are American citizens.

562.  Plaintiffs further seek to enjoin Defendant Boeing/McDonnell Douglas and its agents, officers and employees from providing weapons systems, including the Apache and Apache Longbow helicopters, to Israel pursuant to a contract executed in February 2001 until such time as Defendants Bush and Powell have reported to Congress pursuant to the Arms Export Control Act and the Foreign Assistance Act and Israel has publicly committed not to use such weapons systems directly or indirectly against the Palestinian civilian noncombatant population, many of whom are American citizens.

563.  **PRAYER FOR RELIEF** WHEREFORE, each and every plaintiff prays for judgment against each and every defendant in excess of $50,000, as follows:

   a.  for compensatory damages, the amount to be fixed at trial;

   b.  for punitive damages, the amount to be fixed at trial;

   c.  for treble damages, the amount to be fixed at trial;

   d.  for injunctive relief, including, but not limited to, an order directing Defendants George W. Bush and Colin Powell to cease providing military assistance to Israel until they have reported to Congress the misuse of American military assistance by Israel, and an order directing

Defendants Boeing/McDonnell Douglas, its officers, employees and agents, to cease delivery of any and all weapons systems, including but not limited to Apache helicopters, called for in a contract between Boeing and Israel executed in February 2001 until Defendant George W. Bush has reported to Congress, and such other injunctive relief as this Court deems appropriate;

e. for costs of suit, attorneys fees and such other relief as the Court deems just and proper.

## JURY TRIAL DEMAND

564. Plaintiffs hereby demand a jury trial on all issues so triable.

**STANLEY L. COHEN**, Esq., an attorney admitted to practice as such, hereby affirms under pain and penalty of perjury and pursuant to the Federal Rules of Civil Procedure that the herein information is true based upon personal knowledge or upon information and belief, the sources being investigation of the facts and circumstances related to the instant complaint and discussions had with plaintiffs and witnesses to the events complained of.

Dated: New York, New York
on this 16th day of July, 2002

Stanley L. Cohen, Esq.
Attorney for Plaintiffs
*Pro Hac Vice* (Pending)
Robert Jones, Esq. Of Counsel
Elizabeth Johnston
351 Broadway, Suite 300
New York, New York 10013
(212) 979-7572

Mahar Hanania, Esq.
Local Counsel
1510 H Street NW, Suite 20
Washington, DC 20005
Washington, DC Bar No. 464 766