# EXHIBIT A

## AFFIDAVIT IN SUPPORT OF ACTION

John Doe I, being duly sworn, deposes and says:

1. I am a citizen of the United States, and I currently reside (address redacted), on Maslakh Street (known as "the street of butchers"), in the Ein Misbah neighborhood of Ramallah, in the occupied West Bank of Palestine.

2. I submit the herein affidavit in support of the above-entitled cause.

3. The sources of your affiant's information and belief are: first-hand knowledge and observation, and discussions with witnesses to the events complained of herein.

4. On Friday, 29 March 2002, at approximately 4:30 in the morning, my late daughter, Jill Doe I, age twenty-two, was brutally shot dead by a large group of soldiers of the Israeli Defense Forces, as she held her nine-month old baby in her arms while sitting in her car. My daughter was a United States citizen, born (date of birth redacted) at George Washington Hospital in Washington, D.C. Her social security number is (number redacted). Her U.S. passport number is (number and issue date redacted).

5. As set forth more fully in the affidavit of her husband, Charles Doe II, who himself was critically wounded in the same attack, my daughter was murdered by military forces during the earliest stages of the Israeli invasion of Ramallah. My daughter, her husband and her child lived on the other side of the same block where I live, and when the invasion began, they drove the short distance by car to my home in order to seek refuge with the rest of our family. Although this event occurred in early

1

morning hours and it was raining lightly, the soldiers were close enough to the car to discern clearly that my daughter and her family were not armed, nor were they combatants of any kind. Jill Doe I and Charles Doe II were dressed in ordinary street clothes, without anything unusual about their dress, and my daughter held her baby in her arms. Only fifty meters from my door, soldiers stopped their car, and without warning or questioning of any kind whatsoever, opened fire with machine guns at a distance of approximately five meters (a little more than five yards). The only guns discharged in the immediate vicinity of the place where my daughter was murdered were those carried by the soldiers of the IDF; there was no fire in that immediate area prior to this encounter, nor was there any return fire after the soldiers finished discharging their weapons. Jill Doe I suffered multiple bullet wounds to her head; Charles Doe II was struck by two bullets in his head, two in the shoulder and neck area, and one in the leg; the baby was miraculously unhurt. After the soldiers moved on, my son-in-law went around to the other side of the car to help his wife, but she died almost immediately. He carried their son, Baby Doe I, to within ten meters of our house, when he collapsed unconscious in the street. During this time my family and I could hear gunfire in our street, and throughout our neighborhood. We also heard the baby crying but could not get to Charles Doe II and Baby Doe I because the Israeli soldiers were shooting indiscriminately in nearby areas. When there was a pause in the shooting, my wife Jill Doe XIX ran out to get the baby and bring her to my house; my neighbors from across the street ran out and took my son-in-law to safety in the lobby of their building. A few minutes later, I ran across the street to join them with first aid materials.

Among the neighbors who came to help my son at that time was a pediatrician from my block whom I know as Dr. Mohammed.

6. At that time, my family called an ambulance, but because of the Israeli military actions, it did not reach the scene until some thirty minutes later. The Red Crescent ambulance crew took the body of my daughter from the car and drove away. During this time, my neighbors and I gave first aid to Charles Doe II, with cotton bandages, paper towels and water, while gunfire and explosions could be heard from surrounding neighborhoods. An ambulance was called, but would not arrive for another two hours. During this time, Charles Doe II was alternately unconscious, or awake and in great pain, deliriously crying out his wife's name, before falling back into shock, then losing consciousness again. His bullet wounds were clearly visible; the two wounds in his shoulder and neck were each approximately one inch in diameter and bleeding steadily. His head wounds were difficult to do anything for, and we were not sure how many bullets had struck him there. At approximately 7 a.m., the Red Crescent returned and took Charles Doe II to the Arab Care Hospital, where he would spend three days in the intensive care unit under the care of Drs. Wahel Hamouri and Shaupye Harb, before being sent home in my care due to lack of space. During all this time, my family and I were unable to leave our homes due to a twenty-four hour curfew on the streets of the city, in which anyone found out of doors could be shot by the Israeli army. My daughter's car remains in the road at approximately where the killing occurred, though it has been pushed three meters to one side by IDF trucks to keep the way open.

7. On the Thursday following the attack, the same hospital telephoned to inform me that my daughter had been brought there, dead on arrival.

They further informed me at that time that during a break in curfew, hospital personnel had buried her in a mass grave in the parking lot, along with twenty-four men and two other women. The hospital explained that their electrical service was failing because the IDF had destroyed the utility infrastructure during the early hours of the invasion, and it was not possible to keep the morgue refrigerated. Because the hallways and stairwells had become triage areas for the many wounded victims of that morning, the hospital was unable to store cadavers anywhere inside. I have not seen my daughter since the day before the invasion, and my family has not been able to perform the religious rites of mourning and burial which are the custom for practicing Muslims.

8. Since the day my daughter was murdered by the Israeli army, the city I live in has been under military siege by the Israeli Defense Forces. Curfew is sporadically lifted for a few hours at a time on select days, with little prior warning, during which time city residents are able to move around and purchase food or supplies. My family and I have been shuttered in our apartment for two weeks as of this writing, including: my wife, my wounded son-in-law, and his infant son; my son Omar, age nineteen, born in Washington, D.C. and currently a student in business accounting at Bir Zeit University; my daughter Sana, born in Arlington, VA, age sixteen and a high school senior; my daughter Taqua, a fifteen year old high school student, born in Jerusalem; my daughter Sugoud, a high school student, age thirteen and born in Ramallah; and my ten year old son Othman, who was born in Ramallah and attends the fifth grade. None of the children have attended school since December, after a series of Israeli attacks in Ramallah made it too unsafe.

9. I was born (date of birth redacted) in the village of Sa'ir, in the Hebron area, in the final years of the British Mandate. I left school in the sixth grade, in 1956, when I went to work at various unskilled jobs. I left Palestine in 1965, at which time I was a subject of the Hashemite Kingdom of Jordan, and emigrated to South America, residing variously in Ecuador, Colombia and Peru. I sold clothing door-to-door in that region, until 1968, when I moved to the island of Puerto Rico to live with my cousins there. I lived there until 1978, when I moved to Arlington, Virginia, where I worked in restaurants. In 1980, I became a partner with another cousin in a Waffle Shop restaurant franchise on Mount Vernon Ave. in Alexandria, VA, which I co-operated until 1983, when I bought another restaurant, (name redacted), on L'Enfant Plaza in Washington, D.C. I operated this restaurant with my brothers Mahmoud and Ibrahim until 1987, when I sold my stake to them, who still operate the restaurant today. At that time I bought a pizza restaurant, (name redacted), on Connecticut Ave. in the District with a third brother, Farhat. I bought a house on George Mason Drive in Arlington, where I lived with my family from 1986 until approximately 1989. In 1987, I bought an ownership stake in an apartment building in Ramallah, in the occupied West Bank. I applied for residency in the occupied West Bank from the Israeli civil authority, and was granted that status in 1989. From 1987 until 1996 I maintained an address in Ramallah center city, near the post office. In 1996, I bought the apartment house where I currently reside, and moved there. Since then, I have worked full time as the superintendent and manager of my two buildings, which have approximately ten apartments, plus the two apartments where my extended family lives. My annual income from my apartment building is

5

normally approximately $15,000. But since the beginning of the current *intifada* in September, 2000, my earnings have steadily dwindled to less than half that due to the constant closures and military incursions by Israel during this time, which make it impossible for many of my tenants to keep their jobs or pay their rent. Like many Palestinians living under occupation, I have tried to accommodate them according to their ability to pay, given the extraordinary circumstances we all live under here.

10. I was first married at the age of sixteen, to (name redacted), in 1960. This union produced two daughters, (name redacted), born in 1961, and a housewife with six children in Virginia; and (name redacted), born in 1962, and a housewife with five children in Bet Sahour, in the West Bank. I was divorced in 1965, and re-married in 1968 to (name redacted), in Puerto Rico. This union produced one daughter, (name redacted), born in 1969, who now lives near Rio Piedras in Puerto Rico. In 1977 on a trip to the West Bank, I met and married my wife Jill Doe XIX, with whom I have nine children. My wife was born in El Bireh (referred to, with Ramallah, as the other of the "twin cities") in 1957. In addition to the children who live with me today, as set forth in ¶ 7 above, I have three other daughters by my wife Jill Doe XIX who all live in the United States. Mariam, born in 1978 in Puerto Rico, is a housewife in Chicago; Sahar, born in 1979 in Maryland, is a housewife in Philadelphia; and Samar, born in D.C. in 1980, lives in Brooklyn. In all, I have twelve children, and fifteen grandchildren.

11. I became a United States citizen in 1973. My social security number, (name and number redacted). My U.S. passport number is (number and expiration date redacted). My Virginia driver's license # is (number redacted).

12. I have never been arrested, detained, or charged with any crime whatsoever by any government anywhere.

13. At the present time, no civil authority exists where I reside, as the government of the Palestinian Authority, its ministries and police services, has been completely suppressed. To the best of my knowledge, there is no governing Israeli military police authority in Ramallah to which I might make any official complaint, as the city is still under siege and is an active military combat zone. Moreover, it would be absolutely futile for me to bring any claim in any Israeli court seeking justice for my daughter's loss. Palestinians have little or no standing in Israeli civil courts for the Israeli government's activities in the Occupied Territories. Although several treaties and charters of international law apply to my status in the Occupied Territories, I am not recognized by Israeli courts and there are no meaningful remedies or relief that I can seek through Israeli courts. Despite my American citizenship, I am unable to leave the military zone, either to travel to Jerusalem or anywhere else in the West Bank; nor may I travel in Israel. I am a second-class citizen under Israeli control; I cannot vote in their elections nor exercise any franchise that gives me representation.

14. During this time, no one from the American Consulate or Embassy has contacted me. Although my attorney attempted to secure assistance for my family and me through the consular officials in East Jerusalem, the officials there rebuked these overtures on technical grounds.

15. Since the vicious and wanton killing of Jill Doe I, I have been afflicted by terrible emotional suffering. I see her face constantly, and I remember when she was a baby in America, and when our family was happier. My wife cries nearly every hour, and my daughters are

terrorized.  On the two occasions that curfew has been lifted in the past ten days, they have been too frightened and anxious to venture out of the house for more than a few minutes at a time: the continuing presence of IDF snipers on many nearby rooftops, as well as their tanks and sandbagged positions, fills my daughters with mortal dread.  At times, my daughters are listless and non-responsive, sunk in depression.  My ten year old son, Othman, is especially affected by the killing of his older sister, and is now consumed with rage against the Israelis.

