# EXHIBIT N

## AFFIDAVIT IN SUPPORT OF ACTION

John Doe IX, being duly sworn, deposes and says:

1. I have retained the law office of Stanley L. Cohen to represent me in this action. His office is located at 351 Broadway, Suite 300, New York, NY 10013.

2. I am a citizen of the United States, and I currently reside at (number redacted) Post Office Street, post office box (number redacted), Ramallah Palestine.

3. I submit the herein affidavit in support of the above-entitled action.

4. The sources of your affiant's information and belief are: first hand knowledge and observation, and discussions with witnesses to the events complained of herein.

5. I was born in Bogota, Colombia on (date redacted), 1952. My social security number is (number redacted). My passport number is (number redacted).

6. I graduated from high school in the United States. I attended college at Loop College in Chicago and completed my college education at the University of Illinois where I received a Bachelor of Science degree in Biology.

7. I have been living in Palestine since 1998. I live with my wife, Nina and five children: (names redacted: ranging in age from three months to nine years). My wife and all my children are also United States citizens.

8. I own a jewelry store on (name redacted) Street in Ramallah. During the Israeli incursion the Israeli forces shelled this area frequently, although there was no other fighting, and no shooting by Palestinian people. As a result of the shelling sometime between April 3 and April 7 the store windows of the jewelry store were destroyed. In addition, I had a restored 1976 Peugeot parked outside. Sometime between April 14 and April 21 it was side swiped by an armored personal carrier and a few days later several infantry soldiers forced open the doors and trunk and took personal items from inside. In addition they smashed the radio, the

1

windshield and side windows.

9. Several buildings near where I live were targeted by Israeli forces during the incursion. For instance, the Municipality City Hall, which is the offices for the civil administration of the area, is approximately twenty yards up Post Office Street at Municipality Street. The Chamber of Commerce Building, which is an organization of private businesses, formed to promote business in the Ramallah area, is some fifty yards from my home. Also fifty yards away is a Jordanian bank that was destroyed.

10. Through the month of April, during the invasion, there were several occasions when there was intense Israeli military action outside my home. These actions would occur at any time and were of varying duration. At times, tank fire would last for several hours. At other times .50-caliber machine gun fire would strafe buildings on my block. Routinely Israeli forces used explosive devices to open entries into or to destroy nearby buildings. Finally, on at least one entire day two or three helicopters hovered over our home launching rocket fire continuously for the entire day. These actions would occur even though there was no resistance from the people

11. The emotional damage of these combined actions can hardly be estimated. It is an understatement to say that all of my children have been deeply impacted by this. All are jumpy, nervous and irritable. All suffer from nightmares of soldiers. They play games in which they imagine that they are soldiers shooting at each other. They use Lego building blocks to construct buildings and then using sounds imitating helicopters, saying "here comes an Apache." Then they knock the Lego building down. Many nights now (child's name redacted) wakes up screaming. When I ask her what she is dreaming she says that she does not know. My five year old, (name redacted) now wets the bed with some frequency. Their trauma

2

can also be seen in their reactions to otherwise ordinary events. For instance, on June 5, 2002 there was a truck up the street. People were loading gravel and rocks on it. Inexplicably, my son, (name redacted) ran to me yelling "They're shooting. They're shooting." it took several minutes before I could calm him down. Prior to April of 2002 my children did not have these types of anxiety, trauma and fear.

12. I estimate the monetary damage as follows. All amounts are in U.S. dollars. Store damage two thousand eight hundred dollars ($2,800.00). Prior to the incursion I estimate retail sales at two hundred fifty dollars per day ($250.00) Car: two thousand five hundred dollars ($2,500.00).

13. At the present time no civil authority exists in Ramallah, as the government of the Palestinian Authority, its ministries and police services, has been completely suppressed. To the best of my knowledge, there is no governing Israeli military police authority in Ramallah to which I might make any official complaint, as the city is still under siege and is an active military combat zone. Moreover, it would be completely futile for me to bring any claim in any Israeli court seeking justice for my injuries. Palestinians have little or no standing in Israeli civil courts for the Israeli government's activities in the occupied territories. Although several treaties and charters of international law apply to my status in the occupied territories, I am not recognized by Israeli courts and there are no meaningful remedies or relief the I can seek through Israeli courts.

Because I live in the occupied territories, and inasmuch as the Israeli Defense Force and Shin Bet, the State security force, routinely and regularly invade our communities, I live in a constant fear of being singled out by these forces in retaliation for my complaints and this law suit. Accordingly, I ask for an order of this Court permitting my identity and, where appropriate, the identity of others referred to in my affidavit to remain under seal for as long as possible. In the

3

alternative, I ask for an order of this Court instructing counsel for the defendant to refrain from providing my identity and the identity of others referred to herein until and unless absolutely necessary. Given the events described in this affidavit and the frequency of Israeli forays into my neighborhood I have a well-founded fear that military and security forces of Israel will harm me, my family or our property in retaliation for this suit.


Dated: _____
on this ___ day of_____,2002


_____
                              JOHN DOE IX

# EXHIBIT O

## AFFIDAVIT IN SUPPORT OF ACTION

John Doe II, being duly sworn, deposes and says:

1. I have retained the law office of Stanley L. Cohen to represent me in this action. His office is located at 351 Broadway, Suite 300, New York, NY 10013.

2. I am a citizen of the United States and reside in Patterson N.J.  In addition, I have a valid Jordanian passport and have had one since 1972.

3. I submit the herein affidavit in support of the above-entitled cause.

4. The sources of your affiant's information and belief are: first hand knowledge and observation, and discussions with witnesses to the events complained of herein.

5. I, along with several family members, all of whom are United States citizens, own fifty dunums (or about fifteen acres) of land in Deirnitham, Palestine. This land has been owned by my ancestors for approximately 1,600 years. Even before the creation of the state of Israel, under the British Mandate we received a declaration reflecting my family's ownership of this land.

6. In the late 1970s the Israeli government began construction of the Halamish settlement. At that time Arabs from Deirnitham village were farming there, and using the open space for recreation.  The settlement was constructed just to the boundary of my family's land. Apprehensive at the actions of the incoming settlers, and at the construction of the settlement itself I wrote the American Consulate, the State Department, the Secretary of State and then President James Carter. I was given assurances at that time that the settlement would not take my land.

7. In 1995 or 1996 the fence around the settlement was moved onto my family's land and expanded the Halamish settlement, taking at least four and perhaps as many as eight dunums of our land. (There are almost four dunums to the acre.) This land was taken without any form of notice. It was taken without any form of compensation, and in no way with any permission. I sought the return of our land in two ways: first, I lodged a formal complaint with the Committee for the Defense of Land, which led to an Israeli attorney being appointed to represent me in this matter. I have called this attorney on numerous occasions and have never been informed what if any action has been taken in this matter.

8. Secondly, I made a complaint to the Israeli police. I went there on at least six occasions. I supplied them with copies of the deed to the land that clearly showed my family's ownership. Each time I have gone I have been told a different story. On at least one occasion I invited the officer in charge to come with me and I would show him the land that had been taken. The officer declined the invitation.

