# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOHN DOE I on behalf of himself and his grandson, BABY DOE I and as next of kin for his deceased daughter, JILL DOE I, JOHN DOE II, JOHN DOE III, JOHN DOE IV, JOHN DOE V, JOHN DOE VI, JOHN DOE VII, JOHN DOE VIII, JOHN DOE IX, JOHN DOE X, JOHN DOE XI, JOHN DOE XII and JOHN DOE XIII on behalf of themselves; JOHN DOE XIV on behalf of himself and his son, BABY DOE II, JOHN DOE XV on behalf of himself and his son, BABY DOE III, JOHN DOE XVI on behalf of himself and his deceased son, BABY DOE IV, JOHN DOE XVII on behalf of himself, JANE DOE I on behalf of herself and the estate of her aunt, JILL DOE II and cousin, BABY DOE V, and JANE DOE II on behalf of herself and the estates of her two deceased sisters, JILL DOE III and JILL DOE IV and as next of kin for her nephew, CHARLES DOE I and niece JILL DOE V,

    Plaintiffs,

v.

STATE OF ISRAEL, ARIEL SHARON in his individual capacity and as former Israeli Minister of Defense, NATAN SHARANSKI individually and in his capacity as Israeli Minister of Construction and Housing, BINYAMIN BEN ELIEZER individually and in his capacity as Israeli Minister of Defense, SHIMON PERES individually and in his capacity as Israeli Minister of Foreign Affairs, UZI LANDAU individually and in his capacity as Israeli Minister of Internal Security, MEIR SHEETRIT individually and as Israeli Minister of Justice, THE ISRAELI GENERAL SECURITY SERVICE (the "Shin Bet"), AVI DICHTER, the head of the Shin Bet, ISRAELI DEFENSE FORCES (IDF), LT. GENERAL SHAUL MOFAZ individually and as Chief of the General Staff, MAJOR GENERAL AMOS GILAD individually and as the IDF Coordinator of Government Activities in Judea, Samaria and the Gaza, MAJOR GENERAL AHARON ZE'EVI FARKASH individually and as IDF Director of Military Intelligence, AMOS YARON individually and in his capacity as Secretary General of the Defense Ministry and as former Brigadier General and Commandant of IDF forces in Beirut, Lebanon (collectively the "Israeli Defendants"),

GEORGE W. BUSH, in his individual capacity and as President of the United States,
COLIN POWELL, in his individual capacity and as Secretary of State,

THE BOEING COMPANY, MCDONNELL DOUGLAS HELICOPTER SYSTEMS, TEXTRON, BELL HELLICOPTER, COLT'S MANUFACTURING COMPANY, INC., GLEN E. HESS, as former Vice-President of the Boeing Company and current President and Chief Operating Officer of BELL HELLICOPTER, JOHN R. MURPHY, Chairman and Chief Executive Officer of BELL HELLICOPTER, LEWIS B. CAMPBELL, Chairman and Chief Executive Officer of TEXTRON, PHILLIP CONDIT, Chief Executive Officer of BOEING COMPANY, LT. GENERAL (Ret.) WILLIAM M. KEYS, President and Chief Executive Officer of COLT'S MANUFACTURING COMPANY (collectively the "Arms Defendants"),

HALAMISH/NEVE TZUF SETTLEMENT, NEVE TZUF FOUDATION (KEREN NEVE TZUF), CHRIST LUTHERAN CHURCH, CENTRAL FUND FOR ISRAEL, ONE ISRAEL FUND, CONGREAGATION RINAT YISRAEL, RABBI YOSEF ADLER, ARNON HILLER, JOAV MERRICK, RUTH KOHN, JAY MARCUS (collectively the "Settler Defendants"),

02 1431

-MOES –1-100,

    Defendants,

**FILED**

JUL 18 2002


NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOHN DOE I on behalf of himself and his grandson, BABY DOE I and as next of kin for his deceased daughter, JILL DOE I, JOHN DOE II, JOHN DOE III, JOHN DOE IV, JOHN DOE V, JOHN DOE VI, JOHN DOE VII, JOHN DOE VIII, JOHN DOE IX, JOHN DOE X, JOHN DOE XI, JOHN DOE XII and JOHN DOE XIII on behalf of themselves; JOHN DOE XIV on behalf of himself and his son, BABY DOE II, JOHN DOE XV on behalf of himself and his son, BABY DOE III, JOHN DOE XVI on behalf of himself and his deceased son, BABY DOE IV, JOHN DOE XVII on behalf of himself, JANE DOE I on behalf of herself and her aunt, JILL DOE II and cousin, BABY DOE V, and JANE DOE II on behalf of herself and the estates of her two deceased sisters, JILL DOE III and JILL DOE IV and as next of kin for her nephew, CHARLES DOE I and niece JILL DOE V,

       Plaintiffs,

v.

STATE OF ISRAEL, ARIEL SHARON in his individual capacity and as former Israeli Minister of Defense, NATAN SHARANSKI individually and in his capacity as Israeli Minister of Construction and Housing, BINYAMIN BEN ELIEZER individually and in his capacity as Israeli Minister of Defense, SHIMON PERES individually and in his capacity as Israeli Minister of Foreign Affairs, UZI LANDAU individually and in his capacity as Israeli Minister of Internal Security, MEIR SHEETRIT individually and as Israeli Minister of Justice, THE ISRAELI GENERAL SECURITY SERVICE (the "Shin Bet"), AVI DICHTER, the head of the Shin Bet, ISRAELI DEFENSE FORCES (IDF), LT. GENERAL SHAUL MOFAZ individually and as Chief of the General Staff, MAJOR GENERAL AMOS GILAD individually and as the IDF Coordinator of Government Activities in Judea, Samaria and the Gaza, MAJOR GENERAL AHARON ZE'EVI FARKASH individually and as IDF Director of Military Intelligence, AMOS YARON individually and in his capacity as Secretary General of the Defense Ministry and as former Brigadier General and Commandant of IDF forces in Beirut, Lebanon (collectively the "Israeli Defendants"),

GEORGE W. BUSH, in his individual capacity and as President of the United States,
COLIN POWELL, in his individual capacity and as Secretary of State,

THE BOEING COMPANY, MCDONNELL DOUGLAS HELICOPTER SYSTEMS, TEXTRON, BELL HELLICOPTER, COLT'S MANUFACTURING COMPANY, INC., GLEN E. HESS, as former Vice-President of the Boeing Company and current President and Chief Operating Officer of BELL HELLICOPTER, JOHN R. MURPHY, Chairman and Chief Executive Officer of BELL HELLICOPTER, LEWIS B. CAMPBELL, Chairman and Chief Executive Officer of TEXTRON, PHILLIP CONDIT, Chief Executive Officer of BOEING COMPANY, LT. GENERAL (Ret.) WILLIAM M. KEYS, President and Chief Executive Officer of COLT'S MANUFACTURING COMPANY (collectively the "Arms Defendants"),

HALAMISH/NEVE TZUF SETTLEMENT, NEVE TZUF FOUDATION (KEREN NEVE TZUF), CHRIST LUTHERAN CHURCH, CENTRAL FUND FOR ISRAEL, ONE ISRAEL FUND, CONGREAGATION RINAT YISRAEL, RABBI YOSEF ADLER, ARNON HILLER,JOAV MERRICK, RUTH KOHN, JAY MARCUS (collectively the "Settler Defendants"),

-MOES --1-100,

       Defendants,

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOHN DOE I on behalf of himself and his grandson, BABY DOE I and as next of kin for his deceased daughter, JILL DOE I, JOHN DOE II, JOHN DOE III, JOHN DOE IV, JOHN DOE V, JOHN DOE VI, JOHN DOE VII, JOHN DOE VIII, JOHN DOE IX, JOHN DOE X, JOHN DOE XI, JOHN DOE XII and JOHN DOE XIII on behalf of themselves; JOHN DOE XIV on behalf of himself and his son, BABY DOE II, JOHN DOE XV on behalf of himself and his son, BABY DOE III, JOHN DOE XVI on behalf of himself and his deceased son, BABY DOE IV, JOHN DOE XVII on behalf of himself, JANE DOE I on behalf of herself and the estate of her aunt, JILL DOE II and cousin, BABY DOE V, and JANE DOE II on behalf of herself and the estates of her two deceased sisters, JILL DOE III and JILL DOE IV and as next of kin for her nephew, CHARLES DOE I and niece JILL DOE V,

      Plaintiffs,

v.

STATE OF ISRAEL, ARIEL SHARON in his individual capacity and as former Israeli Minister of Defense, NATAN SHARANSKI individually and in his capacity as Israeli Minister of Construction and Housing, BINYAMIN BEN ELIEZER individually and in his capacity as Israeli Minister of Defense, SHIMON PERES individually and in his capacity as Israeli Minister of Foreign Affairs, UZI LANDAU individually and in his capacity as Israeli Minister of Internal Security, MEIR SHEETRIT individually and as Israeli Minister of Justice, THE ISRAELI GENERAL SECURITY SERVICE (the "Shin Bet"), AVI DICHTER, the head of the Shin Bet, ISRAELI DEFENSE FORCES (IDF), LT. GENERAL SHAUL MOFAZ individually and as Chief of the General Staff, MAJOR GENERAL AMOS GILAD individually and as the IDF Coordinator of Government Activities in Judea, Samaria and the Gaza, MAJOR GENERAL AHARON ZE'EVI FARKASH individually and as IDF Director of Military Intelligence, AMOS YARON individually and in his capacity as Secretary General of the Defense Ministry and as former Brigadier General and Commandant of IDF forces in Beirut, Lebanon (collectively the "Israeli Defendants"),

GEORGE W. BUSH, in his individual capacity and as President of the United States,
COLIN POWELL, in his individual capacity and as Secretary of State,

THE BOEING COMPANY, MCDONNELL DOUGLAS HELICOPTER SYSTEMS, TEXTRON, BELL HELLICOPTER, COLT'S MANUFACTURING COMPANY, INC., GLEN E. HESS, as former Vice-President of the Boeing Company and current President and Chief Operating Officer of BELL HELLICOPTER, JOHN R. MURPHY, Chairman and Chief Executive Officer of BELL HELLICOPTER, LEWIS B. CAMPBELL, Chairman and Chief Executive Officer of TEXTRON, PHILLIP CONDIT, Chief Executive Officer of BOEING COMPANY, LT. GENERAL (Ret.) WILLIAM M. KEYS, President and Chief Executive Officer of COLT'S MANUFACTURING COMPANY (collectively the "Arms Defendants"),

HALAMISH/NEVE TZUF SETTLEMENT, NEVE TZUF FOUDATION (KEREN NEVE TZUF), CHRIST LUTHERAN CHURCH, CENTRAL FUND FOR ISRAEL, ONE ISRAEL FUND, CONGREAGATION RINAT YISRAEL, RABBI YOSEF ADLER, ARNON HILLER, JOAV MERRICK, RUTH KOHN, JAY MARCUS (collectively the "Settler Defendants"),

-MOES –1-100,

      Defendants,

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOHN DOE I on behalf of himself and his grandson, BABY DOE I and as next of kin for his deceased daughter, JILL DOE I, JOHN DOE II, JOHN DOE III, JOHN DOE IV, JOHN DOE V, JOHN DOE VI, JOHN DOE VII, JOHN DOE VIII, JOHN DOE IX, JOHN DOE X, JOHN DOE XI, JOHN DOE XII and JOHN DOE XIII on behalf of themselves; JOHN DOE XIV on behalf of himself and his son, BABY DOE II, JOHN DOE XV on behalf of himself and his son, BABY DOE III, JOHN DOE XVI on behalf of himself and his deceased son, BABY DOE IV, JOHN DOE XVII on behalf of himself, JANE DOE I on behalf of herself and the estate of her aunt, JILL DOE II and cousin, BABY DOE V, and JANE DOE II on behalf of herself and the estates of her two deceased sisters, JILL DOE III and JILL DOE IV and as next of kin for her nephew, CHARLES DOE I and niece JILL DOE V,

       Plaintiffs,

v.

