As noted, in numerous interviews conducted *in situ* during the recent military operations in April 2002, my staff and I met with or spoke via telephone to numerous Palestinian-Americans in the West Bank.  Many of these Americans were still under IDF military closure in Ramallah at that time, unable to leave their houses for five or six days at a time, under twenty-four hour curfew with shoot-on-sight orders for anyone found in the street.  On those infrequent days when the IDF curfew was lifted for a few hours so that residents might re-stock their homes with food and necessities, attempts by Palestinian-Americans to leave the closed areas was denied by military officials.  In the same type of curfews re-instated now, persons who even inadvertently violate the curfew, or go out to look for food, are shot down in the street.  Additionally, those Americans who attempted to enter military zones to visit their relatives or bring food to besieged family members were turned back at military checkpoints.

are generally inaccessible to civil litigants, before a civil action may be brought against an Israeli Palestinians must initiate a formal criminal complaint in order to obtain information about the identity of the wrongdoer and the specific cause of the injury which he or she sustained. That complaint must be lodged with Israel pursuant to Section I (2) of the Washington Agreement because Israel has exclusive jurisdiction over any suspected criminal activity of its citizens in the Territories. These complaints invariably fail. As established by the last *intifada* , virtually all complaints were dismissed without any investigation whatsoever. And even on that extremely rare occasion when a file was opened, the ensuing investigation was superficial and preordained: such cases were routinely closed for investigation for lack of evidence or for lack of "public interest." (See B'Tselem, *Illusions of Restraint,* pp.18-20) (See also, Ha'aretz, *The Army is Acting like a Blindfolded Boxer.* Dec. 12, 2000)(In practice judicial monitoring of the military actions of the lower ranks in the field is simply non-existent). Similarly, financial constraints render it virtually impossible for a Palestinian resident to file a suit against anyone in an Israeli court, including the state itself, as they must deposit a costly performance bond with the court because they are considered to live outside its jurisdiction -whether they reside in the Territories under Palestinian control or under Israeli control. Given the disparity between the per capita income of Israelis, with an average yearly salary of 7000 NIS, and that of Palestinians, who average less than 1000 NIS per year, and the usual demand that Palestinians deposit tens of thousands of dollars with the court as collateral in order to proceed with an action (see, Abu Araman v. Israel,

We heard numerous stories from Palestinian-Americans, who, holding their U.S. Passports in their hands and declaring themselves American, were nonetheless rebuffed at checkpoints, or detained, or even threatened with violence. In my four attempts to enter Ramallah during curfew-liftings between during the second week of April 2002, for the express purposes of visiting clients, I was repeatedly denied entry without cause. My Palestinian-American translator, a resident of East Jerusalem, was similarly denied access, along with the entire international press corps on the scene, UN officials, relief workers and many others.

Unable to meet with many of the Plaintiffs, who were trapped in the closure areas and in fear for their lives, I resolved to visit at their request the offices of the United States Consul General in Jerusalem. Arriving in mid-afternoon one day to find that the Consulate was closed to members of the public, I was told that no walk-in consultations were permitted over the next three or four days. Because many of the Plaintiffs had told me that consular officials had been non-responsive to their attempts to get help, I refused to leave at that time without speaking to someone of ranking stature. Approximately twenty minutes thereafter, a representative of the Consulate came down to meet me on the street, but citing privacy concerns refused to take any specific complaints or names, or to discuss

---

18537/98) it is little wonder that the docket sheets of civilian courts do not include, or very rarely include, disputes between Palestinians and the state or any affiliated institutions or individuals.

specific individuals with me, unless I possessed written authorization from the person to do so. While this position seemed reasonable at first blush, what ensued proved that the privacy concerns articulated by the representative were entirely pre-textual.

I was informed by her at that time that Americans could call the Consulate and ask for assistance or file complaints directly, and that consular workers had the ability to determine by phone whether the callers were indeed the citizens they claimed to be, and that based on that verification, the Consulate could provide assistance. I then proposed that inasmuch as the Consulate could determine by phone that a caller was a U.S. citizen, that they should be able to orally authorize my role as legal counsel, thereby permitting the consul to discuss their particular case with me. Unfortunately, the consular official rejected this idea, and insisted that any declarations of legal representation had to be submitted by original documents, with verified signatures. No faxes or e-mail or oral communications of any kind, she stated, would be acceptable to the Consulate. As the consular official knew very well, it was impossible for me to gain entry into military zones at that time in order to secure written releases from Plaintiffs. Thus, her refusal to intercede on behalf of these Americans, rejecting out of hand any process by which the Consulate might verify my representation of these citizens, and the fact that the Consulate would be unavailable to take any complaints for three days hence meant

that either the Consulate was acknowledging its powerlessness to help U.S. citizens under siege in the Occupied Territories, or that it was acting complicit in a deliberately obstructionist manner.

## X. GENERAL PRESENT CONDITIONS OBSERVED IN THE OCCUPIED TERRITORIES

The IDF employs three principal means of sealing off areas of the occupied territories, depending on the degree of control desired: comprehensive closure, internal closure and curfew.  While in the West Bank and Gaza in April of this year, I observed the most severe form of these three modes in effect in Ramallah, internal closure in East Jerusalem, and general or comprehensive closure in effect in the Gaza Strip.  As the Israeli human rights monitoring group B'Tselem writes,

> During a comprehensive, or hermetic, closure, there is a prohibition on entry of Palestinians into Israel, no issuance of entry permits, and revocation of the permits previously issued, for whatever purpose: work, medical treatment (except for emergency cases), family visits, travel to Ben-Gurion Airport, etc. This type of closure results in the severance of the West bank from Gaza and it also severs Gaza and the West Bank from East Jerusalem, since travel through parts of Israel is necessary in order to travel between these areas. The second method of siege is "Internal Closure" which constitutes all activities that prevent movement between Palestinian villages and cities, effectively isolating towns and villages from each other. Checkpoints, trenches, roadblocks, etc., all severely limit internal movement. Internal closure is often used as a form of selective punishment when it is believed that a resident of a particular town or village is responsible for an attack that has taken place against Israelis. Internal closures have been

placed on cities and villages in areas A (areas in complete Palestinian control) B and C.[67] The final and most extreme form of siege is the "Curfew" which imprisons Palestinians within the confines of each person's house.

During practically the entire time I was in contact with my Palestinian-American clients in Ramallah, they were subject to the stringent constraints of "curfew," and were entirely unable to leave their homes for up to a week at a time. In many instances, entire extended families of ten people or more were sheltering together in two- or three-room apartments, subsisting on limited food and water, their windows barricaded against shrapnel and stray bullets, while IDF operations in the streets outside continued. Grandparents, infants and parents all remained together in crowded conditions rather than risk separation. Before the initiation of the invasion, Ramallah and its environs were under internal closure for fifteen months, and virtually all business and marketing contact with the outside world had ceased, as amply noted in the affidavit of **Plaintiff John Doe (XIII)**, owner of a tire distribution company in the Ramallah industrial zone.

In 1991 Israel ratified the Covenant on Economic, Social and Cultural Rights. "The CESCR is customarily understood to define a state's duty regarding all rights, such as the right to work, right to health, right to education. The

---

[67] These designations refer, respectively, to post-Oslo mapping of areas under (A) Palestinian Authority control, select urban areas [7.6% of land], (B) partial PA civil control, but shared security with IDF [21.4% of land], and (C) IDF control [71% of land]. *See* The Taba Agreement, or Oslo II, signed Sept.26 1995.

Covenant examines these rights on three different levels: the duty to take proactive measures to ensure enjoyment of the right, the duty to prevent third parties from violating the right, and the duty of the state itself to refrain from violating the right."[68]

Israel, as the occupying power in the West Bank and Gaza, explicitly bears responsibility for the welfare of the population it occupies. While it may be argued that since the beginning of the period "governed" by the Oslo Accords,[69] Israel's primary duty of acting positively to ensure enjoyment of these basic rights has transformed into the responsibility of the Palestinian Authority, this cannot relinquish Israel's obligation to maintain her second and third duties—that is, the duty to prevent third parties from violating the right, and the duty to prevent the state itself from violating the right. Yet our investigations and research, taken with the substantial testimony of Plaintiffs and witnesses, provide significant evidence that shows that Israel's closure and siege policies violate the Palestinians' right to work, right to health, and right to education.

In addition to the violation of these basic rights, it is clear after examination of Israel's policy of imposing and lifting sieges that the goal of these policies is not

---

[68] Taken from B'tselem's report "Civilians Under Siege – Restrictions on Freedom of movement as collective Punishment – January 1991." p. 26. For a discussion on these categories, see Matthew Craven, *The International Covenant on Economic, Social and Cultural Rights* (Oxford, Clarendon Press, 1995), pp. 109-114.

[69] While that period technically extends to the present moment, the very future of the Oslo process is gravely doubted by all sides, with much analysis suggesting that Israel and the Palestinian Authority have already abandoned all of Oslo's principles in deed, if not in public declaration.

Israel's security. Rather, sieges and closures serve as a means of collective punishment aimed at subduing a civilian population that understandably chafes at the continued realities of occupation after thirty-five years. The IDF adamantly denies all such claims, stating that the sieges are absolutely necessary in order to protect Israeli citizens and settlers, and that the sieges are implemented in as humane a manner as possible. However, once one looks at the specific reasons for tightening a siege (generally immediately following an attack against Israelis) and for lifting a siege (generally done for diplomatic or political reasons) it is obvious that the siege's intent is not to prevent attacks. There is also a flagrant policy of discrimination in play based on nationality, since settlers living in the West Bank are not subject to sieges, curfews and closures. In fact, closures have been justified by the IDF on the basis of insuring the free movement of settlers.

