# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

JOHN DOE, et.al.,

      Plaintiffs,                No. 1:02 CV 01431 (JDB)

      v.

STATE OF ISRAEL, et.al.,

      and

THE BOEING COMPANY, MCDONNELL DOUGLAS HELICOPTER SYSTEMS, TEXTRON, BELL HELLICOPTER, COLT'S MANUFACTURING COMPANY, INC., GLEN E. HESS, as former Vice-President of the Boeing Company and current President and Chief Operating Officer of BELL HELLICOPTER, JOHN R. MURPHY, Chairman and Chief Executive Officer of BELL HELLICOPTER, LEWIS B. CAMPBELL, Chairman and Chief Executive Officer of TEXTRON, PHILLIP CONDIT, Chief Executive Officer of BOEING COMPANY, LT. GENERAL (Ret.) WILLIAM M. KEYS, President and Chief Executive Officer of COLT'S MANUFACTURING COMPANY (collectively the "Arms Defendants")

      Defendants.

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO ARMS DEFENDANTS' MOTION TO DISMISS

Stanley L. Cohen, Esq.
Attorney for Plaintiffs
*Pro Hac Vice*
119 Avenue D
New York, New York 10009

Mahar Hanania, Esq.
Local counsel
1510 H Street NW, Suite 20
Washington, DC 20005
Washington, DC Bar No.  464766

The motion to dismiss brought by The Boeing Company, McDonnell Douglas Helicopter Systems, Textron, Bell Helicopter, Colt's Manufacturing Company, Inc., Glen E. Hess, as former Vice-President of the Boeing Company and current President and Chief Operating Officer of Bell Helicopter, John R. Murphy, Chairman and Chief Executive Officer of Bell Helicopter, Lewis B. Campbell, Chairman and Chief Executive Officer of Textron, Phillip Condit, Chief Executive Officer of Boeing Company, Lt. General (Ret.) William M. Keys, President and Chief Executive Officer of Colt's Manufacturing Company (collectively the "Arms Defendants" or "Arms Manufacturers") purposefully attempts to obfuscate and twist what are, in essence, very straightforward and manageable questions posed by Plaintiffs.  Did the defendant Arms Manufacturers continue to sell weapons to Israel when they knew that Israel used those weapons contrary to well established norms of international and U.S. law?  Did the Arms Manufacturers actively participate with Israel to violate international law and thereby cause harm to Plaintiffs?

Contrary to defendants' suggestion, the Court need not decide whether Israel should be a U.S. ally or evaluate whether a particular weapon ought to have been financed and sold or whether that weapon belongs on the U.S. Munitions List.  Nor must the Court concern itself with secret intelligence

used by the government to support its decisions.  The Court instead must determine whether the acts complained of violate well established norms of international law and, if so, the consequences under the ATCA and TVPA and U.S. tort law.

Although unspoken in their motion, the munitions manufacturers appear to suggest that the issue of arms sales to foreign governments is too complicated and beyond the competence of the Court.  Such an argument ignores the point – Plaintiffs are not challenging how or why a particular weapon or weapon system was chosen.  Nor do Plaintiffs claim that the munitions manufacturers failed to comply with the labyrinth of arms procurement regulations cited in their brief.  Plaintiffs ask a much different and more compelling question – what culpability do the Arms Manufacturers have when they continue to sell weapons to a country that uses them against an ethnic minority civilian population, many of whom who are American citizens.

Defendants, quite understandably, do not wish the Court to confront this question.  Rather, they say the question is too complicated, too unmanageable for the Court to handle and if the Court rules a particular way it would embarrass and insult the President and hold him up to international

ridicule.  The question is straightforward – the answer may not be easy or obvious - but the question is manageable.

## STATEMENT OF FACTS

This is an action brought pursuant to the Alien Tort Claims Act ("ATCA") (28 U.S.C. § 1350) and the Torture Victim Protection Act (28 U.S.C. § 1605) ("TVPA") for compensatory and punitive damages for wrongful death, personal injuries including psychological trauma, and property damage inflicted directly by the State of Israel, Ariel Sharon and other senior members of the Israeli military, security and police hierarchy; and financed facilitated, aided and abetted by several international arms manufacturers including Boeing and Colt; and Halamish/Neve Tzuf, a Jewish settlement that has terrorized its Palestinian neighbors and illegally confiscated their lands, all the while being funded by American religious and charitable groups.

Plaintiffs, many U.S. citizens, seek damages for a decades-long pattern of extra-judicial killing; torture, cruel, inhuman and degrading treatment, arbitrary arrest, illegal detention and other violations of customary international law and the laws of the United States.  Plaintiffs allege that defendants, have entered into an enterprise and civil conspiracy to violate

the rights of Plaintiffs protected by international law and the laws of the United States.

Specifically, Plaintiffs allege that the Arms Defendants are culpable for Israel's violations of international law because they actively participated in the development and modification of weapons systems to be used specifically against the civilian Palestinian population.  Additionally, the Arms Defendants are alleged to be culpable for Plaintiffs' injuries because they continued to provide weapons to Israel with the knowledge that the weapons were being used by Israel in violation of international law.

## STANDARD OF REVIEW

Because the case is before the Court on Motions to Dismiss the Complaint at the threshold of litigation, the Court need only determine whether the plaintiffs have stated a justiciable claim for relief which falls within the jurisdiction of the Court. In so doing, the Court must proceed under the settled rule for assessing the propriety of dismissal under Rule 12(b) of the Federal Rules of Civil Procedure. Because there has been neither fact-findings by the Court nor stipulation of undisputed facts by the parties, the Court must accept as true all of the material allegations in the Plaintiffs' Complaint. Dismissal is proper only when "it appears *beyond doubt* that the plaintiff can prove *no set of facts* in support of his claim which

would entitle him to relief." Schuler v. United States, 617 F. 2d 605, 608

(D.C. Cir. 1979) (*quoting Conley v. Gibson,* 355 U.S. 41, 45-46, 2 L. Ed. 2d.

