## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA


JOHN DOE I, <u>et.al.,</u>

     Plaintiffs,                 No. 1:02 CV 01431 (JDB)

     v.

STATE OF ISRAEL, <u>et.al.,</u>

     and

GEORGE W. BUSH,
President of the United States

     and

COLIN POWELL,
Secretary of State,

     Defendants.


**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO FEDERAL DEFENDANTS' MOTION TO DISMISS OFFICIAL CAPACITY CLAIMS**

                     **Stanley L. Cohen, Esq.**
                     **Attorney for Plaintiffs**
                     ***Pro Hac Vice***
                     **119 Avenue D**
                     **New York, New York 10009**

                     **Mahar Hanania, Esq.**
                     **Local counsel**
                     **6066 Leesburg Pike, Suite 101**
                     **Falls Church, VA 22041**
                     **Washington, DC Bar No.  464766**

Lawyers for Defendants President Bush and Secretary of State Powell ("Federal Defendants") spin a fine, seemingly impenetrable cocoon around the Federal Defendants' decisions with respect to weapons sales and transfers to Israel.  They have erected a veritable hornbook of prudential reasons why the Court should not entertain Plaintiffs' claims.  Permeating all of their varied defenses is the stark theme – the President's choices – even choices that are alleged to violate a clear directive of Congress – are beyond accountability in the Courts.

Plaintiffs ask of the Federal Defendants only one thing – obey the law. In the dozens of pages supporting their motion, the Federal Defendants do not say once "we have obeyed the law."  What they say is "you cannot make us obey the law."  The lawyers for the Federal Defendants do not unequivocally say that Israel has only used weapons from the United States for internal security purposes because to do so would be a lie.  They know it; Plaintiffs know it; the whole world knows it;[1] yet they maintain the Court is incompetent to make that judgment.

Yes, there are any number of reasons that are perhaps available  for the Court to dismiss many of the claims asserted against the Federal

---

[1] See pages ___ - ___ in Plaintiffs' Memorandum of Points and Authorities in Opposition to the Arms Defendants' Motion to Dismiss "Arms Def. Mem in Opp."

Defendants.  There is one compelling reason for the Court not to do so –
Plaintiffs have nowhere else to go.  Plaintiffs cannot effect the policies of the
Israeli occupation force; Plaintiffs' dreams of an independent Palestinian
government have been cast aside; Plaintiffs – even those who are American
citizens – have no ability to effect American policy.  What Plaintiffs have is
a hope.  A hope that if the President and Secretary of State are forced to
comply with the notice provisions of the AECA and the FAA that the
dialogue created by that compliance will modify United States policy toward
Israel.

        To be clear, Plaintiffs desperately want the United States to stop
providing Israel with the military means to oppress them.  However,
Plaintiffs do not ask or expect this Court or any other Court to change
American policy.  That change must come from the political branches.
Plaintiffs simply ask that the Court ensure that the Executive branch comply
with the directives of the Legislative branch so that military funding
decisions are made in the light of day after the decision-makers are provided
all relevant information.

## STATEMENT OF FACTS

        This is an action for compensatory and punitive damages for wrongful
death, personal injuries including psychological trauma, and property

damage inflicted directly by the State of Israel; Ariel Sharon and other senior members of the Israeli military, security and police hierarchy; and financed facilitated, aided and abetted by several international arms manufacturers including Boeing and Colt; and Halamish/Neve Tzuf, a Jewish settlement that has terrorized its Palestinian neighbors and illegally confiscated their lands, all the while being funded by American religious and charitable groups.

Plaintiffs, many U.S. citizens, seek damages for decades-long pattern of extra-judicial killing, torture, cruel, inhuman and degrading treatment, arbitrary arrest, illegal detention and other violations of customary international law and the laws of the United States.  The Defendants, individually and collectively have entered into an enterprise and civil conspiracy to violate the rights of Plaintiffs protected by international law and the laws of the United States.

Plaintiffs also allege that the President and Secretary of State are in receipt of information that a substantial violation of the Arms Export Control Act ("AECA") (22 U.S.C. § 2751 et seq.) may have occurred by Israeli's use of U.S. military assistance against the civilian Palestinian population and are therefore required to promptly report the same in writing to Congress. Further, Plaintiffs maintain that the President's failure to report has deprived

Congress of information necessary for Congress to fulfill its constitutional role and has requested that the Court enjoin the provision of future military assistance until such time as the President notifies Congress pursuant to dictates of the AECA.

