# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____

JOHN DOE I, et. al.,

                   Plaintiffs,

                                1:02CV01431 - JDB

      -against-


STATE OF ISRAEL, CONGREGATION
RINAT YISRAEL, RABBI YOSEF ADLER
AND ARNON HILLER, et. al.,

                   Defendants.


_____

<u>MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO MOTION
OF DEFENDANTS CONGREGATION RINAT YISRAEL, RABBI YOSEF ADLER
AND ARNON HILLER TO DISMISS CLAIMS</u>


     The motion to dismiss[1] brought by defendants Congregation Rinat
Yisrael, Rabbi Yosef Adler and Arnon Hiller (the "Rinat defendants")
strives to complicate what is a straightforward question – may those who
knowingly fund terror and oppression against an American citizen occurring
in foreign lands be held accountable in the United States courts?

_____

[1] Plaintiffs have filed responses to two other motions to dismiss by the Federal
Defendants in their official capacities and the Arms Defendants.  The arguments made
therein are incorporated in this response.

The Rinat defendants say no – "we only gave money".  John Doe II says those who solicit funds via an interactive Internet site to fill specific orders for bulletproof vests, armored vehicles and night vision goggles and who provide those funds to the Halamish settlers, who have seized his land by violence and the threat of violence in violation of U.S. and international law must be held accountable.

## STATEMENT OF FACTS

This is an action for compensatory and punitive damages for, among other relief, civil RICO violations and several common law torts including trespass, conversion and intentional infliction of emotional distress. Specifically, John Doe II, an American citizen, alleges that the Halamish Settlement has appropriated and occupied his lands by violence and threat of violence in violation of U.S. and international law.  John Doe II further alleges that the Rinat defendants have conspired with and aided and abetted the Halamish Settlements by soliciting funds and providing those funds to Halamish for specific paramilitary equipment.

Plaintiff John Doe II is a U.S. citizen and holds a valid Jordanian passport.  He, along with several family members, all of whom are U.S. citizens, own approximately fifteen acres in Deirnitham, Palestine.  The land has been in John Doe II's family for about 1,600 years.  Since 1995, the Doe

II land holdings have been diminished by the expansion and encroachment of the Halamish/Neve Tzuf settlement.  Since 1995 John Doe II and his family have been harassed and threatened by Jewish settlers and Israeli security officers.  In October, 2000, between 15 and 20 settlers from the Halamish Settlement set fire to the trees on John Doe II's property and riddled his home with gunfire.  As late as June 13, 2002, Halamish settlers began bulldozing trees on John Doe II's property in an effort to expand the settlement's boundaries.  John Doe II also owns a tract of land near Ramallah where he grows olive trees.  In October 2000, Halamish settlers destroyed over 100 of John II's olive trees in preparation of another settlement expansion.

## STANDARD OF REVIEW

Defendants filed their motions to dismiss pursuant to Fed. R. Civ. P. 12(b)(1),(2) and (6).  As the moving parties, Defendants bear the burden of proof, a burden they have clearly failed to meet.  Plaintiffs' allegations of fact must be taken as true, and construed in the light most favorable to them. See, e.g., *Scheuer v. Rhodes,* 416 U.S. 232, 40 L.Ed. 2d 90, 94 S.Ct. 1683 (1974); *Phillips v. Bureau of Prisons*, 591 F.2d 966, 968 (D.C. Cir. 1979). In assessing a motion to dismiss, it is well-settled that "[a] complaint should be liberally construed in favor of the plaintiff and not readily dismissed.

"Motions to dismiss should be denied unless it appears beyond doubt that the plaintiff can prove no facts in support of his claim." *EEOC v. St. Francis Xavier Parochial School*, 117 F.3d 621, 624 (D.C. Cir. 1997).

I.     **THE CIVIL RACKETEER INFLUENCED AND CORRUPT ORGANIZATION ACT (RICO) SHOULD BE GIVEN EXTRATERRITORIAL EFFECT UNDER THE FACTS AS ALLEGED**

Generally, as alleged in the Complaint, defendants are liable under RICO for conspiring with the Israeli defendants to provide funds specifically earmarked for materials that are used by the Halamish Settlement to illegally terrorize neighboring property owners and confiscate their land. The Rinat defendants' participation in this conspiracy with the other named defendants culminated in the acts of attempted murder; threat of murder; arson; and extortion that are well documented in the Complaint and supporting papers.[2]

Here, the conspiring defendants acted together in an effort to force Plaintiff John Doe II to surrender his property and to acquire and maintain an interest in his land. Undeniably, substantial acts in furtherance of the conspiracy took place in the United States.  After all, the various Rinat

---

[2] Though defendants suggest that plaintiff's fifth claim for relief lacks essential allegations amounting to a RICO violation, it should be noted that plaintiffs specifically reincorporated each preceding paragraph in the complaint.

defendants are residents of the United States; Rinat Yisrael is located in

Teaneck, New Jersey and its leaders, defendants Rabbi Yosef Adler and

President Arnon Hiller are U.S. citizens.

The RICO statute is silent as to its extraterritorial application.  See,

*North South Finance Corp. v. Al-Turki*, 100 F.3d 1046, 1051 (2d Cir. 1996).

