# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOHN DOE, *et al.,* | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| STATE OF ISRAEL, ARIEL SHARON in his | ) |
| individual capacity and as former Israeli Minister | ) |
| of Defense, NATAN SHARANSKI individually | ) |
| and in his capacity as Israeli Minister of | ) |
| Construction and Housing, BINYAMIN BEN | ) |
| ELIEZER individually and in his capacity as | ) |
| Israeli Minister of Defense, SHIMON PERES | ) |
| individually and in his capacity as Israeli | ) |
| Minister of Foreign Affairs, UZI LANDAU | ) |
| individually and in his capacity as Israeli | ) |
| Minister of Internal Security, MEIR SHEETRIT | ) |
| individually and as Israeli Minister of Justice, | ) |
| THE ISRAELI GENERAL SECURITY | ) |
| SERVICE (the "Shin Bet"), AVI DICHTER, the | ) |
| head of the Shin Bet, ISRAELI DEFENSE | ) |
| FORCES (IDF), LT. GENERAL SHAUL | ) |
| MOFAZ individually and as Chief of the General | ) |
| Staff, MAJOR GENERAL AMOS GILAD | ) |
| individually and as the IDF Coordinator of | ) |
| Government Activities in Judea, Samaria and the | ) |
| Gaza, MAJOR GENERAL AHARON ZE'EVI | ) |
| FARKASH individually and as IDF Director of | ) |
| Military Intelligence, AMOS YARON | ) |
| individually and in his capacity as Secretary | ) |
| General of the Defense Ministry and as former | ) |
| Brigadier General and Commandant of IDF | ) |
| forces in Beirut, Lebanon (collectively the | ) |
| "Israeli Defendants"), *et al.,* | ) |
| | ) |
| Defendants. | ) |
| | ) |

Civil Action No. 1:02 CV 01431 (JDB)

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THE STATE OF ISRAEL'S AND RELATED DEFENDANTS' MOTION TO DISMISS THE COMPLAINT**

## TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................1

ARGUMENT ..............................................................................................................5

I.  PLAINTIFFS HAVE NOT SERVED THE ISRAELI
    GOVERNMENT DEFENDANTS IN ACCORDANCE WITH
    THE LAW..........................................................................................5

    A.  The Foreign Sovereign Immunities Act Requires Strict
        Compliance with the Hague Convention for Service on the
        State of Israel and Related Defendants ............................................6

    B.  Plaintiffs Have Not Complied with the Hague Convention ...........9

II. THE COURT LACKS SUBJECT MATTER JURISDICTION
    BECAUSE THE STATE OF ISRAEL AND ITS OFFICIALS
    ARE IMMUNE FROM SUIT...................................................................12

    A.  Israel, the IDF and Shin Bet Are Immune from Suit Under
        the FSIA .......................................................................................13

        1.  Israel Has Not Waived Its Immunity Under the
            FSIA ..................................................................................14

        2.  The FSIA Exception for "Commercial Activity"
            Does Not Apply ...............................................................16

        3.  The FSIA "Tortious Act" Exception Does Not
            Apply.................................................................................19

    B.  Israel's Sovereign Immunity Extends to Officials Acting on
        Its Behalf .......................................................................................19

    C.  Head of State Immunity Bars Any Suit Against the Prime
        Minister .........................................................................................23

## <u>TABLE OF CONTENTS</u>

continued…

<u>Page</u>

III.    THE COURT LACKS JURISDICTION OVER THE
        INDIVIDUAL ISRAELI DEFENDANTS TO THE EXTENT
        SUED IN THEIR PERSONAL CAPACITIES .........................................24

        A.    Plaintiffs Have Not Alleged Jurisdictional Contacts for the
              Individual Defendants in Their Personal Capacities.....................24

        B.    Plaintiffs Could Not Satisfy The Requirements of the D.C.
              Long-Arm Statute or of Due Process with Respect to the
              Individual Defendants....................................................................26

        C.    Plaintiffs' Peremptory Allegations of Conspiracy Cannot
              Ground Personal Jurisdiction over the Individual
              Defendants .....................................................................................28

IV.     THE COURT SHOULD DECLINE TO EXERCISE
        JURISDICTION UNDER THE POLITICAL QUESTION  AND
        ACT OF STATE DOCTRINES................................................................30

        A.    The Complaint Raises Nonjusticiable Political Questions
              Reserved to the Executive Branch ..................................................30

        B.    The Complaint Asks the Court To Judge the Legality and
              Validity of Sovereign Acts by Israel..............................................39

CONCLUSION...........................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**:

*Aktepe v. United States*, 105 F.3d 1400 (11th Cir. 1997) ...........................................33, 34

*Al Odah v. United States*, 321 F.3d 1134 (D.C. Cir. 2003) ........................................13, 14

*Alfred Dunhill v. Republic of Cuba*, 425 U.S. 682 (1976)...........................................39, 42

*Ali v. Dist. of Columbia*, 278 F.3d 1 (D.C. Cir. 2002).......................................................25

*Anderman v. Fed. Republic of Austria,* No. CV01-01769FMCAIJX, 2003 WL 1903455 (C.D. Cal. Apr. 15, 2003)..........................................................................35

*Antolok v. United States*, 873 F.2d 369 (D.C. Cir. 1989) ..................................................31

\* *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989) ..........5, 13, 15

*Asociacion de Reclamantes v. United Mexican States*, 735 F.2d 1517 (D.C. Cir. 1984) ...................................................................................................................19

\* *Baker v. Carr*, 369 U.S. 186 (1962)................................................................................30, 31

\* *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398 (1964) ...............................39, 40, 45

\* *Bao Ge v. Li Peng*, 201 F. Supp. 2d 14 (D.D.C. 2000), *aff'd*, No. 00-7290, 2002 WL 1052012 (D.C. Cir. Mar. 1, 2002) .................17, 18, 22, 44

*Bernstein v. Van Heyghen Freres Societe Anonyme*, 163 F.2d 246 (2d Cir. 1947)...........39

*Campbell v. Clinton*, 203 F.3d 19 (D.C. Cir. 2000)...........................................................43

*Chicago & S. Air Lines Inc. v. Waterman S.S. Corp.*, 333 U.S. 103 (1948).....................31

*Chuidian v. Philippine Nat'l Bank*, 912 F.2d 1095 (9th Cir. 1990).........................8, 19, 22

\* *Cicippio v. Islamic Republic of Iran*, 30 F.3d 164 (D.C. Cir. 1994) ....................17, 19, 22

*Color Sys., Inc. v. Meteor Photo Reprographic Sys., Inc.,* No. Civ. A. 86-2516, 1987 WL 11085 (D.D.C. May 8, 1987).................................................................9

*Creighton Ltd. v. Gov't of Qatar*, 181 F.3d 118 (D.C. Cir. 1999)....................................14

## TABLE OF AUTHORITIES

continued…

**Page(s)**

*Crockett v. Reagan*, 558 F. Supp. 893 (D.D.C.), *aff'd*, 720 F.2d 1355
    (D.C. Cir. 1983) ...........................................................................43

*Croesus EMTR Master Fund L.P. v. Federative Republic of Brazil*,
    212 F. Supp. 2d 30 (D.D.C. 2002) ........................................18

*Daliberti v. Republic of Iraq*, 97 F. Supp. 2d 38 (D.D.C. 2000) ......................................17

*DeNegri v. Republic of Chile,* No. Civ. A. 86-3085, 1992 WL 91914
    (D.D.C. 1992) ...........................................................................14, 15, 16

*Doe v. Islamic Salvation Front*, 993 F. Supp. 3 (D.D.C. 1998).........................................25

*Doe v. Unocal Corp.,* Nos. 00-56603, 00-57195, 00-57197, 00-56628,
    2002 WL 31063976  (9th Cir. Sept. 18, 2002) .....................................18

*Dorman v. Thornburgh*, 740 F. Supp. 875 (D.D.C. 1990),
    *aff'd in relevant part*, 955 F.2d 57 (D.C. Cir. 1992).......................................27, 29

*Eisenfeld v. Islamic Republic of Iran*, 172 F. Supp. 2d 1 (D.D.C. 2000) ...........................7

\*   *El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668 (D.C. Cir. 1996)............................... *passim*

*El-Hadad v. Embassy of the UAE*, 69 F. Supp. 2d 69 (D.D.C. 1999), *rev'd in part*
    *on other grounds*, 216 F.3d 29 (D.C. Cir. 2000) ........................................8, 19, 26

*Envtl. Tectonics v. W.S. Kirkpatrick, Inc.*, 847 F.2d 1052 (3d Cir. 1988), *aff'd,*
    493 U.S. 400 (1990)...................................................................41

\*   *First Am. Corp. v. Al-Nahyan*, 948 F. Supp. 1107 (D.D.C. 1996)...................................23

*First Chicago Int'l v. United Exch. Co.*, 836 F.2d 1375 (D.C. Cir. 1988) .................24, 25

*Ford ex rel. Estate of Ford v. Garcia*, 289 F.3d 1283 (11th Cir. 2002),
    *cert. denied*, 123 S. Ct. 868 (2003) .......................................................44

*Friedman v. Israel Labour Party,* No. Civ. A. 96-CV-4702, 1997 WL 379181
    (E.D. Pa. July 2, 1997) ........................................................................11

*Frolova v. USSR*, 761 F.2d 370 (7th Cir. 1985) ................................................................15

*GTE New Media Servs., Inc. v. Bellsouth Corp.*, 199 F.3d 1343 (D.C. Cir. 2000) ..........27

*Gibbons v. Republic of Ireland*, 532 F. Supp. 668 (D.D.C. 1982)....................................13

# TABLE OF AUTHORITIES

continued…

                                                                                    **Page(s)**

*Goldwater v. Carter*, 444 U.S. 996 (1979) .......................................................31

*Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408 (1984) ......................26

*Herbage v. Meese*, 747 F.Supp. 60 (D.D.C. 1990), *aff'd*, 946 F.2d 1564
    (D.C. Cir. 1991) ................................................................................8, 19, 21

*Hilao v. Estate of Marcos*, 103 F.3d 767 (9th Cir. 1996) ..................................44

*Hilao v. Marcos (In re Estate of Ferdinand Marcos Human Rights Litig.)*,
    94 F.3d 539 (9th Cir. 1996) ...............................................................15

*Holtzman v. Schlesinger*, 484 F.2d 1307 (2d Cir. 1973)........................................43

\* *Hwang Geum Joo v. Japan*, 172 F. Supp. 2d 52 (D.D.C. 2001)................................. *passim*

*Int'l Ass'n of Machinists v. OPEC*, 649 F.2d 1354 (9th Cir. 1981)...................................40

*Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945)........................................................28

*Iwanowa v. Ford Motor Co.*, 68 F. Supp. 2d 424 (D.N.J. 1999)..................................35

\* *Jungquist v. Nahyan*, 115 F.3d 1020 (D.C. Cir. 1997) ............................................. *passim*

*Kline v. Republic of El Salvador*, 603 F. Supp. 1313 (D.D.C. 1985) ...............................19

*Kucinich v. Bush*, 236 F. Supp. 2d 1 (D.D.C. 2002).....................................................30, 31

\* *Lafontant v. Aristide*, 844 F. Supp. 128 (E.D.N.Y. 1994) ............................................19, 23

*Linder v. Portocarrero*, 963 F.2d 332 (11th Cir. 1992).................................................33, 34

*Luftig v. McNamara*, 373 F.2d 664 (D.C. Cir. 1967) .......................................................43

*MacArthur Area Citizens Ass'n v. Republic of Peru*, 809 F.2d 918
    (D.C. Cir. 1987) ......................................................................................13

*Made in the USA Found. v. United States,* 242 F.3d 1300, 1312
    (11th Cir. 2001).......................................................................................31

*Magness v. Russian Fed'n*, 247 F.3d 609 (5th Cir. 2001) ...............................................6, 7

## TABLE OF AUTHORITIES
continued…

Page(s)

*Millen Indus., Inc. v. Coordination Council for North Am. Affairs*, 855 F.2d 879
(D.C. Cir. 1998) ..............................................................................41

*Monell v. Dep't of Soc. Servs. of N.Y.*, 436 U.S. 658 (1978) ...............................8

*Moskovits v. Drug Enforcement Admin.*, 774 F. Supp. 649 (D.D.C. 1991)......................27

*Overseas Partners, Inc. v. PROGEN Musavirlik ve Yonetim Hizmetleri, Ltd.*
*Sikerti*, 15 F. Supp. 2d 47 (D.D.C. 1998)..................................................24

*Park v. Shin*, 313 F.3d 1138 (9th Cir. 2002).....................................................20

*Persinger v. Islamic Republic of Iran*, 729 F.2d 835 (D.C. Cir. 1984) .............................19

*Phoenix Consulting Inc. v. Republic of Angola*, 35 F. Supp. 2d 14 (D.D.C. 1999),
*rev'd on other grounds*, 216 F.3d 36 (D.C. Cir. 2000).............................................7

\*   *Princz v. Fed. Republic of Germany*, 26 F.3d 1166 (D.C. Cir. 1994) .................14, 16, 18

*Ramey v. Bowsher,* 915 F.2d 731 (D.C. Cir. 1990) ............................................21

*Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607 (1992) ....................................17, 18

*Richard v. Bell Atl. Corp.*, 946 F. Supp. 54 (D.D.C. 1996).......................................25

*Roe v. Unocal Corp.*, 70 F. Supp. 2d 1073 (C.D. Cal. 1999) ...............................39, 42, 44

