# APPENDIX OF UNITED STATES GOVERNMENT COURT SUBMISSIONS CITED IN THE ISRAELI GOVERNMENT DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES

**Exhibit 1**         **Brief for the United States as *Amicus Curiae*, *Magness v. Russian Fed'n*, No. 00-20136 (5th Cir.), May 30, 2000**

**Exhibit 2**         **Brief for the United States as *Amicus Curiae*, *Doe v. Unocal*, Nos. 00-56603, 00-56628 (9th Cir.), May 8, 2003**

**Exhibit 3**         **Statement of Interest of the United States, *Doe v. Liu Qui*, No. C 02 0672 CW (N.D. Cal.), Sept. 27, 2002**

1:02 CV 01431 (JDB)

# EXHIBIT 1

No. 00-20136

IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

NINA SCHRODER MAGNESS, AGNES SCHRODER ATKINS,
and LEE ALEXANDER MAGNESS,
Plaintiffs/Appellees,

v.

RUSSIAN FEDERATION, et al.
Defendants,

RUSSIAN FEDERATION, RUSSIAN MINISTRY OF CULTURE,
and RUSSIAN STATE DIAMOND FUND
Defendants/Appellants.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS

BRIEF FOR THE UNITED STATES AS *AMICUS CURIAE*
SUPPORTING APPELLANTS

DAVID W. OGDEN
*Acting Assistant Attorney General*

LINDA JACOBSON
*Assistant Legal Adviser*
*Department of State*
*2201 C St., N.W.*
*Washington, D.C. 20520*

DOUGLAS N. LETTER
*Appellate Litigation Counsel* (202) 514-3602
*Civil Division, Room 9106*
*U.S. Department of Justice*
*601 D Street. N.W.*
*Washington, D.C. 20530-0001*

1:02 CV 01431 (JDB)

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

---

### No. 00-20136

---

### NINA SCHRODER MAGNESS, AGNES SCHRODER ATKINS, and LEE ALEXANDER MAGNESS,

**Plaintiffs/Appellees,**

**v.**

### RUSSIAN FEDERATION, et al.
### Defendants,

### RUSSIAN FEDERATION, RUSSIAN MINISTRY OF CULTURE, and RUSSIAN STATE DIAMOND FUND

**Defendants/Appellants.**

---

## ON APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

---

## BRIEF FOR THE UNITED STATES AS *AMICUS CURIAE*
## SUPPORTING APPELLANTS

---

Pursuant to 28 U.S.C. § 517 and Federal Rule of Appellate Procedure 29, the

United States files this brief as *amicus curiae*, supporting the defendants/appellants

Russian Federation, *et al.* The United States urges that the default judgment of well

over $234 million against foreign sovereign defendants be set aside because of

improper service of process, so that this dispute can be litigated on its merits rather than through a default.

## INTERESTS OF THE UNITED STATES

The United States has a strong interest in this case for several reasons.

First, the United States has a substantial foreign affairs concern that the Foreign Sovereign Immunities Act (hereafter "FSIA") be properly applied so that foreign states are brought into our courts only pursuant to the conditions set by Congress in that statute. As this Court has explained, "[t]he FSIA's purpose was to promote harmonious international relations." *Pere v. Nuovo Pignone, Inc.*, 150 F.3d 477, 480 (5th Cir. 1998), *cert. denied*, 525 U.S. 1141 (1999).

In this instance, contrary to plaintiffs' contention, we believe that there was neither full nor substantial compliance with the FSIA service of process requirements, and that a foreign government should not be found liable by our courts under such circumstances.

Second, although the United States obviously wishes its citizens to be treated fairly while litigating against foreign governments, it also has a great stake in having the service of process rules followed so that the likelihood that those governments will appear in our courts to defend the merits of claims against them is increased. Having controversies involving foreign governments resolved on their

merits rather than through default judgments is clearly in the public interest. For the reasons described below, this goal is best achieved when service of process is accomplished as the FSIA provides.

Third, proper service of process against the United States in foreign courts is of enormous importance to the Federal Government. If United States courts follow the service rules established for suits against foreign states, we believe that practice will increase the likelihood that the United States will be treated properly in foreign courts, according to developed service of process rules, rather than through *ad hoc* procedures that individual judges deem sufficient in particular circumstances. Moreover, it is more difficult for United States officials to complain about improper service of process in foreign courts if our own courts are not following the rules.

In this case, the district court correctly found that the plaintiffs did not follow the service of process requirements of the FSIA. The district court nevertheless excused plaintiffs' failure because it believed that the Russian government defendants had "actual" notice of the suit here, and that plaintiffs "substantially complied" with the FSIA mandates. The second conclusion is wrong as a matter of law. Plaintiffs failed to follow (or even attempt to follow) key provisions of the FSIA service rules, despite the clarity and simplicity of those rules, and thus did not substantially comply with them. Accordingly, this Court need not in this case

3

resolve the issue of whether perfect compliance with the FSIA service of process rules is mandated in all cases; the record here shows that plaintiffs did not come close to substantially complying with those rules.

The court's first conclusion - that actual notice was received - finds no support in the record; there is no evidence that appropriate Russian government officials actually had proper notice before default was entered.

For these reasons, we urge that the default judgment here be vacated and the plaintiffs be given a reasonable time within which to serve the Russian government defendants properly.  The United States expresses no views on the merits of the underlying controversy at this time, and whether the defendants might have jurisdictional defenses to plaintiffs' claims.[1]

---

[1] We do note, however, that a substantial question is raised here concerning plaintiffs' claims concerning actions by the Bolsheviks in 1918, nationalizing plaintiffs' property.  Because we do not believe that the FSIA has retroactive application (see *Carl Marks & Co. v. Union of Soviet Socialist Republics*, 841 F.2d 26, 27(2d Cir.), *cert. denied*, 487 U.S. 1219 (1988)), there is a strong likelihood that foreign governmental actions taken at that time are absolutely immune from suit in our courts.  In addition, there is considerable doubt that plaintiffs can state a cause of action under the FSIA through their allegations of nationalization of property in the 1990s.

## STATEMENT

### A.  The Applicable Statutory Scheme – The FSIA

This case involves a suit brought by several members of the Magness family against the Russian state itself (the Russian Federation), the Russian Ministry of Culture, and the Russian State Diamond Fund.  Because this suit is against a foreign government, it is controlled by the FSIA, the sole mechanism for a civil action against a foreign state in our courts.  See *Argentine Republic v. Amerada Hess*, 488 U.S. 428, 443 (1989); *Pere v. Nuovo Pignone, Inc.*, 150 F.3d 477, 480 (5th Cir. 1998), *cert. denied*, 525 U.S. 1141 (1999).  This Court has also observed that the FSIA was enacted "to bring uniformity to determinations of sovereign immunity." *De Sánchez v. Banco Central de Nicaragua*, 770 F.2d 1385, 1390 (5th Cir. 1985).

Significantly for this case, under the FSIA, "personal jurisdiction depends not only on the applicability of an exception to sovereign immunity but also on service of process in compliance with 28 U.S.C. § 1608." *De Sánchez*, 770 F.2d at 1390 n.4.  See 28 U.S.C. § 1330(b); *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 485 n.5 (1983); *Argentine Republic*, 488 U.S. at 435 n.3.  An understanding of the FSIA service of process provisions is therefore essential here.

The FSIA states clearly in Section 1608 (28 U.S.C. § 1608) the rules governing appropriate service on foreign states and upon their agencies and

5

instrumentalities.[2]  The House of Representatives report on the FSIA reveals that these service of process provisions were the product of careful development after studies carried out by "[a] number of bar associations" and after consultation with the Departments of State and Justice.  H.R. Rep. No. 1487, 94th Cong., 2d Sess. (1976), at 11 (*reprinted at* 1976 USCCAN 6604, 6609).[3]

Of considerable importance here, this report further explains that "Section 1608 sets forth the *exclusive* procedures with respect to service on * * * a foreign state or its political subdivisions, agencies or instrumentalities."  *Id.* at 23 (1976 USCCAN at 6622) (emphasis added).  In addition, these service provisions were not crafted in isolation; they "are closely interconnected with other parts of the bill * * *."  *Ibid.*

As described next, the FSIA established different methods of service, and Congress provided that "[t]here is a hierarchy in the methods of service."  *Id.* at 24 (1976 USCCAN at 6623).  Thus, a plaintiff is to use the methods set out in Section

---

[2]  The text of Section 1608 is reprinted in Addendum A to appellants' opening brief.

[3]  The Senate report on the FSIA is nearly identical to the House report, showing agreement between both bodies on the key provisions in the statute.  See S. Rep. No. 1310, 94th Cong., 2d Sess., 23-25 (1976).

1608 in order. *Ibid.* Moreover, the rules differ depending upon the nature of the foreign sovereign defendant.

Under either set of rules, however, the methods of service prescribed by 28 U.S.C. § 1608(a) and (b) are mandatory – both subsections state that service "shall be made" in the manner specified – and 28 U.S.C. § 1608(c) provides that service shall be deemed to have been effected as of the date that a specific event occurs with respect to each method of service.  See also Federal Rule of Civil Procedure 4(j)(1) (service on a foreign state or agency or instrumentality thereof "shall be effected" pursuant to 28 U.S.C. § 1608).

Service on a "foreign state or political subdivision of a foreign state" is controlled by Section 1608(a), which provides first for service pursuant to a special arrangement with the foreign nation at issue, or with an applicable international convention. (In this case, service on the defendants Russian Federation and Russian Ministry of Culture should be governed by Section 1608(a).)  Neither of these special service provisions was available here.  R. at 296-97.

When these methods are not available, service can be accomplished  by "sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the

court to the head of the ministry of foreign affairs of the foreign state concerned *

* *." 28 U.S.C. 1608(a)(3).  Service shall be deemed to have been made under this

method "as of the date of receipt indicated in * * * the signed and returned postal

receipt."  See 28 U.S.C. § 1608(c)(2).

The "notice of suit" required to be sent to the foreign state under paragraph

(a)(3) (as well as paragraph (4), discussed below) is a notice "addressed to a foreign

state and in a form prescribed by the Secretary of State by regulation."  *Id.* at

1608(a).  See 22 C.F.R. Part 93 (providing form and requirements of notice of suit).

The notice of suit is not a minor point; the House report addresses it

specifically, explaining that "notice of suit is designed to provide a foreign state

with an introductory explanation of the lawsuit, together with an explanation of the

legal significance of the summons, complaint, and service."  H.R. Rep. No. 94-

1487, *supra*, at 12 (1976 USCCAN at 6609).  Accord *id.* at 24-25 (1976 USCCAN

at 6623).

If service cannot be made under paragraph (3) within 30 days, the plaintiff

may provide two copies of the necessary materials for the district court clerk to send

to the Director of Special Consular Services at the United States Department of

State, one copy of which is then to be transmitted through diplomatic channels to

8

the foreign state. If this method is used, the State Department must send the district court a certified copy of the "diplomatic note" indicating when the papers were transmitted. *Id.* at 1608(a)(4). Service of process shall be deemed to have been accomplished under this method "as of the date of transmittal indicated in the certified copy of the diplomatic note." 28 U.S.C. § 1608(c)(1).

Different rules apply for service on "an agency or instrumentality of a foreign state." 28 U.S.C. § 1608(b). (That subsection appears to control service on defendant Russian State Diamond Fund. R. 488.)

This section also provides first for service pursuant to special arrangement or convention. 28 U.S.C. § 1608(b)(1) and (2). If, as here, there is none, service can be accomplished by delivering a copy of the summons and complaint either to an officer, a managing or general agent, or to any other agent authorized to receive service for the foreign agency or instrumentality involved. 28 U.S.C. § 1608(b)(2). If service cannot be made under paragraph (1) or (2), it can be made, "if reasonably calculated to give actual notice," by delivery to an authority of the foreign state through a method designated in response to a "letter rogatory or request," or by a form of mail requiring return receipt from the court clerk to the foreign agency or instrumentality to be served, or as otherwise determined by the court involved. 28 U.S.C. § 1608(b).

9

1:02 CV 01431 (JDB)

## B. This Litigation and the Service Attempted by Plaintiffs

1.    The Magness family owned a piano factory and a mansion in St. Petersburg before the Russian Revolution, and these properties were expropriated by the Soviet government in 1918.[4]   R. at 93-97.    In recent years, the plaintiff Magness family members believed that changes in law within Russia might provide them certain legal rights concerning this property.   They met with government officials in St. Petersburg in the 1990s, in an ultimately unsuccessful attempt to regain their property, and paid fees to Russian agencies in pursuing procedures for this purpose.   At the same time, one of the family members purchased two antique pianos, but was not permitted to export them because they were deemed to be state treasures.   R. at 90-93.

The Magness family members then filed this suit in federal district court in the Southern District of Texas against the Russian state defendants in July 1997. That court immediately heard plaintiffs' request for a TRO that would have precluded a traveling exhibit of Romanov family jewels from leaving the jurisdiction.   In their complaint, plaintiffs alleged that Russia nationalized their

---

[4] The United States has little independent knowledge of the facts involved in this case, and our presentation is thus drawn from the allegations in the complaint and the rest of the district court record.

10

property twice (once in 1918 and again recently) and has now also confiscated and expropriated the antique pianos. R. at 1-15.

The Russian Federation was represented at the TRO hearing by United States private counsel. The court denied the TRO in July 1997. R. at 512-13. The case apparently then sat largely dormant, until in August 1998, the district court ordered plaintiffs to serve the summons and the complaint on the defendants before September 1, 1998. R. at 510.

As noted above, plaintiffs did not follow the provisions set out in the FSIA governing service of process. Rather than requesting the clerk of the district court to send the summons, complaint, and notice of suit (together with a translation of each) by mail, with return receipt, to the head of the Russian foreign ministry (as required for service on the Russian Federation and the Ministry of Culture) under 28 U.S.C. § 1608(a)(3), plaintiffs sent their complaint to the Texas Secretary of State for forwarding to Boris Yeltsin, the Russian Federation then-President, at the Kremlin, and directly to the Russian Deputy Minister of Culture in Moscow. R. at 495-502, 668-69.

The record shows that some persons signed for these documents, but it gives no indication who did so, and provides no further evidence of any kind who in the Russian government might have seen these documents after that time and when. R.

