# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

JOHN DOE I, et. al.,      )
           Plaintiffs,    )
                      )        Civil Action No.
                      )        1:02 CV 01431 (JDB)
     -v.-              )
                      )
STATE OF ISRAEL et al.    )
                      )
            Defendants.   )

## PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO THE STATE OF ISRAEL'S AND RELATED DEFENDANTS' MOTION TO DISMISS CLAIMS

## INTRODUCTION

The Israeli Defendants[1] claim that Plaintiffs[2], who have lost their lives, their loved ones, their limbs, their dreams, and their property, have brought a "political" case, as they remind the Court that Israel is a "close ally", in fact a "key U.S. ally", and again a "key ally" to the United States. *See* Israeli Defendants' Motion to dismiss ("Mot."), pp.39, 40, 44.  Israeli Defendants' argument that any acts that they *claim* fall under Israel's "security policy" cannot be challenged is nothing more than a political defense. Mot. p.39.  Israeli Defendants *cannot* justify violations of international and United States law, including genocide, crimes against humanity, extra-

---

[1] The "Israeli Defendants" or "Defendants" include the State of Israel, the Israeli General Security Service ("Shin Bet"), the Israeli Defense Forces ("IDF"), as well as the "individual Israeli Defendants," each in their individual and official capacities: Ariel Sharon, Natan Sharanski, Binyamin Ben Eliezer, Shimon Peres, Uzi Landau, Meir Sheetrit, Shaul Mofaz, Avi Dichter, Amos Gilad, Aharon Ze'evi Farkash, and Amos Yaron.
[2] Plaintiffs are JOHN DOE I on behalf of himself and his grandson, BABY DOE I and as next of kin for his deceased daughter, JILL DOE I; JOHN DOES II, III, IV, V, VI, VII, VIII, IX, X, XI, XII, XIII, and XVII on behalf of themselves; JOHN DOE XIV on behalf of himself and his son, BABY DOE II; JOHN DOE XV on behalf of himself and his son, BABY DOE III; JOHN DOE XVI on behalf of himself and his deceased son, BABY DOE IV; JANE DOE I on behalf of herself and the estate of her aunt, JILL DOE II and cousin, BABY DOE V; and JANE DOE II on behalf of herself and the estates of her two deceased sisters, JILL DOE III and  JILL DOE IV and as next of kin for her nephew CHARLES DOE I and niece JILL DOE V.

judicial killing, and torture, by any so-called "war on terrorism." *See* Mot. pp.1-4 (17 references to terror, terrorists, and terrorism).

"[T]orture committed under color of law of a foreign nation in violation of international law is 'our business,' as such conduct not only violates the standards of international law but also as a consequence violates our domestic law. *Wiwa v. Royal Dutch Petroleum Co.*, 226 F.3d 88, 106 (2d Cir. 2000) *cert. denied*, 121 S.Ct. 1402 (2001).  Because no state can officially condone torture, extra-judicial killing, genocide, war crimes, or other such violations of *jus cogens* international law, such acts cannot be considered sovereign, and the Individual Israeli Defendants are therefore not immune under the Foreign Sovereign Immunities Act (FSIA). *See* sec. II.a, *infra*.

Despite allegedly arising in the context of a "war on terrorism," the Israeli Defendants acts as set forth in Plaintiffs' Complaint clearly violate international law and the laws of the United States and Israel.  The Supreme Court of Israel has found that even despite the continual terror unleashed against Israeli civilians, Israeli and international law absolutely forbid interrogation methods such as cuffing, hooding, loud music, deprivation of sleep, and positional abuse.[3]  Even the State Department has recognized that, "Historically, Israel's main human rights problems have arisen from its policies and practices in the occupied territories and from its fight against terrorism."[4]  These human rights "problems" are actionable under the law.

Israel's alliance with the United States government is ***not*** relevant in determining whether the Israeli Defendants have violated international law and the laws of the United States, or whether they are even subject to the law; the Israeli Defendants are not exempt from justice or the jurisdiction of this Court.  The Palestinian Intifada, much less the war on Iraq, al Qaida, and

---

[3] *Judgment on the Interrogation Methods Applied by the GSS*, Supreme Court of Israel, sitting as the High Court of Justice (September 6, 1999), available at <http://www.derechos.org/human-rights/mena/doc/torture.html>.
[4] United States State Department, Country Report on Human Rights Practices in Israel and the Occupied Territories for the year 2000, Released by the Bureau of Democracy, Human Rights, and Labor,

the search for Saddam Hussein and Osama Bin Laden, is as relevant to the legal analysis here as it is to victims of torture and genocide in Latin America and Eastern Europe.  Granted, some rights have been suspended due to the "war on terrorism"; but the laws that the Israeli Defendants have violated in this case are still in full force and effect and must be enforced by this Court.  This Court "need not delve into the legal quagmire of apprehending terrorists or even resolve many of the complex issues spawned by this international…dispute." *Alvarez-Machain v. United States*, 331 F.3d 604, 608 (9th Cir. 2002) (en banc).  Rather, this case presents only the narrow and justiciable issues regarding whether Plaintiffs have a remedy at law.

None of the Plaintiffs, most of whom are American citizens, all of whom are "civilian noncombatants", has been connected to, charged with, much less convicted of any such crime. Compl. ¶ 436.  Plaintiffs' claims are legal, not political, and should be heard by this Court. Plaintiffs' "courage and steadfastness in pursuing this litigation, and their efforts to do something to deter more tragic deaths and suffering of innocent Americans at the hands of these terrorists, are to be commended and admired." *Eisenfeld v.* Iran, 172 F. Supp. 2d 1, 9, 2000 U.S. Dist. LEXIS 9545 (D.D.C. 2000).  This case would only be political if Plaintiffs were denied justice under the law because the foreign officials who are responsible for their torture, their deaths, and their nightmares, operate from a country that is an "ally" of the United States.

The thorough background information set forth in the Complaint must not detract from the fact that Plaintiffs have alleged very specific justiciable claims for relief against the Israeli Defendants.  Based on the law set forth herein and in the Complaint, the Israeli Defendants' Motion to Dismiss must therefore be denied.  If deemed necessary, Plaintiffs should be allowed the opportunity to properly serve Defendants and to conduct personal jurisdiction discovery.

---

February 23, 2001, <http://www.state.gov/g/drl/rls/hrrpt/2000/nea/794.htm> ("State Dept.'s Israel Report").

## STATEMENT OF FACTS

John Doe I, a U.S. citizen, witnessed his daughter, Jill Doe I, a twenty-two year old U.S. citizen, get shot and killed by IDF soldiers with machine guns who were about 5 meters away from her, while she sat in her car holding her 9-month old baby, Baby Doe I. Compl. ¶¶ 7, 234-242.  U.S. citizen John Doe II had his life threatened and his property in the Occupied Territories set fire to, his land was bulldozed, his home was riddled with gunfire, and over 100 of his olive trees were destroyed by settlers supported by the Israeli Defendants. Compl. ¶¶ 8, 243-256.

After U.S. citizen John Doe III suffered a stroke, his injuries were compounded and he has since died because IDF soldiers prevented him from going to the hospital or getting medical attention from his son John Doe IV for two days.[5] Compl. ¶¶ 9, 257-261.[6]

U.S. citizen John Doe V was assaulted, pushed to the ground, kicked in his back and in the back of his head, hit on the side of his head with a rifle butt, unlawfully detained and threatened at gunpoint by Israeli soldiers at a checkpoint. Compl. ¶¶ 11, 270-279.  U.S. citizen John Doe VI was stopped at a border, shackled, detained without charge and tortured for 40 days, including being deprived of adequate food and drink, subjected to sensory deprivation and overload, strip searched, "hooded," immobilized in the 'Shabach' position, and held in isolation. *Id.*  U.S. citizen John Doe VII was also stopped at a border, unlawfully detained and tortured for 36 days, kept in a filthy cell, fed rancid food, and hooded. Compl. ¶ 13.  U.S. Citizen John Doe VIII was assaulted and degraded, his family was removed from its home, his car and other possessions were destroyed, and his law office was looted and ransacked by IDF soldiers. Compl. ¶ 14.

---

[5] The home and medical clinic of John Doe IV, also a U.S. citizen, have been subjected to numerous searches by Israeli soldiers and security forces, while he and his family have suffered almost routine invasions of their privacy and property damage to computers in their home. See Compl. ¶¶ 10, 262-269.

[6] *See also* Attorney Stanley L. Cohen's Affidavit in Opposition to Israeli Defendants' Motion to Dismiss ("Cohen Aff."), attached hereto as Ex.A, ¶ 3.

Plaintiff John Doe XIV's son BABY DOE II, who was born in New York, New York and resides there part time, was driving away from his father's farm when several Israeli soldiers opened fire on his vehicle, shooting a bullet through his back and out his stomach. See Compl. ¶ 7,Ex. B, ¶¶ 2-3.  Various Israeli soldiers then delayed his ambulance and otherwise interfered, causing the 10-15 minute trip to the hospital to take seven hours. *Id.* at ¶ 10.

John Does IX, X, XI[7], XII, XIII, XV had their property destroyed by the IDF by shelling, tank fire, rockets, and theft, without any military necessity. Compl. ¶¶ 16-18, 20, 353-369, 383-398.

Plaintiff John Doe XV's 10-year old unarmed son, Baby Doe III, was shot and seriously wounded outside their home by an Israeli soldier, and is currently paralyzed; when John Doe XV attempted to help his son, the soldier again opened fire on both of them.[8] Compl. ¶¶ 20, 383-398, Ex. G.  U.S. citizen John Doe XVI' son, Baby Doe IV, was shot in the head by IDF soldiers indiscriminately firing into a crowd, and then bled to death while the soldiers detained his ambulance. Compl. ¶ 21.  John Doe XVII is a resident alien who was shot and severely wounded by soldiers in Israeli uniforms in the 1982 massacre at the Sabra refugee camp in Southern Lebanon.[9] See Compl. ¶¶ 22, 404-408.

U.S. citizen Jane Doe I's aunt, Jill Doe II, and cousin, Baby Doe V, were shot in the heads and killed by IDF soldiers firing indiscriminately into their home. Compl. ¶¶ 23, 409-413. U.S. citizen Jane Doe II's childhood home was destroyed by IDF rockets, killing her sisters (Jill

---

[7] An IDF soldier also hit John Doe XI in the face with the butt of his rifle.  Aff. of John Doe XI, Compl., Ex. L, ¶ 10.
[8] Moreover, four of John Doe XV's wholesale wheat flour, seeds, animal feed, and basic foodstuff stores have been destroyed by Israeli tank fire. Compl. ¶ 397-398.
[9] He also witnessed the indiscriminate slaughter of his family, friends and neighbors at the hands of the same soldiers, including seeing his neighbor's head torn off by an explosion, and pregnant women being slaughtered. *Id.*

Does III and IV), crushing the spine of her niece, Jill Doe V, and severely burning and injuring her nephew, Charles Doe I.[10] Compl. ¶¶ 24, 414-421.

Plaintiffs bring this suit against the Israeli Defendants for acts of genocide, crimes against humanity, war crimes, extra-judicial killings, torture, arbitrary arrest and detention, cruel, inhuman, or degrading treatment, violations of the Racketeer Influenced And Corrupt Organizations Act (RICO), wrongful death, assault, battery, false imprisonment, intentional infliction of emotional distress, negligent infliction of emotional distress, negligence per se, trespass, and conversion.

## **STANDARD OF REVIEW**

Israeli Defendants filed their motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1), (2) and (5), as well as the political question and act of state doctrines.[11]  Plaintiffs are entitled to have their complaint and any doubts resolved in the light most favorable to them in establishing a prima facie showing of personal jurisdiction (*El-Hadad, v. Embassy of the United Arab Emirates*, 69 F. Supp. 2d 69 (D.D.C. 1999); *GTE New Media Servs., Inc. v. Ameritech Corp.*, 21 F. Supp. 2d 27, 36 (D.D.C. 1998)), and in establishing subject matter jurisdiction. *Bao Ge v. Li Peng*, 201 F. Supp. 2d 14, 19 (D.D.C. 2000), *aff'd*, No. 00-7290, 2002 WL 1052012 (D.C. Cir. 2002), citing *Artis v. Greenspan*, 158 F.3d 1301, 1306 (D.C. Cir. 1998).  A complaint need only "give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 47, 2 L. Ed. 2d 80, 78 S. Ct. 99 (1957).  A court cannot

---

[10] Jane Doe II lives in South Carolina, and witnessed the destruction of her childhood home and learned of her sisters' deaths while watching television. Compl. ¶¶ 414, 421.

[11] Plaintiffs have filed with this Court three Oppositions to other Motions to Dismiss by the Federal Defendants in their official capacities (2/7/03), the Arms Defendants (2/7/03), and the Rinat Defendants (3/14/200).  The arguments made therein are incorporated in this Opposition.

dismiss a complaint unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."[12] *Id.* at 45-46.

I.    **PLAINTIFFS HAVE ATTEMPTED TO SERVE THE ISRAELI DEFENDANTS IN ACCORDANCE WITH THE LAW, THE ISRAELI DEFENDANTS HAVE ACTUAL NOTICE, AND HAVE NOT BEEN PREJUDICED**

It is undisputed that the Israeli Defendants have received actual notice of this lawsuit, and have filed a motion to dismiss.  Defendants do not argue that they have been prejudiced.  Even if service is deemed technically improper, to require Plaintiffs to now go through the procedures of technically complying with the Hague Convention, the purpose of which is to ensure actual notice and simplify and expedite the procedure (*see* Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents, Feb. 10, 1969, 20 U.S.T. 361, T.I.A.S. 6638, 658 U.N.T.S. 163) ("Hague Convention"), would be extraordinarily burdensome, especially given the fact that Plaintiffs requested that the Individual Israeli Defendants waive service, which they were obligated to do.

    a.  **Plaintiffs attempted to avoid the cost of serving the Individual Israeli Defendants by complying with Federal Rule of Civil Procedure 4(d).**

An individual in a foreign country who receives notice of an action in accordance with Federal Rule of Civil Procedure 4(d) "has a duty to avoid unnecessary costs of serving the summons." Fed. R. Civ. P. 4(d) and (f).  The Individual Israeli Defendants were sued in their personal as well as official capacities, and therefore had a duty to save the costs of service, at least in their personal capacities.[13]  In an attempt to avoid the exorbitant cost of service, Plaintiffs first notified the Individual Israeli Defendants of the commencement of the action and requested that the Defendants waive service of the summons as provided in Rule 4(d).  The required

---

[12] "A motion to dismiss premised on the act of state doctrine is treated as a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure." *Roe v. Unocal*, 70 F. Supp. 2d 1073 (C.D. Cal. 1999), citing *Siderman de Blake v. Republic of Argentina*, 965 F.2d 699, 707 (9th Cir. 1992).

[13] Government officials are not covered by FSIA protections when the officials' actions are outside the legitimate scope of the sovereign's authority by violating *jus cogens* norms of international law.  *See* Sec. II.a., *infra.*

documents were mailed to the Israeli Defendants from New York via airmail by the United

States Postal Service on August 9, 2002.  *See* Declarations of Delivery by United States Mail,

attached hereto as Exhibit E.  None of the Israeli Defendants responded. Cohen Aff., Ex.A, ¶ 2.

Defendants Yaron and Landau's packages were returned to Attorney Cohen, acceptance having

been refused. *Id.*

**b.  Service was effected under Article 10(a) of the Hague Convention**

The Hague Convention does not interfere with "the freedom to send judicial documents,

by postal channels, directly to persons abroad".  See the Hague Convention, Article 10(a),

<http://www.hcch.net/e/conventions/text14e.html#annex>.  Israel has not objected to this section

of the Hague Convention. Mot. p.11; *see also* <http://www.hcch.net/e/status/stat14e.html#il>.

Article 10(a) has been interpreted to include service, so that parties are allowed to serve process

on foreign defendants through "postal channels." *See Chrysler Corp. v. General Motors Corp.*,

589 F. Supp. 1182, 1206 (D.D.C. 1984) (service of the summons and complaint via postal

channels under 10(a) of the Hague Convention is proper, citing *Shoei Kako Co. v. Superior

Court*, 33 Cal. App. 3d 808, 821-22, 109 Cal. Rptr. 402, 411-12 (1973)); *See also Ackermann v.