16.  My family, in the nearly twelve years since our return to Palestine, has never been politically active.

17.  Jill Doe I and her husband were not political, but were simply regular working people living their lives under the ongoing occupation.  Most recently, she finished high school in Ramallah in 1999, and attended two years of college at the Palestine Education Center, where she studied accounting.  Three months ago, she was hired for a permanent position by the Palestinian Authority as an accountant and secretary in the Education Ministry.  This job included further educational opportunities, and the possibility of promotion.  Her salary was approximately $350 per month, which represents average entry-level salaries for young people in the West Bank.  But because of the Israeli military siege on the Presidential compound and surrounding government buildings beginning in December of last year, my daughter had not been paid any of her wages by her embattled employer for her tenure up to the time of her death.  She remains on the payrolls of the Palestinian Authority and is due all back wages.

18.  During the twelve years that I have resided in Ramallah, the Israeli government, through its army and its occupation administration, has

exercised *de facto* control over the economy of the West Bank and the lives of ordinary Palestinians here. Nearly every aspect of economic life, including licensing, permitting, importing and exporting, freedom of movement, registration of vehicles, land use regulations, and taxation has been, to varying degrees, controlled by the occupation forces and used in a manner intended to punish, manipulate or exploit the local population. At times throughout this period, conflicts between Palestinians and the Israeli occupational authority in Ramallah have resulted in military action by the IDF, police action, or Israeli judicial sanction against Palestinians, in many of these areas. These responses have included land seizure, denial of permits and licenses, withholding of identity cards or stripping of status, denial of rights to travel, and so forth. I personally know many neighbors and friends who have been subjected to unjust and capricious treatment by the occupation authority.

19. In the nineteen months since the beginning of the current troubles, the Israeli Defense Forces have been responsible for many killings without cause in the Ramallah area and throughout the West Bank. During this time I have heard from friends and neighbors, and have seen news reports nearly every day, of killings by soldiers of unarmed civilians. In the past two weeks since the full-scale invasion of the West Bank, widespread news reports from sources around the world as well as in Palestine have reported accounts of hundreds of deaths of civilian non-combatants by the IDF, with many hundreds more wounded. Additionally, reports are now surfacing in all media outlets of mass killings of civilians in the West Bank cities of Jinin and Nablus. Conditions in Ramallah at this time are devastation: buildings are collapsed from missile and tank strikes, roads are torn up, sewer and

water services have been destroyed in many neighborhoods, electricity services are day-to-day, food stores are scarce in the shops and the traditional market is not allowed to operate. Worst of all, we are unable to leave our house but for short breaks in the round-the-clock curfew—usually only three or four hours in duration—that occur with no fixed schedule every four days or so.

20. To the best of my knowledge, my daughter Jill Doe I and her husband and baby posed no threat whatsoever to the soldiers who killed her on that terrible morning. They were ordered to stop their car, they complied with the order and awaited further instructions. No effort was made by the soldiers whatsoever to identify them or question them in the few seconds that elapsed between Charles Doe II turning off the car motor and the barrage of bullets that killed Jill Doe I and wounded her husband. Since the murder, no IDF authority in the West Bank has made any statement whatsoever about my daughter's murder, nor given any indication of any kind why the soldiers fired with overwhelming force with intent to kill on civilians they made no attempt to identify.

21. Because my grandson Baby Doe I is by operation of U.S. law a citizen, and inasmuch as his father is not a citizen, while I am, it is my intent to file in the appropriate state and federal courts an application to be appointed surrogate for the child and trustee for his estate. These applications will be made with the support of the child's father and will not be done for purposes of establishing me as legal guardian or custodian of the child in any venue, but rather as his legal representative during the course of proceedings in the United States.

22. As recently as this past week, on Thursday 10 April, a detachment of IDF soldiers with tanks and armored personnel carriers came to my block

and stopped at my building. First they removed all the men and boys in the building and lined them up in the street; eventually, one tenant was detained and taken away. Then they searched each apartment, including my own. One of my tenants is a children's daycare center on the ground floor, which was closed because of the troubles. I did not have the key to open the center, but the soldiers insisted that I did. They took me out to the street, where in full view of their commander, they pointed guns at me and threatened me. I informed that I was an American citizen, and showed them my passport. They took my passport and showed it around, cursing at me, and brandishing weapons at me.  A neighbor fluent in Hebrew, who at that time was corralled with all the other men from the building, said later that the soldiers were told by the commander to take my passport and "stick it up his [rear]." After some more menacing, the soldiers took a sledgehammer and knocked down the daycare center door, then ransacked it. They took me back to my apartment, returned my passport, and brandished weapons in front of my wife and children, all of whom were crying and upset. They noted where I live and said they would return. My wife and I did not sleep for two nights in a row, as every troop movement we heard outside our home filled us with dread and uncertainty.

23. For this reason, I have a great fear of extra-judicial retaliation from the IDF if I pursue a legal action against them in the United States. As I reside in the military zone controlled by the Israelis, and as there is no supervening, neutral police authority that might protect me, in practice anything could happen to me or my family at their hands. Consequently, I herein ask that my specific identity in the early stages of this litigation be accorded privileged status; and that it be limited solely to the

attorneys in this case; and that they be instructed not to share my specific
identity with governmental officials of Israel and/or the United States.

Dated: _____

on this ___ day of_____, 2002

_____

JOHN DOE I

# EXHIBIT B

## AFFIDAVIT IN SUPPORT OF ACTION

John Doe XIV, being duly sworn, deposes and says:

1. I have retained the Law Office of Stanley L. Cohen to represent me and my son in this matter. His office is located at 351 Broadway Suite 300, New York, NY 10013.

2. I am a citizen of the United States. Currently I reside part of the time at (address redacted), Bronx NY, and part of the time in the Deir-Debwan area of Ramallah, Palestine.

3. I submit the herein affidavit in support of the above entitled cause. I am the father of Baby Doe II, a seventeen year old, as such I bring this action on his behalf.

4. The source's of your affiant's information and belief are: first hand knowledge and observation, and discussions with witnesses to the events complained of herein.

5. I have six sons and six daughters, all of whom were born in the United States. One of my sons, Baby Doe II was born on (date of birth redacted) at Jacobi Hospital in New York City. He is a United States citizen.

6. I have a farm in the Deir-Debwan section of Ramallah. On Saturday, April 20, 2002, my son Baby Doe II was at the farm from approximately 6:00 or 6:30 pm until 8:00 pm. He was with a friend, Charles Doe XXV. They were feeding chickens on my land. During the time that he was at the farm neither he nor his friend heard any gunfire in the area. At approximately 8:00 pm they got into a van my son was using and drove on the road from Deir-Debwan to Rammon. He had been driving for approximately ten minutes and was passing an area where there

1

are several trees.

7. At that time he heard faint shouting from a short distance away, alongside the road, but could not hear what the people were shouting. He then saw numerous IDF soldiers in the area. He did not speed up or attempt to flee. There was at that time no reason for him to think the soldiers were calling him. Shortly thereafter several soldiers fired at the van. He was shot once. The bullet entered from his back and passed through into his stomach area. In addition his friend Charles Doe XXV was shot twice in the shoulder. The van he was driving had approximately twenty bullet holes.

8. Though wounded he was able to drive to the house of my brother, Charles Doe XXVI. At that time both my son and his friend were bleeding severely. My brother then took them to the local doctor. His wound, however, was too serious for the local doctor to attend to and so he called an ambulance. It is my understanding that the ambulance was delayed for almost an hour while IDF soldiers searched it and other vehicles. The ambulance was finally allowed to proceed but several soldiers came along inside the ambulance to the doctor's office where my son was waiting.

9. When the ambulance arrived the soldiers further delayed my son's evacuation by entering the doctor's office, pointing their weapons, and demanding that all of the people at the doctor's office first raise their hands, then lay on the ground. The soldiers interfered with the doctor, and in spite of his protests, made him stop attending my son while they questioned him and searched the doctor's offices. The soldiers then insisted on reviewing each person's identification and determining that none of the people were armed.

10. Only after this further delay of almost another hour was my son permitted to go to the hospital in Ramallah, though IDF checkpoints along the way stopped the

2

ambulance repeatedly. By that time my son had been laying, wounded, for two hours. At one checkpoint outside Ramallah, both my son and his friend were removed from the ambulance, stripped naked by IDF soldiers, and left on the ground for an additional two and a half hours. With al the delays and stops, it took seven hours from when he was shot to when he arrived at the hospital in Ramallah, a trip that would ordinarily take ten to fifteen minutes, were it not for Israeli closures and interference.

11. My son stayed at the hospital for three weeks. He was treated for the bullet wound to his stomach. My understanding is that the entry wound was through the lower right part of his back, and theat the bullet tumbled through his abdomen, piercing his liver, colon and intestines. While I do not know fro certain, the bullet has been described to me as what would be called a "dum-dum" bullet, and it flattened out and fragmented inside his body. Surgery lasted four hours. As a result of his wound, doctors were unable to save his gall-bladder, and he currently wears a colostomy bag for excreting solid wastes through a two inch diameter hole in his abdomen. Doctors removed fifteen centimeters from his large and small intestines.

12. He has terrible pain in his abdomen in general and digestion is painful. His appetite is reduced and he suffers from extreme fatigue. He is only able to sleep on his back, and he passes each night badly. He can neither work nor study and is listless and distracted all the time. Since being released from the hospital he has attempted to work but has been unable to. If he stands for any length of time he becomes dizzy and had, on at least one occasion, fallen over. In addition, with only moderate exertion the wound has reopened causing him great pain. I do not know why his wound can not be closed so that this does not happen anymore.

3

13. Neither my son nor his friend had done anything hostile toward the troops. Neither of them were armed in any sense. Neither of them had thrown rocks or any other thing at the soldiers. Neither of them had called to the soldiers or made any gesture toward them. My son had been feeding the chickens, and in the area for at least two hours prior to the appearance of the IDF. During that time no one on or near my land had done any of the above described actions toward any IDF force. My son has never been arrested, detained, or charged with any crime by any government anywhere.

14. Three days before my son was shot he had taken 4,000 chicks on contract to raise them for a chicken company, with feed costs and supplies. This was the third time he had entered into such a pact with the chicken company. Typically, such an arrangement can earn $4,000.00 minus expenses, for bringing the birds to market in approximately forty-five days. After he was shot, no one dared go near the farm again and as a result the chicks all died. He presently owes the chicken company approximately $2,500.00.