9. During this time I was the Head of (name of organization redacted) and was able to make informal inquiries and requests of my government. I also formally notified the United States government of this illegal taking. Despite my efforts no action has been taken in this matter. Instead, men and woman that can not possibly make any claim of legitimate occupation continue to use and enjoy the use of my family's land.

10. In 1996 I was standing on the part of my land which the settlement had not taken. I was looking at the fence constructed which took the part of my land as described in paragraph 7. At that time an Israeli settler came to within twenty meters of me. He was standing on my land that had been taken. He yelled at me in Hebrew. I do not know Hebrew and said so in English. In

2

English he said "if you don't move I am going to shoot you. This is my land." at that point he raised a gun and pointed it at me. I had no gun. I looked around to see if there was a place for me to run for safety. The land there is very flat. My car was not far away so I walked over to it and made a phone call on my cell phone. I called the American Embassy, and yelled loud enough so that the settler could hear that I am an American citizen and that I was making a complaint to the embassy. The settler yelled something at me that I did not hear or understand. He then threw a stone at me and very nearly hit me.

11. On another occasion I was with my then-five year old son, Baby Doe VI, also an American citizen, and a niece and nephew. We were walking on our land. An Israeli security officer of the settlement, obviously armed, came to the area and yelled at me, ordering us to leave. The children were obviously frightened, it was clearly not an appropriate time to debate with him. We left the area. I cannot emphasize enough that both of these events occurred when I was standing on my own land—property owned by my family for more than one thousand six hundred years. Each time I was threatened by people who have no legal right to be there, who were standing on land that they took from my family, and that they threatened me with imminent death—a very credible threat, in that they possessed guns, and it is well-known in this area that settlers are prone to violence against Palestinians. Although I have formally complained of these events, no action has ever been taken that I am aware of.

12. In late May of 2001, I was in my house with my then-nine year old son and other relatives. It was near sunset. We could hear a commotion, and we could see fires outside the window. I could see that between 15 and 20 settlers were near our house, on my land. They were setting fire to our trees

and other parts of our property, and throwing things. But then they started shooting guns at the house. I could hear bullets ripping into our home. I could see that the settlers were surrounding the house, and they were breaking my windows, with stones, sticks, rifle butts and gunfire. As this horror was developing I called the United States Embassy and after a series of calls at least six cars of Israeli soldiers came and made the settlers go away. I have never heard of any prosecution being attempted or initiated against the people that did this. I have never been offered or received any kind of compensation for this. I did bring this matter up with the attorney that was assigned to represent me as indicated in paragraph 7.

13. As of June 13, 2002 settlers from the Halamish settlement began bulldozing my family's land. I spoke with witnesses there on June 30th who told me that the settlers are presently constructing two parallel roads across my land, adjacent to the expanded settlement.

14. I can not overstate the trauma to my son, now ten years old. Baby Doe VI had been a straight-A student. In the Palestinian education system a student must achieve scores of between 95 and 100% in order to be called straight-A. His grades have now dropped markedly. He used to be interested in television shows like Bugs Bunny. He now is interested only in news. He can tell me at any time which cities are under curfew, what cities are suffering a new incursion. This is the kind of knowledge one expects and sees in adults in Palestine. It is immeasurably sad for a ten year old to be driven to seek such knowledge. He frequently suffers from nightmares. I have, until recently, had to have him stay here in New Jersey.

15. In addition to the land described above I own land along the main road from Ramallah to Abud. I grow olive trees on this land and it is a tract that is next to a tract owned by my cousin. He also grows olive trees. On

4

October 2, 2000 and on two subsequent occasions over the next few weeks, Israeli settlers entered onto my land and destroyed many of the olive trees, in preparation for another expansion they are presently carrying out. Between my land and my cousin's they destroyed 108 trees. Olive trees can typically live and bear fruit for up to three hundred years, and it takes a full generation, about thirty years or so, before juvenile trees become useful and bear enough fruit.

16. Several weeks after this destruction I was picking olives from the trees that weren't destroyed. I placed the ladder against a branch and climbed up. I did not know at the time that the branch had been partially sawed through, and as I climbed up, the branch broke and I fell to the ground, badly twisting my arm and leg. I was unable to continue harvesting for two weeks.

17. In March of 2002 I was driving my car. I was halted by armed settlers. They had three cars, two of which appeared to be of a military kind. They were armed with rifles or machine guns. I was unable to determine which settlement they were from. They demanded my identification. I gave them my United States passport. They had me sit in my car while they had a conversation with each other. At least one of the settlers, who seemed to have a hump on his back, approached me and showed me a knife that was approximately 40cm long. He stated that if he saw me again he would slash my tires. After about an hour they ordered me to move my car several feet forward. I complied and they made me wait another hour, to no apparent purpose. After another hour they had me proceed to an Israeli check post. Eventually I was permitted to proceed.

18. On April 2, 2002, I was driving westbound on the Deirnitham-Aboud road, going to Aboud for a funeral. My cousin, an American doctor, was

accompanying me. Without warning or cause, we were fired on by Israeli soldiers. Bullets struck the road around our car.

19. I have never so much as been accused of a crime. No one has ever suggested that I have been involved in any act of violence against another person or their property.

20. I came to the United States in 1977 and attended Montclair State College where I received a M.A. I marrried in 1982 and naturalized. Later I attended CUNY and received a Ph.D. in Urban Studies. I am currently employed at (name redacted) University in Nablus, Palestine where I teach Urban Geography.

21. Because I live in the occupied territories, and inasmuch as the Israeli Defense Force and Shin Bet, the State security force, routinely and regularly invade our communities, I live in a constant fear of being singled out by these forces in retaliation for my complaints and this law suit. Accordingly, I ask for an order of this Court permitting my identity and, where appropriate, the identity of others referred to in my affidavit to remain under seal for as long as possible. In the alternative, I ask for an order of this Court instructing counsel for the defendant to refrain from providing my identity and the identity of others referred to herein until and unless absolutely necessary. Given the events described in this affidavit and the frequency of Israeli forays into my neighborhood I have a well-founded fear that military and security forces of Israel will harm me, my family or our property in retaliation for this suit.

6

Dated: _____

on this _____ day of_____,2002

_____

　　　　　JOHN DOE II

**EXHIBIT P**

# AFFIDAVIT IN SUPPORT OF ACTION

John Doe VII, being duly sworn, deposes and says:

1.  I have retained the Law Office of Stanley L. Cohen to represent me in this action. His office is located at 351 Broadway, Suite 300, New York, NY 10013.

2.  I am a United States citizen.

3.  I submit the herein affidavit in support of the above-entitled cause.

4.  The sources of your affiant's information and belief are: first-hand knowledge and observation, and discussions with witnesses to the events complained of herein.

5.  I was born on June 10, 1955 in the town of Maithalun, near the city of Jenin, Palestine. I finished high school there.

6.  I came to the United States in 1978. I attended the American Islamic College in Chicago and graduated with a B.A. in Islamic and Arabic studies in 1988. I am currently employed as the office manager of the (name of employer redacted) of Illinois.

7.  My wife, Anadel, is also a United States citizen.

8.  The fist time I visited Mathalun after coming to the United States was in 1993. On that visit there were no problems.