STATE OF ISRAEL, ARIEL SHARON in his individual capacity and as former Israeli Minister of Defense, NATAN SHARANSKI individually and in his capacity as Israeli Minister of Construction and Housing, BINYAMIN BEN ELIEZER individually and in his capacity as Israeli Minister of Defense, SHIMON PERES individually and in his capacity as Israeli Minister of Foreign Affairs, UZI LANDAU individually and in his capacity as Israeli Minister of Internal Security, MEIR SHEETRIT individually and as Israeli Minister of Justice, THE ISRAELI GENERAL SECURITY SERVICE (the "Shin Bet"), AVI DICHTER, the head of the Shin Bet, ISRAELI DEFENSE FORCES (IDF), LT. GENERAL SHAUL MOFAZ individually and as Chief of the General Staff, MAJOR GENERAL AMOS GILAD individually and as the IDF Coordinator of Government Activities in Judea, Samaria and the Gaza, MAJOR GENERAL AHARON ZE'EVI FARKASH individually and as IDF Director of Military Intelligence, AMOS YARON individually and in his capacity as Secretary General of the Defense Ministry and as former Brigadier General and Commandant of IDF forces in Beirut, Lebanon (collectively the "Israeli Defendants"),

GEORGE W. BUSH, in his individual capacity and as President of the United States,
COLIN POWELL, in his individual capacity and as Secretary of State,

THE BOEING COMPANY, MCDONNELL DOUGLAS HELICOPTER SYSTEMS, TEXTRON, BELL HELLICOPTER, COLT'S MANUFACTURING COMPANY, INC., GLEN E. HESS, as former Vice-President of the Boeing Company and current President and Chief Operating Officer of BELL HELLICOPTER, JOHN R. MURPHY, Chairman and Chief Executive Officer of BELL HELLICOPTER, LEWIS B. CAMPBELL, Chairman and Chief Executive Officer of TEXTRON, PHILLIP CONDIT, Chief Executive Officer of BOEING COMPANY, LT. GENERAL (Ret.) WILLIAM M. KEYS, President and Chief Executive Officer of COLT'S MANUFACTURING COMPANY (collectively the "Arms Defendants"),

HALAMISH/NEVE TZUF SETTLEMENT, NEVE TZUF FOUDATION (KEREN NEVE TZUF), CHRIST LUTHERAN CHURCH, CENTRAL FUND FOR ISRAEL, ONE ISRAEL FUND, CONGREAGATION RINAT YISRAEL, RABBI YOSEF ADLER, ARNON HILLER, JOAV MERRICK, RUTH KOHN, JAY MARCUS (collectively the "Settler Defendants"),

-MOES –1-100,

       Defendants,

# INDEX

I.      INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     OVERVIEW OF ISRAELI OCCUPATION IN THE WEST BANK
        SINCE SEPTEMBER 2000 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

III.    THE PLAINTIFFS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

IV.     THE COST TO AMERICAN TAXPAYERS . . . . . . . . . . . . . . . . . . . . . 11

V.      THE INDISCRIMINATE USE OF FORCE BY THE IDF . . . . . . . . . . 16

VI.     DELAY OF MEDICAL TREATMENT, ATTACKS ON
        AMBULANCES AND EMERGENCY MEDICAL PERSONNEL . . . . 26

VII.    INDISCRIMINATE USE OF OVERWHELMING FIREPOWER
        IN CROWED CIVILIAN AREAS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

VIII.   EXTRA-JUDICIAL ASSASSINATIONS AND THEIR
        COLLATERAL CONSEQUENCES . . . . . . . . . . . . . . . . . . . . . . . . . . . . .37

IX.     CLOSURES, ECONOMIC   WARFARE   AND   COLLECTIVE
        PUNISHMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

X.      GENERAL PRESENT CONDITIONS OBSERVED IN THE
        OCCUPIED TERRITORIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .59

XI.     CLOSURES TRIGGER NEAR-COLLAPSE OF ECONOMY . . . . . . . . 62

XII.    SETTLERS, THE IDF, AND TERRITORIAL EXPANSION . . . . . . . . . 70

XIII.   SETTLER TERRORISM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 78

XIV.    THE AMERICAN SOURCES OF MONEY FOR SETTLERS . . . . . . . . 87

XV.    THE USE OF TORTURE AGAINST AMERICANS IN DETENTION . . 89

XVI.   THE MASSACRE AT SABRA AND SHATILA REFUGEE
       CAMPS, SOUTHERN LEBANON, SEPTEMBER 16-18 1982 . . . . . . . . .104

XVII.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

XVIII. APPENDIX A . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 121

XIX.   APPENDIX B . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 135

XX.    AFFIDAVITS

# I. INTRODUCTION

In the last days of March of this year, the Israeli Defense Forces (IDF), under the command, orders and direction of their Prime Minister Ariel Sharon, launched "Operation Defensive Shield." This operation took the form of a multiple-pronged military assault on the Palestinian cities of the West Bank—Ramallah, Nablus, Jenin, Bethlehem, Tulkarm and Qalqilya—and incursions of armored divisions for containment and control of all roads and rural and agricultural areas. The operation continued throughout the month of April and concluded after approximately seven weeks, with partial or complete withdrawals from select urban areas, while further re-deployment to other areas was carried out. After some three weeks of slightly decreased tensions, the Israeli Defense Forces renewed operations and re-invaded most of these areas on June 19th purportedly in retaliation for several bombing attacks in Jerusalem and elsewhere. On June 21st the Israeli cabinet announced a plan "for all-out seizure of the West Bank,"[1] and began implementing a new full-scale deployment immediately, sending columns of armor and thousands of troops into seven out of eight West Bank urban areas. During the re-invasion on the night of the 21st of June, ten Palestinian civilian non-combatants were killed by IDF troops, including three children in the marketplace of Jenin, where Israeli tanks opened fire on a crowd of shoppers attempting to buy food during what they thought was a break in the 'round-the-clock military curfew.

In a rare admission of guilt, an IDF spokesperson said the army had made a mistake.[2] Then, on June 27th in operations in Qalqilya, IDF forces fired on school children again after a curfew break had been arranged so that students could take final exams. Israel admitted for the second time in a week that its forces had "acted improperly;" as a result, three children were wounded, one with brain damage.[3] The government vows to take all Palestinian lands and institute total closure until all armed resistance stops. Apparently, what the government means by this is exemplified by the massive explosion that demolished the four-story Palestinian Authority regional headquarters in Hebron on June 29th, in an attempt to kill ten to fifteen suspects inside who refused to come out. Simultaneously, the government of Ariel Sharon has now announced the commencement of a vast construction project to build a security fence, which may eventually stretch to some 1,400 miles around Palestinian areas, despite the absence of any final-status negotiations on what may legally constitute that border. Finally, Israel appears to be in the final stages of implementing a policy of mass deportations, as the IDF's highest legal counsel formulates a theory by means of which Israel can justify forcibly relocating perhaps thousands of Palestinians from the West Bank to Gaza.[4]

---

[1] *New York Times*, June 22,2002, A1.
[2] Ibid.
[3] Susan Sevareid, "Israelis Fire Missiles in Hebron," June 27, Associated Press.
[4] "Legal experts address planned deportations," The Jerusalem Post, 24 June 2002.

During the March and April operations, my staff and I were present in the West Bank, working from East Jerusalem, where we met with local human rights activists in an effort to pursue information on Palestinian-American victims of Israeli violence. We had learned of these individuals from a variety of sources in the United States earlier that spring, including their families in various cities in the U.S., and domestic organizations active in the Arab-American community. In our effort to meet and work with the Palestinian-Americans in the West Bank, we encountered many insurmountable obstacles related to Israeli military control of the region at gunpoint. We were repeatedly turned away at checkpoints and security barriers, and impeded by Israeli authorities in all our attempts to physically meet with our fellow American citizens trapped in the military zones of Ramallah, Nablus, Jenin and elsewhere. In addition, officials of the American Consulate in East Jerusalem were unwilling to intercede on our behalf when we met with them in April.[5] Despite this, we were in extensive telephone contact with a number of plaintiffs and witnesses daily while in the West Bank, and through the use of intermediary Palestinian attorneys and other assistants within the closure areas, we were able to take many statements by telephone and execute several signatures for some of them with great effort. Often, this effort took the form of

---

[5] Indeed, consular officials would not even discuss the situation with us (see discussion *infra*, pp. 45-46).

3

utilizing the brief curfew-liftings that occurred irregularly every three to five days, when IDF troops would allow civilians out of their homes for only three hours at a time to purchase food or move around within a given area.   In some cases, Palestinian assistants trapped within the closure areas received e-mailed text from us, took it during curfew lifting to a plaintiff, the plaintiff read and acknowledged the contents and then executed his signature.   Finally, several finished affidavits were posted via the Israeli postal system to our offices in New York.   On at least two occasions, these documents were lost, requiring that the process be re-started with great difficulty.   Likewise, for at least some of the named plaintiffs, it has not been physically possible to get completed affidavits to them for signatures, as they live in areas under complete military closure, cut off from the outside world for more than five months as of this writing.   [A more detailed discussion of the Israeli military practice of comprehensive closure in the Occupied Territories follows below].

Since returning to the United States, my staff and I have made every possible effort to keep in close contact with each of the plaintiffs.   My office is constantly monitoring the military situation on the ground in the West Bank, and my staff and I await the moment when we might practicably and safely enter the cities of the West Bank to meet with our clients and other witnesses.   Most of the

affidavits submitted herein were, per force, prepared as a result of extensive phone discussions between plaintiffs and myself, lawyers assisting in this litigation and my staff. Unable to meet with plaintiffs and other witnesses to the events complained of herein on a face-to-face basis because of Israeli closures and re-occupation these affidavits have been read back to each plaintiff upon completion and approved by each one of them by telephone. In most of the cases, we have been able to fax a copy of the affidavit to a plaintiff in the Occupied Territories, who signed the signature page in the appropriate spot and returned it the same way, although they were not always able to secure the signature of a notary because of restrictions on their movement.

## II. OVERVIEW OF ISRAELI OCCUPATION IN THE WEST BANK SINCE SEPTEMBER 2000

While precise casualty figures will not be known for some time, it is estimated that at least 600, and perhaps as many as 1,000 Palestinian civilians have been killed, with as many as 4,000 injured or seriously wounded and many thousands rendered homeless[6] in the six weeks of military operations conducted in the Defensive Shield campaign. With the slaying of Randa al-Hindi and her daughter Nur, age 2, who were killed by the IDF on July 6,2002 when the Taxi

---

[6] "Horror at Jenin 'War Crime,'" The Washington Report on Middle East Affairs, June/July 2002, p. 43.

they were passengers in near a settlement in Gaza was destroyed by an Israeli tank shell, the total official death figures for both sides of the conflict since September, 2000, is now given as 1,435 Palestinians and 548 Israelis.[7]

International donors—including the World Bank, the United States Agency for International Development, the European Union and the United Nations—at $361 million, currently estimate physical damage in the cities of the West Bank from the IDF invasion.[8] This figure extends the already substantial physical damage estimates of $305 million resulting from the seventeen months of conflict preceding Operation Defensive Shield, a period now referred to as "the second *intifada*," or uprising.[9] And while both these figures seek to detail material, on-the-ground destruction of property, neither can approximate the true depth of economic devastation for both the West Bank and Gaza, which will necessarily result in the coming months and years as a result of this terrible Spring. United Nations and European Union sources have recently estimated economic losses since September 2000 in the billions of dollars.

These latest operations, while only the most recent phase in thirty-five years of occupation, have heralded a quantum increase in the level of Israeli violence, illegality, and wholesale violation of human rights against a subjugated population.

---

[7] Reuters, July 7, 2002.
[8] New York Times, May 16, 2002, A12.