## XI.  CLOSURES TRIGGER NEAR-COLLAPSE OF ECONOMY

Researchers at the Israeli human rights organization, B'Tselem, have reported extensively on the effects of closure on the Palestinian economy. In their report *Civilians Under Siege*[70], they note how "the various restrictions on the movement of people and goods has seriously damaged the Palestinian economy. One of the main reasons is the great difficulty, amounting almost to the total

---

[70] B'Tselem, Jan.2001.

impossibility, of workers to get to their job site and of suppliers and dealers to move from place to place." In addition, the Palestinian economy is almost entirely dependent on its foreign trade. The customary index for evaluating dependence of a particular economy on foreign trade is the segment of its GDP (Gross Domestic Product) comprised of imports and exports together. In the economy in the Occupied Territories, foreign trade comprises 80.4 percent of GDP, whereas that figure is 22.4 percent in Egypt, 60 percent in Syria, and 52.4 percent in Israel. Furthermore, the Palestinian economy is more dependent than any other economy on imports, which comprise 58.4 percent of GDP, compared to 17.2 percent in Egypt, 32.6 in Syria, and 30.6 percent in Israel. Of all imports into the Occupied Territories, an enormous segment - some two-thirds - are raw materials and industrial inputs.[71]

The economy in the Occupied Territories is similarly dependent on access to the Israeli economy—its jobs, its ports, its roads and its markets. Some 80 percent of the foreign trade of the Occupied Territories takes place with Israel, whereas only 2.4 percent is with Jordan and one percent with Egypt. It should be noted that though the West Bank shares a nominal boundary with Jordan, as Gaza does with Egypt, neither of these borders are readily accessible to the Palestinian

---

[71] UNSCO (United Nations Special Coordinator's Office), *Report on the Palestinian Economy,* Spring, 2000, pp. 35-36. These data relate to 1998, which was the last year for which the Palestinian Central Bureau of Statistics published information on the Palestinian National Accounts.

residents therein, and indeed, Israel continues to maintain wide security buffer zones that cut off the Occupied Territories from their foreign neighbors, "containing" them within Israel's greater security perimeter. Also, the Occupied Territories' foreign trade with the rest of the world, some 17 percent, is almost entirely handled via the Israeli container ports of Haifa and Ashdod, with attendant fees, duties and tariffs which all make Palestinian goods less competitive in the global marketplace.[72]

During the current *intifada*, the dependence on transportation of goods from Israel to the Gaza Strip and to the West Bank has resulted in a severe shortage of raw materials and industrial goods, which has paralyzed many businesses and factories throughout the Occupied Territories. For example, a building company in the West Bank cannot get Jordanian cinder blocks into the Nablus region due to closures and import restrictions by the Israeli military, and for fifteen months cannot build a single structure due to lack of materials. These restrictions also hampered the export of goods from the Gaza Strip and the West Bank to Israel and elsewhere, resulting in heavy losses to the Palestinian economy. Similarly, a fruit grower in Gaza dependent upon transporting his figs or oranges to the West Bank for market cannot get his trucks out of Gaza due to military closure. The Erez military checkpoint at the north end of Gaza was a sixteen-lane wide, bustling

---

[72] *Ibid.*, p. 37.

trans-shipment point of all manner of goods when I visited there in 1998, with tractor trailers lined up for nearly two miles, waiting to clear Israeli security and customs. But in April of this year Erez Crossing was completely deserted of all trucks, cars, and any indication of commerce whatsoever, but for desperate taxi drivers awaiting a fare on the Palestinian side of the checkpoint.[73] Similarly, at the Qalandiyah checkpoint near Ramallah in the West Bank, on days when the curfew was rumored to lift, no trucks bearing supplies were allowed to move through any of the IDF military crossings in the area.

Beyond the paralyzing effect of closures, the use of other forms of collective punishment by IDF forces also contributes to the overall economic crisis. Selective IDF targeting of particular buildings or districts for military reprisals, demolition or bulldozing has cut a broad swath through the physical terrain of the Palestinian economy and its gradual development, virtually wiping out the very same small industries and manufacturing sectors that are vital to maintaining a stable society, and therefore giving any hope to securing peace. For their part, the Israelis always insist that their actions are predicated on issues of security, but to the average Palestinian living in the Occupied Territories, the destruction of their

---

[73] A comparison of the movement of trucks and goods into Gaza from Israel during April of 2000 and the same month in 2002 is telling indeed. For example, in April of 2000 3,773 trucks brought goods worth NIS 97 million into Gaza while during the same month two years later that figure had dropped precipitously to 979 trucks carrying NIS 27 million worth of goods. The export figures from Gaza to Israel for the same period were no better with NIS transport of goods worth 424,000 compared to NIS 28 Million worth two years previously. Ha'aretz, Amira Hass,"No materials to Build in Gaza", July 9,2002.

businesses, manufacturing plants, office buildings and service centers must look rather more like a campaign against their very future. The mechanism of these measures, as employed by the IDF, is typically couched in retaliatory terms: on June 16th 2002, the IDF used bulldozers and wrecking equipment to demolish an idled factory in the Gaza Strip that they said had been a favorite vantage point used by roof-top snipers attempting to fire on their military positions.[74] Because of the Israeli response, the factory will never re-open, and the loss of jobs will be permanent. Similarly, **Plaintiff John Doe (XIII)**, an American from New Jersey who owns a truck tire distribution company in the Bitonia Industrial Park in Ramallah, lost his entire stock, the building that contained it, and his equipment and records when Apache helicopters attacked the industrial park in the early hours of Operation Defensive Shield. As John Doe (XIII) says, witnesses have stated "no weapons were discharged in the moments before the attack from the area of my business, nor was there any return fire directed at IDF operations from the area of [his] business during or after the attack." He further states that many of the businesses in the industrial park were also destroyed during the attack, though the industrial park had no military value whatsoever. (Indeed, a small amusement park with rides for children and the like, directly next to John Doe's (XIII) business was

---

[74] Hamudah Hassan, Reuters, June 17,2002.

destroyed when it took a direct hit during the attack.)   (See annexed hereto as Exhibit K, affidavit of John Doe III)].

So, too, **Plaintiff John Doe (X)**, an American in Ramallah who is a partner in the Max supermarket there states that in the first days of April, during the IDF operations laying siege to Ramallah, his supermarket was blown open by tank fire, then systematically looted by the soldiers.  The entrance was destroyed, the office and all his computers and records were destroyed, some food was stolen and the rest left to rot, all the cigarettes were stolen, and finally the safe which held the supermarket's receipts was blown open by military demolitions and emptied of its contents.   The electrical system for the building was likewise completely ruined. He estimates his combined losses of goods and physical plant at more than $50,000 US.  (See annexed hereto as Exhibit L, affidavit of John Doe (X)].

**Plaintiff John Doe (VIII),** a Palestinian-American attorney living in Beit Hanina reports that in February of this year his car was destroyed when he parked it behind the Uncle Same restaurant in Ramallah, after an IDF rocket attack on a nearby building went awry and poured down on the restaurant instead.  During the recent siege of Ramallah, in April 2002, IDF soldiers broke into his law office where he maintains a busy practice in commercial contracts, destroying all his office equipment and files, including computers, furniture, a photocopy machine and the essentials of his practice.  In 1997, John Doe (VIII) notes in his affidavit,

he was pushed and beaten by IDF soldiers in the hallway outside his own apartment, in full view of his children, and while holding his daughter. The soldiers then demanded the family vacate the apartment immediately, which they proceeded to use as a firing position for four or five days, trashing the place in the process. During all this time, John Doe (VIII), his wife and his children were not permitted to leave the hallway area. (See annexed hereto as Exhibit M, affidavit of John Doe (VIII)].

**Plaintiff John Doe (IX)**, an American living in Ramallah since 1998, states in his affidavit that IDF soldiers in the first week of the Ramallah operation destroyed his jewelry store's windows and wrecked his car parked in front. In addition, while the city was under curfew, tanks repeatedly strafed his apartment block while he was inside with his family, including five children. He states that his children suffer psychologically now from the experience of the siege, and that they display symptoms of post-traumatic stress. (See annexed hereto as Exhibit N, affidavit of John Doe (IX)].

**Plaintiff John Doe (XV)**, whose 10 year old son was severely injured during a savage, unjustified shooting by the IDF earlier this year (see, discussion *infra,* pp. 31-33) suffered further devastating commercial losses shortly after the onset of this *intifada.* Prior to the early winter of 2000, John Doe (XV) and his three brothers had operated a very successful business venture comprised of seven

stores in Tulkarm which supplied more than half the town's wheat, flower, seeds, animal-feed and other basic foodstuffs. Over the course of several weeks in November and December of 2000, four of the stores that were located in an important commercial district of the town were inexplicably shelled and destroyed by Israeli tanks. In addition, because the Israeli army arbitrarily declared that particular area of the town --which coincidently happens to serve as the commercial heartbeat of Tulkarm--to be a "closed military zone," civilians have been unable to buy supplies at the remaining stores. As a result of the destruction and the loss of commercial business, John Doe (XV) projects he and his brothers have suffered losses of more than a million and a half dollars profit. According to John Doe (XV) it is unknown "when or if " the businesses will reopen. (See, Exhibit G, affidavit of John Doe (XV)].

For their part, the IDF claims all their operations have military value, yet in the absence of any process by means of which a Palestinian might challenge such assertions, the Israeli military behaves with absolute impunity. Yet this marauding tendency is by no means new in the storied history of the Israel Defense Forces. Perhaps none other than the founding architect of Israel, David Ben-Gurion, better indicated the Israeli political endorsement of the indiscriminate use of force when he wrote on January 1, 1948—only three months before the notorious massacre of

some 250 Palestinian men, women and children by Jewish paramilitaries at Deir

Yasin—in his Independence War diary these words:

> There is no question as to whether a reaction is necessary or not. The question is only time and place. Blowing up a house in not enough. What is necessary is cruel and strong reactions. We need precision in time, place and casualties. If we know the family-- [we must] strike mercilessly, women and children included. Otherwise the reaction is inefficient. At the place of action there is no need to distinguish between guilty and innocent.[75]

Ben-Gurion's words of nearly fifty years ago have apparently been taken to heart

by today's IDF, and many times in the intervening years as well—if history's

record of Israeli atrocities, extra-judicial murder, systematic forced removal,

colonization, civil and economic oppression and military rule is to tell us anything

at all.


## XII. SETTLERS, THE IDF, AND TERRITORIAL EXPANSION

Admittedly, the specter of a rampaging army bent on terror, humiliation,

looting, and the cold-blooded murder of men, women and children recalls the

darker eras of European history, when inter-communal violence and the absence of

modern states to regulate it was the norm. Or alternatively, such an image recalls

the spasms of inter-tribal ethnic hatreds in present-day central Africa. But in this

---

[75] Excerpts from the diaries, Yediot Ahronot, April 17, 1983, Independence Day Edition.

case such actions instead describe those of a modern, enlightened, "democratic" state like Israel, which enjoys the international prestige of its cultural achievement in the arts and sciences, its long-term membership in the United Nations, and its status as the most favored ally of the United States.   Unfortunately, much of American media response to this reality is to ignore the facts of thirty-five years of occupation.  Indeed, such barbaric, illegal behavior by a "civilized" nation of the first order demands explication.   To better understand Israel's otherwise puzzling motivation—as it ignites and ignores international opprobrium in its pursuit of ever-elusive "security" goals while brutally occupying as an invader the West Bank and Gaza—one need look no further than the tragic, misguided and illegal policy of settling hundreds of thousands of Israeli citizens in hundreds of fortified hamlets since 1967 throughout the Occupied Territories.  Virtually all of Israel's perceived security threats today, and the brutal, illegal means to which that state will go to combat them, can be traced to either the efforts by Palestinian nationalist organizations to repel the illegal settlers, or by the IDF's efforts to protect settlements, extend their dominions, and effectively annex the lands on which settlers live.

In other words, the Israeli campaign of terror against the Palestinians under occupation is explicable as a campaign of territorial expansion. In this regard, Israel's continuing illegal occupation and the ever-escalating war to extend it can

be viewed alongside every other war of ethnic cleansing, including Serbian efforts in the Balkans, the Hutu attempts to drive Tutsis from their midst in Rwanda, the Turks in Armenia, and other similar events of the not-so-distant past. That Israeli techniques of ethnic subjugation and removal may not yet include machete killings or evidence of mass graves is only an observation as to the degree of their policy's implementation. Israel's intent—to remove Palestinians from their lands by means of terror, violence and oppression, driving them into "refugee" camps or neighboring states such as Jordan, Syria or Lebanon, while settling its population on the land as a precursor to annexation—is fundamentally the same.