80, 78 S. Ct. 99 (1957)) (emphasis added); Shear v. National Rifle Ass'n 606

F. 2d 1251, 1253 (D.C. Cir. 1979).

I.    **PLAINTIFFS' CLAIMS AGAINST THE ARMS
      MANUFACTURERS ARE JUSTICIABLE** [1]

a.    THE CLAIMS

Plaintiffs' claims against the Arms Manufacturers fall into two

categories, neither of which raises a political question barring review by the

Court.  First, Plaintiffs allege that the arms manufacturers are culpable

pursuant to the Alien Tort Claims and Torture Victim Protection Acts for the

acts of Israel, and its government officials, because the Arms Manufacturers

were active participants in those acts by modifying the weapons specifically

for urban assault, providing training to Israeli forces in the use of its

weapons and by continuing to provide weapons to Israel with the knowledge

that the weapons would be used against a civilian population in violation of

international law.  Second, Plaintiffs allege that the Arms Manufacturers are

---

[1] The issues raised in footnote 2 of the Arms Defendants' Motion are curious.  Other than preserving them for appeal, it is unclear why the Arms Defendants would reserve the right to raise further issues at a later date.  Defendants have chosen to make this 12(b) motion and are, of course, required to include all issues that they believe argue for dismissal.  In any event, the issues raised have no merit.  Plaintiffs have standing to allege tort claims against all of the Arms Defendants.  Taken as true, as they must be at this juncture in the litigation, Plaintiffs claim that the Arms Manufacturers' culpable conduct is responsible for their injuries.  At this stage, nothing more is required.

culpable as coconspirators, aiders and abettors, and facilitators for the common law torts committed against Plaintiffs by the Israeli defendants. Plaintiffs seek compensatory and punitive damages against the Arms Manufacturers.  As part of the remedy for the Federal Defendants' failure to comply with the notice requirements of the AECA and FAA, Plaintiffs seek to enjoin further transfers of weapons to Israel until the required notice to Congress is provided by the President and Secretary of State.

Contrary to the Arms Defendants "parade of horribles" Plaintiffs' claims do not require the Court to become entangled in the policy choices made by the political branches.  Nor does resolution of those claims require the Court to divine unmanageable legal norms.  To resolve Plaintiffs' claims the Court will be required to make two decisions:  did Israel's conduct toward Plaintiffs violate nondelegable norms of international law?  If yes, did the Arms Manufacturers commit culpable conduct by continuing to sell Israel weapons with the knowledge that those weapons were routinely and deliberately being used by Israel against a civilian, noncombatant population.

Plaintiffs contend that the Arms Manufacturers not only knew of Israel's intended misuse of their weapons but, more than that, the Arms Manufacturers actively participated in the design and modification of their

weapons systems to make them more effective against the civilian
population of Palestine.(Complaint, paragraphs 45,46,47,48,
56,57,58,59,63,65,66,67).

Rather than assert defenses to these questions, the Arms
Manufacturers attempt to wrap themselves in the dual cloaks of official U.S.
and Israeli policy.  They should find no comfort there.  Plaintiffs need only
allege and ultimately prove that the Arms Manufacturers are culpable with
Israel in its misuse of U.S. – provided weapons in violation of international
law and that misuse was the proximate cause of Plaintiffs' injuries.  The
Arms Manufacturers, like the rest of us, are responsible for the foreseeable
consequences of their acts.

Contrary to the Arms Manufacturers contentions, the Court need not
entangle itself with Israel's policy.  Why Israel committed the acts
complained of is wholly irrelevant because they are violations of
nondelegable, definable norms of international law applicable to all
countries.  As such, under the accepted principles of the law of nations,
Israel's acts are never acceptable for legitimate internal security or self -
defense or any other purpose.

Nor will the court be required to evaluate whether Israel should be a
U.S. ally, whether funds should be appropriated by Congress for Israel or

even whether specific weapons systems are appropriate.  None of those

policy determinations are relevant to the questions – did Israel use the

weapons in violation of international law; did the Arms Manufacturers know

that Israel was violating international law, was the harm to Plaintiffs a

foreseeable consequence of continuing to sell weapons to Israel with the

knowledge that they would be misused?

b.     PLAINTIFFS' CLAIMS ARE NOT BARRED BY THE POLITICAL
       QUESTION DOCTRINE

       The Supreme Court articulated the definition of a "political question"

in *Baker v. Carr*, 369 U.S. 186, 82 S. Ct. 691, 7 L.Ed. 2d 663 (1969) as an

issue arising from a case involving one or more of the following factors:

> a textually demonstrable constitutional commitment of the issue to a
> coordinate political department; or a lack of judicially discoverable
> and manageable standards for resolving it; or the impossibility of
> deciding without an initial policy determination of a kind clearly for
> nonjudicial discretion; or the impossibility of a court's undertaking
> independent resolution with expressing lack of the respect due
> coordinate branches of government; or an unusual need for
> unquestioning adherence to a political decision already made; or the
> potentiality of embarrassment from multifarious pronouncements by
> various departments on one question.

Id. at 217.

There has been wide debate over the proper use of the doctrine in cases dealing with "foreign relations".[2]  While the Supreme Court in *Baker v. Carr* noted a variety of foreign affairs issues that would raise nonjusticiable political questions, it also established that it would be error to suppose that "every case or controversy which touches foreign relations lies beyond judicial cognizance." 369 U.S. at 217.  However, the line between a "political question" and a case or controversy merely touching on foreign relations has never been clearly identified.

At its base, the political question doctrine reflects a concern for the separation of powers. It recognizes that Article III courts should refrain from participating in those areas that are either committed by the text of the Constitution to another branch of government, or beyond judicial expertise. Necessarily, therefore, the doctrine applies only if the dispute is "committed

---

[2] See, K. Lee Boyd, Are Human Rights Political Questions ?, 53 Rutgers L. Rev. 277 (Winter 2001); Thomas M. Franck, Political Questions/Judicial Answers: Does the Rule of Law Apply to Foreign Affairs? 97-106 (1992) (discussing judicial abdication regarding foreign affairs under the act of state and sovereign immunity rules, and the political branch's efforts to compel judiciary resolution on such claims).  Discussing the act of state doctrine, Professor Franck notes that the "reasons for abdication are virtually identical with those that inform the political-question doctrine."  Franck, supra, at 99.  Professor Franck argues that the political question doctrine is "incompatible with American constitutional theory" and its application debunks the practical necessity arguments that underlie the doctrine's reasoning; Anne-Marie Slaughter Burley, Are Foreign Affairs Different? 106 Harv. L. Rev. 1980 (June 1993) (reviewing Thomas M. Franck, Political Questions/Judicial Answers: Does the Rule of Law Apply to Foreign Affairs? (1992); Felix Frankfurter, John Marshall and the Judicial Function, 69 Harv. L. Rev. 217, 227-28 (1955) (noting that the judiciary will have to discern between "political" cases and those involving liberties they are charged with enforcing as judges); Louis Henkin, Is There a "Political Question": A Response, 101 Harv. L. Rev. 524, 529, 625 (Dec. 1987) (arguing that there is no indication that "Constitutional framers intended to close our courts")

by the text of the Constitution" to one of the political branches of

government, requires that the court "move beyond areas of judicial

expertise," or raises "prudential considerations [that] counsel against judicial

intervention." *Ramirez de Arellano v. Weinberge*r, 745 F.2d 1500, 1511

(D.C. Cir. 1984)(*en ban*c)(*quoting Goldwater v. Carte*r, 444 U.S. 996, 998,

100 S. Ct. 533, 62 L. Ed. 2d 428 (1979)(Powell, J., concurring), *vacated and

remanded on other grounds, Weinberger v. Ramirez de Arellan*o, 471 U.S.