Plaintiffs also allege that the Secretary of State has failed to report to Congress as required by the Foreign Assistance Act ("FAA") (22 U.S.C. § 2304 et seq.) that Israel has engaged in a "consistent pattern of gross violations of internationally recognized human rights", and that the failure to notify Congress is the direct and proximate cause of the injuries to persons and property suffered by Plaintiffs.

It is also important to note what the Plaintiffs have not requested. They have not requested permanent injunctive relief against military assistance to Israel; they have asked for limited, interim injunctive relief to secure compliance with the notice provisions of the AECA and FAA.

## STANDARD OF REVIEW

Because the case is before the court on motions to dismiss the complaint at the threshold of litigation, the Court need only determine whether the plaintiffs have stated a justifiable claim for relief which falls within the jurisdiction of the Court. In so doing, the Court must proceed under the settled rule for assessing the propriety of dismissal under Rule

12(b) of the Federal Rules of Civil Procedure. Because there has been

neither fact-findings by the Court nor stipulation of undisputed facts by the

parties, the Court must accept as true all of the material allegations in the

Plaintiffs' complaint. Dismissal is proper only when "it appears *beyond*

*doubt* that the plaintiff can prove *no set of facts* in support of his claim which

would entitle him to relief."  Schuler v. United States, 617 F. 2d 605, 608

(D.C. Cir. 1979) (*quoting Conley v. Gibson,* 355 U.S. 41, 45-46, 2 L. Ed. 2d.

80, 78 S. Ct. 99 (1957)) (emphasis added); Shear v. National Rifle Ass'n 606

F. 2d 1251, 1253 (D.C. Cir. 1979).

## I.     THE POLITICAL QUESTION DOCTRINE DOES NOT BAR PLAINTIFFS' CLAIMS

The Government's assertion that the political question doctrine bars

Plaintiffs' claims against the Federal Defendants is interesting.  In other

ATCA and TVPA cases, where the Government is not sued, the Justice

Department has filed amici briefs eloquently resisting the application of the

doctrine.

For example, the U.S. government amicus brief submitted to the

Second Circuit in the Filartiga case specifically rejects the argument that

judicial resolution of ATCA suits is barred by the political question

doctrine.[2] Although acknowledging that such cases are likely to implicate foreign policy considerations, the brief concludes that "the protection of fundamental human rights is not committed exclusively to the political branches of government".[3]

Id at 45.

> The Courts are properly confined to determining whether an individual has suffered a denial of rights guaranteed him as an individual by customary international law.  Accordingly, before entertaining a suit alleging a violations of human rights, a court must first conclude that there is a consensus in the international community that the right is protected and that there is a widely shared understanding of the scope of this protection. When these conditions have been satisfied, there is little danger that judicial enforcement will impair our foreign policy efforts.  To the contrary, a refusal to recognize a private cause of action in these circumstances might seriously damage the credibility of our nation's commitment to the protection of human rights.[4]

Id at 46.

Plaintiffs have addressed the political question issue in its Memorandum in Opposition to the Arms Defendants' Motion to Dismiss and incorporates those arguments herein.

Cutting through pages of analysis and excuse, the crux of the dispute between Plaintiffs and the President and Secretary of State is captured on

---

[2] Memorandum for the United States submitted to the Court of Appeals for the Second Circuit in Filartiga v. Pena-Irala, 19 I.L.M. 585, reprinted in 12 Hastings Int'l & Comp. L. Rev. 34 (1988)
[3] Id. at 45
[4] Id. at 46.

page 39 of the Federal Defendants' Motion.  The Government maintains

that:

> what constitute legitimate actions in the furtherance of Israel's
> internal security or self-defense for purposes of the AECA
> (and the bilateral agreements entered into there under) are
> determinations for the President to make, taking into account
> complex historical, diplomatic, military and factual
> circumstances that are only developed and accessible through
> the conduct of the Nation's diplomatic and military
> relationships.  The same is true with respect to any assessments
> of Israel's human rights record.  All such determinations, at
> core, include value-laden judgments based on complex factual
> circumstances that the President is uniquely qualified to make
> and that the courts are, as an institutional matter, uniquely
> unqualified to make in these circumstances.