Although it is clear that a foreign corporation is not shielded from RICO

liability merely because of its location, the degree of domestic activity

required to justify RICO jurisdiction over a foreign enterprise is not obvious.

Id.  Courts have been guided in this determination by "precedents

concerning subject matter jurisdiction for international securities

transactions and antitrust matters." Id.   Courts have cautioned, however, that

the appropriate test varies "depending on the substantive law to be applied,"

and that the tests developed in securities and antitrust cases may not provide

perfect models because they are "premised upon congressional intent in

enacting the Securities Exchange Act and the antitrust statutes, not the

intention of Congress concerning RICO."  *North South Finance*, 110 F.3d at

1052.  The ultimate inquiry is whether " Congress would have wished the

precious resources of United States courts" to be concerned with the

transactions at hand.  Id. (quoting *Bersch v. Drexel Firestone, Inc.*, 519 F.2d

974, 985 (2d Cir. 1975).

RICO cases have yet to fully embrace the need to provide a remedy when a conspiracy occurs in the U.S., but most of the harmful effects occur outside the country.  In the new global economy, large fund-raising groups should not escape conspiracy liability simply because their operations are worldwide, and domestic conspiracies can be exported to countries where innocent victims have no remedies.

Justification for extraterritorial application of RICO in this case can be found in the application of the "conduct test".  Under the "conduct" test, the court will have jurisdiction where the conduct in the United States directly caused the loss.  *Psimenos v. E.F. Hutton & Co*., 722 F.2d 1041, 1046 (2d Cir. 1983).  The facts alleged show that defendants conduct in the United States goes far beyond the mere facilitation of a wire transfer.  Rather, their U.S. resident status and their leadership roles in fund-raising here in the United States – and in particular their specific solicitation of funds for items that would be used to perpetuate human rights abuses – as well as their consent to the paramilitary activity, were important in furthering the conspiracy.  Indeed, without their involvement, the activity may never have taken place.

Plaintiffs emphasize that they have no way of proving with certainty the extent to which the conspiracy was born and nurtured in the United

States until the court grants them the right to conduct discovery. Through discovery, the record will be clarified as to precisely what kind of conduct occurred within the United States that culminated in the violence and illegal acquisition of lands. Questions such as what decisions were made from the United States and which decisions were made by U.S. residents will be answered. For now, the end result of the anti-Palestinian conspiracy is clear; John Doe II's land was taken and multiple human rights abuses were inflicted upon him and his family. Most importantly, defendants were well aware that this kind of activity was taking place and rather than take action to prevent it or withdraw from the conspiracy, the Rinat defendants instead continue to provide material support for the illegal confiscation and occupation of John Doe II's land.

Plaintiff's allegations, taken as true, establish that major aspects of the conspiracy occurred in the United States and that the conduct of the defendants in the United States directly caused the loss of John Doe II's land. Having met their threshold pleading burden, plaintiffs are entitled to gather evidence supporting their allegations of RICO violations.

Justification for extraterritorial application of the Rico statute also can be found in the application of the "effects" test. As the Second Circuit observed in *North South Finance*, there are differences between the effects

test as it applies in securities fraud cases and as it applies in antitrust cases.

Statutes prohibiting securities fraud "may be given extraterritorial reach

whenever a predominantly foreign transaction has substantial effects within

the United States."  100 F.3d at 151 (quoting *Consolidated Gold Fields PLC*

*v. Minorco, S.A.*, 871 F.2d 252, 261-62 (2d Cir. 1989)). With respect to

anticompetitive behavior occurring outside the United States, antitrust

liability may attach "if the conduct is intended to and actually does have an

effect on United States imports or exports which the state reprehends." Id;

see also, *National Bank of Canada v. Interbank Card Ass'n*, 666 F. 2d 6, 8

(2d Cir. 1981) (noting that inquiry is whether alleged antitrust violation "has,

or is intended to have, any anticompetitive effect upon United States

commerce, either commerce within the United States or export commerce

from the United States").  Under either variant of the effects test the

Complaint adequately pleads facts that support subject matter jurisdiction

over John Doe II's RICO claim.

It is hard to adequately quantify the effects felt within the United

States – on its commerce; on its core political principles – of illegal Israeli

settlements on Palestinian land and the support of that illegal occupation by

the Rinat defendants.  As stated in paragraph 101 of the Complaint,

President Reagan said in 1981 on the possibility for peace in Palestine, "an

immediate adoption of a settlement freeze by Israel, more than any other action, could create the confidence needed"; and the Secretary of State James Baker said ten years later "I don't think there is any bigger obstacle to peace than the settlement activity that continues not only unabated but at an enhanced pace." Complaint, ¶ 101.

Illegal Israeli settlements such as Halamish drive the conflict in Palestine and that conflict costs American taxpayers billions of dollars. The RICO enterprise alleged in the Complaint – the appropriation and occupation of John Doe II's land by the Halamish settlers by violence and coercion is the exact activity that has been identified by our Government as the chief obstacle to peace.