*Saltany v. Reagan*, 702 F. Supp. 319 (D.D.C. 1988), *aff'd in relevant part,*
*rev'd in part*, 886 F.2d 438 (D.C. Cir. 1989)..................................................23, 42

*Sampson v. Fed. Republic of Germany*, 250 F.3d 1145 (7th Cir. 2001)...........................16

\*   *Sarei v. Rio Tinto PLC*, 221 F. Supp. 2d 1116 (C.D. Cal. 2002)................................35, 42

\*   *Saudi Arabia v. Nelson*, 507 U.S. 349 (1993)..............................................13, 17

*Second Amendment Found. v. United States Conference of Mayors*, 274 F.3d 521
(D.C. Cir. 2001) .........................................................................24, 29

*Shapiro v. Republic of Bolivia*, 930 F.2d 1013 (2d Cir. 1991) .........................................15

*Siderman de Blake v. Republic of Argentina*, 965 F.2d 699 (9th Cir. 1992) ...............15, 16

*Smith v. Socialist People's Libyan Arab Jamahiriya*, 101 F.3d 239 (2d Cir. 1997)..........16

## TABLE OF AUTHORITIES
continued…

**Page(s)**

*Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court*, 482 U.S. 522 (1987) ................................................................................................................8

*Sunlite, Inc. v. BfG Bank AG*, 849 F. Supp. 74 (D.D.C. 1994) ...........................25

*Tachiona v. Mugabe*, 169 F. Supp. 2d 259 (S.D.N.Y. 2001) .............................23

*Tel-Oren v. Libyan Arab Republic,* 726 F.2d 774, 801-23 (D.C. Cir.), *cert. denied*, 470 U.S. 1003 (1984) ........................................................13, 34

*Trajano v. Marcos (In re Estate of Ferdinand E. Marcos Human Rights Litig.)*, 978 F.2d 493 (9th Cir. 1992) ..........................................................14, 19

\* *Transaero Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148 (D.C. Cir. 1994) ................6, 7

*Underwood v. United Republic of Tanzania*, Civ. No. 94-902, 1995 WL 46383 (D.D.C. Jan. 27, 1995) ..............................................................................7

*United States v. Ferrara*, 54 F.3d 825 (D.C. Cir. 1995) ....................................25

*United States v. Philip Morris Inc.*, 116 F. Supp. 2d 116 (D.D.C. 2000) .........................28

*Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694 (1988) ...............................9

*Von Dardel v. USSR*, 736 F. Supp. 1 (D.D.C. 1990) ........................................19

*W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp. Int'l*, 493 U.S. 400 (1990) ..................39

*Wiggins v. Equifax, Inc.*, 853 F. Supp. 500 (D.D.C. 1994) ...............................25

*World Wide Minerals Ltd. v. Republic of Kazakhstan*, 116 F. Supp. 2d 98 (D.D.C. 2000), *aff'd in part, remanded on other grounds*, 296 F.3d 1154 (D.C. Cir. 2002), *cert. denied*, 123 S. Ct. 1250 (2003) .............................25, 27, 29

\* *World Wide Minerals Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154 (D.C. Cir. 2002), *cert. denied*, 123 S. Ct. 1250 (2003) .............................15, 16, 39

*World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286 (1980) ...................................28

# TABLE OF AUTHORITIES
continued…

**Page(s)**

**Statutes:**

22 U.S.C. § 7421(9) ...........................................................................38

Alien Tort Claims Act, 28 U.S.C. § 1350........................................13

\* Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1330, 1602-11 .......................4

   28 U.S.C. § 1330.........................................................................5

   28 U.S.C. § 1605(a)(1)...............................................................14

   28 U.S.C. § 1605(a)(2)...........................................................14, 16

   28 U.S.C. § 1605(a)(5)...........................................................14, 19

   28 U.S.C. § 1605(a)(7)...............................................................16

   28 U.S.C. § 1608(a). ....................................................................6

Torture Victim Protection Act of 1991, Pub. L. No. 102-256, 106 Stat. 73 (1992),
   *reprinted at* 28 U.S.C. § 1350 note........................................13

D.C. Code Ann. (2001):

   § 13-422 ......................................................................................26

   § 13-423 .........................................................................24, 26, 27

   § 13-423(a)(1) ............................................................................27

   § 13-423(a)(3) ............................................................................27

   § 13-423(a)(4). ...........................................................................27

**Rules:**

Fed. R. Civ. P. 4 ...............................................................................9

Fed. R. Civ. P. 12(h)(2)...........................................................5, 13, 18

## TABLE OF AUTHORITIES

continued…

Page(s)

**Legislative Materials:**

137 Cong. Rec. H11244-04 (1991) ...............................................................28

137 Cong. Rec. S1369-01 (1991) ...............................................................28

138 Cong. Rec. S2667-04 (1992) ...............................................................28

H.R. Rep. No. 102-367(I), *reprinted in* 1992 U.S.C.C.A.N. 84 .................14, 23

H.R. Res. 392, 107th Cong. (2002) ............................................................3

S. Rep. No. 102-249 .....................................................................14, 23, 28, 44


**Miscellaneous:**

"All Israel Defendants Personally Served," Press Release #5, *at*
    http://www.palestinianjustice.com/casenews/cn1.htm (last visited May 20,
    2003) ....................................................................................................10

Black's Law Dictionary 270 (6th ed. 1990).................................................17

Brief for the United States as *Amicus Curiae, Doe v. Unocal Corp.,* Nos. 00-
    56603, 00-56628 (9th Cir.), May 8, 2003 ........................................13, 41

Brief for the United States as *Amicus Curiae, Magness v. Russian Fed'n,*
    No. 00-20136 (5th Cir.), May 30, 2000. .........................................11, 12

"Casualties During 'Ebb and Flow' Since 29.09.00" and "Monthly Analysis of
    All Terrorist Incidents Since September 2000," *at*
    http://www.idf.il/daily_statistics/english/1.gif and /4.gif (last visited June
    12, 2003) ................................................................................................2

\*  Convention on the Service Abroad of Judicial and Extrajudicial Documents in
    Civil or Commercial Matters, Nov. 15, 1965, [1969] 20 U.S.T. 361,
    T.I.A.S. No. 6638 ("Hague Convention") ...................................4, 9, 10

Interview with Secretary of State Colin L. Powell (May 18, 2003), *at*
    http://www.state.gov/secretary/rm /2003/18810.htm (last visited May 19,
    2003) ....................................................................................................37

## TABLE OF AUTHORITIES

continued…

**Page(s)**

\*    Israel's Decls. & Reservs. to the Hague Convention, *reprinted following*
     Fed. R. Civ. P. 4 and *at* http://www.hcch.net/e/status/stat14e.html#il
     (last visited Apr. 25, 2003) ..................................................................11

Presidential Address to the Nation (Mar. 17, 2003) (emphasis added), *available at*
     http://www.whitehouse.gov/news/releases/2003/03 /iraq/20030317-7.html...........3

Presidential Military Order:  Detention, Treatment and Trial of Certain Non-
     Citizens in the War Against Terrorism (Nov. 13, 2001), 2001 WL
     1422287 (White House)........................................................................3

1 Bruno A. Ristau, *International Judicial Assistance* § 4-3-5 (2000). .............................11

S.C. Res. 1373, U.N. SCOR, 56th Sess., 4385th Mtg., U.N. Doc. S/Res/1373
     (2001)......................................................................................................2

Statement of Interest of the United States, *Doe v. Liu Qui,* No. C 02 0672 CW
     (N.D. Cal.), Sept. 27, 2002 .....................................................................22, 36, 38

Statement of State Department Spokesman Richard Boucher (Apr. 28, 2003), *at*
     http://www.state.gov/r/pa/prs/dpb/2003/20025.htm (last visited May 19,
     2003) .......................................................................................37

Statement of Marc Grossman, Under Secretary of State for Political Affairs,
     Remarks to the Center for Strategic and Int'l Studies (May 6, 2002), *at*
     http://www.state.gov/p/9949.htm (last visited Apr. 25, 2003) ...........................37

Statement of Philip T. Reeker, Deputy State Department Spokesman (May 14,
     2003), *at* http://www.state.gov/r/pa/prs/dpb/ 2003/20584.htm (last visited
     May 19, 2003).......................................................................................37

Statement of Secretary of Defense Donald Rumsfeld, Foreign Press Center
     Briefing (June 21, 2002), *at* http://fpc.state.gov/11359.htm (last visited
     Apr. 25, 2003) .......................................................................................37

This is a political case that does not belong in a federal court.  To begin with, plaintiffs have not come even close to effecting proper service on Israel, its governmental subdivisions, or its current and former officials (the "Israeli Government Defendants").  Moreover, even if they had properly served these defendants, plaintiffs could not overcome the sovereign and official immunity that precludes any suit.  And even if they could somehow blink away both these hard realities, plaintiffs' case remains at its core an effort to entangle this Court in judgments about foreign policy that are reserved to the political branches of government.  Indeed, they seek to lure the Court into second-guessing not just any foreign policy judgments, but ones involving perhaps the most volatile region in the world, at a time when the United States seeks to exert leadership in the search for peace.  This, however, is a Court of law.  It is not the proper forum for political claims, propaganda, or the conduct of foreign relations.  As the United States observed in its reply brief in this case, "[T]his is a political case seeking to make a political point that has no place in this Court."  Fed. Defendants' Reply Br. at 1-2.  Plaintiffs' complaint therefore must be dismissed.

## INTRODUCTION

Since it was founded over 50 years ago, the State of Israel has weathered ongoing, deadly attacks threatening its very right to exist.  There have been, over the years, intense efforts to end these attacks and bring peace to the Middle East.  These efforts have borne some fruit:  Israel and two of its neighbors, Egypt and Jordan, have signed peace treaties.  Agreements were reached also with the Palestinians.  But a comprehensive peace, an end to the violence, has proved elusive.  Israel continues to face a war of terror.  In the last two and a half

years alone, Palestinian terrorists carried out more than 17,000 acts of violence, killing more than 780 persons and injuring more than 5,000 others, many critically.[1]

And the toll continues to rise, even today.  These attacks respect no boundaries of age, killing children as well as the elderly.  They respect no boundaries of gender, or nationality, or even geography.  The suicide bombers, snipers, and other terrorists have slaughtered Israeli civilians in Israel, the West Bank, Gaza, and abroad; in cities and on highways; in shopping malls, open markets, restaurants, nightclubs and private homes.  Moreover, these attacks have affected almost every Israeli household.  With a population of only 6.5 million – one forty-fifth that of the United States – Israel's casualties have been staggering.  But the numbers of dead and injured still do not convey the devastating impact of the terror – the families shattered, the children orphaned, the livelihoods lost, the fear enkindled.

A worldwide network of terrorist organizations, including Hamas, Islamic Jihad, and Hizbollah, trains, equips and deploys these murderers, proudly claiming responsibility for each attack and inciting armed struggle not only against Israel, but also against the United States.  Combating these terrorist assaults is difficult.  The attackers often operate from the midst of Palestinian civilians, whom they use as human shields.  In this way, Palestinian terrorists often escape and continue their lethal attacks.

All States have a basic right to protect their citizens against this type of war waged by terrorists.  The United Nations has recognized that sovereign nations have a fundamental right, indeed an obligation, to defend against such terrorist attacks.  S.C. Res. 1373, U.N. SCOR, 56th Sess., 4385th Mtg., U.N. Doc. S/Res/1373 (2001).  Indeed, President George W. Bush affirmed

---

[1] *See* "Casualties During 'Ebb and Flow' Since 29.09.00" and "Monthly Analysis of All Terrorist Incidents Since September 2000," http://www.idf.il/daily_statistics/english/1.gif and /4.gif (last visited June 12, 2003).

recently that the most basic responsibility of government is to defend its citizens from violent

attacks, in particular mass terrorist attacks:  "Instead of drifting along towards tragedy, we will

set a course toward safety.  Before the day of horror can come, before it is too late to act, this

danger will be removed.  *The United States of America has the sovereign authority to use force*

*in assuring its own national security.*"  Presidential Address to the Nation (Mar. 17, 2003)

(emphasis added), *available at* http://www.whitehouse.gov/news/releases/2003/03/iraq

/20030317-7.html.

   That is as true of the Israeli government as it is of the United States.  Israel, as a

sovereign nation, has the right – indeed, the supreme duty – to protect its citizenry against these

mass homicides.  In response to terrorist attacks, in particular the attack on September 11,

2001, the United States embarked upon a global war against terrorism, "a state of armed

conflict that requires the use of the United States Armed Forces."  Presidential Military Order:

Detention, Treatment and Trial of Certain Non-Citizens in the War Against Terrorism

(Nov. 13, 2001), 2001 WL 1422287 (White House).  The unprecedented violence Israel has

faced, and continues to confront, has required it, too, to defend itself by arms.  Israel's effort

may be on a smaller scale than America's war on terror, but it is just as vital, if not more so, to

the survival of the nation and its citizens.  The President and Congress, therefore, have stood by

Israel in its war, recognizing Israel's operations as "an effort to defend itself against the

unspeakable horrors of ongoing terrorism, ... aimed only at dismantling the terrorist

infrastructure in the Palestinian areas."  H.R. Res. 392, 107th Cong. (2002) (enacted).

   Quarreling with the position of the President and Congress, plaintiffs allege that these

same operations reflect a broad policy of "genocide," "war crimes," "ethnic cleansing" and

other "crimes against humanity."  Compl. ¶¶ 427, 432, 437.  Plaintiffs direct this polemic not

only at Israel, not only at its defense and intelligence services, but also at Prime Minister Ariel
Sharon as well as current and former Israeli government officials in their *individual* capacities.
*Id.* ¶¶ 26-31, 33, 35-38.