11

1:02 CV 01431 (JDB)

at 40, 41, 497, 498. In addition, without first attempting service under Section 1608(a)(3), plaintiffs sent the complaint (directly, rather than by request to the district court clerk) to officials at the U.S. State Department, and they also transmitted the complaint to the private attorneys who had appeared at the TRO hearing. R. at 500-02.[5]

As explained earlier, service on the Russian government itself and its Ministry of Culture should have been sent by the clerk of the court to the head of the Russian foreign ministry, and, if that method did not succeed after 30 days, by the clerk of the district court by certified mail to a designated U.S. State Department official, who would then transmit it through diplomatic channels to the Russian state. Under Section 1608(b) (for service on the Russian State Diamond Fund), if service was not made on an authorized agent, the complaint should have been sent pursuant to instructions in response to a letter rogatory to the proper Russian agency official.

With respect to the Russian Federation and the Ministry of Culture, there is no evidence in the record that plaintiffs ever attempted to serve the Russian foreign

---

[5] There is disagreement in the record on this point, but the private counsel who is listed in the district court docket sheet as counsel for the Russian defendants (Brendan D. Cook) stated that plaintiffs were told he represented Russia only in the TRO proceedings, and could not accept service of process for Russia after those proceedings ended. R. at 345-47, 596-97.

12

ministry by the proper method – much less that the foreign minister actually received the required materials. In addition, after it received plaintiffs' summons and complaint, the State Department explicitly informed plaintiffs that it would not transmit the documents to the Russian foreign minister because plaintiffs had committed several errors; specifically, plaintiffs had failed to attempt service first under Section 1608(a)(3) through the clerk of the district court to the head of the Russian foreign ministry, to refer in the summons to the 60-day period in which the defendants must answer the complaint, and to provide a notice of suit conforming to State Department regulations. (The State Department requirements are available through the internet and were made clear to plaintiffs' attorneys.) R. at 296-97, 320. The State Department gave plaintiffs' counsel advice on correcting these errors, and provided a contact should plaintiffs have questions. R. at 296-97, 318. There is no evidence that plaintiffs' counsel ever responded.

The record also gives no indication that plaintiffs attempted to fix the deficiencies in service identified by the State Department in order to meet the FSIA rules for service on the Russian Federation or its Ministry of Culture. In addition, there is no evidence that plaintiffs sent the complaint in response to instructions following a letter rogatory, or request the district court clerk to send the complaint

13

properly to the Russian State Diamond Fund, in conformity with the separate requirements for service on that entity under Section 1608(b)(3).

**2.a.** The Russian defendants did not timely appear before the district court. That court accordingly entered a default judgment in June 1999, for $234.5 million. R. at 95, 99. *Magness v. Russian Federation*, 54 F. Supp.2d 700 (S.D. Texas 1999).

The Russian defendants later moved to have the default judgment set aside, arguing that process had not been served properly under the FSIA, and thus that the district court had lacked jurisdiction to enter the default judgment.  In addition, the Russian state defendants urged public policy considerations for setting aside the judgment because it was hindering cultural exchanges between the United States and Russia through plaintiffs' efforts to execute on the judgment against a traveling exhibit of Russian art treasures.  R. at 343, 518-32.

Plaintiffs opposed the motion to set aside the default judgment, arguing that the Russian state defendants had waived any service problems and that there had been substantial compliance with the FSIA requirements. R. at 658-70, 706-13.  In doing so, however, plaintiffs did not provide any evidence showing who within the Russian government had actually received notice of the summons and complaint, and when, or that anyone in the Russian Government had received a notice of suit,

the form mandated by the FSIA and prescribed by State Department regulations to explain the nature and significance of the documents.

**b.**  On January 12, 2000, the district court denied the motion to set aside the judgment.  R. 714-21.  *Magness v. Russian Federation*, 79 F. Supp.2d 765 (S.D. Texas 2000).

The court noted that plaintiffs acknowledged that they had not complied with the FSIA service requirements.  R. at 716.  It found the case law mixed on whether complete compliance with the FSIA's mandates is required for jurisdiction or whether substantial compliance is sufficient (the court noted that there is no precedent within this Circuit on this point).  R. at 715-16.

After describing the arguments of the parties, the district court stated that the Russian defendants had received "actual notice" of the proceedings.  R. at 715. However, the court did not point to anything in the record supporting or explaining this conclusion, or discuss it in any way.  R. at 714-15.  The court nevertheless found the service provided by plaintiffs sufficient:  "[T]echnical compliance with the [FSIA] would not serve the interests of justice or judicial economy."  R. at 714-15.  Accordingly, the court denied the motion to set aside the default judgment.

# ARGUMENT

This Court has made clear that default judgments are not favored when the amount of the judgment against a foreign state is "very great," as it is here. See *Hester International Corp. v. Federal Republic of Nigeria*, 879 F.2d 170, 175 (5th Cir. 1989). Moreover, in *Hester*, this Court emphasized the preference against default judgments when foreign sovereign nations are involved: "It is in the interest of United States foreign policy to encourage foreign states to appear before our courts in cases brought under the FSIA. When a defendant foreign state has appeared and asserts legal defenses, albeit after a default judgment has been entered, it is important that those defenses be considered carefully and, if possible, that the dispute be resolved on the basis of all relevant legal arguments." *Ibid.*, quoting *Practical Concepts, Inc. v. Republic of Bolivia*, 811 F.2d 1543, 1551-52 (D.C. Cir. 1987).

For these reasons, other federal courts have vacated default judgments against foreign states so that litigation against those defendants can be resolved on their merits, rather than through default (even when those merits include jurisdictional defenses). See, *e.g.*, *Jackson v. People's Republic of China*, 794 F.2d 1490, 1495-96 (11th Cir. 1986), *cert. denied*, 480 U.S. 917 (1987) (affirming district court decision

16

setting aside default judgment, and finding no jurisdiction for suit against foreign state under FSIA); *Carl Marks & Co. v. Union of Soviet Socialist Republics*, 841 F.2d 26, 27 (2d Cir.), *cert. denied*, 487 U.S. 1219 (1988) (same).

In this instance, the Russian defendants have in their opening appellate brief (at 8-9, 11) indicated their desire for the default judgment to be set aside so that they can appear and properly litigate this case. See Br. at 11 ("Had plaintiffs served appellants properly, they would have appeared and defended this action); *id*. at 8-9 (invoking this Court's language in *Hester*, quoted above, concerning the preference for deciding cases on their merits against foreign sovereigns).

The district court nevertheless declined to set aside the default judgment, stating that the Russian defendants had actual knowledge of this suit and that there had been substantial compliance with the service requirements of the FSIA. We believe these conclusions were mistaken, and that this Court can vacate the default judgment without resolving the issue that has divided other courts about whether absolute or substantial compliance with the FSIA is sufficient. As we argue below, the flaws in service here are serious enough as a matter of law so that no substantial compliance with FSIA requirements could be shown. In addition, there is no evidence in the record of actual notice of the sort required by the FSIA.

17

**A.**  As the district court explained (R. at 715-16), and as the Russian defendants discuss in their opening brief (at 18-21), there is a split among both the federal courts of appeals and the district courts concerning whether full compliance with FSIA service requirements is necessary.  That issue has not been decided by this Court.

We note, though, that not one of the court of appeals opinions cited by the district court (R. at 716) or by the plaintiffs in their papers below (R. at 667, 710-11) for the proposition that substantial compliance is sufficient deals with service under Section 1608(a) on a foreign state itself, as opposed to service on one of its agencies or instrumentalities (covered by Section 1608(b)).

By contrast, the D.C. Circuit in *Transaero, Inc. v. La Fuerza Aerea Boliviana,* 30 F.3d 148, 153-54 (D.C. Cir. 1994), *cert. denied,* 513 U.S. 1150 (1995), held that service on the Bolivian state was insufficient when made only on the Bolivian Ambassador and the Consul General in the United States, and on the Bolivian First Minister and Bolivian Air Force in La Paz, but not the Ministry of Foreign Affairs. The D.C. Circuit cited two other Circuit decisions in which service under Section 1608(a) was found deficient because, in the first a translation of the complaint had not been provided, and in the second service was made on the Ambassador rather than on the head of the foreign ministry.  See *Gerritsen v. Consulado General de*

18

*Mexico*, 989 F.2d 340, 345 (9th Cir. 1993), *cert. denied*, 510 U.S. 828 (1994); *Alberti v. Empresa Nicaraguense de la Carne*, 705 F.2d 250, 253 (7th Cir. 1983) (service by mail on an embassy is precluded by the FSIA).

Thus, the court of appeals opinions that have addressed the subject have not allowed "[l]eniency" or "excused defective service" when dealing with service under Section 1608(a), which applies to two of the defendants here. See *Transaero*, 30 F.3d at 154.

Furthermore, in the analogous area of service of process on the United States and its agencies under Federal Rule of Civil Procedure 4(i), this Court has in a variety of cases upheld dismissal of cases against the United States and/or federal agencies when the service requirements set out in Federal Rule of Civil Procedure 4(i) have not been closely followed, even when federal officials have had actual notice of a suit. See, *e.g., Flory v. United States*, 79 F.3d 24, 25-26 (5th Cir. 1996) (affirming dismissal for lack of proper service even when the United States actually responded on the merits, and plaintiff later failed to correct the service error or show good cause for defective service); *Peters v. United States*, 9 F.3d 344, 345-46 (5th Cir. 1993) (affirming dismissal when United States Attorney was not served properly, regardless of actual notice); *McGinnis v. Shalala*, 2 F.3d 548, 551 (5th Cir. 1993), *cert. denied*, 510 U.S. 1191 (1994) (affirming dismissal for failure to serve

19

United States Attorney properly, despite actual notice); *George v. U.S. Department of Labor*, 788 F.2d 1115 (5th Cir. 1986) (affirming dismissal for improper service on Attorney General).

With regard to service on the United States and its agencies, at least three other Circuits have endorsed the proposition that "[w]here the necessary parties in the government have actual notice of a suit, suffer no prejudice from a technical defect in service, and there is a justifiable excuse for the failure to serve properly, courts should not * * * construe [Rule 4(i)] so rigidly * * * as to prevent relief from dismissal." *Jordan v. United States*, 694 F.2d 833, 836 (D.C. Cir. 1982); accord *Borzeka v. Heckler*, 739 F.2d 444, 447 (9th Cir. 1984); *Zankel v. United States*, 921 F.2d 432, 436 (2d Cir. 1990).

In light of these various precedents, if substantial compliance is to be accepted by this Court for service under the FSIA, at a minimum it should require the plaintiff to demonstrate a good faith effort to comply with the methods prescribed by the FSIA, and have a justifiable excuse for its failure to succeed under these methods.

**B.**  The record here cannot support a conclusion that there was substantial compliance with the FSIA service requirements.

First, as pointed out above, plaintiffs never provided or attempted to provide service, through the district court clerk, on the Russian foreign ministry. Second, when they asked the State Department to send the summons and complaint to the Russian defendants, they did not include the required notice of suit. R. at 296-97. Plaintiffs also have provided no evidence that they included the notice of suit in the documents they had the Texas Secretary of State forward either.

As explained earlier (*supra*, at 8), Congress believed the Notice of Suit provision important, discussing it in both the Senate and House reports, and expressly delegating to the State Department in the FSIA the responsibility to determine its form by regulation. See 28 U.S.C. § 1608(a).

The Department of State did not transmit the summons and complaint to the Russian government because of the defects discussed above. Accordingly, there is no basis for concluding that plaintiffs substantially complied with the requirements of Section 1608(a)(4), much less that the Russian government received actual notice through the State Department.

The requirement for service on the foreign minister of the foreign state involved is essential, and the failure even to attempt it wholly undermines any claim of substantial compliance. That ministry is the one most likely to be familiar with the practices of other nations and the proper way to deal with those nations and their

21

1:02 CV 01431 (JDB)

judicial systems.  Service on the foreign ministry is thus best calculated to obtain the appropriate and timely response from the foreign government.  Service on the foreign ministry obviously reduces the likelihood of a summons, complaint, and notice of suit being lost in the bureaucracy of a foreign government, or of these documents not being treated with the necessary amount of gravity.

Thus, Congress enacted the FSIA – after consultation with bar associations and the Departments of State and Justice – in a way designed to minimize friction with foreign governments and to accomplish the goal of having foreign governments actually appear in our courts.  Plaintiffs here disregarded that expert legislative judgment.

Compliance with the requirement of formal service on the foreign ministry of a foreign state is also critical to the United States as it responds to suits in foreign courts.  The Office of Foreign Litigation in the Civil Division of the Department of Justice regularly opposes assertions of foreign jurisdiction that fall short of what the United States considers proper service under international practice.  For example, we have opposed an assertion of jurisdiction through mere notice by publication, naming the United States Ambassador as a defendant, with a 15-day response time, and where the ambassador saw the notice (Venezuela).  And, we have opposed jurisdiction where a foreign attorney simply telephoned our embassy and informed

22

a secretary there that he was suing the United States Army (Honduras). Finally, we have also opposed jurisdiction where an AID mission secretary was merely handed an envelope concerning a suit (Peru, Bolivia).

In our view, none of these situations should constitute proper service. Moreover, the United States Government would not consider that it had been properly served if a foreign party merely provided the type of notice used here, such as delivery of a package addressed to "William Clinton, the White House," and delivery to a Deputy Secretary of a specific agency – such as the Department of Transportation or the Department of Health and Human Services – that might have dealings with foreign states, but lacks centralized responsibility for foreign relations, and does not have expertise in dealing with foreign judicial systems.

Accordingly, the United States Government has a strong interest in foreign judicial matters being brought to its attention through the State Department, which has a firmly established practice of coordinating expeditiously and efficiently with the appropriate office at the Department of Justice in dealing with such foreign matters.  Service through other means runs a serious risk of delay and confusion, and is regularly opposed by the United States overseas.