Levine*, 788 F.2d 830, 839 (2d Cir. 1986) ("the word 'send' in Article 10(a) was intended to

mean 'service'"); *Koehler v. Dodwell*, 152 F.3d 304, 308 (4th Cir. 1998) (stating that the liberal

service options provided in the Hague Convention include service by mail); *Coblentz

GMC/Freightliner, Inc. v. General Motors Corp.*, 724 F. Supp. 1364, 1372 (M.D. Ala. 1989),

*aff'd*, 932 F.2d 977 (11th Cir. 1991); *but see Nuovo Pignone v. Storman Asia M/V*, 310 F.3d

374 (5th Cir. 2002) (international service under article 10 must be made personally, and not by

mail).  Therefore the packages mailed to the Israeli Defendants on August 9, 2002, as mentioned

above, constituted service according to Article 10(a) of the Hague Convention, with the possible
exception of Defendants Yaron and Landau, whose packages were refused and returned.[14]

### c. Service was Effected on Persons Authorized to Accept Service for the Israeli Defendants

Service was effected on January 21, 2003, on Defendants Israel, IDF, and Shin Bet, and
each individual Israeli Defendant in both his official and individual capacities, by Eitan
Newman, a process server for Process Service Network, an international process service agency,
who left copies of the Summons, the Complaint and its Attachments, Appendices and Exhibits,
with a person authorized to accept service for each Israeli Defendant.[15]  *See* Proofs of Service,
filed concurrently herewith.  Because the documents were hand delivered to Defendants' offices
and actually handed to persons authorized to receive them, actual notice to the Israeli Defendants
was further ensured.

### d. Israeli Defendants Received Actual Notice, They Were Not Prejudiced, and Service Was Sufficient under the Hague Convention

The Israeli Defendants had actual notice, which they do not deny. *See Sherer v.
Construcciones Aeronauticas, S.A.,* 987 F.2d 1246, 1250 (6th Cir. 1993) (finding actual notice
because defendant did not deny actual notice and timely moved to dismiss the complaint).  If
service is considered technically faulty, the Israeli Defendants have not been prejudiced, which
they do not claim to have been.

"When in doubt [in interpreting the Hague Convention], the courts should favor that
treaty interpretation which tends to reduce the cost and delay of litigation…." *Schiffer v. Mazda
Motor Corp.*, 192 F.R.D. 335, 12.  The Hague Convention provides "a simpler way to serve

---

[14] Plaintiffs surmise that such refusal was likely done in bad faith since the return addresses identified on the
packages bore the name of Plaintiffs' Attorney Stanley Cohen. Apparently Defendants had notice of the suit even
before receiving and refusing the packages.
[15] The only person not specifically declared to be authorized to receive service was the Security Officer who denied
the process server access to the office to serve Defendant Israel, but told the process server that she would accept the
documents.  See Return of Service, Defendant Israel, filed concurrently herewith.

process abroad, to assure that defendants sued in foreign jurisdictions would receive actual and timely notice of suit, and to facilitate proof of service abroad." *Volkswagenwerk Aktiengesellschaft v. Schlunk*, 486 U.S. 694, 698, 108 S. Ct. 2104, 2107, 100 L. Ed. 2d 722 (1988); *see also* the Hague Convention, *supra*.

The FSIA does not apply to the Individual Israeli Defendants because they acted outside the scope of their authority. See sec. II.a., *infra*.  If the FSIA is determined to apply to the Individual Israeli Defendants because they fall under an exception (see sec. II.c., *infra*), then they fall under § 1608(b) as instrumentalities of the state, in which case faulty service is sufficient. *See Jungquist v. Al-Nahyan*, 115 F.3d 1020, 1027 (D.C. Cir. 1997).  "The authorities generally hold that section 1608(b) may be satisfied by technically faulty service that gives adequate notice to the foreign state." *Transaero, Inc. v. La Fuerza Aerea Boliviana,* 30 F.3d 148, 153, 308 U.S. App. D.C. 86, 1944 U.S. App. LEXIS 19477 (D.C. Cir. 1994).[16]  "The failure to follow precisely those steps in § 1608 designed to insure that actual service be made should not override and invalidate the fact that in this case notice was actually received." *Harris Corp. v. National Iranian Radio and Television,* 691 F.2d 1344, 1352 (11th Cir. 1982).[17]  The Individual Israeli Defendants have clearly received actual notice of the Complaint against them and have

---

[16] In holding "that strict adherence to the terms of 1608(a) is required", the court in *Transaero* reasoned that a foreign government may lack knowledge or familiarity with the U.S. legal system, so therefore under § 1608(a)(3) service must be effected on the Ministry of Foreign Affairs, "the department most likely to understand American procedure." *Id.* at 154.  The service at issue in *Transaero* was attempted under § 1608(a)(3), not § 1608(a)(2), which provides for service under an international convention, the Hague Convention.  Clearly a lack of familiarity with the U.S. legal system is not at issue in this case.  Defendant Sharon, Prime Minister of Defendant Israel, has previously used the U.S. legal system to bring suit.  *See Sharon v. Time, Inc.*, 575 F. Supp. 1162 (S.D.N.Y. 1983).  The court further held "that armed forces are as a rule so closely bound up with the structure of the state that they must in all cases be considered as the 'foreign state' itself [thus served under § 1608(a)], rather than a separate 'agency or instrumentality' of the state", and therefore able to be served under § 1608(b).  *Id.* at 153.  Although Defendant IDF would likely be considered comparable to the "armed forces," Defendant Shin Bet may be an agency or instrumentality of the state under 28 U.S.C. § 1608(b), in which case faulty service is sufficient.  The court's artificial differentiation between a 'foreign state or political subdivision' and an 'agency or instrumentality' by determining that the former is governmental and the latter is commercial, is "insufficiently deferential to the legislature. *Id*. at 154, dissenting opinion; s*ee also Hyatt Corp. v. Stanton*, 945 F. Supp. 675 (S.D.N.Y. 1996) (rejecting the "core function" test).
[17] In *Harris Corp.,* the court found sufficient service even though there was no technical compliance with the provisions of 28 U.S.C. § 1608. *Harris Corp.* at 1352.  The defendant did not deny that it had notice of the action;

responded with a Motion to Dismiss; service was sufficient.  Service on Defendants Israel, IDF

and Shin Bet should also be deemed proper because their head Ministers (Defendants Sharon,

Mofaz, and Dichter, respectively), were properly served under the Hague Convention.

### e.  If the Court Finds that Service was Improper, Plaintiffs Should Be Afforded the Opportunity to Effect Proper Service

> The 'general rule' is that "'when a court finds that service is insufficient but
> curable, it generally should quash the service and give the plaintiff an opportunity
> to re-serve the defendant.'" Gregory v. United States Bankruptcy Court, 942 F.2d
> 1498, 1500 (10th Cir. 1991) (quoting Pell v. Azar Nut Co., 711 F.2d 949, 950 n. 2
> (10th Cir. 1983)); see also 5A Wright & Miller, § 1354, at 289-90 (explaining that
> where the propriety of service is unclear, "the simplest solution ... is to quash
> process and allow plaintiff another opportunity to serve defendant").

*Rhodes v. J.P. Sauer & Sohn, Inc.*, 98 F. Supp. 2d 746, 750 (W.D. Louis. 2000).

"Although plaintiffs have failed to effectuate valid service [under the Hague

Convention], the court determine[d] that the preferable action [was] to quash service and DENY

the motion to dismiss pursuant to Rule 12(b)(5)." *Id.* at 751.  See also *Golub v. Isuzu Motors*,

924 F. Supp. 324, 328, 1996 U.S. Dist. LEXIS 6470 (D.C. Mass. 1996) (Because it appeared

"that the plaintiff has stated a possible theory under which his action might be maintained in

federal court, and because there appear[ed] to be a reasonable prospect that the plaintiff will

ultimately be able to serve the defendant properly, the court [saw] no reason to dismiss the

action", and ordered the plaintiff to effect proper service of process upon the defendant under the

Hague Convention.)[18]  Therefore, if this Court determines that service should be quashed,

Plaintiffs' Complaint should not be dismissed in order to afford them the opportunity to effect

proper service on the Israeli Defendants.

---

defendant's attacks went "only to asserted noncompliance with certain FSIA requirements that exist merely to assure that actual notice be received." *Id.*

[18] Moreover, the 120-day time limit for service prescribed by Fed. R. Civ. P. 4(m) "does not apply to service in a foreign country pursuant to subdivision (f) or (j)(1)."  Fed. R. Civ. P. 4(m), *accord Pennsylvania Orthopedic Ass'n v. Mercedes-Benz A.G.*, 160 F.R.D. 58, 61, 1995 U.S. Dist. LEXIS 1243, (E.D. Penn. 1995) (although service had not yet been effected on Defendant, the Complaint could not be dismissed "under Rule 4(m) because that deadline does not apply to foreign service.")

## II.    THE STATE OF ISRAEL AND ITS OFFICIALS ARE NOT IMMUNE FROM SUIT UNDER THE FSIA

### a.    The Individual Israeli Defendants Are Not Immune from Suit Under the FSIA Because Their Actions Were Outside the Legitimate Scope of the Sovereign's Authority

The FSIA does not apply to conduct outside the legitimate scope of the sovereign's authority, such as the acts complained of by Plaintiffs, including extra-judicial killing, torture, genocide, and other violations of *jus cogens* norms of international law, and the laws of the United States.  It is well established that government officials are not covered by FSIA protections when the officials' actions are outside the legitimate scope of the sovereign's authority.[19]  Defendants do not claim that the torture, genocide, and war crimes, etc., alleged by Plaintiffs fall with the scope of their authority.  They do not argue that such acts are permissible under any law; nor can they.

"Sovereign immunity similarly will not shield an official who acts beyond the scope of his authority. 'Where the officer's powers are limited by statute, his actions beyond those limitations are considered individual and not sovereign actions. The officer is not doing the business which the sovereign has empowered him to do . . ..'" *Chuidian* at 1106, quoting *Larson*, 337 U.S. at 689.  In *Chuidian*, the defendant, a member of a government commission, acted pursuant to an "executive order, [and] instructed the Bank not to make payment on the letter of credit issued to" the plaintiff. *Id.* at 1097.  The plaintiff did not allege that the defendant's "*actions* departed from his statutory mandate," but that his "personal motive render[ed] his actions ultra vires even though the actions themselves were fully authorized." *Id.* at 1107 (emphasis in original).  Here, however, Plaintiffs assert that the Israeli Defendants' actions were not authorized by the sovereign, and therefore not entitled to immunity.  Whatever their motive, the Israeli Defendants' acts of genocide, crimes against humanity, war crimes, extra-judicial

killings, torture, arbitrary arrest and detention, cruel, inhuman, or degrading treatment, and other unlawful violations were clearly outside the statutory scope of their authority.

In *Hilao v. Marcos* (*In re Estate of Ferdinand Marcos, Human Rights Litigation*) 25 F.3d 1467, 1471 (9ᵗʰ Cir. 1994), "Marcos' acts of torture, execution, and disappearance were clearly outside of his authority as President."  *Hilao*, 25 F.3d at 1472.  "Marcos' acts were not taken within any official mandate and were therefore not the acts of an agency or instrumentality of a foreign state within the meaning of the FSIA." *Id.*, citing *Trajano v. Marcos* (*In re Estate of Ferdinand Marcos, Human Rights Litigation*) 978 F.2d 493, 498 (9ᵗʰ Cir. 1992), *cert. denied*, 508 U.S. 972 (1993) (alleged acts of torture and summary execution "cannot have been taken within any official mandate and therefore cannot have been acts of an agent or instrumentality of a foreign state within the meaning of the FSIA."); *Chuidian*, 912 F.2d at 1106.  In *Hilao*, the FSIA did not apply because the action was "against the estate of an *individual official* who [was] accused of engaging in activities outside the scope of his authority." *Hilao* at 1472 (emphasis in original).  "A lawsuit against a foreign official acting outside the scope of his authority does not implicate any of the foreign diplomatic concerns involved in bringing suit against another government in United States courts." *Id., see also Xuncax v. Gramajo*, 886 F. Supp. 162, 175 (D. Mass. 1995) (FSIA immunity is "unavailable in suits against an official arising from acts that were beyond the scope of the official's authority").

Torture, arbitrary arrest and detention, and genocide, cannot be considered legally authorized by any state because "*jus cogens* violations are considered violations of peremptory norms, from which no derogation is permitted." *Presbyterian Church of Sudan v. Talisman Energy, Inc. and the Republic of Sudan*, 244 F.Supp.2d 289, 345 (S.D.N.Y. 2003) *citing* Restatement (Third) of Foreign Relations § 702 cmt. N (1987)(identifying slavery, murder or

---

[19] Some courts have even determined that the FSIA doesn't apply to individuals at all.

disappearance, cruel, inhuman or degrading treatment, and other international law violations, and is not an exhaustive list); *see also Bao Ge,* 201 F. Supp. 2d at 22.

The Israeli Defendants misplace reliance on several cases to attempt to argue that their unlawful violations are protected because they acted on behalf of the sovereign state. Mot. p.19. In *Jungquist,* 115 F.3d at 1028, the court found that defendant was *not* entitled to immunity under the FSIA for entering into a contract to pay for medical treatment through a government program, even if he was authorized to do so, because he did so in exchange for plaintiff's silence, a "corrupt bargain" that could not have been authorized.   "The fact that there was some convergence between [defendant's] official and unofficial conduct does not cloak his unofficial actions with immunity under the FSIA." *Id.*

Nor can the Israeli Defendants rely on *Herbage v. Meese*, 747 F. Supp. 60; 1990 U.S. Dist. LEXIS 12388 (D.D.C. 1990), in which the plaintiff alleged that British officials violated his Constitutional due process rights by making false statements and giving false testimony in connection with his extradition to the United States. *Herbage* at 62.  The plaintiff did not allege any violation of international law against the British defendants. *Id.*  As opposed to this case, the "actions of which [plaintiff] complain[ed] are ones that those defendants could have taken only in their official capacities." *Id.* at 66.

Defendants also misplace reliance on *Saltany v. Reagan*, 702 F. Supp. 319 (D.D.C. 1998), *aff'd in relevant part, rev'd in part*, 886 F.2d 438 (D.C. Cir. 1989), *cert. denied*, 495 U.S. 932, 110 S. Ct. 2172, 109 L. Ed. 2d 501 (1990), to support their contention that government officials acted in their official capacities, for they failed to disclose that in that case, "plaintiffs [did] not allege otherwise." Mot. p.23; *Saltany* at 321-322.  Here, Plaintiffs allege that the Israeli Defendants acted outside the scope of their official capacity; their *jus cogens* violations cannot be considered acts of the sovereign as defined by the FSIA.  Moreover, the court in *Saltany* was

14

determining the immunity of United States government officials, which is not even covered by the FSIA.[20]  *Saltany* at 321-322.  The "doctrine of foreign sovereign immunity is quite distinct from the doctrine of domestic sovereign immunity…being based upon considerations of international comity rather than separation of powers…." *Sanchez-Espinoza v. Reagan*, 770 F.2d 202, 207 n.5, 248 U.S. App. D.C. 146 (D.C. Cir. 1985)(citations omitted).

Israeli Defendants also misrepresent the decision in *El-Fadl v. Central Bank of Jordan*, 75 F.3d 668 (D.C. Cir. 1996), conflating the managerial actions of Jordanian "officials" (the court only reviewed the dismissal of one individual defendant) with the false arrest, detention, and torture by the military police, implying that the court determined that all such actions were undertaken in an official capacity. Mot. p.20.  In *El-Fadl*, the Appeals Court affirmed the dismissal of the Deputy Governor of the Central Bank of Jordan on sovereign immunity grounds because the plaintiff had failed to present any evidence that the defendant was acting outside of his official capacity, whereas defendant had submitted an affidavit regarding his responsibilities. *Id.* at 671.[21]

In this case, the Israeli Defendants have not even contended much less provided any evidence that they had authority to commit any of the acts alleged; in other words, that they acted within the scope of their authority.  Plaintiffs have alleged and can show that the Israeli Defendants were acting outside their official authority, and that their actions were in violation of international law, the laws of Israel, and the laws of the United States.

---

[20] Moreover, the court in *Saltany* noted that ATCA "is not itself a waiver of sovereign immunity, *at least not that of the United States.*" *Saltany* at 321, n.4 (emphasis added).  Therefore *Saltany* clearly does not support the Israeli Defendants' contention that this Court should apply sovereign immunity to Plaintiffs' ATCA or TVPA claims. Instead, it implicitly supports Plaintiffs' contention that ATCA does waive sovereign immunity for other governments or any governmental officials.

[21] The Deputy Governor defendant had been appointed as Chairman and General Manager of a subsidiary of a privately owned bank that the Central Bank had placed in receivership, in order to liquidate the subsidiary. *Id.* at 670.  Plaintiff claimed that defendant was acting in his individual capacity as Chairman and General Manager of the subsidiary, and therefore was acting outside of his official capacity as Deputy Governor. *Id.* at 671.  The acts alleged in *El-Fadl* were wrongful termination of employment and other tort claims; there were no allegations of command responsibility for the torture or other acts by the military police. *Id.* at 670.