15. At the present time no civil authority exists in the Deir-Debwan section of Ramallah, as the government of the Palestinian Authority, its ministries and police services, has been completely suppressed. To the best of my knowledge, there is no governing Israeli military police authority in Ramallah to which I might make any official complaint, as the city is still under siege and is an active military combat zone. Moreover, it would be completely useless for me to bring any claim in any Israeli court seeking justice for my injuries. Palestinians have little or no standing in Israeli civil courts for the Israeli government's activities in the occupied territories. Although several treaties and charters of international law apply to my status in the occupied territories, I am not recognized by Israeli courts

4

by security personnel at Ben Gurion Airport in tel Aviv not to return to Israel ever again.

16. In addition, any travel in the area of Deir-Debwan requires frequent contact with IDF forces, and other officials of the Israeli government. Given his experience, and given how quickly and with no reason whatsoever he was shot by the IDF, these encounters are now almost intolerable, filling him with dread and panic.

17. Because my family lives in the occupied territories, and in as much as the Israeli Defense force and Shin Bet, the State security force, routinely and regularly invade our communities, my family lives in a constant fear of being singled out by these forces as retaliation for these complaints and this law suit. Accordingly, I ask for an order of this court permitting my identity, my son's and, where appropriate, the identity of others referred to in my affidavit to remain under seal for as long as possible. In the alternative, I ask for an order of this court instructing counsel for the defendant to refrain from providing my identity and the identity of others referred to herein until and unless absolutely necessary. Given the events described in this affidavit and the frequency of Israeli forays into my neighborhood I have a well founded fear that military and security forces of Israel will harm me, my family and our property in retaliation for this suit.

5

Sworn to before me on this _____ day
of _____, 2002, in _____.


JOHN DOE XIV

# EXHIBIT C

## AFFIDAVIT IN SUPPORT OF ACTION

Jane Doe I, being duly sworn, deposes and says:

1. I have retained the law office of Stanley L. Cohen to represent me in this action. His office is located at 351 Broadway, Suite 300, New York, NY 10013.

2. I am a citizen of the United States. My social security number is (number redacted).

3. I submit the herein affidavit in support of the above-entitled cause.

4. The sources of your affiant's information and belief are: first hand knowledge and observation, and discussions with witnesses to the events complained of herein.

5. I have resided in the United States since 1993. My current address is (address redacted) Birmingham, Alabama 35216. I have lived at this address since 1997.

6. Many of my relatives live in the Old City part of Bethlehem. Among them are my aunt Jill Doe II and my cousin Baby Doe V. It is my intention to seek appointment as executrix for the estate of my deceased aunt and cousin.

7. On April 2, 2002 the Israeli army began its invasion of Bethlehem. At approximately 8:00 am forces of the Israeli Defense Force were firing numerous weapons in and near the street where my family lives. Several soldiers came to the door of their home and apparently demanded entry to the house. A neighbor informed them that only an old woman and her children lived there. The soldiers were not satisfied, and unable to open the door, they set off an explosion, I believe using dynamite. The explosion damaged but did not open the door.

8. It is my understanding that my family members did not know what the soldiers wanted of them. Terrified by the massive military presence and demolitions assault, everyone was taking cover in a room on the first floor. The soldiers, having failed to blow the door open, began firing at the house, the windows, and

the partially damaged door. This firing was without warning and the only apparent purpose was to kill everyone inside.

9. Assuming that was their purpose they were partially successful. My aunt Jill Doe II was shot at least once in the head and died soon after. My understanding, from conversations with family members that were there, is that at least one bullet entered her brain. There was massive bleeding from her head. I believe this to be the cause of death. In addition my cousin Baby Doe V was also shot at least once in the head. Again, it is my understanding, based on conversations with family members that were there, that at least one bullet entered his brain also. As with my aunt I believe this to be the cause of death.

10. I have made inquiries of several family members that were there at the time and soon thereafter. I am unaware of any accusation relating to any family member of having committed or being wanted for any action criminal or otherwise. Nor has there ever been any suggestion that they or any other family member was associated with any political organization that has been involved in any illegal act. No explanation or comment has ever been given to me as to the reason for killing my family members. No explanation or reason has ever been given to me for why the forces wished to gain entry into my family's house. There was no firing from within the house either at the time the soldiers murdered my aunt and cousin, nor at any other time.

11. My aunt was born in Bethlehem and lived there her entire life. She completed her high school education there. She married and had six children, one of whom died in July of 1976. She is survived by four children: (names redacted).

Because I live in the occupied territories, and inasmuch as the Israeli Defense Force and Shin Bet, the State security force, routinely and regularly invade our communities, I live in a constant fear of being singled out by these forces in

2

retaliation for my complaints and this law suit. Accordingly, I ask for an order of this Court permitting my identity and, where appropriate, the identity of others referred to in my affidavit to remain under seal for as long as possible. In the alternative, I ask for an order of this Court instructing counsel for the defendant to refrain from providing my identity and the identity of others referred to herein until and unless absolutely necessary. Given the events described in this affidavit and the frequency of Israeli forays into my neighborhood I have a well-founded fear that military and security forces of Israel will harm me, my family or our property in retaliation for this suit.

Dated: _____

on this _____ day of_____,2002

_____

JANE DOE I

3

# EXHIBIT D

# AFFIDAVIT IN SUPPORT OF ACTION

John Doe XVI, being duly sworn, deposes and says:

1. I have retained the Law Office of Stanley L. Cohen to represent me in this action. His office is located at 351 Broadway, Suite 300, New York, NY 10013.

2. I am a United States citizen. I submit the herein affidavit in support of the above-entitled cause, which I am filing on behalf of my deceased son, Baby Doe IV (Passport #(number redacted), who was also a United State citizen, and for whom I intend to secure designation as the executor of his estate in the near future.

3. The sources of your affiant's information and belief are: first hand knowledge and observation, and discussions with witnesses to the events complained of herein.

4. I was born on (date redacted), 1958 in Beit Ur, a town near the city of Ramallah, Palestine. I lived there until 1974 when my father, my brothers and sisters moved to the United States. We lived first in Maine for two years and then in Belleglade, Florida. In 1976 I began working in my father's grocery. I worked with him for four or five years. I met my wife, Nadia, in the U.S., and we married in 1983 in Jerusalem. We had five children, Baby Doe IV, Mahammed, Samah, Wayel and Abdel. Approximately two dozen of my relatives are American citizens and reside all over the United States.

5. My eldest son Baby Doe IV was born in Jerusalem on June 21, 1984. A few months after he was born my wife and I returned with him to Belleglade, Florida. We lived there for six years. We returned in 1990 and presently live in the Shuffat camp near Jerusalem. The camp is not overseen by the Palestinian Authority, but is administered instead by Israel itself. The camp is less than two square miles in

1

size, with more than 20,000 persons living there.  Most homes have electricity and indoor plumbing.

6. From first to ninth grade Baby Doe IV went to the Shuffat camp school; for tenth and eleventh grade he attended the Rasha Dia school in Jerusalem and was a good student. People always said that he was good with people, always happy. He never got into trouble of any kind, and for his age he seemed very serious and religious. People in the community often commented on how my son had a great future before him, and I felt proud.

7. Friday, December 8, 2000 was during Ramadan, the holy month of fasting and prayer, and the most important time of the year in the Muslim religion.  On that day, as on every Friday for years, Baby Doe IV was going to the Mosque in Jerusalem. At that time there was a demonstration against the Israeli occupation of the Palestinian land. Baby Doe IV had no great political convictions. He was devoted only to Islam. While he was on his way to the mosque there was a problem at the demonstration. Israeli soldiers began firing indiscriminately into the crowd and at any other people in the vicinity.

8. Baby Doe IV was shot once in the head. He lay there bleeding until an ambulance arrived immediately and took him in. The Israeli soldiers, however, would not allow the ambulance to go to the hospital. They made the ambulance, with Baby Doe IV in it, sit for forty minutes and during the delay he bled to death. Once the ambulance arrived at the hospital, he was pronounced dead on arrival.

9. I have never received an explanation for the wanton killing of my son. Nor could I ever imagine an explanation that might help me understand how the soldiers could have so little value for human life as to shoot into a crowd of people. Baby Doe IV was always a good boy, and no one had ever accused him of doing anything illegal or misbehaving in any way.

10. My family has not been the same since Baby Doe IV died. We used to always eat together, as a happy family, and his absence now fills all of us, especially his siblings, with a deep sorrow we cannot understand. The children are traumatized, they don't speak much anymore, and they are doing poorly in school since Baby Doe IV's death. My next-eldest son, Mohammed, is sixteen, and fears he will not live to adulthood, and is deeply troubled.

11. Because I live in the occupied territories, and inasmuch as the Israeli Defense Force and Shin Bet, the state security force, routinely and regularly invade our communities, I live in a constant fear of being singled out by these forces as retaliation for my complaints and this lawsuit. Accordingly, I ask for an order of this court permitting my identity and, where appropriate, the identity of others referred to in my affidavit to remain under seal for as long as possible. In the alternative, I ask for an order of this court instructing counsel for the defendant to refrain from providing my identity and the identity of others referred to herein until and unless absolutely necessary. Given the events described in this affidavit and the frequency of Israeli forays into my neighborhood I have a well-founded fear that military and security forces of Israel will harm me, my family and our property in retaliation for this suit.

Dated: _____
on this ___ day of _____,2002


_____
          JOHN DOE XVI

     Sworn to before me on this _____ day
     of _____ 2002, in_____.


_____
                              NOTARY

3

**EXHIBIT E**

## AFFIDAVIT IN SUPPORT OF ACTION

JOHN DOE IV, being duly sworn, deposes and says:

1. I have retained the Law Office of Stanley L. Cohen to represent me in this action. His office is located at 351 Broadway, Suite 300, New York, NY 10013.

2. I am a citizen of the United States.

3. I submit the herein affidavit in support of the above-entitled cause.

4. The sources of your affiant's information and belief are: first-hand knowledge and observation, and discussions with witnesses to the events complained of herein.

5. I was born in El Bireh on March 25, 1958. I attended high school in Palestine. I attended the City College of New York starting in 1978 and received a B.S. in 1982. I was then accepted to Howard University for Medicine and graduated in 1986. I did my residency at King's County University Hospital from 1986-1990. From then until July 2000 I worked there and taught at the medical school specializing in pediatrics, internal medicine and emergency medicine.