9.  On March 18, 1999 my wife and I went to Mecca to perform the pilgrimage. On April 5 of that year we went to Jordan and visited with my brother, Riad, and my sisters, Muhadia, Lutlufia and Huda. We visited with them until April 26.

10. On April 26, intending to visit my mother, Sada, and father Mohammed, in Maithalun, we went to the crossing point of Allenby Bridge. We arrived there at approximately 8:00am. I went to the Israeli checkpoint because I have an American passport. My wife was not yet a United States citizen so she went to a

1

separate checkpoint.

11. The Israeli authorities detained me at the border. They never told me a reason for this. I was held there in handcuffs for fourteen hours in a detention room and the officers would not tell me what had happened to my wife. At one point when I asked what was happening to her, one of the officers said "Are you sure she is your wife. Maybe she is 80% your wife." I believe he intended to insult me in the gravest manner by this remark.

12. After fourteen hours they took me, in handcuffs, to the Jalameh prison near the city of Haifa. I was shocked. I was thrown into a small, filthy and smelly cell. It was four feet by eight feet. The overhead lights were extremely bright and on twenty-four hours a day. The blankets were very dirty and smelly. The toilet in one corner of the cell was very dirty and smelly. The fan on the ceiling was noisy. Sleeping under those conditions was impossible.

13. I was not able to receive word of my wife until the second day I was held. On that day Mr. Todd Haskell, the American Counsel in Tel Aviv visited me. He was able to tell me that my wife was fine. I thought that finally this nightmare would end, that he would take me to my family. He said, however, that this was a matter between me and the Israeli government and that he could not get involved. He gave me a magazine and left.

14. I was continuously subjected to the most outrageous torture. The food was foul. I was given meat that looked like it was rancid. I was given boiled eggs at times. I tried to eat one boiled egg once and became ill. I did not eat any more eggs. Instead I ate only bread and tomatoes.

15. I was subjected to interrogation every day for several hours each day. Most times I would be interrogated for a few hours, returned to my cell for only a few minutes only to be brought back for further interrogation. They knew a great deal about my

2

life and so it was incomprehensible to me that they were insisting that I was involved in illegal activities. I had never been accused of any wrongdoing ever.

16. Despite this I was repeatedly questioned as to what machine guns I was trained on. I have never even touched a bullet or any kind of gun. They demanded to know what bombs I had learned to make and I told them that I knew nothing of any kind of bomb. They insisted that I had given money to terrorist groups and I have no idea, even to this day, what they were talking about. Despite my constant denials, and despite my pointing out that I am an American citizen, the officers persisted in these lengthy sessions.

17. A few days after I was first held I was taken to the interrogation room. There was a chair there. I was handcuffed behind my back, through the seat. My feet were then tied and the chair itself was tied to the ground. It made movement impossible. At that time a small and putrid hood was placed over my head. The hood was made of a material like khaki. Between the stench and the material it was very hard to breathe through. At the same time music was played at an intolerably high volume overhead. I was kept in this position for at least three hours. I have learned that this treatment is called "Shabah."

18. On another occasion I was interrogated by a man that identified himself to me as Mizrahi. He was like a tough-guy. He shouted at me almost all of the time. At one point I stated to him that I am an American citizen. He stated to me that "Your mother is shit. Your father is shit. America is shit."

19. When I was not being interrogated and subjected to these tortures I was kept in the small cell. The cells were always horrid. They were most often lice ridden, always small and always dirty. The blankets were always dirty, and they too were lice ridden. The worst cell was no larger than three feet by seven feet. As with the other cells a bright light blazed overhead. The dimensions of the cell made it seem

3

very much like a grave.

20. Whenever I was brought to the interrogation room I was handcuffed and had either the hood placed over my head or dark glasses so that I could not see where I was going. I was often woken at odd hours. Sometimes this was to take me to the interrogation room. Sometimes this was just to wake me up.

21. After many days the officers stopped questioning me. Instead I had to stay in the cell for entire days on end.

22. At one point, after a few weeks, I was feeling severe pain in my back. I asked guards several times to take me to see a doctor. Each time they said "later, later." Finally after repeated requests they took me to a doctor. He wrote what I took to be a prescription. It was in Hebrew and he handed it to the guard. Whatever the note was I never received any medicine.

23. During the first few weeks that I was held my family hired an attorney. His name is Mr. Faris Abu Hassan. He was able to visit me twice in the prison although we never appeared in a court.

24. My family was never permitted to see me.

25. In late May I was taken to a place called "Me ebaar" (the waiting place). There I was held with approximately ten other men. None of us knew what would happen with any of us. Some were taken to regular jail. Some were released. Some waited months.

26. On June 1, 1999 a guard called my name. He ordered me to get ready immediately. He told me I was going to Jerusalem. I thought they were taking me to the Supreme Court in Jerusalem so that my lawyer could convince a judge to release me. I was taken by truck from the prison to Jerusalem. I was chained to another prisoner in the truck.

27. I was wrong about being taken to court. Instead they took me to the Moscobiya

4

prison in Jerusalem. When I got there I was forced to strip naked and they searched me. I was not told what was to be done with me and I spent the night there.

28. On June 2 a guard told me that I was to be expelled back to the Allenby Bridge. I was again taken in the back of a truck, my foot chained to another prisoner's and driven to the Allenby Bridge. There the Israeli authorities handed my American and Jordanian passports to the Jordanian bus driver, and told him to give them to the Jordanian authorities.

29. Shortly after I was released I went to the United States Embassy in Jordan with my American passport. The officer there did not pay much attention. He said "We know about it and we can't do anything about it."

30. In total, I was held for thirty six days. I was never charged with any crime or offense by the Israeli authorities. I have never been accused of any crime by anyone, nor have I ever participated in any organization that has committed any crimes.

31. My parents still live in Maithalun. I am unable to even imagine trying to visit them. When we talk on the phone they cry and I cry. This is not only where my family lives. It is the place where I was born and raised. This has removed me from the structure of my family. My sister, Awina, who was living in the West Bank, has passed away since I went through this. I was never able to see her again.

32. I still experience a real sense of fear from this outrageous event. In addition, I have chronic pain in my knees. They were swollen from my being detained, in part due to the conditions, in part due to the minimal nutrition. The pain in my knees is an on going discomfort to me.

33. Because my family lives in the occupied territories, and in as much as the Israeli Defense Force and Shin Bet, the State security force, routinely and regularly

5

invade our communities, I live in a constant fear of their being singled out by these forces as retaliation for my complaints and this law suit. Accordingly, I ask for an order of this court permitting my identity and, where appropriate, the identity of others referred to in my affidavit to remain under seal for as long as possible. In the alternative, I ask for an order of this court instructing counsel for the defendant to refrain from providing my identity and the identity of others referred to herein until and unless absolutely necessary. Given the events described in this affidavit and the frequency of Israeli forays into my neighborhood I have a well founded fear that military and security forces of Israel will harm me, my family and our property in retaliation for this suit.

Dated: _____,
　　　this ____ day of _____, 2002.


_____

JOHN DOE VII


Sworn to before me on this _____ day

of _____2002, in_____.
_____,
　　　　NOTARY.