6

The widespread, continuing use of indiscriminate military force against civilians, the use of comprehensive and systematic collective punishment against an occupied civilian population, the use of its military for extra-judicial assassinations of militant or nationalist Palestinian activists, and the deliberate rampant destruction of economic, social and political viability—all place the state of Israel in clear violation of many international standards and covenants of legal behavior to which Israel is a signatory, including the United Nations Charter, the Fourth Geneva Convention of 1949, and the Hague Regulations of 1907. For many years, Israel has been declared a gross violator of the human rights of those millions of Palestinians subject to occupation by such august monitoring and research bodies as: the United Nations High Commission on Human Rights, Amnesty International, Human Rights Watch, the Palestine Human Rights Monitoring Group, the International Committee of the Red Cross, Be'Tselem, and the United States Department of State[10]. Indeed, for decades Israel's current Prime Minister has best been known to a large part of the international community as an un-indicted war criminal for his command role in southern Lebanon, where he presided over the massacres at the Sabra and Shatila refugee camps in 1982. It is well documented that Sharon, Israeli Defense Minister at that time, was forced to

---

[9] As distinct from the first intifada of 1987-1992, which ended with the advent of the Oslo peace accords.
[10] See Country Report on Human Rights Practices, 2000—Occupied Territories, U.S. Dept. of State, Feb. 2001.

step down following an investigation by Israel because of the role he played in the massacre, when a thousand or more Palestinians were brutally murdered by a proxy force of IDF Lebanese allies who rampaged through the refugee camps while Israeli tanks surrounded them, barring all exit.[11]   That the IDF command knew before hand what the militias would do to the unarmed refugees has never been doubted; the craven disregard for human life at the highest levels of the Israeli army in southern Lebanon has become synonymous with its policies towards Palestinian civilians everywhere.  Indeed, that same disregard now stains every part of Prime Minister Sharon's policies today in the Occupied Territories.[12]

## III.  THE PLAINTIFFS

The Plaintiffs in this case are all United States citizens or resident aliens, all Palestinian-Americans who have suffered significant losses to life, limb, family or property as a result of the continuing illegal acts of Israel and its armed forces or settler populations in the Occupied Territories, and in Sabra-Shatila twenty years earlier.  The number of actual Palestinian-American victims is likely in the

---

[11] Another current high-ranking Israeli official, Amos Yaron, Director-General of Israel's Defense Ministry, held a senior military position at the time of the massacre.

[12] On June 30th, 2002, the Israeli daily Ha'aretz reported that Sharon's cabinet voted unanimously that Israel would not join the International Criminal Court in the Hague, which began operations July 1st of this year, out of concern that its activities in the West Bank would be subject to prosecution.  A senior government official reportedly indicated that Israel intends to rescind its signing of the landmark Dec. 2000 treaty which established the court to investigate and prosecute, among other crimes, genocide and crimes against humanity. That Israel, of all nations,

thousands. The small sampling of named Plaintiffs who join in the above action represents the fruit of only the barest of efforts—conducted by myself and my staff in the midst of military operations in the West Bank—to identify, research and document innocent Americans in the way of a brutal military machine bent on the destruction of an entire people and culture. While the exigencies of time and resources have limited our efforts to document more exhaustively other individuals who may be affected by recent events in the Occupied Territories and the events of twenty years ago in Sabra-Shatila, by any standards the true number of potential plaintiffs is enormous, although they may never be fully known. It is our hope that this action will go a long way in initiating the process of identifying, protecting and vindicating the rights of Palestinians, U.S. citizens and aliens alike, who have been subjected over decades to a systematic pattern of unjustified violence and collective punishment at the hands of the IDF and Israel's political leadership.

The Plaintiffs and their families have suffered a wide range of victimization and violation: loved ones have been killed, and some Plaintiffs have witnessed their loved ones die before their eyes; some have lost their children; some have been gravely, permanently injured, or have witnessed the same fate befall their families; some have lost their personal property, their homes, or their automobiles;

---

would not join in such a laudable enterprise speaks to the depth of her isolation and burgeoning pariah status in the eyes of the world.

some have lost their businesses and their life's work and investment; some have lost their land and their olive trees; still others, especially the many children involved in the instant action, have lost their innocence and forever their emotional well-being. A partial list of the specific military means by which they have suffered these losses reads like the pages of *Jane's Defense Equipment* guide: Apache attack helicopters firing 30 mm chain guns (675 rounds per minute) and Hell-Fire air-to-ground missiles; Huey Cobra helicopters firing 20mm chain guns; naval ship artillery including Reshef patrol boats firing 76mm high explosive rounds off the coast of Gaza; M-1A1 Abrams and Merkava Mk2 tanks firing 105mm and 120mm Tungsten carbide DFDS Sabo rounds or high explosive rounds[13]; M203 grenade launchers firing 40mm M406 HE grenades; MK19 Automatic Grenade Launcher firing 40 mm M383 grenades fed with a grenade belt carrying 48 grenades with a shooting range of 2200 meters; light anti-tank weapons (LAW): shoulder-fired, anti-armor weapons with 84mm or 90mm rockets; 5.56 mm bullets fired from M-16 machine guns; 7.62 mm high velocity bullets fired from general purpose machine guns and Galil Sniper rifles; 12.7 mm bullets fired from Browning machine guns and Barret sniper rifles; M114 TOW

---

[13] Both Israel's Apache and Abrams weapons systems are known to be supplied with depleted-uranium (DU) armor and ordnance. While it is not clear at this time if the IDF has used DU rounds in live fire in the Occupied Territories, at least one international monitoring group, the DU Educational Project of the International Action Center, has begun to publish its findings.

rockets; 40-90 mm mortar fire; Air Burst grenades; Rapid Detonating Explosives;
rubber and plastic coated metal bullets; blank rounds to scare crowds; and CS
gas.[14]

## IV.  THE COST TO AMERICAN TAXPAYERS

Nearly all the weaponry listed above, used in the attacks against the
Plaintiffs, is manufactured in the United States.   Simultaneously, all of this
weaponry is purchased by means of funds supplied by the taxpayers of the United
States, including the Plaintiffs themselves, to Israel, pursuant to the Arms Export
Control Act and the Foreign Assistance Act.   While media accounts of the post-
1967 fighting in Palestine typically depict the United States as a bystander,
desirous only of mediating a peaceful settlement to the conflict, in truth, the United
States is a fully-vested partisan, having spent vast sums in arming one party to the
conflict.

Direct military aid and foreign assistance used for military purchases has
totaled approximately $91 billion in the last fifty years.   Since 1976, Israel has
ranked first among recipients of US military aid and economic assistance, typically
averaging in recent years about $3 billion annually, including $1.8 billion in

---

[14] See National Lawyer's Guild, The Al Aqsa Intifada and Israel's Apartheid: The U.S. Military and Economic Role in the Violation of Palestinian Human Rights, January, 2001, New York.

11

Foreign Military Financing (FMF) grants from the Department of Defense and $1.2 billion in Economic Support Funds (ESF) from the Department of State. Since 1992, FMF grants to Israel have totaled $18.2 billion. Currently, 17% of *all* US foreign aid[15] is disbursed to Israel. US State Department analysts noted in fiscal year 2001 that military assistance to Israel would

> enable the Israeli government to meet cash flow requirements associated with the procurement of U.S. origin systems such as F-16 and F-15I fighter aircraft, Apache Longbow upgrades, field vehicles, and advanced armaments. Israel's annual [foreign military financing] level is expected to increase incrementally (by $60 million each year) to a level of $2.4 billion in FY 2008, as [economic assistance] is phased out. Israel also will be eligible in FY2001 to receive Excess Defense Articles under section 516 of the Foreign Assistance Act for defense maintenance, spare parts, support equipment and other needs.[16]

It should be noted that unlike other foreign countries receiving U.S. military aid, the United States permits Israel to use up to 25 percent of the aid to purchase weapons manufactured in Israel, thus providing a significant subsidy to Israeli military industries.[17]

For example, in the fiscal year ending September, 1997, the U.S. had given Israel $6.72 billion: $6.194 billion disbursed under Israel's foreign aid allotment

---

[15] Military and economic or development aid.

[16] U.S. State Dept., Office of the Sec'y of State, Congressional Budget Justification for Foreign Operations, FY 2001, written statement by Asst. Sec'y of State Edward S. Walker Jr. (March 15, 2000), available at http://www.state.gov/www/budget/fy2001/fn150/forops_full/ ("Congressional Budget Justification for Foreign Operations").

and $526 million originated from agencies such as the Department of Commerce, the U.S. Information Agency and the Pentagon. It should be noted that the $6.72 billion figure does not include loan guarantees and annual compound interest totaling $3.122 billion, which the U.S. pays on money it borrowed to give to Israel. It also does not include the cost to U.S. taxpayers of IRS tax exemptions that donors can claim when they donate money to Israeli charities.[18]

To summarize the balance sheet of Israel's "special relationship" with the United States, the following figures, covering the period from 1949-1998, tell the story:[19]

### Benefits to Israel of U.S. Aid 1949-1998

### Cost to U.S. Taxpayers of U.S. Aid to Israel, 1949-1998

| Benefits to Israel | Cost to U.S. Taxpayers |
|---|---|
| **Foreign Aid Grants and Loans:** $74,157,600,000.00, | **Grand Total:** $84,854,827,200 |
| **Other U.S. Aid (12.2% of Foreign Aid):** $9,047,227,200.00 | |
| **Interest to Israel from Advanced Payments:** $1,650,000,000 | **Interest Costs Borne by U.S.:** $49,936,680,000 |
| **Grand                    Total:** $84,854,827,200 | **Total Cost to U.S. Taxpayers:** $134,791,507,200 |

---

[17] McArthur, Shirley, A Conservative Total for U.S. Aid to Israel: $91 Billion—and Counting, WASH. REP. ON MIDDLE EAST AFFAIRS, at 15, (Jan/Feb 2001).
[18] The Washington Report on Middle East Affairs, U.S. Aid to Israel: Facts, Figures and Impact, 2001.
[19] Ibid.

13

| Total Benefits per Israeli: | Total Cost to U.S. taxpayers, per Israeli: |
|---|---|
| $14,630 | $23,240 |

While it is tempting to draw comparisons with other massive U.S. aid programs—for instance, the Marshall Plan to stabilize and re-build post-war Europe cost approximately $13 billion in grants and loans over the decade following 1947—such an exercise borders on the perverse, insofar as Israel is a country the size of New Jersey, with fewer than six million citizens today (and far fewer than that during much of the period in question).

In 2003, the Bush administration proposes that Israel receive $2.76 billion in foreign aide, $2.1 billion in FMF, and $600 million in ESF.  An additional $28 million is dedicated to the purchase of so-called "anti-terrorism" equipment for Israel.  Israel possesses the largest fleet of tactical military fighter jets, mostly F-15's and F-16's, outside the United States, more than 200 fighters, with an additional shipment of 102 Lockheed Martin F-16's currently scheduled for delivery over the next two years.[20]

United States law authorizes the Congress and the President, under the Arms Export Control Act of 1976 (AECA), 22 U.S.C. 2751 *et seq.*, to sell or lease "defense articles and services" to foreign governments, and sets the terms by which

---

[20] See Clyde R. Mark, Israel: U.S. Foreign Assistance, CONGRESSIONAL RESEARCH SERVICE ("CRS"), I.B. 85066, at 1 (updated Jan. 5, 2001); cf. Mark, CRS, I.B. 85066, supra; and cf. McArthur, supra note 9 at 16.

such sales may be legally undertaken.  The Act defines the term "defense article" as including any weapon or material used for the purpose of furnishing military assistance, while a "defense service" includes, among other things, technical assistance or defense information.  The AECA provides that U.S. military assistance to a foreign country must "strengthen the security of the United States and promote world peace."   It must further

> the security objectives of the United States and ... the purposes and principles of the United Nations Charter," and must be "...consistent with...the purposes of the foreign assistance program of the United States as embodied in the  Foreign Assistance Act of 1961, as amended...[21]

The defense articles or services may only be provided for four areas of use by the purchasing country: internal security, legitimate self-defense, participation in regional or collective arrangements consistent with the UN Charter or as requested for international UN peacekeeping duties, and to engage in the construction of public works.  Finally, under the Foreign Assistance Act, the US may not provide assistance to any foreign government "which engages in a consistent pattern of gross violations of internationally recognized human rights . . .."[22]

On all of the critical test points above, Israel's use of U.S.-provided military equipment and aid fails to comply with U.S. law.  The plaintiffs in this case are

---

Hartung, William, and Berrigan, Frida, "U.S. Arms Transfers and Security Assistance to Israel," an Arms Trade Resource Center Fact Sheet, May 6,2002 [available online at www.worldpolicy.org/projects/arms/reports/israel.]
[21] 22 U.S.C. §2751.

victims of systematic human rights abuses by a well-equipped and financed army made possible by fifty years of American largesse; that these victims are taxpaying Americans themselves can only intensify their pain.