While most of the events at bar occurred in the past few years of the ongoing occupation, it is necessary briefly to view them through the delineating prism of the Zionist movement in Palestine: its eastern European origins, its socio-religious aspirations, and its territorial motivations and designs. Historical documents from the earliest days of the Zionist movement, through the period of incipient statehood, up to last week's pronouncements by Prime Minister Sharon and various leaders of the settlement movements all confirm that removal of the Palestinians has always been an explicit objective of the project of Zionism.

For example, Theodore Herzl, a journalist, playwright and lawyer, and founder of the first World Zionist Congress, even at the very start anticipated

privately that the Arab natives would have to be removed, as he wrote in his diary in 1895:

> "We must expropriate gently . . . . We shall try to spirit the penniless population across the border by procuring employment for it in the transit countries, while denying it any employment in our country . . . . Both the process of expropriation and the removal of the poor must be carried out discreetly and circumspectly."[76]

The gentleness of this expropriation would undergo various adjustments through the next fifty-four years, as successive waves of Zionists applied increasingly militant perspectives to their messianism.  In October 1882, Simon Dibnow, an Orthodox Russian of the Biluim movement of Zionists declared

> The ultimate goal . . . is, in time, to take over the Land of Israel and to restore to the Jews the political independence they have been deprived of for these two thousand years . . . .  The Jews will yet arise and, arms in hand (if need be), declare that they are the masters of their ancient homeland.[77]

Similarly, Israeli founding father Eliezer Ben-Yehuda writes in the same month to his Zionist brethren in Lithuania,

> There are now only five hundred [thousand] Arabs, who are not very strong, and from whom we shall easily take away the country if only we do it through stratagems [and] without drawing upon us their hostility before we become the strong and populous ones.[78]

---

[76] As quoted in Benny Morris, Righteous Victims: A History of the Zionist-Arab Conflict, 1881-2001, from Herzl, Diaries, vol. I, 88 [June 12, 1895].
[77] Morris, note supra, at p. 49.
[78] Ibid.

By the late 1930's, responding to Arab uprisings against the British colonizers, Zionist settlers formed offensive paramilitary units in 1937 and '38 to carry out raids against the local Arab population, often in tactical collaboration with British forces. David Ben-Gurion understood explicitly the Arab revolt's ultimate meaning when he wrote, "There is a conflict, a great conflict . . .. We and they want the same thing: we both want Palestine. And that is the fundamental conflict."[79] Indeed, Ben-Gurion's pragmatism took Palestinian nationalism very seriously:

> In internal discussions, he noted that "in our political argument abroad, we minimize Arab opposition to us," but he urged, "let us not ignore the truth among ourselves" . . . [that] . . . "politically we are the aggressors and they defend themselves . . . . The country is theirs, because they inhabit it, whereas we come here and settle down, and in their view we want to take away from their country, while we are still outside." The revolt "is an active resistance by the Palestinians to what they regard as a usurpation of their homeland by the Jews . . .. Behind the terrorism is a movement, which though primitive is not devoid of idealism and self-sacrifice."[80]

**Plaintiff John Doe (II)**, a naturalized American since 1972 who lives in New Jersey (and who also holds a Jordanian passport), owned fifteen acres of farmland in the DeirNitham area of the West Bank. His clan documents their

---

[79] Yehoyada Haim, Abandonment of Illusions: Zionist Political Attitudes Toward Palestinian Arab Nationalism, 1936-1939 (Boulder: Westview Press, 1983), p. 36.

ownership of this land for approximately 1,600 years, and possesses not only Ottoman and Jordanian documents, but ownership documents from the British Mandatory period as well.  In 1978, the Israeli government, working in conjunction with the Zionist Organization and the Jewish National Fund, began construction of the settlement today known as Halamish/Neve Tzuf.   Farmers and other Palestinians working the land at that time were forcibly removed by the (IDF), and John Doe (II) watched as the settlement grew immediately right up to the property line of his own land.  As he states in his affidavit, "Apprehensive of the actions of the incoming settlers, and at the construction of the settlement itself, I wrote the American Consulate, the State Department, the Secretary of State and then-President James Carter.  I was given assurances at that time that the settlement would not take my land."

Unfortunately, successive Israeli governments in the 1990's, cynically side-stepping the Oslo process to create what Menachem Begin once characterized as irrefutable "facts on the ground," aided and encouraged the settler movement through official policy, political expediency and willful ignorance.

In 1995, settlers from Halamish moved their perimeter fence so that it cut across John Doe's (II) land, taking approximately one-fourth of his farms in one

---

[80] Noam Chomsky, The Fateful Triangle: The United States, Israel and the Palestinians, (Boston, South End Press, 1983), pp. 91-92, citing a 1938 speech by Ben-Gurion recounted in Flapan, Zionism and the Palestinians, pp. 141-142.

fell swoop.  He formally complained to both the Israeli Committee for the Defense of Land, and the Israeli police, neither of which took any action.  As head of the Palestinian American Society, he also made formal inquiries here in the U.S., requesting his government to take action on his behalf.  Again, U.S. officials have taken no action in nearly seven years.  As he states in his affidavit, to this very day, "men and women who can not possibly make any claim of legitimate occupation continue to use and enjoy the use of my family's land," without recompense, any colorable title or permission whatsoever.  Furthermore, the settlers have threatened John Doe (II) with murder on at least two occasions.  In 1996, he stood "too close" to the settlers' fence (that bisects his own land) and an armed settler came to within twenty yards, aimed his rifle at the Plaintiff, and while standing on John Doe's (II) own property said, "If you don't move I'm going to shoot you.  This is my land." This time, the settler only threw rocks at John Doe II as he left the area.  On a second occasion, while walking on the remaining part of his land in the company of his five-year-old son, John Doe (II)  was confronted by an armed security officer from the settlement who demanded that he leave the area.

These threats escalated to explicit violence in October 2000, when a group of about twenty armed settlers staged an evening raid on John Doe's (II) land, crossing over the fence with the intent to burn down his house.  At first his trees and other property—including outbuildings and equipment—were destroyed by

arson. Not being satisfied, the settlers surrounded his house, broke its windows and fired at its doors and walls. As they were preparing to ignite his home, John Doe (II) was able to call the American Embassy on his cell phone while he crouched inside with his now nine year old son, also an American citizen, and other relatives. Fortunately, on this occasion, IDF troops arrived and were able to disperse the settlers before they put the torch to his home. No charges were ever filed by the Israeli government against the settlers of Halamish for their rampage. More recently, on June 13th of this year, John Doe (II) received reports from other relatives living under curfew and closure that settlers from Halamish/Neve Tzuf began bulldozing his land, destroying his property, and initiating the first steps of another expansion of the settlement at his expense. He has since learned that Halamish is building two parallel security roads for use by the settlers only.

As a result of the attacks on John Doe (II), his family and their home, his son Baby Doe VI, now ten, has been suffering from nightmares and psychological disturbances, and has become non-responsive in school. He shows a singular obsession with televised news accounts of the troubles in the mideast, and will not watch anything but news programs on television. John Doe (II) reports on other unsought confrontations with armed residents of Halamish, and their continuing threats against his life and safety. On another nearby, non-contiguous parcel of land he owns with his cousin, Halamish settlers have destroyed 108 olive trees.

Olive trees take a generation to become productively fruitful, and are known to live for hundreds of years. In a matter of moments they were gone: razed by settlers, with an insatiable appetite to take and take and take, with the approval and support of the Israeli government and supporters in the United States. (See annexed hereto as Exhibit O, affidavit of John Doe (II)].

### XIII. SETTLER TERRORISM

While the thirty-four year history of the settlements in the Occupied Territories has become an emotional and heroic narrative thread woven into the grander fabric of Israeli mythology—how the Zionists settled the empty waste land, made it bloom, and brought forth civilization where none had been before—in truth, the settler movement has evolved amid violence, illegality and terror from the very beginning of the Occupation. Acts of violence by settlers against local Arabs are recorded as early as 1970, and by the end of that decade, the influence of messianic, extremist Orthodox religious groups connected to communities in the United States had risen to the forefront of the settler campaign, and would increasingly come to shape its ideology and tactics.

Today, there are more than 400,000 Israelis settled in more than 200 "purposely built towns, suburbs and villages" in the Occupied Territories,[81] with approximately 200,650 settlers residing in 145 settlements in the West Bank alone,

exclusive of East Jerusalem.[82]  The recent report issued by former U.S. Senator George J. Mitchell's diplomatic mission in April of this year quotes the Palestine Liberation Organization's estimate of the rate of expansion in the 1990's, during the context of the so-called "peace process" thusly:

> "In the seven years since the [Declaration of Principles], the settler population in the West Bank, excluding East Jerusalem and the Gaza Strip, has doubled to 200,000 and the settler population in East Jerusalem has risen to 170,000.  Israel has constructed approximately thirty new settlements, and expanded a number of existing ones to house these new settlers . . .."[83]

Fundamentally, the settlement campaign in the Occupied Territories is illegal by several established standards of international law, including the Fourth Geneva Convention and its prohibitions against an occupying force displacing the occupied population from its land, or acting to permanently change the occupied land by force of occupation.  While the urgent prominence today of the settlement issue, both within the context of the interim negotiations and the stalled negotiations over final status, might give a disinterested observer the mistaken impression that this problem is new, in fact, its centrality to the post-1967 conflict has always been understood, if little discussed.  Moreover, official U.S. government opposition to the settlements has been clear at least since the administration of President Jimmy

---

[81] Foundation for Middle East Peace, *Report on Israeli Settlement in the Occupied Territories*, Vol. 11, No. 4, July/August 2001.

[82] Peace Now, report of the Monitoring of Settlements Committee, November, 2000.

[83] Report of the Sharm el-Sheikh Fact-Finding Committee,  April 30, 2001.