1113 (1985).  Plaintiffs' claims, properly understood, implicate none of the

concerns that counsel against a judicial role.

In the area of foreign affairs, some broad challenges to the Executive's

conducting of foreign relations have been found nonjusticiable because

formulation of foreign policy is constitutionally committed to the political

branches. In *Johnson v. Eisentrager*, 339 U.S. 763, 789, 70 S. Ct 936, 94 L.

Ed 1255 (1950) for example, the Supreme Court refused to adjudicate claims

by enemy aliens who were convicted of violating laws of war in China after

Germany had surrendered. The aliens' claims were found to be committed to

resolution by the political branches because they fundamentally challenged

the propriety of United States military activities in China. There, the Court

stated: "It is not the function of the Judiciary to entertain private litigation . .

. which challenges the legality, the wisdom, or the propriety of the

Commander-in-Chief in sending our armed forces abroad or to any

particular region."

Not every issue related to foreign relations, however, is

constitutionally committed for resolution by the Executive. Issues which are

not sweeping challenges to the Executive's foreign policy typically are

adjudicated by the courts because they do not involve judicial usurpation of

the Executive's constitutional powers to manage foreign affairs.

See, *Ramirez*, 745 F.2d 1500.


**i.     The Issues Raised in the Complaint Are Not Textually Committed
to the Executive Branch**

First, and most importantly, the issues raised by this case are not

textually committed by the Constitution to the Executive Branch.

Defendants mischaracterize the claims raised by Plaintiffs as a broad assault

on the war-making and foreign relations powers of the Executive Branch.

But the complaint does not seek judicial review of the President's authority

to wage war or conduct foreign policy. The Complaint does not pose a

"sweeping challenge" to Executive Branch policy decisions. *Ramirez*, 745

F.2d at 1512. Instead, it is one particular application of that policy that is at

issue: whether the President must notify Congress if Israel "may" have

violated its bilateral agreement with the U.S.  Indeed, as noted, the questions concerning the Arms Manufacturers have little to do with foreign policy, per se, and are resolved by application of international law and U.S. tort law.

To be sure, Articles I and II of the Constitution confer the power to wage war, regulate the military and conduct foreign policy to the Executive and Legislative branches. But that observation establishes only that challenges to the Executive's power to prosecute armed hostilities may present political questions. The multiple cases cited by Defendants concern challenges to the Executive Branch's authority to commit military forces, direct their combat and training operations, and fund their activities.

Courts have often intervened – even during times of armed conflict – to protect individual rights, particularly where the judicial intervention does not infringe upon the manner in which the military is conducting its overseas operations. Indeed, in the midst of the Second World War, the Supreme Court heard the complaints of individual alien enemies challenging the legal basis for their detention and trial. *Ex Parte Quirin,* 317 U.S. 1 (1942); *see also, Ramirez*, 745 F.2d at 1512 (plaintiff's suit under takings clause seeking relief for damages by military to ranch in Honduras did not raise political question; rather, takings clause presents "paradigmatic issue for the judiciary.")

For the same reason, the Arms Manufacturers reliance on cases involving damages sustained during military exercises is misplaced. These cases involved challenges either to internal military affairs, *see, e.g., Aktepe v. United State*s, 105 F.3d 1404 (11th Cir. 1997)(foreign navy personnel participating in joint exercises with U.S. Navy could not recover for injuries caused during exercise), or decisions involving broad governmental policies. *See, e.g., Industria Panificadora S.A. v. United State*s, 763 F. Supp. 1154, 1161 (D.D.C. 1991)(allegation that U.S. did not provide sufficient population control during military incursion in Panama raised political question concerning combat strategy); *In re Korean Air Lines Disaster of Sept. 1, 198*3, 597 F. Supp. 613, 616 (S.D.N.Y. 1983)(tort suit for accidental downing of civilian aircraft by naval ship presented political question where alleged tortious conduct involved inquiry into reasonableness of military operations near other countries); *Greenham Women Against Cruise Missile*s, 591 F. Supp. 1332, 1337-38 (S.D.N.Y. 1984). (alleged harm caused by increased risk of war due to presence of cruise missile in foreign country constituted a political question).

**ii.**    **The Issues Are Not Beyond Judicial Expertise**

Second, nothing in this case calls upon the Court to "move beyond" the "areas of judicial expertise." Respondents attempt to obscure this by

suggesting the Executive bears the primary responsibility for the conduct of the nation's foreign affairs. This argument, however, cuts too broadly, for it amounts to the suggestion specifically rejected in *Bake*r: "it is error to suppose that every case or controversy which touches foreign relations lies beyond the judicial cognizance." *Baker v. Car*r, 369 U.S. at 212; *cf. also Japan Whaling Association v. American Cetacean Societ*y, 478 U.S. 221, 230 (1986) (interpretation of treaties and executive agreements is within judicial authority).

The suggestion that the case presents no "judicially discoverable and manageable standards" is similarly incorrect. *See Linder v. Calero-Portocarrer*o, 963 F.2d 332,337 (11th Cir. 1992) (tort claims arising out of U.S. funded war justiciable, given that "the common law of tort provides clear and well-settled rules on which the district court can easily rely"). Reference to international law does not render a claim nonjusticiable. *Kadic v. Karadzic,* 70 F.3d 232, 249-50 (2d Cir. 1995)("[U]niversally recognized norms of international law provide judicially discoverable and manageable standards for adjudicating lawsuits of this nature."). *United States v. Norieg*a, 808 F. Supp. 791, 796 (S.D. Fla. 1992)(determination of federal prisoner's prisoner of war status under the Geneva Convention did not present a political question); *United States v.Dugga*n, 743 F.2d 59 (2d Cir.

15

1984)(interpreting statute dealing with foreign intelligence and terrorism did

not embroil court in political question).

The Supreme Court has also demonstrated a willingness to interpret

and apply international law, even when doing so involves matters relating to

foreign policy or the war power. *See, e.g., The Paquette Haban*a, 175 U.S.

677 (1900) (determining that, under international law, Spanish fishing

vessels seized during wartime were noncombatants).

It is now beyond peradventure that the acts Plaintiffs allege against

Defendants violate international law.  As stated by several international law

scholars in *Ortiz v. Gramajo:*.