The Government further argues,

> The requirements set forth in the AECA and the FAA embody
> U.S. foreign policy goals and provide benchmarks by which
> Congress and the President can make determinations as to
> whether particular countries are deserving of American
> assistance.  But these requirements do not establish any precise,
> detailed standards based on facts that would be accessible to the
> Court by which to assess a particular country's compliance.

Federal Defendants Motion to Dismiss, p. 39

   Plaintiffs, on the other hand point to countless interpretations of fixed

norms set by international law to argue that regardless of how imprecise

these concepts may appear to the President, the actions alleged to have been

committed against Plaintiffs by official Israeli policy simply cannot be characterized as "in furtherance of Israel's internal security or self defense."[5]

The perpetration by an occupying force of collective punishment on a civilian noncombatant population can <u>never</u> be considered legitimate self defense as a matter of international law.  Thus, all of the purported unmanageability and nuanced value judgments supposedly required of the President are inapplicable here because the acts alleged are never allowed under universal norms or international law.  To take it to its extreme – if Israel systematically killed every man, woman and child in Palestine, would the Court have any difficulty telling the President he must report such actions to Congress?  There is no excuse or justification relevant here; there is no balancing of interests required.  The only question at this stage in the litigation is: do the acts complained of trigger the President's and Secretary of State's obligation to notify Congress.  The answer to that question lies squarely within the Court's expertise in interpreting statutes.

Moreover, the AECA and FAA embody far more than "goals" and "benchmarks."  The statutes state unequivocally that the President "shall" report to Congress if a country "may" have breached a unilateral agreement. The Government argues, in essence, that the President can choose to obey

---

[5] See, Arms Def. Mem in Opp., 16-25

the statutes' directive or not based on "historical, diplomatic, military and factual circumstances."  Plaintiffs disagree.  Regardless of any other circumstances, if a country "may" have violated its military assistance agreement, the President "shall" alert Congress.  That is what the law says. If the President does not like what the law requires the remedy for the "political branch" is to change the law – not pretend it does not exist.

Requiring the President to comply with the notice provisions of the law is the only way to allow the rest of the checks and balances built into the statute to work.  Congress obviously wanted an "early warning system" and relies on the President to provide it.  That is why Congress used the word "may" instead of "has."  Congress expressed its will unambiguously in these statutes.  Congress was concerned that the United States not provide weapons to countries that would use them to perpetrate human rights abuses on its people.  Congress concluded that the President and the State Department had the most current and the most thorough information so it required the President to report at an early state – when a country "may" have misused U.S. arms and it required the Secretary of State to annually catalog human rights abuses and to report when a pattern of abuse emerges.

Quite obviously, if the President fails to comply with his obligation of early warning, the statutory scheme so eloquently portrayed by the Government of checks and balances and overrides – is completely frustrated.

The Government misconstrues Plaintiffs' claims against the President and Secretary of State.  Plaintiffs do not presume to dictate the foreign policy of the United States, nor do they wish to put the Court in that position.  Plaintiffs claim is simple – the President and Secretary of State's failure to comply with the notice provisions of the AECA and FAA have prevented the appropriate dialogue from occurring between the political branches.  Plaintiffs simply ask the Court to facilitate – to kick start if you will – the exchange of information between the Executive and Legislative branches.

## II.   THE FEDERAL DEFENDANTS' STANDING, EXHAUSTION, CAUSATION, REDRESSABILITY AND PRIVATE RIGHT OF ACTION DEFENSES DO NOT REQUIRE DISMISSAL OF PLAINTIFFS' CLAIMS[6]

### a.   Standing

The Government correctly notes that plaintiffs pled in June, 2002 that they will be subject to future harm if the notice provisions of the AECA and

---

[6] Plaintiffs do not quarrel with the Federal Defendants' contention that the RICO and other tort claims must be asserted against George W. Bush and Colin Powell in their individual capacities. Leave is requested to clarify this in the Complaint and to serve Mr. Bush and Mr. Powell, individually.

FAA continue to be violated.  And, in fact, today, in February 2003, Plaintiffs suffer continuing harm.