The expended U.S. resources – political and economic – required to address the crisis created in large part by the illegal occupation of Palestinian land should be more than adequate to meet the substantial effects standard outlined above. However, in heeding first principles and seeking to answer the ultimate inquiry of whether "Congress would have wished the precious resources of United States courts" to be concerned with the transaction at hand one should look beyond the securities fraud and antitrust statutes to a different source of Congressional will.

In cases such as this, alleging violations of international law directly causing harm to a U.S. citizen outside the territory of the United States, rather than look to antitrust and securities fraud statutes to determine the extraterritorial reach of the civil RICO statute, it would appear more appropriate to look to 18 U.S.C.§2333.  Section 2333 allows U.S. citizens who have been injured "by reason of an act of international terrorism" to sue in the federal courts of the United States.  Surely, Congress' intent to open the federal courts in obvious cases of extraterritorial torts against U.S. citizens is at least as persuasive as the Congressional intent underlying the extraterritorial application of the Clayton Act, a law that has no real factual or legal connection to this case.

The Seventh Circuit has recently had occasion to review the Congressional intent of the reach of section 2333 in *Boim v. Quranic Literacy Institute et.al.,* 291 F.3d 1000 (7th Cir. 2002).  In *Boim*, plaintiffs, Joyce and Stanley Boim, parents of David Boim, sued the Quranic Literacy Institute and the Holy Land Foundation for the death of their son David – whom they claim was murdered in Israel by Hamas terrorists.  After an extensive review of the history of section 2333, the court concluded that the charities could be held liable under a traditional tort theory of aiding and abetting.  What is interesting for present purposes is that the Court gave little

pause to the grand extraterritorial reach of the statute.  A U.S. citizen, wherever injured, is granted access to the federal courts to redress wrongs caused by international terrorism.

Likewise, the Torture Victim Protection Act (TVPA), grants access to the federal courts for U.S. citizens to redress injuries caused by torture or other violations of international law. 28 U.S.C. § 1605 et seq.  In the past two decades, Congress has recognized that American citizens must be protected by the extraterritorial reach of U.S. law.  Extending the protection of the civil RICO statute would appear no less warranted.

Regardless of whether the Court accepts plaintiffs' argument to extend the extraterritorial reach of the civil RICO statute, John Doe II requests permission to amend the Complaint to allege a cause of action pursuant to  18 U.S.C. §2333 against the Israeli defendants, the Settler defendants, the Rinat defendants, and other named and unnamed defendants who have aided and abetted Halamish to commit acts of international terrorism against him.

As pertinent to this matter, "international terrorism" is defined in 18 U.S.C.§ 2333(a) as activities that

> (A)involve violent acts or acts dangerous to human life
>    that are a violation of the criminal laws of the United
>    States or of any State, or that would be a criminal
>    violation if committed within the jurisdiction of the

United States or of any State;

(B) appear to be intended (i) to intimidate or coerce a civilian population; and

(C) occur primarily outside the territorial jurisdiction of the United States.

Clearly, John Doe II has alleged that Halamish has engaged in acts of violence against him and his family intended to coerce the civilian Palestinian population to give up their lands and farms. Complaint, ¶ 8, 69, 93-113.   These acts violate U.S. and international criminal law and are acts of international terrorism.  The Rinat defendants have aided and abetted these acts of terrorism. Complaint, ¶ 109.  Simply because defendants' actions have the express or tacit approval of Israel make them no less acts of terrorism.  Israel and its ministers and agencies are not immune from jurisdiction of U.S. courts for acts of state sponsored terrorism. 28 U.S.C. §1605(a)(7).

## II.   THE COMPLAINT SUFFICIENTLY ALLEGES VIOLATIONS OF 18 U.S.C. § 1962 (b), (c) & (d).

John Doe II, like thousands of other Palestinians, has lost his land and business under the Israeli occupation of Palestine.  Stated simply – Israeli settlement policy violates fundamental tenets of international law and amounts to state sponsored terrorism against Palestinians.  The Convention Relative to the Protection of Civilian Persons in Time of War, Aug. 12,

1949, 9 U.S.T. 3516, 75 U.N.T.S. 287 (Fourth Geneva Convention);

Protocol Additional to the Geneva Conventions of 12 August 1949 and

relating to the Protection of Victims of Non-International Armed Conflicts

(Protocol II), opened for signature Dec. 12, 1977, reprinted in 16 I.L.M.

1442 (1977).[3]

Specifically, the acts alleged against each group of defendants –

Israeli policy made by the State of Israel, Arial Sharon and his ministers;

enforced by defendants Israeli military and security forces; implemented by

and for the benefit of the defendants Halamish and its fund-raising arm Neve

Tzuf Foundation; and the funding provided by, among others, the Rinat

defendants; constitute an illegal enterprise that has appropriated the land and

business of John Doe II, an American citizen living in Palestine.  Complaint,

¶ 93-113.