This is political exhibitionism, a manipulation of the judicial process to achieve policy
goals and generate publicity, to drag the Court into a military and geopolitical conflict that has
raged for over 50 years.  If allowed to proceed, this case could intrude into the decision-making
of a sovereign nation on matters critical to its security and, as the U.S. Government's briefs on
behalf of President Bush and Secretary of State Powell have emphasized, undermine core
foreign policy objectives of the United States.  Plaintiffs ask this Court to participate in, if not
displace, the President's judgments on foreign affairs.  They ask the Court to interject its voice
into the international dialogue the President is having on the United States' efforts to achieve
peace in the Middle East.  And, as the U.S. Government stresses in its briefs, plaintiffs ask this
Court to set a precedent that could seriously hamper the war on terrorism by Israel, the United
States, and other countries.

There is no basis – in fact, no jurisdiction – to set such a precedent, for several reasons:

- First, plaintiffs have not served any of the Israeli Government Defendants as
  required by the Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1330,
  1602-11 ("FSIA"), and the Convention on the Service Abroad of Judicial and
  Extrajudicial Documents in Civil or Commercial Matters, Nov. 15, 1965, [1969] 20
  U.S.T. 361, T.I.A.S. No. 6638 ("Hague Convention").  The Israeli Government
  Defendants respond to the Complaint now, despite the lack of proper service, out of
  respect for the U.S. courts.

- Second, even if plaintiffs had effected proper service or did so in the future, Israel
  is immune from suit under the FSIA.  Plaintiffs cannot circumvent this immunity
  by suing Israel's ministries or its public servants in their official capacity.  In
  addition, Prime Minister Sharon has absolute immunity as Israel's recognized head
  of government.  And to the extent plaintiffs (improperly) allege wrongdoing by
  Israeli officials in their personal rather than official capacities, the Complaint does
  not – and could not – allege personal contacts that could sustain jurisdiction in this
  forum.

- <u>Third</u>, even if plaintiffs could overcome these barriers, this political suit is not justiciable. It presents issues reserved to other branches of government. It would interfere with vital foreign policy objectives of the United States. And it would infringe on the sovereignty of a foreign nation. Under either the political question or act of state doctrines, the Court should not exercise jurisdiction.

The Court therefore should dismiss the complaint on these threshold jurisdictional grounds.[2]

## ARGUMENT

### I.   PLAINTIFFS HAVE NOT SERVED THE ISRAELI GOVERNMENT DEFENDANTS IN ACCORDANCE WITH THE LAW

Plaintiffs' failure to make any serious effort properly to serve the Israeli Defendants is telling evidence that this lawsuit is merely political theater. By no standard can plaintiffs demonstrate, as they must, that they complied with the explicit requirements of the law.

The FSIA is the sole basis for jurisdiction over a foreign state in U.S. courts. *Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 434 (1989). Before a court may exercise jurisdiction, it must be satisfied not only that a statutory exception to sovereign immunity applies (*see* Part II *infra*), but also that the plaintiff served the foreign sovereign as required by the FSIA. *See* 28 U.S.C. § 1330. In this case, the FSIA mandates strict compliance with the Hague Convention, which specifies in detail the rules governing service of process between the United States and Israel. Plaintiffs have not attempted to follow those rules. At best, they might seek to demonstrate haphazard attempts at other forms of service that do not bear the slightest resemblance to the ones prescribed by Hague Convention.

---

[2] Pursuant to Fed. R. Civ. P. 12(h)(2), the Israeli Government Defendants reserve the right to move later to dismiss the complaint for failure to state a claim under Fed. R. Civ. P. 12(b)(6), should any part of the case survive this threshold motion.

**A.      The Foreign Sovereign Immunities Act Requires Strict Compliance with the Hague Convention for Service on the State of Israel and Related Defendants**

Section 1608(a) of the FSIA sets forth the "exclusive procedures" for serving foreign sovereigns.  *Magness v. Russian Fed'n,* 247 F.3d 609, 615 (5th Cir. 2001) (quoting legislative history); *Transaero Inc. v. La Fuerza Aerea Boliviana,* 30 F.3d 148, 154 (D.C. Cir. 1994) (same).  The statute spells out those "exclusive procedures" step by step, providing that service on a foreign state may be made:

> (1)      by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or
>
> (2)      if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or
>
> (3)      if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned, or
>
> (4)      if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit … to the Secretary of State in Washington, District of Columbia … and the Secretary shall transmit one copy of the papers through diplomatic channels to the foreign state ….

28 U.S.C. § 1608(a).  These provisions are "hierarchical, such that a plaintiff must attempt the methods of service in the order they are laid out in the statute."  *Magness,* 247 F.3d at 613.

In this case, the parties have made no "special arrangement for service" under Section 1608(a)(1).  Under Section 1608(a)(2), however, there is clearly an "applicable international convention" – the Hague Convention.  Therefore, plaintiffs *must* serve their complaint in

accordance with the Convention.  Only if such service proved impossible might plaintiffs

attempt the other methods of service contemplated by Sections 1608(a)(3) and (4).

The Hague Convention is a treaty negotiated by sovereign nations to delimit when they

will permit other countries to intrude on their sovereignty by effecting service within their

territory.  Therefore, courts have insisted upon "strict adherence" to the procedures the

Convention mandates where the defendants are sovereign states.  *Transaero,* 30 F.3d at 154.  In

this Circuit and others, courts cannot overlook defective service, even where the foreign state

may be aware of the lawsuit.  *Id.*; *Phoenix Consulting, Inc. v. Republic of Angola,* 35 F. Supp.

2d 14, 17 (D.D.C. 1999), *rev'd on other grounds,* 216 F.3d 36 (D.C. Cir. 2000); *Underwood v.*

*United Republic of Tanzania*, Civ. No. 94-902, 1995 WL 46383, at *1 (D.D.C. Jan. 27, 1995);

*see also Magness,* 247 F.3d at 615-16 (collecting circuit decisions).

The courts have insisted on equally strict compliance in actions against core ministries

of sovereign State signatories, such as the Israeli Defense Forces ("IDF") and the Israeli

General Security Service ("Shin Bet") in this case.  Whether a foreign entity triggers the duty

of "strict compliance" under the FSIA turns on whether it is "'an integral part of a foreign

state's political structure, [or rather] an entity whose structure and function is predominantly

commercial.'"  *Transaero*, 30 F.3d at 151 (quotations omitted).  The D.C. Circuit has

confirmed that "armed forces are as a rule so closely bound up with the structure of the state

that they must in all cases be considered as the 'foreign state' itself."  *Id.* at 153.  The same is

true for security and intelligence services such as the Shin Bet.  *See Eisenfeld v. Islamic*

*Republic of Iran,* 172 F. Supp. 2d 1, 6 (D.D.C. 2000) (action against Iran's intelligence service

must be brought under the FSIA).

Plaintiffs cannot evade the requisite "strict compliance" by suing foreign officials in their official capacities.  After all, a State can act only through its designated representatives.  *See generally Monell v. Dep't of Soc. Servs. of N.Y.,* 436 U.S. 658, 690 n.55 (1978) ("[O]fficial capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent …").  As a matter of law and logic, individuals acting in their official capacities receive the same protections under the FSIA that the State would enjoy for their official acts.  *See Jungquist v. Nahyan,* 115 F.3d 1020, 1027 (D.C. Cir. 1997); *El-Fadl v. Cent. Bank of Jordan*, 75 F.3d 668, 671 (D.C. Cir. 1996) (FSIA applied to acts by Deputy Governor of Jordan's Central Bank in his official capacity); *El-Hadad v. Embassy of the UAE,* 69 F. Supp. 2d 69, 73 (D.D.C. 1999), *rev'd in part on other grounds,* 216 F.3d 29 (D.C. Cir. 2000) ("the scope of sovereign immunity for a foreign state extends to … individuals committing acts within their official capacities"); *Herbage v. Meese,* 747 F. Supp. 60, 66 (D.D.C. 1990), *aff'd*, 946 F.2d 1564 (D.C. Cir. 1991) ("the sovereign immunity granted in the FSIA does extend to natural persons acting as agents of the sovereign"); *see also Chuidian v. Philippine Nat'l Bank,* 912 F.2d 1095, 1103 (9th Cir. 1990) (collecting cases).

Nor can plaintiffs negate U.S. treaty obligations under the Hague Convention by purporting to sue foreign officials in their personal capacities.  Even if such claims – on the tenuous assumption that they were not a sham – could arguably fall outside the FSIA, they still would be subject to the same rules governing service on individuals, as opposed to governments, in Hague Convention countries.  The Supreme Court has confirmed that the Hague Convention is the mandatory and exclusive way to serve such individuals.  *See Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court,* 482 U.S. 522, 534 n.15 (1987).  The Convention, as a treaty, "pre-empts inconsistent methods of service prescribed by state law in

all cases to which it applies." *Volkswagenwerk Aktiengesellschaft v. Schlunk,* 486 U.S. 694, 699 (1988). Correspondingly, in federal court, the Hague Convention – not Fed. R. Civ. P. 4 – prescribes the method of service on individuals within signatory countries. *Color Sys., Inc. v. Meteor Photo Reprographic Sys., Inc.,* No. Civ. A. 86-2516, 1987 WL 11085, at *8 (D.D.C. May 8, 1987).

### B.    Plaintiffs Have Not Complied with the Hague Convention

The "primary innovation of the [Hague] Convention is that it requires each state to establish a central authority to receive requests for service of documents from other countries." *Volkswagenwerk,* 486 U.S. at 698. To serve a summons or a complaint, then, plaintiffs must arrange for the documents to be forwarded to the Central Authority in the appropriate country. Hague Convention, art. 3. Once it receives the documents in the proper form, the Central Authority must serve them on the party named in the suit, unless the receiving State "deems that compliance would infringe its sovereignty or security." *Id.,* arts. 5, 13. The Central Authority must then certify that the documents have been served or state the reasons that prevented service. *Id.,* art. 6.

Here, there is no evidence that plaintiffs even attempted service through the Central Authority mechanism. *See* Declaration of Brian Zietman, May 27, 2003, ¶ 3 (submitted herewith). Nor can plaintiffs establish (as it is their burden to establish) that they served process through any other mechanism approved by the Hague Convention, such as diplomatic or consular channels. Hague Convention, arts. 8-9. The most plaintiffs might seek to show is that they concocted their own methods of attempted service in violation of the Hague Convention.

Despite these failings, plaintiffs have publicly proclaimed (in press releases and on a public web site) that they "personally served" each of the defendants in Israel. *See* "All Israel Defendants Personally Served," Press Release #5, *at* http://www.palestinianjustice.com /casenews/cn1.htm (last visited May 20, 2003). Plaintiffs, however, must establish proper service in this Court, not in the press. And in fact, plaintiffs cannot demonstrate that any agent of theirs personally delivered a copy of the summons and complaint to any individual defendant in this case. Indeed, they are unable to establish that their agents did anything more than haphazardly leave copies with building guards and other persons not authorized to receive service, six months after the filing of this lawsuit.

The Court will search the Hague Convention in vain for any mention of these procedures. If plaintiffs were seeking somehow to evade the Convention by attempting a species of personal service, they have failed. For one, their slipshod approach would not qualify: they cannot show that their agents delivered anything personally to any of the defendants here. Second, even if it were otherwise, Israel has *specifically objected* to the only provisions of the Hague Convention arguably authorizing direct personal service. Articles 10(b) and (c) state:

> *Provided the State of destination does not object*, the present Convention shall not interfere with – ...
>
> (b)     the freedom of judicial officers, officials or other competent persons of the State of origin to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination,
>
> (c)     the freedom of any person interested in a judicial proceeding to effect service of judicial documents directly through the judicial officers, officials or other competent persons of the State of destination.

Hague Convention, arts. 10(b) & (c) (emphasis added).

Whatever type of personal service this language might authorize, it applies only to "contracting states which have not, by declaration, ruled out service under Article 10(c)."  1 Bruno A. Ristau, *International Judicial Assistance* § 4-3-5, at 213 (2000).  Israel is a contracting state that *has* ruled out such service.  Israel filed the following declaration and reservation upon ratifying the Hague Convention:

> The State of Israel, in its quality as State of destination, will, in what concerns Article 10, paragraphs b) and c), of the Convention, effect the service of judicial documents *only through the Directorate of Courts*, and only where an application for such service emanates from a judicial authority or from the diplomatic or consular representation of a Contracting State.

Israel's Decls. & Reservs. to the Hague Convention, *reprinted following* Fed. R. Civ. P. 4 and *at* http://www.hcch.net/e/status/stat14e.html#il (emphasis added).  Thus, plaintiffs cannot invoke Article 10 to evade the requirement that they serve their Complaint through Israel's Central Authority.  *See Friedman v. Israel Labour Party,* No. Civ. A. 96-CV-4702, 1997 WL 379181, at *3 (E.D. Pa. July 2, 1997) (rejecting efforts to serve Knesset members through private process server, in light of Israel's declaration with respect to Articles 10(b) and (c)).

The U.S. Government, emphasizing the importance of the issue, has expressly concluded that the type of service plaintiffs may claim they attempted here (assuming they could show they attempted anything within established legal rubrics) is inadequate.  In *Magness v. Russian Fed'n,* involving the FSIA but not the Hague Convention, plaintiffs tried to serve Russia and its Ministry of Culture simply by delivering summonses "c/o Boris Yeltsin and ... Deputy Minister of Culture Mikhail Schvidkoy."  The United States filed an *amicus* brief, expressing concern that "[c]ompliance with the requirement of formal service ... [is] critical to the United States as it responds to suits in foreign courts," and noted the following:

> [T]he United States Government would not consider that it had been properly served if a foreign party merely provided the type of notice used here, such as delivery of a package addressed to "William Clinton, the White House," and delivery to a Deputy Secretary of a specific agency ... that might have dealings with foreign states, but lacks centralized responsibility for foreign relations and does not have expertise in dealing with foreign judicial systems.