This position is reinforced by generally accepted international practice, which does not even provide for the more liberal means of service in Section 1608(a)(3),

23

1:02 CV 01431 (JDB)

through a form of mail requiring return receipt by the clerk of the district court on

the head of the relevant ministry of foreign affairs (which, as explained above,

plaintiffs did not attempt to follow here).[6] Thus, Article 20 of the United Nations

Draft Articles on the Jurisdictional Immunities of States and their Property (see

Report of the International Law Commission on the Work of its 43rd Session (April-

July 1991) of the United Nations General Assembly, at 145), explains that service

of process is to be accomplished against a sovereign state, absent an international

convention binding on that state or other means accepted by the state, by

transmission through diplomatic channels to the Ministry of Foreign Affairs.  And,

the European Convention on State Immunity (11 I.L.M. 470 (1972)) provides in

Article 16, that in a legal proceeding against a contracting state, competent

authorities of the forum state shall transmit the documents by which such

proceedings are instituted through diplomatic channels to the Ministry of Foreign

Affairs of the defendant state.  The same rule applies in, for example, the United

---

[6] Section 1608(a)(3) in effect affords the foreign ministry a means of accepting service at its option if the summons, complaint, and notice of suit (and a translation of each) are properly sent by the clerk of the court.  Service by this method is deemed to be made only if the receipt is signed and returned.  28 U.S.C. § 1608(c)(2).  If service is not accomplished (through return of a receipt signed by an authorized agent of the head of the foreign ministry) within 30 days, then service through transmission by the clerk though the Secretary of State for transmittal to the foreign ministry is the only approved method of service.

Kingdom State Immunity Act of 1978 (17 I.L.M. 1123 (1978)), and the Pakistan State Immunity Ordinance of 1981 (U.N. Legislative Series, Materials on Jurisdictional Immunities of States and their Property (1982), at 24).

Thus, the United States through FSIA Section 1608(a)(3) has already provided a liberalized means of process. In light of accepted international practice, the courts of this country should not fashion an even more lax method of service, as the district court did here.

There appears to be no compelling reason why the rules established by Congress could not be followed in this case. Obviously, there will be some special situations when a foreign country is in the middle of a revolution or great civil unrest or where the United States does not have diplomatic relations with the foreign country, and the normal service rules might not be fully available. But no such circumstances were present in this instance. In addition, the record in this case demonstrates that the State Department has made the service requirements – which are not onerous – easily available to the public, and, in this specific instance, pointed out clearly to plaintiffs' attorneys what the problems were. R. at 468-69. And, the State Department offered to assist plaintiffs by providing the name and telephone number of a staff person to answer questions. R. at 468. See also 22

C.F.R. Part 93 (describing proper service requirements). Yet, there is no record of plaintiffs' counsel attempting to follow the FSIA correctly.

**C.** Moreover, there is no evidence in the record to support the district court's conclusion that the Russian Federation, the Russian Ministry of Culture, or the Russian State Diamond Fund received actual notice.

The evidence placed in the record by the parties reveals that some persons – who might simply have been security guards at building entrances – signed at the Kremlin and the Ministry of Culture in Moscow for packages containing the summons and complaint here. R. at 497, 498. In addition, the Texas Secretary of State notified plaintiffs' counsel that copies of the summons and complaint had been sent by that office by registered mail to Boris Yeltsin in the Kremlin and to the Deputy Minister of Culture in Moscow, and that the return receipt bore the "Signature of Addressee's Agent." R. at 40-41. There is no record evidence that the documents were actually received by any Russian government official with responsibility for responding to a suit in a court in the United States, or any knowledge about how to do so.

In their district court papers opposing the Russian defendants' motion to set aside the default, plaintiffs provided no further information to show actual notice on any of the defendants. See R. at 655-70, 706-13. Rather, plaintiffs relied

largely on the fact that they had served the papers on the attorneys who appeared in the earlier TRO hearings. As noted earlier, Mr. Cook, the attorney listed in the district court docket sheet for the Russian defendants, explained that plaintiffs' counsel were told that he had no authority to represent Russia beyond the TRO hearing or to accept service of process. R. at 346.

Moreover, at the hearing on whether to enter a default judgment, the district court merely asked whether any appearance was being made for the defendants. Plaintiffs' counsel responded by explaining his attempts to notify a representative of a different, private party defendant (the American Russian Cultural Foundation, which plaintiffs have voluntarily dismissed from this case (R. at 338, 382-83)), and that he had attempted to notify the two attorneys who had appeared at the TRO hearing. R. at 383. The district court made no further inquiry as to whether the defendants had actually or properly been served, or had been notified of the hearing on the motion for a default judgment.

Under these circumstances, plaintiffs fell far short of meeting their burden of showing that the Russian defendants had the sort of actual notice of the case or of the default proceedings that the FSIA would require, even if we assume for the purposes of argument that substantial compliance with the FSIA's service requirements would suffice and that there was substantial compliance.

By contrast, the courts of appeals have found actual notice to foreign instrumentalities under Section 1608(b) in quite different situations, *e.g.*, when the defendant has hired counsel and actually moved to dismiss the complaint (see *Sherer v. Construcciones Aeronauticas, S.A.*, 987 F.2d 1246, 1250 (6th Cir.), *cert. denied*, 510 U.S. 818 (1993)), or when the plaintiffs have served a ship's master, who was an official employed by the defendant and was the defendant's "general agent for conducting the ship's business," and the defendant's officers "immediately became aware of the suit" (see *Velidor v. L/P/G Benghazi*, 653 F.2d 812, 821 (3d Cir. 1981), *cert. dismissed*, 455 U.S. 929 (1982). These circumstances are a far cry from the facts here.

## CONCLUSION

For the foregoing reasons, the default judgment entered by the district court should be vacated for failure to serve process adequately on the defendants, and

28

plaintiffs should be given an opportunity to serve their summons and complaint properly under the FSIA rules so that this case can be resolved on its merits.

                                    Respectfully submitted,

                                    DAVID W. OGDEN
                                      *Acting Assistant Attorney General*

LINDA JACOBSON                      DOUGLAS N. LETTER
*Assistant Legal Adviser*             (202) 514-3602
*Department of State*                 *Appellate Litigation Counsel*
*2201 C St., N.W.*                    *Civil Division, Room 9106*
*Washington, D.C.  20520*             *U.S. Department of Justice*
                                      *601 D St., N.W.*
                                      *Washington, D.C.  20530-0001*

May 30, 2000

1:02 CV 01431 (JDB)

## CERTIFICATE OF SERVICE

I hereby certify that on May 30, 2000, I served original and six copies of the

foregoing Brief for the United States as *Amicus Curiae* Supporting Appellants and

a diskette copy upon the Clerk of this Court and two copies and a diskette to the

following named counsel, by Federal Express overnight delivery:

> Daniel B. Nelson, Esq.
> 1770 St. James Place
> Suite 420
> Houston, TX  77056

and served two copies of this brief and a diskette copy via U.S. Mail, First Class

Postage prepaid, to:

> Martin Mendelsohn, Esq.
> Verner, Liipfert, Bernhard, McPherson
>   and Hand
> 901 15th Street, N.W., Suite 700
> Washington, D.C.  20005

DOUGLAS LETTER
*Appellate Litigation Counsel*

# EXHIBIT 2

Nos. 00-56603, 00-56628

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

JOHN DOE I, ET AL.,

Plaintiffs-Appellees,

v.

UNOCAL CORPORATION, ET AL.

Defendants-Appellants

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

BRIEF FOR THE UNITED STATES OF AMERICA,
AS AMICUS CURIAE

ROBERT D. McCALLUM, JR.
Assistant Attorney General

DEBRA W. YANG
United States Attorney

DOUGLAS N. LETTER
(202) 514-3602
ROBERT M. LOEB
(202) 514-4332
Attorneys, Appellate Staff
Civil Division, Room 9126
Department of Justice
601 "D" Street, N.W.
Washington, D.C. 20530-0001

## *TABLE OF CONTENTS*

                                                                              *Page*

INTRODUCTION AND SUMMARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I.    THE ATS DOES NOT PROVIDE A CAUSE OF ACTION
      AND DOES NOT PERMIT A COURT TO INFER A CAUSE
      OF ACTION TO ENFORCE INTERNATIONAL LAW NORMS
      DISCERNED BY THE COURTS FROM DOCUMENTS SUCH
      AS UNRATIFIED AND NON-SELF-EXECUTING TREATIES,
      AND NON-        BINDING RESOLUTIONS . . . . . . . . . . . . . . . . . . . . 5

      A.    The ATS Is Merely A Jurisdictional Provision . . . . . . . . . . . . . . . 5

      B.    Neither The ATS Itself, Nor International Law Norms,
            Based On Documents Such As Unratified And Non-Self-
            Executing Treaties, And Non-Binding UN Resolutions,
            Provide Any Basis For Inferring A Cause Of Action. . . . . . . . . 12

      C.    The TVPA Also Does Not Support Implying A Cause
            Of Action Under The ATS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

II.   NO CAUSE OF ACTION MAY BE IMPLIED BY THE
      ATS FOR CONDUCT OCCURRING IN OTHER NATIONS . . . . . . 27

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

i

## TABLE OF AUTHORITIES

*Cases:*                                                                  <u>*Page*</u>

<u>Abebe-Jira</u> v. <u>Negewo</u>, 72 F.3d 844 (11th Cir. 1996) . . . . . . . . . . . . . . . . . . . 7

<u>Al Odah</u> v. <u>United States</u>, 321 F.3d 1134 (D.C. Cir. 2003) . . . . . . . . 3, 14, 26

<u>Alexander</u> v. <u>Sandoval</u>, 532 U.S. 275 (2001) . . . . . . . . . . . . . . . . . . . . . . 12, 13

<u>Alvarez-Machain</u> v. <u>United States</u>, 266 F.3d 1045 (9th Cir. 2001),
    <u>vacated and rhg en banc granted</u>, 284 F.3d 1039
    (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 14, 15, 17, 22

<u>Argentine Republic</u> v. <u>Amerada Hess Shipping Corp.</u>, 488 U.S. 428
    (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15-16

<u>Banco Nacional de Cuba</u> v. <u>Sabbatino</u>, 376 U.S. 398 (1964) . . . . . . . . . . . . 23

<u>Blankenship</u> v. <u>McDonald</u>, 176 F.3d 1192 (9th Cir. 1999) . . . . . . . . . . . . . . 16

<u>Bolchos</u> v. <u>Darrel</u>, 3 F. Cas. 810 (D.S.C. 1795) . . . . . . . . . . . . . . . . . . . . . . 28

<u>Buell</u> v. <u>Mitchell</u>, 274 F.3d 337 (6th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . 15

<u>Chicago & So. Air Lines, Inc.</u> v. <u>Waterman Steamship Corp.</u>,
    333 U.S. 103 (1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

<u>EEOC</u> v. <u>Arabian American Oil Co.</u>, 499 U.S. 244 (1991) . . . . . . . . . . . . . . 27

<u>Erienet, Inc.</u> v. <u>Velocity Net, Inc.</u>, 156 F.3d 513 (3rd Cir. 1998) . . . . . . . . . 11

<u>FDIC</u> v. <u>Meyer</u>, 510 U.S. 471 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

<u>Filartiga</u> v. <u>Pena-Irala</u>, 577 F. Supp. 860 (E.D.N.Y. 1984) . . . . . . . . . . . . . . 7

<u>Filartiga</u> v. <u>Pena-Irala</u>, 630 F.2d 876 (2d Cir. 1980) . . . . . . . . . . . . . . . . . 6-7

ii

Foley Bros., Inc. v. Filardo, 336 U.S. 281 (1949) . . . . . . . . . . . . . . . . . . . . . . 27

Fong Yue Ting v. United States, 149 U.S. 698 (1893) . . . . . . . . . . . . . . . . . . 20

Foster v. Neilson, 27 U.S. (2 Pet.) 253 (1829) . . . . . . . . . . . . . . . . . . . . . . . . 15

Hilao v. Estate of Marcos, 25 F.3d 1467 (9th Cir. 1994),
    cert. denied, 513 U.S. 1126 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 13

Martinez v. City of Los Angeles, 141 F.3d 1373 (9th Cir.1998) . . . . . . . 14, 15

Montana-Dakota Co. v. Northwestern Pub. Serv., 341 U.S. 246
    (1951) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Moxon v. The Fanny, 17 F. Cas. 942 (D. Pa. 1793) . . . . . . . . . . . . . . . . . . . 28

Oetjen v. Central Leather Co., 246 U.S. 297 (1918) . . . . . . . . . . . . . . . . . . . 20

Ex Parte Quirin, 317 U.S. 1 (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

R.M.S. Titanic, Inc. v. Haver, 171 F.3d 943 (4th Cir. 2000) . . . . . . . . . . . . 24

Respublica v. De Longchamps, 1 U.S. (1 Dall.) 111 (1784) . . . . . . . . . . . . . . 9

Sampson v. Federal Republic of Germany, 250 F.3d 1145
    (7th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Siderman de Blake v. Republic of Argentina, 965 F.2d 699
    (9th Cir.1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 16

Tel-Oren v. Libyan Arab Republic, 726 F.2d 774 (D.C. Cir.),
    cert. denied, 470 U.S. 1003 (1984) . . . . . . . . . . . . . . . . . . . 6, 12, 23, 29

The American Ins. Co. v. 356 Bales of Cotton, 26 U.S. (1 Pet.) 511
    (1828) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

The Paquete Habana, 175 U.S. 677 (1900) . . . . . . . . . . . . . . . . . . . . 18-19, 23

iii

Trajano v. Marcos, 978 F.2d 493 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . 6, 7

United States v. Curtiss-Wright Export Corp., 299 U.S. 304 (1936) . . . . . . 21

United States v. Flores, 289 U.S. 137 (1933) . . . . . . . . . . . . . . . . . . . . . . . . 24

United States v. La Juene Eugenie, 26 F. Cas. 832 (D. Mass. 1822) . . . . . . . 29

United States v. Palmer, 16 U.S. 610 (1818) . . . . . . . . . . . . . . . . . . . . . . . . 27

Vermont Agency of Natural Resources v. U.S. ex rel. Stevens,
    529 U.S. 765 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

Winstead v. J.C. Penney Co., 933 F.2d 576 (7th Cir. 1991) . . . . . . . . . . . . 11

Zschernig v. Miller, 389 U.S. 429 (1968) . . . . . . . . . . . . . . . . . . . . . . . . . . . 23


*Statutes:*

Alien Tort Statute:

    28 U.S.C. § 1350 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Torture Victim Protection Act of 1991

    28 U.S.C. § 1350 note  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 22, 25-26

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
28 U.S.C. § 1337 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
28 U.S.C. § 1340 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
28 U.S.C. § 1343 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Regulations:*