The Individual Israeli Defendants merely argue that they are immune from suit because they are officials acting on behalf of Israel, and that they cannot be sued in their personal capacity for acts done as government officials.  Just because Defendants' ability or opportunity to do what they did came from their official positions in government does not mean that their acts were within the scope of their official capacity or authorized by the sovereign.  If officials were immune even when acting outside the scope of their authority, the Alien Tort Claims Act (ATCA) and the Torture Victim Protection Act (TVPA) would be rendered meaningless.[22]

Moreover, the Israeli Defendants cannot rely on *Siderman, supra*, 965 F.2d 699, a case against a foreign state, Argentina, in which the Ninth Circuit determined that due to the Supreme Court's opinion in *Argentine Republic v. Amerada Hess Shipping*, 488 U.S. 428 (1989), "the fact that there has been a violation of *jus cogens* does not confer jurisdiction under the FSIA." *Siderman* at 718.  The Supreme Court, however, precluded an ATCA suit against a *foreign state*, not an individual, and explained that the "Alien Tort Statute by its terms does not distinguish among classes of defendants, and it of course has the same effect after the passage of the FSIA as before with respect to defendants other than foreign states." *Amerada Hess* at 438.  Moreover, there were no allegations that defendant had violated a *jus cogens* norm of international law, only that it had attacked a neutral ship in international waters. *Id. at 433*.  The FSIA therefore does not preclude Plaintiffs' claims against the individual Israeli Defendants for *jus cogens* violations.

b.  **The Individual Israeli Defendants Have Clearly Acted Outside Their Authority**

---

[22] Specifically, Israeli Defendants claim that the TVPA "does not void the immunity protecting foreign officials for their public rather than private acts."  Mot. p.13.  The TVPA provides jurisdiction for a civil action against "an individual who, u*nder actual or apparent authority, or color of law*, of any foreign nation" subjects someone to torture or extrajudicial killing.  28 U.S.C. § 1350 note, Sec. 2 (emphasis added).  The Individual Israeli Defendants essentially allege that they are immune under the FSIA because they acted under the authority, or under color of law, of Israel.  If individuals were always immune under the FSIA when acting under the supposed authority of a foreign nation, they could never be liable under the TVPA, which requires such authority (whether actual or apparent), or acts under color of law, for liability.  Such a reading of official acts is therefore impossible, for no one could be liable under the TVPA.[22]  Similarly, under ATCA, most international law violations require an element of state action, other than such egregious crimes as genocide, war crimes, or other crimes against humanity. *See Tachiona, supra,* at 313.  All other violations would not be actionable under Defendants' interpretation, but they are.

Although it is not necessary to establish here that the Israeli Defendants have acted outside of their authority, the following provide some examples of how Defendants have done so.  Because Plaintiffs have alleged Defendant Sharon acted outside the scope of his authority as Minister of Defense when the Israeli military command under his direct control gave the Phalangist militia a green light to enter the Sabra and Shatila refugee camps, while the IDF provided air and ground support. See Compl. ¶126.  The Israeli parliament (Knesset) named a commission of inquiry, presided over by Mr. Yitzhak Kahan in September 1983 [the "Kahan Commission", a "highly respected quasi-judicial body"[23]], which concluded that Defendant Sharon was personally responsible for the massacre at Sabra and Shatila." Compl. ¶¶ 133, 134. "Upon the insistence of the Commission, Mr. Sharon resigned from his post of Minister of Defense." Compl. ¶ 134.  On September 19, 1982 the United Nations Security Council condemned the massacre with Resolution 521, and on December 16, 1982, the General Assembly adopted a resolution qualifying the massacre as an "act of genocide." Compl. ¶ 132. IDF soldiers, under the command of Defendant Sharon, shot and severely wounded John Doe XVII at the Sabra refugee camp, as well as slaughtered his family, friends and neighbors. Compl. ¶ 22.  Defendant Sharon had command responsibility for those soldiers, as well as individual responsibility for his approval of the entry of the Phalangist militia into the camps.  Clearly Defendant Sharon's acts with regard to Sabra and Shatila were outside the scope of his authority as Minister of Defense, since he was forced to resign from his position for his participation in the massacre.[24]

---

[23] *Sharon v. Time, Inc.*, 575 F. Supp. 1162, 1167 (S.D.N.Y. 1983), discussed *infra*.

[24] Defendant Sharon also has individual and command responsibility as Prime Minister for the acts alleged by Plaintiffs other than John Doe XVII, although he apparently has head of state immunity for those acts while he is in office.  On March 5, 2002, Defendant Sharon said "'The Palestinians must be hit and it must be very painful. We must cause them losses, victims, so that they feel the heavy price.'"  Compl. ¶ 179.  Defendant Sharon announced his intent to attack Palestinians – not terrorists, not those suspected of terrorism, not those criminally culpable, but the Palestinians in general – evidently including United States citizens of Palestinian ethnicity, as well.

Defendant Yaron individually and as former Brigadier General and Commandant of IDF forces in Beirut has individual culpability and command responsibility for the actions of IDF and other military personnel in Beirut. Compl. ¶38.  Defendant Yaron is responsible for the soldiers who shot and severely wounded John Doe XVII in the Sabra refugee camp and who slaughtered his family, friends and neighbors. Compl. ¶22.  The Israeli military command that was commanded by Defendant Yaron, field commander for West Beirut, gave the Phalangist militia a green light to enter the Sabra and Shatila refugee camps, while the IDF provided air and ground support. Compl. ¶126.  Defendant "Yaron's command staff, having been informed of the killings while they were in progress, even allowed the Phalange to re-enter the camps with a bulldozer, presumably to dispose of the mass of corpses."[25] Compl. ¶129.  Defendant Yaron was subsequently stripped of his post, as recommended by the Kahan Commission.[26]  Clearly Defendant Yaron's behavior was outside the scope of his authority.

Defendants Yaron,[27] Ben Eliezer,[28] [29] Peres,[30] Landau,[31] Sheetrit,[32] Dichter,[33] Mofaz,[34] Farkash,[35] and Gilad,[36] all have individual and command responsibility for the actions of IDF

---

[25] Defendant "Yaron, according to the [Kahan] Report, received reports of the killings of women and children on Thursday evening, yet (1) did not check the report; (2) did not pass the reports on to the G.O.C. and Chief of Staff; and (3) did not take appropriate steps to stop the Phalangists and protect civilians." *Commentary: The Appointment of General Yaron: Continuing Impunity for the Sabra and Shatilla Massacres,* Linda A. Malone, 32 Case W. Res. J. Int'l L. 287, 302, citing *Report of the Commission of Inquiry into the events at the refugee camps in Beirut,* 8 February 1983 ("Kahan Report"), at 19.  The massacre continued until 8:00 a.m. on Saturday.  *Id.* at 299.

[26] "As to other of the named individuals found responsible by the Commission, … Yaron was stripped of his field command." Malone at 303, n. 137, citing Commanders in Disgrace, TIMES (London), Mar.2, 1983, at 6; see also Kahan Report ("we recommend that Brigadier General Amos Yaron not serve in the capacity of a field commander in the Israel Defense Forces").

[27] Defendant Yaron, individually and as Secretary General of the Defense Ministry, has individual culpability and command responsibility for the actions of IDF in Palestine. Compl. ¶38.

[28] Defendant Ben Eliezer individually and as Israeli Minister of Defense, has individual culpability and command responsibility for the actions of the Israeli military and security services, including actions taken by Defendants IDF and Shin Bet. Compl. ¶ 28. "In addition to this the ministry is responsible for the emergency economic system, internal auditing of the defense system, rural settlement affairs, and infrastructure." <http://www.la.utexas.edu/chenry/aip/fall01/roles01/msg00030.html>, citing <http //www.israel-mfa.gov>.

[29]     Israeli Defense Minister Binyamin Ben Eliezer, gloated Friday over the fact that the international community has been silent about the recent Israeli killing of Palestinians in the West Bank. The hard-line minister, in an interview published in the Yediot Aharonot daily, said this is a 'disaster' for Palestinian leader Yasser Arafat. It is a fact that *we* have killed 14 Palestinians in Jenin, Kabatyeh and Tammun, with the world remaining absolutely silent. It's a disaster for Arafat, Ben Eliezer told the Yediot.

and Shin Bet personnel and are therefore responsible for violating Israeli law, international law, and the law of the United States as regards all Plaintiffs' claims, other than John Doe XVII's.

They are responsible for the following acts, none of which they had authority for, and all of which violated international law and the laws of the United States: the deaths of John Doe I's daughter and John Doe XVI' son, who were shot and killed by IDF soldiers; the injuries to the minor sons of John Doe XIV and XV, who were shot and injured by IDF soldiers; the deaths of Jane Doe I's aunt and cousin, who were shot and killed in their home by IDF soldiers; the deaths of Jane Doe II's sisters and the injuries to her niece and nephew when IDF rockets destroyed their house; the death of John Doe IV's father, John Doe III, who died after IDF soldiers delayed his medical treatment; the destruction of John Does II's property by people supported and protected by the Israeli Defendants; the assault and degradation of John Doe V by IDF soldiers; the unlawful detention and torture of John Does VI and VII for 40 and 36 days, respectively, by IDF and Shin Bet personnel; the assault, degradation and property destruction of John Doe VIII by IDF soldiers; John Doe IX's property damage due to IDF shelling; John Does X, XI, XII, XIII, XV's property destruction by the IDF, and John Doe XI's assault by IDF soldiers.

---

*Israeli defense minister gloats over world silence at Palestinian deaths*, Jerusalem, Sept. 14, 2001, <http://www.metimes.com/2K1/issue2001-37/reg/israeli_defense_minister.htm> (emphasis added).

[30] Defendant Peres, individually and as Israeli Minister of Foreign Affairs, has individual culpability and command responsibility for the actions of the Israeli military, security and police. Compl. ¶ 29.

[31] Defendant Landau, individually and as Israeli Minister of Internal Security, has individual culpability and command responsibility for the actions of the Israeli military, security and police, specifically the acts of illegal detention and torture of American citizens. Compl. ¶ 30.

[32] Defendant Sheetrit, individually and as Israeli Minister of Justice, has individual culpability and command responsibility for the actions of the Israeli military, security and police, specifically the acts of illegal detention and torture of American citizens. Compl. ¶ 31.

[33] Defendant Dichter, the head of Defendant Shin Bet, has individual culpability and command responsibility for the actions of Shin Bet personnel. Compl. ¶ 33.

[34] Defendant Mofaz, individually and as Chief of the General Staff, has individual culpability and command responsibility for the actions of IDF personnel. Compl. ¶ 35.

[35] Defendant Farkash, individually and as IDF Director of Military Intelligence, has individual culpability and command responsibility for the actions of IDF personnel. Compl. ¶ 36.

[36] Defendant Gilad, individually and as the IDF Coordinator of Government Activities in Judea, Samaria and the Gaza Strip, has individual culpability and command responsibility for the actions of IDF personnel, personnel particularly those actions in the Occupied Territories. Compl. ¶ 37.

Defendant IDF has a clear responsibility toward civilian noncombatants, including Plaintiffs, under international law; intentional killing, torture, and other inhumane treatment are crimes against humanity and war crimes.[37] Compl. ¶ 432.  Moreover, the destruction of property without military necessity is a war crime. Compl. ¶ 436-437.  It is especially clear that the Israeli Defendants did not have the authority of their government to do the precise torturous acts alleged by Plaintiffs.  The Supreme Court of Israel has confirmed that the "GSS [Shin Bet] does not have the authority to 'shake' a man, hold him in the 'Shabach' position…, force him into a 'frog crouch' position and deprive him of sleep in a manner other than that which is inherently required by the interrogation."[38]

The above-mentioned Israeli Defendants, in addition to Defendant Sharanski, individually and as Israeli Minister of Construction and Housing, have individual culpability and command responsibility for the creation and expansion of Jewish settlements in the Occupied Territories in violation of international law, including the Fourth Geneva Convention which prohibits an occupying force from displacing the occupied population from its land, or acting to permanently change the occupied land by force of occupation, Compl. ¶ 100, as well as deporting or transferring parts of its own civilian population into the territory it occupies. *Convention (IV) relative to the Protection of Civilian Persons in Time of War*, Art. 49, ¶ 6, Geneva, 12 August 1949; *See also* U.N Security Resolution 446 (determining that the "policies and practices of Israel in establishing settlements in the Palestinian and other Arab territories occupied since 1967 have no legal validity"), March 22, 1979.  Defendants have acted outside

---

[37] See Compl. ¶ 426 for a full list of the laws Defendants' actions have violated.

[38] "[N]either the government nor the heads of security services possess the authority to establish directives and bestow authorization regarding the use of liberty infringing physical means during the interrogation of suspects suspected of hostile terrorist activities…" *Judgment on the Interrogation Methods Applied by the GSS*, Supreme Court of Israel, sitting as the High Court of Justice (September 6, 1999), available at <http://www.derechos.org/human-rights/mena/doc/torture.html>; see also the Supreme Court of Israel's official website, <http://www.court.gov.il.>.  "An investigator who insists on employing these methods, or does so routinely, is exceeding his authority." *Id.*

the scope of their authority by adopting, implementing, and permitting Israel's settlement policy in the Occupied Territories, which is illegal by several established standards of international law.

Plaintiffs assert that this Court has the authority to rule on the legality of Defendants' settlement policy, but it need not do so in order to decide whether the Israeli Defendants are legally responsible for the settlers' attacks on John Doe II and his property.

### c.   Head-of-State Immunity Should Not Bar This Suit Against Defendant Sharon

Given that the FSIA applies to individuals in this Circuit, this Court is not bound by the Department of Justice's Suggestion of Immunity, because the purpose of the FSIA was to transfer the "determination of sovereign immunity from the executive branch to the judicial branch." H.R. Rep. No. 94-1487, 94th Cong., 2d Sess. 7 (1976), *reprinted in* 1976 U.S. Code Cong. & Ad. News 6604, 6606 ("H.R. Rep.").  Congress passed the FSIA to "free the Government from case-by-case diplomatic pressures, to clarify the governing standards, and to 'assure litigants that . . . decisions are made on purely legal grounds and under procedures that insure due process.'" *Verlinden B.V. v. Central Bank of Nigeria*, 461 U.S. 480, 488, 76 L. Ed. 2d 81, 103 S. Ct. 1962 (1983), quoting H.R. Rep. (alterations in original).

Defendants assert without analysis that the recognition of Defendant Sharon as sitting head of state by the Suggestion of Immunity entitles him to absolute immunity. Mot. p.23.  The decision, however, is a legal one for this Court to make, not a political one to be made by the Executive Branch.  The court in *Tachiona, supra*, acknowledged a "breach in the theoretical walls that once absolutely impeded the exercise of national jurisdiction against heads-of-state and other foreign officials for private conduct that violates clear and unambiguous norms of established international law." *Tachiona* at 280.  "The power of the executive to determine when courts may exercise jurisdiction over foreign sovereigns has been abolished, and those cases inconsistent with the FSIA are obviously no longer persuasive." *Republic of the Philippines v.*

*Marcos*, 665 F. Supp. 793, 797 (N.D. Cal. 1987) (rejecting State Department's Suggestion of Immunity and argument of entitlement to head of state immunity).

This Court must consider piercing Defendant Sharon's immunity in his individual capacity for conduct outside the scope of his authority that has violated *jus cogens* norms of international law.[39]  *See Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1361 (9th Cir. 1988) (en banc), *cert. denied*, 490 U.S. 1035, 104 L. Ed. 2d 404, 109 S. Ct. 1933 (1989) (Marcos "was not the state, but the head of state, bound by the laws that applied to him," and his illegal acts were not official acts pursuant to his authority as President).  "There is now growing recognition that the sovereign is solely the state and that the nation's ruler is a distinct entity." *Tachiona* at 277.

Head of state immunity does not apply to Plaintiff John Doe XVII 's claims against Defendant Sharon, who is sued not in his official capacity as Prime Minister, but in his individual capacity for his actions as Minister of Defense, for acts committed in 1982 while he held the position of Minister of Defense, long before he was Prime Minister.  Defendants do not cite any cases for which head of state immunity has been granted for actions committed prior to taking such office.[40]  Foreign head of state immunity is derived from foreign sovereign immunity and founded on "mutual respect and comity among foreign states." *In re Doe*, 860 F.2d 40, 45 (2nd Cir. 1988).  As shown herein, foreign sovereign immunity is not absolute.  As to mutual respect and comity, Defendant Sharon's acts with regard to Sabra and Shatila (and the basis of

---

[39] Plaintiff John Doe XVII is a resident alien, not a U.S. citizen, therefore ATCA applies, and the legislative history of the TVPA regarding head of state immunity (Mot. p.23 n.10) is inapposite in this instance.