6. I returned to Ramallah in July 2000. The Israeli army began the invasion of Ramallah in late March 2002. For the next several weeks the city was occupied by Israeli military forces. As a consequence the Israeli army was able to, and did in fact, severely curtail and at times prohibit all people from entering the street except during brief, unannounced periods when they would lift the curfew. During periods when the curfew was imposed, even emergency vehicles were prohibited to move.

7. On or about April 10, 2002 I was attending to patients at the hospital (name redacted) where I am director of emergency medicine. Shortly before dinner time I received a phone call from my brother, Ali, stating that my father, John Doe III,

1

slurred speech and could not move his left hand. Based on these indications and my familiarity with my father's medical history I was able to diagnose that in all probability he was suffering from the onset of stroke.

8. My father lives in the Al Sharafa section of Ramallah. It is only a few miles from the hospital. Immediate medical attention is indicated in such a situation. Indeed, at an early stage, introducing a blood thinner can often avert, and will certainly mitigate the damage from stroke. I immediately called for the ambulance service, the Red Crescent, to go and attend to my father. Alternatively, that an ambulance be sent to his home to bring him to the hospital. In order to secure the medical attention essential to my father's health. I was told that the Israeli military forces would not allow any people or vehicles, even emergency vehicles to be on the street at that time. I was told that any people or vehicles on the street would be shot. I was not permitted to see my father for two days. Nor were any other medical personnel permitted to see him for two days.

9. By the time I was permitted to see my father he had undergone a stroke. When I came to him he was unable to control his bladder. He was unable to move his left side and he did not recognize me. Since that time he has been under my care and has shown some signs of improvement. However, he still suffers from slurred speech, has obvious impairment in his motor skills, typical of stroke victims. He also suffers from obvious short term memory problems. This also is typical of people that have suffered from stroke.

10. Based on my training and expertise as outlined in paragraph 5 above, I am able to say to a reasonable degree of medical certainty that had my father been treated promptly or even within a reasonably appropriate period of time, the stroke may have been averted and that in any event, the effects would have been less pronounced if at all.

11. There was no obvious military engagement in and around the hospital where I work at the time that I was trying to have my father brought there and during the entire day. It is my understanding that at the time my father first complained of the symptoms described above there was no military action in the area around his house. There was certainly no firing at or from his house at that time or any time for that matter.

12. On 8 April of this year, at least six soldiers came to the house at one o'clock in the morning, while I was attending at the hospital. My wife and six daughters were home alone. My daughters range in age from fifteen years to two years old. The soldiers demanded entry, ordered all the family into the kitchen and then searched the house. After approximately half and hour, they left without giving any indication of why they had come.

13. More recently, my wife and children were at home in Ramallah, on 24 June 2002. A full-scale re-invasion of the city had occurred approximately 48 hours before, and all Ramallah was and remains as of this writing under a shoot-on-sight curfew. I was attending the emergency room at the hospital when 50-60 IDF soldiers surrounded my house. Eight soldiers came to the door, demanded entry, and ordered my wife and children to wait on the verandah under armed guard, while they searched the entire house and my medical clinic downstairs. My clinic advertises itself with a large sign that reads (name and practice redacted).

14. The soldiers opened all my drawers and closets, and then they searched all my computers, both personal and business, in the house and in the office and clinic, systematically opening all my computer files. They also searched my daughter's computer, and damaged the hard drive, rendering it inoperable. After approximately forty-five minutes, they left to search my neighbor's house.

3

whether my sisters were killed upon impact, as a result of the house collapsing, or whether, buried under the rubble, they suffocated or died from injuries sustained but for which no medical personnel could attend.

7. I can say that both sisters died on April 3 as a direct result of the rocket attack. My niece was fortunate. Her spine was crushed. She has had to undergo operations to replace the fourth and seventh vertebrae, which were destroyed. She is currently immobilized, and she can not move her neck. She is 26 years old, and is currently being treated at Allmadeenah medical center, a hospital in Jordan.

8. My nephew, age 23, was also fortunate, in that he was not killed with his mother and his aunt. His face was burned and he suffered injuries to his body. He is being treated at the hospital in Nablus. He is currently unable to see clearly with one eye. The doctors are hopeful that one day he will regain his eyesight.

9. There is not now, nor has there ever been, any accusation that any member of my family has committed any crime. There is not now, nor has there ever been, any accusation that our house was used for any military, terrorist, or any other criminal purpose.

10. I first learned of the deaths of my sisters and the destruction of our home while watching television on April 3. The reporter showed the area that the Israeli forces had fired on and then the reporter stated my sisters' names as among those that were dead. I screamed, I cried, I hoped that they had made a mistake. Through numerous long-distance telephone conversations with family members I was able to verify the statements made above.

11. Like myself, both my sisters as well as my niece and nephew were born in Nablus. For my part I stayed until I was eighteen, when I left to attend the University of Baghdad, College of Economics and Business, where I received my bachelor's degree. My sisters remained there: Jill Doe III, born February 1959 went to the

2

college at Nablus where she received an Associate's degree in General Management. Jill Doe IV, born August, 1953, both loved to be with our family and in the home we had lived in since we were children.

12. When this happened my niece, Jill Doe V, just twenty five years old, was in her first year at Al Najah University where she was studying English. Now she is unable to move, and still has no feeling in her hands and legs. My nephew Charles Doe I is just twenty two years old, had finished high school in Nablus, and was unsure if he wanted to attend college. Now he is in the hospital, his face burned and vision in his eye uncertain.

13. I think of my sisters several times a day. It still seems impossible that this has happened, and I can not comprehend how the Israeli forces could do this thing. My sisters were a threat to no one. They have never injured anyone and killing them was senseless in every sense of the word. It is my intention to seek appointment as executrix of their estate. Because I live in the occupied territories, and inasmuch as the Israeli Defense Force and Shin Bet, the State security force, routinely and regularly invade our communities, I live in a constant fear of being singled out by these forces in retaliation for my complaints and this law suit. Accordingly, I ask for an order of this Court permitting my identity and, where appropriate, the identity of others referred to in my affidavit to remain under seal for as long as possible. In the alternative, I ask for an order of this Court instructing counsel for the defendant to refrain from providing my identity and the identity of others referred to herein until and unless absolutely necessary. Given the events described in this affidavit and the frequency of Israeli forays into my neighborhood I have a well-founded fear that military and security forces of Israel will harm me, my family or our property in retaliation for this suit.

3

Dated: _____
on this _____ day of_____,2002


_____
        JANE DOE II

# EXHIBIT I

# AFFIDAVIT IN SUPPORT OF ACTION

John Doe XII, being duly sworn, deposes and says:

1. I have retained the Law Office of Stanley L. Cohen to represent me in this action. His office is located at 351 Broadway, Suite 300, New York, NY 10013.

2. I am a United States citizen and have been since 1968. My social security number is (number redacted). My passport number is (number redacted). More than forty of my family members are also United States citizens.

3. I submit the herein affidavit in support of the above-entitled cause.

4. The sources of your affiant's information and belief are: first-hand knowledge and observation, and discussions with witnesses to the events complained of herein.

5. I was born on (date redacted), 1941 in the Al- Bireh section of Ramallah, Palestine. I lived there and went to school there until 1960. In 1965 I went to the United States in Youngstown Ohio, where I met and married my wife, Amineh. I became a United States citizen in 1968. We remained in Youngstown until 1993, and we still own a house there, although I currently reside part of the year on Al-Mobadeen Street in the Al- Bireh section of Ramallah.

6. While in Youngstown, I worked and later bought, owned and ran several grocery stores. Amineh and I raised our family there. We have five daughters: Heba, who currently lives in Salem Ohio; Rana, who currently resides in Fairfax, Virginia; Janan, who currently resides in Twinsburg, Ohio; Haya, who lives in the house I still own in Youngstown; and Jill Doe XXXIV, who lives in the Al-Bireh section of Ramallah.

7. Through hard work we were able to save enough money that in 1976 we bought land on Al Mobadeen Street in the Al-Bireh section of Ramallah. In 1976 we had a two-story apartment building constructed there. In 1993 my wife and I moved

1

into the building, and in 1998 we had two stories added to the building. There are at least thirty families in this section that are United States citizens.

8. In July 2001 my daughter Jill Doe XXXIV lived here with her was her husband Charles Doe XXXXI and their five children: Baby Doe XXXII and Baby Doe XXXIII, both daughters; and Baby Doe XXXIV, Baby Doe XXXV and Baby Doe XXXVI, all boys. The children at that time ranged in age from eleven to three. Her family, along with my wife and I, were living on the second floor. Tenants in the building included a woman who was in her sixties and her teenaged daughter.

9. In July 2001, two Apache helicopters of the Israeli Defense Force hovered outside my building on opposite sides and fired at least two rockets into the fourth story. The rocket fire killed a guest of the tenant in the fourth floor apartment. The rocket fire destroyed the interior walls of the third and fourth floor, the doors, and windows. The rockets also damaged an exterior gas line for the building and thereby caused a fire to break out. Luckily, neighbors in the area were able to put out the fire before the entire building was burned up.

10. My daughter and her children were in the apartment on the second floor at the time of the fire. It is a miracle that none of them was killed or severely injured. There was substantial damage to the apartment including: shrapnel entered into the apartments and damaged walls; some of the doors were blown off their hinges; all of the windows were destroyed. It is difficult to describe the horror my grandchildren experienced at this event. They were screaming and yelling and obviously terrified.

11. The sixty year old woman who is my tenant was hit with shrapnel, and her daughter suffered a broken arm.

12. This happened nearly one year ago. The trauma of my grandchildren is still manifest. They are all frequently prey to the most terrifying nightmares, often of

2

soldiers suddenly appearing and firing at them. They also suffer from a chronic need to go to the bathroom. This happens several times during the day in which they have to use the bathroom immediately. They have been to the doctor several times to treat this but it is his diagnosis that there is no physiological explanation for this. He believes it is directly related to their trauma.

13. There are literally more than 1000 holes throughout the building from shrapnel from the rocket fire. All windows in the building were destroyed, the sewer line was destroyed as was the water line. The repairs that I have made, largely superficial so far, have already cost me approximately fifty thousand dollars ($50,000.00). In addition, many of the units are not yet habitable and I estimate that I have lost somewhere between thirty-five and fifty thousand dollars ($35,000.00 - 50,000.00) in rental income.