6

# EXHIBIT Q

# AFFIDAVIT IN SUPPORT OF ACTION

JOHN DOE VI, being duly sworn, deposes and says:

1. I have retained the Law Office of Stanley L. Cohen to represent me in this action. His office is located at 351 Broadway, Suite 300, New York, NY 10013.

2. I am a citizen of the United States.

3. I submit the herein affidavit in support of the above-entitled cause.

4. The sources of your affiant's information and belief are: first-hand knowledge and observation, and discussions with witnesses to the events complained of herein.

5. I was born on October 1, 1971 in the town of Silwad which is near the city of Ramallah in Palestine. Many of my family members still live in or near Silwad. They include my father, also an American citizen and several aunts, uncles, cousins, nieces and nephews. I currently live in Orlando, Florida.

6. In 1989, I moved to Florida and lived with my brother Charles Doe V in Miami Beach. My brother had a restaurant, (name redacted), in Miami Beach, which served American food. I worked first as a dishwasher and later became a general manager.

7. I married and had a son in 1991. My son's name is Baby Doe VII. I became naturalized in 1994.

8. In early 1998 my brother and I went into business together and opened a pizzeria, (name redacted) in Miami.

9. The business I had opened with my brother was doing reasonably well by October of 1998 and I decided to visit my family in Silwad. I flew to Ben Gurion airport in Tel Aviv on or around 15 October 1998. By that time I had visited Silwad three times before and had never had any problems whatsoever. As in times past, I was

1

able to go to Silwad and visit with my family without incident. I visited with them for between 12 and 14 days. There were no incidents or problems during that time. I did not do anything improper or illegal while I was there.

10. On October 28 I went to visit with my sister Jill Doe VI who lives in Amman, Jordan. I went there via the Sheik Hussein/Allenby Crossing border post, where I paid my exit taxes and fees, and presented my United States passport. I was told to wait, which I did. All of the officials in the area who told me to wait were Israeli police or soldiers. I was made to wait for two hours without explanation. After approximately two hours, two officers escorted me to a room and searched all my luggage and reviewed all my papers. They left me in that room for another two hours.

11. I became very hungry and called out to tell them so, and to learn why I was being held. A woman officer came in, I believe her name tag indicated that her name was Smith, she seemed to be in charge, she stated to me that I was under arrest. I said "yeah, right." I thought she was joking, and she stated that she was serious and that I was actually under arrest. I asked her what the charge was, and she said that I was a member of a terrorist organization. I was incredulous and asked how this could be. She would not provide me with any information from which I could understand this accusation. She would not say what organization, what I was supposed to have done with any organization, nor when I was supposed to have done anything.

12. At that point at least two officers pointed guns at me. I stated to them that I am a United States citizen and asked to call my embassy or consulate. She said that I could not. I asked if I could at least call my family. She said that I could not. Instead, one of the officers put papers in front of me and said that I should sign them. They were in Hebrew. I am unable to read Hebrew. I asked what these

2

papers were. They told me that it just says that I am under arrest. I refused to sign the papers. The officers then spoke to each other in Hebrew and then took the papers away.

13. Some of the officers left the room and I was left there for awhile. I did not understand what was going on and became increasingly alarmed. I could not imagine how I could be thought to have ever done anything wrong. I had been held for several hours at that time and I began to worry that they were going to kidnap me. I saw some tourists passing by, I could see that they were Italians and I spoke to them in Spanish. I said to them, "My name is John Doe VI. Remember my face."

14. Officers then came in and shackled my legs, and handcuffed me. They put me in a jeep and had me hold my luggage. They had their guns pointed at me. They drove me to a jail, which I believe was in the city of Jericho.

15. When they took me to this jail I again asked if I could call the United States Embassy or Consulate or if I could call my family. The officers laughed at me. They then put me in a small, dirty cell where I was held for about two hours.

16. After two hours the officers came in and again shackled my legs, and this time blindfolded me. I was taken out to a small car and I could sense that we were traveling at a high rate of speed. The radio in the car was blasting, playing Rock and Roll music. They drove me for about two hours. At times during this trip I again stated that I am a United States citizen and asked to call my embassy or consulate. These requests were refused.

17. Finally, the car ride stopped and my blindfold was removed. I asked where we were and they answered that we were in Jerusalem. In my mind I kept thinking this was all a horrible mistake and it will all be cleared up soon. I kept thinking that if only I could call the embassy everything would be straightened out. They

3

took me inside of a jail where they videotaped me. I objected to this. An officer that spoke Arabic said to me that this was the problem of the Shin Bet. He said "You just have to do what you are told. You are now in the Makobiya Prison." I had heard of this prison as a place where people were tortured. I became very worried at this point.

18. I was taken to a holding room where a guard ordered me to strip. I took off my clothes, down to my underwear. He demanded that I take that off. I said he would have to kill me first. He said "okay." I was then shackled again. He placed a hood on my head. The hood was rank. The smell was very strong and it was very foul. I suspected the odor was of vomit and urine. The officer was able to grip the hood and pull me around by it. Between the foul odor and being pulled around this way, the experience was deeply humiliating. After jerking me around for several minutes he removed the hood and I could see other prisoners that I later learned were being held for non-political offenses.

19. I was taken to a doctor. He asked if I had any medical problems. I told him that I have chronic ear pain from an injury while working. I explained that I need a special pillow which I always take with me when I travel in order to sleep. The doctor and the officer laughed at me. One of them said, "What do you think? You are at the Sheraton?"

20. The officer then placed the hood back on my head and led me to another room. There was a chair in this room. I had to sit in the chair. The officer took one of my hands, behind my back, and placed my hand through the slats in the chair. He took my other hand and, behind my back, placed it over the back of the chair. He then cuffed my hands in this position very tightly. He then shackled my legs together and anchored then to a hook in the floor. This made any movement impossible. The hood made breathing difficult and offensive. In the first place the fabric of the

4

hood impedes breathing and then the wretched odor made breathing ever so difficult. I have been informed that the manner in which I was bound is referred to in Arabic as "shabeh." I understand the Israeli's call it "Moderated Physical Pressure".

21. I was forced to remain in this position for three days. The only relief was that at one time during the three days I was taken to a bathroom.

22. During the first day that I was held in this position a man came in and removed the hood from my head. I saw that there was a desk with a computer in the room. The man introduced himself as Shouki. Based on conversations I have had since then, I believe that his real name is Cohen and that he has worked in the prison for twenty years.

23. Whatever his name, I asked him what I was doing there. He said "No. You are going to tell us what you are doing here." I told him that I had done nothing to merit being here and asked that I be permitted to make a call. He refused my request and asked me if I had heard about a law called "Emergency Law." I told him that I had read about it in the newspaper. He told me that I should know that my being an American citizen meant nothing. He said: "We can do anything we want with you." He then held up my passport and said "This passport doesn't mean anything to us. We are America. You are going to die in here." I asked him what he wanted from me. He stated that he wanted information about fund raising at my restaurant. The only thing I could think of was that when I was a manager at (name redacted), around 1996 or 1997, I agreed to help an African-American Muslim group to raise funds to build a mosque.

24. He then asked about a contribution I had made to a charitable organization, which permitted me to sponsor a disabled child overseas.   I made the contribution and considered it my responsibility to help children, and so I provided $25.00 a month

5

to help the child. As arranged, the child and I exchanged letters. I told him that I have no reason to believe that my contributions were ever used for anything other than to aid the child. He asked me several questions about the organization, like how was I contacted by them. I told him they had sent a fund raising letter to me. He asked if I knew the president of the organization, and I told him that I did not.