## V. THE INDISCRIMINATE USE OF FORCE BY THE IDF

In the nearly two years since the start of the current *intifada*,[23] Israel has continually escalated its level of violence, using regular uniformed military forces, armed with the latest in U.S.-provided armaments, tanks, and helicopters, with overwhelming force against a largely unarmed civilian population.    During the period of September 2000 until the end of 2001, the IDF wounded more than 10,000 persons and killed at least 357, most of this violence occurring in the context of IDF raids and attacks on refugee camps.[24]  Eighty-nine percent of the casualties were civilians, and one-third of these were children below the age of eighteen.[25]    Many of the dead and wounded during this period were civilian

---

[22] 22 U.S.C. §§2152n(a) and 2304.

[23] The present intifada has been popularly called "the Al Aqsa *Intifada*," in reference to the mosque that sits atop the Temple Mount in the old city of Jerusalem, and is the center of Islamic life for Palestinians, and one of the holiest shrines in the Muslim world. On September 29th 2000, during his campaign for the Prime Minister, candidate General Ariel Sharon, in what many have described as a grand political gesture, visited the sanctuary of the mosque, accompanied by more than 1,000 Israeli armed security police.  The preceding weeks had been tense, and the gesture was taken by the Palestinian community to be a clear act of intimidation and a violation of their religion, thus sparking riots and the present spiral of violence.  Reuters reported on October 7th that the week of rioting had left 78 Palestinians dead, including 20 children; and 2000 wounded.  Three Israelis died as well.

[24] National Lawyers Guild, note *supra*, at 27.

[25] *Ibid*, at 27.

16

demonstrators, completely unarmed and vulnerable to attack.[26] Furthermore, the injuries sustained by Palestinians have been predominantly to the head and upper body.  According to a report by HDIP, 146 Palestinians (43.8%) died from head and neck injuries, 109 (32.7%) suffered chest injuries, 30 (9%) were shot in the abdomen, 42 (13%) suffered injuries to multiple parts of their body, and four (1%) died from lower limb injuries.[27]

Open Fire Regulations governing IDF soldiers in the field specify that soldiers may only shoot under two conditions: when a human life is in jeopardy; or when attempting to apprehend a fleeing suspect, and then only by shooting at their legs.  These rules govern all ammunition; in the case of rubber bullets, restrictions are even more specific.  Rubber bullets may be used only when there is a clear threat to life, at distances of no less than 40 meters, and they may be aimed only at the lower body, and never used against children.[28]   Yet on October 22nd, 2000,

---

[26] That is not to suggest that Palestinian police officers have been immune to the often indiscriminate and precipitous use of overwhelming firepower which has become synonymous with Israeli operations in the territories. One such egregious example occurred more than a year ago when the IDF killed five Palestinian policemen by "mistake" at an outpost near the West Bank City of Ramallah. According to government spokesperson Raanan Gissan the "death of the five policemen was an error caused by bad information given to soldiers who took part in the operation." The Guardian, "Israeli Troops shot Five Dead in Error." May17, 2001

[27] Health Care Under Siege II: The Health Situation of Palestinians During the First Four Months of the Intifada, (HDIP, Ramallah), Feb. 2001, at 4, 6, available at: http://www.hdip.org/reports/Currentintifada_contents.htm ("Health Care Under Siege II").

[28] Be'Tselem notes that while the IDF has traditionally published its Open Fire Regulations, since the start of the al-Aqsa *intifada* Israel has ceased disseminating its current regulations. Col. Daniel Reisner, the head of the IDF's international law branch, has repeatedly used the justification that "There is a genuine operations problem in disclosing the Open-Fire Regulations... We know that they [the Palestinians] are trying to learn the loopholes and exceptions in our open-fire regulations so as to exploit them against us... This is not done to cover or conceal, but to protect and prevent."[28] In the absence of a written policy, the IDF now depends upon verbal dissemination from commanders to soldiers in the field.  Confronted with such widespread evidence of aiming to kill, one can only conclude that commanders, soldiers, or both have decided to implement their own rules.

Wael Emad, 16, of El-Bireh, Ramallah, was killed by a rubber bullet that hit him in the head; two days later Iyyad Shath, 14, was killed by a rubber bullet in Khan Younis; and on December 16, 2001, Yasser Kussba, 12 years old from Qalandia, was hit in the head with a rubber bullet and died.[29]  And while these are just three such victims, the numbers of children killed by live rounds is far greater.

The history of the current *intifada*, as well as the earlier uprising in the 1980's, is replete with hundreds of examples that establishing a pattern of deliberate misuse by the IDF of both live rounds and rubber bullets, as documented by many groups.  Furthermore, the Israeli human rights group, B'Tselem, has studied the use of rubber bullets extensively, and they report in depth on the essentially indiscriminate nature of such ammunition, even when used according to design, as well as the fundamentally lethal nature of their use by the IDF:

> IDF experiments have shown that rubber shot from a range of 40-50 meters will deviate by 2-6 meters from the intended target. According to the director of the IDF central ammunitions laboratory in a testimony before the Or commission there is a "good chance" that fire aimed at a person standing in a group at a distance of 40 meters will strike those standing near him, while the chance of hitting the targeted person is "moderate." This witness stated, "It is difficult to aim at a particular person, and certainly not at the head or legs."

---

[29] See annexed hereto as Appendix A, data compiled by American Educational Trust, Americans for Middle East Understanding, Inc., Black Voices for Peace, Jews for Peace in Palestine and Israel, and published as *"Who Will Save the Children,"* June 2002, Washington, D.C. setting forth a breakdown of Palestinian children killed during the most recent *intifada*.

Another problem with the use of rubber bullets is their frequent misuse. According to testimonies taken by B'Tselem, many soldiers manipulate rubber bullets in order to make them more lethal:

> Rubber bullets come in packages of three bullets, which are fired together. However, if a soldier dismantles the packaging and fires the bullets one at a time, then the bullet's [individual] velocity is increased, making them more lethal. The following soldier's testimony provides a disturbing example of the widespread use of this practice:
>
>> When the company commander gave us a lesson about rubber bullets, he said that you shoot them together in packets of three, and that is almost ineffective because they are too heavy; but if you separate them – it can kill. He added, with a wink: "I'm not hinting at anything... The guys laughed and said to him: 'you are not hinting – you're saying. He didn't correct them. One day, I got into the "Sufa" jeep that serves as the mobile headquarters for the battalion means of transportation. I saw that lots of separated rubber bullets had been tossed inside. I asked the driver about it, and he said that everyone separates the bullets, even the commander.[30]

Indeed, the alarmingly high rate of casualties among Palestinians in the past two years has uniformly led those in the human rights community to conclude that Israel has engaged in a systematic pattern of terror against civilians as a form of collective punishment for the acts of a few Palestinians in clear derogation of several international covenants including Article 33 of the Fourth Geneva Convention.[31]   As explained by the Commentary of the International Committee

---

[30] All information and quotations are taken from B'Tselem's report *Trigger Happy: Unjustified Shooting and Violation of the Open Fire Regulations During the al-Aqsa Intifada*, March 2002.

[31] In relevant part this Article states:" no protected person may be punished for an offense he or she has not personally committed. Collective penalties and likewise all measures of intimidation or terrorism are prohibited . . . Reprisals against protected persons and their property are prohibited."

of the Red Cross (ICRC), Article 33 of the Geneva Convention prohibits "penalties of any kind inflicted on persons or entire groups of persons, in defiance of the most elementary principles of humanity, for acts that these persons have not committed."[32]

By words and deeds, for more than two decades Prime Minister Sharon has repeatedly proven himself unwilling to adhere to the most rudimentary covenants of international law in so far as they relate to the treatment of Palestinian civilians, be they in Lebanon or the Occupied Territories. For example, on March 5,2002 the Prime Minister said, "The Palestinians must be hit and it must be very painful. We must cause them losses, victims, so that they feel the heavy price".[33] These odious words came on the heels of an IDF invasion on February 27,2002 of various cities and Palestinian sectors (in the Area A category of Palestinian autonomy, according to the Oslo nomenclature) of the Occupied Territories, using tanks, armored personnel carriers and Apache helicopters. In the six weeks up to April 11, 2002 more than 600 Palestinians may have been killed and more than 3,000 injured.[34] According to a briefing on March 1[st,] 2002 by the Commander of the West Bank division Brigadier General Yitzhak Gershon, the aim of the incursions into the

---

[32] ICRC, Commentary IV,p.225. (The ICRC, the body charged with monitoring adherence to the Geneva Convention, has consistently affirmed the application of the Fourth Geneva Convention in all its statements dealing with the Occupied Territories since Israel's occupation of the West Bank and Gaza Strip. Indeed, on December 4,2001, the Declaration of the Conference of High Contracting Parties to the Fourth Geneva Convention reaffirmed the applicability of the Fourth Geneva Convention to the West Bank, Gaza Strip and East Jerusalem).
[33] Amnesty International online report, "The Heavy Price of Israeli Incursions," April 12,2002.

Occupied Territories was to root out terrorists and their support network. General Gershon added that "It is important to clarify that this activity is not intended against the population which is not involved in terrorism. We have done all efforts to prevent causing harm to civilians."[35]  Yet clearly the IDF did not do enough, as attested to by the high numbers of civilian, non-combatant casualties, including the many named plaintiffs in the case before the Court.

According to research by B'Tselem,

> Numerous disturbing patterns exist in IDF Open-Fire policies. Soldiers use rubber coated metal bullets in order to disseminate crowds, even though these bullets have proven in many cases to be lethal. There is indiscriminate firing at Palestinians in certain "danger areas" without warning, despite the fact that many of these danger areas are either in, or very near to, civilian areas. If a Palestinian civilian enters a danger zone, or is carrying arms or what is thought to be arms or an explosive, then they will be shot to kill. There is evidence of soldiers firing "out of boredom." Soldiers return fire in a sweeping, disproportionate and indiscriminate measure to fire received. Soldiers shoot to kill, even when it would be possible to shoot non-lethally.

In addition, during the full-scale invasions of the urban centers of the West Bank in March—June of this year, all evidence seems to indicate that entire residential neighborhoods and business districts were turned into free-fire, shoot-to-kill zones, neither giving the inhabitants time to leave nor warning them whatsoever.

---

[34] Ibid.
[35] *Ibid.*, at 2.