Carter and the Camp David summit talks in the 1970's;[84] indeed, President Ronald Reagan identified settlements and settlers as key in 1981, stating that "the immediate adoption of a settlement freeze by Israel, more than any other action, could create the confidence needed." Ten years later, President George H.W. Bush's administration re-iterated this centrality when Secretary of State James A. Baker III said on 22 May 1991:

> Every time I have gone to Israel in connection with the peace process, on each of my four trips, I have been met with the announcement of new settlement activity. This does violate United States policy. It's the first thing the Arabs—Arab governments, the first thing that the Palestinians in the territories—whose situation is really quite desperate—the first thing they raise when we talk to them. I don't think there is any bigger obstacle to peace than the settlement activity that continues not only unabated but at an enhanced pace.[85]

As the international community's near-unanimous condemnation of this Israeli criminality has solidified over time into a substantial force that has pushed Israel into moral isolation—like South Africa before it—the settlement movement has simultaneously hardened into an *explicitly* racist, expansionist, para-militarized militia intent on carrying out the ultra-nationalist objectives of the Israeli state.[86]

---

[84] The Foundation for Middle East Peace writes on this point:
"At Camp David in 1979, Jimmy Carter thought that he had won an Israeli commitment to a five year freeze. But Menachem Begin was only prepared to stop for three months. And he forgot to tell Carter that the "thickening" of existing settlements, whose population then numbered 50,000, would continue unabated. FMEP, *op cit.*
[85] As quoted in the Mitchell Report, April 30,2001.
[86] While the recent controversy attendant upon the United Nations Conference on Racism in Durban, South Africa, and its attempt to reach an acceptable definition of Zionism is reported in the mainstream American media as if the entire issue were inexplicably born, *ex nihilo*, out of some new anti-semitic plot, the international legal and human rights communities have made the connection between the basic tenets of Zionism as practiced in Palestine and

As B'Tselem, the Israeli human rights organization, writes,

> Violence by settlers and other Israeli civilians against Palestinians has occurred in the Occupied Territories practically since the occupation began. Major acts of violence that occurred prior to the first *intifada* include the attempted assassination of three West Bank mayors in 1980, the raid on the Islamic College in Hebron in July 1983, in which three students were killed and many others wounded, and the "Jewish Underground," which planned to bomb a number of Arab buses, and was apprehended by the General Security Service in 1984.[87]

To these accounts we might add from the more immediate past an attack by the settlers of Itamar on Palestinians in the town of Hawara on June 21st of this year, in which several carloads of armed settlers drove to a nearby town and rampaged with guns, killing Adnan Odeh, age 22;[88] the thwarting by the Israeli security services of an attempt by a Jewish settler network to bomb a Palestinian girls' grammar school in Jerusalem in May of this year,[89] and the revelations by the Israeli police on Jan. 27, 1984, that a group of Jews had smuggled 22 pounds of explosives and 18 hand grenades of Israeli army issue onto the Haram al-Sharif (on the Temple Mount in Jerusalem, third holiest site in Islam) in an attempt to blow up the two mosques.[90]

---

contemporary definitions of racism since at least since 1975, and the formulation of U.N. Declarations condemning the occupation of Palestinian lands.

[87] B'Tselem, *Tacit Consent: Israeli Policy on Law Enforcement toward Settlers in the Occupied Territories,* Jerusalem, March, 2001.

[88] *New York Times,* June 22,2002, A1.  See also, June 27, "Jewish Settlers Released on Bail," AP, detailing how the two suspects from the murderous rampage in custody were released: one on personal guarantee, and the other without any bail or conditions.  This, despite the presence of dozens of eyewitnesses, including their fellow-settlers.

[89] *New York Times,* John Kifner, "Israel Arrests Settlers It Says Tried to Bomb Palestinians," 19 May 2002, A10. Two of the six suspects taken into custody were prominent leaders of the settlement political movement: Menashe Levenger, a founder of the ultra-provocative settlement in Hebron; and Noam Federman, leader of the outlawed Kach movement, founded by Rabbi Meir Kahane.

[90] Donald Neff, "Middle East History—It Happened in June," *Washington Report on Middle East Affairs,* June 1999, pp. 87-88.

Since the uprising of the first *intifada* in 1987, settlers have killed at least 119 Palestinians, of whom twenty-three were under the age of eighteen. Hundreds of Palestinians have been wounded by settlers, and countless incidents of destruction of property have been reported—house burnings, destruction of crops, razing of orchards, looting of Palestinian-owned shops and businesses, destruction of cars and other vehicles, and perhaps most seriously, various attacks on mosques and study centers, ranging from vandalism and spray-painting of offensive slogans to the deadly attack by Kiriat Arba settler Baruch Goldstein on worshippers at the Ibrahimi Mosque in Hebron in 1994, which killed twenty-nine Palestinians as they prayed.

Nor have settlers acted with restraint against Palestinian children of very tender years. As noted by American Educational Trust, et al.,[91] more than a few Palestinian children have been killed by direct settler violence, including: Ahmad Khuffash, age 7, run over by settlers on November 7th 2000; Shadi Zaghoul, age 14, rundown by a settler car and left to bleed to death, November 30th 2000; Muhammad Nasser, age 10, "killed by settlers with stones or sharp implements" on March 17th 2001; Diya Tmeizi, age 3 months, killed by settler gunfire to head, back and body, on July 19th 2001; and Khaled Batsh, age 3, dead from a fractured skull due to fall during settler teargas attack, on September 8th, 2001. Perhaps one of the

---

[91]American Educational Trust, see Appendix A.

most shocking cases in the last six years of settler violence against children is the tragic death of ten-year-old Hilmi Shousa on October 27th 1996, killed by settler Nahum Kurman. Kurman was the security chief of the Hadar Beitar settlement, near Bethlehem; Hilmi had thrown stones near the settlement. For this crime, Kurman chased the boy down, kicked him to the ground, then reportedly removed his shoe and used the heel to beat the boy's head. Once the boy stopped moving, he removed his pistol from his belt, and used the gun-butt to fracture Hilmi's skull several times, killing him. After a trial for manslaughter, Kurman was sentenced to six months of community service by an Israeli judge.[92]

A cursory examination of the circumstances of this violence reveals that since the 1980's settlers have become increasingly militarized as a force, and a large part of the settler population carries weapons given them by the Israeli Defense Force. As outlined by B'Tselem and others, the armed settlers fall into three broad categories. Chief among them are army regional defense units, organized by the IDF as a reservist army in the Occupied Territories. These units theoretically operate with IDF oversight, though reservists with IDF-issued weapons have been known to take part often in violence or acts of intimidation (roadblocks, land confiscations, provocative parades), when not on actual reserve duty. The second force consists of the settlements' own security forces—each

---

[92] BBC News, January 22 2001, "Israeli Child-Killer Escapes Jail."

settlement maintains a coordinator of security and a security office where ammunition and weapons, provided by the IDF, are stored for use by the settlement's residents. Though the security coordinator, in theory, reports to IDF commanders and is not authorized to initiate any actions outside the perimeter of his or her settlement, numerous acts have been recorded in which armed settlers have made forays with their weapons into Palestinian areas outside the settlements proper. Lastly, a third group of armed civilians active in the Occupied Territory includes IDF reservists not on active duty and not part of the regional defense units who reside in the Territories, and have permission to carry their weapons at all times. In addition, under current Israeli civil statutes, any citizen residing or working permanently in the Territories may apply for a pistol permit from the Ministry of the Interior. While it should be noted that only some of the settler violence against Palestinians involves the use of guns—as distinct from the use of stones, sticks, knives, fire or even bulldozers—the presence of so many armed civilians among the settler movement emboldens the extremists among them into ever more deadly acts of violence against Palestinians, armed or otherwise.

B'Tselem records[93] reveal that during the period from 29 September 2000, when the latest *intifada* began, through March, 2001, settlers have killed outright more than a dozen Palestinians, duly noting, however, that the number is likely

---

[93] *Ibid.*

substantially higher due to the many cases in which IDF regulars were firing their weapons at the same time as the settlers. Inasmuch as the IDF does not report its own killings of Palestinians, and does not admit culpability for such acts, it is simply impossible to discern clear responsibility for a particular death. B'Tselem lists the following deaths during this period:

- Fahed Mustafa Bacher 'Odeh, 23, killed by gunfire in the village of Bidia, Qalqilya district, on October 7, 2000.

- Farid Musa 'Issa Nasasreh, 28, killed by gunfire in Bet Furiq, Nablus district, on October 17, 2000.

- Mustafa Mahmud Musa 'Alyan, 47, killed by stone throwing near Kufur Malek, Ramallah district, on November 14, 2000.

- Muhammad Juda Abu-'Iasi, 27, killed by gunfire in the Erez industrial area in the Gaza Strip, on December 7, 2000.

- Muhammad Hamed 'Ali Shalash, 18, killed by gunfire in the area of 'Abud Village, Ramallah district, on December 17, 2000.

- Muhammad Najib 'Abido, killed by gunfire at Beit Hagai, near Hebron on December 22, 2000.

These killings are only the ultimate form of settler violence, and must be considered within the context of the general campaign of terror that surrounds them. The Israeli Attorney General's office has identified three general areas of settler violence, in an investigative report it commissioned on the lack of prosecutions of settlers in the Occupied Territories:

- Gunfire and stone-throwing intended to cause bodily harm;

- Rioting in Palestinian communities, including breaking windows, damaging motor vehicles, overturning stands in the market, and the like;
- Blocking roads and initiating disturbances on roadways and intersections.[94]

In addition to these categories we might add assaults on individual houses, calculated to drive the occupants away; assaults on farms and agricultural projects, including destruction of orchards, irrigation systems, killing of livestock and the like; and confiscation of land by settlers to create "security zones" around their settlements, then patrolled by armed settlers to intimidate the rightful owners from returning.

The messianism at the foundation of Israel would find its fullest modern expression at the conclusion of the Six Days' War in June of 1967. Within two weeks, Israel officially annexed East Jerusalem and the West Bank areas adjacent to it. The rapid success of the war against Israel's Arab neighbors more than tripled the territorial area now under Israeli control, from the Golan to the Sinai, from the Jordan to the sea. The euphoria was no where more intense than among the orthodox religious movements, who interpreted Israel's victory against the poorly-equipped, outnumbered and disorganized Arab forces as a divine sign that the new Kingdom of David and the arrival of the Messiah was at hand. As Benny Morris writes,

"religious nationalists . . . declared that the "miraculous" conquests were *at'halta dege'ula,* the start of divine redemption, and that the settlement and annexation of the conquered territories were a divine command . . . . The admixture of messianism and nationalism proved heady and powerful. Casting caution and pragmatism to the wind, God's skull capped legions and the vigorous, bearded rabbis forayed into the hills and dales of Judea and Samaria to choose sites for settlements. They skirted government policies and army roadblocks to map out the new "Greater Israel." At site after site they coerced the government into giving way to their pioneering zeal and acceding to the establishment of a chain of settlements that would define and secure the new territories. In March 1974 these cadres and this spirit were formally consolidated in an extra parliamentary movement, Gush Emunim (Bloc of the Faithful) . . . . The goal was massive, irreversible settlement leading, inevitably, to annexation.[95]

## XIV.  THE AMERICAN SOURCES OF MONEY FOR SETTLERS

Sadly, in the case of Plaintiff John Doe II and thousands of others similarly affected, that messianic fervor, abetted by decades of government subsidies and policy, has been joined in its support by messianic American Christian groups here in the United States.   The settlement, which took John Doe's (II) land, Halamish/Neve Tzuf, is supported financially by various groups here, including Christ Lutheran Church, of Jacksonville, Florida, and the Jerusalem USA Assistance Fund of Charleston, South Carolina.    In addition, conservative American Jewish organizations send money to Halamish/Neve Tzuf, including

---

[94] "Law Enforcement Procedures and Arrangement Concerning Israeli Offenders in Judea and Samaria and in the Gaza Strip," Office of the Attorney General, September, 1998.  See also, B'Tselem, *op cit.*
[95] Morris, *op cit.,* at p. 331-332.

Congregation Rinat Yisrael of Teaneck, New Jersey; the One Israel Fund of New York, New York; and the Central Fund for Israel, also of New York, New York. All of these groups are tax-exempt charitable organizations doing business under §§501(a) and (c) of the Internal Revenue Code. In their many on-line presences, and corroborated in the website of Neve Tzuf itself, these contributions are used for various "security" purposes, including dozens of bullet proof vests and body armor, night-vision goggles, armored jeeps and ambulances, floodlights, ballistic helmets, communications equipment, gun cabinets, generators, and even security fence repairs—perhaps repairs to the very fence that now illegally cuts across the confiscated land of John Doe II..