> Torture, cruel, inhuman or degrading treatment, arbitrary detention,
> summary execution and disappearance violate universal , obligatory,
> and definable norms of international law.  These acts are both
> condemned in and defined by international agreements and state
> pronouncements.  No state claims the right to cause, encourage, or
> condone torture, cruel, inhuman, or degrading treatment, arbitrary
> detention, summary execution or disappearance.  There is an
> international consensus that certain definable acts constitute torture,
> cruel, inhuman, or degrading treatment, arbitrary detention, summary
> execution or disappearance.[3]

The international law prohibitions against torture; cruel, inhuman or

degrading treatment; summary execution; arbitrary detention; and collective

---

[3] Affidavit of International Law Scholars, submitted in Ortiz v. Gramajo, (D. Mass.) consolidated for
decision sub norm. Xuncax v. Gramajo, 886 F. Supp. 162 (D. Mass. 1995). Reprinted at Appendix I in B.
Stephens and M. Ratner, International Human Rights Litigation in U.S. Court (Transnational Publ. 1996)

punishment are universal, obligatory and definable.[4]  The United States

recognizes these universal international norms.[5]

International law prohibits collective punishment by an occupying

force.  Article 50 of the Hague Regulations prohibits collective punishment.

"No general penalty, pecuniary or otherwise, shall be inflicted upon the

population on account of the acts of individuals for which they cannot be

regarded as jointly and severally responsible."  The Fourth Geneva

Convention[6] is equally clear on this issue:

> Article 33.  No protected person may be punished for an
> offence he or she has not personally committed.  Collective
> penalties and likewise all measures of intimidation or of
> terrorism are prohibited…Reprisals against protected persons
> and their property are prohibited.

---

[4] See, e.g., Universal Declaration of Human Rights, art. 5, adopted Dec. 10, 1948, G.A. Res. 217A, U.N.
Doc. A/811 at 71 (1948); International Covenant on Civil and Political Rights, art. 7, adopted Dec. 16,
1966, G.A. Res. 2200, 21 U.N. GAOR Supp. (No. 16) at 52, U.N. Doc. A/6316 (1966), 999 U.N.T.S. 171
(entered into force Mar. 23, 1976); American Convention on Human Rights, art. 5(2), opened for signature
Nov. 22, 1969, O.A.S.T.S.No. 36 at 1, O.A.S. Doc. OEA/Ser. L/V/11.50, doc. 6 at 27 (1980), reprinted in 9
I.L.M. 673 (1970)(entered into force July 18, 1978); European Convention for the Protection of Human
Rights and Fundamental Freedoms, art. 3, opened for signature Nov. 4, 1950, 213 U.N.T.S. 222 (entered
ino force Sept. 3, 1953); African Charter on human and Peoples' Rights, art. 5, adopted June 27, 1981,
O.A.U. Doc. CAB/LEG/67/3 Rev. 5 (entered into force Oct. 21, 1986), reprinted in 21 I.L.M. 58 (1982);
Declaration on the Protection of All Persons from Being Subjected to Torture and Other Cruel, Inhuman or
Degrading Treatment or Punishment, art. 2, adopted Dec. 9, 1975, G.A. Res. 3452, 30 U.An. GAOR Supp.
(No.34) at 91, U.N. Doc. A/1034 (1975); and Convention Against Torture and Other Cruel, Inhuman or
Degrading Treatment or Punishment, art. 2, adopted Dec. 10, 1984, G.A. Res 46, 39 U.N. GAOR Supp.
(No.51) at 197, U.N. Doc. A/39/51 (1984) (entered into force June 26, 1987).  Body of Principles for the
Protection of All Persons under Any Form of Detention or Imprisonment, Principles 1 & 6, G.A. Res
43/173, 43 U.N. GAOR Supp. (No. 49), U.N. Doc A/43/49, at 297 (1988) J.H. Burgers & H. Danelius,
supra note 7, at 149.
[5] See Filartiga v. Pena-Irala, 630 F.2d 876, 878 (2d Cir. 1980) (torture, summary execution); Forti v.
Suarez-Mason, 672 F.Supp. 1531, 1541 (N.D.Cal. 1987 (torture), on reconsideration, 694 F. Supp. 707
(N.D. Cal. 1988) (summary execution, disappearance).  Cf. Tel-Oren v. Libyan Arab Republic, 726 F.2d
774 (D.C. Cir. 1984), cert. denied, 470 U.S. 1003 (1985) (Edwards J., concurring)
[6] The Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12, 1949.  6 U.S.T.
3516, 75 U.N.T.S. 287.

> Article 53.  Any destruction by the Occupying Power of real or
> personal property belonging individually or collectively to
> private persons, or to the State, or to other public authorities, or
> to social or cooperative organizations, is prohibited, except
> where such destruction is rendered absolutely necessary by
> military operations.

Protocol I to the Geneva Conventions even more explicitly prohibits such collective punishment.  Article 51 codified the established rule that civilians must not form the object of attack.[7]  Furthermore, acts which are intended to spread terror among the civilian population, and indiscriminate attacks "those which are not directed at a specific military objective" are prohibited.

Just as there is universal international agreement prohibiting torture; cruel, inhuman and degrading treatment; summary execution and extra judicial killing; arbitrary detention; and collective punishment, so is there agreement that Israel's response to the Al Aqsa Intifada has systematically violated international law.

Since the beginning of the Al Aqsa Intifada, international organizations that traditionally investigate and report on violations of international human rights and humanitarian laws have visited Israel, the West Bank and Gaza Strip to independently assess the conduct of the parties

---

[7] Protocol on the Protection of Victims of International Armed Conflicts, June 8, 1977, 1977 U.N. Jurid. Y.B. 95, 16 I.L.M. 1391; *see also* I. Detter, *The Law of War* 288 (Cambridge U. Press, 2nd ed. 2000).

to this conflict.  These organizations include Amnesty International, Human

Rights Watch, Physicians for Human Rights/USA, and the United Nations

High Commission for Human Rights.[8]  All of them have condemned Israel

for its excessive and indiscriminate use of force against Palestinian citizens

and civilian areas,[9] affirming the conclusions made by human rights and

humanitarian agencies based in the occupied Palestinian territories and

Israel.[10]  The United Nations Human Rights Inquiry Commission, charged

with investigating the conflict, stated in its March 16, 2001 report:

---

[8] The reports of these organizations are available at: Amnesty International, at  www.amnesty
.org.Israel; Human Rights Watch, www.hrg.org/reports/2000/Israel; Physicians for Human
Rights/USA, www.phrusa.org; the United Nations High commission for Human Rights,
www.unhchr.ch, (E/CN.4/2001/114).