The cases cited by the Federal Defendants are inapposite to this case because they deal only with past or speculative future harms.  Plaintiffs claim of future harm is apparent on the face of the Complaint (Complaint, para. 559).  Moreover, the flow of U.S. weapons has remained unabated since the filing of the Complaint, and Israel's use of those weapons in violation of international law and treaties with the United States, has not abated but, indeed, has intensified – all causing harm to the Plaintiffs. One need only turn on the evening news to see that Palestinian civilians continue to be killed and maimed, their homes and businesses destroyed, they continue to be subjected to cruel and inhuman treatment at the hands of the Israeli occupying force.  The likelihood that Plaintiffs will continue to be harmed is, unfortunately, not speculative but a near certainty.

Defendants' reliance on *Mahorner v. Bush*, 224 F. Supp 2d 48 (D.D.Cir 2002) is misplaced but instructive on the standing issue.  In *Mahorner*, the plaintiff initiated an action by way of a Motion for Emergency Preliminary Injunction enjoining the President from "engaging in further military action in Iraq without a Congressional declaration of war."  The underlying compliant sought a permanent injunction on all future

aid to Israel.  The Court dismissed the action on standing and political

question grounds.

As to standing, the Plaintiff alleged as injury in fact his concern that

he would be vaporized by nuclear war if the injunction did not issue.

Plaintiffs in this case allege that they have been tortured, arbitrarily detained,

members of their families have been killed and maimed, their homes and

businesses destroyed all because of official acts of Israel.  The Israeli

policies which drive these acts have not changed.  In fact, more civilian

casualties in the occupied territories occur every day.  There is nothing

"conjectural or hypothetical, remote, speculative, or abstract" about

Plaintiffs' injuries.  See *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 119

L.Ed 351, 112 S.Ct. 2130 (1992); *National Treasury Employees Union v.

United States*, 101 F.3d 1423 (D.C. Cir. 1996).

On February 5, 2003, Reuters reported, "Israeli forces killed five

Palestinians in separate incidents on Wednesday, including the stepmother

of a militant who was crushed to death when Israeli forces razed their Gaza

home … Late on Wednesday, Israeli gunships opened fire on the edge of a

Gaza City suburb, killing two Palestinian medical staff from a hospital in the

area … A Palestinian youth was shot dead by troops during a stone throwing

clash in Nablus …At least 1816 Palestinians and 678 Israelis have been

killed since the revolt began in September 2000."[7]   Today's report is

chillingly familiar to yesterday's, last week's and those of April 2002 when

the Complaint was filed.  Plaintiffs continue to suffer physical and

psychological injury and damage to their property and businesses.  To

compare Plaintiffs' plight to that of Mr. Mahorner is to deny reality in

Palestine.

**b.      Exhaustion**

The Government claims Plaintiffs' failure to exhaust administrative

remedies require dismissal of their claims.  Exactly how and where Plaintiffs

were required to exhaust is not explored in the Government's argument.  The

President and the Secretary of State have ignored several requests by

renowned international human rights organizations to better monitor Israel's

use of U.S. weapons, to report Israeli misuse of these weapons to Congress,

and in some instances, to cease providing weapons to Israel until its human

rights record improves.[8]

---

[7] See, (http// www.reuters.com/newsArticle.jhtml?type=worldnews&storyID-2177550).
[8] Amnesty International Condemns State Assinations, Requests U.S. Government to Review All
Arms Transfers to Israel, Amnesty International Press Release, (Amnesty International, Wash.
D.C.) Feb. 20, 2001 (www.amnesty-usa.org/news/2001/israel02202002.html.)  Israel, the
Occupied West Bank of Gaza Strip, and the Palestinian Authority Territories: Investigation into
unlawful use of force in the West Bank, Gaza Strip and Northern Israel (Human Rights Watch,
New York, NY, October 2000.  The Al Agsa Intifada and Israel's Apartheid: The U.S. Military
and Economic Role in the Violation of Palestinian Human Rights, Report of the National
Lawyers Guild Delegation to the Occupied Palestinian Territories and Israel, January 2001.