Although the Rinat defendants appear to have difficulty grasping the

nettle of the RICO allegations, the RICO claim is really quite simple –

---

[3] UN Security Council Resolution 465 of 1980 states in relevant part : 5.  Determines that all measurers taken by Israel to change the physical character, demographic composition, institutional structure or status of the Palestinian and other Arab territories occupied since 1967, including Jerusalem, or any part thereof, have no legal validity and that Israel's policy and practices of settling parts of its population and new immigrants in those territories constitute a flagrant violation of the Fourth Geneva Convention … and also constitute a serious obstruction to achieve a comprehensive, just and lasting peace in the Middle East.
The Rome Statute of International Criminal Court (1988) defines "the transfer directly or indirectly by the Occupying power of parts of its own civilian population into the territory it occupies" as a war crime indictable by the International Criminal Court.

indeed it is correctly characterized as a classic case of an illegal organization moving in and taking over a neighborhood by means of coercion, intimidation, extortion, assault and murder. "The motivation for Israel's unending quest for evermore Palestinian land is economic at its core.  Like most racketeering enterprises, Israel seeks to dominate its market area through force and violence and has thereby driven off or destroyed any nascent Palestinian economic competitor."  Complaint, ¶ 113.  When such activity is attributed to John Gotti and his organization few would question that it constitutes racketeering under the RICO statute.

Defendants recite, as if a mantra, "we only gave money, we did nothing more."  John Doe II has alleged, however, that defendants have done far more than donate money to Halamish.  The Complaint, fairly read, alleges that the Rinat defendants in essence filled orders for paramilitary equipment – orders provided by the Halamish. Id. at ¶ 111. It is also alleged that the Rinat defendants filled these orders for paramilitary equipment by soliciting others through its interactive Internet site (id.); all with the knowledge that the Halamish Settlement violates international law and its existence is maintained by threats and coercion of the civilian Palestinian population, including John Doe II.

RICO provides a civil cause of action for "any person injured in his business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c).  Plaintiffs allege violations of three subsections found in section 1962; section 1962 (b), (c) and (d). 18 U.S.C.§ 1962(c) provides that

> It shall be unlawful for any person employed by or associated with any enterprise  engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

Section 1962(d) makes it "unlawful for any person to conspire to violate any of the provision of subsection (a), (b), or (c)" of Section 1962.

To state a claim under §1962(c), a plaintiff must demonstrate: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." *Sedima S.P.R.L. v. Imrex Co., Inc.*, 473 U.S. 479, 496, 87 L.Ed. 2d 346, 105 S. Ct. 3275 (1985). RICO defines "racketeering activity" as the commission of any one of the many enumerated "predicate acts" listed in section 1961(1).  In addition, by its own terms, section 1962(c) requires that, to be actionable under RICO, the enterprise must be "engaged in, or the racketeering activities affect, interstate or foreign commerce." 18 U.S.C. § 1962(c).

Section 1961(1) defines racketeering activity, in relevant parts, as (a) any act or threat involving murder, kidnapping, gambling, arson, robbery,

bribery, extortion…which is chargeable under State law and punishable by imprisonment for more than one year" and (b) "any act which is indictable under" the Hobbs Act, Title 18 U.S.C. §1951 (relating to interference with commerce, robbery, or extortion) 28 U.S.C.§ 1961(1).  Plaintiffs have alleged numerous predicate acts, including attempted murder and arson.  See Complaint ¶ 465. These acts constitute "racketeering activity" as defined in section 1961.

In order to plead a civil RICO violation, plaintiffs must allege the existence of an enterprise, "a group of persons associated together for a common purpose of engaging in a course of conduct."  *Procter & Gamble Co. v. Big Apple Indus. Bldgs., Inc.*, 879 F. 2d 10, 15 (2d Cir. 1989).  Under RICO, an enterprise "includes any individual, partnership, corporation, association or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. §1961(4).

Plaintiffs allege a RICO enterprise between the Israeli defendants, the Settlement, the Foundation, the One Israel Fund, and the Rinat defendants. Each of these named participants is an "individual or entity capable of holding a legal or beneficial interest in property," thus satisfying 18 U.S.C.§1961(3). See, *United States v. Angelilli*, 660 F.2d 23, 30-33 (2d Cir. 1981)(section 1961(4) definition of "enterprise" encompasses governmental

entity).  Plaintiffs further allege that the various defendants coordinated activities in an effort to facilitate the illegal appropriation of John Doe II's land and olive groves.  These allegations satisfy plaintiffs' pleading burden to overcome a motion to dismiss.

The Rinat defendants argue that they exercised no control over the enterprise.  The statute does not require "control", it requires only an "interest" in the enterprise.  18 U.S.C.§1962(b).  Defendants regular and continuous donations of thousands of dollars earmarked for specific paramilitary equipment more than suggests an interest in the success of the enterprise – the occupation of John Doe II's land and the exclusion of John Doe II from his land.

Defendants further argue that the elements of 18 U.S.C.§1962(c) have not been alleged – specifically defendants question the lack of organization of the enterprise and assert that no pattern of racketeering activity has been alleged.  Defendants are wrong on both counts.  First, section 1962(c) does not require a rigid organization; a loosely connected group with a clear common purpose is sufficient.  Here, the Complaint alleges a clear common purpose – the illegal appropriation and occupation of John Doe II's land through intimidation and coercion.  Each of the groups of defendants, including the Rinat defendants, is alleged to play a definite and specific part

in achieving their common purpose.  Defendants' characterization of the

RICO enterprise as "far-flung" and "amorphous" does not alter the fact that

a RICO enterprise has been alleged.  Also alleged is defendants' conduct

with respect to the enterprise – to raise money and fill orders for paramilitary

equipment used to coerce and intimidate John Doe II and other Palestinians.