Brief for the United States as *Amicus Curiae*, *Magness v. Russian Fed'n,* No. 00-20136 (5th Cir.), May 30, 2000, at 22-23 (submitted herewith).  Indeed, the Government noted that it had opposed jurisdiction in foreign courts where plaintiffs used analogous methods to serve the United States.  *See id.* at 23 (noting prior opposition to suit where documents were simply handed to AID mission secretaries in Peru and Bolivia).  In short, should plaintiffs – in trying to meet their burden of proof – seek to show efforts to serve Israeli officials by "drop and run" tactics on building guards or other functionaries not authorized to receive service, that would fall far short of what the law requires.

The Hague Convention is clear.  Plaintiffs cannot demonstrate that they complied with it.  Their complaint must be dismissed.

## II.  THE COURT LACKS SUBJECT MATTER JURISDICTION BECAUSE THE STATE OF ISRAEL AND ITS OFFICIALS ARE IMMUNE FROM SUIT

Even if plaintiffs ultimately could perfect service on Israel and the other Israeli Government Defendants, this suit could not proceed against them.  Again, the clarity of this issue, the absence of any colorable argument to defeat sovereign immunity, illuminates this case as mere political grandstanding.

The FSIA grants broad immunity to foreign states and their ministries.  Plaintiffs have established no applicable exception to this immunity.  Moreover, Israel's immunity extends to its officials acting on behalf of the State and – scrutinizing the substance of the allegations – that is all the Complaint avers.  That plaintiffs dress their arguments in the garb of the Alien

Tort Claims Act, 28 U.S.C. § 1350 ("ATCA"), and the Torture Victim Protection Act of 1991,

28 U.S.C. § 1350 note ("TVPA"),[3] does not void the immunity protecting foreign officials for

their public rather than private acts.  Finally, independent of the shield of the FSIA, Prime

Minister Sharon has absolute immunity from suit as the recognized head of the government of

Israel.

> ### A.   Israel, the IDF and Shin Bet Are Immune from Suit Under the FSIA

The Supreme Court has held that "a foreign state is presumptively immune from the

jurisdiction of United States courts," and "unless a specified exception applies, a federal court

lacks subject matter jurisdiction over a claim against [it]."  *Saudi Arabia v. Nelson*, 507 U.S.

349, 355 (1993).  The exceptions specified under the FSIA are narrow, and "immunity remains

the rule rather than the exception" for foreign sovereigns.  *MacArthur Area Citizens Ass'n v.*

*Republic of Peru,* 809 F.2d 918, 919 (D.C. Cir. 1987) (quoting *Gibbons v. Republic of Ireland*,

532 F. Supp. 668, 671 (D.D.C. 1982)).

These principles do not fade away merely because plaintiffs exercise the literary license

in their Complaint to allege violations of international law, including under the ATCA or

TVPA.  *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 436 (1989)

("[I]mmunity is granted in those cases involving alleged violations of international law that do

---

[3] Plaintiffs' reliance on the ATCA for their broadest claims rekindles the lingering doubt in this Circuit whether
the ATCA actually provides an independent cause of action for international law violations, *see Al Odah v. United*
*States*, 321 F.3d 1134, 1145-47 (D.C. Cir. 2003) (Randolph, J., concurring); *Tel-Oren v. Libyan Arab Republic,*
726 F.2d 774, 801-23 (D.C. Cir.) (Bork, J., concurring), *cert. denied,* 470 U.S. 1003 (1984), particularly in light of
the U.S. Government's recent request that more expansive ATCA jurisprudence in other Circuits be reevaluated in
light of core constitutional principles.  *See* Brief for the United States as *Amicus Curiae, Doe v. Unocal Corp.,*
Nos. 00-56603, 00-56628 (9th Cir.), May 8, 2003 (submitted herewith).  Plaintiffs' invocation of the TVPA is
equally questionable, since that statute on its face permits claims only against individuals, not foreign states such
as Israel.  The Israeli Government Defendants reserve the right to present these and other points as part of a
broader motion to dismiss for failure to state a claim, should any part of this case survive this threshold motion.
*See* Fed. R. Civ. P. 12(h)(2).

not come within one of the FSIA's exceptions"); *Al Odah v. United States,* 321 F.3d 1134,

1149 (D.C. Cir. 2003) (Randolph, J., concurring) (the ATCA "does not itself waive sovereign

immunity"); *Trajano v. Marcos (In re Estate of Ferdinand E. Marcos Human Rights Litig.),*

978 F.2d 493, 497 (9th Cir. 1992) ("[T]he FSIA trumps the [ATCA] when a foreign state or ...

an individual acting in her official capacity is sued"); *DeNegri v. Republic of Chile,* No. Civ. A.

86-3085, 1992 WL 91914, at *2 (D.D.C. Apr. 6, 1992) ("[T]here is no generalized international

law exception to sovereign immunity under the FSIA.").[4]

Plaintiffs bear the burden of "produc[ing] evidence" establishing an applicable

exception to immunity, although the ultimate burden of persuasion remains with Israel.  *Hwang*

*Geum Joo v. Japan*, 172 F. Supp. 2d 52, 56 (D.D.C. 2001).  Here, plaintiffs have alleged three

purported bases for FSIA jurisdiction:  that (a) Israel has "waived, either explicitly or implicitly

[its] immunity"; (b) that Israel has "engaged in commercial activity outside of the United States

which has an effect within the United States"; and (c) that Israel has "commit[ted] tortious acts

that cause injury within the United States."  Compl. ¶¶ 3-4 (citing 28 U.S.C. §§ 1605(a)(1), (2)

and (5)).  There is no colorable argument that any of these exceptions applies.

### 1.      Israel Has Not Waived Its Immunity Under the FSIA

Israel has not "waived its immunity either explicitly or by implication."  28 U.S.C.

§ 1605(a)(1).  The Court of Appeals for this Circuit has held that a foreign state does not waive

immunity unless it "intended" to do so.  *Creighton Ltd. v. Gov't of Qatar,* 181 F.3d 118, 122

(D.C. Cir. 1999) (emphasis added); *see also Princz v. Fed. Republic of Germany*, 26 F.3d 1166,

---

[4] The TVPA's legislative history makes clear that the same principle applies.  *See* S. Rep. No. 102-249, at 7
("TVPA Senate Report") ("[T]he TVPA is not meant to override the [FSIA] ...."); H.R. Rep. No. 102-367(I), at 5,
*reprinted in* 1992 U.S.C.C.A.N. 84, 88 ("TVPA House Report") ("The TVPA is subject to restrictions in the
[FSIA].").

1174 (D.C. Cir. 1994) (waiver "depends upon the foreign government's having at some point indicated its amenability to suit").  That intent must be clear and unambiguous.  *World Wide Minerals, Ltd. v. Kazakhstan,* 296 F.3d 1154, 1162 (D.C. Cir. 2002), *cert. denied*, 123 S. Ct. 1250 (2003).

Here, plaintiffs have identified nothing Israel said, or did, or agreed to, or did not agree to, that waives its sovereign immunity.  None of the treaties or international agreements that plaintiffs invoke elsewhere in the Complaint (*see* ¶ 426) abandons this protection.  To strip a foreign state of sovereign immunity, an international agreement must expressly create a right of action in the United States courts or expressly waive immunity to suit.  *See Amerada Hess*, 488 U.S. at 442-43; *Hwang Geum Joo,* 172 F. Supp. 2d at 59.  None of these agreements does so.  *See, e.g., Hilao v. Marcos (In re Estate of Ferdinand Marcos Human Rights Litig.),* 94 F.3d 539, 548 (9th Cir. 1996) (Philippines did not waive immunity by entering into Convention Against Torture); *Frolova v. USSR,* 761 F.2d 370, 378 (7th Cir. 1985) (Soviet Union's accession to U.N. Charter did not waive immunity); *DeNegri,* 1992 WL 91914, at *3 (Chile's signature to U.N. Charter, Universal Declaration of Human Rights, International Covenant on Civil and Political Rights, and Declaration Against Torture did not waive sovereign immunity).

Nor can plaintiffs point to any evidence of an implied waiver.  The D.C. Circuit has "followed the 'virtually unanimous' precedents construing the implied waiver provision narrowly."  *World Wide Minerals,* 296 F.3d at 1161 n.11*; see also Hilao,* 94 F.3d at 546; *Siderman de Blake v. Republic of Argentina,* 965 F.2d 699, 720 (9th Cir. 1992); *Shapiro v. Republic of Bolivia*, 930 F.2d 1013, 1017 (2d Cir. 1991).  On that narrow construction, courts have found implied waivers where foreign states filed responsive pleadings without raising a sovereign immunity defense, agreed to arbitrate particular disputes in the United States, or

agreed that U.S. law should govern a particular contract.  However, the "courts have been reluctant to stray beyond these examples" to find an implicit waiver.  *World Wide Minerals,* 296 F.3d at 1161 n.11 (quoting *Princz,* 26 F.3d at 1174).  None of those examples applies here.

Moreover, the D.C. Circuit has rejected any presumptive waiver of sovereign immunity for cases alleging violations of *jus cogens* norms of international law.  *See, e.g., Princz*, 26 F.3d at 1174; *accord, Hwang Geum Joo*, 172 F. Supp. 2d at 60; *DeNegri,* 1992 WL 91914, at *3. Courts in other circuits consistently have reached the same conclusion.  *See Sampson v. Fed. Republic of Germany,* 250 F.3d 1145, 1156 (7th Cir. 2001); *Smith v. Socialist People's Libyan Arab Jamahiriya,* 101 F.3d 239, 245 (2d Cir. 1997); *Siderman,* 965 F.2d at 718.[5]  This result is appropriate here as well.

### 2. The FSIA Exception for "Commercial Activity" Does Not Apply

Plaintiffs' second alleged basis for jurisdiction, the "commercial activity" exception of the FSIA, is equally far afield.  Section 1605(a)(2) denies immunity in civil actions "based upon ... an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere [that] causes a direct effect in the United States."  This case against Israel involves neither a "commercial activity" nor a "direct effect in the United States."

First, plaintiffs' allegations regarding supposed violations of their human rights causing injury to person or property could be characterized in various ways – wrong, vituperative, abusive or the like.  But one characterization that plainly does not apply is "commercial."  Acts

_____

[5] Among other things, this "waiver" theory is inconsistent with the explicit exception to sovereign immunity in Section 1605 for claims alleging torture and extrajudicial killing by foreign states that the President has formally designated as "state sponsor[s] of terrorism."  28 U.S.C. § 1605(a)(7)(A).  This provision reflects Congress' intent to retain sovereign immunity for all *other* States confronting allegations that they violated international law.

are commercial if they are "the *type* of actions by which a private party engages in 'trade and traffic or commerce.'"  *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992) (quoting Black's Law Dictionary 270 (6th ed. 1990)).  The exception for commercial activity codifies the rule that "a state is immune from the jurisdiction of foreign courts as to its sovereign or public acts (*jure imperii*), but not as to those that are private or commercial in character (*jure gestionis*)*."  Saudi Arabia v. Nelson*, 507 U.S. 349, 359-60 (1993).

In *Nelson*, the Supreme Court concluded that the alleged wrongful arrest, imprisonment and torture of an American citizen was not "commercial" under the FSIA, because "a foreign state's exercise of the power of its police has long been understood ... as peculiarly sovereign in nature."  The Court explained that the "[e]xercise of the powers of police and penal officers is not the sort of action by which private parties can engage in commerce." 507 U.S. at 361-62. Following this reasoning, courts in this Circuit have repeatedly rejected attempts to bring ostensible human rights claims within the commercial activity exception.  *See, e.g., Cicippio v. Islamic Republic of Iran*, 30 F.3d 164, 168 (D.C. Cir. 1994) (Iran's sponsorship of hostage-taking could not be considered commercial activity); *Hwang Geum Joo,* 172 F. Supp. 2d at 63-64 (Japan's wartime slavery of foreign "comfort women" was "not in connection with a commercial activity," but rather "'boils down' to an abuse ... of Japan's military power, an activity that is 'peculiarly sovereign in nature'"); *Bao Ge v. Li Peng,* 201 F. Supp. 2d 14, 24 (D.D.C. 2000) ("the allegedly unlawful incarceration and mistreatment of plaintiffs in prison ... arises out of an alleged abuse of China's police power," not commercial activity), *aff'd*, No. 00-7290, 2002 WL 1052012 (D.C. Cir. Mar. 1, 2002); *Daliberti v. Republic of Iraq*, 97 F. Supp. 2d 38, 47 (D.D.C. 2000) (Iraq's detention and torture of plaintiffs "could not be considered

'commercial' in nature," because "only a government has the power to arrest and imprison someone in its territory").