67 Fed. Reg. 35423 (May 16, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Legislative Materials:*

132 Cong. Rec. S1355-01, S1378 (daily ed. Feb. 19, 1986) . . . . . . . . . . . . . . 18

136 Cong Rec. S17491 (daily ed. Oct. 17, 1990) . . . . . . . . . . . . . . . . . . . . . . 18

138 Cong. Rec. 8068, 8070-71 (Apr. 2, 1992) . . . . . . . . . . . . . . . . . . . . . . . 18

140 Cong. Rec. S14326 (daily ed. June 24, 1994) . . . . . . . . . . . . . . . . . . . . . 18

H.R. Rep. No. 102-367, pt. 1, at 4 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

S. Exec. Rep. No. 23, 102d Cong., 2d Sess. 9, 19, 23 (1992) . . . . . . . . . . . . . 18

S. Rep. 102-249 (1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26


*Miscellaneous:*

1 M. Farrand, RECORDS OF THE FEDERAL CONVENTION (1911) . . . . . . . . . . 9

4 W. Blackstone, COMMENTARIES (1783) . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Casto, <u>The Federal Courts' Protective Jurisdiction over Torts</u>
     <u>Committed in Violation of the Law of Nations</u>, 18 Conn.
     L. Rev. 467 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 9

Christenson, Federal Courts and World Civil Society,
     6 J. Transnat'l L & Policy 405 (1997) . . . . . . . . . . . . . . . . . . . . . . . . 12, 16

Dept. of State, CONDITIONS IN BURMA AND U.S. POLICY TOWARD
     BURMA FOR THE PERIOD OF SEPTEMBER 28, 2002 - MARCH 27, 2003
     (<u>http://state.gov/p/eap/rls/rpt/burma/19554.htm</u>) . . . . . . . . . . . . . . . . . . . 4

v

E. De Vattel, THE LAW OF NATIONS, bk. II, ch. XVIII
    (Carnegie ed. trans. Fenwick 1916)(1758 ed.) . . . . . . . . . . . . . . . . . . . . . . 9

Ford, THE WORKS OF THOMAS JEFFERSON IN TWELVE VOLUMES,
    <u>Thomas Jefferson Papers Series 1. General Correspondence,</u>
    (December 3, 1792)
    (<u>http://memory.loc.gov/ammem/mtjhtml/mtjhome.html</u>) . . . . . . . . . . . 8

G. Schwarzenberger & E.D. Brown, A MANUAL OF INTERNATIONAL
    LAW 237 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

G.A. Res. 218A, U.N. GAOR, 3d Sess. pt. 1, 67th Plea. Mtg.,
    U.N. Doc. A/810 (1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Goodman & Jinks, <u>Filartiga's Firm Footing: International Human</u>
    <u>Rights and Federal Common Law</u>, 66 Fordham L. Rev. 463 (1997) . . 26

Koh, <u>Is International Law Really State Law?</u>, 111 Harv. L. Rev. 1824
    (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

Letter from Edmund Randolph, Governor, Virginia, to the Honorable
    Speaker of the House of Delegates (Oct. 10, 1787) . . . . . . . . . . . . . . . . . 9

1 Op. Att'y Gen. 29 (1792) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29
1 Op. Att'y Gen. 57 (1795) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

<u>Report of Secretary for Foreign Affairs on Complaint of Minister</u>
    <u>of United Netherlands</u>, 34 J.Cont. Cong. 109, 111 (1788) . . . . . . . . . . . 9

RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § cmt. h (1987) . . . . . 15

THE WRITINGS OF GEORGE WASHINGTON FROM THE ORIGINAL
    MANUSCRIPT SOURCES, 1745-1799, Fitzpatrick, ed. Letter
    of George Washington to James Monroe, August 25, 1796
    (<u>http://memory.loc.gov/ammem/gwhtml/gwhome.html</u>) . . . . . . . . . 29-30

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

Nos. 00-56603, 00-56628

---

JOHN DOE I, ET AL.,

Plaintiffs-Appellees,

v.

UNOCAL CORPORATION, ET AL.

Defendants-Appellants

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA

---

BRIEF FOR THE UNITED STATES OF AMERICA,
AS <u>AMICUS CURIAE</u>

---

## INTRODUCTION AND SUMMARY

Pursuant to Rule 29(a), Fed. R. App. P., the United States of America

hereby submits this <u>amicus curie</u> brief.

Especially in light of the numerous cases that have recently been litigated in

United States courts based on the Alien Tort Statute, 28 U.S.C. § 1350 ("ATS"),

the United States has a substantial interest in the ATS' proper application. The

ATS was enacted in 1789, as a jurisdictional provision. It ensures that federal

courts may entertain causes of action that are otherwise properly cognizable under

the "law of nations" insofar as that law is made part of U.S. law (Art. I, Sec. 8, Cl.

10), or under "a treaty of the United States."  It was an obscure provision, which

was almost never invoked and which became even less relevant after the

enactment of general federal question jurisdiction and the elimination of the

amount in controversy requirement.

In recent years, however, the ATS has been commandeered and transformed

into a font of causes of action permitting aliens to bring human rights claims in

United States courts, even when the disputes are wholly between foreign nationals

and when the alleged injuries were incurred in a foreign country, often with no

connection whatsoever with the United States.

In recent decisions, panels of this Court have made several fundamental

analytical errors regarding the ATS.  The Court has construed a statute that on its

face merely confers subject matter jurisdiction as also affording an implied private

right of action.  Recent Supreme Court precedent, however, prohibits finding an

implied private right of action in this jurisdictional grant.  Moreover, it is clearly

error to infer a right of action to enforce unratified or non-self-executing treaties,

and non-binding United Nations General Assembly resolutions. Finally, contrary

to the long-established presumption against extraterritorial application of a statute,

-2-

1:02 CV 01431 (JDB)

this Court has extended the causes of action recognized under the ATS to conduct occurring wholly within the boundaries of other nations, involving only foreign sovereigns or nationals, and causing no direct or substantial impact in the United States.

Under this new view of the ATS, it has become the role of the federal courts to discern, and enforce through money damage actions, norms of international law from unratified or non-self-executing treaties, non-binding United Nations General Assembly resolutions, and purely political statements. Although often asserted against rogues and terrorists, these claims are without bounds, and can easily be asserted against allies of our Nation.  For example, such claims have already been asserted against foreign nationals who have assisted our Government in the seizure of criminals abroad.  See Alvarez-Machain v. United States, 266 F.3d 1045, 1051 (9th Cir. 2001), vacated and rhg en banc granted, 284 F.3d 1039 (9th Cir. 2002). This Court's approach to the ATS bears serious implications for our current war against terrorism, and permits ATS claims to be easily asserted against our allies in that war.  Indeed, such claims have already been brought against the United States itself in connection with its efforts to combat terrorism.  See Al Odah v. United States, 321 F.3d 1134, 1144-1145 (D.C. Cir. 2003) (ATS claims asserted by aliens detained at the U.S. Naval Base at Guantanamo Bay).

-3-

Wide-ranging claims the courts have entertained regarding the acts of aliens in foreign countries necessarily call upon our courts to render judgments over matters that implicate our Nation's foreign affairs.  In the view of the United States, the assumption of this role by the courts under the ATS not only has no historical basis, but, more important, raises significant potential for serious interference with the important foreign policy interests of the United States, and is contrary to our constitutional framework and democratic principles.

While the United States unequivocally deplores and strongly condemns the anti-democratic policies and blatant human rights abuses of the Burmese (Myanmar) military government, it is the function of the political Branches, not the courts, to respond (as the U.S. Government actively is[1]) to bring about change in such situations.  Although it may be tempting to open our courts to right every wrong all over the world, that function has not been assigned to the federal courts. When Congress wants the courts to play such a role, it enacts specific and carefully crafted rules, such as in the Torture Victim Protection Act of 1991 ("TVPA"), 28 U.S.C. § 1350 note.  The ATS, which is a simple grant of jurisdiction, cannot properly be construed as a broad grant of authority for the

---

[1]  See 67 Fed. Reg. 35423 (May 16, 2002) (order continuing sanctions against Burma); Dept. of State, CONDITIONS IN BURMA AND U.S. POLICY TOWARD BURMA FOR THE PERIOD SEPTEMBER 28, 2002 – MARCH 27, 2003 (http://www.state.gov/p/eap/rls/rpt/burma/19554.htm).

1:02 CV 01431 (JDB)

courts to decipher and enforce their own concepts of international law.  Thus,

respectfully, the Government asks the Court to reconsider its approach to the ATS.

## STATEMENT OF THE ISSUES

In this brief, the United States will address the following issues:

1.  Whether the ATS permits a court to infer a cause of action to enforce

international law norms discerned by the courts from documents such as unratified

and non-self-executing treaties, and non-binding UN resolutions.

2.  Whether the ATS applies to claims brought by aliens relating to acts in

other countries.

## ARGUMENT

**I.    THE ATS DOES NOT PROVIDE A CAUSE OF ACTION AND
DOES NOT PERMIT A COURT TO INFER A CAUSE OF
ACTION TO ENFORCE INTERNATIONAL LAW NORMS
DISCERNED BY THE COURTS FROM DOCUMENTS SUCH
AS UNRATIFIED AND NON-SELF-EXECUTING TREATIES,
AND NON-BINDING RESOLUTIONS.**

**A. The ATS Is Merely A Jurisdictional Provision.**

1.  It is a fundamental mistake to read the ATS as anything but a

jurisdictional provision.  See Casto, The Federal Courts' Protective Jurisdiction

over Torts Committed in Violation of the Law of Nations, 18 Conn. L. Rev. 467,

479-480 (1986) ("any suggestion that the statute creates a federal cause of action

-5-

1:02 CV 01431 (JDB)

is simply frivolous"). Congress passed this statute as part of the Judiciary Act of

1789. As slightly revised today, the ATS provides:

> [T]he district courts shall have original jurisdiction of
> any civil action by an alien for a tort only, committed in
> violation of the law of nations or a treaty of the United
> States.

28 U.S.C. § 1350. "The debates that led to the [Judiciary] Act's passage contain

no reference to the Alien Tort Statute, and there is no direct evidence of what the

First Congress intended it to accomplish." Trajano v. Marcos, 978 F.2d 493, 498

(9th Cir. 1992).

This jurisdictional statute remained virtually dormant for almost 200 years,

until the Second Circuit, in 1980, for the first time gave it an expansive

construction. See Filartiga v. Pena-Irala, 630 F.2d 876 (2d Cir. 1980). That court

held that the ATS conferred subject-matter jurisdiction on federal courts to hear a

dispute between citizens of Paraguay regarding torture allegedly committed in

Paraguay. The court did not opine, however, on whether the ATS itself provided a

cause of action.

Thereafter, in Tel-Oren v. Libyan Arab Republic, 726 F.2d 774 (D.C. Cir.),

cert. denied, 470 U.S. 1003 (1984), both Judges Bork and Robb disagreed with

Filartiga insofar as it allowed such a suit to proceed. Judge Bork explained that

-6-

the ATS was a jurisdictional statute only and did <u>not</u> provide plaintiffs a cause of action. <u>Id</u>. at 801-823.  Judge Robb stated that the <u>Filartiga</u>'s approach was "fundamentally at odds with the reality of the international structure and with the role of United States courts within that structure." <u>Id</u>. at 826 n.5.[2]

In <u>Trajano</u>, however, this Court held that a court in an ATS action could define and enforce the law of nations as part of its common law powers.  <u>See</u> <u>Trajano</u>, 978 F.2d at 499-502.  Three years later in, <u>Hilao</u> v. <u>Estate of Marcos</u>, 25 F.3d 1467, 1474-76 (9th Cir. 1994), <u>cert. denied</u>, 513 U.S. 1126 (1995), the Court expressly held for the first time that the ATS itself created a cause of action to enforce the "law of nations."  The Court misread <u>Filartiga</u> as having so held[3] and simply followed <u>Filartiga</u> without independently examining the question.[4]

---

[2]  Judge Edwards wrote a separate opinion supporting dismissal of the ATS claim. He agreed with <u>Filartiga</u>, but believed that a torture claim could be asserted against a state actor. <u>Id</u>. at 777-798.

[3]  <u>See</u> <u>Filartiga</u> v. <u>Pena-Irala</u>, 577 F. Supp. 860 (E.D.N.Y. 1984) ("We must now face the issue left open by the Court of Appeals, namely, the nature of the 'action' over which [the ATS] affords jurisdiction").

[4]  The Eleventh Circuit thereafter held that the ATS "establishes a federal forum where courts may fashion domestic common law remedies to give effect to violations of customary international law."  <u>Abebe-Jira</u> v. <u>Negewo</u>, 72 F.3d 844 (11th Cir. 1996).

1:02 CV 01431 (JDB)

The Court should now examine the issue in this en banc proceeding and should overrule Trajano and Hilao because they erroneously read the ATS as providing, or permitting a court to infer, a private right of action.

2.  By its terms, the ATS vests federal courts with "original jurisdiction" over a particular type of action; it does not purport to create any private cause of action. An examination of the Judiciary Act of 1789 strongly supports that view. That Act in Sections 1 through 13 establishes the federal courts and delineates the jurisdiction of those courts.  The ATS is set out in Section 9, adjacent to provisions establishing jurisdiction over crimes on the high seas, admiralty issues, and suits against consuls.  See 1 Stat. 76 (1789).  In context, the ATS is thus properly read as being solely a jurisdictional provision.  See Ford, THE WORKS OF THOMAS JEFFERSON IN TWELVE VOLUMES, Thomas Jefferson Papers Series 1. General Correspondence (Dec. 3, 1792 Jefferson letter citing the "act of 1789, chapter 20, section 9" as a statute "describing the jurisdiction of the Courts") (emphasis added) (available at http://memory.loc.gov/ammem/mtjhtml/mtjhome.html); cf. Montana-Dakota Co. v. Northwestern Pub. Serv., 341 U.S. 246, 249 (1951) ("The Judicial Code, in

-8-

vesting jurisdiction in the District Courts, does not create causes of action, but only confers jurisdiction to adjudicate those arising from other sources").[5]

Although there is no direct legislative history regarding the ATS, many scholars agree that Congress passed this jurisdictional provision, in part, in response to two high profile incidents of the time concerning assaults upon foreign ambassadors on domestic soil (Respublica v. De Longchamps, 1 U.S. (1 Dall.) 111 (1784); Report of Secretary for Foreign Affairs on Complaint of Minister of United Netherlands, 34 J.Cont. Cong. 109, 111 (1788)). See, e.g., Casto, 18 Conn. L. Rev. at 488-498. These two cases raised serious questions of whether the then-new federal institutions would be adequate to avoid international incidents that could arise if such matters were left to the state courts. Id. at 490-494.