[40] The court in *Tachiona* also noted that "inroads have been recorded against the absolute immunity from suit that heads-of-state once enjoyed at home." *Id.* at 281.  In *Jones v. Clinton*, 869 F.Supp. 690, 698 (E.D. Ark. 1994), *aff'd and rev'd in part*, 72 F.3d 1354 (8th Cir. 1996) *en banc reh'g denied*, 81 F.3d 78 (8th Cir. 1996), *judgment aff'd*, 520 U.S. 681 (1997), the District Court decided that a President does not have "absolute immunity from civil causes of action arising prior to assuming the office."  The Court of Appeals enlarged the scope of the decision, holding that the President is not "entitled to immunity, for as long as he is President, from civil suits alleging actionable behavior by him in his private capacity rather than in his official capacity as President." *Jones*, 72 F.3d at 1357-58.  The Court of Appeals affirmed the District Court's decision to permit discovery to proceed and reversed its decision to stay the trial during his presidency. *Id.* at 1363.

Plaintiff John Doe XVII's claims) were not taken as Prime Minister, were outside the scope of his authority as Defense Minister, and have already been condemned by the Israeli Kahan Commission and the international community. *See* sec. II.b., *supra*.

Moreover, Defendant Sharon has waived his immunity by suing on claims arising from the incidents of Sabra and Shatilla in a United States District Court.[41] *See Sharon v. Time, Inc.*, 575 F. Supp. 1162 (S.D.N.Y. 1983).  Head of State immunity can be waived. *See Paul v. Avril*, 812 F. Supp. 207, 211 (S.D. Florida 1992)(head of state immunity waived); *In re Doe*, 860 F.2d 40, 45 (2nd Cir. 1988)(same).  Specifically, immunity can be waived by suing on claims arising from the same underlying subject matter. *See McDonnell v. American Leduc Petroleums, Ltd.*, 456 F.2d 1170, 1180 (2d. Cir. 1972)(defendant waived immunity by suing on claims arising from the same underlying subject matter); *see also Siderman de Blake v. Republic of Argentina,* 965 F.2d 699 (9th Cir. 1992) (Argentina may have waived sovereign immunity by seeking United States court's assistance in furthering persecution scheme from which plaintiff's claim arose); *see also Cabiri v. Assasie-Gyimah*, 921 F.Supp. 1189, 1194 (S.D.N.Y. 1996)(immunity from service waived because defendant was served while witness in closely related action involving vindication of same cluster of rights and interests).

Defendant Sharon sued *Time, Inc*. for libel for publishing a statement accusing Sharon "of knowingly permitting or encouraging the murder of Palestinian refugees at the Sabra and Shatilla camps in West Beirut, Lebanon."  Sharon at 1163.  Defendant Sharon denied that he "discussed with the Gemayels the need for the Phalangists to take revenge against the West Beirut Palestinians and that [he] encouraged the Phalangists to perpetrate bloodshed among them." Id. at 1165.  Defendant Sharon has waived his immunity by bringing suit in a U.S. District Court, subjecting himself to this sovereign's jurisdiction, especially because the suit was

---

[41] Besides waiving Defendant Sharon's head of state immunity, any FSIA immunity would also be waived under 28 U.S.C. § 1605(a)(1), although it need not be since the FSIA does not apply. See II.a., *supra*.

based on the same underlying subject matter, and requested the court to make determinations

regarding his acts with regard to Sabra and Shatilla.  Defendant Sharon has therefore waived his

head of state immunity with regard to the claims of John Doe XVII.  If head of state immunity is

applied to Defendant Sharon, Plaintiffs respectfully request that the proceedings against him be

stayed until he is no longer sitting Prime Minister.

### d.  Defendants Israel, IDF, and Shin Bet Should Not Be Immune from Suit Under the Foreign Sovereign Immunities Act (FSIA)[42]

The Israeli Defendants should not be immune under the FSIA exceptions to immunity, 28

U.S.C. § 1605(a)(2), and (5).[43]

### i.  The FSIA Exception for "Commercial Activity" May Apply to the Israeli Defendants' Actions

Under the FSIA, a foreign state is not immune in a case in which the action is based

"upon an act outside the territory of the United States in connection with a commercial activity

of the foreign state elsewhere and that act causes a direct effect in the United States". 28 U.S.C. §

1605(a)(2).

### 1.  Acts Were Performed in Connection with Defendant Israel's Commercial Activity

"A 'commercial activity' means either a regular course of commercial conduct or a

particular commercial transaction or act." 28 U.S.C. § 1603(d).  By participating in the

acquisition of land and the construction of housing (settlements), Defendant Israel is essentially

engaging in a regular course of commercial conduct, private real estate development.  When "a

---

[42] The FSIA immunity exceptions similarly apply to the Individual Israeli Defendants, but need not be reached because their conduct was outside the scope of their authority.  *See* sec. II.a, *supra*.

[43] Given this Circuit's decision in *Princz v. Federal Republic of Germany*, 26 F.3d 1166 (D.C. Cir. 1994), Plaintiffs do not pursue their claim that Defendants Israel, IDF and Shin Bet have waived their immunity under 28 U.S.C. § 1605(a)(1).

foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA." *Argentina v. Weltover, Inc.*, 504 U.S. 607, 614, 119 L. Ed. 2d 394, 112 S. Ct. 2160 (1992). Defendant Israel is not acting as a governmental regulator here, but rather as a private real estate developer, which acquires, builds, transfers, and supports private real estate communities. Settlements have been described as neighborhood developments constructed for profit.[44]

The Israeli Defendants are not expropriating private property within their territory to be used for a public use, as a sovereign might; they obtain land outside their territory, demolish buildings in order to have other private housing constructed and developed, and transfer the property to a private party, as is the role of a real estate developer.

Whether the purpose or motive of the activity is economic profit is not relevant to the inquiry. "The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d). The nature of the act, private real estate development, rather than the purpose, whether political, economic, historical, religious, or discriminatory, is what makes Israel's actions commercial. Nor does the legality of the act affect whether it is considered commercial.

The acts done in connection with Defendants Israel's real estate development include almost all of those alleged in the Complaint[45], including property destruction, torture, extra-judicial killing, etc. These acts need not be commercial under the FSIA, they only need to be

---

[44] "Jerusalem Mayor Ehud Olmert, long committed to Jewish expansion in the eastern sector, said: 'The truth is, if it were up to me this neighborhood would have been built a long time ago. And I am very happy, very happy at this particular time when everyone is going around like they are in mourning and are crying about lost opportunities, there are diligent private entrepreneurs that know how to make economic considerations.'" *Court Orders Militant Freed; Palestinian Leaders Balk*, JOHN KIFNER, The New York Times, June 4, 2002. In fact, some reporters have been banned from or pressured into calling them neighborhoods instead of settlements. *See MEDIA ADVISORY: Euphemisms for Israeli Settlements Confuse Coverage,* FAIR: Fairness and Accuracy in Reporting, June 26, 2002, <http://www.fair.org/press-releases/settlement-euphemisms.html>.

[45] With the possible exception of Plaintiff John Doe XVII's allegations regarding Sabra and Shatila in Lebanon.

performed "in connection with" a commercial activity. 28 U.S.C. § 1605(a)(2); *see also Cicippio v. Islamic Republic of Iran*, 30 F.3d 164, 168 (D.C. Cir. 1994); *see also Adler v. Federal Republic of Nigeria*, 107 F.3d 720, 725-6 (9th Cir. 1997) ("FSIA does not require that every act by the foreign state be commercial for the third clause of the commercial activity exception to apply . . . .  Rather, its activities must merely be made 'in connection with' a commercial activity".)  Israel has gone to "brutal, illegal means to… protect settlements, extend their boundaries, and effectively annex the lands on which settlers live." Compl. ¶ 95.  The assaults and murders of commercial rivals, in this case of Palestinian and Palestinian-American Plaintiffs (and their relatives), as well as the theft and destruction of their property, are acts done in connection with the commercial activity of real estate development.[46]  Even if this Court determines that the Israeli Defendants' acts that are complained of may be considered sovereign, the commercial activity exception still applies because they have been done "in connection with" Israel's settlement developments.

Defendants misinterpret *Bao Ge, supra,* in which the court determined that the "operation of …judicial and penal systems" (rather than the "mistreatment of plaintiffs in prison" (Mot. p.17)) was not a commercial activity. *Bao Ge*, 201 F. Supp. at 24.  Although the court made this determination even "accepting as true that products of forced prison labor are being imported into the United States" (*id.*), it did not address whether there were explicit allegations that the government was actually engaging in a commercial activity, such as selling the soccer balls, other than the allegation that there was a business relationship with Adidas, which plaintiffs

---

[46] These acts may also be considered commercial activities because they take place in a commercial context of real estate development in which the Israeli Defendants are attempting to eliminate their commercial rivals.  "Perhaps a kidnapping of a commercial rival could be thought to be a commercial activity…because the kidnapping took place in a commercial context." *Cicippio,* 30 F.3d at 168. The Israeli Defendants have conspired to dominate its market area through force and violence and has thereby driven off or destroyed any nascent Palestinian economic competitor. Compl. ¶ 113.

showed no evidence of, other than the presence of its logo on the balls, despite having had the opportunity to conduct jurisdictional discovery.[47] *Id.* at 21-22.

### 2.   Direct Effects Were Caused in the United States

Under the third prong of the commercial activity exception, the act must cause a direct effect in the United States. 28 U.S.C. § 1605(a)(2).  In this case, the acts of the Israeli Defendants and their co-conspirators, especially the Settler Defendants, have caused numerous direct effects in the United States (Compl. ¶ 451), including but not limited to pain and suffering of Plaintiffs that have immediately returned to the U.S. (See Affidavit of John Doe V, Ex. B, attached hereto, ¶ 2; Affidavit of John Doe VI, Compl., Ex. Q, ¶¶ 10, 53, 56; Affidavit of Baby Doe II, Ex. C, attached hereto, ¶ 4), relatives receiving the news on television in the U.S. of the deaths of their loved ones (Jane Doe II, Compl. ¶421), the receipt of publicly paid for medical treatment, (Aff. of Baby Doe II, Ex.C, ¶ 6), financial effects on Plaintiffs and the economy generally, including effects on U.S. exports (see Aff. of John Doe XV, Ex. D, attached hereto, ¶¶ 3-4; see also Compl. ¶ 69 (Defendants' conspiracy has effects on foreign and interstate commerce in the United States)); the payments by the U.S. public to the Settler Defendants soliciting money in the U.S., the inability of  Plaintiffs to travel from the U.S. to Israel/Palestine (e.g., John Doe VI, who lives in Florida, cannot go visit his family or the house that was left to him because of the humiliation and torture he suffered,  Compl. ¶¶ 12, 331, Ex. Q, ¶ 59).

The court in *Princz, supra,* determined that plaintiff's subsequent suffering, which "was *clearly* an effect," did not occur in the United States because "*much time* passed before he came to this country." *Princz*, 26 F.3d at 1173 (emphasis added).  The "*immediate* consequences of his enslavement were felt" in the county where he was enslaved and in another country he went to

---

[47] With all due respect, the commercial activity exception is misstated in *Bao Ge* to require that the sovereign's "acts" be commercial (*id.* at 22), and therefore the issue is misframed by declaring that the "'acts' that are the basis of plaintiffs' claims are the acts of Chinese authorities operating or supervising labor camps. *Id.* at 25.  Had it been

*after* that, after he had "spent time recuperating in a military hospital." *Id.* (emphasis added); *see also Martin v. Republic of S.A. Martin v. Republic of South Africa,* 836 F.2d 91, 95 (2d Cir. 1987) (no direct effect because U.S. citizen did not return to the U.S. until more than a year later).  In this case, Plaintiffs John Does V and VI and Baby Doe II experienced subsequent suffering in the United States immediately or soon after the acts complained of occurred.[48]

On May 5, 2002, U.S. citizen John Doe V was assaulted, pushed to the ground, kicked in the back and in the back of his head, hit on the side of his face/head with a rifle butt, unlawfully detained and threatened at gunpoint by Israeli soldiers at a checkpoint. Compl. ¶¶ 11, 270-279. Within a few days after he was assaulted and humiliated by Israeli soldiers, John Doe V returned to Nevada, where he lives, and continues to suffer and receive treatment.  *See* Affidavit of John Doe V, Ex. B, attached hereto, ¶ 2.  He cannot hear at all in the ear where he was struck, and suffers dizziness. *Id.* at ¶ 3.  John Doe V has a business selling clothes, and must travel by car to do his job. *Id.* at ¶ 4.  Due to the dizziness resulting from his injuries, he cannot always drive, and must take off time from work. Id. at ¶¶ 4-5.  His gross receipts have thereby decreased by around 25% to 34%. *Id.* at ¶ 5.

Baby Doe II returned to New York, where he lives part-time, within two months of having been shot in the back by Israeli soldiers, as soon as he could after he got out of the hospital.  *See* Affidavit of Baby Doe II, Ex. C, attached hereto, ¶ 4. Upon returning to the United States he received substantial medical treatment for his injuries, and had to apply for and receive

---

shown that the government was engaged in a commercial activity of selling soccer balls, the tortious act would have been the inhumane treatment of plaintiffs "in connection with" that commercial activity.

[48] Again Defendants misplace reliance on *Bao Ge, supra,* in which the court noted that soccer balls being sold in the United States was not a direct effect because there were "a number of events and actors that intervened between" that time and when the balls were made. *Bao Ge,* 201 F. Supp. at 25.  To rule out direct effects in the U.S., as Defendants allege (Mot. p.18), because "all of the legally acts giving rise to plaintiffs' claim occurred in China, not in the United States", would render the third prong of 28 U.S.C. § 1605(a)(2) impossible to satisfy, because the act *must* be "outside" the United States. 28 U.S.C. § 1605(a)(2); s*ee also Adler,* 107 F.3d 720 (deals with "mere financial loss").  Regardless, in this case legally significant acts of Defendants' conspiracy took place in the U.S. *See* sec. III.c., *infra.*

Medicaid (paid for by the American public). *Id.* at ¶ 6. He is still injured and unable to perform manual labor. *Id.* at ¶ 6.

John Doe VI returned to his home in the United States as soon as he could after the nightmare he experienced. His unlawful detention and torture began on October 28, 1998, and he wasn't released until 40 days later. Compl., Ex. Q, ¶¶ 10, 53. He had a travel restriction placed on him, prohibiting him from leaving for another month or month and a half, and was not able to return home until late January, 1999. Compl., Ex. Q, ¶¶ 10, 53, 56. He continues to suffer physically and psychologically due to the torture. Compl., Ex. Q, ¶ 57. Because of the humiliation and torture suffered by John Doe VI, who currently resides in Florida, cannot go to the Palestinian Territories to visit his family or the house that was left to him. Compl. ¶¶ 12, 331, Ex. Q, ¶ 59. The financial effects of the acts alleged by Plaintiffs are not merely personal financial losses, but effects on commerce and the American public. *See Keeton,* 465 U.S. at 776 (considering harm on public). One such harm is the effect on exports in the United States. Plaintiff John Doe XV estimates that the business from his stores is down 90% since November or December 2000, when they were destroyed by the IDF, and that 70% - 80% of his business involves products imported from the United States through Israel. See Aff. of John Doe XV, Ex. D, attached hereto, ¶¶ 3-4. Moreover, these effects in the United States have been substantial and foreseeable by Defendants; destroying businesses that import goods from the United States clearly affects United States' exports.[49] Other effects on the public in the United States are

---

[49] The standard for a foreseeable and substantial "direct effect" is not stringent. In *Harris Corp. v. National Iranian Radio and Television,* 691 F.2d 1344 (11th Cir. 1982), the court determined that the effect of demands for payment on letters of credit by an agency of the State of Iran was sufficiently direct and sufficiently in the United States under § 1605(a)(2) because the demands triggered the entry of a blocked account on plaintiff's books in Florida and discharged the letter of credit. *Id.* at 1351. The court determined that the letter of credit arrangement extended into the United States, and that the demands therefore had significant, foreseeable financial consequences here, which sufficiently established a "direct effect", rejecting the argument that the effect had an intervening element. *Id.* Some circuits have rejected the "substantial and foreseeable" standard of direct effects under section 1605(a)(2). *See Texas Trading & Milling Corp. v. Federal Republic of Nigeria,* 647 F. 2d 300, 311 & n.32 (2d Cir. 1981), *cert. denied,* 454 U.S. 1148, 71 L. Ed. 2d 301, 102 S. Ct. 1012 (1982). Moreover, in a due process analysis, the foreseeability that is

discussed in sec. III.b., *infra*.  Therefore the Israeli Defendants' conduct in connection with a commercial activity has caused direct effects in the United States.