14. I am the owner of the building. This is a matter of both public record and common knowledge. I have resided here since 1993. I am a responsible landlord. I am always available and responsive to any and all complaints and inquiries. I can assert that I have never been approached by any authority, Palestinian or Israeli, concerning any resident of my building or any of their guests. No one has ever approached me about any wanted person ever having been to my building. I would, of course, have been responsive to any such concerns. As such I am entirely unable to say why Israeli forces fired at my building without warning or investigation. I am incapable of saying what they intended by this action or even if they intended to kill the guest who was there. I can however say that there are many entirely obvious alternatives to destroying two floors of my building, traumatizing children that they had to know were present. In fact it was merely fortuitous that my grandchildren were not playing outside at the time. If they were they surely would have been killed by either the shrapnel or the rubble that fell

3

immediately to the ground.

15. In addition to the damage done by the Israeli rocket fire,  Israeli bulldozers have knocked down the wall around the house on two occasions. When I have complained of this the soldiers have laughed at me.

16. I have also made complaints to the United States consulate about the damage done by the rocket fire and have been told that there is nothing that they can do.

17. Because I live in the occupied territories, and in as much as the Israeli Defense Force and Shin Bet, the State security force, routinely and regularly invade our communities, I live in constant fear of being singled out by these forces as retaliation for my complaints and this lawsuit. Accordingly, I ask for an order of this court permitting my identity and, where appropriate, the identity of others referred to in my affidavit, to remain under seal for as long as possible. In the alternative, I ask for an order of this court instructing counsel for the defendant to refrain from providing my identity and the identity of others referred to herein until and unless absolutely necessary. Given the events described in this affidavit and the frequency of Israeli forays into my neighborhood I have a well-founded fear that military and security forces of Israel will harm me, my family and our property in retaliation for this suit.

Dated: _____

on this _____ day of_____,2002

_____

JOHN DOE XII

**EXHIBIT J**

## AFFIDAVIT IN SUPPORT OF ACTION

JOHN DOE V, being duly sworn, deposes and says:

1. I have retained the Law Office of Stanley L. Cohen to represent me in this action. His office is located at 351 Broadway, Suite 300, New York, NY 10013.

2. I am a citizen of the United States of America.

3. I submit the herein affidavit in support of the above-entitled cause.

4. The sources of your affiant's information and belief are: first-hand knowledge and observation, and discussions with witnesses to the events complained of herein.

5. I currently reside at (address redacted), Winnemucca Nevada, 89445. I have resided here since 1990. Before that I lived in California from 1972 to 1990. My social security number is (redacted). I was born on (date redacted), 1950 in Deir Debwan, Palestine, which is a town approximately seven miles north east of Ramallah. It is my understanding that perhaps as many as 80% of the population of Deir Debwan are United States citizens. My wife Fouzieh and three children live there now. My children's names are Omar age 17, Jhadah age 14, and my only daughter, Entisare who is 12 years old.

6. On January 30, 2000 I flew into the Ben-Gurion airport in Tel Aviv. While my luggage was being checked the Israeli security officer asked if I had any electronic equipment. Thinking that he was referring to computers, radios or recorders, I said that I did not. He opened my bag and, finding a Nintendo game that I had brought for my nephew, he accused me of lying. He also insisted that I would have to pay two hundred dollars ($200.00) as a duty. I explained that I was not lying, but that I had not thought the game was the type of equipment he was concerned about. I also stated that the game had only cost fifty dollars ($50.00) at WalMart, and that

1

such an unreasonable duty was absurd. He slapped me in the face, causing a red mark and intense pain. Dozens of other American travelers were watching this event, and the humiliation I felt was acute.

7. Soon after, I went to the United States consulate in East Jerusalem to complain of such treatment of a United States citizen. The person I spoke with there said that there was nothing they could do about it and stated that if I did not like it, I don't have to travel in this part of the world.

8. On May 5, 2002, my fifty-second birthday, I was traveling from Jerusalem to Ramallah. I was wearing an American flag lapel when I arrived at the Kalendia checkpoint. It is located about ten miles from Jerusalem, near the old Jerusalem airport. I got to the checkpoint at approximately 11:30 am. I presented my American passport to the Israeli soldiers guarding the checkpoint. At least one of the soldiers pointed a gun at my head and another shoved me. I stated that they had no reason to treat me like this. I stated that I am an American citizen, I am not a terrorist, and that I was here as a tourist. The soldier that had pushed me stated "I am an Israeli guard and I can do anything I want. If you don't like it you can go back to the United States." He then pushed me to the ground and kicked me twice: once in my back, once in the back of my head. His blows knocked the breath out of me, and caused me to black out momentarily, as my vision went blurry and I could not see. Afterward, my head throbbed for hours with pain, and my back was bruised, tender and in so much pain I could not move normally. Walking and sitting were extremely painful.

9. The soldier then ordered me to sit on a rock next to the checkpoint. It was hot. When I had been pushed to the ground my suit was torn and dirtied. I felt that I looked like a bum. After sitting there for no apparent reason for approximately one hour, I got up and asked if I could speak with his supervisor. He hit me on the

2

right side of my face with his rifle butt. He ordered me to go back and sit on the rock. I did so. At approximately 2:00 pm there was a change of soldiers. The one that had hit me and kicked me, and the one that had pointed his gun at my head and struck me with the rifle butt both left. Another soldier, who had just come there reviewed my passport and said I could continue on my way. I complained to him of the treatment I had just been subjected to and he said that each checkpoint is different and each soldier is.

10. I promptly went to a doctor in Ramallah. He could see a large bruise on my face and was able to determine that I had damage to my right eardrum and a 50% loss of hearing in that ear. He could also see a bruise on my back from being kicked, and correctly stated that it would hurt for a few days. He gave me a pain killer.

11. I have never so much as been accused of having committed any crime. I have never caused any injury to another person. I am not affiliated with any organization that conducts violence against any one. I am like the vast majority of Americans in this regard.

12. Because I go to the occupied territories, and my wife and children live there, and inasmuch as the Israeli Defense Force and Shin Bet, the State security force, routinely and regularly invade our communities, I live in a constant fear of being singled out by these forces in retaliation for my complaints and this lawsuit. I have a reasonable and substantial fear that my ability to travel there will be hampered or even prohibited should my name be revealed. Accordingly, I ask for an order of this court permitting my identity and, where appropriate, the identity of others referred to in my affidavit to remain under seal for as long as possible. In the alternative, I ask for an order of this court instructing counsel for the defendant to refrain from providing my identity and the identity of others referred to herein until and unless absolutely necessary. Given the events described in this affidavit

3

and the frequency of Israeli forays into my neighborhood I have a well founded-
fear that military and security forces of Israel will harm me, my family and our
property in retaliation for this suit.

Dated: _____
on this _____ day of_____, 2002


_____

JOHN DOE V

4

# EXHIBIT K

## AFFIDAVIT IN SUPPORT OF ACTION

JOHN DOE XIII, being duly sworn, deposes and says:

1. I am a citizen of the United States, and I currently reside on Othman bin Affan St., Sheik Jarrah, East Jerusalem, in the occupied West Bank of Palestine.

2. I submit the herein affidavit in support of the above-titled cause.

3. The sources of your affiant's information and belief are: first-hand knowledge and observation, and discussions with witnesses to the events complained of herein.

4. On the morning of Friday, 30 March 2002, soldiers of the Israeli Defense Forces attacked the city of Ramallah and its environs. My business, (name redacted), a tire distribution company, (location redacted in part), in the Bitonia Industrial Zone in Ramallah, was completely destroyed by an Apache helicopter rocket attack sometime just after noon on Saturday, 31 March 2002. My only remaining employee at the time of the attack, Charles Doe VII, lives less than 100 feet from my business, and that morning he called on his mobile phone to inform me that a helicopter attack on the Industrial Park was in progress, and that my company had been hit. Charles Doe VII said at that time that he watched the entire premises burning out of control, that he could see fire and thick black smoke, and that no one was attempting to fight the blaze, as all emergency services were interrupted or destroyed by the IDF operations. In subsequent telephone conversations with Charles Doe VII that day and in the days following, I was informed that he had inspected the premises, and that all my inventory had burned, my offices were destroyed with everything in them, and that much of the rubber was still burning days later.

5. My business has no strategic military function whatsoever, nor did it pose any threat to the IDF. Neither my business nor myself has ever had any connection of any kind with the Palestinian Authority and its operations, or with any paramilitary or political organizations whatsoever. Charles Doe VII states that no weapons were discharged in the moments before the attack from the area of my business, nor was there any return fire directed at IDF operations from the area of my business during or after the attack. Other businesses in the Industrial Park were also destroyed that day, as numerous people in the Palestinian business community have informed me.

1

6. The devastation has been widespread and apparently deliberate. I can only conclude that this destruction is simply the latest in a long series of acts by the government of Israel in their campaign of economic warfare against the residents of the West Bank.

7. I opened my business in May of 2000, with an initial investment of $300,000US, which I raised principally from my savings in the United States, augmented by some funds from my brother Mohammed, who maintains a silent partnership interest in the business. In its first six months of operation, my business grossed approximately $100,000US per month, selling as many as 3,000 tires each month; from this, my company earned approximately $75,000US in net receipts during this period, and was steadily building accounts throughout the West Bank. By the start of the current *intifada,* or uprising, and the Israeli military incursions into the West Bank, I had assembled major accounts with semi-annual standing orders with tire shops in Jenin worth $50,000; in Nablus worth $100,000; accounts in Qalquiya worth $60,000; and accounts in Bethlehem worth $20,000. During the early stages of the disturbances, my company was still able to do some business, though orders began to flag within months as IDF forces took control of the movement of goods and traffic on the roads connecting the major cities of the West Bank. Other tire shops outside Ramallah that depended on my distribution were shut down by the IDF, or placed in zones off-limits by the military. When Ramallah was closed by the Israeli military in April 2001, and became a restricted military zone, my company lost all ability to conduct business entirely, save for the occasional single tire sold to a Ramallah resident.   Revenue began to disappear as the Palestinian communities under closure experienced a constriction of the general economy, which rippled through all sectors of trade among Palestinians. Since April of last year, my company has not sold a single tire outside of the Ramallah military zone as a direct result of IDF closure. During the early stages of this period, I continued to try to fill deliveries, but every time I loaded my trucks with hundreds of tires and sent them out, they were detained at military checkpoints, unloaded and searched, then turned back with their load. Often my drivers would have spent an entire day at a checkpoint before being turned back. Eventually the accounts in other cities began to disappear, as the entire Palestinian economy shrank as a result of closure. All the roads are controlled by the IDF with machine-gun positions, tanks and armored vehicles with heavy weapons. It is not possible to make deliveries anywhere under their control; for example, as of this writing, I have not visited Jenin in two years because Palestinians are not allowed to travel there. At the time of the

attack, my monthly gross receipts had dwindled to less than $1,000, or barely enough to cover transport, electricity and phones. I was forced to lay off all my remaining employees in December.