25. He also asked me many questions about whether I belonged to a terrorist organization, and he asked if I was hiding anything. I told him that I did not belong to any terrorist organization and that I was not hiding anything. I also told him that my life is an open book. At the end of his questioning he said that if I would not talk, the next day he would get someone who would make me talk.

26. Before he left the room the man put the foul hood back on my head and turned the air conditioner on at full blast. In only a short while, not even an hour, with the air conditioner on full, unable to move at all I felt like I was in a snowstorm with almost no clothes.

27. I cannot adequately describe how terrifying, how constantly painful over my whole body this was. I was held in this position for three days. Once in awhile a person would come in and ask who I was. After three days I felt I was losing my mind. I began screaming from the bottom of my lungs. I was finally released from the chair but kept in the room, the air conditioner still blasting at full. My hands were so badly swollen it was like they were balloons. I had no feeling in my hands and knew that I had not had any feeling in them for a long time. I was afraid that I might totally lose the use of my hands.

28. Food was brought to me in the form of a plastic bag that contained one tomato, one cooked egg, and four slices of bread. I was not given anything to drink.

29. The fourth day of my captivity another interrogator came to the room. He asked me "what are you doing here." I asked him what I was doing there. I was then

6

taken to a cell. It was approximately six feet by six feet. There was a dirty mattress on the floor and a hole in the floor in the corner for a toilet. I was given some water.

30. The next day I was taken to another room. It seemed to be a kind of courtroom. A woman was there who seemed to be a judge. No one identified themselves to me or announced any official proceedings. I told her how I had been detained. I told her that I was a United States citizen. She spoke through a translator and said that I would be held 15 days. I asked her why but she did not answer. There was no attorney there for me.

31. I was brought back to the cell and a few hours later taken to a room with two people from the United States consulate. One was named Abdel Noor and the other I only was told Majed. They told me that they had been notified that day of my detention. I explained my situation. They commented that they could see the effects of the torture I had been through. I assumed they would take me out of there but they said they could not. I asked them to get the torture to stop or take me to another facility. They told me that if I signed a "privacy waiver" they could visit me. My heart was breaking, and I was angry. I said to them that "My government can't help even though there are no charges against me?" They replied that there was nothing they could do. It was only during that conversation that I was able to determine what day it was.

32. I was taken back to the cell and held in isolation for the next ten days. There were no windows in the room. I was fed for the next ten days the same way I had been before. A plastic bag with bread, vegetable and an egg. It was from these bags that I could mark the passage of time. The bags were bags used for bread. They had the ingredients printed on them and I read over and over and over again the ingredients in the bread.

7

33. After ten days in isolation a guard came and said that I was free to go. That was a lie though, told just to torment me. Instead, I had a visit by a woman from the Red Cross. I think her name was Mary Lourdes. She said that she did not understand what was happening to me.

34. It is difficult for me to describe how terrifying this isolation was. The portions of food were small. There was only just enough room to stand. The walls were dirty. The overhead light was on for 24 hours a day. There was an air vent in the ceiling. It had 249 holes in it.

35. After fifteen days in isolation I was once again taken to the interrogation room. A man who said his name was Ahed was there. I later learned that he was a Shin Bet agent for the area around Silwad. He showed me an aerial view photograph of Silwad. I showed him where my house is. He asked me questions about other people that live in the area. I explained that I don't know them since I have not lived there for ten years. He said that I look like my brother. He said that he knew my brother. I said, "Then you know I am okay."

36. I am somewhat uncertain about the passage of time at this point. Some days later I was interrogated by a man who said that his name was Uri. He had a paper and a pen. He asked me questions about people I did not know.

37. Some days later a Palestinian lawyer came and told me that he had done an appeal for me, and that the appeal might help me. For the trip to the appeal hearing, my legs were tightly shackled. I was forced to run to the truck that would take me. The shackles cut into my legs. In the truck the hood was placed on my head again, and I was shackled in the back of the truck to a pipe. They then drove fast, with sharp turns. Shackled and hooded, I was thrown about wildly, the chains hurt my legs, and my head knocked against the van.

38. I was taken to a court at Betil. My family was there and when they saw me they

started crying. At this hearing, the prosecutor said they had secret evidence. They showed something to the judge. The judge looked at it and I was taken back to the cell.

39. I had not been given any food that day. I began talking to myself. I thought I was going crazy. I yelled. I begged for water. They finally put some water in a bucket at my cell, but no cup. I used one of the bread bags to dunk in the water to drink from that.

40. While in jail, I would give me four cigarettes a day. It was almost like they wanted me to still want to smoke, but wouldn't give me as much as I would normally smoke.

41. By this time I was seriously ill. I had a fever, had lost considerable weight, and had serious trouble standing, I also had a tightness in my chest. A guard came and gave me some cough medicine. I was glad to have something to drink.

42. My sense is that on the 23rd day that I was held the man called Uri and two other men interrogated me. Later, two policemen came in with papers and a picture they had taken of me a few weeks before. Uri held up the papers and told me it was my file and "the order." It was written in Hebrew. He told me to sign it. I told him that I couldn't read it and would not sign. They insisted. They said that I would have to go to jail for three months. I knew that I could not bear three months of this but I refused to sign the papers.

43. I was taken to a cell with other prisoners. A Palestinian guy told me that I would next meet the "Prince of Jail". I did meet the man called the "Prince of Jail." He implied that he was a leader of other prisoners. He said that he could move freely in the prisons because the Israelis were afraid of him since he could call for a hunger strike. He stated that he believed that I was an informer of Shin Bet, sent here to spy on the other prisoners. He said that I better tell him who I was, and

9

show that I am not a Shin Bet informer, and that if I didn't they would kill me. I was appalled. Imagine—tortured by the Israelis, ignored by the United States, and killed by other Palestinians. The man had an odd watch. I was staring at it and he pulled his sleeve over the watch. He requested my name. He wanted to know if I was with Hamas, or if I was with Jihad. I told him I was not. He said he did not believe me. Other prisoners said that if I did not tell what they wanted to know, they would kill me. Eventually I wrote down my name, the pizzeria I work at in Florida. The man called the "Prince" was not satisfied and said that I would pay for that.

44. I have since learned that these men worked with the Israelis and were trying to get me to say that I do things I do not do.

45. Later that day a guard came and put the hood on me and tugged me by the hood down a hallway. We came to some steps that I obviously could not see. I stumbled down them, injuring my leg, and seriously cutting my arm. I felt that my arm was maybe broken. The guard cursed me and took me to a room. There was a loudspeaker in the room. He put it on at full blast right in my face, playing the same song over and over for hours. It was the Paul Simon song "You Can Call Me Al." The guard said that most of the prisoners would not understand the song but that I would. At first I was shackled in a small chair, to a pipe behind me, and with the air conditioner on.

46. After a few hours I was taken to the interrogation room. I was shouting about the pain I was in, that I needed to see a doctor. A man there asked what was the matter. I told him my elbow was broken. He came over and pressed it. It sent a shooting pain up my arm. He asked if that hurt. I said that it did, and he said "good."