21

Clearly, the phenomenon of the free-fire zone where civilians are targets explains many of the worst reports. **Plaintiff John Doe (I)**, an American citizen from Ramallah, details the death of his daughter in a hail of IDF bullets in the very early hours of the invasion of Ramallah. Jill Doe (I), twenty-two years old and also an American, was fleeing the sound of fighting in the distance, with her husband and infant son in the family car. Attempting to drive around the block from their own apartment to their father's, they were stopped by IDF soldiers only meters from Farhan's door. While they made no threatening gestures, were unarmed, and were complying with all orders, the platoon of soldiers opened fire at close range with machine guns, spraying the family where they sat in their car. Jill Doe (I) was killed, shot multiple times in the head and body, while her husband Charles Doe (II) was shot twice in the head and lived. Miraculously, the baby was unharmed, apparently saved only by her mother's limp body as it fell over the child. Once the shooting had ended, the IDF soldiers began to move on. (See annexed hereto as Exhibit A, affidavit of John Doe (I)]. Further investigation, however, reveals that sometime shortly thereafter, when several witnesses came out of their nearby homes to see if they could help Charles Doe (II), his gravely injured wife, and the crying baby, they were themselves shot and wounded by the Israeli soldiers. Although medics were able to remove Jill Doe's (I) body, because the soldiers fired at the ambulance taking her from the scene, her husband was not

removed or treated for his various injuries for several more hours. Her body lay for days in a morgue at the hospital to where she was removed, and which was already overflowing with dead bodies awaiting burial. Prohibited by the IDF from taking the dead to the cemetery, and fearing an outbreak of disease from the rotting corpses, hospital officials decided to bury Jill Doe (I) and twenty-six others in a mass grave that was constructed by digging up the hospital parking lot.

Shooting out of boredom also explains an alarming number of casualties. **Plaintiff John Doe's (XIV)** seventeen year old son Baby Doe II from the Bronx, New York, who now lives in Ramallah, was driving in his van with his friend, leaving his father's farm where he tended chickens, during the third week of the Spring, 2002, military invasion of the West Bank. He noticed some IDF soldiers near the roadside, but there was no roadblock nor did they order him to stop. Nevertheless, they opened fire on his van without warning, and bullets struck Baby Doe II and his friend. A bullet entered Baby Doe's (II) back and tumbled through his intestines, and liver; IDF troops delayed the arrival of an ambulance by an hour, then delayed its progress further almost another six hours—all for what should be a ten-minute drive to the hospital in Ramallah. As a result of his wounds, Baby Doe (II) will have permanent disabilities: he presently wears a colostomy back for the excretion of solid waste through a tennis-ball sized hole in his lower abdomen. His friend was struck by two bullets, and in all, the van had

more than twenty bullet holes in it. Neither boy was wanted by the IDF for any reason, nor had they ever taken part in any kind of illegal activity. No reason has been provided by anyone in command of the troops in that area to explain why they shot the boys, nor have any charges been filed against IDF personnel. (See annexed hereto as Exhibit B, affidavit of John Doe (XIV)].

The unthinking, reckless savagery of IDF troops in their assaults on Palestinian cities this past Spring raises serious questions as to whether IDF training is deficient, creating undisciplined fighting units who cannot distinguish between their enemy and those civilians the law says they must protect, or whether their wanton disregard for human life is deliberate, and thus a policy of terror calculated to punish civilian populations with its random, life-shattering brutality. Indeed, one hardened war correspondent, Phil Reeves, writing in *the Times* (London) declared, "Rarely in more than a decade of war reporting from Bosnia, Chechnya, Sierra Leone, Kosovo, have I seen such deliberate destruction, such disrespect for human life."[36] Indeed, speaking of the Israeli operations in Jenin alone, U. N. Middle East envoy Terje Roed-Larsen described the assault as " a sad and disgraceful chapter " in the history of the Jewish state.[37]

**Plaintiff Jane Doe (I)**, an American residing in Alabama, relates a horrific

---

[36] April 16th, 2002.

[37] Reuters, April 19, 2002. In describing what he had found after touring the Jenin camp Roed-Larsen noted that he discovered "massive suffering" among the civilian population. *Ibid.*

scene of IDF violence that can only be described as terror inducing for its unfortunate victims. Much of her family still lives in the Old City of Bethlehem, where IDF troops launched an invasion on April 2nd, 2002. Again, as has been reported countless times in the past weeks, IDF troops assaulted entirely residential areas, pouring rifle and machine-gun fire, rockets and tank shells down blocks of houses and apartment buildings where thousands of civilians lived. As Jane Doe (I) reports, based on accounts provided to her in Arabic by her surviving family members in Bethlehem, IDF troops came to the door of their family's house in the early morning, and set off an explosion to blow open the door. The family, already terrified by the sound of gunfire outside, was huddled together in the inner rooms and had no idea that the IDF was trying to enter. The explosion failed to blow open the door, so the IDF began firing through the windows of the house, though they had no way of seeing within or even of knowing if people were inside or not. The plaintiff's aunt Jill Doe (II), a U.S. citizen, was shot at least once in the head and died on the scene from massive head trauma; her cousin Baby Doe (V), a U.S. citizen, was also shot in the head and died from his wounds.

The family of Jane Doe (I) has never been accused by the IDF of any involvement whatsoever with any nationalist groups; nor have charges against Helwa's family ever been alleged by Israel, nor has any explanation of the shooting been forthcoming from IDF authorities. Rather, the intent on the part of

the IDF appears to have been pure, stark terror, delivered at random to unarmed civilians taking shelter in their own homes. (See annexed hereto as Exhibit C, affidavit of Jane Doe (I)].

## VI.  DELAY OF MEDICAL TREATMENT, ATTACKS ON AMBULANCES AND EMERGENCY MEDICAL PERSONNEL

Many wounded civilians have died or suffered serious injuries made even worse due to the routine stopping of ambulances and emergency vehicles by the IDF.  For example, Plaintiff Baby Doe (II), gravely wounded, lay in a village medical clinic for nearly an hour awaiting an ambulance stopped at a nearby roadblock by the IDF.  When the ambulance finally arrived, soldiers jumped out, entered the clinic and made all the personnel and family members present subject to a search.  This delayed his transfer to the hospital almost another hour; when Baby Doe II was finally loaded into the ambulance, they were barely underway when the ambulance was stopped at yet another checkpoint, and Baby Doe (II) was stripped naked, removed and left lying in the dirt for several hours.  In all, a ten-minute trip to an emergency room would take nearly seven hours.

The deliberate delaying of emergency medical treatment by the IDF has been well documented in hundreds of cases from this spring's invasion. Furthermore, human rights and international medical aid groups have documented many dozens of cases of medical personnel and ambulances not only delayed in

their duties, but also shot at, killed, wounded, arrested and detained.   In a

Be'Tselem report from March of this year,[38] covering only two weeks of Operation

Defensive Shield, they detailed five Palestinian medical personnel killed while on

ambulance duty, ten Red Crescent Society personnel wounded, twelve ambulances

damaged by gunfire, and two ambulances destroyed.   Since the beginning of the

current *intifada*, the Red Crescent notes that three of its personnel have been killed,

134 wounded, and 174 ambulances damaged.

The Fourth Geneva Convention explicitly forbids attacks of this kind,

stating, "The wounded and sick, as well as the infirm, and expectant mothers, shall

be the object of particular protection and respect."[39]   Be'Tselem writes "the

provision of medical treatment to the wounded and the immunity of medical teams

and hospitals are fundamental principles of the laws of war, which bind the

combatants in all circumstances."[40]   The Convention further states that "the Parties

to the conflict shall endeavor to conclude local agreements for the removal from

besieged or encircled areas, of wounded, sick, infirm, and aged persons, children

and maternity cases, and for the passage of ministers of all religions, medical

personnel and medical equipment on their way to such areas."   For their part, the

---

[38] Be'Tselem report: "Impeding Medical Treatment and Firing at Ambulances by IDF Soldiers in the Occupied Territories—March, 2002."

[39] Geneva Convention relative to the Protection of Civilian Persons in Time of War, Part II, Article 16.   Adopted on August 12th 1949 by the Diplomatic Conference for the Establishment of International Conventions for the Protection of Victims of War, held in Geneva from April 21st to August 12th, 1949 *entry into force* October 21st 1950.

IDF routinely denigrate the work of ambulance crews and hospitals serving at great risk in the Occupied Territories by claiming that these services are used in a clandestine fashion to transport combatants and materiel through military lines. This cynical claim has never been documented in a single case, though the IDF has been pressured for evidence of their irresponsible claims many times by representatives of the International Committee of the Red Cross/Red Crescent, Amnesty International, Doctors without Borders, and other groups. With respect to medical transport and facilities, the Convention notes that "the fact that sick or wounded members of the armed forces are nursed in these hospitals, or the presence of small arms and ammunition taken from such combatants which have not yet been handed to the proper service, shall not be considered to be' acts harmful to the enemy" which might justify voiding the protections afforded in Articles 16-20.

The capricious, illegal delay of emergency medical treatment is a dangerous precedent set by Israel, if allowed to go unchallenged by the international community and the rule of law. Nor is their wanton disregard merely a reflection of the exigencies of the most recent military operations. Rather, a pattern is demonstrable over much of the entire period of occupation, and the results are

---

[40] Be'Tselem, note *supra* at 2.

often tragic and lethal for the wounded civilians whose lives hang in the balance while eighteen-year old IDF troops play God while manning the checkpoints.

**Plaintiff John Doe (XVI)** lost his sixteen-year-old son Baby Doe (IV) in the first weeks of the current *intifada* when the ambulance taking him to the hospital with a bullet in his head was delayed for approximately an hour by IDF troops in East Jerusalem. Baby Doe (IV), a devout Muslim and American citizen who had lived nearly his entire life in Florida, was on his way to a local mosque to pray one Friday afternoon during the holy month of Ramadan when he noticed a nearby peaceful, if angry, Palestinian street demonstration against the Occupation. Not wanting to get involved, he avoided the demonstration, and was some distance away from it when IDF troops opened fire to disperse the demonstrators with live rounds. Witnesses say a bullet from the IDF position struck Baby Doe (IV) in the head. Bystanders summoned an ambulance, and they started to take him to the Al Maskedas hospital nearby in Jerusalem. Almost immediately, however, the ambulance was stopped at a checkpoint, where it languished for approximately forty-five minutes while IDF troops searched the vehicle and all its personnel. By the time Baby Doe (IV) arrived at the triage unit, the wound to his brain was too edematous, with multiple fractures to his skull and extensive bleeding, for doctors to stabilize him. Baby Doe (IV) died in the ICU an hour later. (See annexed hereto as Exhibit D, affidavit of John Doe (XVI)].

29

**Plaintiff John Doe (IV)**, a Palestinian-American who taught and practiced pediatrics, internal and emergency medicine at King's County Hospital in New York City, moved to Ramallah in 2000 to become chief of emergency medicine at a local hospital. During the first weeks of this year's spring invasion, John Doe (IV) stood by helplessly as his own father, John Doe (III), also an American citizen, suffered irreversible brain damage due to the denial of right of passage to an ambulance. John Doe (IV) was working at the hospital when family members called him to say his father was not feeling well. After listening to the symptoms, John Doe (IV) decided that his father was in the early onset of a stroke, and sent for a Red Crescent ambulance to get his father immediately, some five minutes away. Ramallah was under a comprehensive twenty-four hour curfew at that time, with shoot-on-sight orders for anyone in the street. The Red Crescent called IDF authorities to inform them of the emergency, but they were denied access. John Doe (IV) would not see his father for two more days, when the next temporary curfew lifting allowed him to leave the hospital. By that time, his father had suffered a catastrophic stroke, leaving him with moderate impairment to his brain and faculties—loss of memory, speech and motor control. (See annexed hereto as Exhibit E, affidavit of John Doe (IV)]. **Plaintiff John Doe (III)** notes in his affidavit that on the day he began to suffer from his the onset of stroke, there was

no fighting in his area of the city, and that he cannot understand why he was denied medical care. (See annexed hereto as Exhibit F, affidavit of John Doe (III)].