Various established principles of international law prohibit Israel's policy of settlements and annexation. The Fourth Geneva Convention explicitly forbids a conquering nation from settling its own population on the lands of the conquered people, when it states in Article 49:

> Individual or mass forcible transfers, as well as deportations of protected persons from occupied territory to the territory of the Occupying Power or to that of any other country, occupied or not, are prohibited, regardless of their motive.
> The Occupying Power shall not deport or transfer parts of its own civilian population into the territory it occupies.[96]

---

[96] UN Office for the High Commissioner on Human Rights, Geneva Fourth Convention, Article 49, 1949.

For its part, Israel claims that settlers have either returned to lands they have historically come from, or that they start their settlements of their own free will, acting individually; in either event Israel, by pure force of willful fantasy, claims that settlers do not displace Arabs.   The truth is undeniable; these settlements, which serve as the ultimate tripwire for the pain and suffering in the Occupied Territories, are illegal, and nothing more than a brazen land-grab by a nation which has from its very start planned for the removal of all Palestinians from their ancestral homeland.

## XV. THE USE OF TORTURE AGAINST AMERICANS IN DETENTION

The foregoing analysis of Israeli tactics of collective punishment, indiscriminate violence and assassinations, and their use in terrorizing an civilian population for the calculated goals of ethnic removal and territorial expansion, delineates the many sufferings of Palestinians and American citizens of Arab origin under Israeli occupation.   Yet to the outrages of these policies must be added one last, grim indicator that Israel, inasmuch as she enjoys the billions of dollars our taxpayers send her year in and year out, has no compunctions when it comes to violating our citizens' human and civil rights with impunity.

Israel's use of torture against suspects in detention, including Americans, has been extensively documented[97] in the last thirty years by many human rights groups, non-governmental organizations, and U.S. governmental reports. In 1970, both the United Nations and Amnesty International issued reports charging Israeli authorities with practicing torture in the occupied territories.[98] The International Committee of the Red Cross and Israeli lawyers also reported the use of torture in Israeli prisons in the early and mid-1970s. For example, in 1977, Israeli lawyer Felicia Langer wrote:

> "The use of torture during investigations is a method, and I declare it as a lawyer who has dealt with thousands of cases. I have seen the marks of torture on the bodies of hundreds of my clients ... I knew prisoners who went mad as a result of torture ... Many people have died in prisons as a result of torture, or are condemned to a slow death because of the lack of medical treatment."

Israeli torture of Palestinian detainees became headline news in June 1977, when the *London Sunday Times* printed a detailed report which concluded that

---

[97] See, for example, Memorandum to the United Nations Security Council (June 8 1970); Report of the Special Committee to Investigate Israeli Practices Affecting Human Rights of the Population of the Occupied Territories (October 26,1970 and October 5,1971); Amnesty International, Report on the Treatment of Certain Prisoners under Interrogation in Israel (1970); Amnesty International Annual Report, (1977-1980, 1982-1986, 1988, 1995-2000, inclusive); Amnesty International, Torture in the Eighties (1984), pp. 233-236; Al-Haw/Law in the Service of Man, The Case of al-Fara'a Prison (1985); *Concluding Observations - Eighteenth session : Israel.* UN Committee against Torture (04/11/97); Oral Statement to the United Nations Commission on Human Rights on the Israeli Occupied Territories, a statement by Amnesty International (March 11,1997); *Israel's Interrogation Policies and Practices:* Israel's Response to Concerns about Interrogation, prepared by Adv. Tamar Gaulan, Director, Human Rights and International Relations Department, Ministry of Justice, State of Israel (December 1996); *Committee against Torture, Consideration of reports submitted by States Parties under article 19 of the Convention, Israel,* UN Doc. A/49/44 at 24 (Forty-ninth session, 1994); *Stop Torture Now!* Amnesty International's Ongoing Campaign; *Torture and Ill-Treatment: Israel's Interrogation of Palestinians from the Occupied Territories* Human Rights Watch/Middle East Report (June 1994).

[98] Stephen J. Sosebee, "Speaking About the Unspeakable: Officially-Sanctioned Torture," *Washington Report on Middle Eastern Affairs,* Oct. 1991, p. 41.

"torture of Arab prisoners is so widespread and systematic that it cannot be dismissed as `rough cops' exceeding orders. It appears to be sanctioned as deliberate policy."

Researcher Stephen J. Sosebee documents that

In a two-year period between 1977 and 1979, the US consulate in East Jerusalem sent more than 40 cables to the State Department reporting that torture is a common practice employed by Israelis to extract confessions and to punish Palestinian prisoners. Documentation of Israeli torture, deaths of Palestinians under detention, and other abuses increased in the late 1970s. The absence of human rights organizations in Palestine in the late 1960s and 1970s makes it difficult to estimate the number of Palestinian prisoners who died in prison in the early years of Israeli occupation.[99]

In 1982, it became clear that widespread use of torture by the IDF was common following the Israeli invasion and occupation of Lebanon, especially at the notorious Ansar detention camp. As Sosebee writes,

An incident in 1984, however, became the turning point in precise documentation of torture in Israel. Majid and Subhi Abujumaa were beaten to death by the Israeli secret police (the Shin Bet) following a failed bus hijacking in Gaza. The truth that the cousins were murdered during interrogation, and not during the storming of the bus as the Israeli government had reported, only surfaced after an Israeli newspaper printed a photograph of one of the men being led away in handcuffs. This incident led to the Landau Commission investigation into the practices of the Shin Bet. The Israeli Government Commission documented the use of torture to obtain confessions from detained Palestinians, yet none of the convictions based upon such coerced confessions reversed.[100]

---

[99] *Ibid.*
[100] *Ibid.*

During the first *intifada* of the late 1980's, Israel detained thousands of

Palestinians in a network of internment camps, many of them under the age of

eighteen, for such actions as throwing stones or demonstrating against the

Occupation. Recalling his stint as a guard in Gaza Beach "one of the best" of such

camps, respected Israeli journalist Ari Shavit wrote of his experiences with rare

candor and insight:

> Most Palestinians are awaiting trial; most were arrested because they
> were throwing stones or were said to be members of illegal
> organizations. Many are in their teens. Among them, here and there,
> are some boys who are small and appear to be very young.  .  . The
> prison has twelve guard towers. Some Israeli soldiers are struck – and
> deeply shaken - by the similarity between these and certain other
> towers, about which they have learned at school.  .  . Maybe the
> Shin Bet is to blame for this- for the arrests it makes and what it does
> to those arrested. For almost every night, after it has managed in its
> interrogations, to "break" a certain number of young men, the Shin
> Bet delivers to the [soldiers] a list with the names of the friends of the
> young men.  . . [Then] the soldiers ;  . . go out almost every night
> to the city and  .  . . come back with children of fifteen or sixteen
> years of age. The children grit their teeth. Their eyes bulge from their
> sockets. In not a few case they have already been beaten  . . . And
> soldiers crowd together in the "reception room" to look at them while
> they undress. To look at them in their underwear, to look at them as
> they tremble with fear. And sometimes they kick them- one kick
> more, before they put on their new prison clothes  . . . Or maybe
> the doctor is to blame. You wake him up in the middle of the night to
> treat one of the individuals just brought in- a young man, barefoot,
> wounded, who looks as if he is having an epileptic fit, who tells you
> that they beat him just now on the back and stomach and over the
> heart. There are ugly red marks all over his body. The doctor turns to
> the young man and shouts at him. In a loud, raging voice he says:
> may you die! And then he turns to me with a laugh: May they all die!
> Or maybe the screams are to blame. At the end of the watch  . . .
> you some times hear terrible screams  . . . hair-raising human

screams. Literally hair-raising  .  .  . In Gaza our General Security Services therefore amount to a Secret Police, our internment facilities are cleanly run Gulags.  Our soldiers are jailers, our interrogators torturers  .  .  . Thus in the forty months of the *intifada*, more than ten thousand Israeli citizens in uniform have walked between the fences, have heard the screams, have seen the young being led in and out  .  .  . And the country has been quiet. Has flourished  .  .  . The thousand (if not fifteen thousand, if not twenty thousand) Israelis have done their work faithfully – have opened the heavy iron doors of the isolation cell and then closed it. Have led the man from the interrogation chamber to clinic, from the clinic back to the interrogation chamber. They have looked close up at people shitting in terror, pissing in fear.  And not one among them has begun a hunger strike in front of the house of the prime minister. Not one among them that I know has said, this will not happen.  Not in a Jewish state.[101]

According to an I.D.F. report in February 1991, some 75,000 Palestinians had been arrested during the first three years of the Intifada, of whom a yearly average of 15,000 were actually charged each year. The Israeli human rights group B'Tselem estimates[102] that most of these administrative detainees were not interrogated intensely or over long periods, and were released within the first 18-day military detention phase. Others were tried in "quick trials" on the basis of evidence given by the arresting soldier alone. However, B'Tselem researchers have concluded that some 1,600 detainees per year underwent interrogation during that period, and that it is likely most of them experienced some form of physical or

---

[101] Norman G. Finkelstein, *The Rise and Fall of Palestine: A Personal Account of the Intifada*, University of Minnesota Press, Minneapolis and London, 1966, pp.71-73.

[102] B'Tselem, "The Interrogation of Palestinians Under the *Intifada:* Ill-treatment, 'Moderate Physical Pressure,' or Torture?"  Comprehensive report, March 1991.

93

psychological pressure, including: beatings; threats against themselves and their families; sleep deprivation; loud music; denial of medical treatment; prolonged, cruel restraint, or "shabah;" use of the "tiny chair;" extreme cold; hooding the prisoner for days with urine-soaked bags; violent shaking of the prisoner; and other practices.

The General Security Services used and continues to use these methods pursuant to secret procedures that were based on the recommendations of the 1987 judicial commission of inquiry headed by retired Supreme Court Justice Moshe Landau. The Israeli High Court appointed a special body, the Landau Commission, to study allegations of torture and make recommendations. The Commission found that not only were methods of physical abuse and torture used extensively in interrogation, but also that the Shin Bet then routinely lied about the practice in open court whenever asked about the confessions they had extracted by prosecutors.   Then, in a stunning development that left many in the human rights and international law communities astonished, the Commission explicitly endorsed the use of physical abuse as part of an interrogation, stating, "The Commission agrees that . . . clearly delineated psychological [and] physical pressures may legitimately be exerted in the interrogation of one suspected of terrorism and has proposed precise guidelines for the Shin Bet adopt."

According to the Landau Commission recommendations, the GSS interrogation methods may combine "non-violent psychological pressure of an intense and prolonged interrogation . . . with a moderate measure of physical pressure." [103] The Landau Commission also suggested the legal support for the use of these methods, which contravene various provisions of the Penal Law. The support proposed by the commission is the "defense of necessity," which removes criminal responsibility where a person "committed an act that was immediately necessary" to save life or property from serious injury, and was done in a reasonable manner under the circumstances.[104] While these procedures are revised periodically by a special ministerial committee, the official guidelines to this day have never been published, and Shin Bet has continued to use many of the practices otherwise banned by the High Court by simply declaring a detainee a terrorist suspect.