[9] As reported by UN High Commissioner, Mary Robinson, "a wide range of observers, including
United Nations representatives, expressed the strong view that the very high number of casualties,
combined with the nature of the injuries being sustained, including by young people, could only
be consistent with a military response which was both excessive and inappropriate*." Report of
the High Commissioner on Her Visit to the Occupied Palestinian Territories, Israel, Egypt and
Jordan* (8-16 November 2000) U.N. Commission on Human Rights, 57th Sess., Provisional
Agenda Items 4 and 8, at ¶26, U.N. Doc. E/CN,4/2001/114 (2000), available at www.unhchr.ch,
*("Report of the High Commissioner").*

[10] Numerous Palestinian-based organizations, such as the Palestinian Human Rights Monitoring
Group, www.phrmg.org, and the Israeli-based organization, B'Tselem, www.btselem.org, have
condemned Israel's indiscriminate and excessive use of force during the Al Aqsa Intifada.  The
following international resolutions and reports have additionally condemned Israel's aggression
and failure to follow international law: U.N. SCOR, 420, 5th mtg. At 2,
U.N..Doc.S/RES/1322(2000), *available* at
http://www.un.org/Docs/scres/2000/res1322e.pdf;*Grave and massive violations of the human
rights of the Palestinian people by Israel,* U.N. Commission on Human Rights, Resolution S-5/1,
5th Special Sess., Agenda Item 3, at 1, 2, 4, and 5, U.N. Doc. E/CN.4/RES/S-5/1(2000), *available*
at www.unhchr.ch; *Question of the Violation of Human Rights in the Occupied Arab Territories,
including Palestine: Report of the Human Rights Inquiry Commission Established Pursuant to
Commission Resolution S-5/1 of 19 October 2000,* U.N. commission on Human Rights, 57th Sess.,
Provisional Agenda Item 8, at 31, U.N. Doc. E/CN4/2001/121(2001), *available* at
www.unhchr.ch, *("Report of the Human Rights Inquiry commission"); Report of the Committee
on the Exercise of the Inalienable Rights of the Palestinian People,* U.N. GAOR, 55th Ess., Supp.
No. 35, at 18, U.N. Doc.A/55/35(2000), *available* at
http://www.un.org/documents/ga/docs/55/a5535/pdf; and *Mission Report on Israel's Violations of*

It seems incontestable that the Israeli Security Forces…have used excessive and disproportional force from the outset of the (Al Aqsa Intifada), whether their conduct is measured by the standards of international humanitarian law applicable to armed conflict, the codes of conduct applicable to policing in situations not amounting to armed conflict or by the open-fire regulations binding upon members of the Israeli Security Forces.[11]

The National Lawyers Guild Middle East Delegation made the following findings in April, 2001:

Since September 29, 2000, when demonstrations against the Israeli occupation of the West Bank and Gaza broke out, the number of Palestinians killed and wounded by the Israeli security forces keeps escalating.  Four months after the start of the Al Aqsa Intifada, Israeli security forces had wounded more than 10,000 Palestinians, and killed 357 in the West Bank and Gaza Strip.[12]  As of April 2, 2001, 11,142 Palestinians have been injured and 426 killed.  Eighty-nine percent of those killed were civilians, and about one-third were children 18 years of age or younger.[13]

Of those injured, 36.3% in the West Bank and 63.6% in the Gaza Strip were less than 20 years old.[14]  Human Rights Watch, corroborating the findings of Israeli and Palestinian human rights organizations, concluded

---

*Human Rights in the Palestinian Territories Occupied Since 1967, submitted by Mr. Giorgio Giacomelli, Special Rapporteur,* U.N. Commission on Human Rights, 5th Special Sess., Agenda Item 3, U.N. Doc E/CN.4/S-5/3(2000), *available* at www.unhchr.ch.

[11] *Report of the Human Rights Inquiry Commission, supra* note 39, at 31.  The Human Rights Inquiry Commission was established on January 2, 2001 with the following members: Dr. Kamal Hossain, former Prime Minister of Bangladesh, Professor Richard Falk, professor of international law at Princeton University; and Professor John Dugard of South Africa, lecturer at Leiden University in the Netherlands.

[12] *Health Care Under Siege II: The Health Situation of Palestinians During the First Four Months of the Intifada* (HDIP, Ramallah), Feb. 2001, at 4, 6, *available at* http://www.hdip.org/reports/currentifida_contents.htm ("Health Care Under Siege II").

[13] *Id.* at 4.

[14] *Id.* at 6.

that "rubber bullets, as well as plastic-coated metal bullets and live ammunition, have been used routinely in an illegal and indiscriminate manner.'[15]

There is a pattern of excessive Israeli force against Palestinian demonstrators who are unarmed and pose no threat of death or serious injury to Israeli soldiers or settlers.[16]  The IDF employed military weapons, such as live ammunition, plastic coated metal bullets, and snipers to inflict massive trauma against civilian demonstrators.  Evidence at hospitals showed that of the fatal gun shot wounds in Gaza, 50% were to the head.  "This high proportion of fatal head wounds suggests that given broad rules of engagements, solders are specifically aiming at peoples' heads."[17]

Israeli forces have indiscriminately and excessively shelled residential areas throughout the West Bank and Gaza Strip, affecting over a million Palestinians.[18]  Through December 2000, Israeli bombardment had wounded 729 Palestinian civilians in their own homes, killed 25 civilians, damaged more than 3,000 Palestinian civilian homes, and rendered over 4,100

---

[15] *Israel, the Occupied West Band and Gaza Strip, and the Palestinian Authority Territories: Investigation into unlawful use of force in the West Bank, Gaza Strip, and Northern Israel,* (Human Rights Watch, New York, N.Y.), October 2000, *available at* http://www.hrw.org/reports/2000/Israel/.
[16] *Id.*
[17] *Evaluation of the Use of Force in Israel, Gaza and the West Bank, a Medical and Forensic Investigation,* (Physicians for Human Rights Report, Boston, Mass.), Nov. 3, 2000, at 2.

Palestinians homeless.[19]  In describing the use of excessive force against Palestinians in their homes and cities, the Palestinian Human Rights Monitoring Group ("PHRMG") concludes that:

> The Israeli army intentionally attacked densely populated residential areas in order to inflict collective punishment on civilians.  The shelling of residential areas occurred without warning, and excessive and indiscriminate military power was used against a defenseless and unarmed population.[20]

The PHRMG found that IDF attacks against Palestinian homes and civilian areas have in numerous cases been totally indiscriminate and that:

> Israeli shelling of civilian areas has continued for long periods after any threat of Palestinian gunmen has been removed. Further, using extremely inaccurate grenade machine guns covering wide areas of civilian areas, as a response, constitutes a serious violation of international humanitarian law.[21]

During the first four months of the Al Aqsa Intifada, indiscriminate weaponry which cause large paths of destruction and are not aimed at a specific target have been deployed repeatedly against the residents of Rafah, Beit, Jala, Ramallah, Nablus, Hebron, and Gaza.  "Israel's most sophisticated weaponry (helicopter-launched missiles, long range-sniper

---

[18] *Overkill: Israeli Bombardment and Destruction of Palestinian Civilian Homes and Infrastructure During the Al-Aqsa Intifada,* (PHRMG< East Jerusalem), Jan. 29, 2001, Table 1, *available* at www.phrmg.org ("*Overkill*").
[19] *Id.*
[20] *Id.* at 25. PHRMG's consultant for this report was David Holley, a British military consultant. PHRMG had had its own field investigators on the ground in Israel, the West Bank and Gaza.
[21] *Id.* at 16.

rifles and hidden bombs)"[22]  are used to shell Palestinian homes and

infrastructures in densely populated civilian areas.  Shrapnel from air burst

grenades have killed and wounded youth and women in these areas.