Given the Government's deaf ear, any suggestion that Plaintiffs' weak voice would have been anything but futile is pure gamesmanship by the Government. Making Plaintiffs jump through clearly futile administrative hoops is not required by the APA or case law. See *Bowen v. City of N.Y.*, 476 U.S. 467 (1986); *Artis v. Greenspan*, 158 F.3d 1301 (D.C.Cir. 1998); see also *Oglesby v. Dept. of the Army*, 920 F.2d 57, 61 (D.C.Cir 1990)

**c.    Causation**

Plaintiffs claim on the face of the Complaint that the failure of the Federal Defendants to provide the notices of potential treaty violations and gross human rights abuses by Israel caused their injury. The failure of the Federal Defendants to comply with statutory obligations need not be the only cause of Plaintiffs' injuries; it must be pled to be a substantial cause. *Center for Automobile Safety v. Dole*, 828 F.2d 799 (D.C.Cir. 1987), citing *Allen v. Wright*, 468 U.S. 737, 82 L. Ed 2d 556, 104 S.Ct. 315 (1984); ("a plaintiff must allege personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief.").

The Government's position on causation is intriguing. After spending considerable ink and paper to argue that any suggestion by the Court that the Federal Defendants report to Congress would upset the delicate and intricate

foreign policy between Israel and the U.S., the Government then turns around and states that there is no causal link between what happens to Plaintiffs in Palestine and whether the President reports to Congress as he is required by statute.  The Government seeks to have it all ways.

Congress itself provides the clearest indication of a causal link between notice under the AECA and FAA and the human rights abuses complained of.  The legislative history of both statutes amply demonstrates that Congress believed it could effect the human rights record of foreign countries by conditioning the sale of U.S. arms to those countries.  Indeed, the very struggle between the Executive and Legislative branches in the 1970s to require the Executive to report human rights abuses indicates the degree to which Congress felt that mere notice of potential violations could effect the conduct of foreign countries.[9]

In strictly practical terms, nowhere is this more clear than in the case of Israel.  Virtually every weapon system and individual weapon used by Israel in Palestine is manufactured in the U.S. and paid for by U.S. tax dollars.  Any suggestion by the Federal Defendants that Israel may be misusing those weapons would have an enormous effect in Israel.

---

[9] See generally, Stephen B. Cohen, Conditioning U.S. Security Assistance on Human Rights Practices, 76 Am.J.Int'l. L. 246, 248 (1982) for a chronicle of the Executive's fight to keep the directive language out of the FAA.

Israel is not economically self-sufficient, and relies on foreign assistance and borrowing to maintain its economy.  Since 1985, the United States has provided $3 billion in grants annually to Israel.  Since 1976, Israel has been the largest annual recipient of U.S. foreign assistance, and is the largest cumulative recipient since World War II.

In addition to the foreign assistance, the United States has provided Israel with $625 million to develop and deploy the Arrow anti-missile missile, $1.3 billion to develop the Lavi aircraft, $200 million to develop the Merkava tank, $130 million to develop the high energy laser anti-missle system, and other military projects.

In FY2000 the United States provided Israel an additional $1.2 billion to fund the Wye agreement, and in FY2002 the United States provided an additional $200 million in anti-terror assistance. For FY2003, the Administration requested $600 million in economic, $2.1 billion in military, and $60 million in migration resettlement assistance.

Moreover, the notice provisions of the AECA and FAA have been used successfully in the past when Israel may have violated its mutual defense agreement with the U.S. On at least four occasions, the United States has raised questions regarding Israel's misuse of U.S. military assistance.  In 1978 and 1982, the Secretary of State informed Congress that

Israel may have violated the AECA when Israel invaded Lebanon.[10]  Israel's

attack on an Iraqi nuclear reactor in 1981, resulted in the Secretary of State

reporting to Congress that Israel may have violated the 1952 mutual defense

agreement.  In that case, the President suspended the shipment of four F-16

planes scheduled to be delivered to Israel.[11]  Delivery of another ten F-16's

and two F-15 aircraft was later suspended.[12]  The President eventually lifted

the suspension, however, and all the planes were transferred.[13]  Israeli

operations in Lebanon also raised concern in 1979 when the President

informed Congress of Israel's possible illegal use of U.S. military equipment

there.[14]  Although there have been other situations in which a U.S. President

expressed concern over Israel's misuse of U.S. weapons, the President did

not send Congress a written statement regarding the possible violations in

those cases.[15]

**d.    Redressability**

The Federal Defendants claim that the Complaint must fall because

the Court cannot provide adequate redress is belied by the history outlined

above.  History makes clear, if the President and Secretary of State give

---

[10] Clyde R. Mark, *Israel: Israeli – United States Relations*, CRS, I.B. 82008, at 2 (updated Jan. 12, 2001).