Defendants' assertion that the armored vehicle and night vision

goggles and other equipment could just as easily be used for security

purposes as for offensive purposes misses the point.  The illegal occupation

of the land is the RICO enterprise.  Sending paramilitary equipment to

"secure" that illegal occupation is "conduct" in furtherance of the illegal

enterprise.  The fact that John Doe II cannot at the pleading stage trace the

exact night vision goggles used in the nighttime raid on his home can hardly

be used as grounds for dismissal.  Defendants' claims to the contrary

misapprehend the rules applied to motions to dismiss.  There will be plenty

of opportunity for the Rinat defendants to establish that, as a matter of fact,

their support was unrelated to the illegal taking and occupation of John Doe

II's land.

Fairly read, John Doe II alleges the essential elements to satisfy

18U.S.C.§1962(c) - conduct of an enterprise – the illegal appropriation and

occupation of John Doe II's land – through a pattern of racketeering activity

- regularly and systematically raising money to purchase and filling orders for paramilitary equipment for the Halamish Settlement.

Defendants argue that 18 U.S.C.§1962(d) is not satisfied because the Complaint fails to allege an agreement between the Rinat defendants and the other RICO participants.  This assertion is patently false and frivolous.  John Doe II alleges that the Halamish settlers' provide the Rinat defendants with a specific list of paramilitary equipment and the Rinat defendants endeavor to raise money to purchase these specific items.  Again, defendants seek to wash their hands of the matter by claiming there was no specific agreement that the equipment would be used for illegal offensive purposes against John Doe II.  Such an agreement is not necessary to satisfy the pleading requirements – John Doe II alleges that the occupation of his land itself is illegal and constitutes racketeering activity.  Any agreement - - tacit or express - - to assist the illegal occupation of his land is perforce an agreement in furtherance of racketeering activity.

Defendants' claim that the RICO enterprise is not alleged to be the proximate cause of John Doe II's injury is likewise without merit.  As Judge Lamberth stated  in *W.L. Meng, et al. v. Schwartz et al*., 116 F. Supp. 2d 92 (D.C. Dist. 2000),  "the Second Circuit has extensively explored the concept of causation in the RICO context.  Its exploration reveals [that]…, proximate

causation demands that the plaintiff be the intended target of the RICO violation." Id. at 95. The Complaint alleges that John Doe II was driven from his land by threats and coercion and that the Rinat defendants made those threats and coercion possible by providing the means to purchase paramilitary equipment. John Doe II is a Palestinian landowner, who has been driven from his land – he is the quintessential "intended target of the RICO violation". Moreover, the Rinat defendant funding of the Halamish orders was a substantial factor in the sequence of responsible causation and John Doe II's injury was the intended and reasonably foreseeable consequence of that funding. See, *Hecht v. Commerce Clearing House, Inc*., 897 F.2d 21, 25 (2d. Cir. 1990).

## III.   THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA HAS PERSONAL JURISDICTION OVER CONGREGATION RINAT YISRAEL AND RABBI YOSEF ADLER

Although none of the Rinat defendants resides in the District of Columbia, the requirements for the District of Columbia's long-arm statute are met here. A federal court can exercise personal jurisdiction over non-residential defendants if (1) the long-arm statute confers personal jurisdiction over the defendants; and (2) exercise of such jurisdiction is consistent with due process under the United States Constitution. The Rinat

defendants transact business in the District and their contacts with the

District are in furtherance of the conspiracy alleged.  As such, exercising

jurisdiction over these defendants does not offend the traditional notions of

fair play and substantial justice.

## A.    Long-Arm Jurisdiction

The District of Columbia's long-arm statute provides that the Court may

exercise personal jurisdiction over:

> A person who acts directly or by an agent as to a claim
> for relief arising from the person's (1) transacting any
> businessin the District of Columbia; or (2) causing
> tortious injury in the District of Columbia by an act or
> omission outside the District of Columbia if he regularly
> does or solicits business, engages in any other persistent
> course of conduct, or derives substantial revenue from
> goods used or consumed, or services rendered, in the
> District of Columbia.

D.C. Code §13-423(a)(4).

As held in *Heroes Inc. v. Heroes Foundation*, 958 F. Supp. 1, 2 (D.

D.C. 1996),  "The 'transacting of business' clause of the District's long-arm

statute provides jurisdiction to the full extent allowed by the Due Process

Clause."  Therefore, the constitutional jurisdictional question merges with

the statutory analysis to become a single inquiry.  *U.S. v. Ferrara*, 54 F.3d

825, 828 (D.C. Cir. 1995).  The Due Process Clause permits the exercise of personal jurisdiction over a non-resident defendant when (1) the defendant has purposefully availed himself of the benefits and protections of the forum state by establishing "minimum contacts" with the forum state; and (2) the exercise of personal jurisdiction over the defendant does not offend the "traditional notions of fair play and substantial justice."  *International Shoe Co. v. State of Washington*, 326 U.S. 310, 316 (1945).