Nor, based on plaintiffs' allegations, did the claimed misconduct cause a "direct effect in the United States" within the meaning of this exception.  As this Court recently explained, "the Supreme Court has held that an effect is direct if it follows as an 'immediate consequence' of a defendant's activity."  *Croesus EMTR Master Fund L.P. v. Federative Republic of Brazil,* 212 F. Supp. 2d 30, 35 (D.D.C. 2002) (Bates, J.) (quoting *Weltover,* 504 U.S. at 618); *see id.* at 35-36 ("As further explained by the D.C. Circuit, an effect is direct if it 'has no intervening element, but rather, flows in a straight line without deviation or interruption.'") (quoting *Princz*, 26 F.3d at 1172).  Here, plaintiffs claim that defendants' alleged wrongful acts took place in Israel, the West Bank or Lebanon, and that those alleged acts injured plaintiffs at the same locations.[6]  Plaintiffs do not allege and cannot establish any direct effect in the United States.  *See Bao Ge v. Li Peng,* 201 F. Supp. 2d at 25 (no direct effect where "all of the legally significant acts giving rise to plaintiffs' claims occurred in China, not in the United States"); *see also Doe v. Unocal Corp.,* Nos. 00-56603, 00-57195, 00-57197, 00-56628, 2002 WL 31063976, at *19 (9th Cir. Sept. 18, 2002) (rehearing en banc pending) (injuries resulting from alleged abuses by Myanmar military all occurred in Myanmar, and any effects in the United States were not "direct" for purposes of the FSIA).

---

[6]  *See, e.g.,* Compl. ¶¶ 15, 234, 240, 244, 258, 262-263, 270-273, 280, 283, 286, 333-334, 340, 343, 349-350, 353-354, 358-361, 366-367, 370-372, 376, 383, 400, 404, 410, 412, 415-420.  The one plaintiff alleging injury in Lebanon, John Doe XVII, predicates his suit on events allegedly occurring 20 years ago, in 1982.  Cplt. ¶ 22.  The Israeli Government Defendants reserve their right to move to dismiss this claim on statute of limitations grounds, should the Court determine that it otherwise has jurisdiction to proceed with this case.  *See* Fed. R. Civ. P. 12(h)(2).

### 3.     The FSIA "Tortious Act" Exception Does Not Apply

Finally, there is no basis to invoke the exception in Section 1605(a)(5) for claims involving "personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment."  For that exception to apply, the "entire tort" – meaning *both* the tortious act and the injury to plaintiff – must occur in the United States.  *See, e.g., Cicippio,* 30 F.3d at 169; *Asociacion de Reclamantes v. United Mexican States,* 735 F.2d 1517, 1525 (D.C. Cir. 1984); *Persinger v. Islamic Republic of Iran,* 729 F.2d 835, 842 (D.C. Cir. 1984); *Von Dardel v. USSR,* 736 F. Supp. 1, 7 (D.D.C. 1990); *Kline v. Republic of El Salvador,* 603 F. Supp. 1313, 1315-16 (D.D.C. 1985).

Here, plaintiffs assert that both the alleged misconduct and the immediate injuries occurred overseas.  *See supra* n.6.  These admissions rule out the tortious act exception to sovereign immunity.

### B.     Israel's Sovereign Immunity Extends to Officials Acting on Its Behalf

The Court also must dismiss plaintiffs' claims against Israeli officials, because they have been sued in their official capacities.  Sovereign immunity protects foreign officials acting on behalf of their governments, just as it would protect those governments from suit based on the officials' acts.  *Jungquist,* 115 F.3d at 1027; *El-Fadl,* 75 F.3d at 671; *El-Hadad,* 69 F. Supp. 2d at 73; *Herbage,* 747 F. Supp. at 66; *see also Chuidian v. Philippine Nat'l Bank,* 912 F.2d 1095, 1103 (9th Cir. 1990) (collecting cases).  This is as true in the ATCA and TVPA context as in all others.  *See, e.g., Trajano*, 978 F.2d at 497 ("[T]he FSIA trumps the Alien Tort Statute when ... an individual acting in her official capacity is sued."); *Lafontant v. Aristide,* 844 F.

- 19 -

Supp. 128, 139 (E.D.N.Y. 1994) ("Because ... the TVPA applies to individuals while the FSIA applies to states and state actors, the TVPA will only apply to state actors when they act in their individual capacity ....").

Here, plaintiffs purport to sue each of the 11 individual defendants in both their official and individual capacities.  *See* Compl. caption and ¶¶ 26-31, 33, 35-38 (alleging each defendant's "individual culpability and command responsibility").  But they identify the exact same conduct as falling in both categories.  This ambidextrous characterization is legally unsound and does not bind the Court.  Plaintiffs' claims arise from the *status* of these individual defendants as representatives of the sovereign, not from their own actions, much less from conduct undertaken in their private capacities.  Thus, these defendants are entitled to the same immunity as the State.

On a motion to dismiss based on sovereign immunity, courts are not bound by plaintiffs' tactical characterization that acts were taken in an "individual" capacity.  Rather, courts have a duty to "consider whether an action against the foreign official is merely a disguised action against the nation that he or she represents."  *Park v. Shin,* 313 F.3d 1138, 1144 (9th Cir. 2002).  Courts in this Circuit have not hesitated to disregard plaintiffs' labels that do not fit the facts alleged.  For example, in *El-Fadl v. Central Bank of Jordan,* the plaintiff claimed that Jordanian officials had instigated an unwarranted investigation of his activities, leading to his detention and torture by Jordanian military police.  75 F.3d at 670.  Although plaintiff alleged these actions were undertaken "in an individual capacity," the D.C. Circuit rejected this label.  Rather, the Court confirmed the officials' immunity, because "the only evidence in the record" showed that the officials acted on behalf of the sovereign and not in their purely personal capacities.  *Id.* at 671.

- 20 -

Similarly, in *Herbage v. Meese*, the district court rebuffed the plaintiff's suggestion that Britain's Home Secretary and the Director of Public Prosecutions had conspired "solely in their individual capacity" wrongfully to extradite him to the United States. 747 F. Supp. at 65. The Court found that these defendants "were acting as law enforcement officers," which could only be in their official capacities. *Id.* at 66. The Court explained:

> Although for the purposes of deciding a motion to dismiss the Court must accept as true all factual allegations of the complaint, plaintiff's attempt to sue the British defendants in their individual capacities does not qualify for such treatment. It is merely a characterization, and an incorrect characterization, [plaintiff's] protests notwithstanding.

*Id.*

Whether an individual was acting in an official capacity turns "on the nature of the individual's alleged actions, rather than the alleged motives underlying them." *Jungquist,* 115 F.3d at 1028. The Courts in this Circuit consider whether a defendant's activities were "personal []or private" or "undertaken only on behalf of the [sovereign]." *El-Fadl,* 75 F.3d at 671. In other words, immunity is warranted when the acts in question were "sovereign or governmental in nature." *Herbage,* 747 F. Supp. at 67. Whether defendants violated their own state's law in carrying out their duties is irrelevant to this determination. *Id.* (the FSIA is "absolute in this regard").[7]

Behind the screen of pejorative rhetoric here, the Complaint does not allege a single act purportedly taken by senior Israeli officials in their personal or private capacities. Indeed, the only references to most of the individual defendants explain the official positions they once

---

[7] As the Court of Appeals has observed in another context, "if the scope of an official's authority or line of duty were viewed as coextensive with the official's lawful conduct, then immunity would be available only where it is not needed; in effect, the immunity doctrine would be 'completely abrogate[d]'." *Ramey v. Bowsher,* 915 F.2d 731, 734 (D.C. Cir. 1990) (citations omitted).

held.  For example, the Complaint indicates that Shimon Peres served as Israel's Minister of

Foreign Affairs, *see* ¶ 29, but says nothing about any wrongful acts he allegedly committed –

much less undertook in a personal capacity.  Similarly, the Complaint identifies Natan

Sharanski as Israel's then-Minister of Construction and Housing, *see id.* at ¶ 27, but says not a

word about any personal acts.  Plaintiffs also object broadly to Israel's "creation and expansion

of Jewish settlements in the Occupied Territories," *id.,* but that activity on its face reflects a

policy of a sovereign state, not the actions of any individual defendant on his own behalf.[8]

Plaintiffs' allegations regarding Israel's senior defense and security officials are equally

infirm.  The Complaint focuses on official government activity, in particular the conduct of

Israeli military or security forces in the West Bank; plaintiffs disparage this activity as

involving the "systematic and routine extra-judicial killing, torture and collective punishment"

of Palestinian-Americans.  Compl. ¶¶ 76-77; *see also id.* ¶¶ 91, 135-150, 171.  Such political

hyperbole, however, cannot obscure the legally conclusive fact that the only acts alleged by the

individual defendants were "neither personal nor private," but were quintessentially

governmental, "undertaken only on behalf of the [sovereign]."  *El-Fadl,* 75 F.3d at 671.[9]

Plaintiffs do *not* allege that any of the individual defendants participated personally in alleged

wrongful acts, or personally directed that they occur.  Plaintiffs simply indict them for the

---

[8] The State Department has recently urged the courts to be "especially careful" in FSIA analysis where a claim against a foreign official appears grounded in criticism of the official policies of a foreign state.  *See* Statement of Interest of the United States, *Doe v. Liu Qui,* No. C 02 0672 CW (N.D. Cal.) (Sept. 27, 2002) (appending letter from State Department Legal Adviser arguing that "denial of immunity in such circumstances would allow 'litigants to accomplish indirectly what the [FSIA] barred them from doing directly,' ... by the simple expedient of naming a high level foreign official as a defendant rather than a foreign state") (quoting *Chuidian,* 912 F.2d at 1101-02) (submitted herewith).

[9] *See generally Bao Ge,* 201 F. Supp. 2d at 19 (where a complaint contains "numerous, sweeping allegations" concerning a foreign government, "the Court must consider as true only the 'well-pleaded facts' set forth" in the complaint) (citing *Cicippio,* 30 F.3d. at 165 n.2).

positions they held.  Such allegations cannot rob senior officials of the sovereign immunity that protects their service to the State.  Plaintiffs' allegation that they suffered injury during military or security operations does not alter this legal conclusion.  *See, e.g., Saltany v. Reagan,* 702 F. Supp. 319, 321 (D.D.C. 1988) (finding it "manifest" that "civilian or military officials of the U.S. Government who are alleged to have planned and/or executed the air strikes [on Libya] ordered by the President ... did so in their official capacities," and thus were entitled to immunity in ATCA suits alleging injuries to civilians), *aff'd in relevant part*, *rev'd in part*, 886 F.2d 438 (D.C. Cir. 1989).

### C.        Head of State Immunity Bars Any Suit Against the Prime Minister

Independent of the FSIA, Prime Minister Sharon has absolute immunity from suit.  That absolute immunity flows from his status as the sitting head of government of the State of Israel, confirmed by the Executive Branch in a Suggestion of Immunity filed in this case on June 11, 2003.  Once the political branches have recognized an individual as a sitting head of government, the "courts of the United States are bound to accept such … determinations as conclusive."  *First Am. Corp. v. Al-Nahyan,* 948 F. Supp. 1107, 1119 (D.D.C. 1996); *Saltany,* 702 F. Supp. at 320.  There is no room for argument or equivocation.  No "judicial hearing or factual determination ... is warranted."  *Lafontant*, 844 F. Supp. at 133; *Tachiona v. Mugabe*, 169 F. Supp. 2d 259, 293 (S.D.N.Y. 2001).  The immunity is absolute.  *Lafontant,* 844 F. Supp. at 131-32.[10]  Therefore, all plaintiffs' claims against the Prime Minister must be dismissed.

---

[10] That a case purportedly arises under the ATCA or TVPA "does not negate head-of-state immunity."  *Lafontant,* 844 F.Supp. at 138.  Congress was quite explicit on this point in enacting the TVPA.  *See* TVPA Senate Report at 7-8 ("The TVPA is not intended to override traditional diplomatic immunities …. Nor should visiting heads of state be subject to suits under the TVPA."); TVPA House Report at 5 ("[N]othing in the TVPA overrides the doctrines of diplomatic and head-of-state immunity.  These doctrines would generally provide a defense to suits against foreign heads of state and other diplomats ....").  Logically, "there are no defensible grounds for a different outcome as it relates to an action invoking the ATCA."  *Tachiona,* 169 F. Supp. 2d at 297.

III.   **THE COURT LACKS JURISDICTION OVER THE INDIVIDUAL ISRAELI DEFENDANTS TO THE EXTENT SUED IN THEIR PERSONAL CAPACITIES**

Even if Israel's sovereign immunity did not encompass the individual Israeli defendants, the Court still would have no jurisdiction over the claims against them. Plaintiffs cannot satisfy their *prima facie* burden of showing jurisdictional contacts for these individual defendants. Nor, on the face of the Complaint, could plaintiffs satisfy the requirements of the applicable long-arm statute. Among other things, plaintiffs cannot demonstrate that the individual Israeli defendants caused tortious injury in the United States, much less in the District of Columbia. D.C. Code Ann. § 13-423.[11] This is not a mere procedural nicety. The requirement of a jurisdictional nexus between the individual defendants, the cause of action, and the forum is a basic demand of due process, to prevent the type of abuse the political filing in this case represents.

A.   **Plaintiffs Have Not Alleged Jurisdictional Contacts for the Individual Defendants in Their Personal Capacities**

Plaintiffs bear the burden of making a *prima facie* showing of personal jurisdiction. *See Second Amendment Found. v. United States Conference of Mayors*, 274 F.3d 521, 524 (D.C. Cir. 2001); *First Chicago Int'l v. United Exch. Co.*, 836 F.2d 1375, 1378 (D.C. Cir. 1988). Moreover, they must meet this requirement for *each* defendant. *First Chicago*, 836 F.2d at 1378; *Overseas Partners, Inc. v. PROGEN Musavirlik ve Yonetim Hizmetleri, Ltd. Sikerti*, 15 F. Supp. 2d 47, 50 (D.D.C. 1998). Plaintiffs cannot rest on "bare allegations" to make this *prima facie* showing, but must allege specific acts linking each defendant with the forum. *First*

---

[11] The Court need not resolve for this Motion the question posed by Congregation Rinat Israel's motion to dismiss – whether pleading RICO claims transforms the personal jurisdiction inquiry into one of nationwide rather than D.C. contacts. As regards the individual Israeli Government Defendants, the result is the same, because plaintiffs have not pled *any* personal contacts by these defendants with the United States, from which plaintiffs' claims allegedly arise.