At the time, "denial of justice" to one's own citizens abroad was a justification for a country to launch a war of reprisal. E. De Vattel, THE LAW OF NATIONS, bk. II, ch. XVIII, §350, at 230- 231 (Carnegie ed. trans. Fenwick 1916) (1758 ed.). For example, Edmund Randolph commented that, without an adequate federal forum, "[i]f the rights of an ambassador be invaded by any citizen it is only

---

[5] As we discuss below, a court's authority to adjudicate admiralty cases by reference to non-statutory law is based upon a distinct clause of the Constitution and a unique history and background, and does not authorize a court to create causes of action to enforce international law norms under the ATS. See pp. 24-25, infra.

in a few States that any laws exist to punish the offender." Letter from Edmund Randolph, Governor, Virginia, to the Honorable Speaker of the House of Delegates (Oct. 10, 1787). James Madison also feared the country's inability to "prevent those violations of the law of nations & of treaties which if not prevented must involve us in the calamities of foreign wars." 1 M. Farrand, RECORDS OF THE FEDERAL CONVENTION, 316 (1911). Notably, the protection of ambassadors is one of the three classic protections afforded by the law of nations, as given effect in domestic law. William Blackstone explained that "[t]he principal offences against the law of nations as animadverted upon by the municipal laws of England are of three kinds; 1. Violation of safe-conducts; 2. Infringement of the rights of ambassadors; and, 3. Piracy." 4 W. Blackstone, COMMENTARIES, 67-68 (1783).

Article III jurisdiction is not self-vesting. Congress did not enact a general federal question statute until much later. The ATS, however, permitted the federal courts to hear one subset of "arising under" cases -- i.e., those arising under Acts of Congress incorporating principles of the "law of nations" into the laws of the United States or under "treaties of the United States." In this way, the First Judiciary Act ensured that the federal courts would have jurisdiction over any claim brought by an ambassador, or other alien, seeking redress for a violation of such traditional law of nations protections. Then, the next year, invoking its

-10-

constitutional authority to define and punish violations of the "Law of Nations,"
see Article I, Sec. 8, Cl. 10, Congress made assaults on ambassadors (as well as
the two other traditional violations of the "law of nations" identified by
Blackstone (piracy and violating the right of safe conduct)) offenses under the
federal law.  1 Stat. 113-115, 117-118.  Thus, the origins of the ATS are consistent
with an understanding that it grants the federal courts subject matter jurisdiction
over only those claims brought to enforce the "law of nations" insofar as that law
has been affirmatively incorporated into the laws of the United States.

Under this understanding of the ATS (and Supreme Court jurisprudence
regarding the recognition of causes of actions under federal law), Congress must
enact a cause of action (or provide a basis for inferring a cause of action).  Such
causes of action would also fall within the present-day federal question
jurisdiction (28 U.S.C. § 1331).  While this interpretation may appear to render the
ATS superfluous today, it would not have been so in 1789.  General federal
question jurisdiction was not enacted until nearly 100 years later, in 1875, and
until 1980, that jurisdictional grant contained a minimum amount-in-controversy
requirement.  The courts have recognized that the elimination of the amount-in-

-11-

1:02 CV 01431 (JDB)

controversy requirement in 1980, rendered numerous jurisdictional provisions superfluous.[6]

Accordingly, although the ATS is somewhat of a historical relic today, that is no basis for transforming it into an untethered grant of authority to the courts to establish and enforce (through money damage actions) precepts of international law regarding disputes arising in foreign countries. Moreover, as we discuss next, this Court has erred to the extent that it has permitted ATS actions to proceed based on asserted international norms stemming from documents such as unratified and non-self-executing treaties, and non-binding United Nations General Assembly resolutions.

**B.    Neither The ATS Itself, Nor International Law Norms, Based On Documents Such As Unratified And Non-Self-Executing Treaties, And Non-Binding UN Resolutions, Provide Any Basis For Inferring A Cause Of Action.**

1. International law does not generally provide causes of action enforceable in federal court. See Tel-Oren, 726 F.2d at 779 ("the law of nations consciously leaves the provision of rights of action up to the states") (Edwards, J., concurring); id at 810 (Bork, J., concurring). See also Christenson, Federal Courts and World

---

[6] See, e.g., Erienet, Inc. v. Velocity Net, Inc., 156 F.3d 513, 520 (3rd Cir. 1998) (28 U.S.C. § 1337 superfluous); Winstead v. J.C. Penney Co., 933 F.2d 576, 580 (7th Cir. 1991) (§§ 1337, 1340, and 1343 superfluous).

Civil Society, 6 J. Transnat'l L & Policy 405, 511-512 (1997) ("U.S. courts will not incorporate a cause of action from customary international law"). This Court, however, has read the ATS statute as itself providing an implied cause of action to enforce international law norms. Reading the ATS' grant of jurisdiction as a broad implied right of action cannot today be reconciled with the Supreme Court's repeated refusal in recent decisions to recognize implied private causes of action. See, e.g., Alexander v. Sandoval, 532 U.S. 275 (2001). As the Court emphasized in Sandoval, it has "sworn off the habit of venturing beyond Congress's intent" when it comes to recognizing implied private rights. Sandoval, 532 U.S. at 287. And the renunciation of that "habit" of inferring private causes of action applies equally to older statutes, such as the ATS. Ibid.

Under controlling Supreme Court precedent, a court must focus on whether the statute at issue has "'rights-creating' language." Sandoval, 532 U.S. at 288. The ATS is demonstrably a jurisdiction-vesting statute. Although it refers to a particular type of claim (i.e., a "civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States"), it does not purport to create any particular statutory rights, much less rights that in turn could be interpreted to confer a private right of action for money damages. Thus, under

-13-

the governing analysis established by the Supreme Court, it is plainly erroneous to construe the ATS itself as conferring a private cause of action.

2. Moreover, it is clearly improper to infer a cause of action when the documents relied upon by this Court to discern norms of international law were not themselves intended by that the Executive or Congress to create rights capable of domestic enforcement through legal actions by private parties.

Although this Court has said that violations of international law "must be of a norm that is specific, universal, and obligatory" to be actionable under the ATS, Hilao, 25 F.3d at 1475, the Court has not actually applied those standards. Instead, it has found an implied right of action to enforce rights based upon international agreements that the United States has refused to join, nonbinding agreements, and agreements that are not self-executing, as well as political resolutions of UN bodies and other non-binding statements. See, e.g., Siderman de Blake v. Republic of Argentina, 965 F.2d 699, 714-716 (9th Cir. 1991); Martinez v. City of Los Angeles, 141 F.3d 1373, 1383 (9th Cir. 1998); Alvarez-Machain, 266 F.3d at 1051. None of these documents is "obligatory" in the sense that is critical for present purposes, because none in itself creates duties or rights enforceable by private parties in court. The Court has erroneously transformed these non-binding, non-self-executing documents -- none of which

-14-

remotely creates a private cause of action --into sources of binding obligatory

rights actionable in private suits for damages in federal court.

If the United States refuses to ratify a treaty, or regards a U.N. resolution as

non-binding, or declares a treaty not to be self-executing, there obviously is no

basis for a court to infer a cause of action to enforce the norms embodied in those

materials. See Al Odah, 321 F.3d at 1148 (Randolph, J., concurring) (to enforce

such agreements "is anti-democratic and at odds with principles of separation of

powers"). As to treaties or conventions not ratified by the United States, it is

clearly inappropriate for the courts to adopt and enforce principles contained in

instruments that the President and/or the Senate have declined to embrace as

binding on the United States, or enforceable as a matter of U.S. law through

judicially-created causes of action. And, where a treaty is ratified but is not self-

executing (as modern human rights treaties have been declared by the President

and the Senate not to be), such a treaty neither creates a cause of action nor

provides rules that a court may properly enforce in a legal action brought by a

private party. As the Supreme Court has held, a non-self-executing treaty

"addresses itself to the political, not the judicial department; and the legislature

must execute the [treaty] before it can become a rule for the Court." Foster v.

Neilson, 27 U.S. (2 Pet.) 253, 314 (1829) (Marshall, C.J.). See also RESTATEMENT

-15-

(THIRD) OF FOREIGN RELATIONS LAW § 111 cmt. h (1987) (emphasis added). Despite this established principle, this Court has, for example, based ATS claims on the International Covenant on Civil and Political Rights ("ICCPR").  Martinez, 141 F.3d at 1384; Alvarez-Machain, 266 F.3d at 1051-1052.  That treaty is non-self-executing, see, e.g., Buell v. Mitchell, 274 F.3d 337, 372 (6th Cir. 2001), and therefore clearly does not itself provide a private cause of action and cannot furnish a basis for a court to infer one.[7]

Furthermore, the labeling of an international law norm, derived from unratified agreements, etc., as "jus cogens" violations, see Siderman de Blake, 965 F.2d at 714, does not grant any greater legitimacy to judicial enforcement of such norms.  Like the other types of perceived  international law norms mistakenly enforced by this Court under the ATS, "the content of the jus cogens doctrine * * * emanates from academic commentary and multilateral treaties, even when

---

[7] Even where a treaty is self-executing, that fact does not necessarily mean that it provides a cause of action. Rather, it means only that the treaty is "regarded in courts of justice as equivalent to an act of the legislature." Foster, 27 U.S. at 314. Like an Act of Congress, a treaty may establish legal standards or rules of decision in litigation without itself creating a private right of action.  See, e.g., Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 442 (1989) (explaining that the treaties at issue "only set forth substantive rules of conduct and state that compensation shall be paid for certain wrongs," but did not "create private rights of action for foreign corporations to recover compensation from foreign states in United States courts").

unsigned by the United States." Sampson v. Federal Republic of Germany, 250

F.3d 1145, 1155 (7th Cir. 2001).  Such sources do not authorize a court to infer a

federal cause of action when the political Branches have elected not to use their

powers to create one.  See Christenson, supra, 6 J. Transnat'l L & Policy at 485

("courts in the United States have uniformly rejected application of an asserted jus

cogens norm as the sole basis for a cause of action.").  Cf. Blankenship v.

McDonald, 176 F.3d 1192,  1195 (9th Cir. 1999) (a Bivens cause of action should

not be recognized where "congressional action has not been inadvertent in

providing certain remedies and denying others to judicial employees").

 This Court's approach of looking to unratified agreements to discern the

"law of nations" under the ATS cannot be squared with the text of the ATS, which

refers to both "treaties of the United States" and the "law of nations."  The obvious

import of the reference to treaties is that an international agreement must be a

ratified treaty of the United States, receiving the advice and consent of the Senate,

before it could be subject to enforcement in a private suit resting on the

jurisdiction of the ATS (assuming further that the treaty confers a private right of

action, see pp. 15-16 n.7, supra).  This Court, however, has  erroneously construed

the ATS to imply a cause of action to enforce such norms even where the

Executive and Congress have declined to embody the norms in a binding or domestically enforceable law or treaty.

For example, in <u>Alvarez-Machain</u>, <u>supra</u>, a panel of this Court allowed a claim for a transborder arrest authorized by the U.S. Government even though "no international human rights instruments [even] refers to transborder abduction specifically." 266 F.3d at 1051. The panel erroneously relied upon, <u>inter alia</u>, general provisions of the Universal Declaration of Human Rights[8] (a non-binding resolution of the General Assembly of the United Nations), the American Convention on Human Rights[9] (which the Senate <u>refused</u> to ratify), and the ICCPR (a non-self-executing treaty). <u>Id.</u> at 1051-1052. These documents plainly do not create domestically enforceable <u>rights</u>. A court cannot properly find enforceable rights in the American Convention on Human Rights, where the Senate has refused to ratify that convention. And even as to the ICCPR, which is a treaty, when ratified by the United States, the Senate and the Executive Branch (as it has with other modern human rights treaties[10]) expressly agreed that it would <u>not</u> be

_____

[8] G.A. Res. 218A, U.N. GAOR, U.N. Doc. A/810 (1948). Similarly, here, the panel relied upon the Universal Declaration of Human Rights.

[9] 9 I.L.M. 673 (July 4, 1977).

[10] In addition to the ICCPR, the Senate either expressly conditioned its consent or clearly understood that the Genocide Convention, the Torture Convention, and the

-18-

self-executing and may <u>not</u> be relied upon by individuals in domestic court proceedings.  <u>See</u> S. Exec. Rep. No. 23, 102d Cong., 2d Sess. 9, 19, 23 (1992); 138 Cong. Rec. 8068, 8070-71 (Apr. 2, 1992).  It is flatly inconsistent with that decision of the political Branches for a court to infer a cause of action to enforce the terms of the agreement.

In certain areas, of course, a court, in connection with a matter already properly pending before it, may properly look to norms of international  law to furnish a rule of decision, <u>e.g.</u>, <u>The Paquete Habana</u>, 175 U.S. 677, 700 (1900). That is very different from a court's inferring a cause of action as an initial matter based on international law.  But even where a court may properly look to international law norms, it does so only <u>in the absence</u> of a "controlling executive or legislative act * * *." <u>The Paquete Habana</u>, 175 U.S. at 700.  A ratified treaty accompanied by an express declaration that it is not self-executing is plainly such a controlling act.  Similarly, the existence of a treaty or convention that has been ratified by some nations and even signed by the United States (but not yet ratified) falls in the same category, because the political Branches have taken the matter

--------

Convention on the Elimination of All Forms of Racial Discrimination would not be self-executing.  <u>See</u> 140 Cong. Rec. S14326 (daily ed. June 24, 1994); 136 Cong. Rec. S17491, S17486-01 (daily ed., Oct. 27, 1990); 140 Cong. Rec. S7634-02 (daily ed., June 24, 1994); 132 Cong. Rec. S1355-01, S1378 (daily ed. Feb. 19, 1986).

-19-

fully in hand, but not yet taken the necessary steps to make the treaty binding on the United States; the treaty therefore cannot properly be relied upon in our courts as a source of the law of nations. And United Nations General Assembly resolutions are (with narrow exceptions) not binding on the member nations, and require further action by the member states before they can create any enforceable rights. See G. Schwarzenberger & E.D. Brown, A MANUAL OF INTERNATIONAL LAW 237 (1976). The actions or inactions of the political Branches with respect to those instruments must be deemed dispositive with respect to what effect they have on the law of nations to be applied within the United States. Thus, it is plainly wrong to infer a cause of action to enforce such documents in a suit for damages when the political Branches have elected not to do so.