### ii.  The FSIA Exception for "Tortious Acts" May Apply

A foreign state is not immune in a case "in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment".  28 U.S.C. § 1605(a)(5).  If plaintiffs allege at least one tort occurring in the United States, the case is brought within 28 U.S.C. § 1605(a)(5), even if other tortious acts took place outside the United States.[50]  *Olsen v. Government of Mexico*, 729 F.2d 641 (9th Cir. 1984), *cert. denied*, 469 U.S. 917 (1984).  Defendants may have intentionally or negligently inflicted emotional distress on Plaintiff Jane Doe I when they killed her aunt and her cousin in their home, which she received news of in the United States; and Jane Doe II when they killed her sisters, destroyed her house, and severely injured her niece and nephew.  Jane Doe witnessed this on television from the United States. Compl. ¶ 421.  Defendants may have also intentionally or negligently inflicted emotional distress on Plaintiffs in the United States through the acts discussed below, in Sec. III.

### III.   THIS COURT HAS PERSONAL JURISDICTION OVER THE INDIVIDUAL ISRAELI DEFENDANTS[51]

---

critical is "that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

[50] This Circuit has held that the tortious act needs to occur in the United States. *Cicippio* at 169.  The tortious *actor* does not necessarily need to be here.

[51] This Court has personal jurisdiction over Defendants Israel, IDF, and Shin Bet if it finds that they are not immune under the FSIA and they have been properly served.  "Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title."  28 U.S.C. § 1330(b).  Moreover, the "Constitution imposes no limitation on the exercise of personal jurisdiction by the federal courts over" a foreign state because it "is not a 'person' within the meaning of the Due Process Clause." *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82,85-6 (D.C. Cir. 2002).  Due Process concerns should similarly not apply to Defendants IDF and Shin Bet because they are also not 'persons'.  Therefore, if this Court determines that Defendants Israel, IDF, and Shin Bet are not immune under the FSIA and they have been served, this Court has personal jurisdiction over them.  If the Individual Israeli Defendants fall under an FSIA exception, this Court has personal jurisdiction over them as long as due process is accorded.

It is plaintiffs' burden to make a *prima facie* showing of personal jurisdiction, but the burden is 'only a minimal one.' *Jacobsen v. Oliver*, 201 F. Supp. 2d 93, 104 (D.D.C. 2002) (internal quotation omitted). Close factual disputes concerning jurisdiction are to be resolved in favor of the plaintiffs. *See Crane v. N.Y. Zoological Soc'y*, 282 U.S. App. D.C. 295, 894 F.2d 454, 456 (D.C. Cir. 1990); *Jacobsen*, 201 F. Supp. 2d at 104.

*Burnett, Sr., v. Al Baraka Investment and Development Corp.,* 274 F. Supp. 2d 86, *18-19 (D.D.C. 2003).

This Court "may exercise personal jurisdiction if there is any basis consistent with the United States Constitution for the exercise of personal jurisdiction." D.C. Code §13-423(e). Plaintiffs can establish personal jurisdiction over the Individual Israeli Defendants under the District of Columbia long-arm statute, the effects doctrine, and a conspiracy theory; Plaintiffs may also be able to establish general jurisdiction over some of the Defendants.

The Individual Israeli Defendants' minimum contacts with the United States[52] are sufficient to satisfy due process.  Due process permits the exercise of personal jurisdiction over an absent defendant if he has "certain minimum contacts with the [territory of the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. State of Washington*, 326 U.S. 310 (1945) (citations omitted).

---

[52] The relevant geographic area for determining whether this Court has personal jurisdiction over the Israeli Defendants is the United States, not the District of Columbia.  "[D]ue process requires only certain minimum contacts between the defendant and the sovereign that has created the court." *Stafford v. Briggs*, 444 U.S. 527, 554 (1980), citing *Shaffer v. Heitner*, 433 U.S. 186, *International Shoe Co. v. Washington,* 326 U.S. 310.  "The issue is not whether it is unfair to require a defendant to assume the burden of litigating in an inconvenient forum, but rather whether the court of a particular sovereign has power to exercise personal jurisdiction over a named defendant." *Id.*; *see also Texas Trading and Milling Corp. v. Federal Republic of Nigeria*, 647 F.2d 300, 314 (2d. Cir 1981) (the relevant forum for due process analysis in claims brought under FSIA is the United States, not particular forum state); *Ruiz v. Transportes Aereos Militares Ecuadorianos,* 103 F.R.D. 458, 459 (D.D.C.1984) ("the relevant contacts [under the FSIA] are those in the United States, not just the District of Columbia"); *Vermeulen v. Renault*, 985 F.2d 1534, 1552 (11th Cir. 1993) (holding that defendant had "sufficient contacts with the *United States* to satisfy due process requirements, and that jurisdiction in an *American court* over [defendant] comport[ed] with traditional notions of fair play and substantial justice") (emphasis added).  Moreover, Plaintiffs have alternatively alleged personal jurisdiction under the Federal long-arm statute, Fed. R. Civ. P. 4(k)(2).  Israeli Defendants claim that the Court need not resolve "whether pleading RICO claims transforms the personal jurisdiction inquiry into one of nationwide rather than D.C. contacts" because Plaintiffs have not pled any personal contacts by the Israeli Defendants with the United States. Mot. p.24, n.11.  "A Complaint does not need to include allegations of personal jurisdiction or venue." *See* 1-1 Federal Litigation Guide, P 1.32[5], Matthew Bender & Co., 2003.

Based upon the Israeli Defendants' contacts with the United States and the District of Columbia, personal jurisdiction over them satisfies due process concerns.

### a.   The Individual Israeli Defendants' Jurisdictional Contacts Should Be Considered by This Court, Whether They Are "Official" or "Personal"

Defendants misplace reliance on cases that distinguish between contacts in a corporate and individual capacity to suggest that only Defendants' "personal" contacts can establish jurisdiction. Mot. p.25.  The cases cited by Defendants essentially stand for the proposition that a corporation's contacts cannot be attributed to employees, not that someone sued in their individual capacity must have personal rather than business contacts to a forum.  In *Richard v. Bell Atl. Corp.,* 946 F. Supp. 54 (D.D.C. 1996), the court dismissed the individual defendants, *without* prejudice, because the plaintiffs did not allege *any* contacts they had with the district, or that they did anything illegal outside of their official capacities; the plaintiffs did not even allege that the individual defendants were subject to D.C.'s long-arm statute.  The court did "not have jurisdiction over individual officers and employees of [a corporation] and its subsidiaries just because it may have jurisdiction over" the corporation. *Id.* at 73. *See also Wiggins v. Equifax, Inc.* 853 F. Supp. 500, 503 (D.D.C. 1994) (court did not have personal jurisdiction over individual defendants who were not alleged to have their own contacts, business or personal, with the District, but had directed employees into the District and supervised the transmission of data into the District because they were "merely employees of a company that ha[d] contacts with the District").  The "official" and "personal" contacts of the Individual Israeli Defendants must be considered in establishing personal jurisdiction.

Plaintiffs do not attempt to attribute all of Defendant Israel's contacts with the United States to each Individual Israeli Defendant, but instead show that each Individual Israeli Defendant has sufficient contacts with the United States, whether in their "personal" or "official" capacities.  Therefore *Ali v. District of Columbia*, 278 F.3d 1 (D.C. Cir. 2002), in which State of

Virginia officials were sued under 42 U.S.C. § 1983, is inapposite.[53]  The court rejected the

argument that it could exercise personal jurisdiction over the officials in their personal capacities

merely because "Virginia has contracts with the District, makes reports to the District concerning

District inmates it houses, and receives money from the District."  *Id.* at 7.

Defendants cannot rely on *El-Hadad*, in which the plaintiff provided "no specific factual

support" for his conclusory allegations that the defendants, who he did not even refer to in his

complaint other than to describe as a party (with the exception of one brief reference to one

defendant) had contacts with the United States or the District.[54] El-Hadad, 69 F. Supp. 2d at 80.

Here, Plaintiffs provide specific allegations regarding each Individual Israeli Defendants'

contacts.  Defendants also misplace reliance on *El-Fadl,* 75 F.3d at 671, where the court

determined the defendant's acts "were neither personal nor private" in assessing sovereign

immunity, as discussed, *supra*, not personal jurisdiction.

In *Jungquist*, the court found that it did not have personal jurisdiction over two of the

defendants who did act in the District because they were "merely performing their official

duties." *Jungquist*, 115 F.3d 1020, 1029. One defendant was "assisting patients, supervising their

medical care, and serving as the liaison," while another "took care of logistical matters." *Id.*

There was no evidence that they had any knowledge of the "corrupt bargain" entered into by the

other defendant, mentioned above. *Id.*  The court therefore did not have personal jurisdiction

over the main defendant and another defendant who were never physically in the District in the

relevant time period and did not personally perform any acts there under a conspiracy theory

because there was no overt act in the district, nor under the long-arm statute because they did not

---

[53] Under 42 U.S.C. § 1983, government officials are sued in their personal capacity to impose personal liability on them for actions done under color of state law, whereas suits brought against them in their official capacity are generally treated as suits against the government. *Kentucky v. Graham*, 473 U.S. 159, 165 (1985).

[54] The plaintiff merely alleged that each defendant held office in the Embassy and "from time to time functions as an instrumentality, arm, agency or representative of the UAE in the United States and the District of Columbia and who has substantial contact with the United States and with the District of Columbia and who engages in and transacts

have the requisite minimum contacts. *Id.* at 1031-32.  Finally, the court also didn't have personal jurisdiction over the main defendant for tort claims because they did not arise from an act in the District as required under § 13-423(a)(3). *Id.* at 1032.

Therefore this Court should consider the Individual Israeli Defendants' jurisdictional contacts, in whatever capacity they are made.  Nonetheless, the Israeli Defendants' contacts, even if just "personal," are sufficient to satisfy due process concerns, or at least warrant jurisdictional discovery, as requested below.[55]  Moreover, visits or other contacts by the Israeli Defendants may have dual purposes, which Plaintiffs should be allowed to discern through jurisdictional discovery.

### b.  This Court Has Personal Jurisdiction over the Individual Israeli Defendants Under The Effects Doctrine

This Court has personal jurisdiction over the Israeli Defendants under the effects doctrine.  The "effects test…began with the Supreme Court's finding that a minimum contacts analysis may be satisfied 'even when the defendant's only contact with the forum was calculated to cause and did cause injurious effects to plaintiffs in the forum state.'" *Midland v. F. Hoffman-Laroche, Ltd. (In Re Vitamins Antitrust Litig.)*, 270 F. Supp. 2d 15, 32 (D.D.C. 2003) (citation omitted) (citing *Calder v. Jones*, 465 U.S. 783, 79 L. Ed. 2d 804, 104 S. Ct. 1482 (1984) ("Jurisdiction over [defendants] is therefore proper in California based on the 'effects' of their Florida conduct in California", *Id.* at 789, citing *World-Wide Volkswagen Corp. v. Woodson*, 444

---

commercial activity, and engages in a regular course of commercial conduct in the United States and the District of Columbia". *Id.*

[55] Moreover, the "governmental contacts" exception to minimum contacts is not applicable here because the "First Amendment provides the only principled basis for exempting a foreign defendant from suit in the District of Columbia, when its contacts are covered by the long-arm statute and are sufficient to withstand a traditional due process attack." *Rose v. Silver*, 394 A.2d 1368, 1374 (D.C. 1978) *reh'g denied*, 398 A.2d 787 (D.C. 1979).  The rationale behind the exception is to permit public participation in government for the national citizenry and to avoid the threat of converting D.C. into a national judicial forum. *Environmental Research Int'l, Inc. v. Lockwood Greene Eng'rs, Inc.,* 355 A.2d 808, 813 (D.C. 1976) (en banc).  These policy concerns, as well as the First Amendment, the only basis for applying the exception, are not applicable in this case, since Defendants are not U.S. citizens attempting to participate in government, and because there is no other forum for Plaintiffs.  *See Lex Tex Ltd. v. Skillman*, 579 A.2d 244, 250 n.13 (D.C. 1990) ("Personal jurisdiction over a defendant able to invoke the 'government contacts' principle would presumably exist in some jurisdiction somewhere.").

U.S. 286, 297-298 (1980); Restatement (second) of Conflict of Laws § 37 (1971)).  "Where a forum seeks to assert specific jurisdiction over an out-of-state defendant who has not consented to suit there, this 'fair warning' requirement is satisfied if the defendant has 'purposefully directed' his activities at residents of the forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities."  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985) (citations omitted).

In *Rein v. Socialist People's Libyan Arab Jamahiriya*, 995 F. Supp. 325 (E.D.N.Y. 1998), the court found personal jurisdiction over Libya for destroying Pan Am Flight 103 en route to the United States "with 189 United States nationals on board" because it was charged with "intentional, tortious actions that were 'expressly aimed at' the United States." *Rein* at 330, quoting *Calder v. Jones*, 465 U.S. 783, 789, 79 L. Ed. 2d 804, 104 S. Ct. 1482 (1984).  The court also took into consideration the effects on the American public, including security concerns and harm to the domestic economy. *Id.*  Similarly here, enacting and condoning policies and practices to torture and kill United States citizens and destroy their businesses should have alerted Defendants that they could be subject to jurisdiction in a United States court.  A tortious act in violation of international law against U.S. citizens outside of the United States gives rise to personal jurisdiction over defendants because the aim of their action was to create effects here in the United States.  "Any foreign state would know that the United States has substantial interests in protecting its flag carriers and its nationals from terrorist activities and should reasonably expect that if these interests were harmed, it would be subject to a variety of potential responses, including civil actions in United States courts."[56] *Rein* at 330.

The Israeli Defendants are responsible for "intentional, tortious actions that were 'expressly aimed at' the United States."  They have been responsible for targeting Palestinian-

Americans and resident aliens of the United States to harm, intimidate, and terrorize them and other United States residents of Palestinian descent.  By torturing and maiming them, killing their families, and taking their land, their homes, their businesses and livelihood, they are trying to send Plaintiffs and all Palestinian-Americans back to the United States, or prevent them from leaving the United States to return to their homeland.[57]  For example, Plaintiff John Doe X, a U.S. citizen who lived in the U.S. for more than twenty years, decided to move back to Palestine with two friends after his hopes were raised by the Oslo peace accords in order to start businesses to help establish a meaningful infrastructure in Palestine. *See* Compl., Ex. L, John Doe X Aff., ¶ 12.  In destroying John Doe X's store and looting its contents (Compl. ¶ 16), the message from the IDF soldiers was plainly to leave the occupied territories and go back to the United States.  In fact, the Israeli guard who pushed and kicked John Doe V told him he could do anything he wanted, and that if John Doe V didn't like it, he could go back to the United States. Compl., Ex. J, ¶ 8.

This targeting of and scorn toward U.S. citizens returning to or visiting their homeland was also exemplified in John Doe VI's harrowing experience.  In the midst of 40 days of torture at the hands of those under the control of Israeli Defendants, an Israeli official told him that he should know that his being an American citizen meant nothing. "We can do anything we want with you….This [U.S.] passport doesn't mean anything to us. *We are America.* You are going to die in here."  Compl. ¶ 293 (emphasis added).  "We are America."  The message to John Doe VI was clear – do not even try to assert your rights as a U.S. citizen here.  Unfortunately, it has

---

[56] Although *Rein* was brought under sec. (a)(7) of the FSIA, the analysis remains the same here; the United States also has a substantial interest in protecting its nationals from torture, extrajudicial killing, and other *jus cogens* violations, and any foreign state would know that.

[57] It is certainly true that Palestinians other than Palestinian-Americans or resident aliens are also targeted by the Israeli Defendants, but that does not take away from the fact that their actions toward Plaintiffs are "expressly aimed at" the United States.  Moreover, Palestinians who are forced out of their homeland (alive), must go somewhere, and many come to the United States.

worked; John Doe VI, who lives in Florida, cannot go visit his family or the house that was left to him because of the humiliation and torture he suffered. Compl. ¶¶ 12, 331, Ex. Q, ¶ 59).

That official who told John Doe VI, in the midst of 40 days of torture, that his U.S. passport didn't mean anything, and "We are America," (Compl. ¶ 293), behaved with impunity as though he knew that he and the policies and practices he was implementing were immune from challenge.  These arbitrary detentions, torture and degrading acts also send a message to Plaintiffs' friends and relatives and other Palestinian-Americans living in the United States – stay in the United States, for this is what awaits you in what used to be your homeland.[58]

The Israeli Defendants' conduct also impedes on the rights of Palestinian-Americans in the United States to complain or to lobby to affect foreign policy by essentially branding them as terrorists by humiliating them, detaining them, torturing them, demolishing their homes and businesses, and wounding or killing them. Compl., Ex. R, Bird Aff. ¶ 14 (most Palestinian-Americans who have been detained and/or tortured by Israel refuse to complain because of fear of being perceived as a terrorist by the U.S. government or public).  They also accomplish this silencing by posing a real and continued threat to Palestinians in the Occupied Territories whose safety must be considered by relatives in the United States. *See, e.g.* Compl., Ex. B, ¶ 17, Ex. Q, ¶ 60.