8. A Palestinian importing company in Gaza is my principal supplier. They currently hold approximately $100,000US in debt owed by my company against the nearly $150,000US in stock-on-hand I kept at the company's warehouse—approximately 3,000 tires, or a month's supply, many of them high-end truck tires which cost as much of $350US each.   Upon information and belief, all of this stock is now destroyed. In addition, my offices and warehouse contained approximately $25,000 in office equipment, warehouse equipment and physical plant, all of which is also presumably destroyed in the fire that consumed the buildings. My business has no insurance, because after July 2001, I was no longer able to pay the premiums due to loss of receipts, and the policy lapsed. All my inventory records are kept in file cabinets on the premises of the business, and I have not been able to enter the military zone since the attack, and cannot provide supporting documentation at this time. My business consisted of three rented premises, with two warehouse/stockrooms and one showroom/office.   The combined annual rent on the premises was approximately $8,000US.

9. I was born in Talloza, West Bank, on (date of birth redacted) 1963. My U.S. Passport number is (redeacted), issued in Philadelphia, (date partially redacted) 1993. My father, Jameel, was a farmer in the Talloza area, and died in 1992. My mother, Izziah, age eighty-three, lives in the West Bank. My family lived for part of my childhood in the Palestinian refugee camp Al Farah, operated by the United Nations Relief and Works Administration in Palestine. I have eleven siblings, and three of them are U.S. citizens: my brothers Khalid and Walid are independent home improvement contractors in Edgewater, and my sister Mariam, a U.S. citizen, is a housewife with six children in New York. The rest of my siblings live in Jordan or Palestine.

10. I have never been arrested or detained at any time or anywhere.

11. I moved to the United States at age eighteen in 1981, after graduating from high school in Ramallah. I first lived with my brother Khalid, a student who had been in the U.S. already for two years, and we shared an apartment in North Bergen. Upon arrival I began attending Essex County College in Newark, N.J. I graduated from Jersey City College (now New Jersey State College at Jersey City) with a B.S. degree in computer science in 1992. In 1993 I became a naturalized U.S. citizen.

12. After I finished my schooling, I entered a management training program with Hardee's Corporation, the fast-food franchise company, in

Hackensack, N.J. From 1993 to 1995, I managed various Hardee's, Roy Rogers, and Pudgees franchises in northern New Jersey and New York City. In 1995, I began working as a manager at Café Italiano, a full service restaurant in Englewood Cliffs, N.J., where I was employed until 1999. I then became a manager at Il Villino restaurant in Waldwick, N.J., where I was employed until early 2000, when I decided to move my family to Palestine and start my tire business. From 1987 through 2000, I lived and paid taxes at various addresses in North Bergen and Union City, N.J. During this time, my annual income averaged approximately $27,000.

13.   My wife Samar was born in Jerusalem in 1973. We met in 1997 when I was visiting my brother at a center for ex-detainees in Ramallah, and were married in Oct. 1998, in Ramallah. We set up house in New Jersey, and our first daughter, Shadia, was born in Edgewater in 1999 and is a U.S. citizen; our second daughter, Noor, was born in August, 2001, in Jerusalem, and we are in the process of applying for her American citizenship at this time. My wife is a Permanent Resident Alien, (number redacted). Her social security number is (redacted).

14.   Since the first attacks on the Ramallah presidential compound in December of last year, I have been unable to do any business at all, I have been unemployed, and with little means of supporting my family except for assistance from my extended family in the West Bank. At the time of the attack, I had been living at Sateh Marhaba, in Al Bireh, Ramallah. But due to my mounting losses, I could no longer afford the rent on my family's apartment, and I was forced in February of this year to move in with my sister-in-law and her family in the house they rent at my present address in East Jerusalem. At this time, I am unable to re-enter Ramallah, and since the full-scale military invasion on 30 March, I have not seen my business. For the past week, I have tried to enter Ramallah three times at the Kalendiah military checkpoint of the IDF, during the momentary suspension of curfew that occurs sporadically, but Israeli military officials will not recognize my property rights nor my right to pass. At this time, there is no Israeli civil procedure by which I might seek redress for my losses, and to the best of my knowledge, no military tribunal yet exists which would hear my claim, or recognize my right to make such a claim. The Palestinian Authority, the nominal government under which my business operates, has been drastically reduced—if not eliminated—with its ministries shelled by tanks and rocket attacks, its president trapped in his compound, and its police forces arrested, killed or dispersed. To my knowledge, there is no legal remedy in Israel for the losses I have suffered

as a result of the wanton, systematic and intentional destruction of my property and business at the hands of the IDF.

Dated: _____

on this _____ day of _____,2002


_____

      JOHN DOE XIII

**EXHIBIT L**

# AFFIDAVIT IN SUPPORT OF ACTION

John Doe X, being duly sworn, deposes and says:

1. I have retained the Law Office of Stanley L. Cohen to represent me in this action. His office is located at 351 Broadway, Suite 300, New York, NY 10013.

2. I am a citizen of the United States, and I currently reside on Nablus Street, Alberahl, Ramallah, Palestine. My social security number is (number redacted) and my passport number is (number redacted). I was born on (date redacted), 1953 in Jerusalem.

3. I submit the herein affidavit in support of the above entitled cause.

4. The sources of my information and belief are: first-hand knowledge and observation, and discussion with witnesses to the events complained of herein.

5. I am one of several owners of a supermarket located in the Almasion area of Ramallah and known as (name redacted). The other owners are: (four names redacted) who are all United States citizens, John Doe XI, (four names redacted).

6. The Israeli army invaded Ramallah on March 28, 2002. For the next three days no one was able to enter the store. By March 31 several armored personnel carriers of the Israeli army were stationed outside my store. At least one fired at and knocked into the door of the store thereby knocking open the front doors.

7. As affirmed in paragraph 6 no one had been able to enter the store since March 29. There was no firing from inside the store or in the immediate vicinity of the store. After the tank blew open the front of the store several soldiers entered. Within the store there is a locked door which leads to the basement. The soldiers used an explosive device to break that door. Because I am unfamiliar with explosive devices I am unable to make any statement as to what type of device this was.

8. In any event, contained within the basement are a few computers and a safe. The

1

soldiers destroyed the computers. There is also a safe in the basement that the soldiers attempted to break into. In addition to the damages in the basement the soldiers took or destroyed numerous foodstuffs in the store. Within the supermarket there was a room of various cigarettes. These, like the food, were taken or destroyed.

9.  On April 11 five armored personnel carriers, one tank and about thirty soldiers returned to the store, and using an explosive device, blew the safe open and took the money that was inside.

10. Whether due to the force used to gain entry or because of acts by the soldiers once inside, the electrical system for the store was destroyed. No effort, so far as I know, was ever made by the Israeli forces to fix this. As a result, all perishables within the store were ruined.

11. I have never been involved in any political organization that has been accused of criminal activities. I have never been arrested. None of the other partners in the store has ever been arrested so far as I know. There has never been even so much as a suggestion that the supermarket was used for any illegal reason, neither to harbor people accused of anything criminal, nor to store items that would be used for criminal purposes. I have never been informed that the Israeli soldiers recovered anything suggesting criminality. In short there is little to suggest their reasons for this destruction other than for their own desire to take the goods within, to damage the supermarket, to loot our products and steal our money.

12. I lived in the United States for more than twenty years. With the hope raised by the Oslo peace accords I along with two friends decided to move back to Palestine. It was my intention to start businesses in order to help establish a meaningful infrastructure in Palestine. In some degree we had been successful. The supermarket, prior to the invasion employed twenty-five people in good jobs.

2

We were doing retail sales of between six and seven thousand dollars U.S. currency. Our supermarket provided a variety of goods to people in the area.

13. I estimate the damage to the store, the cost of repairs and the replacement of items such as computers as being thirty thousand dollars U.S. ($30,000.00). My estimate as to goods stolen or ruined as twenty five thousand dollars U.S. ($25,000.00). The store was closed due to the invasion for twenty three days. As stated above, retail sales were between six and seven thousand dollars a day. In addition, even by the beginning of June 2002 we have not been able to fully repair the entire store.

14. At the present time no civil authority exists in the Deir-Debwan section of Ramallah, as the government of the Palestinian Authority, its ministries and police services, has been completely suppressed. To the best of my knowledge, there is no governing Israeli military police authority in Ramallah to which I might make any official complaint, as the city is still under siege and is an active military combat zone. Moreover, it would be completely futile for me to bring any claim in any Israeli court seeking justice for my injuries. Palestinians have little or no standing in Israeli civil courts for the Israeli government's activities in the occupied territories. Although several treaties and charters of international law apply to my status in the occupied territories, I am not recognized by Israeli courts and there are no meaningful remedies or relief the I can seek through Israeli courts.

15. Because I live in the Occupied territories, and inasmuch as the Israeli military and Shin Bet, the State security force, routinely and regularly invade our communities, I live in a constant fear of being singled out by these forces in retaliation for my complaints and this law suit. Accordingly, I ask for an order of this Court permitting my identity and, where appropriate, the identity of others referred to in

3

my affidavit to remain under seal for as long as possible. In the alternative, I ask for an order of this Court instructing counsel for the defendant to refrain from providing my identity and the identity of others referred to herein until and unless absolutely necessary. Given the events described in this affidavit and the frequency of Israeli forays into my neighborhood I have a well-founded fear that military and security forces of Israel will harm me, my family or our property in retaliation for this suit.


Dated: _____
on this ___ day of_____,2002


_____
     JOHN DOE X

# EXHIBIT M

## AFFIDAVIT IN SUPPORT OF ACTION

John Doe VIII, being duly sworn, deposes and says:

1. I have retained the Law Office of Stanley L. Cohen to represent me in this action. His office is located at 351 Broadway, Suite 300, New York, NY 10013.

2. I am a citizen of the United States and have been since 1985, my social security number is (number redacted), my passport number is (number redacted). I was born on (date redacted), 1958 in Jerusalem. I currently reside in a suburb of Jerusalem, Beit Hanina, Alshkary district. I also have my own law office on the second floor of the (address redacted) in Ramallah, Palestine.

3. The source of your affiant's information and belief are: first-hand knowledge and observation, and discussions with witnesses to the events complained of herein.

4. From 1983 to 1993 I resided in the United States. The addresses where I resided were: (three addresses redacted) all of which are in Chicago. During that time I attended courses at Northeastern University and worked at my cousin's supermarket.

5. Since leaving Chicago I have resided first, in the Satehmarhaba area of Ramallah, Palestine until late 1997, and at my current address in Beit Hanina.