47. A day or two later I was taken back to the interrogation room and placed again in

10

the position with my hands cuffed behind my back and my legs shackled and anchored to the floor. Uri was there and he said "Now we've got you." He had the paper that I had written my name on and what I did at the pizzeria in Florida. He told me that he could give me life for this. I told him that he was disgusting. I told him that he was a coward, that they were all cowards to do this to me, and I told him that they could only do with me what God wants. I told him I had nothing to hide. He came over to me and said, "If you aren't going to confess, I will still go home, sleep with my wife, and come back tomorrow and you will confess." I was given no food that day.

48. I spent two days in the chair. This was the lowest point for me. I could only think of my son Baby Doe VII. Thinking of him. Thinking of how desperately I wanted to see him again: thinking of how he needed me, and how I needed to see him, was the only way I was able to survive.

49. On, I believe the twenty-sixth day of my being held I was taken to the woman judge again. She was wearing a military uniform. I begged her to release me. I told her I was dying, that I was fevered, that I had little to eat. She looked at me and said that I had to stay 15 more days.

50. For the next few days I was held in various cells with other prisoners. I could see how badly they had been tortured. One looked like he would have to lose his leg from being kicked in the shin repeatedly over several days. Another made noises like an animal. I did not hear him speak any language. In some cells I was able to hear men screaming. I assumed they were being tortured. One day I was placed in a cell alone that was filled with roaches. They were all over they place. I became ill.

51. I had one more interrogation with Uri. I told him that I knew that I would die in there and that I would meet him on Judgement Day.

11

52. Three or four days before I was released the two men from the United States consulate visited again. I was upset that they had done nothing for me. I was upset that they were never at the court when I had to go. I told them that they might as well come back in a few days and pick up my dead body. They wrote that down and left.

53. On the fortieth day a guard came. He put the hood on my head. He led me down a hall and took the hood off. I saw my suitcases. He said "You can go. You better not cause us any trouble." I requested my passport and my money, which they gave me though they wrote in my passport that I need a Palestinian travel document to travel. Remembering how they tormented me by making me think I could leave and then saying no I suspected this was all a trick. It was not though. A cab came and took me to my family in Silwad.

54. We were all overjoyed to see each other. My family cried. I cried.

55. I could not walk well. The first night I could not sleep for fear that they were just playing a trick on me and would come and take me back. I stayed with my family a few days. Then I called the United States consulate to ask what this travel requirement was they put in my American passport. He told me that I better comply with what they required. I asked how that could be, when I have a United States passport. He said "You have to listen to the Israelis."

56. That restriction meant that I could not leave for another month or month and a half. I finally got back home in late January, 1999.

57. When I went there I weighed 182 lbs. When I returned I weighed 140 lbs. My hands finally seem to be fine though it took awhile for the swelling to go down. I now have chronic, sometimes disabling back pain from this, where I never had a back problem before. I suffer from depression, especially when I talk about this; it takes at least a week before I can recover. I have stomach problems. I feel bloated

12

even though I have only eaten a little. My stomach also feels like it is burning. I have chest pains and a sense of being congested much of the time. I have also lost much of my hair.

58. I was never charged with anything. I was never convicted of anything. I never did anything. I have contacted numerous United States officials about this horror. I have never been given any explanation as why I was tortured this way. I have never been compensated in any way.

59. It is now impossible for me to visit my family members that live in Silwad. The land my parents owned has been left to my brothers and me. In fact, the house was specifically left to me. It is impossible for me to go there, though. I could not ever run the risk that I would be taken for no reason and subjected to the disgusting conditions, the torture and the grinding humiliation I was subjected to.

60. Because family members of mine live in the occupied territories, and in as much as the Israeli Defense Force and Shin Bet, the State security force, routinely and regularly invade our communities, I live in a constant fear of their being singled out by these forces in retaliation for my complaints and this lawsuit. Accordingly, I ask for an order of this court permitting my identity and, where appropriate, the identity of others referred to in my affidavit to remain under seal for as long as possible. In the alternative, I ask for an order of this court instructing counsel for the defendant to refrain from providing my identity and the identity of others referred to herein until and unless absolutely necessary. Given the events described in this affidavit and the frequency of Israeli forays into my neighborhood I have a well-founded fear that military and security forces of Israel will harm me, my family and our property in retaliation for this suit.

13

Dated: _____
on this _____ day of_____, 2002


_____

DOE VI

# EXHIBIT R

# AFFIDAVIT IN SUPPORT OF ACTION

Jerri Bird, being duly sworn, deposes and says:

1. I am the President and founder of Partners for Peace, a non-governmental organization based in Washington, D.C.  I am also an author and have published numerous articles on the role of women in the Muslim world and on the Palestinian-Israeli conflict.

2. I reside at_____.

3. I submit this affidavit in support of the above-titled cause.

4. The sources of your affiant's information are first-hand knowledge, observation, academic research, and interviews I personally conducted with officials of the U.S. and Israeli governments, and detainees and their families.

5. I am married to retired Foreign Service Officer Eugene Bird.  I have lived in Jordan, Israel, Lebanon, Egypt and Saudi Arabia.  In addition, I have traveled extensively throughout all the Arab world with the exception of Iraq and Sudan.

6. The mission of Partners for Peace is to educate the public about the issues in the Israeli-Palestinian conflict, with particular emphasis on developing productive relationships with the professional media.

7. For more than thirty years, Israel has repeatedly detained, tortured and incarcerated Americans of Arab origin, without suffering any sanctions or even a single public reprimand from Washington.  A State Department spokesman confirmed on 2 April of this year that Israel was holding at least eighteen American citizens on "security" charges, and that the State Department has "no way of knowing for certain the numbers of American citizens who may have been detained for short periods and released."

1

8. It is the legal obligation of every host government to notify the local diplomatic mission within 48 hours of the detention of a foreign national.

9. The Department of State publishes each year human rights reports on the countries of the world. For many years now, these reports have documented Israel's violations of the human rights of Palestinians, documenting countless house demolitions, land confiscations, arbitrary arrests, and widespread torture. Many human rights organizations in Israel, the Occupied Territories and around the world corroborate these findings with their own research.

10. It is well documented that Palestinian detainees are routinely denied access to counsel, and are not permitted family visits. In addition, they are frequently subjected to interrogations that employ torture to extract forced confessions. They are then often "tried" before a single military officer by means of a hearing in a court established in a West Bank settlement. This disturbing process applies as well to many Americans of Arab origin who have been detained by the Israeli military.

11. I first became aware of the detention and torture of American detainees by Israel in 1998, when the case of Hashem Mufleh was brought to my attention. Mr. Mufleh, then eighteen years old and born in Albuquerque, New Mexico, had just finished high school in the West Bank and was returning to start college in Albuquerque, traveling with his mother and brother. He was seized at the airport by Israeli police, and subsequently jailed for more than a year. During this time, he was repeatedly tortured. My organization publicized Mr. Mufleh's case throughout the U.S., and as a result, a dozen more cases were referred to me over the next few years. Partners for Peace has documented these cases of Americans tortured by Israel, and has investigated torture practices employed over

2

the period of the Occupation in general. I know both John Doe VI and John Doe VII, two Americans whom I understand to be Plaintiffs in the above-titled cause of action, and whom I believe from my organization's investigations to have been tortured detainees.