Finally, the IDF's criminal use of indiscriminate force against civilians and its barbaric denial of emergency medical care come together in the tragic case of **Plaintiff John Doe (XV),** a resident alien from the Seattle area, whose ten year old son Baby Doe (III) was gravely wounded on May 25 of this year, while outside the family's apartment building in Tulkarm. The family of John Doe (XV) owns a five-story apartment house in Tulkarm where his parents, and three of his brothers (all U.S. citizens) reside with their children. The building has a central courtyard, and on the day of the incident, his uncles had sent Baby Doe (III) to a neighbor's home to get them some tea and coffee. As he was returning, IDF tanks appeared around a corner, some fifty meters away, and opened fire on the boy just as he reached the gate to the courtyard. Baby Doe (III) fell, wounded in the leg, and lay there screaming. His father ran outside and covered the boy with his own body as the IDF continued to shoot at them; John Doe (XV) twisted his ankle and was paralyzed with fear as he lay covering his son, as dozens of heavy machine-gun rounds pock-marked the side of the building. The IDF never ceased firing during *the entire episode, despite the fact that no return fire ever originated from their* building or courtyard, nor were their combatants anywhere in the vicinity, nor were any of the family of John Doe (XV) armed or belligerent in any way whatsoever.

That they were firing on a boy was almost certainly evident to the tank crew, only a short distance away. John Doe's (XV) brothers eventually dragged the father and son back inside, and the family called for an ambulance from local authorities that act as liaison with the IDF for the evacuation of wounded persons. An ambulance, though only a minute away, was denied entry to the area for a significant period. His son lost a great deal of blood, and his leg was shattered. Doctors at a hospital in Nazareth have diagnosed extensive nerve damage to the boy's leg, and the bone has multiple fractures; it is unclear at this time whether Baby Doe (III) will ever walk again. (See annexed hereto as Exhibit G, affidavit of John Doe XV)].

This policy of delaying medical treatment and emergency vehicles to wounded civilians has especially struck hard among children. An examination of casualty reports since September 2000 for Palestinian and Israeli children under the age of eighteen compiled by a coalition of American peace organizations[41] lists a number of Palestinians children victimized by interference with medical assistance, including: an unnamed infant girl (Obeisi family), dead because her pregnant mother delivered, with complications, at a checkpoint on January 7,2001; Israa Ahmad, age 11, died in an ambulance delayed at a checkpoint on March 17'2001; Zahra Abu Shallouf, age 2, who was denied access to medical care and died on August 11,2001; an unnamed infant (Safdi family), stillborn to her mother at a

---

[41] American Educational Trust, see Appendix A.

checkpoint near Nablus on September 23,2001; and a newborn named Abed Rabo,

who died October 24, 2001, at Bethlehem.

## VII. INDISCRIMINATE USE OF OVERWHELMING FIREPOWER IN CROWDED CIVILIAN AREAS

The IDF's routine denial of medical attention to wounded civilians is denounced by many organizations for its patent illegality. To the impartial observer perhaps unacquainted with the rules governing war zones, it must appear as sadistically cruel, and when this practice is applied to wounded children and women, it is surely indicative of a special kind of programmatic depravity. Its crime compounds and intensifies the crime that has come before it: a civilian wounded by gunfire or rocket attacks has already suffered terror, loss and pain, and if conscious, must now feel a new dread at being denied help while being delivered into the hands of those who have done them harm. Yet for its all its person-to-person sadism, it at least affords the victim the chance to look upon the face of her tormentors. Many more Palestinians in the recent months of the fighting have never had any such chance, as random, unannounced death crashes down on them without any warning.

The extensive use by the IDF of sophisticated, tactical combat systems in densely populated, urban areas against civilians is nothing short of criminal. The IDF's increasing willingness to rely on the Lockheed-Martin F-16 armed with air-

to-ground rockets and missiles, or the McDonnel-Douglas Apache attack helicopter, armed with chain-feeding rapid cannon fire, Hydra rockets, Hellfire missiles and heavy machine guns, for population control and retaliatory strikes is most disturbing.   For example, on May 18th an F-16 strike on Palestinian Authority buildings in Ramallah and Nablus left twelve dead, forty-seven wounded, including five children, and leveled a police facility in Nablus,[42] leaving many victims homeless. That same day in Gaza, an attack on the Ansar police station in Gaza City left nineteen injured and completely destroyed the facility.[43] Israeli F-16's attacking P.A. buildings in the city of Tulkarem on January 18th of this year killed two persons and wounded over 100; more than seventy shops were destroyed or damaged in the attack on the busy downtown district;[44] on March 6th an Israeli air strike on the main security headquarters in Gaza City killed a dozen and leveled a city block;[45] and Apache helicopters attacked two cars in the Rafah

---

[42] The IDF claims it launched the F-16 strike—the first such aerial attack inside the Occupied Territories since 1967—in order to kill Mahmoud Abu Hanoud, a Hamas activist being detained there by the Palestinian Authority. Major-General Giora Eiland, head of strategic planning for the Israeli army, justified such disproportionate force targeted at one individual thusly: "When we bomb a target we are trying to show the Palestinian leadership that there are costs on both sides. In the long run, this will create problems for the Palestinian regime and that will help persuade them to stop the violence." This policy, intended to sow fear through a civilian population in order to undermine its leaders, constitutes a form of terror-attack, much as Franco and Hitler's airborne attacks on the Spanish town of Guernica in 1936 were designed to do. [As quoted in Edward Pilkington, "Israel Admits F-16 Attack was Flawed," *the Guardian*, 23 May 2001].

[43] LAW: the Palestinian Society for the Protection of Human Rights and the Environment, May 19,2001 press release.

[44] LAW: press release, Jan. 18, 2002.

[45] I visited the facility almost a month after this attack, and toured the pile of twisted steel and concrete slabs, completely collapsed, covering a city block in a busy commercial district. That a modern air force would launch such an attack against a downtown center without first warning residents to leave the area is unconscionable. I was informed at that time by witnesses to the air-strike that at first a helicopter attacked the site, doing moderate damage that started fires. Once the helicopter had withdrawn, rescue workers and firefighters arrived to fight the fire. At

camp in Gaza on June 23rd of this year, killing six Palestinians and wounding nine.[46]

Israel justifies these attacks by claiming they are pursuing terrorists and eliminating them in self-defense; or alternatively, that they are ensuring their security against the Palestinian Authority, whose ministry buildings, main offices and facilities have nearly all been attacked or destroyed. On the one hand, the civilized, international rule of law cannot countenance extra-judicial state executions of persons wanted for even the gravest of crimes. Even when pursuing armed suspects known to be dangerous, Israel, as the occupying power, must respect the human and civil rights of the civilian population, as instructed by the Geneva Convention, and take care to ensure their safety at all times. Clearly, tactical combat systems like helicopter gunships and fighter jets are entirely inappropriate to the task of pursuing suspects in civilian areas. On the other hand, their justification on security grounds of the zealous destruction of the viability of P.A. governance rings hollow, in light of the fact that the P.A. possesses neither an army nor an air force,[47] no anti-aircraft defenses, and no means to repel armored invaders.

---

that point ,an F-16 swooped in and struck with missiles, killing several emergency rescue workers as they worked to save lives.

[46] "Israeli Missile Attack Kills Six," CNN-Online, June 24,2002.

[47] Indeed, the Oslo Process explicitly forbids the P.A. from developing any defensive capabilities whatsoever. Only a lightly-armed police force is authorized at all, and much of that has been systematically destroyed by the IDF at the very same time that Israel complains that the P.A. will not pursue and apprehend suspects.

During the Israeli invasion of Nablus on April 3rd of this year, the childhood home of **Plaintiff Jane Doe (II)** was hit by an air-to-ground rocket or missile strike, from either an Apache helicopter or an F-16. No warning was given to any inhabitants of the neighborhood to evacuate or seek shelter, and private homes were damaged throughout the quarter. Jane Doe (II), a forty-six year old American who lives in South Carolina and is co-owner of the family property in Nablus, states that the rocket destroyed the third floor of the building, causing it to collapse on its occupants, killing her two sisters Jill Doe (III) and Jill Doe (IV), who were buried under the rubble. Her nephew Charles Doe (I), age 23, was burned extensively and has lost vision in one eye. Her niece Jill Doe (V), age 26, suffered spinal injuries and is now paraplegic, undergoing treatment in a hospital in Jordan, where she was permitted to travel by the IDF. That American-produced military equipment destroyed the home of Jane Doe (II) and her family bears an added, tragic dimension, in that her husband, Charles Doe (III), retired recently from active duty in the United States Army with an honorable discharge after a proud career of some fifteen years. The depth of her pain can scarcely be imagined, as she struggles to come to grips with the incomprehensible and senseless horror of what has happened to her family in Palestine. As she states so eloquently in her affidavit, "I think of my sisters several times a day. It still seems impossible that this has happened, and I cannot comprehend how the Israeli forces could do this

36

thing.  My sisters were a threat to no one.  They have never injured anyone and killing them was senseless in every sense of the word." (See annexed hereto as Exhibit H, affidavit of Jane Doe (II)].

While employing its high-tech military as judge, jury and executioner may project an image of Israel's resolute toughness to domestic audiences and the world, the effectiveness of this tactic in eliminating nationalist resistance is entirely debatable.  But what is not subject to debate is the undeniable terrorizing effect of this practice on urbanized civilians living in the bull's eye.  The Israeli use of massive, disproportionate retaliation against undefended populations is intended to spread terror through all the cities of the West Bank and Gaza, making thousands pay with their lives, their peace and their sanity for the alleged, unproven crimes of a relatively small number of suspects.  In this, it constitutes another arrow in the quiver of collective punishment from which Israel draws all its responses to the political and logistic challenges of ruling as an occupier on someone else's land.

## VIII.  EXTRA-JUDICIAL ASSASSINATIONS AND THEIR COLLATERAL CONSEQUENCES

Perhaps the most shocking examples of the use of indiscriminate force are those involving civilians killed or wounded during IDF missile, bomb and rocket attacks aimed at assassinating particular Palestinian individuals, typically alleged militants and political activists.  These deliberate extra-judicial executions of

persons against whom no charges or legal proceedings have been brought are in violation of the standards of all decent, law-abiding societies, and have been widely condemned by international opinion. Israel's military intelligence has admitted on a number of occasions that they employ this practice, and that they will continue to do so.[48] Indeed, as recently as June 24th 2002, an Israeli missile strike in Gaza killed a carload of what IDF spokespersons described as Palestinian militants; as noted in the news reports, "a passenger in a nearby vehicle was also killed."[49] Similarly, on April 30th of this year, an explosion destroyed a two-story building in Ramallah, some three hundred yards from Yasir Arafat's compound there. According to PA intelligence chief Amin Al-Hindi, the powerful blast struck the building, killing Fatah activist Hasa Al-Qadi, three-year-old Malak Barakat and seven-year-old Shahid Barakat. In addition, a woman and her two-year-old child were injured in the blast. The Israeli army initially issued a routine disclaimer, denying any involvement in the two explosions, but later tacitly admitted responsibility, saying it "felt sorry for the death of the civilians."[50] Amnesty International, investigating cases of state assassination in Gaza and the West Bank found that in nearly all of the cases, the arrest of the suspected

[48] BBC News, Feb. 21 2001, "Israeli 'assassination policy' condemned;" quoting Israeli Embassy (London) spokesperson DJ Schneeweis on Israel's "pinpoint killings." See also NY Times, July 6 2002, Israeli Tank Machine-guns Taxi, Killing Woman and Toddler," which reports that Israel has admitted killing "dozens" of deliberately targeted Palestinian leaders and militants.
[49] Reuters, Nidal al-Mughrabi, June 24,2002, "Israel Kills 6 in Gaza Strike, Surrounds Arafat HQ."
[50] Al-Ahram Weekly On-line, May 3-9,2001, Issue No. 532.

individuals could have been accomplished or at least attempted by Israeli forces in superior numbers, but was never even attempted in any of the cases.[51]

In a recent report on Israel's practice of "liquidating" individuals without trial or charges, B'Tselem reviews nine such deliberate assassinations in the past two years and notes that six innocent civilian bystanders were also killed as a result of those operations. That the level of blatant illegality in such a practice sets a new standard for the criminal misuse of state power is only one component of the moral shortcomings represented by this practice: its indiscriminate disregard for the safety and lives of bystanders is tantamount to barbarism. The assassination policy[52] not only deprives the intended targets of their lives without judicial process, but all too frequently it deprives "unintended" targets—bystanders whose only "crime" is one of being in their homes or streets—of their lives without any means to seek redress whatsoever. Decisions on assassination targeting operations are made behind closed doors at the highest levels within the military, with the full support of the political leadership of Israel, and there is no means of redress or accountability whatsoever for injured bystanders or the families of the dead.