The years since the first *intifada* have witnessed various legal struggles by groups within Israel, as well as international groups, which culminated in a second review by the Israeli High Court of torture practices by the General Security Services three years ago. Yet many groups report that as the resistance to the occupation has intensified in the past few years, reports of torture and brutality by

---

[103] Report of the Commission of Inquiry in the matter of Interrogation Methods of the General Security Service regarding Hostile Terrorist Activity, First Part (Jerusalem, October 1987), par. 4.7.

the interrogators have become more frequent. B'Tselem estimated on the eve of the High Court's codifying of GSS interrogation rules, based on official sources, human rights organizations, and attorneys, "that the GSS annually interrogates between 1,000-1,500 Palestinians. Some eighty-five percent of them—at least 850 persons a year—are tortured during interrogation."[105] Unfortunately, the procedure rules remain unpublished, and in the permanent emergency climate of the Occupied Territories, the "ticking time-bomb" theory is nearly omnipresent, giving the GSS a free hand to torture any detainee that comes before them.

The U.S. Department of State reported this year that

> Israeli laws and administrative regulations prohibit the physical abuse of detainees and a landmark decision by the High Court of Justice in September 1999 prohibited the use of a variety of abusive practices, including violent shaking, painful shackling in contorted positions, sleep deprivation for extended periods of time, and prolonged exposure to extreme temperatures; however, during the year, human rights organizations, including B'Tselem, Human Rights Watch, LAW, and the Mandela Institute for Political Prisoners reported that there was an increase in the number of allegations that Israeli security forces tortured and abused detainees, including using methods prohibited in the 1999 High Court decision. There also were numerous allegations that police officers beat detainees. The Government stated that the security forces have complied with the High Court's decision and that the Attorney General's office investigates any allegations of mistreatment. Human rights groups indicate that the person who is responsible for carrying out the initial investigation into such allegations is a GSS officer, and that, as a result, the GSS provides preliminary research in injuries into its own

---

[104] Paragraphs 34k and 34q of the current Penal Law. See the detailed discussion in the B'Tselem publications mentioned in fn. 5.
[105] B'Tselem, *Routine Torture: Interrogation Methods of the General Security Service*, 1998, p. 5.

alleged abuses. Human rights groups charge that largely because of they system, few cases have been opened and no GSS agent has been criminally charged with torture or other ill-treatment for the past several years.[106]

In addition, the role played by confessions in winning convictions against suspects remains as crucial as ever, if not more so.   Palestinian detainees, including American citizens, remain subject to military law and as such cannot avail themselves of anything like the constitutional protections accused persons enjoy here in the United States.  As the State Department cautiously puts it,

> Most convictions in security cases before Israeli courts are based on confessions. The law prohibits the admission of forced confessions as evidence; however, there have been allegations that this occurs. A detainee may not have contact with a lawyer until after interrogation, a process that may last days or weeks. The Government does not allow representatives of the International Committee of the Red Cross (ICRC) access to detainees until the 14th day of detention. Detainees sometimes state in court that their confessions are coerced, but judges rarely exclude such confessions. According to Palestinian human rights groups, some Palestinian detainees fail to make complaints either due to fear of retribution or because they assume that such complaints would be ignored. During the year, there were no known cases in which an Israeli court excluded a Palestinian confession because of a finding of improper means of investigation or interrogation.[107]

**Plaintiff John Doe (VII)**, forty-seven year old Palestinian-American from Chicago, went with his wife in the spring of 1999 to make his religious pilgrimage to Mecca, the historic center of the Islamic world.  He was born in a Palestinian

---

[106] U.S. Department of State, *Israel and the occupied territories: Country Reports on Human Rights Practices— 2001.*  Released by the Bureau of Democracy, Human Rights, and Labor, March 4, 2002.

West Bank village called Maithalun, and had not been there in many years. He had

planned to visit his so after a few weeks in the middle east and a short stay with

siblings in Jordan, he traveled on the morning of April 26 to the Husseini/Allenby

Bridge border crossing between Jordan and the West Bank, where Israel maintains

its port of entry to the Occupied Territories. Though he possesses a U.S. passport,

he was detained without explanation, and after fourteen hours, taken to a prison

near Haifa. His wife, not yet a U.S. citizen, was admitted to the West Bank

without trouble. The next day, an American consular official visited John Doe

(VII), gave him some magazines and told him he could not get involved. He was

kept in a series of tiny, foul cells, measuring three feet by seven feet, with only a

filthy, lice-ridden blanket and a hole in the floor for a toilet, and every day he was

interrogated for several hours. Overhead lights blazed all night, and never let him

sleep. For approximately six weeks, he was subjected to interrogations using the

*shabeh* methods of the GSS—painfully bound and shackled to a chair, hooded with

a suffocating, putrid burlap sack, deafened with endless loud music at full volume

next to his head, and threatened and insulted. At one point, his interrogator told

John Doe (VII), who repeatedly protested that he was an American, that "America

is shit." John Doe (VII) was denied medical treatment for the intense pain in his

back, he was denied visits, and he was sometimes left in his tiny cell for days.

[107] *Ibid.*

Eventually, he was transferred to the notorious Moscobiya Prison, stripped naked and humiliated, and on June 2, he was driven back to Allenby and expelled to Jordan with his American passport. (See annexed hereto as Exhibit P, affidavit of John Doe (VII)].

John Doe's (VII) subsequent efforts to get help in this matter from the American government have come to nothing. He can never again visit his childhood home or see his aging parents there, for fear of being detained again. John Doe (VII) has never been accused of any crime, yet he was held for thirty-six days of torture, humiliation and terror. As he attests in his affidavit so movingly, his sister Awina, whom he had hoped to see on his visit home, has passed away in the meantime, and because of his mortal fear of ever setting foot in Palestine again, he never again had a chance to see her.

B'Tselem notes that the GSS still uses all of the methods as a routine matter of interrogation procedure, as we find in John Doe's (VII) affidavit:

> The GSS methods include holding the interrogees [sic] in prolonged isolation from the external world and in filthy and unsanitary conditions, sensory isolation, and disorientation. The interrogators deprive interrogees of sleep for extended periods, threaten and curse at them, and shackle them for prolonged periods so tightly as to cause pain. Interrogators compel interrogees to kneel or bind them in positions that lead to extreme pain and exhaustion. They also use direct physical violence, such as shaking, beating, and kicking.[108]

---

[108] B'Tselem, note *supra,* at 6.

Similarly, **Plaintiff John Doe (VI)**, a thirty-one year old American who is a partner in a pizzeria in Miami, tells a terrifying story of his arrest at Allenby and his subsequent torture and ill treatment at the hands of the GSS.  He went to the West Bank in October 1998 to visit his childhood home and see his family there.  After about two weeks, he went to visit his sister in Jordan, by means of Allenby Bridge.  As in John Doe's (VII) case, John Doe (VI) was detained at the crossing, and arrested, accused of being a member of a terrorist organization.  The substance of this absurd charge was eventually revealed to him: his sponsorship, through a charitable group, of an Arab child for twenty-five dollars per month, in the style of the late-night television fund-raising group, "Save the Children," was characterized by his tormentors as sending money to terrorists.  But John Doe (VI) would not learn this until he had spent weeks in filthy cells, being interrogated daily and subjected to the harshest treatment.  All of the classic repertoire of Israeli torture is on display in the case of John Doe (VI) : the shackling and *shabeh* restraint; the suffocating hood; the blasting rock music; death threats; sleep deprivation and withholding of food; the confession written in Hebrew, which he can't read, urged on him repeatedly; the use of other 'prisoners,' working for his interrogators, to threaten him with violence; the threats against his family; being stripped naked and exposure to cold.  At one point in his detention, he was shackled painfully to a small chair and left there alone for three days; his hands swelled up grotesquely,

and John Doe (VI) still has nightmares about the ordeal. Throughout his detention, he demanded a lawyer and visits from the Consular office, but the soldiers and agents mostly laughed at him, and abused him even more. (See annexed hereto as Exhibit Q the affidavit of John Doe (VI)].

Throughout it all, John Doe (VI) states, the image of his eight year old boy sustained him and kept him from losing his mind, giving him the will to resist his torturers. In the end, he spent forty days in extreme treatment, and was released to the West Bank, but with a special restriction on his U.S. Passport that forbade him to leave the area for another thirty to forty-five days. Even in this matter—a situation in which one might think the American Consular officials would show concern for the clear violation of the rights of one of its nationals, with a citizen's human and civil rights so blatantly trampled upon—no assistance from the Consulate was forthcoming. In all, John Doe (VI) would not return home to Miami until late in the following January, some seventy-five days so since he had left home.

The Convention against Torture and other Cruel, Inhuman, or Degrading Treatment or Punishment, to which Israel is party, defines torture as intentionally inflicted "severe pain or suffering, whether physical or mental" on a person to

obtain, among other purposes, "information from him or a third person."[109]   The

convention unequivocally prohibits torture under any circumstances. Art. 2 (2).

Other conventions, such as the Covenant on Civil and Political Rights (Art. 7), and

conventions dealing with the laws of war,[110] prohibit torture and other forms of

cruel, inhuman, or degrading treatment and punishment (hereafter: ill- treatment)

in all circumstances. The prohibition on torture and ill- treatment is, therefore,

absolute, and no "exceptional" circumstances may justify derogating from it.

*The Washington Report on Middle East Affairs* reports that

> John Dugard, the United Nations Human Rights Commission special
> rapporteur in the Occupied Territories, has released a report criticizing
> both sides of the ongoing conflict and expressing distinct concern over
> Israel's treatment of Palestinian children held in Israeli prisons.
> According to the march 28 *Arab News*, Dugard put the number of
> Palestinians under the age of eighteen arrested or detained since
> September 2000 at around 1,000.  Over 90% of those, Dugard noted,
> were arrested on suspicion of throwing rocks at Israeli soldiers. The
> evidence Dugard collected "indicates fairly convincingly that children
> are subjected to inhuman treatment, probably amounting to torture in
> terms of the torture convention."  He said the children were held for
> lengthy periods while being interrogated, blindfolded, forced to sit or
> stand in uncomfortable positions, denied food or sleep, and
> occasionally assaulted. Israel, Dugard noted, is 'the state in the region
> that is probably most firmly committed to the rule of law within its
> own territory.  But when it comes to the treatment of Palestinians

---

[109]  Art. 1(1) of the convention was adopted by the UN General Assembly in 1984 and took effect in 1987. Israel ratified the convention in 1991.
[110]  For example: The Hague Regulations of 1907, art. 4, dealing with prisoners of war, and art. 44, regarding civilians; art 3(1), common to the four Geneva conventions of 1949, regarding a non-international conflict; the Third Geneva Convention, articles 13-17, and others, regarding prisoners of war; the Fourth Geneva Convention, articles 27, 31, and 32, regarding civilians under enemy control.

outside its territory, there seems to be a lack of concern for human rights and this I find very disturbing.' "[111]

The official silence on the part of the U.S. government is perhaps even more disturbing, given the extensive documentation of Americans whom Israel has tortured. It is difficult to think of another country that has treated U.S. citizens in such numbers with such a heavy hand in recent times without earning a White House protest or caution. Yet the U.S. has never acknowledged publicly that Israel is a torture regime. Whatever reasons the U.S. might supply for its silence, it cannot claim ignorance. As witness **Jerri Bird**, who has studied the issue of torture in the Occupied Territories for many years (and has had significant contact with the career foreign service culture) notes in her affidavit, by 1978 the consular section of the Jerusalem consulate general had sent over 40 reports on Israeli mistreatment of Palestinian political prisoners in Jerusalem and the West Bank to the State Department. And in the ensuing years, the State Department was informed on at least two occasions by consular staff that Americans had been tortured. (See annexed hereto as Exhibit R, affidavit of Jerri Bird.) Since that time, a steady and solid body of evidence has made its way to Washington indicating that Israel is a torture state and has tortured Americans on many occasions—certainly enough to have warranted after twenty-five years an

---

[111] *Washington Report on Middle East Affairs*, June/July 2002—Vol XXI, No.5.

investigation. But sadly, the government apparently does not feel that the vast sums of taxpayer dollars paid to Israel by the U.S. entitles Americans to know about this dirty secret—all our billions do not buy us any truth in this regard.