Precision guided missiles as well as high-velocity ammunition have been

used to penetrate and destroy homes.  Grenade launchers underneath the M-

16 are used against residential housing.

That Plaintiffs have suffered harm because of Israel's systematic and

continuous violation of universally accepted norms of international law

cannot be subject to serious debate.  Even the United States, through its State

Department, has cited numerous instances of Israeli human rights abuses and

violations of international law:

> Israel's overall human rights record in the occupied territories was
> poor, continuing a deterioration that began in late 2000, after the
> beginning of the sustained violence of the Intifada. Israeli security
> forces committed numerous, serious human rights abuses during the
> year. Security forces killed at least 501 Palestinians and 1 foreign
> national and injured 6,300 Palestinians and other persons during the
> year, including innocent bystanders. Israeli security forces targeted
> and killed at least 33 Palestinians whom the Israeli authorities
> suspected had in the past attacked or were planning to attack Israeli
> settlements, civilians, or military targets. On August 27, Israeli forces
> also killed the secretary general of the political wing of the Popular
> Front for the Liberation of Palestine (PFLP), which some claimed
> expanded the scope of such operations to include political figures.
> Palestinian and Israeli human rights groups stated that four of those
> killed were not directly involved in terrorist activities. At least 18
> other persons, including 4 children, killed by Israeli forces during

---

[22] *Id*. at 5.

such operations were bystanders, relatives, or associates of those targeted …

In contravention of their own rules of engagement, which provide that live fire is to be used only when the lives of soldiers, police, or civilians are in imminent danger, Israeli security units often used excessive force against Palestinian demonstrators including live fire. IDF forces also shelled PA institutions and Palestinian civilian areas in response to Palestinian attacks on Israeli targets. Israeli security forces killed 93 Palestinians and injured 1,500 in these attacks. The IDF killed another 68 Palestinians during Israeli incursions into Palestinian-controlled territory (Area A). Israeli security forces frequently impeded the provision of medical assistance to Palestinian civilians by their strict enforcement of internal closures, which reportedly contributed to at least 32 deaths. Israeli security forces harassed and abused Palestinian pedestrians and drivers who were attempting to pass through the more than 130 Israeli-controlled checkpoints in the occupied territories. During the year, human rights organizations, including B'tselem, Human Rights Watch, the Palestinian Society for the Protection of Human Rights and the Environment (LAW), and the Mandela Institute for Political Prisoners reported that there was an increase in the number of allegations that Israeli security forces tortured detainees, including using methods prohibited in a 1999 High Court decision; there also were numerous allegations that police officers beat detainees. The Government states that the security forces have complied with the High Court's decision and that the Attorney General's office investigates any allegations of mistreatment. Two Palestinian prisoners died in Israeli custody under ambiguous circumstances during the year. Prison conditions were poor. Prolonged detention, limits on due process, and infringements on privacy rights remained problems. The IDF destroyed numerous orchards, olive and date groves, and irrigation systems on Palestinian-controlled agricultural land, and demolished the homes of Palestinians suspected of terrorism, without judicial review. Israeli authorities censored Palestinian publications in East Jerusalem. Some journalists who were covering the clashes were injured and killed by IDF fire. The Israeli authorities placed limits on freedom of assembly, and severely restricted freedom of movement for Palestinians. Israeli security forces failed to prevent, and in some cases protected, some

Israelis who entered Palestinian-controlled areas in the West Bank and injured and killed several Palestinians.[23]

The Court is only asked by Plaintiffs to determine whether  particular acts violate international law regardless of the status of the actors or the status of the conflict between them.  In other words, to take a well defined body of law and apply factual claims to that body of law.  This, of course, is what Courts do and do better than the other branches and it is entirely appropriate for the Court to do it here.

iii.     **Prudential Concerns Do Not Militate Against Judicial Review**

Third, while prudential concerns might well militate against judicial review of the President's decision to wage war, they do not counsel against consideration of the claims at issue here. Numerous courts have held that cases touching upon national security do not necessarily implicate political questions. *See, e.g. Miller v. Case*y, 730 F.2d 773, 776 (D.C. Cir. 1984) ("While the CIA's tasks include the protection of the national security and the maintenance of the secrecy of sensitive information, the judiciary's tasks include the protection of individual rights"); *United States v. Marchett*i, 466 F.2d 1309, 1318 (4th Cir. 1972); *Greenpeace U.S.A. v. Ston*e, 748 F. Supp. 749 (D.Hi. 1990).

---

[23] The report can be found at http://www.state.gov/g/drl/rls/hrrpt/2001/nea/8262.htm.

Finally, Defendants stress the federal government's well-recognized need to speak with one voice in foreign affairs. Applied rigidly, however, the "one voice" requirement proves too much. In any case touching upon foreign affairs, judicial rejection of Executive Branch actions may embarrass the Administration. Yet the Supreme Court has stressed that not all cases touching upon foreign affairs constitute nonjusticiable political questions. The Executive Branch cannot hide behind its fear of embarrassment in order to protect its unfettered discretion and deny plaintiffs any process or review of their legal and factual claims.

c.      **THE ACT OF STATE DOCTRINE IS NO BAR TO PLAINTIFFS' COMPLAINT**

In *Banco Nacional de Cuba v. Sabbatino* 376 U.S. 398, 84 S.Ct 923, 11 L. Ed. 804 (1964), the Supreme Court reaffirmed the act of state doctrine by refusing to probe the validity of a foreign act. *Sabbatino* held that full legal effect must be given to Cuba's expropriation of Cuban sugar companies owned by United States nationals in a case involving a dispute over the confiscated sugar between a Cuban bank and a United States commodity broker. Separation of powers concerns are the underpinnings of the act of state doctrine; the defense bars adjudication when it appears that relief "would interfere with delicate foreign relations conducted by the political

---

branches." *See First Nat'l City Bank v. Banco Nacional de Cuba, 406 U.S. 759, 775, 32 L. Ed. 2d 466, 92 S. Ct. 1808 (1972)* (Powell, J. concurring in the judgment).