[11] Richard F. Grimmett, CRS, *Defense Articles and Services Supplied to Foreign Recipients: Legislative Restrictions on Their Use*, Rep. No. 86-18F at 4 (updated Feb. 6, 1986)

[12] *Id.* at 5.

[13] *Id.*

[14] *Id.*

[15] *Id.* at 6.

notice as required, substantial effect is felt in Israel.  Can the Court directly stop Israel from committing human rights abuses against Plaintiffs – no. Can the Court start in motion the statutory apparatus to effect Israel's illegal conduct – yes.  That is all Plaintiffs ask.

**e.**     **Private Right of Action**

The decision in <u>Crockett v. Reagan</u>, 558 F. Supp 893 (D.D.C. 1982) affd, 720 F.2d 1355, cert den, 467 U.S. 1251, does not require dismissal.  In <u>Crockett</u>, 29 members of Congress brought suit against the President and the Secretaries of Defense and State alleging that the defendants' supply of military equipment to the government of El Salvador while that government was committing gross human rights abuses violated the FAA.  The Court dismissed the FAA claim under its equitable jurisdiction because the Court found that the Congressman ought to debate the propriety of military assistance to El Salvador on the floor of the House and Senate and not in federal court.  558 F. Supp. at 903.  Given the fact that the FAA specifically provides a remedy for members of Congress to formally request information about human rights abuses if the Executive fails to provide it, the Court reasoned that it need not intervene in an intramural squabble between the two branches.

The Court did not, however, rule out the possibility that a case with different plaintiffs could be brought.  Of note, is the Court's statement that:

> A court upon scrutiny of detailed discovery might not agree with the President's assessment of the human rights situation in El Salvador and could possibly conclude that the provision of security assistance under these circumstances violates section [2304 of the FAA] …

Id.

Presumably, the Court in *Crockett* was not engaging in idle banter when it envisioned a case involving "detailed discovery".  Inasmuch as it had just closed the courthouse door to members of Congress, it is fair to assume that the Court envisioned private parties as appropriate plaintiffs to enforce the provisions of the FAA. Cf, *Clark v. United States*, 609 F. Supp 1249, 1251 (D.C.Md. 1985) ("The only parties with standing to seek adjudication under section 2304 are the executive and legislative branches.")

It is important to note, as well, that the relief requested in *Crockett* and in *Clark* was a permanent injunction of military aid until the alleged human rights abuses stopped.  Plaintiffs here do not seek such relief.  They seek much narrower relief – to enjoin further military aid to Israel until the President and the Secretary of State have complied with the notice of provisions of the AECA and FAA.

## III.      THE COURT IS EMPOWERED TO DIRECT COMPLIANCE WITH THE AECA AND FAA

Even were the Government to prevail on the several prudential issues raised in its Motion, dismissal of the action is not required.  Plaintiffs ask the Court to enjoin the transfer of weapons to Israel only as means to an end, not as an end in and of itself.  Thus, the cases seeking a judicially imposed permanent injunction against weapons transfers and Israel cited by the Defendants are inapposite.  If the Court agrees with the Government that a more tailored and less intrusive means of accomplishing Plaintiffs objective would be a directive from the Court to the President and Secretary of State to comply with the reporting requirements of the AECA and FAA, that is all the Plaintiffs can reasonably ask.

As noted in *Ramirez*, "the express purpose of the Declaratory Judgment Act was to create a milder, less coercive form of relief than the injunctive remedy …In assessing the propriety of declaratory relief … any prudential considerations that may detract from the propriety of injunctive relief on the Plaintiffs' asserted facts are even weaker." 745 F.2d at 1533 (citing E. Bochard, Declaratory Judgments 3-15 (2d ed. 1941).

Certainly, it is within the equitable powers of the Court to convert Plaintiffs' claim for an interim injunction to one for a declaratory judgment.