Minimum contacts can give rise to specific or general jurisdiction. Specific jurisdiction occurs when the contacts with the forum state arise from or are directly related to the cause of action.  *Helicopteros Nacionals de Columbia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984)  In the case at hand, specific jurisdiction exists through the defendant's Internet contacts with the District of Columbia.

In determining whether there is personal jurisdiction through contacts with the District via the Internet, the Courts have focused on the level of inter-activity the site provides.  *Blumenthal v. Drudge*, 992 F. Supp. 44, 56 (D. D.C. 1998); *Zippo Mfg. Co. v. Zippo Dot Com, Inc.*, 952 F. Supp. 1119, 1124 (W.D. Pa 1997) (in exercising personal jurisdiction over the defendant, the courts must look to the "nature and quality of commercial activity that an entity conducts over the Internet").  See also, *Maritz Inc. v. Cybergold Inc*,

947 F. Supp. 1328, 1332-33 (E.D. Mo. 1996) (jurisdiction is exercised over a defendant where an interactive web site encourages browsers to add their address to a mailing list subscribing the user to the service.); *Heroes Inc*., 958 F. Supp. at 5 (explicit solicitation of contributions, contact information for making contributions, the subject matter of the underlying claim is contained on the web site, and the fact that the site can be accessed in the forum state twenty-four (24) hours a day are all significant contacts for determining personal jurisdiction.).  Compare, *Bensusan Restaurant Corp. v. King*, 937 F. Supp. 295, 299-300 (S.D.N.Y. 1996), aff'd 126 F3d 25 (2d Cir. 1997) (no personal jurisdiction where defendant's web site is passive).

The Congregation maintains an interactive web site which is accessible twenty-four (24) hours a day to DC residents and solicits donations to support the Congregation and it's mission.  Additionally, the site allows users to interact with the host computer, Congregation and Rabbi via e-mail as well as subscribing to various services offered. The Congregation's web site is an interactive site providing more then mere information to the interested Internet web surfer.  This site actively solicits monetary contributions as well as volunteer services and suggestions from subscribers and the general public.  The site provides information as to

where contributions are to be sent, as well as whom to make the checks payable.

There is a window on the site that is titled "Israel Action." This window solicits general monetary support for Israel as well as the Rabbi's Discretionary Fund. Both the general site and the Israel Action page have subscriber availability as well as e-mail, question and concern interaction.

The web site sets forth the missions for both the general Congregation and its Israel Action activity. Subscribers and interested persons can be very interactive with the Congregation; providing monetary support, volunteering time and talent, as well as obtaining information and contact links with various supportive programs for Israel, some named as co-defendants in this case. District residents can gain access to the page any time of the day.

In *Heroes Inc.*, 958 F. Supp. at 5, the Court sets forth the weighty contacts the web site provides for establishing personal jurisdiction. The Court notes the significance of the explicit solicitation of contributions; that the site provides contact information for the purpose of making the contribution; that the site contains the subject of the Plaintiffs' underlying claim; and that the page sustains contact with the District of Columbia highlighting that the access may be gained at any time, twenty-four (24) hours a day. *Heroes Inc.*, 958 F. Supp. at 5.

In the case at hand, the same contacts via the Internet are present. The Congregation's web site explicitly solicits contributions.  Contributions are solicited on more than one page of the site and for various purposes.  It also provides links to additional sites to make contributions.  The Congregation's web site provides specific information on how to make the contribution, including who to make the check payable to and address of where to send it.  The subject of the Plaintiffs' underlying claim is itself an individual page on the web-site – "Israel Action".  This page provides significant interaction for the user and/or subscriber to actively increase his or her personal involvement with the Israeli settlement movement.

The ability of the subscriber to access either the general page or "Israel Action" to actively participate in the continued hostility between the Palestinians and the Israelis is accomplished through this web site.  The participant can support the efforts through general or specific monetary donations, through donations of their personal time, or through continued correspondence with the host of the site.  This site provides the link between the residents of the District and the Israeli settlement community, located half a world apart.  This web site provides more than mere posting of information for the Internet surfer.  The various subscriptions available, as well as solicitations, e-mail and comments sought provide the continued

contact between the forum and the Rinat defendants.  The Court has looked to these contacts as integral in determining personal jurisdiction.

Although the courts have not gone as far as to determine jurisdiction without non-Internet contacts being present, it has been unequivocally stated that a web site could provide the contacts necessary to avail the defendants of the privileges of the state and confer personal jurisdiction.  *See Heroes, Inc.*, 958 F. Supp. at 5 ("…the Court need not decide whether the defendant's home page by itself subjects the defendant to personal jurisdiction in the District."); *Neogen Corp. v. Neo Gen Screening, Inc.*, 282 F. 3d 883, (6th Cir. 2002) ("Whether NGS's web site alone would be sufficient to sustain personal jurisdiction… is a close question and need not be decided on this appeal).

Because the level of inter-activity of the Rinat defendants' site provides personal jurisdiction in this matter, the more difficult question of whether a mere web page satisfies the long-arm statute need not be reached.