*Chicago*, 836 F. 2d at 1378-79; *see also Sunlite, Inc. v. BfG Bank AG,* 849 F. Supp. 74, 75 (D.D.C. 1994).

Moreover, because plaintiffs purport to sue the individual Israeli defendants in their personal capacities, they must allege *personal* contacts with the forum sufficient to establish jurisdiction. *See Wiggins v. Equifax, Inc.*, 853 F. Supp. 500, 503 (D.D.C. 1994) ("Personal jurisdiction over the employees or officers of a corporation in their individual capacities must be based on their personal contacts with the forum and not their acts and contacts carried out solely in a corporate capacity."); *Richard v. Bell Atl. Corp.*, 946 F. Supp. 54, 73-74 (D.D.C. 1996) (same). Any contacts the individual defendants might have with the District of Columbia in their *official* capacities are irrelevant in determining whether they are personally subject to this Court's jurisdiction. *See Ali v. Dist. of Columbia*, 278 F.3d 1, 7 (D.C. Cir. 2002) (disregarding Virginia officials' contacts with the District for purposes of personal jurisdiction, since contacts were not undertaken in their personal capacities); *Jungquist*, 115 F.3d at 1028-1031 (determining whether activities were undertaken in individual defendants' personal or official capacity); *El-Fadl,* 75 F.3d at 671 (concluding that foreign defendants' activities in the District were neither personal nor private).[12]

The Complaint here does not meet these standards. Though wandering some 140 pejorative pages, it alleges no personal contacts with the United States, much less with the District of Columbia – *not one* – by the 11 individual Israeli Government Defendants. Nor do

---

[12] Nor could plaintiffs rely on any allegations of contacts between the individual Israeli Government Defendants and the U.S. Government. Such contacts, even if undertaken in a personal rather than official capacity, are excluded from personal jurisdiction analysis. *See United States v. Ferrara*, 54 F.3d 825, 831 (D.C. Cir. 1995); *World Wide Minerals Ltd. v. Republic of Kazakhstan,* 116 F. Supp. 2d 98, 105 (D.D.C. 2000), *aff'd in part, remanded on other grounds,* 296 F.3d 1154 (D.C. Cir. 2002), *cert. denied*, 123 S. Ct. 1250 (2003); *Doe v. Islamic Salvation Front,* 993 F. Supp. 3 (D.D.C. 1998).

any specific allegations related to the claims asserted here link the defendants to the District.  In *El-Hadad v. Embassy of the UAE,* Judge Harris dismissed claims against individual foreign officials on precisely these grounds – that no specific factual allegations connected the officials to this jurisdiction or demonstrated minimum contacts in their personal capacities.  69 F. Supp. 2d at 80.  The Court should reach the same result in this case.

### B.    Plaintiffs Could Not Satisfy the Requirements of the D.C. Long-Arm Statute or of Due Process with Respect to the Individual Defendants

Even were the Complaint not silent on the subject, plaintiffs still could not meet their burden of demonstrating personal jurisdiction over the individual Israeli Government Defendants.  First, this is not a case where "general jurisdiction" comes into play. The defendants reside in Israel, not the District, and there is no alleged record of other "continuous and systematic contacts" with the District (or even the United States) in their personal capacities.  *See* D.C. Code Ann. § 13-422; *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408 (1984).

Moreover, plaintiffs cannot rely on the District's long-arm statute to establish "specific jurisdiction" over the individual Israeli Government Defendants.  *See* D.C. Code Ann. § 13-423.  The D.C. long-arm statute enumerates several types of conduct that may give rise to specific jurisdiction over a nonresident defendant, "as to a claim for relief arising from" that conduct.  Specifically, the court may exercise jurisdiction over a person for claims arising from that person's:

> (1) transacting any business in the District of Columbia; ...
>
> (3) causing tortious injury in the District of Columbia by an act or omission in the District of Columbia; [or]
>
> (4) causing tortious injury in the District of Columbia by an act or omission outside the District of Columbia if he regularly does or

> solicits business, engages in any other persistent course of
> conduct, or derives substantial revenue from goods used or
> consumed, or services rendered, in the District of Columbia ....

D.C. Code Ann. § 13-423.  For these provisions to apply, there must be a "significant

connection" between the claim and alleged contact with the District.  *World Wide Minerals*,

116 F. Supp. 2d at 106.

Here, plaintiffs do not allege that their claims arise out of any personal business that the

individual defendants purportedly conducted in the District.  D.C. Code Ann. § 13-423(a)(1).

Nor do plaintiffs allege that the individual Israeli Government Defendants committed tortious

acts within the District, resulting in injuries also within the District.  *Id.* § 13-423(a)(3).

Indeed, the Complaint alleges just the opposite: that each of the plaintiffs suffered injury in

Israel, the West Bank or Lebanon, from wrongful acts in the same places.  *See supra* n.6.

Plaintiffs cannot invoke section (a)(4) of the long-arm statute either, because like

section (a)(3), it requires that the alleged injury occur *within* the District.  Indeed, the courts

repeatedly have dismissed suits for lack of personal jurisdiction under section (a)(4) where the

alleged injury occurred outside the District.  *See, e.g., El-Fadl*, 75 F.3d at 672; *Moskovits v.

Drug Enforcement Admin.*, 774 F. Supp. 649, 652 (D.D.C. 1991); *Dorman v. Thornburgh*, 740

F. Supp. 875, 878 (D.D.C. 1990), *aff'd in relevant part*, 955 F.2d 57 (D.C. Cir. 1992).

Plaintiffs also cannot demonstrate that the exercise of personal jurisdiction over the

individual Israeli Government Defendants comports with due process.  To make this showing –

which is required even where the District's long-arm statute is satisfied, *see GTE New Media

Servs., Inc. v. Bellsouth Corp.*, 199 F.3d 1343, 1347 (D.C. Cir. 2000) – plaintiffs must establish

minimum contacts between these defendants and the District so that "the maintenance of the

suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

Here, plaintiffs have not even alleged that the individual Israeli Government Defendants have *any* personal contacts or connections with the District, or for that matter with any other forum in the United States.  None of these defendants reasonably could have "anticipate[d] being haled into court" here for alleged conduct occurring entirely in Israel, the West Bank and Southern Lebanon.  *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).[13] Neither is there any allegation that these defendants purposefully targeted [their] activities at residents of the District."  *United States v. Philip Morris Inc.,* 116 F. Supp. 2d 116, 129 (D.D.C. 2000).  Subjecting them to suit here would indeed "offend traditional notions of fair play and substantial justice."  *Int'l Shoe*, 326 U.S. at 316.

### C.    Plaintiffs' Peremptory Allegations of Conspiracy Cannot Ground Personal Jurisdiction over the Individual Defendants

Absent any alleged contacts between the individual Israeli Government Defendants and the District, plaintiffs may attempt to predicate personal jurisdiction on the purported existence of a broad conspiracy involving other actors with more likely jurisdictional ties.  Without

---

[13] Congress was acutely aware, in enacting the TVPA, that plaintiffs might try to stretch the statute to reach overseas defendants without minimum contacts with a U.S. forum.  The legislative history establishes that Congress intended the statute to be enforced only against defendants who were physically present in the United States at the time of suit.  *See* TVPA Senate Report at 7 ("this legislation will not turn the U.S. courts into tribunals for torts having no connection to the United States whatsoever," since the courts may exercise jurisdiction only over a defendant with "'minimum contacts' with the forum state, for example through residency here or current travel").  The TVPA's congressional sponsors were even more explicit.  *See, e.g.,* 138 Cong. Rec. S2667-04, S2668 (1992) (statement of Sen. Specter) ("The act is intended to deny torturers a safe haven in this country.  If a torturer does not come to the United States and establish sufficient contacts, then he or she cannot be sued under this act."); 137 Cong. Rec. S1369-01, S1378 (1991) (statement of Sen. Specter) ("This bill will give our P.O.W.'s [in Iraq] a cause of action if any of their torturers should ever enter the United States in the future."); *id* at S1379 (statement of Sen. Kennedy) (TVPA suits "require that both the victim and the torturer must be present in the United States for the matter to be considered"); 137 Cong. Rec. H11244-04, H11245 (1991) (statement of Rep. Broomfield) (TVPA would permit suit in the United States "against the persons responsible, provided they can be found within this country").

elaboration or substantiation, plaintiffs assert that *all* the named defendants, including President Bush, Secretary of State Powell and the defense contractor defendants, "entered into an enterprise and civil conspiracy to violate the rights of Plaintiffs protected by international law and the laws of the United States."  Compl. ¶ 2; *see also* RICO Claims (Fourth and Fifth Claims for Relief).  Three simple and complete answers rebut any such argument.

First, nowhere in the Complaint do plaintiffs specify how the defendants entered into such a conspiracy or carried it out.  Plaintiffs cannot "assert the fiction of a conspiracy simply in order to establish personal jurisdiction over defendants who clearly have no contact or interest with the District of Columbia."  *Dorman*, 740 F. Supp. at 878; *Second Amendment Found.*, 274 F.3d at 524  ("bare allegation[s] of conspiracy or agency [are] insufficient to establish personal jurisdiction").

Second, to establish personal jurisdiction on a conspiracy theory, plaintiffs also must show that an overt act, as well as the resulting injury to plaintiffs, occurred in the District.  *E.g.*, *Jungquist*, 115 F.3d at 1031 (no conspiracy-based jurisdiction where plaintiffs failed to plead with particularity any overt acts in the District in furtherance of the conspiracy); *World Wide Minerals*, 116 F. Supp. 2d at 108 (no conspiracy-based jurisdiction where only alleged overt act in the District, a meeting at the embassy, occurred after plaintiff's injury arose).  Plaintiffs have not even alleged such an overt act, or such an injury, much less established it.

Third, any dealings by employees of the Israeli government with the U.S. government or U.S. defense contractors were necessarily in their official, not their personal capacities.

There is thus no basis for subjecting the individual Israeli Government Defendants to jurisdiction in the District based on a blanket, unsupported allegation of conspiracy.  Doing so would violate their due process rights.  *Cf. Dorman*, 740 F. Supp. at 878 n.2.

**IV.      THE COURT SHOULD DECLINE TO EXERCISE JURISDICTION UNDER
         THE POLITICAL QUESTION AND ACT OF STATE DOCTRINES**

For the reasons stated in Parts I – III, this Court has no personal or subject matter

jurisdiction over this case.  But even if it did, this case still could not proceed, because it is a

political exhibition, not a justiciable controversy.  The case poses a clear and present danger of

interfering with critical and sensitive foreign policy objectives of the United States.  Under

either the political question or act of state doctrines, this Court should refrain from further

adjudication.

**A.      The Complaint Raises Nonjusticiable Political Questions Reserved to the
         Executive Branch**

As this Court recently recognized, the political question doctrine is "'primarily a

function of the separation of powers,' and operates as a prudential limitation on the propriety of

federal courts reviewing the decisions of the other branches of government."  *Kucinich v. Bush,*

236 F. Supp. 2d 1, 15 (D.D.C. 2002) (Bates, J.) (quoting *Baker v. Carr,* 369 U.S. 186, 210

(1962)).  In *Baker*, the Court set forth six criteria for determining whether a case presents a

political question:

> Prominent on the surface of any case held to involve a political
> question is found a textually demonstrable constitutional
> commitment of the issue to a coordinate political department; or a
> lack of judicially discoverable and manageable standards for
> resolving it; or the impossibility of deciding without an initial
> policy determination of a kind clearly for nonjudicial discretion;
> or the impossibility of a court's undertaking independent
> resolution without expressing lack of the respect due coordinate
> branches of government; or an unusual need for unquestioning
> adherence to a political decision already made; or the potentiality
> of embarrassment from multifarious pronouncements by various
> departments on one question.

369 U.S. at 217.[14]  The test mandated by *Baker* does not *balance* these factors.  Rather, it

assesses whether *any* are present.  If they are, then the Court ordinarily should dismiss the case.

*Id.; see also Kucinich,* 236 F. Supp. 2d at 15 ("'[A]ny one of [these] characteristics may be

sufficient to preclude judicial review' under the political question doctrine.") (quoting *Made in*

*the USA Found. v. United States,* 242 F.3d 1300, 1312 (11th Cir. 2001)).

      Although not every single case touching on foreign relations implicates these factors

and thereby raises nonjusticiable political questions, *Baker,* 369 U.S. at 211, courts have been

particularly sensitive in this arena, where "many ... questions uniquely demand single-voiced

statement of the Government's views."  *Id.*  The Supreme Court long ago explained why judges

should fear to tread in this area:

> [T]he very nature of executive decisions as to foreign policy is
> political, not judicial.  Such decisions are wholly confided by our
> Constitution to the political departments of the government,
> Executive and Legislative.  They are delicate, complex, and
> involve large elements of prophecy.  They are and should be
> undertaken only by those directly responsible to the people
> whose welfare they advance or imperil.  They are decisions of a
> kind for which the Judiciary has neither aptitude, facilities nor
> responsibility and have long been held to belong in the domain of
> political power not subject to judicial intrusion or inquiry.