3. Even beyond the general prohibition against judicial inferring of a cause of action, there are additional compelling reasons against inferring a cause of action (or creating common law causes of action to enforce international law norms) when the political Branches have not done so. In other contexts, courts refuse to infer causes of action where they implicate matters that by their nature should be left to the political Branches. See FDIC v. Meyer, 510 U.S. 471, 486 (1994). Matters that implicate international affairs are the quintessential example of a context where a court may not infer a cause of action. Permitting such

-20-

1:02 CV 01431 (JDB)

implied causes of action under the ATS infringes upon the right of the political

Branches to exercise their judgment in setting appropriate limits upon the

enforceability or scope of treaties and other documents.

The Supreme Court has long recognized that the Constitution commits "the

entire control of international relations" to the political Branches.  Fong Yue Ting

v. United States, 149 U.S. 698, 705 (1893).  See Oetjen v. Central Leather Co.,

246 U.S. 297, 302 (1918) ("[t]he conduct of the foreign relations of our

Government is committed by the Constitution to the Executive and

Legislative—'the political'—Departments.").  It is the "plenary and exclusive

power of the President as the sole organ of the federal government in the field of

international relations" to decide the "important complicated, delicate and

manifold problems" of foreign relations.  United States v. Curtiss-Wright Export

Corp., 299 U.S. 304, 319, 320 (1936).  Because the Constitution has so committed

the power over foreign affairs, the Supreme Court has strongly cautioned the

courts against intruding upon the President's exercise of that authority.  See ibid.

Indeed, the Supreme Court has recognized that foreign policy are "of a kind for

which the Judiciary has neither aptitude, facilities nor responsibility."  Chicago &

So. Air Lines, Inc. v. Waterman Steamship Corp., 333 U.S. 103, 111 (1948).

-21-

Despite this instruction from the Supreme Court, the types of claims that are being asserted today under the ATS are fraught with foreign policy implications. They often involve our courts in deciding suits between foreigners regarding events that occurred within the borders of other nations, and in the exercise of foreign governmental authority. The ATS has been wrongly interpreted to permit suits requiring the courts to pass factual, moral, and legal judgment on these foreign acts. And, under this Court's approach, ATS actions are not limited to rogues and outlaws. As mentioned above, such claims can easily be asserted against this Nation's friends, including our allies in our fight against terrorism. A plaintiff merely needs to accuse a defendant of, for example, arbitrary detention to support such a claim. Indeed, that approach has already permitted an alien to sue foreign nationals who assisted the United States in its conduct of international law enforcement efforts. See Alvarez-Machain, 266 F.3d at 1051.[11] As noted above, this Court's approach to the ATS therefore bears serious implications for our current war against terrorism, and permits ATS claims to be asserted against our allies in that war. Notably, such claims have already been brought against the

---

[11] That ruling has, however, been vacated pending the en banc panel's ruling in that case.

United States itself in connection with its efforts to combat terrorism.  See Al

Odah v. United States, supra.

As interpreted by this Court in previous decisions, the ATS thus places the

courts in the wholly inappropriate role of arbiters of foreign conduct, including

international law enforcement.  Where Congress wishes to permit such suits (e.g.,

through the TVPA), it has done so with carefully prescribed rules and procedures.

The ATS contains no such limits and cannot reasonably be read as granting the

courts such unbridled authority.

4.  Moreover, while Congress can and has created specific offenses, such as

piracy, in reference to the "Law of Nations," see Ex Parte Quirin, 317 U.S. 1, 30

(1942), it is error to read the ATS' reference to the "law of nations" as granting the

judiciary the wholesale power, without direction from the legislature, to define and

enforce customary international law through civil damage actions.  There is no

basis for holding that, by referencing the "law of nations" in the ATS, Congress

must have intended to permit the Judicial Branch to engage in a free-wheeling

exercise to develop its own views of "customary international law," based on

sources that are neither law nor customary, such as unratified treaties and other

non-binding documents.

-23-

In some instances a court can, as we have noted, look to international law where "questions of right depending upon it are duly presented for their determination." The Paquete Habana, 175 U.S. at 700.  That principle does not, however, lead to the conclusion that international law provides a private cause of action to be pursued under the ATS.  Even where international law norms are considered part of federal common law (e.g., Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 425 (1964)), they do not supply a private right of action. See Tel Oren, 726 F.2d at 811 (Bork, J. concurring) ( "[t]o say that international law is part of federal common law * * * is not to say that, like the common law of contract and tort, for example, by itself it affords individuals the right to ask for judicial relief").[12]

---

[12] This is not to suggest that the international norms are enforceable as a part of state common law.  Enforcement of such norms as a matter of state law would be inconsistent with the constitutional grant of responsibility over foreign affairs to the Federal Government, to the exclusion of the states. See Zschernig v. Miller, 389 U.S. 429 (1968); Tel Oren, 726 F.2d at 805 n.11 (Bork, J. concurring). That is especially so with respect to norms derived from ratified or unratified treaties, resolutions, and similar documents that have been relied upon in this and other suits under the ATS, for those documents are the work of the political Branches.  For that reason, the absence of enforceable rights in those documents, and the refusal by the political Branches to give them enforceable domestic effect, constitute "controlling executive or legislative act[s]," The Paquete Habana, 175 U.S. at 700, that preclude reliance on those documents as a source of rights enforceable in a private suit for damages under state law.

-24-

Those supporting an expansive view of the ATS might nevertheless argue that a federal court can enforce international law under the ATS just as it enforces admiralty law under its common law powers.  It has been long understood, however, that "the body of admiralty law referred to in Article III did not depend on any express or implied legislative action.  Its existence, rather, preceded the adoption of the Constitution."  R.M.S. Titanic, Inc. v. Haver, 171 F.3d  943, 960 (4th Cir. 2000).  See also The American Ins. Co. v. 356 Bales of Cotton, 26 U.S. (1 Pet.) 511, 544-545 (1828).  The Framers drafted Article III with this full body of maritime law "clearly in view."  R.M.S. Titanic, 171 F.3d at 960.  Thus, the reference in Article III to "all Cases of admiralty and maritime Jurisdiction" has been read as authorizing "the federal courts to draw upon and to continue the development of the substantive, common law of admiralty when exercising admiralty jurisdiction."  Id. at 961.  See also United States v. Flores, 289 U.S. 137, 148 (1933) (Section 2 of Article III "has been consistently interpreted as adopting for the United States the system of admiralty and maritime law, as it had been developed in the admiralty courts of England and the Colonies").

Admiralty law is thus manifestly unique and does not support reading the ATS as granting the courts common law authority to create implied causes of action enforcing vague concepts of international law through an ATS claim.

-25-

Notably, there is no similar express grant in Article III for the general enforcement

of the Law of Nations, as there is for admiralty law.  Rather, the power to define

and legislate causes of actions regarding Law of Nations offenses is assigned to

Congress under Article I.  See Art. I, Sec. 8, Cl. 10.  Nor, unlike the admiralty law

situation, was there a pre-constitutional history of more than 1,000 years of

specialized courts enforcing international law norms relating to human rights.

### C.    The TVPA Also Does Not Support Inferring A Cause Of Action Under The ATS.

In embracing an expansive view of the ATS, some courts have asserted that

Congress ratified Filartiga and its progeny when it enacted the Torture Victim

Protection Act.  See Goodman & Jinks, Filartiga's Firm Footing:  International

Human Rights and Federal Common Law, 66 Fordham L. Rev. 463, 514 (1997).

The TVPA expressly provides a cause of action for damages to persons who

suffered torture at the hands of any individual acting under the law of any foreign

nation. See 28 U.S.C. § 1350 note.

In reporting on the TVPA, the Senate Committee did observe that the TVPA

would provide "an unambiguous basis for a cause of action that has been

successfully maintained under an existing law, section 1350 * * * which permits

Federal district courts to hear claims by aliens for torts committed in violation of

1:02 CV 01431 (JDB)

the law of nations." S. Rep. 102-249 at 4 (1991). The report noted that the

"Filartiga case has met with general approval," but also recognized that at "least

one Federal judge, however, has questioned whether section 1350 can be used * *

* absent an explicit grant of a cause of action by Congress." Id. 4-5. The report

stated that the TVPA was not intended to displace Section 1350, and concluded

that the latter "should remain intact." Id at 5. See also H.R. Rep. No. 102-367 at 4

(1991).

Based on these 1991 legislative statements regarding a statute enacted in

1789, some have argued that, regardless of the best reading of the ATS or of the

original validity of Filartiga, the TVPA evidences Congressional approval of

reading the ATS to provide a cause of action. A Congressional committee

statement in 1991 about the meaning of the ATS, however, is obviously of no

value in discerning the intent of Congress in 1789. In a similar context, the

Supreme Court recently refused to look to legislative history from 1986 setting

forth "a Senate Committee's (erroneous) understanding of the meaning of the

statutory term enacted some 123 years earlier." Vermont Agency of Natural

Resources v. U.S. ex rel. Stevens, 529 U.S. 765, 783 n.12 (2000). As Judge

Randolph explained, "the wish expressed in the committee's statement [about the

TVPA] is reflected in no language Congress enacted; it does not purport to rest on

-27-

an interpretation of § 1350; and the statement itself is legislative dictum." <u>Al</u>

<u>Odah</u>, 321 F.3d at 1146 (Randolph, J., concurring).

## II.   NO CAUSE OF ACTION MAY BE IMPLIED BY THE ATS FOR CONDUCT OCCURRING IN OTHER NATIONS.

This Court has further compounded the significance of its erroneous application of the ATS by inferring causes of actions for acts occurring within other nations.  Even if the ATS could be read to imply (or permit the implication) of a cause of action, it cannot be construed to have that effect in the territory of other nations.  Unless expression to the contrary is found within a federal statute, that statute is presumed to apply only within the territory of the United States, or, in limited circumstances, on the high seas.  See Foley Bros., Inc. v. Filardo, 336 U.S. 281, 284-285 (1949).  This presumption against extraterritoriality "serves to protect against unintended clashes between our laws and those of other nations which could result in international discord."  EEOC v. Arabian American Oil Co., 499 U.S. 244 (1991).  It dates back to the time the ATS was enacted.  Its earliest express application by the Supreme Court is found in United States v. Palmer, 16 U.S. 610 (1818), where the Court held that a federal piracy statute should not be read to  apply to foreign nationals on a foreign ship.  Id. at 630-31.

Nothing in the ATS or in its contemporaneous history suggests an intent on the part of Congress that it would furnish a foundation for suits based on conduct occurring within other nations.  Notably, the only reported cases where courts

-29-

1:02 CV 01431 (JDB)

mentioned the ATS after its recent enactment both involved <u>domestic</u> incidents –

the capture of a foreign ship in U.S. territorial waters and seizure of slaves on a

ship at a U.S. port.  <u>See</u> <u>Moxon</u> v. <u>The Fanny</u>, 17 F. Cas. 942 (D. Pa. 1793);

<u>Bolchos</u> v. <u>Darrel</u>, 3 F. Cas. 810 (D.S.C. 1795).  Moreover, Attorney General

Bradford, while noting the availability of ATS jurisdiction for offenses on the high

seas in 1795, also explained that insofar "as the transactions complained of

originated or took place in a foreign country, they are not within the cognizance of

our courts."  <u>See</u> 1 Op. Att'y Gen. 57, 58 (1795).[13]

 As discussed above, many commentators believe that Congress passed the

ATS in part to respond to two high profile incidents concerning assaults upon

foreign ambassadors <u>on domestic soil</u>.  <u>See</u> pp. 9-10, <u>supra</u>.  Congress enacted the

ATS because it wanted to ensure a federal forum so that traditional international

law offenses (assaults against ambassadors and interference with the right of safe

conduct) committed in this country were subject to proper redress.  The point of

the ATS was to <u>avoid</u> conflict with other countries.

---

[13] <u>See</u> <u>also</u> 1 Op. Att'y Gen. 29, 29 (1792) ("[t]he bringing away of slaves from
Martinique, the property of residents there, may be piracy, and, <u>depending upon the
precise place of its commission</u>, may only be an offence against the municipal laws")
(emphasis added).

1:02 CV 01431 (JDB)

That logic does not support expanding the ATS to encompass claims arising in other nations.  Other nations did not in 1789 (and certainly do not today) expect our courts to provide civil remedies for disputes between their own citizens (or involving third-country nationals) that occur on their own soil.  See THE WRITINGS OF GEORGE WASHINGTON FROM THE ORIGINAL MANUSCRIPT SOURCES, 1745-1799, Fitzpatrick, ed., Letter of George Washington to James Monroe, August 25, 1796 ("no Nation had a right to intermeddle in the internal concerns of another") (available at http://memory.loc.gov/ammem/gwhtml/gwhome.html); United States v. La Juene Eugenie, 26 F. Cas. 832, 847 (D. Mass. 1822) (Story, J.) ("No one [nation] has a right to sit in judgment generally upon the actions of another; at least to the extent of compelling its adherence to all the principles of justice and humanity in its domestic concerns").  To the contrary, litigating such disputes in this country can itself lead to objections from the foreign nations where the alleged injury occurred.  "[T]hose who drafted the Constitution and the Judiciary Act of 1789 wanted to open federal courts to aliens for the purpose of avoiding, not provoking, conflicts with other nations * * *.  A broad reading of section 1350 runs directly contrary to that desire." Tel-Oren, 726 F.2d at 812 (Bork, J.).

-31-

1:02 CV 01431 (JDB)

## CONCLUSION

For the foregoing reasons, this Court's prior ATS precedents should be overruled, and this case should be remanded for application of a more limited construction of the statute.

Respectfully submitted,

ROBERT D. McCALLUM, JR.
 Assistant Attorney General

DEBRA W. YANG
 United States Attorney

DOUGLAS N. LETTER
 (202) 514-3602
ROBERT M. LOEB
 (202) 514-4332
 Attorneys, Appellate Staff
 Civil Division, Room 9126
 Department of Justice
 601 "D" Street, N.W.