Defendants' acts have been aimed at the United States, to keep Palestinian-Americans here, to send Palestinian here, to keep Palestinians in the United States from complaining for fear of the threat to their relatives.  In targeting Americans, other direct effects also occur in the United States, as discussed in Section II.d.i.2, *supra*.

---

[58] In the past, Palestinian-Americans have reportedly been told by the Israeli government that they must give up their American citizenship or lose their residency rights in East Jerusalem. *Israelis Tell Palestinian-Americans in Jerusalem to Surrender Passports,* By Lucille Barnes, People Watch, Washington Report on Middle East Affairs, January/February 1997, pg. 45, <http://www.washington-report.org/backissues/0197/9701045.htm>.  This tactic appears to be just a less violent way of trying to keep Palestinian-Americans in the United States and out of the Palestinian Territories.

"[W]hen minimum contacts have been established, often the interests of the plaintiff and the forum will justify even the serious burdens placed on the alien defendant." *Asahi Metal Industry Co. v. Superior Court of California,* 480 U.S. 102, 114, 107 S. Ct. 1026, 1033, 94 L. Ed. 2d 92 (1987).  The interests of the U.S. citizen Plaintiffs in having their case heard, as well as the interest of the United States in protecting their rights to be free from torture, extrajudicial killing, genocide, etc., far outweigh any burden the Israeli Defendants could have alleged, but that they did not put forth.

      **c.   This Court has Personal Jurisdiction over the Individual Israeli Defendants Under a Civil Conspiracy Theory and Under The Civil Racketeer Influenced And Corrupt Organization Act (RICO)**

This Court has personal jurisdiction over the individual Israeli Defendants under a civil conspiracy theory and under the civil Racketeer Influenced and Corrupt Organization Act (RICO).[59]  "The elements of civil conspiracy are '(1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme.'" *Burnett, Sr., v. Al Baraka Investment and Development Corp.*, 274 F. Supp. 2d 86, *18-19 (D.D.C. 2003), quoting *Halberstam v. Welch*, 705 F.2d 472, 477 227 U.S. App. D.C. 167 (D.C. Cir. 1983) (citation omitted).

---

[59] This section speaks generally in terms of a civil conspiracy, but applies to Plaintiffs' RICO claims as well. RICO provides federal jurisdiction for acts of a racketeering enterprise and conspiracy that have injured Plaintiffs' business and/or property. Compl. ¶ 4.  Plaintiffs John Doe I, VIII, X, XI, XII, XIII, XIV, XV have RICO claims against the Israeli Defendants for conspiring with each other and others to have terrorized and intimidated Plaintiffs into leaving their property to allow the expansion of Defendant Israel's borders and commercial influence in the region, through a pattern of racketeering activity that included specific acts of murder, attempted murder, threats of murder, kidnapping, and arson, the object of which was to force Plaintiffs to surrender their property. Compl. ¶¶ 445, 449, 450.  Plaintiff John Doe II alleges that the Israeli Defendants are liable under RICO for conspiring with each other and the Settler Defendants to have acquired and maintained an interest in his land through a pattern of racketeering including the specific acts of attempted murder, threat of murder, arson, and extortion.  *See* RICO discussion in Plaintiffs' Opposition to the Rinat Defendants' Motion to Dismiss, filed with this Court on March 14, 2003, and incorporated herein, for additional arguments regarding the satisfaction of RICO elements and its extraterritorial effect.

### i.  Israeli Defendants Have Conspired with Each Other
### and with Others to Act in Violation of the Law

Plaintiffs have alleged that the Israeli Defendants have entered into a civil conspiracy to commit violations of international law and the laws of the United States. Compl. ¶ 2.  The Israeli Defendants' conspiracy seeks to drive the Palestinian population from the Palestinian territories and prevent their return, through a plan of torture, killing, terror, theft, and cruel, inhuman, and degrading treatment.  The Israeli Defendants have also conspired and continue to conspire among themselves, with the Settler Defendants and the settlers to expand the territory of Israel by killing or removing Palestinians through these means.[60]  As an essential element of their conspiracy, "Defendants have acted to conceal and cover up the conduct alleged herein so that the Defendants and their subordinates and agents could commit such acts with impunity." Compl. ¶ 479.

In order to get rid of Plaintiffs and other Palestinians, the Israeli Defendants have conspired and continue to conspire among themselves and others to degrade, detain, torture, injure and kill them, as well as to destroy their property and otherwise deny them their legal rights.  Each Defendant, individually and through their positions as government ministers responsible for IDF and Shin Bet personnel and other functions, has conspired to enact and implement policies, condone practices, and fail to enforce rules that have resulted in the injuries to Plaintiffs.  Such policies and practices include but are not limited to unlawful detentions, the use of torture as an interrogation method, the widespread, continuing use of indiscriminate military force against civilians, the deliberate delaying of emergency medical treatment to the injured, the use of comprehensive and systematic collective punishment against an occupied

---

[60] The Israeli Defendants claim that any dealings that any Israeli government employee had "with the U.S. Government or U.S. defense contractors were necessarily in their official, not their personal capacities." Mot. p.29. Defendants offer absolutely no legal nor factual support for this contention, nor do they disclose its legal relevance. Defendants may be referring to their argument that jurisdiction can only be established by their personal contacts

civilian population, the use of the military for targeted extra-judicial assassinations that also kill bystanders, and the deliberate rampant destruction of property and economic, social and political viability.  See Compl. ¶¶145, 188, 199.

As a part of this conspiracy to eliminate the Palestinians and take their land, the Israeli Defendants conspire with the settlers and the Settler Defendants[61] which actively solicit and accept funds in the United States to support the settlements and settler violence. Compl. ¶ 69. Such funds are specifically earmarked for materials that are used to illegal terrorize the neighboring Palestinian property owners and confiscate their land, such as armored jeeps, night-vision goggles, and gun cabinets. Compl. ¶ 111.  Defendant Halamish Neve Tzuf Settlement, supported by the other Settler Defendants and the Israeli Defendants, was illegally established in Palestine by the Israeli government in 1978, and has continuously expanded its borders and has confiscated land owned by John Doe II and his family through violence, threats, coercion, extortion and outright theft. Compl. ¶ 69.

The Israeli Defendants have long fostered and encouraged the development of Israeli settlements, including Defendant Halamish Neve Tzuf Settlement, and implemented a policy to provide material support to settlements engaged in violence against surrounding Palestinian landowners.[62]  See Compl. ¶¶ 83-84.  The Israeli Defendants have conspired with the settlers and the Settler Defendants to fail to protect Palestinians in territories under Israel's control.  The

---

(Mot. pp. 24-26), which Plaintiffs have rebutted. See Sec. III.a., *supra*.  Moreover, their assertion does not apply to Israeli Defendants' "dealings" with each other, the Settler Defendants, or the settlers.

[61] The "Settler Defendants" include the Halamish/Neve Tzuf Settlement, the Neve Tzuf Foudation (Keren Neve Tzuf), the Foundation's Chairman Defendant Joav Merrick, and the other Defendants who have also knowingly provided funds specifically earmarked for materials that the Settlement uses to illegally terrorize neighboring property owners and confiscate their land, including Christ Lutheran Church, located in Jacksonville, Florida, Central Fund for Israel, located in New York, New York (and its Director Jay Marcus), One Israel Fund, located in New York, New York (and its Director Ruth Kohn), and Congregation Rinat Yisrael, located in Teaneck, New Jersey (and its leaders, defendants Rabbi Yosef Adler and President Arnon Hiller). Compl. ¶¶ 71-74.

[62] "The wrongful enterprise may seek political or economic ends and, not uncommonly, as alleged here, may derive critical nurture and command from the not so invisible hand of the state or from rogue government officials who share the lawless and injurious goals of the particular group or venture and who use the cover of law to promote its private ends. At times, the masterminds and managers who hatch these plans are high-ranking leaders of the state

Israeli Defendants have conspired with the settlers and Settler Defendants to provide economic incentives to the settlers and Defendant Neve Tzuf Settlement.[63]

A large part of the settler population carries weapons given them by the Israeli Defense Force. Compl. ¶ 104.  Some of the armed civilians include IDF reservists not on active duty. Compl. ¶ 106.  IDF personnel fail to prevent settler violence or crime, or enforce criminal laws against settlers.  "The Israeli Government [does] not prosecute the settlers for their acts of violence."  *See* State Dept. Occupied Territories 2000 Rep., *infra*.  "In general settlers rarely serve prison sentences if convicted of a crime against Palestinians." *Id.*

U.S. citizen John Doe II had his life threatened and his property in the Occupied Territories set fire to, his land was bulldozed, his home was riddled with gunfire, and over 100 of his olive trees were destroyed by settlers supported by the Israeli Defendants and the Settler Defendants. Compl. ¶¶ 8, 243-256.  Individual Israeli Defendants, as government ministers and individuals, have enacted and implemented policies and encouraged and promoted practices in a conspiracy with the settlers, and Settler Defendants that funded them, to appropriate the land and business of John Doe II, a U.S. citizen living in Palestine. Compl. ¶¶ 93-113.

### ii.   An Overt Act that Resulted in Injury to Plaintiffs Occurred in the United States

As discussed above, personal jurisdiction is determined by Defendants' contacts with the entire United States, not merely the District of Columbia. *See also* Fed. R. Civ. P. 4(k)(2), discussed, *infra*.  Therefore the overt act could have been done anywhere in the United States, or under the effects doctrine, the intentional, tortious act could have been 'expressly aimed at' the

---

who then employ public and private surrogates to implement their unofficial deeds." *Tachiona v. Mugabe*, 169 F.Supp. 2d 259, 312 (S.D.N.Y. 2001).

[63] "Political analyst Yossi Alfer, who served 12 years in Israel's intelligence agency, the Mossad" and later "became Israel Director of the American Jewish Committee" said of the American Christian Fundamentalist groups that "When you see what these people are encouraging Israel and the U.S. Administration to do that is, ignore the Palestinians, if not worse, if not kick them out, expand the settlements to the greatest extent possible, they are leading us into a scenario of out and out disaster."  *Zion's Christian Soldiers,* CBSNEWS.com, June 8, 2003, first

United States, as discussed *supra*.  Moreover, an individual Israeli Defendant did not have to do an overt act, or even know about it, in order to be liable for the injury from the conspiracy.  "A conspirator may be liable for an injury even if he or she did not plan or know about the particular overt act that caused the injury, 'so long as the purpose of the act was to advance the overall object of the conspiracy'". *Burnett,* 274 F. Supp. 2d at *18-19, quoting *Halberstam*, 705 F.2d at 487.

Members of the conspiracy, the Settler Defendants, have performed overt acts in the United States by soliciting and accepting funds to support the settlements and settler violence. Compl. ¶ 69.  Such funds are specifically earmarked for materials that are used to illegal terrorize the neighboring Palestinian property owners and confiscate their land, such as armored jeeps, night-vision goggles, and gun cabinets. Compl. ¶ 111.  The Settler Defendants also have various on-line presences that directly target people in the United States to make such donations to United States' addresses. Compl. ¶ 111. Defendant Neve Tzuf Settlement, armed with materials paid for with funds raised by the Settler Defendants in the United States, threatened Plaintiff John Doe II's life, set fire to his property, bulldozed his land, riddled his home with gunfire, and destroyed over 100 of his olive trees. Compl. ¶¶ 8, 243-256.  The Settlers Defendants' fundraising in the United States for materials used to terrorize Palestinians and steal their land is an act in furtherance of the Defendants' conspiracy to rid Palestinians from their homeland, and therefore brings each of the members of the conspiracy, the Individual Israeli Defendants, under the personal jurisdiction of this Court.[64]

---

reported by Bob Simon on October 6, 2002. <http://www.cbsnews.com/stories/2002/10/03/60minutes/main524268.shtml>.

[64] Defendants do not provide legal authority for their assertion that the resulting injury must have occurred in the District. Mot. p.29.  The effects doctrine provides for jurisdiction if a defendant's contact was calculated to cause injurious effects in the forum. *See* III.b., *supra*.  Injuries that occurred in the United States include emotional distress.

Each Israeli Defendant is liable for Plaintiffs' injuries even if they were not aware of the

Settler Defendants' fundraising in the United States, because its purpose was to further the

conspiracy to commit and genocide, torture, extrajudicial killing, and other offenses described in

the Complaint.  By these substantial acts in furtherance of the conspiracy the Israeli Defendants

have brought themselves within the jurisdiction of this Court.  Through these contacts with the

United States the Israeli Defendants purposefully availed themselves of the laws and privileges

of the United States and the District of Columbia.

### d.  This Court May Also Have Personal Jurisdiction over the Individual Israeli Defendants Under the District of Columbia's Long-Arm Statute[65]

This Court also may have personal jurisdiction over the Individual Israeli Defendants

under the District of Columbia long-arm statute, D.C. Code §13-423(a)(4); Fed. R. Civ. P.

4(k)(1)(a).  A court in the District of Columbia may exercise personal jurisdiction over a

defendant who "directly or by an agent" causes "tortious injury in the District of Columbia by an

act or omission outside the District of Columbia if he…engages in any other persistent course of

conduct…in the District of Columbia." D.C. Code §13-423(a)(4).  Under this section, Plaintiffs'

claims do *not* need to arise out of any act or conduct in the District.  "Section 13-423(a)(4)

contemplates a connection with the forum which may be unrelated to the claim raised in the

suit." *Crane v. New York Zoological Soc'y*, 1991 U.S. Dist. LEXIS 5451, 5 (D.D.C. 1991), citing

*Crane v. Carr*, 814 F.2d 758, 763 (D.C. Cir. 1987).  Personal jurisdiction under the D.C. long-

---

[65] In the alternative, this Court has jurisdiction over Defendants under the Federal Long-Arm Statute if Defendants are not subject to the courts of general jurisdiction of any state. Fed. R. Civ. P. 4(k)(2). Instead of looking to one state's jurisdiction for the requisite minimum contacts, a court may aggregate all of a defendant's contacts with the United States to determine if personal jurisdiction may be exercised. *See Vitamins Antitrust Litigation*, 94 F. Supp.2d 26, 31 (D.D.C. 2000).  To Plaintiffs' knowledge, if the Israeli Defendants are not subject to suit under the District of Columbia's long-arm jurisdiction, then they are not subject to suits in the courts of general jurisdiction of any state.  If the Israeli Defendants' contacts with the District of Columbia as set forth herein are considered insufficient, then their equivalent and additional contacts with every state in the United States should be aggregated to permit personal jurisdiction.  Moreover, Israeli Defendants have waived any defense of improper venue under FRCP 12(h), so venue considerations cannot be considered.

arm statute may be exercised to the extent permitted by the Due Process Clause. *Environmental Research, Int'l, Inc. v. Lockwood Greene Eng'rs, Inc.,* 355 A.2d 808, 810-11 (D.C. 1976).

A "'nonresident defendant need not have been physically present in the District' to be subject to personal jurisdiction here." *First Am. Corp. v. Al-Nahyan*, 948 F. Supp. 1107, 1121 (D.D.C. 1996), quoting *Mouzavaires v. Baxter*, 434 A.2d 988, 992 (D.C. 1981) (en banc), *cert. denied*, 455 U.S. 1006, 71 L. Ed. 2d 875, 102 S. Ct. 1643 (1982).  Moreover, the "level of activity which must be proven under [the 'persistent course of conduct'] prong is less than that required under the 'doing business' or the 'presence' standard." *Id.,* citing *Steinberg v. Int'l Criminal Police Org.*, 672 F.2d 927, 931 (D.C. Cir. 1981); *Crane v. Carr*, 814 F.2d at 763.

Some of the Individual Israeli Defendants have engaged in a persistent course of conduct with the District and the United States through their frequent visits here, engaging not only in governmental business, but speaking tours, fundraising, organizational memberships, etc.  *See* sec. III.e., *infra*.  The Israeli Defendants have purposefully availed themselves of the benefits of the United States because their various contacts "all strengthened [their] reputation and gave [them] more influence within the . . . community."  *Crane v. N.Y. Zoological Soc'y*, 1991 U.S. Dist. LEXIS 5451, *11 (D.D.C. Cir. 1991).

The tortious injuries in the United States include intentional and negligent infliction of emotional distress, as mentioned above, and perhaps the direct effects discussed above, as well.

### e.  This Court May Have General Jurisdiction Over the Individual Israeli Defendants

This Court may also have general jurisdiction over some of the Individual Israeli Defendants who may have "systematic and continuous contacts" with the United States.  *See Helicopteros Nacionales de Colombia, S.A.* v. *Hall*, 466 U.S. 408 (1984); see also Fed.R.Civ.P. 4(k)(2).  Defendants frequently visit the United States, not only for official government trips, but

for nongovernmental conferences, fundraising, speaking tours, and perhaps business or vacation,

or a host of other reasons.