6. I have been injured in a substantial regard, to either my person or my family members or my property, by Israeli forces on at least three occasions.

7. In September of 1997 I resided with my family at El Beira in the Satehmarhaba area of Ramallah. I resided there with my wife, Jill Doe XXVIII. At that time we had two children, Baby Doe XXX, who was then two years old, and Baby Doe XXXI, who was then one year old.

8. Somewhere between five and ten soldiers of the Israeli Defense Forces, armed

1

with M-16s, came to our home and demanded that my family and I come out into the hallway of the building. The soldiers appeared nervous. There was no reason given for this demand and when I merely asked why they were ordering us to do this, at least one soldier became angry. I was holding my daughter Baby Doe XXX in my arms at the time. Despite that, the soldier pushed me and struck me in my shoulder. I fell to the ground as a result of his blows, and just managed to keep the baby from any injury. None of the soldiers would tell me why they were making this demand but after being hit and knocked to the ground, I complied with all their orders. The soldier had hit me in front of my entire family and they were terrified, and they accordingly complied. My injuries required medical attention. None of us were accused then or any time later of having done anything criminal, threatening or wrong. Moreover, I have never been affiliated with any political organization or accused of any wrongdoing.

9. Several soldiers then occupied our apartment. My family and I were not permitted to leave the hallway area. During the course of the night we could hear firing coming from our apartment. We were not permitted to go back into our own home even to get milk or juice for my daughters. In fact later in the evening, at around 11:00pm I asked one of the soldiers if I could get milk for my children and he roughly pushed me away. We were also not permitted to go elsewhere for juice.

10. The following day, a friend of mine, having heard of the situation came and spoke with the soldiers. My friend was a United Nations representative and only through his efforts were we even permitted to leave the hallway area and stay with friends. The soldiers themselves refused to vacate our home. They stayed there for four or five days. It is my understanding that throughout that time they continued to fire guns from our home.

11. The soldiers ruined our apartment and many of our possessions. I was never

2

computer, and damaged the hard drive, rendering it inoperable. After approximately forty-five minutes, they left to search my neighbor's house.

15. During this incident, my wife and children were terrified, and the children were especially traumatized after six months of near-constant siege to have IDF soldiers standing over them with weapons brandished. My absence during this tense moment led my wife and children to fear the worst for me, as the soldiers seemed intent on finding something in our house. No explanation was offered by any commanding officer for why they had come. I have no idea why the IDF has decided to focus on my medical practice and my home, subjecting it to searches with some frequency, and I fear I am being singled out because of the success of my practice and because I am an American.

16. I have no affiliation with any political party that is prohibited or that has ever been involved in any illegal conduct.

17. Because I live in the occupied territories, and inasmuch as the Israeli Defense Force and Shin Bet, the State security force, routinely and regularly invade our communities, I live in a constant fear of being singled out by these forces in retaliation for my complaints and this law suit. Accordingly, I ask for an order of this Court permitting my identity and, where appropriate, the identity of others referred to in my affidavit to remain under seal for as long as possible. In the alternative, I ask for an order of this Court instructing counsel for the defendant to refrain from providing my identity and the identity of others referred to herein until and unless absolutely necessary. Given the events described in this affidavit and the frequency of Israeli forays into my neighborhood I have a well-founded fear that military and security forces of Israel will harm me, my family or our property in retaliation for this suit.

4

Dated: _____
on this _____ day of_____, 2002


_____

**JOHN DOE IV**

# EXHIBIT F

## AFFIDAVIT IN SUPPORT OF ACTION

JOHN DOE III, being duly sworn, deposes and says:

1. I have retained the Law Office of Stanley L. Cohen to represent me in this action. His office is located at 351 Broadway, Suite 300, New York, NY 10013.

2. I am a United States citizen.

3. I submit the herein affidavit in support of the above entitled cause.

4. The sources of your affiant's information and belief are: first hand knowledge and observation, and discussions with witnesses to the events complained of herein.

5. I was born in El Bireh, Palestine in 1931. I completed prep school there and helped my parents working in the fields of their land. Later I did stone work, making statuary for homes and other buildings.

6. In 1969 I moved to the United States where I became naturalized in 1971. For the first few years I lived in Ohio and later moved to New York State. During the time that I lived in the United States I worked in and later owned several grocery stores. I returned to El Bireh in 1982.

7. On or about April 10 there was a curfew imposed by the invading Israeli forces that had been in effect for at least several days. On or about April 10, shortly before dinner, I experienced a headache and chest pain. Family members that were with me could detect a certain slurring of speech although I had not been drinking alcohol. I was also unable to move my left hand. My son John Doe IV is a doctor at (redacted) hospital. His education and expertise are contained in his affidavit. (Submitted herewith). My family contacted John Doe IV at the hospital where he was able to determine from these symptoms and my medical history that I was beginning to suffer a stroke.

1

8. My son indicated that it was essential that I get to the hospital immediately. However, the invading Israeli forces prevented any ambulance from coming to my house. The same forces would not allow any of my family to take me to the hospital. Despite the obvious emergency, no medical personnel were permitted to see me until two days after the onset of these symptoms. I have been informed by my son that when he was finally able to see me I could not hold my urine, I could not stand or move my left side. I could not recognize my own children.

9. It is my understanding that I suffered a stroke. It is also my understanding that had there been prompt treatment there would have been a reasonable likelihood of preventing the stroke or minimizing its effects. It is my understanding that prompt treatment in such situations typically means a matter of hours, not days. It is my understanding I currently have recurrent short term memory difficulties. It manifests itself in ways such that I frequently can not recall where I have left my keys, what room I am in, or what I was doing only a moment before. I am also frequently disoriented as to where I am and I have difficulty recalling people who may have visited me the day before. Moreover, I have some difficulty walking and my speech is sometimes slurred.

10. The decision to refuse me essential medical attention is a mystery to me. I have never been so much as accused of committing any act of violence. Nor have I participated in any political organization that has been accused of any wrongdoing. Moreover, at the time that I was beginning to suffer from the stroke and through that day there was no fighting in the area of my home.

Because I live in the occupied territories, and inasmuch as the Israeli Defense Force and Shin Bet, the State security force, routinely and regularly invade our communities, I live in a constant fear of being singled out by these forces in retaliation for my complaints and this law suit. Accordingly, I ask for an order of

this Court permitting my identity and, where appropriate, the identity of others referred to in my affidavit to remain under seal for as long as possible. In the alternative, I ask for an order of this Court instructing counsel for the defendant to refrain from providing my identity and the identity of others referred to herein until and unless absolutely necessary. Given the events described in this affidavit and the frequency of Israeli forays into my neighborhood I have a well-founded fear that military and security forces of Israel will harm me, my family or our property in retaliation for this suit.

Dated: _____
on this _____ day of_____,2002

_____
JOHN DOE III

3

**EXHIBIT G**

## AFFIDAVIT IN SUPPORT OF ACTION

John Doe XV, being duly sworn, deposes and says:

I have retained the Law Office of Stanley L. Cohen to represent me in this action. His office is located at 351 Broadway, Suite 300, New York, NY 10013.

1. I am a resident alien of the United States.

2. I submit the herein affidavit in support of the above-entitled cause.

3. The sources of your affiant=s information and belief are: first-hand knowledge and observation, and discussions with witnesses to the events complained of herein.

4. From September 1984 to September 1986 I attended the University of Washington and resided in Seattle, Washington.

5. Although I frequently return to Washington State, in 1986 I moved to my current residence on Omar Bin Abdel Aziz Street in Tulkarm, West Bank, Palestine. My family owns the apartment building in which I live, along with twenty-two other U.S. Citizens, Resident Aliens and immediate relatives, seventeen of whom are children under the age of fourteen. The building has five stories and an interior front door that is located in a shared and gated walkway that separates our building from that of our neighbors. Next to our interior front door, there is another door to a backyard where we keep chickens and pigeons. My two brothers Charles Doe XXII and Charles Doe XXIII, both are U.S. citizens, reside here as well. In addition to my brothers, several of my nieces and nephews live here, as does my son Baby Doe III. My son was born in Tulkarm on August 31, 1991.

6. On May 25th, 2002 at approximately 1:30 pm, my brothers Charles Doe XXII,

Charles Doe XXIII, and along with my cousin Mohammed were working in the courtyard. My brothers asked my son to get them some coffee or tea. There had been no gunfire in the area of our home during the day. There had certainly not been any firing from our home. At the time that my son exited the door of the backyard to enter into the building, which is a few feet away, at least three tanks of the Israeli army were coming up the street passing by our building. A soldier in one of the tanks was positioned atop the turret of the tank. He was not more than fifty meters from my son. My son was clearly visible to the soldier. It was obvious that he was not armed. It was also obvious that he was not firing and that no one in the area was firing any guns. For reasons known only to him, the soldier began firing at my son. My son was obviously shot in the leg. I could see that he was bleeding profusely, on the ground and unable to move, screaming for me to help and crying. I ran to my son, who lay in the exposed area of the walkway. I could see the soldier. I saw the soldier look at me and he opened fire again, firing at both of us. I fell on my son, and I thought I had been shot, so I lay on my son hoping in that way to protect him from any more wounds.

7.  The soldier continued firing into our immediate vicinity. The wall nearest us became pitted all over from gunshots. Numerous bullets hit the ground very near to where we were. The soldier also fired into the area where my brothers had come to help my son and me. Words can not describe the terror I felt for the safety of my ten-year old son and for myself. I had wanted only to move him to safety and was initially entirely unable to move; but eventually, I realized I was not wounded but had simply sprained my ankle running to my son.   Yet my own injury and the firing of the soldier made movement impossible.

8.  Finally, after several minutes I was able to drag him to safety with the help of my

brothers. It was obvious that my son had lost a considerable amount of blood. He was clearly unable to walk and he was traumatized. My brothers and I were shouting at our wives, and at our neighbors to call up for an ambulance. There was an ambulance less than one minute away, but it reached us only half an hour later because the tanks were still present down the road. It was my understanding that all emergency services were being intermittently delayed in the area by the Israeli forces.

9.  It was clear that my son needed to be operated on immediately. Because of the lack of personnel and equipment at the local hospital, we asked to transfer the boy to a hospital specializing in bone treatment. There is one in the nearby town called Nablus, but it was too dangerous to travel on any road. We then called the U.S. Consulate to arrange to send the boy to an Israeli hospital. Two days later the Israeli District Liaison office agreed to permit the boy to be transferred to an Israeli hospital on the condition that we provide an affidavit stating that we have to pay for the entire charges. Meanwhile, my child=s leg was tied to a rope connected to a heavy sandbag that kept his leg straight while he awaited the transfer to take place.