12. Typically, interrogations are conducted by officers of the General Security Service. Methods employed include overt beatings and "shabah," or general practices of humiliation and dehumanization. Typically, a detainee subjected to "shabah" is handcuffed with their feet chained, forced to sit in a tilted, small chair tied to the ground, leaving them totally unable to move, while seated in an unnatural and painful position. They are then hooded with a filthy, small bag of a rough, thick fabric that is very hard to breathe through. Many detainees have reported that the bag was foul with urine or vomit. A prisoner may be left in this state while very loud music blasts overhead, for days at a time. Detainees are denied the use of a toilet for long periods. Some of the interrogation practices used by the security services involve psychological methods. For example, detainees are deprived of sleep for days at a time, kept in cells with bright overhead lighting and loud music; they are routinely threatened with death or the death or harming of their family members if they do not sign prepared confessions; they are stripped naked.

13. American detainees are routinely denied access to U.S. Consulate or Embassy officials, as well as to legal counsel, for long periods of time. For example, Jamil Sarsour, 51, an American citizen from Wisconsin, was arrested at Ben-Gurion airport in October 1998, and held 101 days before consular officials were permitted to visit him, during which time he was tortured. His own wife did not see him until another two weeks after that, and his attorney did not first see him in custody until Mr.

3

Sarsour had been held for almost six months. Amjad Ahmad Farah Kur'an, a 21-year-old American from Ohio who was attending Bir Zeit University in Ramallah, was arrested in June, 1998, and held for two years without charges. He was tortured for a week after his arrest before any consular official was permitted to see him. He signed a confession during his torture that he now recants; this confession was the basis of his conviction, for which he is now serving a 52-month sentence in the Megiddo tent prison. Mr. Ku'ran has had only two family visits in two years, and his father was made to clean the prison camp toilets before being permitted to see his son.

14. It is my experience that few Arab-Americans are willing to go public with the details of their torture in Israeli prisons once they gain release and return to America, fearing that they will be targeted by the FBI as so many Arab-Americans have been, or reviled by their fellow citizens as possible security risks. Fear of U.S. reprisal has only increased in the aftermath of Sept. 11. In addition, some detainees, upon release from Israeli prisons, have been threatened by security agents with harm to themselves or their families if they speak out about what has happened to them.

15. Over the past three years, Partners for Peace has repeatedly raised the issues of Israeli torture and abuse of American detainees with congressional offices, the Department of State and the White House. Congressional offices are largely totally unresponsive. From State, we have received boilerplate replies that express regret but are not responsive to our requests for action. President Clinton responded in 1999 with the usual acknowledgment of "an obligation to protect all American citizens, regardless of where they may happen to be," and an

4

assurance that this problem has been raised in the human rights report. He also said that Secretary of State Madeleine Albright had raised the issue at the highest levels, including then-Prime Minister Ehud Barak, whose response was that Israel had "no intention to humiliate or to intimidate any Arab citizens, be they Israelis, Americans or from other countries." Note that this is not a direct reply to the charge of torture.

16. My work during the past four years and the evidence I have compiled suggests that these cases are only tip of the iceberg. All these young men—and, in some cases, women—are extremely proud to be American and have been deeply offended by the official U.S. attitude in the face of their trauma. As John Doe VI has said, "I cannot believe that my government was powerless to take action on my behalf. Is it because I have an Arabic name?"

17. It is my belief that the origin of the unwritten policy permitting these abuses—commonly called the "special relationship"—cannot be pinpointed. But after the Israeli occupation of the West Bank and Gaza in 1967 following the Six Days War, there was a subtle but clear shift in U.S. policy, particularly with regard to the reporting from the consulate general in Jerusalem. That post has had a unique independent status since official U.S. policy deems Jerusalem an international city, not the capital of Israel. Initially, this status provided the basis for offering a different voice to Washington, one that reflected American officials' unique opportunity to observe both sides of the conflict on a day-to-day basis. But by the end of the first decade of occupation, Israeli sensitivities were already increasingly reflected.

18. My research into State Department records indicates that this new pattern was "codified" in the handling of a series of reports

5

of Israeli torture, including the torture of two American teenagers as reported in an airgram (Jerusalem A-19, dated Oct. 9, 1978), filed by junior officer Alexandra Johnson in 1978. The brothers, Gamil Khalid, 15, and Gamal Khalid, 16, were subjected to beatings and thrown to the ground. In a written statement Gamil Khalid reported as follows: "They took me to a room and said to me, 'Sign this paper, and if not we will do to you like we did to Munzer [another detainee] and hit you in the eye and swell it up like his. We will bring border police and beat you in front of your father with a stick on any part of your body, and put the stick into your rear.' So I agreed."

19. The boys were eventually given several hearings (usually called a military court but devoid of any of the usual rules of evidence), and the "trials" were attended by two American consular officers. As Ms. Johnson's airgram reports: "One of the two was present at every session of the trial. It is the opinion of both of these consular officers that the Israeli military authorities made no real effort to investigate the charges of mistreatment. Indeed, both the military judge and the prosecutor made it clear throughout the trial that they considered the questions of mistreatment and coercion to be irrelevant and trivial. They also made it clear from the start that the trial's result was preordained."

20. According to the airgram, the consular section of the consulate general had sent over 40 reports on Israeli mistreatment of Palestinian political prisoners in Jerusalem and the West Bank to the State Department. In two later cables (Jerusalem 1500 and 3239, sent on June 3, 1978, and Nov. 30, 1978, respectively), Ms. Johnson detailed the treatment of Arab prisoners on the West Bank. She received

6

commendatory letters from Arthur Houghton, an aide to then-Secretary of State Cyrus Vance; Pat Derian, Assistant Secretary of the Bureau of Human Rights and Humanitarian Affairs, and Deputy Secretary of State Warren Christopher, but was denied tenure in 1979 and left the Foreign Service. (I have been unable to locate her.) The report dated Nov. 30, 1978, was approved by both the consul general and his deputy, with the following note appended: "The post fully understands Israel's legitimate concern over security on the West Bank and accepts the premise that a military occupation regime may necessarily supercede the basic civil and human rights which are expected in a free democratic state living in a state of peace."

21. The institutionalization of torture practices by the Israeli government has been thoroughly documented by many international human rights groups. In my extensive research of the subject, I have learned that not only have the practices become standardized, but the Israeli government at the highest levels essentially approves of the methods used. B'Tselem (the Israeli Information Center for Human Rights in the Occupied Territories) reports the following: "Since 1987, the General Security Service (GSS) interrogators have tortured thousands of detainees, intentionally inflicting severe pain and suffering. The torture was neither extraordinary nor limited to 'ticking bombs.' Quite the opposite: torture was a bureaucratic routine; there was standard equipment for inflicting torture, and careful recording of the times the pain and suffering were inflicted. Even the state's response in petitions against torture repeated, paragraph after paragraph, the routine justification for what were supposedly extraordinary acts. Supervision of the GSS did not succeed in preventing torture in Israel from becoming routine, systematic and institutionalized."