---

[51] Amnesty International, "AI Condemns State Assassinations," Feb. 20, 2001.

[52] That this practice is official policy at the highest levels is not in dispute. In a meeting of the Foreign Affairs and Defense Committee on January 9th 2001, Chief of Staff Shaul Mofaz explicitly admitted that the policy exists. He claimed that his policy is supported by the legal opinion of the Military Advocate General, Brigadier-General Menachem Finklestein, who determined that, "The IDF has the legal right to fight 'hostile elements' in the Occupied Territories in exceptional and extraordinary cases, when the purpose is to save lives and in the absence of any other alternative." (*Ha'aretz*, "Mofaz: IDF jurist approves killings," Jan 11th '01.) This cynical justification not only sacrifices the rule of law to the occupying military's god-like purview, but implicitly values some lives—the Israeli

Rather, by all accounts, the "collateral damage" inflicted on innocents is intentional, as affirmed by a high ranking unnamed official in the security forces[53] who told reporters that "the liquidation of persons is proving useful . . . this activity paralyzes and frightens entire villages and as a result there are areas where people are afraid to carry out hostile activities." In other words, extra-judicial assassination has become a tool of terror and collective punishment against innocent civilians. The special report, "Who Will Save the Children?" lists Ashraf Abu Khader, age 10 and Bilal Abu Khader, age 12, two brothers from Jenin, as killed by Apache rocket attacks aimed at "liquidating" a suspect on July 31st 2001; and on December 10th 2001, a helicopter firing a missile at another suspect killed thirteen year old Shadi Arafeh and 3-year old Burhan Himuni, both of Hebron. The slaying of these children, and hundreds of others, at the hands of the IDF stands in stark contrast with Israel's obligation under Article 38 (4) of the Convention on the Rights of the Child, the most widely ratified human rights treaty, to "[t]ake all feasible measures to ensure protection and care of children who are affected by an armed conflict."[54]

---

citizens the IDF would nominally defend—above those of others, namely the unfortunate Palestinians caught in harm's way when F-16's fire missiles at targeted suspects.

[53] *Yediot Aharonot*, "Seven liquidations in a week," Dec.19, 2000. This high-ranking official uses language remarkably similar to that used by the 1948 Zionists when they first formulated their plan to clear Arab villages by means of spreading terror, which led to such notorious massacres as that as Deir Yassin.

[54] While Israel is a state party to the U.N. Convention on the Rights of the Child (opened for signature Jan. 26,1990, G.A. Res. 44/25, U.N. GAOR 61st plen. Mtg. At 166, U.N. Doc. A/44/736 (1989), reprinted in 28 I.L.M. 1448 (1989) with corrections at 29 I.L.M. 1340 (1990)(entered into force Sept. 2,1990] in fairness, it elected not to be a party to Article 77 of additional protocol I of the International Humanitarian Law which, in relevant part, specifies

**Plaintiff John Doe (XII),** a Palestinian-American from Youngstown, Ohio, owns an apartment building in Ramallah with eight apartments, four of which are rented by Palestinian-American families. One of his other tenants on the top floor had a houseguest staying with him whom Israel apparently targeted for assassination during August 2001. The operation was carried out by at least two Apache helicopters firing two missiles, which destroyed the top of John Doe's (XII) building, shattered the structural integrity of the building, destroyed all the windows on every floor, burned out the topmost apartments, and killed its intended target. At the time of the attack, all the apartments were full. John Doe's (XII) daughter and five of his grandchildren were in the building at the time, and they were terrorized by the catastrophic explosion, the fire and smoke, and the utter chaos that rained down on them from an unseen attacker without warning. John Doe (XII) states that his building and its rent rolls are his principle source of income, and that it cost him in excess of half a million dollars to build between 1972 and 1976. John Doe (XII) worked in grocery stores in Ohio, first as a checker, then eventually as a manager and owner, diligently saving his wages for almost a decade to buy the land and start the building. His tenants have all sensibly moved out now, as the building is unsafe; he paid $50,000 to stabilize

---

that " Children shall be the object of special respect and shall be protected against any form of indecent assault . . . [and that] The parties to the conflict shall provide them with the care and aid they require, whether because of their age or for any other reason."

partially the building and replace its windows. In the intervening time, only two tenants have returned. His daughter and grandchildren were severely traumatized by the attack, and the children especially have suffered significant psychological consequences. Two tenants were seriously injured during the attack—an elderly woman who was hit by shrapnel, and her daughter, who broke her arm. (See annexed hereto as Exhibit I, affidavit of John Doe (XII)].

The policy of state assassinations has been universally condemned throughout the world, and its practice deplored by all law-abiding countries. As B'Tselem writes,

> Assassinations have been part of Israeli's security policy for many years. Israel is the only democratic country that regards such measures as a legitimate course of action. This policy is patently illegal, according to both Israeli and international law, a policy whose implementation involves a high risk of hurting bystanders and from which there is no turning back even if errors are uncovered after the fact.

Indeed, it is the irreversibility and unaccountability of this practice that makes its effects so much the more tragic for the wounded survivors and the victims' families. Those who have suffered such a brazen, seemingly chance attack of state violence can never again live free of fear or anxiety, not even in their own homes, and must never again see the state in anything but a suspect and frightening light. Such lawlessness and disregard for human life on the part of state entities such as the Israel Defense Forces are calculated to sow terror in the general populace, and

42

strike at the very foundations of civil society and the hope for peace among nations. Yet while state assassinations may be the most dramatic of means by which Israel inflicts terror on its subject populations in the Occupied Territories, there are many other means at its disposal, both petty and grave. Year in and year out, collective punishment has become Israel's true weapon of choice in its campaign of subjugation against the Palestinians, by which it hopes to extend its occupation indefinitely (now going on thirty-six years) while gradually annexing and absorbing Palestinian lands through "settlement."

## IX. CLOSURES, ECONOMIC WARFARE AND COLLECTIVE PUNISHMENT

During my two weeks in the West Bank at the beginning of Operation Defensive Shield, I witnessed first-hand many instances of the IDF treating civilians and their property with reckless disregard in what I can only describe as a calculated effort to humiliate and degrade those persons under Occupation. At Qalandiah checkpoint near Ramallah, I stood for three successive days as soldiers denied access to townspeople and their families, while treating them with utter disdain, throwing their identity papers in the dirt, pushing elderly men and women, often before the eyes of their children, and dumping out their possessions on the ground—food, clothing, water—while "searching" their personal effects. M-16 assault rifles were brandished at elderly women, often pointed in their faces or at

43

groups of persons, including children. Even U.N. workers and officials were left to wait for hours in the trucks, or in the hot sun, only to be denied entry at the end of the day. In addition, I saw automobiles crushed everywhere along the sides of roads, and elsewhere storefronts smashed open or burned. Often, the level of degrading treatment and humiliation seemed on the point of exploding into lethal violence. On or about April 12, 2002, while leaving the Qalandiah area by car, I watched as IDF troops staked out on hilltops fired without warning on a group of Palestinians who were walking through a nearby out-of-bounds area because they had been turned away at the checkpoint, along with hundreds of others in the hours I stood there. Soldiers opened fire with machine guns on unarmed civilians who were walking through a stone quarry near the checkpoint, and they appeared to shoot with intent to kill or wound. As we started to exit the car to take closer note of what was transpiring, a nearby tank swiveled its turret in our direction, as its spotter locked, loaded and took direct aim at us. Later that evening, I heard through local news services that one person had been killed in the quarry earlier that day by IDF fire.

The U.S. Department of State noted in its annual state-by-state review of human rights records that

> There also were many reports that Israeli authorities treat Palestinians in an abusive manner at checkpoints, subjecting them to verbal and physical harassment. Each day, hundreds of thousands of Palestinians who wish to travel between Palestinian towns and villages must pass

44

through one or more of the approximately 130 Israeli checkpoints across the occupied territories. Credible anecdotal stories of checkpoint abuses recounted by international humanitarian aid groups, and by hundreds of Palestinian citizens throughout the year, suggest that abuse is common and that as many as several thousand Palestinians have encountered some form of abuse from soldiers at checkpoints. In extreme cases, there were numerous reports of soldiers forcing Palestinians to hit or spit on other Palestinians in line, to strip off their own clothing, or to eat or drink during the Ramadan fast before being allowed to pass through the checkpoints. In a case reported by local and international press, and videotaped by an Israeli settler, in February in central Hebron, 50-year-old Palestinian pedestrian Jadilallah al-Jabri was stopped at an IDF checkpoint near an entrance to the H-2, Israeli-controlled section. Although al-Jabri provided all the correct documentation, and reportedly was not acting in a threatening manner, a soldier shot him in his ankle, severely injuring him. The soldiers neglected to provide any medical care to the man for several minutes, despite profuse bleeding. Finally, Palestinian bystanders called for an ambulance. [55]

Such cases have proliferated in the last two years as IDF occupation has exhibited a remarkable willingness to escalate its violence, both calculated and casual. In many of the recent operations undertaken by Israel in the Occupied Territories, the IDF has acted in a way, which leaves little doubt that its primary aim was to punish all Palestinians. Actions have been taken routinely by the IDF with no clear or obvious military necessity; many of these, such as unlawful killings, destruction of property and arbitrary detention, and torture and ill treatment, violate international human rights and humanitarian law. The IDF has

---

[55] U.S. Department of State, *Israel and the occupied territories: Country Reports on Human Rights Practices—2001*. Released by the Bureau of Democracy, Human Rights, and Labor, March 4, 2002.

continually instituted closures and strict curfews in most Palestinian cities, and has killed and wounded unarmed Palestinians. In addition they have killed and targeted medical personnel and journalists,[56] and have fired randomly at houses and people in the streets. Mass arbitrary arrests have been carried out in a manner designed to degrade those detained, and even individual encounters by Palestinian-Americans with the IDF in both Israel and the Occupied Territories are characterized by this impulse to humiliate.

**Plaintiff John Doe (V)**, a Palestinian-American from Winnemucca, Nevada, states in his affidavit that when he arrived at Ben-Gurion airport in Tel Aviv in January, 2000, with his family he was abused by airport security officials there, who demanded a $200.00 duty for a pocket Nintendo game he had brought for his nephew. When John Doe (V) voiced his concern that such a fee was absurd, the officer slapped him in the face. He complained to the American consular officials in East Jerusalem, but they declined to help him. In May of this year, John Doe (V) was entering Ramallah on his birthday via the Qalandiah checkpoint to visit family. He showed his U.S. passport to the soldiers there, and they shoved him and pointed guns at his head. He protested that he was an American citizen, and one soldier threw him to the ground and kicked him in the back repeatedly and beat

---

[56] On March 13th of this year, during the invasion of Ramallah, an IDF tank fired upon and killed Italian photo-journalist Raffaele Ciriello, of *Corriere della Sera*. In the ten months since September, 2001, 47 journalists have

him. He was then made to sit in the hot sun for an hour, his suit torn and dirty;

when he rose to ask to speak with the commanding officer, the same soldier struck

him in the face with his rifle butt. John Doe (V), age fifty-two, has experienced

back pain and considerable hearing loss since his beating, and continues to receive

medical care. (See annexed hereto as Exhibit J, affidavit of John Doe (V)].