## XVI.  THE MASSACRE AT SABRA AND SHATILA REFUGEE CAMPS, SOUTHERN LEBANON, SEPTEMBER 16-18, 1982

Much has been written about the massacre at the Sabra and Shatila refugee camps between the 16th and 18th of September, 1982. Although as many as several thousand civilians were slaughtered and many more injured, to date the victims and survivors of the massacres of Sabra and Shatila, including Americans, have never had their day in court, whether in Lebanon, Israel or elsewhere. This act of genocide could not and would not have occurred without the direct knowledge and approval of then-Minister of Defense Ariel Sharon and others with the IDF. Perhaps no account provides a more powerful and chilling recitation of the absolute evil that unfolded during those seventy-two hours some two decades ago than the complaint recently filed against Ariel Sharon, and others, by counsel for twenty-three plaintiffs in Belgium seeking damages for war crimes and like offenses.[112] With their permission we have borrowed liberally from their pleadings as it provides a concise and comprehensive framework upon which to view the

---

[112] The complaint which was initiated against Sharon in Belgium on June 18, 2001 was dismissed on June 26, 2002 by an appeals court not on substantive but procedural grounds because Sharon, who had refused to accept service of

carnage, which ultimately rests at the doorstep of Ariel Sharon, long before he became Prime Minister of Israel.

Israeli ground troops officially began their invasion of southern Lebanon on June 6, 1982 by land, sea and air, aiming to strike a death-blow at the PLO while simultaneously serving the interests of the "Greater Israel" agenda. While Israel suggested that the invasion of 60,000 ground troops led by 500 tanks was in response to the attempted assassination of the Israeli ambassador Argov in London by a dissident Palestinian organization on the 4th of June, there is little credence to that assertion.[113] Indeed, the long-prepared Israeli operation, which was christened "Peace in the Galilee", had been on the drawing board for months awaiting only a convenient excuse to execute the plan.

Initially, the Israeli government had announced its intention to penetrate "only" 40km into Lebanese territory, ostensibly for "security" purposes. The attack however escalated almost immediately, as Sharon crossed various lines on the map that he had vowed he would not cross in order to undertake a far more ambitious and violent offensive. Having quickly occupied the south of the country where it

---

the complaint or to travel to Belgium while it pended, "could not be found" in Belgium. The case is currently on appeal to the Supreme Court of Belgium.
[113] It is widely believed that Israel seized upon the attack on the ambassador as a pretext to invade Lebanon not just to crush the PLO --which had begun to resemble very much a regular fighting force based in Lebanon, with uniforms, command structure, transports and logistics, and which was recognized diplomatically by more than fifty states, had established more than 100 missions, had won observer status in the United Nations and had insinuated a loose bureaucratic structure employing some 8,000 civil servants --but to Intervene in the Lebanese civil war, then seven years old, on the side of its allies, the Phalange, a Maronite Christian party that it hoped to use as a hedge against Syrian and Muslim influence in the region.

inflicted widespread injury to Palestinian and Lebanese civilians, Israeli troops soon penetrated as far as Beirut itself. By June 18,1982 they had surrounded the Palestine Liberation Organization's armed forces in the west side of the town. From that vantage point the IDF not only shelled Beirut by aircraft, artillery and gunboat, but attacked its airport and inserted troops to encircle the southern half of the city.[114]

According to Lebanese statistics, operation "Peace in the Galilee", caused in excess of 18,000 deaths and 30,000 injuries, largely as a result of Israel's intensive shelling of Beirut, where most of the victims were civilians.

After several months of fierce fighting, a ceasefire among all of the combatants including Israel was eventually negotiated through Phillip Habib, the United States special envoy to the region. Pursuant to the terms of the truce, it was agreed that while the PLO would evacuate Beirut, under the supervision of a multinational force deployed in the evacuated part of the town, West Beirut was to be garrisoned by the Lebanese army. Most important, the Palestinian leadership was given American guarantees for the safety and security of the civilians who remained in the camps after their departure. The evacuation of the PLO concluded on September 1,1982, leaving the refugee population of the camps—mostly

---

[114] In addition to this offensive, Israeli troops simultaneously pushed as far northeast as the Bek'aa Valley and crossed the Damascus Highway thereby flirting with a full-scale confrontation with Syria.

women, children and the old and infirm— to fend for themselves, without their Palestinian protectors.

On September 10, 1982, the multinational forces left Beirut. The following day, Mr. Sharon unilaterally announced that "2,000 terrorists" had remained inside the Palestinian refugee camps around Beirut. This refrain, which continues to be Ariel Sharon's call to arms some twenty years later in the Occupied Territories, proved ominous indeed as it set the stage for what was quickly to follow. On Wednesday September 15, after the previous day's assassination of Phalangist President-elect Basher Gemayel, the Israeli army occupied West Beirut, "surrounding and sealing" the camps of Sabra and Shatila, which were inhabited entirely by a population of Palestinians and Lebanese civilians, the entirety of armed resistors (more than 14,000 people) having evacuated Beirut and its suburbs pursuant to the armistice.

Historians and journalists agree that it was probably during a meeting between Ariel Sharon and Bashir Gemayel, the leader of Arab Christians, in Bikfaya on the 12th of September that an agreement was concluded to authorize the "Lebanese forces" to "mop up" these Palestinian camps. Sharon's intention to send the Phalangist forces into West Beirut had however already been announced by him on July 9,1982 and in his biography, he confirms having finalized the operation during his meeting in Bikfaya.

According to Ariel Sharon's declarations in the Knesset (Israeli parliament) on September 22,1982, the entry of the Phalangists into the refugee camps of Beirut was decided on Wednesday September 15,1982. Also according to General Sharon, the Israeli commandant had received the following instruction: "The Tsahal[115] forces are forbidden to enter the refugee camps. The "mopping-up" of the camps will be carried out by the Phalanges or the Lebanese army." Having been advised by Sharon that the Phalanges were preparing to enter the camps his chief of staff Lt. General Rafael Eitan responded, "They're thirsty for revenge. There could be torrents of blood."[116]  Yet Sharon ignored this and subsequent warnings, clearly preferring that Israel's allies clean out the camps.

At dawn on September 15, 1982, Israeli fighter-bombers began flying low over West Beirut in order to assist Israeli ground troops as they made their way into that district of the war torn capital. Encountering little or no resistance at all, General Sharon was present to personally direct the Israeli penetration, installing himself by 9:00 a.m. in the general army area at the Kuwait embassy junction situated at the edge of Shatila. From the roof of this six-story building, it was possible to clearly observe the town and the camps of Sabra and Shatila.

By early afternoon, the camps of Sabra and Shatila—in reality a single zone of refugee camps in the south of West Beirut divided by a narrow street—were

---

[115] In Hebrew, Tsahal is the acronym for the Israeli Defense Forces, Tsavah Haganah L'Israel.

completely surrounded by Israeli tanks and soldiers, who had installed checkpoints all around the camps thereby permitting for surveillance of the entrances and exits. No resistance whatsoever was encountered from the camps. During the late afternoon and evening, the camps were bombarded with shells.

By Thursday September 16, 1982, the Israeli army controlled all of West Beirut. In a release, the military spokesperson declared, "Tsahal controls all the strategic points of Beirut. The refugee camps, including the concentrations of terrorists, are surrounded and closed." In the morning of September 16, the following order was issued by the army high command: "The searching and mopping up of the camps will be done by the Phalangists/Lebanese army." The operation itself was carried out under the direct supervision of Elie Hobeika, the long time leader of the Phalangist militia.

During the morning, shells were fired down towards the camps from high locations and Israeli snipers were shooting down at people in the streets. At about midday, the Israeli military command under the direct control of Defense Minister Sharon and commanded by General Amos Yaron, field commander for West Beirut, in concert with forces under the command of Major Sa'ad Haddad, the commander of Christian forces in Lebanon, gave the Phalangist militia a green light to enter the refugee camps. As evening fell, the IDF forces allowed a unit of

---

[116] Morris, *op cit.*, p. 541.

approximately 150 heavily armed Phalangists to pass through their lines and to enter the camps from the south and southwest- while the IDF provided air and ground support—all of this battle preparation was readied for the camps' thousands of unarmed inhabitants.

At that point, General Drori, the commander of the Israeli army in Lebanon, telephoned Ariel Sharon and announced, "Our friends are advancing into the camps. We have coordinated their entry." Sharon replied, "Congratulations! Our friends' operation is approved."

For the next 40 hours inside the surrounded and sealed camps, the Phalangist militia raped, killed and injured a large number of unarmed civilians, mostly children, women and old people.[117]   More than a few bodies were left booby trapped with explosives.   These actions were accompanied or followed by systematic roundups, backed or reinforced by the Israeli army, resulting in dozens of disappearances.

Throughout the course of the massacre the Israeli army knew perfectly well what was going on in the camps as its leaders were in constant contact with the militia leaders.  As noted, the IDF not only took up positions surrounding the two neighboring camps thereby preventing civilians from escaping a certain death, but ensured that the dark alleys and streets of the crowded refugee camps remained

---

[117] In addition to the thousands of Palestinian victims, several foreign nurses and doctors were killed as well.

illuminated throughout the night of the attack by shooting flares into the sky from

helicopters and mortars. General Yaron's command staff, having been informed of

the killings while they were in progress, even allowed the Phalange to re-enter the

camps with a bulldozer, presumably to dispose of the mass of corpses.[118]  No

resistance was ever offered by the camp's inhabitants; indeed, as noted, the PLO

had long since retreated from the area, and there were no weapons found among

the residents.

Journalist Robert Fisk was one of the first people to enter the Shatila camp

as the Phalangists were finishing their work and withdrawing. He describes in

detail the position of the Israeli forces and the comportment during the massacre,

and their clear view of all the events that transpired within; but most of all, he

gives a Breughelian vision of the hell-on-earth that the camp became for its

inhabitants:

> They were everywhere, in the road, in laneways, in back yards and
> broken rooms, beneath crumpled masonry and across the top of
> garbage tips. The murderers—the Christian militiamen whom Israel
> had let into the camps to "flush out terrorists"—had only just left.  In
> some cases, the blood was still wet on the ground.  When we had seen
> a hundred bodies, we stopped counting.  Down every alleyway, there
> were corpses—women, young men, babies and grandparents—lying
> together in lazy and terrible profusion where they had been knifed or
> machine-gunned to death.  Each corridor through the rubble produced
> more bodies. . . .    Perhaps a thousand people were butchered,
> probably half that number again. . . . Even while we were there, amid
> the evidence of such savagery, we could see the Israelis watching us.