The act of state defense requires the court to analyze the nature of the plaintiffs' claims and the facts of the foreign act and to determine whether judicial abstention is required in order to avoid interference with the political branches conduct of foreign relations. Id.  A successful act of state defense must rest on a factual showing that an act of state has occurred, coupled with a legal showing that no bar to the doctrine is applicable under the factual circumstances.

The act of state doctrine cannot be considered in a factual or procedural vacuum; it must be applied to the facts in the procedural posture of the case. As the Circuit Court stated in *Ramirez:*

> When the defense is raised in connection with a motion to dismiss under Rule 12(b)(6), the court must be satisfied that there is no set of facts favorable to the plaintiffs and suggested by the complaint which could fail to establish the occurrence of an act of state. To the extent crucial facts pertaining to the defense are disputed, or not fully developed in a complete record, the reviewing court must be certain that it does not leap to conclusions arguable under the unelaborated pleadings but which could be refuted through the ordinary process of discovery and fact-finding in the district court. To do otherwise is to deny the claimant an opportunity to prove his case.

745 F.2d at 1536.

The doctrine was never intended to apply when an applicable bilateral treaty governs the legal merits of the controversy. *Kalamazoo Spice Extraction Co. v. Provisional Military Government of Socialist Ethiopia, 729 F. 2d 422 (6th Cir 1984); American Int'l Group, Inc. v. Islamic Republic of Iran, 493 F. Supp. 522 (D.D.C. 1980).*

As enunciated in *Sabbatino*, the act of state doctrine is principally concerned with minimizing judicial interference in the political branches' conduct of foreign affairs. Improper interference with policymaking by the political branch may occur when there is no codification or consensus on the national interest in United States foreign relations law or in United States treaties with the foreign sovereign state. When, however, the political branches have specified the controlling legal principles in a treaty with the foreign sovereign or when there are generally accepted tenets of international law concerning the foreign act, the danger of improper judicial interference with the Executive's responsibilities for foreign affairs is greatly reduced. In *Sabbatino* the Court was careful to distinguish between judicial adjudication of the validity of a foreign act when there are no standards for adjudication from those cases in which United States treaties or international law provide specific guidance to the Judiciary in a particular area of foreign relations.  Sabbatino, 376 U.S. at 430 n. 34.

As noted above, the act of state doctrine does not apply to the clear violations of international law alleged by Plaintiffs.  Formulated somewhat differently, but reaching the same conclusion, the TVPA Senate Report states that torture and similar violations of human rights can never be considered the "public acts" required to involve the act of state doctrine:

> Since this doctrine applies only to "public" acts, and no state commits torture as a matter of public policy, this doctrine cannot shield former officials from liability under this legislation.

S. Rep. No, 249, 102d Cong. 1st Sess. 8 (1992) [Senate Report] citing *Trajano v Marcos*, 878 F.2d 1439. (9th Cir. 1989).

It is telling that the Federal Defendants did not raise the act of state doctrine; only the Arms Manufacturers have "had the temerity to assert in this Court that the acts allegedly committed are the officially approved policy of [Israel]." *Kadic v Karadzic*, 70 F.3d at 250.

The Court should not be long detained by the Arms Manufacturers act of state defense.  As the Second Circuit recently stated, because of the ACTA, "violations of international law is 'our business', as such conduct not only violates the standards of international law but also as a consequence violates our domestic law" *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 106 (2d Cir. 2000) cert. denied, 121 S.Ct. 1402 (2001).

## CONCLUSION

The Arms Manufacturers raise the flag and kick up a lot of dust about how the arms business is best left to the experts, and how there are no manageable standards for the Court to apply; and finally to the most specious argument of all – that even allowing the case to proceed would be an insult and embarrassment not to them – but to the Commander in Chief. Somehow by even questioning whether the Arms Manufacturers are responsible for the foreseeable consequences of their actions – Plaintiffs suffer the thinly veiled accusation that they are giving succor to our enemies. This argument is insulting – insulting to the Plaintiffs, many of whom who are American citizens, all of whom who are civilian noncombatants. Plaintiffs are not our enemy; Plaintiffs are us.

The Arms Manufacturers make too much of Plaintiffs' Complaint and too little.  They claim it is a "wholesale attack" on U.S. foreign policy and will drag the Court into intricate world of international arms dealing. However, in their pages of argument and dozens of citations the Arms Manufacturers cite not a single case in this Circuit or any other Circuit that has dismissed an action brought under the Alien Tort Claims Act and/or the Torture Victim Protection Act on political question or act of state grounds. The reason is quite simple.  There are no such cases.  The federal courts

have recognized for decades that ATCA and VPTA cases may be political and may touch on foreign affairs and even may challenge the actions of a foreign state but they do not raise questions textually committed to the political branches; they raise questions particularly suited to the judiciary – questions of statutory interpretation, of duty, causation and forseeability.

Plaintiffs do not wage an assault on U.S. foreign policy; Plaintiffs seek to hold the Arms Manufacturers accountable for their active participation in Israel's violations of the laws of nations – violations that have done unspeakable harm to Plaintiffs.  No amount of flag waving and fearmongering should shield the Arms Manufacturers from accountability for the foreseeable consequences of their acts.

# Table of Contents

STATEMENT OF FACTS                                                                      3

STANDARD OF REVIEW                                                                      5

I.  PLAITIFFS' CLAIMS AGAINST THE ARMS MANUFACTURERS
   ARE JUSTICIABLE                                                     6

      a.  The Claims                                     6

      b.  Plaintiffs' Claims Are Not Barred by the Political Question Doctrine    9

      i.  The Issues Raised In The Complaint Are Not Textually Committed
        to the Executive Branch                     12

      ii.  The Issues Are Not Beyond Judicial Expertise    14

      iii. Prudential Concerns Do Not Militate Against Judicial Review    25

      c.  The Act Of State Doctrine Is No Bar To Plaintiffs' Complaint    26

CONCLUSION                                                                              30

# Table of Authorities

**Cases**:

*Aktepe v. United States*, 105 F.3d 1404 (11th Cir. 1997).                Pg. 14

*American Int'l Group, Inc. v. Islamic Republic of Iran*, 493 F. Supp.
522 (D.D.C. 1980).                                                        Pg. 28

*Baker v. Carr*, 369 U.S. 186, 82 S. Ct. 691, 7 L.Ed. 2d 663 (1969)   Pg. 9, 10, 15

*Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 84 S. Ct. 923,
11 L. Ed. 2d 804 (1964).                                              Pg. 26, 28

*Conley v. Gibson*, 355 U.S. 41, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957).      Pg. 6

*Filartiga v. Penn-Irala*, 630 F.2d 876, (2d Cir. 1980*)*.                 Pg. 17