As has long been recognized, the Declaratory Judgment Act, 28 U.S.C. § 2201 (1988), "Is an enabling Act, which confers a discretion on the courts rather than an absolute right upon the litigant."  *Green v. Mansour*, 474 U.S. 64, 72, 88 L. Ed. 2d 371, 106 S. Ct. 423 (1985) (quoting *Public Serv. Comm'n v. Wycoff Co.*, 344 U.S. 237, 241, 97 L. Ed. 291, 73 S. Ct. 236 (1952); see also *Cardinal Chem. Co. v. Morton Int'l, Inc*. 124 L. Ed. 1, 113, S. Ct. 1967, 1974 n.17 (1993); *ACLU found. Of Southern California v. Barr*, 293 U.s. App. D.C. 101, 952 F.2d 457, 466 (D.C. Cir. 1991); *Hanes Corp v. Millard*, 174 U.S. App. D.C. 253, 531 F.2d 585, 591 (D.C. Cir. 1976).  The decision whether to grant the declaratory judgment remedy is "informed by the teachings and experience concerning the functions and extent of federal judicial power." *Wycoff*, 344 U.S. at 243.  Public policy favors declaratory judgments "(1) when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and (2) when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." Id.

## CONCLUSION

Why are Plaintiffs consumed with making the AECA and FAA notice provisions work?  After all, in the grand scheme of their hardship, it may seem trivial to focus on such a small piece of the puzzle.  Why?  It is all they

have left.  Plaintiffs, many of whom who are American citizens, have no

voice, have no power, have no way to affect their own Government's policy.

The only way Plaintiffs' plight gets calculated into the vast equation that is

U.S./Israel relations is if Congress is alerted that some of its generous

largesse to Israel may not be being spent to promote U.S. interests but to kill

and maim U.S. citizens.  In the end, it seems so little to ask of one's

Government – simply to recognize the possibility that weapons provided by

the U.S. to Israel maybe are being used to harm U.S. citizens.

Plaintiffs can only hope that this Court is guided by the sentiments

noted in *Ramirez:*

> The words of the Supreme Court in United States v. Lee, 106 U.S. at
> 218-23. continue to guide the judicial conscience, and seem singularly
> apt to the legal defenses asserted by the Government here:  Looking at
> the question upon principle, and apart from the authority of adjudged
> cases, we think it still clearer that this branch of the defense cannot be
> maintained.  It seems to be opposed to all the principles upon which
> the rights of the citizen, when brought in collision with the acts of the
> government, must be determined.  In such cases there is no safety for
> the citizen, except in the protection of the judicial tribunals, for rights
> which have been invaded by the officers of the government,
> professing to act in its name.  There remains to him but the alternative
> of resistance, which may amount to crime.  The position assumed here
> is that, however clear his rights, no remedy can be afforded to him
> when it is seen that this opponent is an officer of the United States,
> claiming to act under its authority; for, as Mr. Chief Justice Marshall
> says, to examine whether this authority is rightfully assumed is the
> exercise of jurisdiction, and must lead to the decision of the merits of
> the question.  The objection of the plaintiffs in error necessarily
> forbids any inquiry into the truth of the assumption that the parties
> setting up such authority are lawfully possessed of it; for the argument

is that the formal suggestion of the existence of such authority forbids any inquiry into the truth of the suggestion.

No man in this country is so high that he is above the law.  No officer of the law may set that law at defiance with impunity.  All the officers of the government, from the highest to the lowest, are creatures of the law, and are bound to obey it.

It is the only supreme power in our system of government, and every man who by accepting office participates in its functions is only the more strongly bound to submit to that supremacy, and to observe the limitations which it imposes upon the exercise of the authority which it gives.

Courts of justice are established, not only to decide upon the controverted rights of the citizens as against each other, but also upon rights in controversy between them and the government; and the docket of this court is crowded with controversies of the latter class.