**IV.    THE COMPLAINT IS FAIRLY READ TO ALLEGE THAT THE RINAT DEFENDANTS ARE LIABLE FOR COMMON LAW TORTS AS CO-CONSPIRATORS WITH AND AIDERS AND ABETTORS OF THE HALAMISH SETTLEMENT.**

Defendants are good enough to provide a primer on the tort law of Washington D.C. and assert that each of the common law torts alleged

against the Rinat defendants must be dismissed on the ground that the Rinat "only contributed money."  As discussed above, this defense is legally and factually deficient.  Again, the Complaint alleges more than the Rinat defendants gave money.  The Complaint alleges that the Rinat defendants solicited funds in order to fill specific orders for paramilitary equipment. Moreover, the tort law in Washington D. C. amply recognizes the principles of joint liability for those acting in a common scheme and for a common purpose.

The Complaint alleges that the Rinat defendants engaged in a civil conspiracy. Complaint ¶ 2, 74.  Moreover, the factual allegations in the Complaint give more than adequate notice to the Rinat defendants that they are being sued as conspirators with and aiders and abettors of the Halamish Settlement.  See, Complaint ¶ 109. Defendants correctly state the law of civil conspiracy and then proceed to misapply the law to the facts alleged in the Complaint.  "A cause of action for civil conspiracy must allege the formation and operation of the conspiracy, wrongful acts done in furtherance of the common scheme, and damages suffered as a result." *Sturdza v. United Arab Emirates*, 281 F.3d 1287, 1306 (D.C.Cir. 2002).  If the object is to steal a car and I provide the tool kit, I am just as liable for the theft even if I never saw the car, never drove the car, or never appeared in the same

location as the car.  Likewise, the Rinat defendants are civilly liable for the

common law torts alleged in the Complaint because they provided money

and equipment knowing and intending that the money and equipment would

be used to further the illegal occupation of John Doe II's land.  Defendants

continue to maintain there was no agreement even in the face of the

allegation that the Halamish Settlement provided detailed orders of

paramilitary equipment and the Rinat defendants endeavored to raise funds

to fill those orders. Id. ¶ 111.

In addition to the civil conspiracy theory, the Complaint is fairly read

to allege that the Rinat defendants aided and abetted the Halamish settlers'

tortious conduct.  The Restatement (Second) of Torts provides for civil

liability for aiders and abettors by holding an actor liable for harm resulting

to a third person from the tortious conduct of another if the actor knows the

other's conduct constitutes a breach of duty and the actor gives substantial

assistance or encouragement to the other.  Restatement (Second) of Torts,

§876(b); see generally, *Halberstam v. Welch*, 705 F.2d 472 (D.C. Cir.

1983)(describing the standards for joint liability for tortious acts).

Here, the Complaint alleges that the Rinat defendants "have

knowingly provided funds specifically earmarked for materials that are used

by the [Halamish] Settlement to illegally terrorize neighboring property

28

owners and confiscate their land." Complaint, ¶ 74.  The elements of aider

and abettor liability are alleged in the above quoted paragraph – provision of

substantial assistance to another with knowledge that the other's tortious

conduct may harm a third person.  The factual claims underlying the tortious

conduct and harm are alleged in paragraphs 93-113 in the Complaint and are

specifically alleged in each common law tort cause of action.  The Rinat

defendants' knowledge is alleged based on the general understanding and

agreement in the international community that the Israeli policy in general

and the specific application of that policy at Halamish is a gross violation of

international law.  Moreover, the nature of the equipment requested put the

Rinat defendants on notice that the Halamish settlers were occupying land

by force or threat of force.  Just as the charities in *Boim* were presumed to be

on notice of the illegality of Hamas activity in Israel, so too must the Rinat

defendants be charged with the knowledge of the illegality of the settlement

policy they support.

At the very least, Plaintiffs must be afforded the opportunity to

establish the depth of the Rinat defendants' knowledge of the Halamish

settlers' tortious conduct through discovery and trial.

## CONCLUSION

One cannot help but wonder if the roles were reversed and the plaintiffs were Israeli-Americans whose land was alleged to have been confiscated illegally by the Palestinian Authority with the assistance of not an American synagogue but an American mosque would the defense of "we only gave money" carry the day?  The relative politics of the parties cannot be allowed to dictate the outcome.  Just as Joyce Boim is allowed access to the U.S. courts to hold those who would fund Hamas accountable for the actions of Hamas in Israel; John Doe II must be allowed access to federal courts to hold accountable those who would fund the theft of his land and business through coercion, intimidation, assault and attempted murder. Justice requires no less.

STANLEY L. COHEN, ESQ.
*Pro Hac Vice*
Attorney for Plaintiffs
119 Avenue D
New York, New York 10009


Mahar Hanania, Esq.
Local Counsel
1510 H Street N.W. Suite 20
Washington, DC 20005
Bar No.: 464766

**TABLE OF AUTHORITIES**

**Cases:**

Bensusan Restaurant Corp. v. King, 937 F. Supp. 295, 299-300          Pg. 23
(S.D.N.Y. 1996), aff'd 126 F3d 25 (2d Cir. 1997)

Bersch v. Drexel Firestone, Inc., 519 F.2d 974, 985 (2d Cir. 1975)    Pg. 5

Blumenthal v. Drudge, 992 F. Supp. 44, 56 (D. D.C. 1998)             Pg. 22

Boim v. Quranic Literacy Institute et.al., 291 F.3d 1000          Pg. 10, 29
(7th Cir. 2002).