*Chicago & S. Air Lines Inc. v. Waterman S.S. Corp.*, 333 U.S. 103, 111 (1948).

      In this case, the U.S. Government has made clear, in the briefs filed on behalf of

President Bush and Secretary of State Powell, that plaintiffs' claims implicate the *Baker* factors

and present issues of foreign policy reserved to the Executive Branch.  The Government has

---

[14] Justice Powell summed up the *Baker* criteria as follows in *Goldwater v. Carter*:  "(i) Does the issue involve resolution of questions committed by the text of the Constitution to a coordinate branch of Government? (ii) Would resolution of the question demand that a court move beyond areas of judicial expertise? (iii) Do prudential considerations counsel against judicial intervention?"  444 U.S. 996, 998 (1979).  The D.C. Circuit has applied Justice Powell's analysis interchangeably with the original *Baker* criteria.  *See, e.g., Antolok v. United States,* 873 F.2d 369, 381 (D.C. Cir. 1989).

also made clear that proceeding with this case would potentially disrupt the Executive's

conduct of foreign affairs:

> [I]n order to award the Plaintiffs the relief they seek the Court
> would have to make findings and determinations respecting the
> nature and appropriateness of Israeli actions undertaken in the
> midst of an ongoing armed conflict abroad that the United States
> (through its political branches) is attempting to resolve.  Such
> findings – which would have to assess the context and
> appropriateness of Israeli actions – themselves *would intrude
> upon the foreign policy prerogatives of the political branches ....*

Fed. Defendants' Motion to Dismiss at 37-38 (emphasis added).

        The complaint here justifies these concerns.  Plaintiffs allege, among other things, that

Israeli forces deliberately targeted areas in the West Bank for military operations, in order to

terrorize and intimidate civilians they knew would be present.  Compl. ¶¶ 79, 91, 136-140.

Plaintiffs also allege negligence in the exercise of military force, in that "[d]efendants failed to

use ordinary or reasonable care in order to avoid injury to plaintiffs."  *Id.* ¶ 543.   They have

alleged that Israel has engaged *not* in legitimate self defense, but rather in a terrorist policy of

attacking Palestinian civilians for "no discernable military or security objective," *id.* ¶ 91, and

that the injuries to plaintiffs thus were "part of a pattern and practice of systemic human rights

violations."  *Id.* ¶ 423.  But as the U.S. Government explained in invoking the political question

doctrine in this case:

> What constitute legitimate actions in furtherance of Israel's
> internal security or self-defense ... are determinations for the
> President to make, taking into account complex historical,
> diplomatic, military and factual circumstances that are only
> developed and accessible through the conduct of the Nation's
> diplomatic and military relationships.  The same is true with
> respect to any assessments of Israel's human rights record.  All
> such determinations, at core, include value-laden judgments
> based on complex factual circumstances that the President is
> uniquely qualified to make and that the courts are, as an

institutional matter, uniquely unqualified to make in these
circumstances.

Fed. Defendants' Motion to Dismiss at 39.

That assessment is consistent with the case law, as the courts have dismissed a wide
range of private tort claims implicating issues like those presented in this case.  For example, in
*Aktepe v. United States*, 105 F.3d 1400 (11th Cir. 1997), Turkish plaintiffs brought wrongful
death and personal injury claims against the United States, arising out of the allegedly negligent
firing of a missile from a naval aircraft carrier.  The Eleventh Circuit dismissed the case on
political question grounds.  It found, at the outset, that the second *Baker* factor was implicated,
because determining whether the Navy acted negligently would require the Court to determine
how a "reasonable military force" should have acted.  *Id.* at 1404.  "[I]t is difficult to conceive
of an area of governmental activity in which the courts have less competence," the court
observed, because "courts lack standards with which to assess whether reasonable care was
taken to achieve military objectives while minimizing injury and loss of life."  *Id.* (citation
omitted).  The same problems implicated the third and fourth *Baker* factors, since judgments
about negligence in this context "inevitably would require ... initial policy decisions of a kind
appropriately reserved for military discretion," and would "express a lack of respect for the
political branches of government."  *Id.*  These concerns were even more pronounced because
the allegations in the complaint went beyond a "common negligence action directed at lower-
level military operatives," and instead "launche[d] a far more sweeping assault" on the
government's military practices.  *Id.*

The Court of Appeals for the Eleventh Circuit also affirmed the dismissal on political
question grounds of broad international law claims against Nicaraguan *contra* leaders.  *Linder
v. Portocarrero,* 963 F.2d 332 (11th Cir. 1992).  The plaintiffs, survivors of an American

citizen allegedly tortured and killed while developing a Nicaraguan hydroelectric plant, alleged that defendants had launched a "policy, pattern and practice ... targeted at development workers and development projects."  *Id.* at 334.  The Court noted that these broad claims would require it:

> [T]o discern between military, quasi-military, industrial, economic and other strategic targets, and rule upon the legitimacy of targeting such sites ... in the course of a civil war.  We would be called upon to inquire into whether, and under what circumstances, defendants were justified in targeting such sites, with knowledge that civilians ... would be present. ... In short, 'we would necessarily be required to measure and carefully assess the use of the tools of violence and warfare in the midst of a foreign civil war' ....

*Id.* at 335.  The "sweeping allegations of the complaint" thus led "into a thicket of nonjusticiable claims for relief."  *Id.* at 336.  As the brief of the United States illuminated, the case at bar raises the same concerns as were implicated as in *Aktepe* and *Linder*.

That this case arises under the ATCA and TVPA does not alter the analysis.  Almost 20 years ago, this Circuit suggested that ATCA claims might be *particularly* suitable for dismissal on political question grounds.  *See Tel-Oren v. Libyan Arab Republic,* 726 F.2d 774, 823, 826 (D.C. Cir.) (Robb, J., concurring), *cert. denied,* 470 U.S. 1003 (1984) (noting the "inherent inability of federal courts to deal with cases such as this one" and predicting that "[t]he certain results of judicial recognition of jurisdiction over cases such as this one are embarrassment to the nation [and] the transformation of trials into forums for the exposition of political propaganda").  Since that time, the courts have not hesitated to dismiss ATCA or TVPA cases on political question grounds – contrary to plaintiffs' sweeping assertion that no courts have ever done so.  *See* Pl. Opp. to Def. Contractors' Motion at 30.  *Linder* itself involved the alleged violation of "fundamental norms of international law."  963 F.2d at 335.  So too did

four other cases dismissed in the last few years.  *See, e.g., Anderman v. Fed. Republic of Austria,* No. CV01-01769FMCAIJX, 2003 WL 1903455, at *15 (C.D. Cal. Apr. 15, 2003) (ATCA claims arising out of Austria's pre-war and wartime confiscation of Jewish property "present a nonjusticiable political question"); *Sarei v. Rio Tinto PLC*, 221 F. Supp. 2d 1116, 1195-98 (C.D. Cal. 2002) (noting that the ATCA "does not speak to the applicability of the political question doctrine" and dismissing war crimes claims where the liability of individual defendants "turns on whether [Papua New Guinea] and/or its military violated international law"); *Hwang Geum Joo v. Japan,* 172 F. Supp. 2d 52, 66 (D.D.C. 2001) (dismissing torture and sexual slavery claims against Japan under political question doctrine, because "prudential concerns together with the court's lack of judicial expertise strongly militate in favor of dismissal"); *Iwanowa v. Ford Motor Co.,* 68 F. Supp. 2d 424, 489-90 (D.N.J. 1999) (dismissing ATCA claim involving forced labor in Germany on political question grounds and as a function of international comity).

  In several of these cases, the courts relied heavily on statements by the Executive Branch that continued adjudication of the suits could undercut important foreign policy interests of the United States.  In *Sarei*, for example, the Court noted the State Department's concern about harming the ongoing peace process in Papua New Guinea, "the success of [which] is an important United States foreign policy objective."  221 F. Supp. 2d at 1196.  It concluded that:

> Ruling on the merits of [plaintiffs' human rights] allegations will inevitably require passing judgment on the pre-war and wartime conduct of the PNG government.  It is this type of judgment that the [State Department] indicates may have serious implications for the future of the peace agreement that has been reached, and thus for the foreign policy objectives the executive branch has set.  It is also the type of judgment that risks placing the court in the position of announcing a view that is contrary to that of a

- 35 -

> coordinate branch of government, with all the attendant
> embarrassment that would ensue.

*Id.* at 1198. *See also Hwang Geum Joo,* 172 F. Supp. 2d at 67 (citing executive branch preference that compensation claims of wartime "comfort women" be negotiated on a government-to-government basis with Japan, so as not to disrupt the framework for other war reparations claims).

Deference to the Executive Branch's assessment is particularly appropriate in this case, which arises at a time of both turmoil and opportunity in the Middle East, while the United States is pursuing diplomatic avenues to promote peace. Any pronouncements by the Court in these areas inevitably will complicate, if not thwart, the Executive Branch's conduct of foreign relations.

Proceeding with this case could also jeopardize another important priority recently articulated by the United States Government: protecting senior U.S. officials against broad suits in foreign courts alleging violations of international law arising out of their official acts. In a recent ATCA case against Chinese officials challenging their implementation of China's policy towards the Falun Gong, the U.S. Government asked the Court "in particular to take into account the potential for reciprocal treatment of United States officials by foreign courts in efforts to challenge U.S. government policy," including suits alleging international law violations against individuals "in carrying out their official functions under the Constitution, laws and programs of the United States." Statement of Interest of the United States, *Doe v. Liu Qui,* No. C 02 0672 CW (N.D. Cal.), Sept. 27, 2002 (submitted herewith).

This concern is particularly tangible here, where plaintiffs bring claims personally against Israel's Prime Minister, current and former members of its Cabinet and leaders of its armed forces and security service for injuries plaintiffs allegedly suffered in the course of

Israeli security operations.  Allowing the case to proceed could – in line with the U.S. concerns

expressed in the Falun Gong case – set a precedent for similar suits against President Bush, the

Secretary of Defense and other top U.S. officials for alleged injuries to Iraqi or Afghan

civilians arising out of U.S. military operations or ongoing security sweeps in the midst of

civilian populations.  Indeed, a complaint already has been filed in Belgium against General

Tommy Franks and others resulting from the invasion of Iraq, and press reports suggest that

similar cases against senior U.S. and U.K. officials are being prepared in other jurisdictions.

The State Department condemned the Belgian suit (which has since been dismissed) as an

"abuse of [Belgium's] legal system for political ends."  Statement of Philip T. Reeker, Deputy

State Department Spokesman (May 14, 2003), *at* http://www.state.gov/r/pa/prs/dpb/2003/

20584.htm (last visited May 19, 2003).[15]  It also articulated the same rationale for opposing

creation of an international criminal court and resisting foreign court proceedings against

present or former U.S. officials.[16]  Congress has even included an explicit finding in federal

legislation that "senior officials of the United States Government should be free from the risk

---

[15] The United States Government has expressed similar views about the impropriety of lawsuits recently filed in Belgium against former President George H.W. Bush and other senior U.S. officials arising out of the 1991 Gulf War.  *See* Interview with Secretary of State Colin L. Powell (May 18, 2003), *at* http://www.state.gov/secretary/rm/2003/18810.htm (last visited May 19, 2003); Statement of State Department Spokesman Richard Boucher (Apr. 28, 2003), *at* http://www.state.gov/r/pa/prs/dpb/2003/20025.htm (last visited May 19, 2003).

[16] *See, e.g.,* Statement of Marc Grossman, Under Secretary of State for Political Affairs, Remarks to the Center for Strategic and Int'l Studies (May 6, 2002), *at* http://www.state.gov/p/9949.htm (last visited Apr. 25, 2003) ("We must ensure that our soldiers and government officials are not exposed to the prospect of politicized prosecutions and investigations.  Our President is committed to a robust American engagement in the world to defend freedom and defeat terror; we cannot permit the [International Criminal Court] to disrupt that vital mission."); Statement of Sec. of Defense Donald Rumsfeld, Foreign Press Center Briefing (June 21, 2002), *at* http://fpc.state.gov/11359.htm (last visited Apr. 25, 2003) (noting "attempt[] to serve a subpoena on [former Secretary of State Henry Kissinger] for something that happened 25 years before in Chile, and something he was not aware of or knowledgeable about," and expressing concern that International Criminal Court could result similarly in "a politicized prosecutor or people making allegations or charges" against U.S. military forces).

- 37 -

of prosecution by the International Criminal Court, especially with respect to official actions

taken by them to protect the national interests of the United States."  22 U.S.C. § 7421(9).

All these factors support a finding of nonjusticiability in this case.  As the U.S.

Government urged in *Liu Qi,*

> U.S. courts should be cautious when asked to sit in judgment on
> the acts of foreign officials taken within their own countries
> pursuant to their government's policy.  This is especially true
> when (as in the instant case) the defendants continue to occupy
> governmental positions, none of the operative acts are alleged to
> have taken place in the United States, … and the substantive
> jurisdiction of the court is asserted to rest on generalized
> allegations of violations of norms of customary international law
> by virtue of the defendants' governmental positions.  Such
> litigation can serve to detract from, or interfere with, the
> Executive Branch's conduct of foreign policy.

Statement of Interest of the United States, *Doe v. Liu Qui,* No. C 02 0672 CW (N.D. Cal.),

Sept. 27, 2002.  These concerns are equally if not more compelling here.

In sum, the reasons to determine that this case presents a nonjusticiable political

question are overwhelming.  In particular:

- The Executive Branch has expressly articulated its concerns about interference with foreign policy and directly asked the Court not to proceed.