May 2003

-32-

1:02 CV 01431 (JDB)

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(C) of the Federal Rules of Appellate Procedure, I hereby certify that this brief complies with the type-volume limitation in Rule 32(a)(7)(B).  The foregoing brief is presented in Time New Roman 14 point font. The word count for the brief (as calculated by the WordPerfect 9.0 word-processing program, excluding exempt material) is 6990, and is under the 7,000 word limitation.


ROBERT M. LOEB
Attorney for the United States

## CERTIFICATE OF SERVICE

I hereby certify that on May 8, 2003, I served copies of the foregoing "Brief

For the United States of America as <u>Amicus Curiae</u>," upon the Court and the

following opposing counsel of record by FedEx overnight delivery:

Daniel Stormer, Esq.
Anne Richardson, Esq.
Hadsell & Stormer, Inc.
128 North Fair Oaks Avenue, Suite 204
Pasadena, CA 91103
(626) 585-9600

Paul Hoffman, Esq.
Schonbrun Desimone Seplow
  Harris & Hoffman LLP
723 Ocean Front Walk
Venice, CA 90291
(310) 396-0731

Judith Brown Chomsky, Esq.          (by overnight U.S. mail)
Law Offices of Judith Brown Chomsky
P.O. Box 29726
Elkins Park, PA 19027
(215) 782-8367

Jennifer M. Green, Esq.
Beth Stephens, Esq.
Center for Constitutional Rights
666 Broadway, Seventh Floor
New York, NY 10012
(212) 614-6464

Richard Herz, Esq.
Katharine J. Redford, Esq.
EarthRights International
1612 "K" Street, N.W., Suite 401

Washington, D.C. 20006
(202) 466-5188

Daniel M. Petrocelli
M. Randall Oppenheimer
Wallace M. Allan
O'Melveny & Myers, LLP
1999 Avenue of the Stars, 7th Floor
Los Angeles, CA 90067-6035

Howrey Simon Arnold & White, LLP
Edwin V. Woodsome, Jr.
550 S. Hope Street, Suite 1400
Los Angeles, CA 90071

Terry Collingsworth, Esq.
Natacha Thys, Esq.
David Grunwald, Esq.
International Labor Rights Fund
733 15th Street, N.W., Suite 920
Washington, D.C. 20005
(202) 347-4100

Joseph C. Kohn, Esq.
Martin J. D'urso, Esq.
Kohn, Swift & Graft, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA 19107
(215) 238-1700

Christopher E. Krafchak, Esq.
Kenderton S. Lynch, Esq.
Krafchak & Associates
2029 Century Park East, Ninth Floor
Los Angeles, CA 90067
(310) 772-0034

Cristobal Bonifaz, Esq.
John C. Bonifaz, Esq.
Law Offices of Cristobal Bonifaz
48 North Pleasant Street
P.O. Box 2488
Amherst, MA 01004-2488

Carter G. Phillips
Daniel M. Price
Joseph R. Guerra
Marinn F. Carlson
Maria T. DiGiulian
Sidley Austin Brown & Wood LLP
1501 K Street, NW
Washington, D.C. 20005
(202) 736-8000

Jan S. Amundson
Quentin Riegel
National Association of
Manufacturers
1331 Pennsylvania Avenue, NW
Washington, DC 20004-1790
(202) 637-3000

Stephen A. Bokat
Robin S. Conrad
Ellen Dunham Bryant
National Chamber Litigation
Center, Inc.
1615 H Street
Washington, D.C. 20062
(202) 463-5337

_____

ROBERT M. LOEB

# EXHIBIT 3

1   ROBERT D. McCALLUM, JR.
    Assistant Attorney General
2   VINCENT M. GARVEY
    Deputy Branch Director
3   ALISON N. BARKOFF
    Trial Attorney, Civil Division
4   Federal Programs Branch
    U.S. Department of Justice
5   Post Office Box 883, Room 1020
    Washington, D.C.  20044
6   Telephone:  (202) 514-5751
    Facsimile:  (202) 616-8470
7
    Attorneys for the United States
8

FILED

2002 SEP 27  AM 10: 25

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

9          UNITED STATES DISTRICT COURT

10      FOR THE NORTHERN DISTRICT OF CALIFORNIA

11

12  JANE DOE I, et al.,              No. C 02 0672 CW (EMC)
                                     No. C 02 0695 CW (EMC)
13        Plaintiffs,
                                     STATEMENT OF INTEREST
14            v.                     OF THE UNITED STATES

15  LIU QI, et al.,

16        Defendants.

17  PLAINTIFF A, et al.,

18        Plaintiffs,

19            v.

20  XIA DEREN, et al.,

21        Defendants.

22

23      By letter dated May 3, 2002, and by order dated August 5,

24  2002, this Court "solicit[ed] the Department of State's opinion

25  on a number of issues" related to the above-captioned cases,

26  including whether the cases are barred by the Foreign Sovereign

27  Immunities Act, 28 U.S.C. §§ 1330, 1605-07, or are nonjusticiable

28  STATEMENT OF INTEREST OF THE UNITED STATES, C 02 0672 CW(EMC), C 02 0695 CW(EMC)

1   under the act of state doctrine. See Letter from U.S. Magistrate

2   Judge Edward M. Chen to William Howard Taft, IV of May 3, 2002;

3   Court's Aug. 5, 2002 Order.  Pursuant to 28 U.S.C. §§ 516-617,

4   the Attorney General, on behalf of the Department of State,

5   hereby submits the following.

6        Attached hereto as Exhibit A is a letter, dated September

7   25, 2002, from William H. Taft, IV, Legal Advisor, U.S.

8   Department of State, to Robert D. McCallum, Jr., Assistant

9   Attorney General, which explains the Department of State's views

10  on the issues raised by the Court.

11

12                    Respectfully submitted,

13                    ROBERT D. McCALLUM, JR.
                      Assistant Attorney General

14

15                    Alison N. Barkoff

16                    VINCENT M. GARVEY
                      Deputy Branch Director

17                    ALISON N. BARKOFF
                      Trial Attorney, Civil Division

18                    Federal Programs Branch
                      U.S. Department of Justice

19                    Post Office Box 883, Room 1020
                      Washington, D.C.  20044

20                    Telephone:  (202) 514-5751
                      Facsimile:  (202) 616-8470

21                    Attorneys for the United States

22  Dated:  September 26, 2002
    ///

23  ///

24  ///

25  ///

26  ///

27  ///

28
    STATEMENT OF INTEREST OF THE UNITED STATES, C 02 0672 CW(EMC), C 02 0695 CW(EMC)

## CERTIFICATE OF SERVICE

I am over the age of 18 years and not a party to the within action.  I am employed by the United States Department of Justice, Civil Division, Federal Programs Branch.  My business address is 901 E Street, N.W., Washington, D.C. 20004.

On September 26, 2002, I served STATEMENT OF INTEREST OF THE UNITED STATES on the persons named below, by enclosing a copy in an envelope addressed as shown below and placing the envelope for collection and mailing on the date and at the place shown below following our ordinary business practices.  I am readily familiar with the practice of this office for collection and processing correspondence for mailing.  On the same day that correspondence in placed for collection and mailing, it is deposited in the ordinary course of business within the United States Postal Service in a sealed envelope with postage fully prepaid.

Date of mailing: September 26, 2002.  Place of mailing: Washington, D.C.  Persons to whom mailed:

Joshua Sondheimer
The Center for Justice & Accountability
870 Market Street, Suite 684
San Francisco, CA  94102
Attorney for plaintiffs in Doe v. Liu Qi

Terri E. Marsh
1333 Connecticut Ave., N.W.
Suite 608
Washington, D.C.  20008
Attorney for plaintiffs in Doe v. Liu Qi

Paul Hoffman
Schonbrun DeSimone Seplow Harris & Hoffman LLP
723 Ocean Front Walk
Venice, CA  90291
Attorney for plaintiffs in Doe v. Liu Qi

///

STATEMENT OF INTEREST OF THE UNITED STATES, C 02 0672 CW(EMC), C 02 0695 CW(EMC)

Karen Parker
154 5th Avenue
San Francisco, CA 94118
Attorney for plaintiffs in <u>Plaintiff A v. Xia Deren</u>

Morton Sklar
World Organization Against Torture USA
1725 K St., N.W., Suite 610
Washington, D.C. 20006
Attorneys for plaintiffs in <u>Plaintiff A v. Xia Deren</u>

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on <u>September 26, 2002</u>, at Washington, D.C.

_Alison N. Barkoff_
Alison N. Barkoff

1:02 CV 01431 (JDB)

A

THE LEGAL ADVISER
DEPARTMENT OF STATE
WASHINGTON

September 25, 2002

Honorable Robert D. McCallum
Assistant Attorney General
Civil Division
United States Department of Justice
10th Street & Constitution Avenue, N.W.
Washington, D.C. 20530

Re:  *Doe, et al. v. Liu Qi, et al.,* and *Plaintiff A,
      et al. v. Xia Deren,* Civil Nos. C 02-0672 CW
      (EMC) and C 02-0695 CW (EMC) (N.D. Cal.)

Dear Mr. McCallum:

By letter dated May 3, U.S. Magistrate Judge Edward M.
Chen of the Northern District of California solicited the
Department of State's views on several issues in connection
with the above-captioned case.  Encl 1.  Magistrate Chen
asked that we respond before July 5, either by letter or
statement of interest pursuant to 28 U.S.C. § 517.  On June
25, the Department of Justice sought and received an
extension of time to August 9.  On July 25, the District
Court consolidated proceedings in the *Plaintiff A v. Xia
Deren* case with *Liu,* and referred that case also to
Magistrate Judge Chen.  On August 5, Magistrate Chen
vacated the previous briefing schedule, and invited the
State Department to provide its views on either or both of
these cases by September 27.  We ask that you please file a
copy of this response to these requests with Magistrate
Chen in whatever manner you deem most appropriate under the
circumstances.

In *Liu,* the gravamen of plaintiffs' complaint is that
the defendant, as Mayor of Beijing, People's Republic of
China ("PRC"), either knew or should have known about
various human rights abuses that were allegedly perpetrated
against adherents to the Falun Gong movement in Beijing,
and that he was under a duty under both Chinese and

international law to prevent such actions.[1]  The complaint alleges that Defendant Liu "planned, instigated, ordered, authorized, or incited police and other [PRC] security forces to commit the abuses suffered by Plaintiffs, and had command or superior responsibility over, controlled, or aided and abetted such forces in their commission of such abuses.  The acts alleged herein…were carried out in the context of a nationwide crackdown against Falun Gong practitioners."  Compl., ¶ 2.

In *Liu*, all but one of the plaintiffs are aliens; four apparently reside in the United States.  Federal subject matter jurisdiction is alleged to lie under customary international law, the Torture Victims Protection Act (TVPA), 28 U.S.C. § 1350, note, the Alien Tort Statute (ATS), 28 U.S.C. § 1350, and 28 U.S.C. § 1331.  *Id.*, ¶ 3.

As noted in Magistrate Chen's May 3 letter, a default was entered in favor of the plaintiffs on March 12.  Plaintiffs subsequently moved for judgment by default.  In reviewing that motion, the Court has asked for the Department's views on two questions: (1) whether the case is barred under the Foreign Sovereign Immunities Act ("FSIA"), and (2) whether the Court should find the case "nonjusticiable" under the Act of State doctrine.  We address these issues in turn.

Before turning to the questions posed by the Court, we would note Magistrate Chen's subsequent invitation to provide the Department's views in the *Xia* case.  From our review of that complaint, we conclude, as did Magistrate Chen in his August 5 order, that the relevant issues involved in both cases are "similar, if not identical."  In these circumstances, we see no need to comment separately on the *Xia* case; the views as expressed below regarding *Liu* may be taken to apply *mutatis mutandis* to *Xia*.  At the same time, we note that the complaint in *Xia* is unambiguous in asserting that the defendant was acting in his official capacity.

We also stress our deep concern about the human rights abuses that have been alleged in these complaints.  The United States has repeatedly made these concerns known to the Government of the PRC and has called upon it to respect

---

[1] We note that the Complaint caption refers to "Liu Qi, and Does 1-5, inclusive," but we have not found specific reference in the complaint to any defendants other than Mr. Liu.

the rights of all its citizens, including Falun Gong practitioners. Our critical views regarding the PRC Government's abuse and mistreatment of practitioners of the Falun Gong movement are a matter of public record and are clearly set forth in the Department's annual human rights reports, the most recent version of which may be found at http://www.state.gov/drl/rls/hrrpt/2001/eap/8289.htm.

With respect to the FSIA, Magistrate Chen asked specifically whether the exception to immunity under 28 U.S.C. § 1605(a)(7) applies to the case against Liu. In our considered opinion, the exception under 28 U.S.C. § 1605(a)(7) does not apply by its terms, since the Peoples' Republic of China has never been designated as a state sponsor of terrorism within the meaning of subsection (A) of that provision. Nor, in our view, does the "tort" exception under 28 U.S.C. § 1605(a)(5) apply since none of the acts in question occurred in the United States. It does not appear to us that any other exception of the FSIA would be relevant to the facts alleged in the complaint. Therefore, if the FSIA is the appropriate legal framework for determining the issue, the action would have to be dismissed. See 28 U.S.C. §§ 1330, 1604 (immunity unless there is exception under 28 U.S.C. §§ 1605-1607).