Defendants Sharanski,[66] Yaron,[67] Landau,[68] Peres,[69] Mofaz,[70] and Sharon[71] often visit the

United States for various conferences, speaking tours, fundraising events, etc.  Defendants Ben

---

[66] Defendant Sharanski recently conducted a speaking tour of United States university campuses, including Rutgers in New Jersey on Sept 18, 2003.  See WNBC/Newschannel 4, *Forward, NYDaily News,* AP, <http://newjersey.indymedia.org/ features.php3?feature_id=1>.  He attended an AIPAC (American Israel Public Affairs Committee) policy conference in Washington, D.C. *AIPAC Stirs Road Map Controversy,* James D. Besser, *The Jewish Week,* April 4, 2003, <http://www.thejewishweek.com/ news/newscontent.php3?artid =7710>.  On October 7, 2002, Defendant Sharanski attended and spoke at the AIPAC National Summit in Atlanta, Georgia. *See* <www.aipac.org>.  Cohen Aff. ¶ 4(a).

[67] *See, e.g., Israel-Syria Deal Called Close; Mubarak Says Secret Contacts Have Settled Tough Issues*, Howard Schneider, The Washington Post, March 22, 2000, (Yaron expected in Washington next week); *High-level talks in US*, Melissa Radler and Janine Zacharia, The Jerusalem Post, February 5, 2002 (Yaron met with senior Pentagon officials); <http://www.israel.org/ mfa/go.asp?MFAH0nte0>, September 23, 2003 (Yaron in Washington DC).  Cohen Aff. ¶ 4(b).

[68] *See Condeleezza Rice to arrive tomorrow*, Janine Zacharia, The Jerusalem Post, June 27, 3003 (Landau was in Washington); News at a Glance, Jewish Telegraphic Agency, September 18, 2002 (Landau is in Washington); *Israel Walks a Fine Line With Plan for Bomb-Sniffing Dogs,* Henry Chu, Los Angeles Times, July 13, 2002 (Landau had recently returned from visiting the United States); *Wakf remains opposed to entry of non-Muslims to Temple Mount*, Etgar Lefkovits, The Jerusalem Post, February 5, 2002 (Landau in the United States); *Powell warns Arafat: US may change* policy, Aluf Benn, Canadian Jewish News, October 11, 2001 (Landau scheduled to travel to the United States); Voice of Israel, Jerusalem, BBC Worldwide Monitoring, July 24, 2001 (Landau has left for the United States on a working visit); *High-level talks in US*, Melissa Radler and Janine Zacharia, The Jerusalem Post, February 5, 2002 (Landau arrived in Washington yesterday). Cohen Aff. ¶ 4(c).

[69] Defendant Peres appeared on the Charlie Rose show February 26, 2003 (<http://www.charlierose.com/archives/archive3.shtm>), attended Fortune's Brainstorm 2002 Conference in Aspen, Colorado on July 31, 2002 (*see* <http://www. fortune.com/fortune>), gave a speech for the Milken Institute in Santa Monica, California on January 13, 2003 (<http://www.milkeninstitute.org/events/events.taf?function= detail&ID=106&cat=Forums>), he was in New York the week of February 5, 2002 (*High-level talks in US*, Melissa Radler and Janine Zacharia, The Jerusalem Post);was scheduled to speak at a luncheon in Florida in January 2003 to raise money for his foundation (<http://www.transmediagroup.com/newsroom/2003/106ShimonPeres. htm?>), at Columbia University on September 28, 2000 (<http://www.cesr.org/EVENTS/ peresflyer.htm>), at the Bakersfield Business Conference in California on October 10, 1998, (http://www.bpcbakbusconf.com/critics.htm>), and at a synagogue in Florida in June 1997 (*Synagogue-Bombing Jew Gets 10 Years*, Associated Press, June 25, 1997). Cohen Aff. ¶ 4(d).

[70] Defendant Mofaz, spent 15 days in the Summer of 2002 on a whirlwind coast-to-coast tour with Friends of the IDF, campaigning to raise money and awareness for the plight of IDF Soldiers, including stops in Michigan, Ohio, California, and the New York area. <http://www.israelsoldiers.org/recent_events.cfm>.  Defendant Mofaz had a "1-1/2 week jaunt through the United States that has taken him to military bases and schools." *IDF chief calls for more women in power in talk here,* Andy Altman-Ohr, Jewish Bulletin of Northern California, October 22, 1999, <http://www.jewishsf.com/bk991022/sfmujab.shtml>.  Defendant Mofaz addressed the policy forum of the Washington Institute for Near East Policy, in Washington DC on June 14, 2002 (*Peacewatch #387, Special Policy Forum Report,* Washington Institute for Near East Policy, June 18, 2002, <http://www.washingtoninstitute.org/watch/Peacewatch/peacewatch2002/397.htm>), and in September, 2002. (*Peacewatch #400, Special Policy Forum Report,* Washington Institute for Near East Policy, October 8, 2002, <http://www.washingtoninstitute.org/watch/Peacewatch/peacewatch2002/400.htm>).  Defendant Mofaz is or has been a visiting military scholar at the Institute.  *Id.* Cohen Aff. ¶ 4(e).

[71] Press release, The White House, 20 March 2001 (Sharon visits DC) <http://www.whitehouse.gov/news/releases/ 2001/03/20010320-3.html>; *Powell arrives in Mideast for peace mission*, 28 June 2001 (the meeting marked Sharon's second visit to the White House in the past three months) <http://www.CNN.com>; Sharon spoke to

Eliezer,[72] Sheetrit,[73] and Farkash[74] also have visited the United States, and Defendants Gilad and

Dichter may contacts as well.  As stated above, Defendants' trips may have both official and

personal purposes.  Plaintiffs have identified but a small sampling of links that some of the

Individual Israeli Defendants have had with the United States, gleaned from a cursory search.

Cohen Aff., ¶ 5.

### f.   If The Court Is Not Convinced That It Has Personal Jurisdiction Over the Israeli Defendants, Plaintiffs are Entitled to Conduct Jurisdictional Discovery

If this Court determines that there are insufficient grounds on the existing record to

support personal jurisdiction, Plaintiffs respectfully request that they be allowed to conduct

jurisdictional discovery to determine what contacts the Israeli Defendants have had with the

forum and the United States.  *See Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 n.13,

57 L. Ed. 2d 253, 98 S. Ct. 2380 (1978) ("discovery is available to ascertain the facts bearing on

[jurisdictional] issues"); *Collins v. New York Central System*, 327 F.2d 880, 882-883, 117 U.S.

App. D.C. 182 (D.C. Cir. 1963)(district court erred in dismissing for lack of personal jurisdiction

without allowing plaintiff to conduct discovery).  If "a party demonstrates that it can supplement

its jurisdictional allegations through discovery, then jurisdictional discovery is justified." *GTE*

*New Media Servs., Inc.*, at 1351, citing *Crane v. Carr*, 814 F. 2d 758, 760, 259 U.S. App. D.C.

229 (D.C. Cir. 1987) (plaintiff pointed to links defendant had with the District, "sufficient at

least to permit further inquiry regarding personal jurisdiction"); *see also Burnett*,  274 F. Supp.

---

American-Israel Friendship League, New York, June 25, 2001, <http://www.mfa.gov.il/mfa/go.asp?MFAH0k890>; BBC News, 8 Feb 2002, (Sharon visits white house) <http://www.israelemb.org/articals/2002/Jun/2002061702. html>; Cabinet Communique (Communicated by the Cabinet Secretariat) June 16, 2002 (Sharon visited the U.S). Cohen Aff. ¶ 4(f).

[72] Defendant Ben Eliezer visited Washington, DC in February, 2002. *Reports from across the globe*, World Jewish News, February 6, 2002.  Cohen Aff. ¶ 4(g).

[73] Defendant Sheetrit, Israeli Minister of Justice, delivered a speech to the American Sephardic Federation on May 10, 2002, in New York (<http://www.asfonline.org/portal/ ArabLandsDisplay.asp?article_id=4&>), and was going to Washington DC in January 2002 (*Behind the Headlines: After hesitating, State Department admits arms ship was bound for P.A.*, Matthew Berger, Jewish Telegraphic Agency, January 9, 2002). Cohen Aff. ¶ 4(h).

[74] Defendant Farkash held talks in Washington in June 2003. *Israel Promises Harsh Reaction if Palestinian Cease-Fire Fails,* Chemi Shalev, Forward, June 27, 2003. Cohen Aff. ¶ 4(i).

2d at *21 (finding that plaintiff's factual showing that a wholly-owned subsidiary of the defendant initiated litigation in a court in a different state, and that defendant's website "informs its customers and potential customers that it provides a banking service to accomplish the quick transfer of funds to relatives here" was sufficient to warrant limited jurisdictional discovery).

Given the opportunity to conduct jurisdictional discovery, Plaintiffs are confident they will encounter abundant contacts, possibly sufficient to satisfy the systematic and continuous standard.  The only way to ascertain the breadth of the Israeli Defendant' contacts with this forum is through discovery, and Plaintiffs have shown sufficient links to warrant it.  Through discovery, Plaintiffs would need to be able to obtain information regarding the dates, locations, purposes and itineraries of each Individual Israeli Defendant's stay in the United States, and other information regarding their contacts and correspondence.  They may also have financial assets, property, business interests, or other contacts in the United States.

Jurisdictional discovery could also assist with better establishing specific jurisdiction.  It would also assist Plaintiffs to know what contacts and correspondence the Individual Israeli Defendants and their agents have had with the Settler Defendants or their agents.

"A plaintiff faced with a motion to dismiss for lack of personal jurisdiction is entitled to reasonable discovery, lest the defendant defeat the jurisdiction of a federal court by withholding information on its contacts with the forum." *El-Fadl v. Central Bank of Jordan*, 75 F.3d 668, 676 (D.C.Cir. 1996).[75]  Plaintiffs should therefore be allowed to supplement their jurisdictional allegations through discovery.

## IV.     THE POLITICAL QUESTION AND ACT OF STATE DOCTRINES DO NOT BAR PLAINTIFFS' CLAIMS

---

[75] Israeli Defendants incorrectly claim that *El-Fadl* is an example of the courts dismissing suits for lack of personal jurisdiction under section (a)(4) of the long-arm statute where the alleged injury occurred outside the district. Mot. p.27.  However, the court remanded plaintiff's claims for lack of personal jurisdiction to the district court "in order to allow El-Fadl to conduct reasonable discovery on personal jurisdiction." *El-Fadl,* 75 F.3d at 676.

Israeli Defendants claim that this Court should refrain from adjudicating this case based on the political question and act of state doctrines. Mot. p.30.  However, "judges should not reflexively invoke these doctrines to avoid difficult and somewhat sensitive decisions in the context of human rights." *Kadic v Karadzic*, 70 F.3d 232, 249 (2d Cir. 1995).

### a.  Issues Are Justiciable, Not Political Questions

The political question doctrine reflects a concern for the separation of powers of the branches of the United States Government. *See Sanchez-Espinoza,* 770 F.2d at 207 n.5; *Powell v. McCormack*, 395 U.S. 486, 518 (1969).  Although cases may "present issues that arise in a politically charged context, that does not transform them into cases involving nonjusticiable political questions.  'The doctrine 'is one of "political questions," not one of "political cases."''" *Kadic v. Karadzic*, 70 F.3d 232, 249 (2d Cir. 1995) citing *Klinghoffer*, 937 F.2d at 49 (quoting *Baker v. Carr*, 369 U.S. 186, 217, 7 L. Ed. 2d 663, 82 S. Ct. 691 (1962).)  In *Kadic*, the plaintiffs alleged "that acts of rape, torture, and summary execution were committed during hostilities by troops under [defendant] Karadzic's command and with the specific intent of destroying [plaintiffs'] ethnic-religious groups." *Id.* at 244.  The court set forth and analyzed the factors in *Baker v. Carr, supra*, and found that plaintiffs' claims were justiciable.[76]

Defendants misplace reliance on *Anderman v. Austria*, 256 F. Supp. 2d 1098 (C.D. Cal. 2003), in which the court analyzed the *Baker* factors and determined that plaintiffs' claims to redress the Nazi confiscation of their property were nonjusticiable.  First, the court determined that plaintiffs' claims were constitutionally committed to the political branch because the U.S. and Austrian governments had already entered into an agreement to provide a forum to address

---

[76] See Plaintiffs' Opposition to the Arms Manufacturers Defendants' Motion to Dismiss, filed with this Court on February 7, 2003, Sec. I.b., where Plaintiffs argue that the issues raised in their Complaint are not textually committed to the Executive Branch or beyond judicial expertise, and prudential concerns do not militate against judicial review.

reparations for Holocaust-related crimes, like those at issue in the action.[77] *Anderman* at 1113-14, n.7, n.8.  Certainly in this case there is not already a mechanism in place to provide Plaintiffs reparations for their claims.

Second, the court determined that the case lacked "judicially discoverable and manageable standards" because the court could not manage and resolve reparations claims for thousands of elderly plaintiffs from around the world whose claims arose over fifty years ago during wartime when any of several treaties may have subsumed those claims. *Id.* at 1114-15. This case, however, arises from acts that occurred within the last few years,[78] and is brought by only nineteen Plaintiffs, all U.S. citizens or resident aliens, who have not already had their claims settled.

Third, the court in *Anderman* decided that private litigation would express a lack of respect for the executive branch, which "has always taken the position that claims arising out of World War II must be resolved through government-to-government negotiations." *Id.* at 1115. Finally, the court determined that for the above-cited reasons, a resolution of Plaintiffs' claims would potentially embarrass the Executive Branch. *Id.*

There can be no comparable position taken here that claims arising out of the Middle East conflict are relegated to the Executive Branch, or that they would impede the role of the U.S. Government in conducting foreign affairs or promoting peace in the region.  Claims arising from the conflict in the region have often been heard by United States District Courts.[79]  It is disingenuous for the Executive Branch to claim that a case regarding "actions undertaken in the

---

[77] Plaintiffs argued unpersuasively that the Executive Branch did not have the power to enter into that agreement. *Id.* at 1115-16.

[78] Other than those by John Doe XVII for the events at Sabra which occurred little over twenty years ago, and involve one injury from an incident that lasted a few days, not twelve years.  See *Anderman* at 1102 (plaintiffs' claims arose from 1933 to 1945).

[79] *See, e.g., Eisenfeld v.* Iran, 172 F. Supp. 2d 1, 9, 2000 U.S. Dist. LEXIS 9545 (D.D.C. 2000)(judgment entered against defendant for deaths of plaintiffs killed when a bomb destroyed their bus in Israel); *Estates of Ungar v. Palestinian Auth.*, 153 F. Supp. 2d 76 (D.R.I. 2001) (suit survived against the PLO and the Palestinian Authority for

midst of an ongoing armed conflict" would intrude upon its "foreign policy prerogatives," when actions have been heard in this context, presumably without their protest. Mot. p.32, citing Fed. Defendants' Motion to Dismiss at 37-38.  This position is especially hypocritical since the State Department has already made findings consistent with Plaintiffs' claims, as discussed below.

Similarly, in *Hwang v. Japan*, 172 F. Supp. 2d 52 (D.D.C. 2001), the court determined that prudential concerns and lack of judicial expertise militated against hearing the claims of World War II victims of sexual slavery and torture by the Japanese military.  Again, because the issues dealt with World War II, from 60-70 years ago, and because there had already been war claims settlement agreements by the political branches of the U.S. Government that explicitly resolved all claims arising out of Japan's actions during the war, the court determined that the claims were nonjusticiable. *Id.* at 22-23.  As discussed above, these factors do not apply here.

Defendants utterly misrepresent the decision in *Linder v. Portocarrero*, 963 F.2d 332, 337 (11th Cir. 1992), in which the court recognized that the complaint challenged "neither the legitimacy of the United States foreign policy toward the contras, nor [did] it require the court to pronounce who was right and who was wrong in the Nicaraguan civil war." *See* Mot. p.33 (court "affirmed the dismissal on political question grounds of broad international law claims"). The court decided that even though a civil war was in progress and the torture and murder of plaintiff "were part of an overall design to wage attacks on foreign development workers…as a means of terrorizing the population" the defendants were not immunized from tort liability for the torture and murder. *Id.* at 336.  The "sweeping allegations of the complaint led the district court into a thicket of non-justiciable claims for relief that overshadowed the narrow issue of…tort liability" before the court. *Id.*  Cases which stand for the "generally accepted premise that acts of *legitimate warfare* cannot be made the basis for individual liability…do not support…findings

the deaths of two U.S. citizens in a shooting attack in Israel); *see also Boim v. Quranic Literacy Institute,* 291 F.3d 1000 (7th Cir. 2002).

that domestic tort actions are not appropriate remedies for injuries to non-combatants occurring outside of the United States during conflicts between belligerents." *Id.* at 337 (citations omitted)(emphasis in original).  Similarly, although the Complaint in this case supplies a lot of background information, Plaintiffs' claims focus specifically on the unlawfulness of the Israeli Defendants' conduct in the incidents alleged.