10. My son is currently hospitalized at Nazareth Hospital in Israel, where he underwent three medical operations to his leg. Because of the travel restrictions and the long curfews imposed by the Israeli government on all Palestinians, whether citizens of the United States or not, as well as the comprehensive closures that limit our movement, I am often not permitted, nor are any of my brothers permitted, to visit him. He is a ten-year-old boy who was shot by a tank, traumatized, and alone in a strange town without a companion. He does not speak Hebrew. Under any decent person=s view a hospitalized ten-year old should have

3

as many family visits as possible.

11. It was my understanding from conversations with my son=s doctors that my son suffered at least one bullet wound in which the bullet entered his thigh from one side through the other. In passing through his body, it broke his bone and caused partial, or total, nerve damage, which renders him unable to walk. The doctors at this time are unable to determine whether his disability is permanent.

12. As with the vast majority of United States Citizens, no member of my family has ever been convicted of a crime. Like most Americans no one in my family has ever even been accused of having committed any crime of violence. My son Baby Doe III is ten years old. He has never hurt anyone in his life. It is impossible that the soldier had even the slightest fear that Baby Doe III presented a danger to him or to anyone else, ever. Nor has the soldier that shot him or any other soldier indicated any reason for shooting my son. Indeed, after wounding my son and shooting at me, no member of the Israeli forces made any effort to detain or question my son or any member of my family. They simply fired at us as if for sport, then they moved on.

13. Indeed, only the day before they shot my son, on May 24th, 2002, members of the Israeli army came to our house and reviewed the identification card of each of the people that live in our building. The identification card of any person living in this area is a nine-digit number. All military units are able to check this number to determine if the bearer is wanted for any reason. The soldiers did in fact make such a check of every member of my household and they were able to determine that no one in our household was wanted by the Israeli government for any reason.

14. On or about May 30th I made a formal complaint as to the shooting of my son to the local police force and the District Coordinating Office. My family has

informed the United States State Department, Consulate and Embassy. In fact we have complained several times seeking protection. The United States representatives have stated that they cannot control the Israeli Army. Since I made my local complaints, the Israeli forces have fired at my family=s building on at least two occasions, during occupations of Tulkarm. These firings are clearly retaliation for my complaint, in that there is never any apparent object to their firing, except to shoot up our apartment building, and the fact that the houses of our neighbors to either side are never hit at the time of these shootings.

15. forces have also caused terrible damage to the business owned by my brothers and me. My three brothers and I have been doing business as (name redacted). Our business was very successful. We are suppliers of wheat flower, seeds, animal-feed and basic foodstuffs, responsible for more than fifty percent of the town=s needs. Apart from the injury to my son and the obvious damage to our home, the Israeli We have seven stores for this purpose. Over the course of several weeks, sometime in either November or December of 2000, four of our stores, which are located in the southern part of town on a main highway connecting to the cities and villages of the Triangle area, were shot at and shelled by Israeli tank fire. In addition, the Israeli army declared the area a closed military zone, a term which is often used to warn civilians not to come near. To this date, we are still unable to reach the stores. Furthermore, a tank sideswiped one of our delivery trucks, rendering it unusable.

16. According to our accounting firm, an estimate for losses caused by the destruction of our stores and the 75% disability of our business caused by the Israeli army could exceed $1,500,000 US in net profit. I am not now able to say at this time when, or if, we will be able to restore our business.

5

17. Because I live in the occupied territories, and inasmuch as the Israeli Defense Force and Shin Bet, the State security force, routinely and regularly invade our communities, I live in a constant fear of being singled out by these forces in retaliation for my complaints and this lawsuit. Accordingly, I ask for an order of this Court permitting my identity and, where appropriate, the identity of others referred to in my affidavit to remain under seal for as long as possible. In the alternative, I ask for an order of this Court instructing counsel for the defendant to refrain from providing my identity and the identity of others referred to herein until and unless absolutely necessary. Given the events described in this affidavit and the frequency of Israeli forays into my neighborhood I have a well-founded fear that military and security forces of Israel will harm me, my family or our property in retaliation for this suit.

Dated: Tulkarm, West Bank, Palestine
on this _____ day of _____,2002

_____
        JOHN DOE XV

# EXHIBIT H

## AFFIDAVIT IN SUPPORT OF ACTION

Jane Doe II, being duly sworn, deposes and says:

1. I have retained the Law Office of Stanley L. Cohen to represent me in this action. His office is located at 351 Broadway, Suite 300, New York, NY 10013.

2. I am a citizen of the United States. I currently reside at (address redacted) Greenville, South Carolina 29609. I have resided at this address since 1994. My date of birth is (date redacted). My social security number is (number redacted). I married my husband, Charles Doe III, also a United States citizen, in June of 1981. He served with the United States army until he retired with an honorable discharge after more than fifteen years of service.

3. I submit the herein affidavit in support of the above-entitled cause.

4. The sources of your affiant's information and belief are: first-hand knowledge and observation, and discussions with witnesses to the events complained of herein.

5. I was born and raised in a house in Nablus, Palestine. The house was situated on the outskirts of the old city, between the old city and the new city. Two of my sisters, Jill Doe III and Jill Doe IV were also raised in that house. Both continued to live there with my nephew, Charles Doe I, and my niece, Jill Doe V until April 3, 2002.

6. On April 3 Israeli forces began the invasion of Nablus. There was no warning given of the invasion. Residents were not directed to leave. Indeed, all residents were prevented from leaving the city. On April 3 a rocket fired by Israeli military forces, either an F-16 or an Apache helicopter, destroyed the house where I was raised. The rocket apparently entered the third story and caused the house to collapse. Both my sisters and my niece and nephew were in the house at the time. Medical services, ambulances, doctors, paramedics were not allowed to attend to

1

offered or given compensation of any kind for my personal injuries, for the use of our home, or the possessions ruined. I reported this incident to the United States Embassy. A woman took all my information, and viewed photographs I had and my medical records. She seemed sympathetic to me and my family's suffering, but I have never heard from them since. I also have never received an explanation for why my family was mistreated this way or why our home was taken over.

12. In February 2002 I owned a 1995 Chrysler Neon. I parked it in the parking lot behind what was the Uncle Sam restaurant in Ramallah. Several other cars were parked there as well. Israeli forces using rocket fire, apparently firing at a nearby building, hit and destroyed my car. Its value was worth several thousand dollars in United States currency. Other than the Israeli forces firing, I heard no other gun shots in the area at that time.

13. Finally, during the Israeli incursion in April of 2002, all of Ramallah was closed for most of the month. As stated in paragraph 2 of this affidavit, I have a law office in (address redacted) in Ramallah. My practice is drafting and reviewing commercial contracts for businesses and advise them in their work related to the Palestinian Trade and Commercial Ministry. Given that I live in Jerusalem I was unable to go to my office during the incursion.

14. In addition, during the incursion Israeli soldiers entered my office and destroyed all of the furnishings necessary to the ordinary operation of a law office. They include but are not limited to a computer, a printer, and a copy machine. In addition personal items were destroyed, my case files were thrown about the room and there was considerable damage to the walls and doors of the office. Although I did not see the soldiers entering or breaking these items, I have spoken with Charles Doe XXXIX, a janitor for the building and Charles Doe XXXX, an attorney with offices below mine and each saw the Israeli forces enter my office.

3

They heard loud crashing noises, and saw the IDF leave sometime later; both also say that no other persons entered my offices before or after the visit by the IDF. Some time later I saw the results of their actions in my office and the extent of the damage as described above.

15. I have never been informed as to the reason for entering my office. I have never been informed of the reason for destroying my office. The Israeli forces knew or should have known that the type of practice I have would not have contained any information or evidence of wrongdoing by anyone.

16. I estimate that the damage to my office, the doors, printer, computer and other furnishings costs seven thousand dollars ($7,000.00) United States currency. I estimate that prior to the incursion I was earning two thousand five hundred dollars ($2,500.00) United States currency per month. I was unable to use my office for the entire month of April and most of May.

17. The cumulative effect of these damages is pervasive. My two children, Baby Doe XXX and Baby Doe XXXI were there when the soldiers took over our apartment in September of 1997. My children saw the soldiers hit me. The effects on them are still manifest. Baby Doe XXX, then age three, has shown since then a marked fear of Israeli men, anyone speaking Hebrew, or persons in uniform. With near constant IDF activity in the past year, she is in a near-constant emotional state of panic, remembering the day her father was holding her and was struck and humiliated by the soldiers. Even now she has nightmares, and upon waking is obviously distraught and asks if the soldiers are coming. Both my children worry at the appearance of any Israeli forces and are reluctant to go outside.

18. As can easily be imagined, entering my law office, destroying all of the necessary equipment, rooting around in my case files, and throwing them about the office, has, as a necessary consequence, severely hindered my ability to effectively

4

represent my clients. Moreover, given the type of practice I have, and given also that there has never been so much as the suggestion that my practice involves anything or anyone harmful to the Israeli people or government, it is hard to imagine any basis for this wanton destruction other than for its own sake.

19. At the present time no civil authority exists in the Dearbwn section of Ramallah, as the government of the Palestinian Authority, its ministries and police services, has been completely suppressed. To the best of my knowledge, there is no governing Israeli military police authority in Ramallah to which I might make any official complaint, as the city is still under siege and is an active military combat zone. Moreover, it would be completely futile for me to bring any claim in any Israeli court seeking justice for my injuries. Palestinians have little or no standing in Israeli civil courts for the Israeli government's activities in the occupied territories. Although several treaties and charters of international law apply to my status in the occupied territories, I am not recognized by Israeli courts and there are no meaningful remedies or relief the I can seek through Israeli courts.

20. Because I live in the occupied territories, and inasmuch as the Israeli Defense Force and Shin Bet, the State security force, routinely and regularly invade our communities, I live in a constant fear of being singled out by these forces in retaliation for my complaints and this law suit. Accordingly, I ask for an order of this Court permitting my identity and, where appropriate, the identity of others referred to in my affidavit to remain under seal for as long as possible. In the alternative, I ask for an order of this Court instructing counsel for the defendant to refrain from providing my identity and the identity of others referred to herein until and unless absolutely necessary. Given the events described in this affidavit and the frequency of Israeli forays into my neighborhood I have a well-founded fear that military and security forces of Israel will harm me, my family or our

property in retaliation for this suit.

Dated: _____
on this ___ day of_____,2002

_____