7

22. A report by the Public Committee Against Torture in Israel defines the issue this way: "Israel's 32-year occupation of the West Bank and Gaza has given rise to patterns of legal proceedings that undermine the rule of law and the democratic values of the state of Israel. According to the latest official estimate, during the Intifada period alone (1987-1993), 30,000 Palestinians were interrogated by the GSS. Those mass arrests led to illegal interrogation, which usually included submitting the detainees to physical and mental pressure and torture and which, from the start, contradicted the Israeli Penal Code and the Israeli Basic Law of Freedom and Dignity. Moreover, this behavior has continued to take place with total disregard to the fact that in August 1991, Israel ratified the United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, which prohibits and denounces actions deliberately causing "suffering or severe pain."

23. According to Miftah (an Arab NGO headed by Hanan Ashrawi), since 1967 the Israelis have carried out over 600,000 arrests or detentions. Both Miftah and B'Tselem concur that between 90 and 94 percent of those arrestees have been tortured. Even if we halve that number, that still means that some 270,000 individuals have been tortured. Or to put it another way: if that proportion were applied to the U.S. population, it would mean that more than 25 million cases of torture had occurred in the past 35 years.

24. There is clear evidence that the United States government has known for at least 24 years that Israel uses torture during interrogations of Palestinians and that the practice was widespread. Furthermore, the U.S. had evidence that American children were also subjected to this abuse.

8

Yet, over more than two decades, no effective action has been taken by the United States to halt this practice. Furthermore, the United States took great care to avoid any public admission that Americans had been tortured.

25. Based on my research, it is my opinion that the "special relationship" offers the United States the opportunity to have enormous influence on the state of Israel. In addition to giving enormous amounts of aid to Israel, the U.S. has provided military resources that have helped make it the fourth most powerful fighting force in the world. Yet rather than using this special relationship in a constructive way, U.S. policy has become "Israel, right or wrong." Even when the lives of American citizens are at stake the U.S. does not intervene effectively to safeguard them. How can this disregard for our citizens be justified? This is not a question of guilt or innocence of the individual detained. The issue is torture.

26. As a concerned American, I believe that we share Israel's guilt in the commission of human rights abuses over a long period of time because we have allowed our friend to commit them. We are enablers. For the sake of our future and our national honor, and for the sake of peace, our "special relationship" must change.

Dated: _____
on this _____ day of _____,2002

_____
JERRI BIRD

Sworn to before me on this _____ day
of _____2002, in_____.

_____
NOTARY

9

**EXHIBIT S**

# AFFIDAVIT IN SUPPORT OF ACTION

JOHN DOE XVII being duly sworn, deposes and says:

1. I have retained the Law Office of Stanley L. Cohen to represent me in this action. His office is located at 351 Broadway, Suite 300, New York, NY 10013.

2. I am a resident alien of the United States and expect to obtain citizenship status in the near future.

3. I submit the herein affidavit in support of the above-titled cause.

4. The sources of your affiant's information and belief are: first-hand knowledge and observation, and discussions with witnesses to the events complained of herein.

5. I was born in Alhwodat Camp, Jordan on (date redacted), 1961. I have resided in the United States since 1989.

6. On September 16, 1982 I was in the Sabra camp in Lebanon, and had been there for a short time prior. During the days that I was there before September 16, I did not see any resident in the camp with any sort of weaponry. Similarly, on September 16 and in the ensuing days, I did not see any resident of the camp with any kind of weapon.

7. On September 16 I was staying with my cousin on the second story of a building a few blocks from the stadium where the children would play soccer. There was a candy store on the first floor of the building that was operated by the landlord Charles Doe VI. With me on the second story were three of my cousins and a fifteen year old boy. In the afternoon, at approximately 4:00pm, I heard shooting from a helicopter. I looked out and could see that the helicopter, coming from the direction of the stadium, was shooting in the direction of the building we were in. Approximately five minutes later either a rocket, a missile or both tore into the

1

building. I do not know how many rockets or missiles hit the building. I can not say if the firing was from the helicopter I had seen or some other, or if the firing was from the ground or some combination of these possibilities.

8. I saw that the fifteen-year old, who had been standing near the window, had his head torn off. One of my cousins had the bulk of his stomach ripped open, another cousin suffered severe wounds to his arms, hands and legs. I was also wounded in my arms legs and feet, suffering, I later learned, eight distinct shrapnel wounds.

9. I and my cousin that had suffered the wound to his stomach, jumped out of the window to the street below. The situation was pandemonium. I could see that soldiers of Haddad's men as well as others that I believed to be Israeli who were coming up the street firing guns in every direction. Residents of the camp were running in order to avoid being shot by the heavily armed forces. I saw that even in the first few minutes many of the residents were killed there on the street. I knew many of the people that lived there and saw them being killed. I could also see that the soldiers were firing into homes and other structures. I could see some people being shot and killed inside the structures and was later able to see that many people were killed while inside their homes.

10. That night I went to the sanitation area, basically a garbage dump, and with three other men was able to hide there. Wounded and terribly hungry I ate some bread that I found among the garbage there.

11. From my position I was able to see many soldiers, both of Haddad's men and those I think may have been Israeli passing in the street. I could see that they were continuing to fire their weapons in such a way as to spray large areas with bullet rounds. In more than one instance I saw soldiers find a person wounded on the street but not dead, and the soldier would shoot the defenseless person.

12. The next day I saw the most horrific scenes. There were many people lying dead

2

 

in the street. Many of them were women, old men and children as were the vast majority of the people that had been living in the camp. I could see that several of the dead women were pregnant. I also saw that somewhere around 95% of the structures, homes and stores were demolished or so badly damaged that they could not be used.

13. Eventually I was able to get to the hospital at Albamaof where I was treated for my wounds for three weeks. It took several months for me to recover fully from my wounds.

14. My observation that some of the soldiers were Israeli is based on their wearing the star insignia of Israeli soldiers and that I was able to hear them speaking in Hebrew. I am familiar with, though by no means fluent in Hebrew from having lived in Jerusalem from when I was one year old until I was six.

15. The entire time that I was in the camp I did not see or hear any resistence whatsoever from the refugees. Nor did I see any fighters from the PLO or any other Palestinian group in the camp. I did not see any weapons laying around the camp or in the hands of or at the side of any of the victims. Moreover, among all of the dead people I saw on the streets I did not see the bodies of any soldiers belonging to Haddad or anyone else among them.

16. Because have family in and hope to travel to the Occupied Territories, and in as much as the Israeli Defense Force and Shin Bet, the State security force, routinely and regularly invade our communities, I live in a constant fear of that my family or I will be being singled out by these forces as retaliation for my complaints and this law suit. Accordingly, I ask for an order of this court permitting my identity and, where appropriate, the identity of others referred to in my affidavit to remain under seal for as long as possible. In the alternative, I ask for an order of this court instructing counsel for the defendant to refrain from providing my identity and the

3

identity of others referred to herein until and unless absolutely necessary. Given the events described in this affidavit and the frequency of Israeli forays into my family's neighborhood I have a well founded fear that military and security forces of Israel will harm me, my family and our property in retaliation for this suit.

Dated: _____
on this _____ day of_____,2002

_____

JOHN DOE XVII

4