Amnesty International delegates, who visited the area between March 13th

and 21st of this year, likewise saw a trail of mass destruction: homes, shops and

infrastructure demolished or damaged; apartments trashed and looted; cars crushed

and lamp-posts bent over, walls and shop fronts smashed.[57] The IDF had

deliberately cut electricity and telephone cables and water pipes, leaving whole

areas without power and water for up to nine days. David Holley, an independent

military expert, one of Amnesty International's delegates, said:

> "The military operations we have investigated appear to be carried out
> not for military purposes but instead to harass, humiliate, intimidate
> and harm the Palestinian population. Either the Israeli army is
> extremely ill-disciplined or it has been ordered to carry out acts which
> violate the laws of war."[58]

---

been wounded by the IDF in the Occupied Territories. Source: *Informazione Senza Frontiere*, and *Reporters Sans Frontieres*, online journalist association newsletters.

[57] Of course this type of scorched earth policy is specifically condemned by Article 53 of the Fourth Geneva Convention which in relevant part states " Any destruction by the occupying power of real or personal property . . . is prohibited except where such destruction is rendered absolutely necessary by military operations." (emphasis supplied).

[58] Amnesty International, *Israel and the Occupied Territories: the Heavy Price of the Incursions*, April, 2002; available online at http://web.amnesty.org/ai.nsf/recent.

Since the beginning of the current *intifada*, the occupied territories of the West Bank and Gaza have been under near constant closure—a practice by which the Israeli government cuts off access to areas by means of controlling all the roads, blocking all external trade and economic activity.   Access to food, fuel, trade goods and supplies are widely disrupted across entire areas as the Israeli Defense Forces pursue their perceived security imperatives in the occupied territories:  securing the highways against all traffic, protecting the illegal settlements and their closed system of settler-only roads, and controlling the high ground of the terrain.   In most cases, only goods and material that originate from Israeli manufacturers are allowed to pass into the controlled areas—food, gasoline, supplies and equipment—with substantial added tariffs and costs, thus making the Palestinian residents of the occupied areas *de facto* economic captives of their occupiers.   Thousands of Palestinian businesses founded and developed in the calmer, more hopeful days of the Oslo peace process have withered and died in the twenty months since September 2000.   Markets cannot get goods cheaply, mechanics cannot buy parts, medical clinics cannot get medicines or equipment, and laborers are not free to travel for work from one part of the West Bank to another. Tractor-trailers full of perishables lose entire loads while waiting in the sun at checkpoints that take days before clearance is denied; restaurants cannot

dependably get supplies, construction companies cannot purchase materials.[59]

Water tankers, delivering drinking water to outlying towns cut off from the

network, are unable to enter closed areas, leaving thousands without the essence of

life for days on end. Unemployment in the West Bank, though figures are not

currently verifiable, has been estimated between sixty and seventy percent.[60] All

movement of Palestinians, in general, has been tightly controlled by means of a

type of pass system, whereby a citizen from the Ramallah area may not travel to

East Jerusalem, or to Nablus, without special authorization from the Israeli

military. In many respects, the IDF system for population control now in place

resembles most closely the Bantu/pass system once employed by white South

Africa to control the movements of blacks and Asians within the country.

By current estimates, forty-five thousand American citizens presently reside

in or visit the West Bank, with a particular concentration in the cities of Ramallah

and Nablus.[61] Many Palestinian-American families returned to the West Bank in

the wake of the Oslo process of 1993 to establish businesses, re-unite with their

families, continue their education, and a variety of other reasons. These families

were often coming out of the experience of twenty years or more of residency in

the United States. They pursued their university education and professional

---

[59] By one estimate more than 1,500 containers of non-perishable raw materials and goods destined for delivery in the territories have been held up by Israel in just one port for "weeks, even months" while Palestinian merchants are required to pay for storage. Ha'aretz, Amira Hass, "No materials to build in Gaza", July 9, 2002.

training at American institutions, married here, and their children were often born on U.S. soil. They come from places such as New Jersey, Ohio, Dallas, Detroit and Virginia. They are Americans in every sense of the word: citizenship, family ties, and property ownership. Yet the unfinished business of Palestine—its halting progress towards statehood and autonomy, its refugee culture of dislocation— remains in the hearts and on the minds of every Palestinian-American. When a kind of *détente* settled in between the Israelis and the Palestinians in the mid-1990's, the temptation to return and create a new Palestinian business and market culture was very strong among these many immigrants. Based on their experiences in America—where they learned English, worked in all manner of jobs from dishwashers to investment bankers, started their own businesses and thrived—the impulse to bring this American style and know-how back to what then appeared to be a nascent country-in-the-making, seemed only to hold great promise.

Yet many of these Palestinian-Americans have suffered total and cataclysmic loss due to the recent direct and indirect actions of the Israeli government, the IDF, groups of illegal settlers, and even the government of the United States. They have been wrongfully detained and imprisoned; they have been arbitrarily subjected to interrogation and intimidation; they have been beaten; they have been shot; they have been killed. Their businesses have been destroyed

---

[60] "Palestinian unemployment surges to 60%," *Middle East News Online*, Jan 29, 2002,

by tanks and helicopters in a capricious, cynical strategy employed by the IDF for no discernible military or security objective, but rather simply to terrorize, to intimidate and to destroy the fabric of stable civilian life. Their property has likewise been destroyed or confiscated by the Israeli military for no other reason than that it was there for the taking. Their homes and apartments have been confiscated at gunpoint by Israeli soldiers for use as bivouacs and sniper-posts, and then left ruined in their wake.

In all this, these Americans have been left unprotected by any mechanism of Israeli civil law, before which they do not have any meaningful standing, as residents of the occupied territories. In addition, their own quasi-governmental institutions of the Palestinian Authority[62] have been destroyed by Israeli military actions, including courts, police infrastructure, and governmental ministerial offices. There is no public means by which those injured might redress their wrongs or get a fair hearing. Indeed, much of the recent Israeli military campaign in the occupied territories was deliberately directed at destroying those aspects of Palestinian civil polity that might have led to eventual statehood, leaving the

---

[61] See, American for Middle East Understanding, "The Link", July 2001.
[62] The existence of provisional elements of government—police, courts, ministries and the like—are only allowed to the entity known as the Palestinian Authority as a result of the Oslo and Wye River Accords. These state entities are part of the first stage in a three-part process originally designed to create statehood for the Palestinians. Since the beginning of the Al Aqsa *Intifada*, the continuance of this process has been widely called into question, and in many cases repudiated by high-ranking Israeli governmental officials. Though the so-called "peace process" never reached the later stages (resolution of borders, removal of some settlements and final withdrawal by Israel) and appears to be dead at this time, Israel began destroying P.A. security forces and police as early as 1997, and has

average Palestinian once again in the position of stateless refugee with only the international community of charitable and development organizations to help them.

It is well settled that there exists no system, process, or means by which the plaintiffs, indeed any Palestinians, can seek judicial redress in the Occupied Territories or Israel proper for the injuries they have sustained at the hands of Israel or those who act at its behest or with its approval in the bantustans of the West Bank and Gaza.  As a matter of law, practice and policy Palestinians have no bona fide judicial vehicle by which to pursue and to obtain justice, let alone to secure just compensation for the massive wrongs they have suffered. Nowhere is the impossibility of redress more painfully evident than in the territories themselves. In short, the "transitional" agreement between Israel and the Palestinian Authority regarding the West Bank and Gaza (Washington, 9/28/95) specifically denies jurisdiction of a Palestinian court over civil suits in which the defendant is the state of Israel, or any other government "affiliated" institution.[63] Consequently, suits for any damage caused to Palestinian residents by the Israeli military and its police, or by any of its specialized security services such as Shin bet and the General Security Services, as well as that occasioned by the settlements

---

continued to strike at any and all aspects of self-governance in the Occupied Territories, including Ministries of Agriculture, Tourism and Transportation offices.

[63] Given the union between the state itself and those aspects of Israeli civilian life which are insinuated most directly and provocatively into the life and turmoil of the Territories, i.e., the settlers and settlements, the accords essentially provide full immunity from suit in Palestinian courts to all Israeli institutions and persons coming in contact with Palestinians in the West Bank and Gaza.

and settlers of the West Bank and Gaza cannot be brought in front of a Palestinian court.[64]

For Palestinians injured in the Occupied Territories at the hands of the Israeli state or through any of its numerous government affiliated entities, the promise of justice is no more alluring or consequential in Israel itself. Thus, as a substantive barrier, the "act of war" exception stands as a shield providing full protection to those who would do harm to Palestinians in the context of the *intifada*. In relevant part under sections 5 and 7 (a) of the civil Nezikim (Tort) law of 1952 . . . "The state is not responsible for damages caused by war activity [and] in the case that the state is not found responsible based upon sections 5 and 7, the person responsible for the damage will not be found responsible either."

Once an action is defined by the Israeli authority as an "act of war", the state and all of its instrumentalities will not be liable to the injured party no matter the nature or the extent of the harm or its cause; whether the injury was occasioned through negligence or intent. The state essentially has full immunity.

While the definition of war is not specifically set forth in Article 5 of 1952, subsequent decisions of the Israeli Supreme Court have provided for the broadest and most advantageous interpretation for the state of Israel. Thus, in 1983, the

---

[64] Indeed, as a practical matter, because as noted Israel has essentially destroyed the entire infrastructure of the PA including its buildings, and idled all of its bureaucratic structure over the last several months, any discussion about a civil court system in the Territories is academic at best.

Israeli High Court opined that the "unique character of fighting and its risks and especially its consequences" defines an act of war In identifying such examples as "gathering of fighting units, combative assault, exchange of fire, and explosions" as acts of war, the court went on to note that the " [u]nique character of fighting and its risks, and especially its consequences and results are evident and [that] these are the situations to which Article 5 refers." (Levi v. Israel, 623/83, Chief Justice Shamgar).

On March 20, 2002, the Israeli Supreme Court elected to revisit its definition of an act of war in the context of a series of appeals regarding damage claims dating back to the first *intifada*. (Jamal Uda v. Israel, 5964/92). Constrained, perhaps, by the "evolving" tactics employed against Palestinians during the second *intifada* including such universally condemned activities as extra-judicial assassination and collective punishment, the Court significantly expanded the definition of an act of war thereby providing even greater immunity for the state. Now, according to the High Court, an act of war is no longer to be defined by whether or not it was "typical of war", but rather whether the nature of the activity itself created an inherent risk.

Consequently, any act or course of conduct, which results in some risk to the party undertaking the act, no matter how negligible it may be, will receive the full benefit of the wartime exemption. In this light one need not be a soothsayer to

54

predict the practical impact of this new interpretation upon suits brought by Palestinians against the state and its instrumentalities for injuries sustained by them in the Occupied Territories- Israel and the individual perpetrator are now essentially immune from civil process.[65]   Now, to prevail in their courts the putative Israeli defendant essentially need only suggest that the injury --no matter how tragic, unnecessary and appalling; whether caused by design or through negligence--was necessitated as part of the wartime effort to "root out terrorism or to neutralize militants" and that the operation or the individual act itself was wrought with peril and undertaken at risk to the soldier, the police officer, the security agent, the settler.

For the Palestinian-Americans at bar, indeed for all Palestinians, justice for the wrongs they have endured and for the injuries they have sustained is but an empty promise in the courts of Israel and the Occupied Territories of Gaza and the West Bank. By virtue of law and practice these plaintiffs have no rights and no remedies for the terrible losses they have suffered in their ancestral homeland, no matter what the harm or its cause; it is simply futile.[66]

---

[65] Not satisfied with the expansive immunity bestowed upon Israel by the most recent decision of the Supreme Court, the Israeli Department of Justice has proposed a new law which is designed to limit the "options" of Palestinian residents to sue for injuries even further. According to this new statute, which is expected to pass and which will be applied retroactively to cases not pending in civil courts, an act of war will include .  .  . "[a]cts of fighting that were done under a threat of physical harm, against terror, hostile activities or uprising, and including any activities meant to prevent such activities."

[66] Without discussing at length the other practical and legal impediments which Palestinians face daily in pursuit of judicial relief, they are many indeed. Several merit discussion. For example, because details about state wrongdoing