---

[118] Chomsky, *The Fateful Triangle,* p. 362.

> From the top of the tower block to the west . . . we could see them
> staring at us through field-glasses, scanning back and forth across the
> streets of corpses, the lenses of the binocular sometimes flashing in
> the sun as the gaze ranged through the camp.[119]

Fisk describes scenes of surreal devastation as he walks the corpse-littered streets of Shatila camp in those first hours of the massacre's aftermath. During the long night and part of a day, Phalangists had separated the men left in the camp and summarily executed many of them against walls; others were taken to a nearby sports stadium and kept in "cells" for interrogation by Shin Bet and militia men, or simply executed. But the bodies of murdered women, children and the elderly provided the images that seared people's minds with the horror of mass murder.

The massacre of between 700 (the official Israeli figure) and 3,500 (notably in the inquiry launched by the Israeli journalist Kapeliouk) shocked the world in its savage barbarity, as millions of people saw televised images of the carnage. The camps themselves were already devastated by weeks of fighting, and were a "scarcely inhabitable"[120] ruin of huts to which many homeless Palestinians had returned over the summer out of desperation. The exact figure will never be determined because in addition to the approximately 1,000 people who were buried in communal graves by the ICRC or in the cemeteries of Beirut by members of their families, a large number of corpses were buried under bulldozed buildings by

---

[119]Fisk, op. cit., at p. 359.
[120] *Ibid.*, pp. 403-405.

the militia themselves.[121]   Also, throughout the 17th and 18th of September, hundreds of civilians were carried away alive in trucks as they passed through Israeli checkpoints towards unknown destinations, never to return.

**Plaintiff John Doe (XVII)**, a resident alien and soon to be U.S. citizen, was twenty-one years old at the time of the massacre, and had been living in the Sabra camp with relatives for a short period of time.  That afternoon, he witnessed an initial air attack by helicopters on the camp that came from the direction of a nearby football stadium.  He states that approximately five minutes later a rocket or a missile tore into the building where he was located although he cannot say with any degree of certainty whether the building was hit by air or ground fire. While he was watching a helicopter with his two cousins and a fifteen year old neighbor from a second story window, an explosion tore the head off the older boy; John Doe (XVII) and his cousins were also wounded, one cousin very seriously with extensive wounds to the abdomen, and they jumped out the window of the building and ran to safety.  John Doe (XVII) had many shrapnel wounds in this limbs and feet.  Down in the street, he immediately saw militia men running and shooting everywhere, killing the Palestinians wherever they found them— Palestinians whom he knew as neighbors.  With three others, he made his way by dark to the camp dump and hid there among the debris.  While hiding in the dump

---

[121] Some twenty years later this practice has become standard fare for the IDF, most notably during the siege of the

for more than twenty-four hours, he was able to watch the carnage as the Phalange militia killed with abandon.  John Doe (XVII), these twenty years later, still sees those corpse-strewn alleys with the clarity of one who can never forget such horror.  He specifically recalls today the pregnant women slaughtered like animals. He also recalls that many of the marauding troops wore Israeli uniforms; this curious fact has been recorded by others,[122] and it is known that Israel supplied everything from boots to uniforms to rifles to the Christian forces in Beirut.  But John Doe (XVII) mentions that at least some of the soldiers wearing Israeli uniforms were speaking Hebrew, a language he is very familiar with from his childhood in Jerusalem.  Following the withdrawal of the Phalangists and their Israeli protectors, other survivors of the bloodbath took John Doe (XVII) to a nearby hospital where he was admitted and received treatment for some three weeks for his various injuries.  (See annexed hereto as Exhibit S affidavit of John Doe (XVII)].

Today, John Doe (XVII) continues to carry the physical and emotional scars that he and countless others[123] suffered under the gaze of Ariel Sharon during the fateful period of the 16th through the 18th of September of 1982: they remain vivid and clear, as if inflicted yesterday; they stand as a stark and ever present reminder

---

Jenin refugee camp, in the West Bank, during Operation "Defensive Shield."
[122] See, for example, Fisk, *op cit.*, at p. 369.

of the horror he experienced as a young man in two refugee camps known as Sabra/Shatila while the world watched, largely in silence.

On September 19, 1982 the United Nations Security Council condemned the massacre with Resolution 521. This condemnation was followed by a General Assembly resolution on December 16, 1982 qualifying the massacre as an "act of genocide."

After 400,000 people took to the streets in protest over the massacre, the Israeli parliament (Knesset) named a commission of inquiry presided over by Mr. Yitzhak Kahan in September 1983. Israel's role in the massacre has never been in doubt, and was demonstrated by abundant evidence at the Kahan Commission when the Israeli judiciary examined the IDF's complicity in the atrocities at Sabra and Shatila. As Israeli historian Benny Morris recounts regarding evidence adduced at the Commission

> At. 6:50 [Gen.] Yaron's aides monitored an exchange between Khobeika and one of his subordinates, who asked what to do with fifty women and children he had rounded up. Khobeika: "That's the last time you ask me. You know what to do." . . . . The next morning, reports continued to filter in to the IDF headquarters. A tank company commander, looking into one of the camps, noticed Phalangists leading away some Palestinians. He then heard shots and saw the Phalangists return without their captives. That afternoon, he saw Phalangists shooting a group of women and children. Ze'ev Schiff, the military correspondent of *Ha'Aretz*, spoke with officers in

---

[123] For additional first hand accounts of the events at Sabra and Shatila during the period of September 16-18 of 1982 see Appendix B containing the personal recollections of more than two dozen survivors of the massacre who are plaintiffs and witnesses in the suit pending against Ariel Sharon in Belgium.

general staff headquarters in Tel Aviv and, worried, contacted Communications Minister Zippori. In turn Zippori contacted Foreign Minister Shamir—but Shamir did nothing. Yaron, though sensing that something was wrong, allowed a second, fresh force of Phalangists, led by the [Lebanese Forces] chief of operations, Fuad Abu Nader, into the camps to complete the "cleanup."[124]

Noam Chomsky, writing in *Fateful Triangle*, his study of Israeli-U.S. relations against the background of the Lebanon war, cites Professor Yeshayahu Leibovitz of the Hebrew University, and the editor of the Encyclopedia Hebraica, as drawing the only fit moral conclusion about Israel's culpability:

> . . . the massacre was done by us. The Phalangists are our mercenaries, exactly as the Ukrainians and the Croatians and the Slovakians were the mercenaries of Hitler, who organized them as soldiers to do the work for him. Even so we have organized the assassins in Lebanon in order to murder the Palestinians.[125]

In spite of the judicial limitations of the Kahn commission's mandate which was purely political in nature and the total absence of the voices and demands of the victims themselves, the Commission concluded that while Phalangist leader Elie Hobeika bore direct command responsibility for what had occurred in the camps,[126] the Minster of Defense, Ariel Sharon was personally culpable as well for

---

[124] Morris, *op cit.*, p. 541-2.

[125] Chomsky, *op cit.*, p. 386-7.

[126] On June 24, 2002, shortly after the final pretrial hearing before the Belgian court that was handling the case against Ariel Sharon, Hobeika and five others were killed in a mysterious car bombing in Beirut. Hobeika's assassination followed a widely reported interview with the English language newspaper, *The Daily Star*, in which he indicated that he possessed new taped evidence that would further implicate Sharon "more directly" in the massacres. Hobeika's claim was reiterated soon thereafter during a meeting he held with two Belgian Senators, including Sen. Josy Dube, when he noted his willingness to testify against Ariel Sharon at his up-coming trial.

the massacre at Sabra and Shatila. With regard to Sharon's responsibility the Commission specifically found:

> that responsibility is to be imputed to the minister of defense for having disregarded the danger of acts of vengeance and bloodshed by the Phalangists against the population of the refugee camps, and having failed to take this danger into account when he decided to have the Phalangists to enter the camp . . . . Responsibility is to be imputed to the minister of defense for not ordering appropriate measures for preventing or reducing the danger of a massacre as a condition for the Phalangists entry into the camps. These blunders constitute the non-fulfillment of a duty with which the defense minister was charged.

Upon the insistence of the Commission, Mr. Sharon resigned from his post of Minister of Defense.

---

*Agence France Press*, 25 January, 2002. After his murder, Hobeika was described by the legal team prosecuting Sharon as not just a "key protagonist" in the events, but one who had offered to assist them in the upcoming trial.

## XVII. CONCLUSION

The Plaintiffs in this case collectively present a profile of the American immigrant or child of immigrants who has embraced this country to partake in its freedoms and contribute to its strength. Yet simultaneously, each carries within himself the memory of dark days in their homeland, or family tragedy bound up with history, or worse still, the memory of sheer terror. Many of these Americans share the common burden of the Palestinian experience of statelessness, disenfranchisement and subjugation. Many of the Plaintiffs spent considerable time reinventing themselves as Americans, succeeding in business, achieving material success and personal triumph. All kept their ties to their troubled homeland intact and vital, and some of the Plaintiffs even took some of the American experience and exported it to the place of their birth.

Yet while their individual achievements in becoming Americans, raising families and contributing to this country's richness is testament to the opportunity that is this country's chief national value, they need only travel home to their ancestral Palestinian farms or villages or cities to find themselves stripped of all dignity and humanity at the hands of an occupation force that sees them collectively as little more than fodder for its machinery of war.

The plaintiffs in this case were not and are not militants or terrorists, labels which Israel and others all too often and easily assign to their victims out of a

desperate need to dehumanize them; to justify the crimes which they perpetrate

against them no matter what their age, their gender, their position, their beliefs-

their individual conduct. Most of the victims in this case are American citizens.

Several are resident aliens. None of them or the persons they survive perpetrated

any crime, committed any wrongdoing, or posed any threat before they were killed,

injured or tortured; before their homes were bombed, their businesses razed and

their property taken; before their lives were forevermore torn asunder, if not

destroyed. They are young, they are old. They are male, they are female. They

are mothers, they are fathers; they are sons they are daughters. They are students,

workers, professionals and farmers. They are pious, they are secular. They are

urban, they are rural. They have lived different lives in different places in different

times. Although they are as different as different can be, one thread binds their

common experience and thus their common suffering-they are Palestinian. These

Palestinian-Americans seek nothing more of this Court than that which they have

been denied for more than five decades in their ancestral homeland— justice.

**STANLEY L. COHEN**, Esq., an attorney admitted to practice as such, hereby affirms under pain and penalty of perjury and pursuant to the Federal Rules of Civil Procedure that the herein information is true based upon personal knowledge or upon information and belief, the sources being investigation of the facts and circumstances related to the instant complaint and discussions had with plaintiffs and witnesses to the events complained of.

Dated: New York, New York
on this     day of July, 2002

/Stanley L. Cohen, Esq.
Attorney for Plaintiffs herein
351 Broadway, Suite 300
New York, N.Y. 10013
(212)-979-7572