*First Nat'l City Bank v. Banco Nacional de Cuba*,
406 U.S. 759, 32 L. Ed. 2d 466, 92 S. Ct. 1808 (1972).                    Pg. 27

*Forti v. Suarez-Mason*, 672 F. Supp. 1531, (N.D.Cal. 1987)
and reconsideration 694 F. Supp. 707 (N.D.Cal. 1988).                     Pg. 17

*Ex Parte Quirin*, 317 U.S. 1, 63 S. Ct. 2, 87 L. Ed. 3 (1942).           Pg. 13

*Goldwater v. Carte*r, 444 U.S. 996, 100 S. Ct. 533, 62 L. Ed. 2d 428
(1979)                                                                    Pg. 11

*Greenham Women Against Cruise Missiles v. Reagan*,
591 F. Supp. 1332 (S.D.N.Y. 1984).                                        Pg. 14

*Greenpeace U.S.A. v. Stone*, 748 F. Supp. 749 (D.HI 1990).               Pg. 25

*Industria Panificadora S.A. v. United States*, 763 F. Supp. 1154,
(D.D.C. 1991).                                                            Pg. 14
*In Re Korean Airlines Disaster of Sept. 1, 1983*, 597 F. Supp. 613,
(S.D.N.Y. 1983).                                                          Pg. 14

*Japan Whaling Association v. American Cetacean Society*, 478 U.S. 221,
(1986).                                                                   Pg. 15

*Johnson v. Eisentrager*, 339 U.S. 763, 70 S. Ct. 936, 94 L. Ed. 1255
(1950).                                                                   Pg. 11

*Kadic v. Karadzic*, 70 F.3d 232, (2d Cir. 1995).                     Pg. 15, 29

*Kalamazoo Spice Extraction Co. v. Provisional Military Government*
 *of Socialist Ethiopia*, 729 F.2d 422 (6th Cir. 1984).          Pg. 28

*Linder v. Calero-Portocarrero*, 963 F.2d 332 (11th Cir. 1992).          Pg. 15

*Miller v. Casey*, 730 F.2d 773, (D.C. Cir. 1984).          Pg. 25

*Ramirez de Arellano v. Weinberger*, 745 F.2d 1500, (D.C. Cir. 1984).
                                              Pg. 11, 12, 13, 27

*Schuler v. United States*, 617 F.2d 605, (D.C. Cir. 1979).          Pg. 6

*Skear v. National Rifle Association*, 606 F.2d 1251, (D.C. Cir. 1979).          Pg. 6

*Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774 (D.C. Cir. 1984).          Pg. 17

*The Paquette Habana*, 175 U.S. 677 (1900).          Pg. 16

*Trajano v. Marcos*, 878 F.2d 1438 (9th Cir. 1989).          Pg. 29

*United States v. Duggan*, 743 F.2d 59 (2d Cir. 1984).          Pg. 15, 16

*United States v. Marchetti*, 466 F.2d 1309, (4th Cir. 1972).          Pg. 25

*Weinberger v. Ramirez de Arellano*,
471 U.S. 1113, 105 S. Ct. 2353, 86 L. Ed. 2d 255 (1985).          Pg. 11

*Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, (2d Cir. 2000).          Pg. 29

*Xuncax v. Gramajo*, 886 F. Supp. 162 (D.Mass. 1995).          Pg. 16

**Statutes**:
28 U.S.C. 1350          Pg. 4

28 U.S.C. 1605          Pg. 4

**Law Reviews and Other Materials**:

Anne-Marie Slaughter Burley, *Are Foreign Affairs Different?*,
106 Harv. L. Rev. 1980 (June 1993).          Pg. 10

Felix Frankfurter, *John Marshall and the Judicial Function*,
69 Harv. L. Rev. 217, 227-28 (1955).          Pg. 10

K. Lee Boyd, *Are Human Rights Political Questions?*,
53 Rutgers L. Rev. 277 (Winter 2001).          Pg. 10

Louis Henkin, *Is There a "Political Question":*
*A Response*, 101 Harv. L. Rev. 524, 529, 625 (December 1987).          Pg. 10

Thomas M. Franck, *Political Questions/Judicial Answers:*
*Does the Rule of Law Apply to Foreign Affairs?* (1992).                 Pg. 10

**Treaties**:

I. Detter, *The Law of War* 288 (Cambridge U. Press, 2nd Ed. 2000).      Pg. 18
*Protocol on the Protection of Victims of International Armed Conflicts*,
June 8, 1977 U.N. Jurid. Y.B. 95, 16 I.L.M. 1391.                        Pg. 17

*The Convention Relative to the Protection of Civilian Persons in*
*Time of War*, Aug. 12, 1949. 6 U.S.T. 3516, 75 U.N.T.S. 28             Pg. 17

G.A. Res. 217A, U.N. Doc. A/811 at 71 (1948).                           Pg. 17

G.A. Res. 2200, 21 U.N. GAOR Supp. (No. 16) at 52, U.N. Doc.
A/6316 (1966).                                                          Pg. 17

999 U.N.T.S. 171 (entered into force March 23, 1976).                   Pg. 17

O.A.S.T.S. No. 36 at 1, O.A.S. Doc. OEA/Ser. L/V/11.50,
Doc. 6 at 27 (1980),reprinted in 9 I.L.M. 673 (1970)
(Entered into force July 18, 1978).                                     Pg. 17

213 U.N.T.S. 222 (entered into force September 3, 1955).                Pg. 17

O.A.U. Doc. CAB/LEG/67/3 Rev. 5 (entered into force
October 21, 1986), reprinted in 21 I.L.M. 58 (1982).                    Pg. 17

G.A. Res. 3452, 30 U.An. GAOR Supp. (No. 34) at 91,
U.N. Doc. A/1034 (1975).                                                Pg. 17

G.A. Res. 46, 39 U.N. GAOR Supp. (No. 51) at 197, U.N. Doc.
A/39/51 (1984) (entered into force June 26, 1987).                      Pg. 17

G.A. Res. 43/176, 43 U.N. GAOR Supp. (No. 49), U.N. Doc.
A/43/49, at 297 (1988).                                                 Pg. 17

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JOHN DOE I, <u>et.al.,</u>

     Plaintiffs,                    No. 1:02 CV 01431 (JDB)

     v.

STATE OF ISRAEL, <u>et.al.,</u>

     Defendants.

PROPOSED ORDER

THIS MATTER having coming before the Court on the Arms

Manufacturers' Motion to Dismiss, and the Opposition thereto, it is hereby

ORDERED that the Arms Manufacturers' Motion to Dismiss is

DENIED.

**SO ORDERED**

_____
HON. JOHN D. BATES
United States District Judge

36