# Table of Contents

STATEMENT OF FACTS                                                3

STANDARD OF REVIEW                                                5

I.  THE POLITICAL QUESTION DOCTRINE DOES NOT BAR
    PLAINTIFFS' CLAIMS                                            6

II. THE FEDERAL DEFENDANTS' STANDING, EXHAUSTION,
    CAUSATION, REDRESSABILITY AND PRIVATE RIGHT OF
    ACTION DEFENSES DO NOT REQUIRE DISMISSAL OF
    PLAINTIFFS' CLAIMS                                            11

        a.  Standing                                             11

        b.  Exhaustion                                           14

        c.  Causation                                            15

        d.  Redressability                                       18

        e.  Private Right Of Action                              19

III.  THE COURT IS EMPOWERED TO DIRECT COMPLIANCE
      WITH THE AECA AND FAA                                      20

CONCLUSION                                                       22

# Table of Authorities

**Cases**:

Allen v. Wright, 468 U.S. 737, 82 L. Ed. 2d 556, 104 S. Ct. 315 (1984).   Pg. 15

Artis v. Greenspan, 158 F.3d 1301 (D.C. Cir. 1998).   Pg. 15

Bowen v. City of New York, 476 U.S. 467, 90 L. Ed. 2d 462, 106 S. Ct. 2022 (1986).   Pg. 15

Cardinal Chem. Co. v. Morton Int'l., Inc., 508 U.S. 83, 124 L. Ed. 2d 1, 113 S. Ct. 1967 (1993).   Pg. 22

Center for Automobile Safety v. Dole, 828 F.2d 799 (D.C. Cir. 1987).   Pg. 15

Clark v. United States, 609 F.Supp. 1249 (D.MD. 1985).   Pg. 20

Conley v. Gibson, 355 U.S. 41, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957).   Pg. 6

Crockett v. Reagan, 558 F. Supp. 893 (D.D.C. 1982).   Pg. 19, 20

Green v. Mansour, 474 U.S. 64, 88 L. Ed. 2d 371, 106 S. Ct. 423 (1985).   Pg. 22

Hanes Corp. v. Millard, 174 U.S. App. D.C. 253, 531 F.2d 585 (D.C. Cir. 1976).   Pg. 22

Lujan v. Defenders of Wildlife, 504 U.S. 555, 119 L. Ed. 2d 351, 112 S. Ct. 2130 (1992).   Pg. 13

Mahorner v. Bush, 224 F. Supp. 2d 48 (D.D.C. 2002).   Pg. 12, 14

National Treasury Employees Union v. United States, 101 F.3d 1423 (D.C. Cir. 1996).   Pg. 13

Oglesby v. Dept. of the Army, 920 F.2d 57 (D.C. Cir. 1990).   Pg. 15

Public Service Commission v. Wycoff Co., 344 U.S. 237, 97 L. Ed. 291, 73 S. Ct. 236 (1952).   Pg. 22

Schuler v. United States, 617 F.2d 605 (D.C. Cir. 1979).   Pg. 6

Shear v. National Rifle Association, 606 F.2d 1251 (D.C. Cir. 1979).   Pg. 6

**Statutes**:

22 U.S.C. §2304                                     Pg. 5 & 20

22 U.S.C. §2751                                     Pg. 4

28 U.S.C. §2201                                     Pg. 22

**Law Reviews and Treatises**:

Clyde R. Mark, *Israel: Israeli – United States Relations*, CRS, I.B.
82008 (updated Jan. 12, 2001).                      Pg. 18

Memorandum for the United States Submitted to the Court of Appeals
for the Second Circuit in Filartiga v. Pena-Irala, 630 F.2d 876
(2d Cir. 1980), 19 I.L.M. 585, reprinted in 12 Hastings Int'l &
Comp. L. Rev. 34 (1988).                            Pg. 6, 7

Richard F. Grimmett, *CRS, Defense Articles and Services Supplied to
Foreign Recipients: Legislative Restrictions on Their Use*, Rep No.
86-18F (updated Feb. 6, 1986).                      Pg. 16

Stephen B. Cohen, *Conditioning U.S. Security Assistance on Human
Rights Practices*, 76 Am.J.Int'l. L. 246 (1982).   Pg. 16

**UNITED STATES DISTRICT COURT**
FOR THE DISTRICT OF COLUMBIA

JOHN DOE I, <u>et.al.,</u>

     Plaintiffs,               No. 1:02 CV 01431 (JDB)

     v.

STATE OF ISRAEL, <u>et.al.,</u>

     Defendants.

PROPOSED ORDER

THIS MATTER having coming before the Court on the Federal Defendants' Motion to Dismiss Official Capacity Claims, and the Opposition thereto, it is hereby

ORDERED that the Federal Defendants' Motion to Dismiss Official Capacity Claims is DENIED.

SO ORDERED

_____
HON. JOHN D. BATES
United States District Judge

28