Consolidated Gold Fields PLC v. Minorco, S.A., 871 F.2d 252,          Pg. 7
261-62 (2d Cir. 1989)

EEOC v. St. Francis Xavier Parochial School, 117 F.3d 621,            Pg. 3
624 (D.C. Cir. 1997)

Halberstam v. Welch, 705 F.2d 472, 477 (D.C. Cir. 1983).             Pg. 28

Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 25              Pg. 20
(2d. Cir. 1990)

Helicopteros Nacionals de Columbia, S.A. v. Hall, 466 U.S. 408,      Pg. 22
414 n.8 (1984)

Heroes Inc. v. Heroes Foundation, 958 F. Supp. 1, 2        Pg. 21, 22, 24, 26
(D. D.C. 1996)

International Shoe Co. v. State of Washington, 326 U.S. 310, 316     Pg. 22
(1945)

Maritz Inc. v. Cybergold Inc, 947 F. Supp. 1328, 1332-33            Pg. 22

(E.D. Mo. 1996)

National Bank of Canada v. Interbank Card Ass'n, 666 F. 2d 6, 8          Pg. 8
(2d Cir. 1981)

Neogen Corp. v. Neo Gen Screening, Inc., 282 F. 3d 883,                  Pg. 26
(6th Cir. 2002)

North South Finance Corp. v. Al-Turki, 100 F.3d 1046, 1051       Pg. 4, 5, 7
(2d Cir. 1996)

Phillips v. Bureau of Prisons, 591 F.2d 966, 968 (D.C. Cir. 1979)        Pg. 3

Psimenos v. E.F. Hutton & Co., 722 F.2d 1041, 1046 (2d Cir. 1983)  Pg. 5

Procter & Gamble Co. v. Big Apple Indus. Bldgs., Inc., 879 F. 2d 10, Pg. 16
15 (2d Cir. 1989)

Scheuer v. Rhodes, 416 U.S. 232, 236, 40 L.Ed. 2d 90, 94                 Pg. 3
S.Ct. 1683 (1974)

Sedima S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 496, 87 L.Ed.          Pg. 15
2d 346, 105 S. Ct. 3275 (1985)

Sturdza v. United Arab Emirates, 281 F.3d 1287, 1306                     Pg. 27
(D.C.Cir. 2002)

United States v. Angelilli, 660 F.2d 23, 30-33 (2d Cir. 1981)           Pg. 16

U.S. v. Ferrara, 54 F.3d 825, 828 (D.C. Cir. 1995)                      Pg. 21

W.L. Meng, et al. v. Schwartz et al., 116 F. Supp. 2d 92                Pg. 19
(D.C. Dist. 2000)

Zippo Mfg. Co. v. Zippo Dot Com, Inc., 952 F. Supp. 1119,              Pg. 22
1124         (W.D. Pa 1997)

**Statutes:**

18 U.S.C. § 1951                                                        Pg. 15

18 U.S.C. § 1961                                                    Pg. 15, 16

18 U.S.C. § 1962                 Pg. 12, 14, 15, 16, 17, 18

18 U.S.C. § 1964                                                 Pg. 14

18 U.S.C. § 2333                                             Pg. 9, 11

28 U.S.C. § 1605                                           Pg. 10, 12

**Other:**

The Convention Relative to the Protection of Civilian Persons      Pg. 12
in Time of War, Aug. 12, 1949, 9 U.S.T. 3516, 75 U.N.T.S. 287
(Fourth Geneva Convention);

Protocol Additional to the Geneva Conventions of 12 August 1949     Pg. 12
and relating to the Protection of Victims of Non-International
Armed Conflicts (Protocol II), opened for signature Dec. 12, 1977,
reprinted in 16 I.L.M. 1442 (1977).

UN Security Council Resolution 465 of 1980         footnote    Pg. 12

Rome Statute of International Criminal Court (1988)      footnote    Pg. 13

Restatement (Second) of Torts, §876(b)                       Pg. 28

## TABLE OF CONTENTS

STATEMENT OF FACTS                                      1

STANDARD OF REVIEW                                   3

I.      THE CIVIL RACKETEER INFLUENCED AND CORRUPT              3
        ORGANIZATION ACT (RICO) SHOULD BE GIVEN
        EXTRATERRITORIAL EFFECT UNDER THE FACTS
        AS ALLEGED


II.     THE COMPLAINT SUFFICIENTLY ALLEGES VIOLATIONS          12
        OF 18 U.S.C. § 1962 (b), (c) & (d).


III.    THE UNITED STATES DISTRICT COURT FOR THE DISTRICT      20
        OF COLUMBIA HAS PERSONAL JURISDICTION OVER
        CONGREGATION RINAT YISRAEL AND RABBI YOSEF ADLER


IV.     THE COMPLAINT IS FAIRLY READ TO ALLEGE THAT            26
        THE RINAT DEFENDANTS ARE LIABLE FOR COMMON
        LAW TORTS AS CO-CONSPIRATORS WITH AND
        AIDERS AND ABETTORS OF THE HALAMISH SETTLEMENT.


CONCLUSION                                                     29