- It has done so in the context of consistent support for Israel from the President and Congress.

- The need for the United States, through the political branches of government, to speak with a single unified voice is critical in light of the volatility of the region and the Administration's involvement in the peace process.

- The Complaint encompasses issues directly involved in the U.S. Government's current efforts to promote peace in the region and to combat international terror.

The last thing that this Court, any court, would wish to do is interfere with the foreign

policy of the United States in one of the most difficult areas of the world, and in particular, with

the search for peace in that region.  This case, from its scurrilous attacks on Israel as a terrorist

state bent on genocide, to its histrionic assault on the very core of Israel's efforts to defend itself against suicide bombers, poses that risk.  It seeks to embroil the Court in changing, if not displacing, the foreign policy of the United States, and in second-guessing the security policy of a close ally, Israel.

In sum, plaintiffs should pursue their political goals in political forums, not here, in a Federal Court.

> **B.**     **The Complaint Asks the Court To Judge the Legality and Validity of Sovereign Acts by Israel**

The act of state doctrine also mandates dismissal of this case.  The doctrine applies where "the outcome of the case turns upon the effect of official action by a foreign sovereign." *W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp. Int'l,* 493 U.S. 400, 406 (1990).  The Supreme Court most recently has described the doctrine "as a consequence of domestic separation of powers, reflecting the 'strong sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state may hinder' the conduct of foreign affairs."  *Id.* at 404 (quoting *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 423 (1964)).  The policies underlying the doctrine include "international comity, respect for the sovereignty of foreign nations on their own territory, and the avoidance of embarrassment to the Executive Branch in its conduct of foreign relations."  *Id.* at 408*; see also World Wide Minerals,* 296 F.3d at 1165.[17]

---

[17] Although stated in terms of acts of the "State" or "sovereign," the doctrine also extends to the governmental acts of State officials vested with sovereign authority.  *See Bernstein v. Van Heyghen Freres Societe Anonyme,* 163 F.2d 246, 249 (2d Cir. 1947).  In order for the doctrine to apply, the acts of an individual defendant must be undertaken on behalf of the state and not privately on his own behalf.  *See Alfred Dunhill v. Republic of Cuba*, 425 U.S. 682, 694 (1976).  Orders given by military officers have "traditionally been viewed as an official act of a sovereign for purposes of the act of state doctrine."  *Roe v. Unocal Corp.,* 70 F. Supp. 2d 1073, 1079 (C.D. Cal. 1999).  If "the officer acted on behalf of a recognized government and if the lawsuit turns on a challenge to the officer's order, then the act of state doctrine bars adjudication."  *Id.* (citing several early Supreme Court cases).  As noted above, on the face of the Complaint, it is clear that the alleged acts at issue here were official, not private.

The Supreme Court has articulated a three-factor test for applying the act of state doctrine, focusing on: (a) "the degree of codification or consensus concerning a particular area of international law," (b) the extent to which the issue "touch[es] ... sharply on national nerves," with greater justification for "exclusivity in the political branches" the more "important the implications of an issue are for our foreign relations"; and (c) whether "the government which perpetrated the challenged act of state is no longer in existence." *Sabbatino*, 376 U.S. at 428. Of these factors, "[t]he 'touchstone' or 'crucial element' is the potential for interference with our foreign relations." *Int'l Ass'n of Machinists v. OPEC*, 649 F.2d 1354, 1360 (9th Cir. 1981).

Here, the second and third *Sabbatino* factors definitively call for application of the act of state doctrine. The third factor ought not to be controversial: Israel is still led by the government of Prime Minister Sharon, as it was at the time of most of the alleged events. And the second, critical *Sabbatino* factor – the sensitivity of the issue for foreign relations – is particularly compelling in this case, for the reasons addressed above.

There is no question that this case is a frontal assault on Israel's policies. Among other things, plaintiffs ask the Court to determine that "Israel is a terrorist state," engaged in a "capricious, cynical strategy … for no discernable military or security objective," involving a "systematic pattern of terror against civilians as a form of collective punishment for the acts of a few Palestinians." Compl. ¶¶ 76, 91, 178. In other words, plaintiffs directly ask the Court to adjudicate the legality, the political justification, and even the morality of security operations of a key U.S. ally within and adjacent to its borders, in areas from which lethal attacks on its citizens repeatedly have been launched.

The U.S. Government has made clear that the courts should not be the vehicle for such judgments.  In an *amicus brief* filed last month before the Ninth Circuit, the U.S. Government argued that permitting ATCA suits to proceed under expansive interpretations of that statute "places the courts in the wholly inappropriate role of arbiters of foreign conduct."  Brief for the United States as *Amicus Curiae, Doe v. Unocal Corp.,* Nos. 00-56603, 00-56628 (9th Cir.), May 8, 2003, at 23 (submitted herewith).  Moreover,

> the types of claims that are being brought today under the [ATCA] are fraught with foreign policy implications.  They often involve our courts in deciding suits between foreigners regarding events that occurred within the borders of other nations, and in the exercise of foreign governmental authority.  The [ATCA] has been wrongly interpreted to permit suits requiring the courts to pass factual, moral and legal judgment on these foreign acts.  And … [ATCA] actions are not limited to rogues and outlaws ….  [S]uch claims can easily be asserted against this Nation's friends, including our allies in our fight against terrorism.

*Id.* at 22.  These concerns are echoed in the U.S. Government's brief in this case, urging the Court *not* "to make findings and determinations reflecting the nature and appropriateness of Israel actions."  Fed. Defendants' Motion to Dismiss at 37.

Such statements by the Executive Branch deserve deference.  *See Millen Indus., Inc. v. Coordination Council for North Am. Affairs,* 855 F.2d 879, 881 (D.C. Cir. 1998) ("[T]he courts recognize the value of obtaining views of the Executive Branch in matters relating to the application of the act of state doctrine and giving appropriate weight to those views."); *Envtl. Tectonics v. W.S. Kirkpatrick, Inc.,* 847 F.2d 1052, 1058 (3d Cir. 1988) ("[C]ourts are required to decline to exercise jurisdiction over cases that may embarrass or impede the political branches in their conduct of foreign affairs."), *aff'd,* 493 U.S. 400 (1990).  Indeed, one court recently observed that it had not found:

> a single case in which a court permitted a lawsuit to proceed in
> the face of an expression of concern [from the executive branch
> about the impact on U.S. foreign policy objectives].  This is
> probably because to do so would have the potential to embarrass
> the executive branch in the conduct of its foreign relations, and
> "[t]he major underpinning of the act of state doctrine is ... [to]
> foreclos[e]" such a possibility.

*Sarei*, 221 F. Supp. 2d at 1192 (quoting *Dunhill,* 425 U.S. at 697) (all but first alteration in

original).

Plaintiffs have suggested, nonetheless, that the Court would be breaking new ground if

it applied the act of state doctrine in an ATCA or TVPA case.  *See* Pl. Opp. To Def.

Contractors' Motion at 30 (asserting that "[t]here are no ... cases" in "this Circuit or any other

Circuit that ha[ve] dismissed an action brought under the [ATCA] and/or the [TVPA] on ... act

of state grounds").  This suggestion is flatly wrong.  In fact, courts have not hesitated to dismiss

ATCA or TVPA claims in appropriate cases, some of which are instructive here.

For example, many plaintiffs in this case charge that they were shot or had their homes

or businesses damaged during "Operation Defensive Shield," the Israeli military sweep into

West Bank cities in the spring of 2002.  Compl. ¶¶ 7-11, 14-16, 18-20, 23-24, 234.  But in

*Saltany v. Reagan*, the Court dismissed ATCA claims against the United Kingdom arising out

of injury or death to civilians and destruction of civilian property in the course of U.S. military

action against Libya.  702 F. Supp. 319, 320-21 (D.D.C. 1988).  The Court explained that

"[w]hat is charged is, quite simply, Britain's complicity in an illicit act of war committed by the

United States.  By any definition that description of the United Kingdom's allegedly wrongful

conduct constitutes an archetypal act of state."  *Id.*

Similarly, in *Roe v. Unocal Corp.,* the court dismissed an ATCA claim that would

"ultimately place the Court in the position of evaluating the legitimacy of orders directed to

subordinate officers" of the Burmese military.  70 F. Supp. 2d at 1079.  The Court reasoned

that this process, necessitating discovery into, among other things, "details of their command

structure and the authority of commanding officers," would place the court "in an unseemly, if

not impossible position."  *Id.*  Because the U.S. courts "rarely, if ever, entertain suits

challenging the propriety of orders from the United States Armed Forces," the Court was "not

persuaded that it should undertake such an inquiry with respect to a foreign military."  *Id.* at

1080.

       This concern – that U.S. courts not judge foreign military activities they would not

second-guess if undertaken by American forces – is compelling.  The courts have repeatedly

dismissed as nonjusticiable challenges to the legality of American military operations.  *See,*

*e.g., Campbell v. Clinton,* 203 F.3d 19, 28 (D.C. Cir. 2000) (Randolph, J., concurring) (legality

of U.S. participation in NATO air strikes against Yugoslavia); *Crockett v. Reagan,* 558 F.

Supp. 893, 898 (D.D.C.), *aff'd,* 720 F.2d 1355 (D.C. Cir. 1983) (legality of U.S. military

operations in El Salvador); *Holtzman v. Schlesinger,* 484 F.2d 1307, 1310-12 (2d Cir. 1973)

(legality of U.S. bombing and other military activity in Cambodia); *Luftig v. McNamara,* 373

F.2d 664, 665 (D.C. Cir. 1967) (legality of U.S. military action in Vietnam).  In light of these

precedents, our courts should be equally if not more unwilling to assess the legality of *foreign*

military or security operations.

       This case, in particular, would require the same type of inquiry the Court in *Roe* found

so problematic.  Plaintiffs seek to hold Israel's current and former Cabinet-level officials and

senior members of the armed forces and security service responsible for the alleged acts of

individual soldiers, security personnel or police officers.  In order to establish such "command

responsibility" for purposes of the TVPA, plaintiffs would need to demonstrate at minimum

that senior officials either directly ordered or participated in these acts, or knowingly tolerated a persistent pattern of such acts by personnel within their command or control.  *See* TVPA Senate Report at 8-9; *Ford ex rel. Estate of Ford v. Garcia,* 289 F.3d 1283, 1288-89 (11th Cir. 2002), *cert. denied*, 123 S. Ct. 868 (2003); *Hilao v. Estate of Marcos,* 103 F.3d 767, 779 (9th Cir. 1996).  As in *Roe,* this inquiry inevitably would require discovery into the command structure and rules of engagement of Israeli military forces, as well as the communications among field officers, their immediate superiors, and their commanders all the way up the line.  This wholesale invasion of sovereignty would be, if anything, more inappropriate for the military of Israel, a key ally, than it was for the Burmese military in *Roe.*

Although most of plaintiffs' allegations arise out of such military operations, two plaintiffs allege detention and abuse in Israeli prisons.  Compl. ¶¶ 12-13.  In *Bao Ge v. Li Peng*, 201 F. Supp. 2d 14, 18 (D.D.C. 2000), the Court dismissed a case that advanced similar allegations.  The plaintiffs there sued China's Politburo and its Chairman, claiming that the government imprisoned them without due process and subjected them to "tortures of various horrifying kinds."  On a motion to dismiss by other alleged co-conspirators, Judge Hogan noted the Chinese government's immunity from suit under the FSIA.  But he also concluded that "[I]t is ... clear that the Act of State doctrine would apply to the actions of the Chinese government defendants," because the relief sought would require the court to assess whether China "abused [its] police power" through acts that were "peculiarly sovereign in nature."  201 F. Supp. 2d at 24 & n.8 (citations omitted).  The same rationale dictates dismissal of the claims of plaintiffs John Doe VI and VII here.

As these cases make clear, the act of state doctrine does not turn on whether, accepting the allegations of the complaint as true, the ostensible acts by the foreign sovereign or its

representatives would comply with international standards or the laws of the foreign State. The Supreme Court has held that the doctrine applies "even if it is claimed that the act of state in question violated international law." *Sabbatino,* 376 U.S. at 422. The issue for purposes of the act of state doctrine is whether even *adjudicating* claims of such wrongs would unduly affront foreign sovereigns and thereby disrupt the conduct of U.S. foreign relations by the Executive Branch. Here, there is no doubt that that is the case, based on the Executive Branch's own submission to this Court. The Court should defer to that judgment and decline to proceed with this action.

## CONCLUSION

For the reasons discussed above, the Israeli Government Defendants' motion should be granted and the claims against them dismissed in their entirety.

Dated: June 12, 2003                    Respectfully submitted,

                                        S/Robert N. Weiner

                                        Robert N. Weiner (D.C. Bar No. 298133)
                                        Jean E. Kalicki (D.C. Bar No. 427679)
                                        Emily M. Pasquinelli (D.C. Bar No. 474688)
                                        ARNOLD & PORTER
                                        555 Twelfth Street, N.W.
                                        Washington, D.C. 20004-1206
                                        Tel: (202) 942-5855
                                        Fax: (202) 942-5999

                                        Attorneys for Defendants the State of Israel, the
                                        Israeli Defense Forces and the Israeli General
                                        Security Service, and defendants Ariel Sharon,
                                        Natan Sharanski, Binyamin Ben Elizer, Shimon
                                        Peres, Uzi Landau, Meir Sheetrit, Avi Dichter,
                                        Shaul Mofaz, Amos Gilad, Aharon Ze'evi
                                        Farkash, and Amos Yaron