Whether the FSIA applies to this case presents a number of issues for the Court to determine. We understand that, since Chuidian v. Philippine National Bank, 912 F.2d 1095 (9th Cir. 1990), the practice in the 9th Circuit has been to evaluate claims brought against individual foreign government officials in United States federal courts according to whether the allegations giving rise to the suit were performed in an official capacity. Where the conduct is found to be official, the courts have deemed the action to be, in effect, a claim against the foreign state, and have applied the analytical framework of the FSIA. Other jurisdictions have also adopted this approach. See, e.g., Byrd v. Corporacion Forestal Y Industrial de Olancho S.A., 182 F.3d 380, 388-89 (5th Cir. 1999); El-Fadl v. Central Bank of Jordan, 75 F.3d 668, 671 (D.C. Cir. 1996).[2]

The following considerations may be relevant given this framework. As noted above, the only named defendant in Liu is Beijing's Mayor, Mr. Liu Qi. The allegations of

_____

[2] The Executive Branch has not specifically endorsed the approach of Chuidian, but recognizes that it is controlling law in the 9th Circuit in which these cases arise.

the complaint are directed solely towards actions he
allegedly took, or failed to take, as a senior official of
the Chinese Government, in implementation of official
policy.  What is at issue, in the words of the complaint,
is the "Chinese government's crackdown on Falun Gong," and
more particularly the "[a]buses being committed by police
and security forces in Beijing against the Falun Gong."
Compl., ¶¶ 31, 32.  The acts and omissions attributed to
Mayor Liu are characterized as part of this "widespread
governmental crackdown"; the duties he is said to have
violated derived from his official position.  The complaint
specifically alleges that "[a]s the Mayor of the City of
Beijing, Defendant Liu held and holds the power not only to
formulate all important provincial policies and policy
decisions, but also to supervise, direct and lead the
executive branch of the city government, which includes the
operation of the Public Security Bureau of Beijing, under
which the police operate, and other security forces."  Id.,
¶ 34.[3]

      It is noteworthy in this regard that the 9th Circuit
has previously held that the FSIA is not rendered
inapplicable because of alleged violations of customary
international law by the officials of a foreign state
defendant.  Siderman de Blake v. Argentina, 965 F.2d 699
(9th Cir. 1992), cert. denied, 507 U.S. 1017 (1993).  See
also Argentine Republic v. Amerada Hess, 488 U.S. 428
(1989)(FSIA is exclusive basis for suit against foreign
state notwithstanding alleged violations of international
law by its officials).  Because suits against current
officials may well constitute the "practical equivalent" of
suits against the sovereign, and because denial of immunity
in such circumstances would allow "litigants to accomplish
indirectly what the [FSIA] barred them from doing
directly," Chuidian, supra at 1101-02, we believe the
courts should be especially careful before concluding that
the FSIA is inapplicable to a suit against a current
official relating to the implementation of government
programs.  Cf., Saudi Arabia v. Nelson, 507 U.S. 349, 361
(1993)("the intentional conduct alleged here (the Saudi
Government's wrongful arrest, imprisonment and torture of

---

[3] As is described more fully below, this is one of a series of suits in
U.S. courts against Chinese officials for actions allegedly taken
against Falun Gong practitioners.  This pattern may reinforce the
inference from the complaint that, at bottom, this suit is directed at
PRC government policies rather than past conduct of a specific
official.

Nelson) ... boils down to abuse of the power of its police
by the Saudi Government, and however monstrous such abuse
undoubtedly may be, a foreign state's exercise of the power
of its police has long been understood ... as peculiarly
sovereign in nature").  Otherwise, plaintiffs could evade
the FSIA altogether by the simple expedient of naming a
high level foreign official as a defendant rather than a
foreign state.

     We acknowledge the expanding body of judicial
decisions under the TVPA holding _former_ foreign government
officials liable for acts of torture and extrajudicial
killing despite (or indeed because of) the fact that the
defendants abused their governmental positions.  _See_, _e.g._,
_Xuncax v. Gramajo_, 886 F. Supp. 162 (D.Mass. 1995); _Hilao
v. Estate of Marcos_, 103 F.3d 767 (9th Cir. 1996); _Cabello
Barreuto v. Fernández Larios_, 205 F.Supp.2d 1325 (N.D.Fla.
2002).  The principal aim of the TVPA was to codify the
decision of the Second Circuit in _Filartiga v. Pena-Irala_,
630 F.2d 876 (2d Cir. 1980), by providing an explicit
statutory basis for suits against former officials of
foreign governments over whom U.S. courts have obtained
personal jurisdiction, for acts of torture and
extrajudicial killing committed in an official capacity.
The Senate Report on the TVPA states that "[b]ecause all
states are officially opposed to torture and extrajudicial
killing ... the FSIA should normally provide no defense to an
action taken under the TVPA against a _former_ official"
(emphasis supplied).[4]

     At the same time, the TVPA was _not_ intended to
override otherwise existing immunities from U.S.
jurisdiction, as courts have recognized in suits brought
under these statutes against _current_ or _sitting_ foreign
governmental officials.[5]  _See_, _e.g._, _Saltany v. Reagan_, 702

---

[4] As this sentence indicates, Congress anticipated that, although it
would not normally be so, in some cases involving officials who had
left office, exercise of jurisdiction under the TVPA would still be
inappropriate.  _See_, _e.g._, S. Rep. No. 102-249, at *8 ("To avoid
liability by invoking the FSIA, a former official would have to prove
an agency relationship to the state, which would require that the state
admit some knowledge or authorization of relevant acts.")(internal
quotation marks omitted).  The cases before Magistrate Chen do not pose
the question of how _Chiudian_ should be applied to such former
officials.

[5] Dealing with sitting officials is a component of the President's power
over the nation's foreign relations.  _See_, _e.g._, _United States v.
Curtiss-Wright Corp._, 299 U.S. 304, 320 (1936) (describing "the very
delicate, plenary and exclusive power of the President as the sole

F. Supp. 319 (D.D.C. 1988); *Lafontant v. Aristide*, 844 F. Supp. 128 (E.D.N.Y. 1994); *Tachiona v. Mugabe*, 169 F.Supp.2d 259 (S.D.N.Y. 2001). These cases are consistent with relevant international authority, such as the decisions of the International Court of Justice in the *Yerodia* case (*Case Concerning the Arrest Warrant of 11 April 2000 - Democratic Republic of the Congo v. Belgium*, Judgment of Feb. 14, 2002) and the European Court of Human Rights in *Al-Adsani v. The United Kingdom* (No. 35763/97, Judgment of Nov. 21, 2001).

In response to Magistrate Chen's second set of questions ("Should the Court find the case nonjusticiable under the Act of State doctrine? What effect will adjudication of this suit have in the foreign policy of the United States?"), we respectfully offer the following observations for the Court's consideration.

Litigation in U.S. courts challenging the legality of a foreign government's actions, or inactions, taken within its own territory, can present sensitive dimensions, as recognized in a number of decisions of the U.S. Supreme Court. See, e.g., *Underhill v. Hernandez*, 168 U.S. 250, 252 (1897); *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 428 (1964); *W.S. Kirkpatrick & Co.; Inc. v. Environmental Tectonics Corporation, Int'l*, 493 U.S. 400, 405 (1990)). Cf., *Baker v. Carr*, 362 U.S. 186 (1962). The Court has recognized that the judiciary should approach such litigation with the utmost care and circumspection.

We note that *Liu* is only one of several recent cases brought in U.S. federal courts by Falun Gong adherents against high-level PRC officials--typically, under the ATS and the TVPA. The case just added to these proceedings, *Plaintiff A et al. v. Xia Deren*, is but the most recent example. See also, e.g., *Peng, et al. v. Zhao*, No. 01 Civil 6535 (DLC) (SDNY) (default judgment in nominal amount of $1 entered, December 26, 2001; defendant Zhao Zhifei was said to be the Department Head of the Public Security

---

organ of the federal government in the field of international relations"). If Congress intended to alter the balance of power between the Executive and Legislative Branches in the area of foreign policy, Congress would be required to adopt a clear statement of that intent. "[T]he 'clear statement' rule," which "was originally articulated to guide interpretation of statutes that significantly alter the federal-state balance," should also be applied to "statutes that significantly alter the balance between Congress and the President." *Armstrong v. Bush*, 924 F.2d 282, 289 (D.C.Cir. 1991).

Bureau of Hubei Province); *Jin, et al. v. Ministry of State Security,* et al., No. 02-CV-627 (DDC)(case pending); *Petit, et al. v. Ding,* No. CV 02-00295 (D. HI)(case pending) (defendant Ding Guangen is said to be the Deputy Chief, Falun Gong Control Office, and Minister for Media and Propaganda, Central Committee of the Chinese Communist Party of the PRC).  In our judgment, adjudication of these multiple lawsuits, including the cases before Magistrate Chen, is not the best way for the United States to advance the cause of human rights in China.

   The United States Government has emphasized many times to the Chinese Government, publicly and privately, our strong opposition to violations of the basic human rights of Falun Gong practitioners in China. We have made clear, on repeated occasions, our absolute and uncompromising abhorrence of human rights violations such as those alleged in the complaint, in particular torture, arbitrary detention, interference with religious freedom, and repression of freedom of opinion and expression.  The Executive Branch has many tools at its disposal to promote adherence to human rights in China, and it will continue to apply those tools within the context of our broader foreign policy interests.

   We believe, however, that U.S. <u>courts</u> should be cautious when asked to sit in judgment on the acts of foreign officials taken within their own countries pursuant to their government's policy.[6]  This is especially true when (as in the instant cases) the defendants continue to occupy governmental positions, none of the operative acts are alleged to have taken place in the United States, personal jurisdiction over the defendants has been obtained only by alleged service of process during an official visit, and the substantive jurisdiction of the court is asserted to

---

[6] As the Department of State testified before the Senate Committee on the Judiciary during its consideration of the TVPA, "From a foreign policy perspective, we are particularly concerned over the prospect of nuisance or harassment suits brought by political opponents or for publicity purposes, where allegations may be made against foreign governments or officials who are not torturers but who will be required to defend against expensive and drawn-out legal proceedings.  Even when the foreign government declines to defend and a default judgment results, such suits have the potential of creating significant problems for the Executive's management of foreign affairs. … We believe that inquiry by a U.S. court into the legitimacy of foreign government sanctions is likely to be viewed as highly intrusive and offensive." S. Hrg. 101-1284 on S. 1629 and H.R. 1662 (June 22, 1990) at 28 (Prepared Statement of David P. Stewart).

rest on generalized allegations of violations of norms of customary international law by virtue of the defendants' governmental positions. Such litigation can serve to detract from, or interfere with, the Executive Branch's conduct of foreign policy.

We ask the Court in particular to take into account the potential for reciprocal treatment of United States officials by foreign courts in efforts to challenge U.S. government policy. In addressing these cases, the Court should bear in mind a potential future suit by individuals (including foreign nationals) in a foreign court against U.S. officials for alleged violations of customary international law in carrying out their official functions under the Constitution, laws and programs of the United States (e.g., with respect to capital punishment, or for complicity in human rights abuses by conducting foreign relations with foreign regimes accused of those abuses). The Court should bear in mind the potential that the United States Government will intervene on behalf of its interests in such cases.

If the Court finds that the FSIA is not itself a bar to these suits, such practical considerations, when coupled with the potentially serious adverse foreign policy consequences that such litigation can generate, would in our view argue in favor of finding the suits non-justiciable. However, if the Court were to determine that dismissal is not appropriate, we would respectfully urge the Court to fashion its final orders in a manner that would minimize the potential injury to the foreign relations of the United States.

Sincerely,

William H. Taft, IV

Enclosures:
    As stated.

1:02 CV 01431 (JDB)

1



CHAMBERS OF
EDWARD M. CHEN
UNITED STATES MAGISTRATE JUDGE

MAY 16 2002

May 3, 2002

The Honorable William Howard Taft, IV
Office of the Legal Adviser
United States Department of State
2201 C Street N.W.
Washington, DC  20520

  Re: *Jane Doe I, et al. v. Liu Qi, et al.*, C-02-0672 CW (EMC) (Northern District of
    California)

Dear Mr. Taft:

On February 2, 2002, six individual plaintiffs, each of whom is a Falun Gong practitioner,
brought suit against Liu Qi, who has served as the mayor of Beijing of the People's Republic of
China since February, 1999. The plaintiffs are citizens of various countries, including the
People's Republic of China, France, Sweden, Israel, and the United States. Four currently reside
in the United States. The suit contends that each of the plaintiffs was subject to arrest and
detention under harsh conditions, including the use of unreasonable force and torture, in
connection with China's crackdown on the Falun Gong practitioners. The suit contends that the
City of Beijing has been a focal point of the repression and persecution against the Falun Gong
and that the defendant Liu knew or should have known that Beijing police and other security
forces were engaged in a pattern and practice of severe human rights abuses against Falun Gong
practitioners. The complaint asserts that defendant Liu had a duty both under customary
international law and Chinese law to prevent police and other security forces under his authority
from engaging in abuses. The complaint asserts five causes of action under the Torture Victim
Protection Act and Alien Tort Claims Act. Enclosed is a copy of the complaint filed herein.

Defendant Liu was served while passing through San Francisco International Airport, apparently
on his way to the Winter Olympics. Having failed to respond to the complaint, the Court entered
a default on March 12, 2002. Plaintiffs now move for judgment by default. This motion has
been assigned to me by the District Judge in this case for a Report and Recommendation.
Enclosed is a copy of the plaintiffs' motion for judgment by default.

Having reviewed the complaint and plaintiffs' motion, the Court has determined that it would be appropriate to solicit the Department of State's opinion on a number of issues. In particular, the Court would appreciate the Department of State's views on the following issues:

1.      Is this case barred under the Foreign Sovereign Immunities Act ("FSIA")? Please address, *inter alia*:

      a.      Whether the exception from immunity under 28 U.S.C. § 1605(a)(7) applies.

      b.      In determining both whether the FSIA applies and whether 28 U.S.C. § 1605(a)(7) applies, what law and facts must be demonstrated to establish defendant Liu was acting within or outside the scope of his authority? Must the court determine defendant's scope of his authority under Chinese law; if so the Court requests translated version of all applicable law material to this determination.

2.      Should the Court find the case nonjusticiable under the Act of State doctrine? What effect will adjudication of this suit have in the foreign policy of the United States?

If the Department of State believes a response to some or all of the above questions from the People's Republic of China is appropriate, it may invite the appropriate representative thereof to submit its written views to the Court as well.

The Court would appreciate your consideration of this matter and your communication of the State Department's position regarding these issues. The Court leaves to your discretion whether your response is best submitted in the form of a letter or a Statement of Interest filed pursuant to 28 U.S.C. § 517. A copy should be sent to plaintiffs' counsel. The Court would appreciate a response by July 5, 2002.

Thank you for attention and cooperation.

Yours very truly,

Edward M. Chen
U.S. Magistrate Judge

EMC/ld
Enc.
cc:    Joshua Sondheimer, Esq., The Center for Justice & Accountability, 870 Market Street, Suite 684, San Francisco, CA 94102 (*Plaintiffs' counsel*)
      Michael S. Sorgen, Esq., Law Offices of Michael Sorgen, 240 Stockton Street, 9th Floor, San Francisco, CA 94108 (*Plaintiffs' counsel*)
      Terri Marsh, Esq., Law Offices of Terri Marsh, 3133 Connecticut Avenue, NW, Suite 608, Washington, DC 20008 (*Plaintiffs' counsel*)