The "fact that the issues before us arise in a politically charged context does not convert what is essentially an ordinary tort suit into a non-justiciable political question." *Klinghoffer v. S.N.C. Achille Lauro*, 937 F.2d 44, 49 (2nd Cir. 1991) (holding that killing of an American citizen by the PLO on the high seas was not a political question).  Plaintiffs claims revolve around the following allegations, which require this Court to resolve factual and legal issues, not political questions: John Doe I's daughter and John Doe XVI' son were shot and killed by IDF soldiers; minor sons of John Doe XIV and XV were shot and injured by IDF soldiers; Jane Doe I's aunt and cousin were shot and killed in their home by IDF soldiers; Jane Doe II's sisters were killed and her niece and nephew were injured when IDF rockets destroyed their house; John Doe IV's father, John Doe III, died after IDF soldiers delayed his medical treatment; John Does II's property was destroyed by people supported and protected by the Israeli Defendants; John Doe V was assaulted and degraded by IDF soldiers; John Does VI and VII were unlawfully detained and tortured for 40 and 36 days, respectively, by Israeli authorities; John Doe VIII was assaulted and degraded and his property was destroyed by IDF soldiers; John Doe IX incurred property damage due to IDF shelling; John Does X, XI, XII, XIII, XV had their property destroyed by the IDF, and John Doe XI was assaulted by IDF soldiers.

Whether these acts occurred, whether they amount to extra-judicial killings, torture, arbitrary arrest and detention, cruel, inhuman, or degrading treatment, war crimes, etc., and whether the Israeli Defendants are responsible, are purely legal questions which this Court is

able and even required to decide.  Defendants cannot merely allege that they may have had a

political reason to do these things ("fighting" terrorism) in order to turn the issues into political

questions.  This ruse may unfortunately work with some, but it cannot pass muster in this Court

of law.

Significantly, Plaintiffs have had their human rights violated by Israeli Defendants in

exactly the same manner which the United States State Department (of the Executive Branch)

has found Israel is violating human rights.  In its year 2000 report on human rights practices in

the Palestinian territories, the State Department found:

> Israeli security forces abused Palestinians in detention suspected of security
> offenses.… There were numerous credible allegations that police beat persons in
> detention.  Three Palestinian prisoners died in Israeli custody under ambiguous
> circumstances during the year….  Israeli security forces sometimes impeded the
> provision of medical assistance to Palestinian civilians.
>
> Israeli civilians, especially settlers, harassed, attacked, and occasionally killed
> Palestinians in the occupied territories.  There were credible reports that settlers
> killed at least 14 Palestinians during the year. …Settlers also caused economic
> damage to Palestinians by attacking and damaging greenhouses and agricultural
> equipment, uprooting olive trees, and damaging other valuable crops.  The settlers
> did not act under government orders in the attacks; however, the Israeli Government
> did not prosecute the settlers for their acts of violence.  In general settlers rarely
> serve prison sentences if convicted of a crime against Palestinians.
> …
> Israeli security forces[80] targeted for killing a number of Palestinians whom the
> Israeli Government stated had attacked or were planning future attacks on Israeli
> settlements or military targets; a number of bystanders reportedly also were killed
> during these incidents.  Since the violence began, Israeli security units often used
> excessive force against Palestinian demonstrators.  Israeli security forces sometimes
> exceeded their rules of engagement, which provide that live fire is only to be used
> when the lives of soldiers, police, or civilians are in imminent danger.  IDF forces
> also shelled PA institutions and Palestinian civilian areas in response to individual
> Palestinian attacks on Israeli civilians or settlers; 7 Palestinians and 1 foreign
> national were killed, and 131 Palestinians were injured in these attacks.[81]

---

[80] "Israeli security forces in the West Bank and Gaza Strip consist of the Israeli Defense Forces (IDF); the Israel
Security Agency (the ISA--formerly the General Security Service, or GSS, and also known as Shin Bet, or Shabak);
the Israeli National Police (INP); and the paramilitary border police." *Id.*

[81] Country Report on Human Rights Practices in the Occupied Territories for the year 2000, Released by the [State
Department's] Bureau of Democracy, Human Rights, and Labor, February 23, 2001, <http://www.state.gov/g/drl/rls/
hrrpt/2000/nea/882.htm> ("State Dept. Occupied Territories 2000 Rep.").  State Department Country Reports are
referenced in Ex. R, ¶ 9 of the Complaint.

The State Department has found that Israel, the IDF and Shin Bet have committed acts just like those alleged by Plaintiffs.  The Israeli Defendants are responsible for having subjected Plaintiffs to torture in detention, killed or injured them as bystanders while targeting others, exceeding their "rules of engagement" and shelling Palestinian civilian areas, and enabling and encouraging settlers to use violence by failing to prosecute them at the very least.[82]

It is difficult if not impossible to fathom how permitting Plaintiffs' case to go forward in this Court based on specific allegations entirely consistent with the findings already made by the State Department could possibly embarrass the Executive Branch in the conduct of its foreign relations.  It would be outrageous, frankly, if deference to potential U.S. Government so-called embarrassment, however hypocritical given its acknowledgement of Israel's human rights violations, took priority over the lives and human rights of its own citizens.

The Israeli Defendants self-servingly reiterate the Executive Branch's claim that any findings regarding the "appropriateness" of Israeli actions would intrude upon foreign policy because the United States Government "through its political branches" is "attempting to resolve" the "ongoing armed conflict." Mot. p.32.  This is a baffling argument, considering that the Executive Branch, through the State Department, has already made findings regarding exactly the same type of conduct Plaintiffs claim in this action.  Moreover, Plaintiffs do not ask this Court to make determinations about the "appropriateness" of Israeli Defendants' actions, but

---

[82] The State Department has even declared that "the establishment of the civilian settlements in those [occupied] territories is inconsistent with international law." Opinion of the Office of the Legal Advisor, Department of State, April 21, 1978, <http://www.fmep.org/documents/opinion_OLA_DOS4-21-78.html>.  President Reagan, however, apparently "declared that settlements were not 'illegal,' in contrast to previous U.S. policy".  <http://www.fmep.org/ reports/2002/sr0203.html>.  Nonetheless, "Opposition to the settlements by the United States Executive Branch has been clear at least since the administration of President Carter and the Camp David summit talks in the 1970's." Compl. ¶ 101.  In 1981, President Reagan called for an "immediate adoption of a settlement freeze by Israel", and in 1991, Secretary of State James A. Baker III of President George H.W. Bush's administration said that Israel's settlement activity violates United States policy and was in his opinion the biggest obstacle to peace. *Id.*  Regardless, Plaintiffs do not ask this Court to rule on the legality of settlements in general, only on Plaintiffs' specific claims.

rather their legality, which is precisely the role of the Judicial Branch.[83]  With all due respect, it seems quite disingenuous, if not threatening, for the Israeli Defendants to essentially argue that peace in the Middle East may be forestalled if they are found accountable for their illegal and unjustifiable violence against Plaintiffs.

**b.  The Act of State Doctrine Does Not Apply to the Israeli Defendants' Acts As Alleged by Plaintiffs**

**i.  Barely Any of the Acts Occurred Within Israel's Own Territory**

"The act of state doctrine in its traditional formulation precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed *within its own territory*." *Banco Nacional De Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964) (emphasis added); *see also El-Hadad,* 69 F. Supp. 2d at 81 ("the Act of State doctrine applies only when the actions of the foreign state occur within that foreign state", citing *Flatow v. Islamic Republic of Iran*, 999 F. Supp. 1, 21 (D.D.C. 1998)).

"As a result of the 1967 war, Israel occupied the West Bank, the Gaza Strip, East Jerusalem, and the Golan Heights.  The international community does not recognize Israel's sovereignty over any part of the occupied territories."  *See* State Dept.'s Israel Report, *supra*; s*ee also* U.N. Security Council Resolution 242, November 22, 1967 (calling for "[w]ithdrawal of Israel armed forces from territories occupied in the recent conflict").

Defendants have not claimed nor offered any evidence that any of the acts alleged were within Israel's territory.  In fact, most of the incidents complained of were not within Israel's own territory, but in the Palestinian Territories that it (illegally) occupies, or in Lebanon. Compl. ¶ 234-421.  Moreover, conspiratorial acts and other violations have also taken place outside of Israel. See, III.c., *supra*.  Clearly the Act of State doctrine is not applicable here.

---

[83] *See, e.g., D.K.T. Memorial Fund, Ltd. v. Agency for International Development*, 258 U.S. App. D.C. 257, 810 F.2d 1236, 1238 (D.C. Cir. 1987) (finding no political question where suit challenged lawfulness of policy

###### ii.  The Act of State Doctrine Does Not Apply To Clear Violations of *Jus Cogens* Norms of International Law

The Act of State doctrine only applies if the "relief sought or the defense interposed would have required a court of the United States to *declare invalid the official act of a foreign sovereign* performed within its territory." *W.S. Kirkpatrick v. Environmental Tectonics Corp.*, 493 U.S. 400, 405, 107 L. Ed. 2d 816, 110 S. Ct. 701 (1990) (emphasis added).  In determining whether an act is official under the act of state doctrine, the analysis is similar to the above analysis showing that Defendants' actions were outside the scope of their sovereign authority.

"It is only when officials having sovereign authority act in an official capacity that the Act of State Doctrine applies." *Jimenez v. Aristegueita*, 311 F.2d 547, 557 (5th Cir. 1962), *cert. denied*, 373 U.S. 914 (1963) (citations omitted).  In *Jimenez*, the court determined that the defendant Chief of State's financial crimes were not sovereign acts but rather "done in violation of his position and not in pursuance of it.  They are as far from being an act of state as rape which appellant concedes would not be an 'Act of State.'" *Id.* at 557-558.

Torture, arbitrary arrest and detention, and genocide, cannot be considered legally authorized by any state because "*jus cogens* violations are considered violations of peremptory norms, from which no derogation is permitted.  Acts of state to the contrary are invalid." *Presbyterian Chuch of Sudan v. Talisman Energy, Inc. and the Republic of Sudan*, 244 F.Supp.2d 289, 345 (S.D.N.Y. 2003) *citing* Restatement (Third) of Foreign Relations § 702 cmt. N (1987).  Israeli Defendants cannot show that the acts challenged by Plaintiffs were official acts of Israel under the Act of State Doctrine, because Israel cannot officially do acts in violation of *jus cogens* norms of international law.  The Act of State doctrine therefore does not immunize Israeli Defendants for violation of *jus cogens* norms, including acts of torture, arbitrary arrest and

---

prohibiting United States funds being given to foreign NGOs that perform or actively promote abortion where plaintiffs challenged the legality of the policy rather than the policy's political and social wisdom).

detention, genocide, crimes against humanity, war crimes, extra-judicial killings, or cruel, inhuman, or degrading treatment.

The TVPA Senate Report confirms that the Act of State doctrine does not apply to violations under the TVPA.  "Since this doctrine applies only to 'public' acts, and no state commits torture as a matter of public policy, this doctrine cannot shield former officials from liability under this legislation. S. Rep. No, 249, 102d Cong. 1st Sess. 8 (1992) [Senate Report] citing *Trajano v. Marcos*, 878 F.2d 1439 (9th Cir. 1989).  *Trajano*, which the Senate Report cited, was brought under ATCA; therefore the enactment of the TVPA revealed Congress' intent to confirm that the Act of State Doctrine similarly does not apply to customary international violations under ATCA.

The Israeli Defendants claim that *Roe v. Unocal Corp.*, 70 F. Supp. 2d 1073 (C.D. Cal 1999) supports their contention that the Act of State doctrine is applicable here. Mot. pp. 42-43. In deciding whether the act in question was "official" under the act of state doctrine, the court in *Roe v. Unocal* first determined that the challenged act, the military officer's order to a subordinate military officer to undertake public works construction, did not conflict with Burmese law. *Roe* at 1078-1079.  Moreover, the plaintiff's allegations did "not constitute a violation of international law." *Roe* at 1080.  In this case, this threshold requirement of an act of state is not satisfied; the Israeli Defendants' acts were not official in so far as they violated Israeli and international law.[84]  Finally, Defendants "must show a 'statute, decree, order or resolution' authorizing the challenged act as an official act." *Id.* at 1079, quoting *Dunhill v. Republic of*

---

[84] Defendants also claim that the court in *Saltany, supra,* 702 F. Supp. 319, dismissed ATCA claims against the United Kingdom (Mot. p.42), but the court never even mentioned whether there were ATCA claims against the U.K. (RICO claims were also generally pled to confer jurisdiction), much less conducted an analysis of how an ATCA claim might affect the act of state doctrine. *Saltany* at 320.  The court merely determined that the act of state doctrine compelled dismissal of claims alleging "Britain's complicity in an illicit act of war committed by the United States." *Id.* at 321.

*Cuba*, 425 U.S. 682, 695 (1976).  Defendants have not even claimed that they had authority for any of the acts alleged, much less provided the applicable authority.

It "would be a rare case in which the act of state doctrine precluded suit under section 1350." *Kadic v. Karadzic, supra*, at 250.  Unlike the Israeli Defendants, the defendant in *Kadic v. Karadzic* did not have "the temerity to assert in this Court that the acts allegedly committed are the officially approved policy of a state." *Kadic,* 70 F.3d at 250; *see also Avril, supra* at 212 (in rejecting the act of state and political question doctrines, the court stated that the "acts as alleged in the complaint, if true would hardly qualify as official public acts").  "Courts in the United States have the power, and ordinarily the obligation, to decide the cases and controversies properly presented to them." Kirkpatrick, 493 U.S. at 405.

### iii.  The Policies Underlying the Act of State Doctrine Prevent its Application to this Case

The policies underlying the Act of State doctrine also militate against its application in this case, as shown when considering the factors outlined in *Sabbatino*.  The first factor, "the degree of codification or consensus concerning a particular area of international law," could not be more clear. *Sabbatino*, 376 U.S. at 428.  By definition, acts violate *jus cogens* norms *because* there is international consensus that such acts violate international law.  Therefore, as shown above, such acts cannot be acts of state.

In analyzing the second *Sabbatino* factor, the impact on foreign relations or the sensitivity of national nerves, Plaintiffs refer to their argument regarding the political question doctrine, above.  Defendants cite to cases dismissing challenges to United States military operations as nonjusticiable to support their argument that this Court should apply the *act of state* doctrine to this case against *Israeli* Defendants for violations of *jus cogens* norms, *not* within their territory.  This is certainly not a compelling argument.  Defendants also cite to the court's

reasoning in *Roe, supra,* that because plaintiff's claim could not have been brought against the United States, it should not be allowed in the context of foreign governments. *Roe* at 1081.  As described above, the act alleged in *Roe* was found not to violate Burmese or international law, and is thus not applicable here.[85]

Defendants essentially argue that any reliance on command responsibility[86] would invade its sovereignty (Mot. p.44), which is clearly untrue given the host of ATCA and TVPA cases against foreign defendants that rely on command responsibility. *See, e.g. Gramajo, supra.* Finally, regarding Plaintiffs' detention and torture claims, Defendants merely cite to dicta in a footnote in *Bao Ge, supra*, that states without explanation or analysis that the act of state doctrine would apply to the actions of the defendants in that case, to argue in essence that any challenge to their use of torture or unlawful detention violate the Act of State Doctrine.  Such an argument is clearly without merit, as again it would render the TVPA and ATCA meaningless, and as the Act of State Doctrine does not apply to clear violations of *jus cogens* norms of international law, as discussed above.  For all of the above-stated reasons, the Act of State Doctrine is not applicable to this case.

## CONCLUSION

For the reasons discussed herein, the Israeli Defendants' Motion to Dismiss should be denied.  If deemed necessary, Plaintiffs be allowed the opportunity to properly serve Defendants and conduct personal jurisdiction discovery.

Dated:  October 31, 2003

---

[85] Moreover, in *Eisenfeld, supra,* the court determined that it was "beyond question that if officials of the United States, acting in their official capacities, provided material support to a terrorist group to carry out an attack of this type, they would be civilly liable and would have no defense of immunity." *Eisenfeld,* 172 F. Supp. 2d at 8 (citations omitted).
[86] Plaintiffs note that Defendants do not accurately convey the standard for command responsibility, but do not think the issues raised in their Motion require it to be briefed. Mot. p.44.

Respectfully submitted,


Stanley L.Cohen_____
STANLEY L. COHEN, Esq.
Attorney for Plaintiffs
*Pro Hac Vice*
351 Broadway, Suite 300
New York, N.Y.  10013
(212) 979-7572


_____
MAHAR H. HANANIA, Esq.
Local Counsel
6066 Leesburg Pike, Suite 101
Falls Church, Virginia 22041
(703) 778-2400
Bar No.: 464766