## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| JOHN DOE, *et al.,* | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) |
| | ) |
| STATE OF ISRAEL, ARIEL SHARON in his | ) |
| individual capacity and as former Israeli Minister | ) |
| of Defense, NATAN SHARANSKI individually | ) |
| and in his capacity as Israeli Minister of | ) |
| Construction and Housing, BINYAMIN BEN | ) |
| ELIEZER individually and in his capacity as | ) |
| Israeli Minister of Defense, SHIMON PERES | ) |
| individually and in his capacity as Israeli | ) |
| Minister of Foreign Affairs, UZI LANDAU | ) |
| individually and in his capacity as Israeli | ) |
| Minister of Internal Security, MEIR SHEETRIT | ) |
| individually and as Israeli Minister of Justice, | ) |
| THE ISRAELI GENERAL SECURITY | ) |
| SERVICE (the "Shin Bet"), AVI DICHTER, the | ) |
| head of the Shin Bet, ISRAELI DEFENSE | ) |
| FORCES (IDF), LT. GENERAL SHAUL | ) |
| MOFAZ individually and as Chief of the General | ) |
| Staff, MAJOR GENERAL AMOS GILAD | ) |
| individually and as the IDF Coordinator of | ) |
| Government Activities in Judea, Samaria and the | ) |
| Gaza, MAJOR GENERAL AHARON ZE'EVI | ) |
| FARKASH individually and as IDF Director of | ) |
| Military Intelligence, AMOS YARON | ) |
| individually and in his capacity as Secretary | ) |
| General of the Defense Ministry and as former | ) |
| Brigadier General and Commandant of IDF | ) |
| forces in Beirut, Lebanon (collectively the | ) |
| "Israeli Defendants"), *et al.,* | ) |
| | ) |
| Defendants. | ) |
| | ) |

Civil Action No. 1:02 CV 01431 (JDB)

**REPLY MEMORANDUM OF
POINTS AND AUTHORITIES IN
FURTHER SUPPORT OF THE
STATE OF ISRAEL AND RELATED
DEFENDANTS' MOTION TO
DISMISS THE COMPLAINT**

## **TABLE OF CONTENTS**

**Page**

INTRODUCTION ...................................................................................................................1

ARGUMENT.........................................................................................................................2

I.     PLAINTIFFS' FAILURE TO PROPERLY SERVE THE
ISRAELI GOVERNMENT DEFENDANTS CANNOT BE
EXCUSED .................................................................................................2

II.    PLAINTIFFS HAVE DEMONSTRATED NO BASIS FOR
ABROGATING THE IMMUNITY OF THE ISRAELI
GOVERNMENT DEFENDANTS ...............................................................7

      A.    The Exceptions to the FSIA Do Not Apply to the Claims
Against Israel, the IDF and Shin Bet, and the Individuals
Sued in Their Official Capacities......................................................8

      B.    Plaintiffs Cannot Challenge the Immunity of Foreign
Officials Sued in Their Individual Capacities................................10

      C.    Head of State Immunity for Prime Minister Sharon is
Mandated by the Law.....................................................................10

III.    PLAINTIFFS CANNOT ESTABLISH JURISDICTION OVER
THE ISRAELI OFFICIALS SUED IN THEIR PERSONAL
CAPACITIES ..........................................................................................13

IV.    THIS SUIT IS NOT JUSTICIABLE ..........................................................18

      A.    This Case Raises Highly Sensitive Political Questions
Appropriately Reserved for the Executive Branch .........................18

      B.    The Act of State Doctrine Applies.................................................20

CONCLUSION.....................................................................................................................23

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Ackermann v. Levine,* 788 F.2d 830 (2d Cir. 1986) ..............................................................4

*Arco Elecs. Control Ltd. v. Core Int'l,* 794 F. Supp. 1144 (S.D. Fla. 1992) .......................4

\*   *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428 (1989) .....................9

\*   *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398 (1964) ...........................................21

*Bankston v. Toyota Motor Corp.*, 889 F.2d 172 (8ᵗʰ Cir. 1989) .........................................4

*Brand v. Mazda Motor of America,* 920 F. Supp. 1169 (D. Kan. 1996)..............................4

*Burger King Corp. v. Rudzewicz,* 471 U.S. 462 (1985).....................................................15

*Burnett v. Al Baraka Inv. & Dev. Corp.,* Civ. A. No. 02-1616, 2003 WL
    22683337 (D.D.C. Nov. 14, 2003)..........................................................................17

*Caribbean Broad. Sys. v. Cable & Wireless PLC,* 148 F.3d 1080 (D.C. Cir. 1998).........16

*Casio Computer Co. v. Sayo,* No. 98-CV-3772 (WK), 2000 WL 1877516
    (S.D.N.Y. Oct. 13, 2000) ..........................................................................................4

*Croesus EMTR Master Fund L.P. v. Federative Republic of Brazil,*
    212 F. Supp. 2d 30 (D.D.C. 2002) ............................................................................9

*Daliberti v. Republic of Iraq,* 97 F. Supp. 2d 38 (D.D.C. 2000) .......................................13

*Dammarell v. Islamic Republic of Iran,* 281 F. Supp.2d 105 (D.D.C. 2003) ......................2

*Daventree Ltd. v. Republic of Azerbaijan,* Civ. A. No. 02 6356, slip op.
    (S.D.N.Y. Oct. 10, 2003) ........................................................................................12

*Deutsch v. U.S. Dep't of Justice,* 881 F. Supp. 49 (D.D.C. 1995), *aff'd,* 93 F.3d
    986 (D.C. Cir. 1996) ..................................................................................................6

*Dickson v. United States,* 831 F. Supp. 893 (D.D.C. 1993)...............................................13

*Doe v. Liu Qi,* No. C-02-0672 CW (EMC), Magistrate's Report and
    Recommendation (N.D. Ca. June 11, 2003) ...............................................20, 21, 22

# TABLE OF AUTHORITIES
continued...

Page(s)

\*  *Doe v. State of Israel,* Civ. A. No. 02-01431, slip op. (D.D.C. Oct. 3, 2003) ........... *passim*

*Dooley v. United Techn. Corp.,* 803 F. Supp. 428 (D.D.C. 1992)......................................16

\*  *First American Corp. v. Al-Nahyan,* 948 F. Supp. 1107 (D.D.C. 1996) ...........................11

*Frolova v. USSR,* 761 F.2d 370 (7th Cir. 1985) ....................................................................9

*Gandal v. Telemundo Group, Inc.,* 997 F.2d 1561 (D.C. Cir. 1993)..................................14

*Golub v. Isuzu Motors,* 924 F. Supp. 324 (D. Ma. 1996) ......................................................4

\*  *Gulf Res. America v. Republic of Congo,* 276 F. Supp.2d 20 (D.D.C. 2003)......................9

*In re Doe,* 860 F.2d 40 (2d Cir. 1988) ................................................................................12

*Int'l Ass'n of Machinists v. OPEC,* 649 F.2d 1354 (9th Cir. 1981), *cert. denied,*
454 U.S. 1163 (1982).....................................................................................................22

*Jimenez v. Aristeguieta,* 311 F.2d 547 (5th Cir. 1962), *cert. denied,*
73 U.S. 914 (1963)....................................................................................................21, 22

*Jones v. Clinton,* 869 F. Supp. 690 (E.D. Ark. 1994), *aff'd and rev'd in part,* 72
F.3d 1354 (8th Cir. 1996), *aff'd,* 520 U.S. 681 (1997) .............................................12

*Kadic v. Karadzic,* 70 F.3d 232 (2d Cir. 1995)............................................................19, 22

*Keller v. Transportes Aereos Militaries Ecuadorianos,* 601 F. Supp. 787 (D.D.C.
1985) ................................................................................................................................9

*Knapp v. Yamaha Motor Corp.,* 60 F. Supp.2d 566 (S.D. W.Va. 1999) ..............................4

\*  *Lafontant v. Aristide,* 844 F. Supp. 128 (E.D.N.Y. 1994) ...........................................11, 12

*Leutwyler v. Office of Her Majesty Queen Rania Al-Abdullah,* 184 F. Supp.2d
277 (S.D.N.Y. 2001)......................................................................................................11

*Midland v. F. Hoffman-Laroche, Ltd. (In re Vitamins Antitrust Litig.),* 270 F.
Supp.2d 15 (D.D.C. 2003) .......................................................................................14, 15

*Northrop Corp. v. McDonnell Douglas Corp.,* 705 F.2d 1030 (9th Cir. 1983), *cert.
denied,* 464 U.S. 849 (1983) .........................................................................................22

### TABLE OF AUTHORITIES
continued…

Page(s)

\*   *Nuovo Pignone SpA v. Storman Asia M/V,* 310 F.3d 374 (5th Cir. 2002)............................4

*Paul v. Avril,* 812 F. Supp. 207 (S.D. Fla. 1993)................................................................12

*Plaintiffs A, B, C, D, E, F vs. Jiang Zemin,* 282 F. Supp. 2d 875 (2003) ....................10, 11

\*   *Pollack v. Meese,* 737 F. Supp. 663 (D.D.C. 1990)............................................................16

*Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 244 F. Supp.2d 289
(S.D.N.Y. 2003)......................................................................................................23

\*   *Princz v. Fed. Republic of Germany,* 26 F.3d 1166 (D.C. Cir. 1994), *cert. denied,*
513 U.S. 1121 (1995)................................................................................................8

*Regier v. Islamic Republic of Iran,* 281 F. Supp.2d 87 (D.D.C. 2003) ................................2

*Rein v. Socialist People's Libyan Arab Jamahiriya,* 995 F. Supp.2d 325
(E.D.N.Y. 1998), *aff'd in relevant part,* 162 F.3d 748 (2d Cir. 1998), *cert.
denied,* 527 U.S. 1003 (1999) ................................................................................15

*Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607 (1992) ............................................8

*Republic of the Philippines v. Marcos,* 862 F.2d 1355 (9th Cir. 1988) (en banc),
*cert. denied,* 490 U.S. 1035 (1989)..........................................................................11

*Roeder v. Islamic Republic of Iran,* 333 F.3d 228 (D.C. Cir. 2003)....................................2

\*   *Sarei v. Rio Tinto PLC,* 221 F. Supp. 2d 1116 (C.D. Cal. 2002).......................................20

\*   *Simpkins v. Dist. of Col. Gov't,* 108 F.3d 366 (D.C. Cir. 1997) .........................................6

\*   *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court,* 482 U.S. 522
(1987).......................................................................................................................3

*Soudevar v. Islamic Republic of Iran,* 67 Fed. Appx. 614, 2003 WL 21401768
(D.C. Cir. June 10, 2003)..........................................................................................8

*Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distribs. Pty. Ltd,* 647 F. 2d
200 (D.C. Cir. 1981) ................................................................................................16

*Tachiona v. Mugabe,* 169 F. Supp. 2d 259 (S.D.N.Y. 2001)........................................11, 12

\*   *Transaero Inc. v. La Fuerza Aerea Boliviana,* 30 F.3d 148 (D.C. Cir. 1994), *cert.
denied,* 513 U.S. 1150 (1995) ...................................................................................2

## TABLE OF AUTHORITIES
continued...

**Page(s)**

*Uppendahl v. American Honda Motor Co.,* Civ. A. No. 3:03 CV-24-S, 2003 WL
    22705294 at *2 (W.D. Ky. Nov. 17, 2003)...............................................4

*Upton v. Empire of Iran,* 459 F. Supp. 264 (D.D.C. 1978), *aff'd,* 607 F.2d 494
    (D.C. Cir. 1979) ....................................................................9, 14

\*   *Volkswagenwerk Aktiengesellschaft v. Schlunk,* 486 U.S. 694 (1988) ...............................3

*Zedan v. Kingdom of Saudi Arabia,* 849 F.2d 1511 (D.C. Cir. 1988) ................................9


### Statutes:

\*   Foreign Sovereign Immunities Act of 1976, 28 U.S.C. §§ 1330, 1602-11 ........................2

    28 U.S.C. § 1605(a)(2)...........................................................................8

    28 U.S.C. § 1605(a)(5)...........................................................................9

    28 U.S.C. § 1605(a)(7).........................................................................23

    28 U.S.C. § 1608(b). ............................................................................5

D.C. Code Ann. (2001):

    § 13-422 .........................................................................................13

    § 13-423(a)(4). .................................................................................14


### Rules:

\*   Fed. R. Civ. P. 4, 1993 Notes of Advisory Committee......................................3

Fed. R. Civ. P. 4(d) ...................................................................................3

Fed. R. Civ. P. 12(b)(5)..............................................................................5

# TABLE OF AUTHORITIES
continued…

**Page(s)**

## Miscellaneous:

Brief for the United States as *Amicus Curiae, Magness v. Russian Fed'n,*
No. 00-20136 (5th Cir.), May 30, 2000. .................................................................5

\* Convention on the Service Abroad of Judicial and Extrajudicial Documents in
Civil or Commercial Matters, Nov. 15, 1965, [1969] 20 U.S.T. 361,
T.I.A.S. No. 6638 ("Hague Convention") ...........................................................4, 5

Form AO398 (Rev. 12/93), *at* http://www.uscourts.gov/forms/AO398.pdf (last
visited Nov. 11, 2003)...............................................................................................3

\* Israel's Decls. & Reservs. to the Hague Convention, *reprinted following*
Fed. R. Civ. P. 4 and *at* http://www.hcch.net/e/status/stat14e.html#il
(last visited Apr. 25, 2003) .......................................................................................5

"Israel: Process Service Guaranteed," *at* http://www.processnet1.com/israel.htm
(last visited Nov. 3, 2003).........................................................................................3

## INTRODUCTION

Plaintiffs' response to the Israeli Government Defendants' motion to dismiss reconfirms what was already obvious from the record before the Court: that this is a political case. Plaintiffs' theory seems to be that if they can conjure up charges that are sufficiently venomous, the Court must deny the motion to dismiss. The casualty of plaintiffs' approach is the law – ignored, distorted, or just plain miscited. Plaintiffs even fail to cite controlling authority from the D.C. Circuit that undercuts their claims. But the chasm between plaintiffs' contentions and legal reality is most readily apparent in their failure to mention this Court's decision *in this very case*, even though they identified the issuance of that opinion as a reason they needed yet more time to finalize their papers. Among other things, plaintiffs ignore the Court's findings that:

- "Even a sampling of the allegations raised in plaintiffs' complaint underscores the highly contentious political nature of their claims";

- "It is difficult to conceive of a more sensitive and volatile foreign policy context" than plaintiffs' claims regarding Israeli settlements; and

- "[T]he ongoing Iraqi conflict, the Palestinian Intifada, al Qaeda terrorism, and efforts to locate Saddam Hussein and Osama Bin Laden ... exacerbate the trip-wire tensions of the Middle East in general."

*Doe v. State of Israel,* Civ. A. No. 02-01431, slip op. at 13-14 (D.D.C. Oct. 3, 2003) ("*Doe* Mem. Op."). Those findings highlight why this case is not appropriate for judicial resolution. Legal argumentation might seek to dispute or distinguish them. But ignoring them is not legal argument. It is political pretense.

Other binding legal authorities fare no better at plaintiffs' hands. With regard to service of process, plaintiffs disregard the mandatory terms of the Hague Convention for serving overseas parties, as well as the bare minimum requirements of U.S. law for serving individual defendants. With regard to personal jurisdiction, they mangle the distinction between actions in the

defendants' personal and official capacities, despite the Court's ruling on the issue just last month.

They advance a muddled argument that personal jurisdiction is somehow portable, that a person

allegedly injured in Israel could create jurisdiction in this Court merely by coming here, without

telling the Court that the D.C. Circuit has rejected the argument. They urge the Court to override

the Department of State's binding invocation of Head of State immunity. And they advance

interpretations of the Foreign Sovereign Immunities Act ("FSIA") that would render that statute,

and the decisions of this Circuit applying it, null and void.

 This is political, not legal advocacy, invoking hyperbole, not precedent. Under any

accurate reading of established case law, the Complaint should be dismissed.

## ARGUMENT

## I. PLAINTIFFS' FAILURE TO PROPERLY SERVE THE ISRAELI GOVERNMENT DEFENDANTS CANNOT BE EXCUSED

 Plaintiffs ask this Court to ignore the binding precedent in this Circuit that service on

sovereign states and their core ministries, such as their defense and intelligence services, must

*strictly* adhere to applicable rules, in this case those specified by the Hague Convention.

*Transaero Inc. v. La Fuerza Aerea Boliviana,* 30 F.3d 148, 154 (D.C. Cir. 1994), *cert. denied,* 513

U.S. 1150 (1994).[1] Plaintiffs similarly ask this Court to ignore the Supreme Court's holding that

the Hague Convention is the *mandatory* mechanism for serving individual, non-sovereign

---

[1] Plaintiffs suggest that improper service may suffice for the Shin Bet because the *Transaero* decision addressed only "armed forces," not intelligence services. Pl. Br. 10 n.16. This Court has previously held that a nation's intelligence service is so central to its operations as a sovereign that it must be considered as the state itself and not as an agency or instrumentality for purposes of the FSIA. *See Regier v. Islamic Republic of Iran,* 281 F. Supp.2d 87, 102-03 (D.D.C. 2003) (Bates, J.) and *Dammarell v. Islamic Republic of Iran,* 281 F. Supp.2d 105, 201-02 (D.D.C. 2003) (Bates, J.), *both citing Roeder v. Islamic Republic of Iran,* 333 F.3d 228 (D.C. Cir. 2003). By the same logic, the "strict adherence" standard must apply to senior officials of the IDF and Shin Bet, and other senior Israeli officials performing core governmental functions, to the extent sued in their official rather than personal capacities. Such suits by definition name individuals as a proxy for the ministries they serve.

defendants in Hague signatory countries. *Volkswagenwerk Aktiengesellschaft v. Schlunk,* 486 U.S. 694, 705 (1988); *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Court,* 482 U.S. 522, 534 n.15 (1987); *see also* Fed. R. Civ. P. 4, 1993 Notes of Advisory Committee, ¶ 41 ("Use of the Convention procedures, when available, is mandatory if documents must be transmitted abroad to effect service"). Plaintiffs advocate this defiance of precedent without any explanation why they failed even to attempt proper service through Israel's Directorate of Courts, its Central Authority for Hague Convention purposes. Notably, even plaintiffs' *own* process server "highly recommend[s]" that service in Israel and other Hague Convention countries be made through their Central Authorities. *See* "Israel: Process Service Guaranteed," *at* http://www.processnet1.com/ israel.htm (last visited Nov. 3, 2003).

Every step of plaintiffs' argument is wrong as a matter of law. First, they contend that mailing requests for waiver of service pursuant to Fed. R. Civ. P. 4(d) should *itself* be deemed effective Hague Convention service. Pl. Br. 7-8. But the Advisory Committee notes state unequivocally that requests for waiver of service are not themselves valid service. Fed. R. Civ. P. 4, 1993 Notes of Advisory Committee, ¶ 20 ("transmission of the notice and waiver forms is a private nonjudicial act that *does not purport to effect service* .... Unless the addressee consents, receipt of the request under the revised rule does not give rise to any obligation to answer the lawsuit ....") (emphasis added). The very form approved for requesting waivers of service instructs recipients that "This is not a formal summons" and that the sender "will take appropriate steps to effect formal service" if the recipient chooses not to waive such proper service. Form AO398 (Rev. 12/93), *at* http://www.uscourts.gov/forms/AO398.pdf (last visited November 11, 2003).

3

Moreover, overwhelming authority confirms that the Hague Convention does not in any event authorize service by mail. Plaintiffs invoke Article 10(a), providing that the Convention "shall not interfere with ... the freedom to send judicial documents, by postal channels, directly to persons abroad" – but several federal courts of appeal, along with scores of district courts, have concluded that this refers only to transmission of legal documents following effective service, not to mail service of an initial summons and complaint. *See Nuovo Pignone SpA v. Storman Asia M/V,* 310 F.3d 374, 383-84 (5th Cir. 2002) (noting Article 10(a)'s use of the word "send" rather than "serve," "service" or "to effect service," used elsewhere in the Convention); *Bankston v. Toyota Motor Corp.*, 889 F.2d 172, 173-74 (8th Cir. 1989) (applying similar tools of statutory construction). As the Fifth Circuit recently explained, the structure of the Hague Convention also supports this result:

> [O]ther provisions of the Hague Convention describe more reliable methods of effecting service. Service of process through a central authority under articles 2 through 7 and service through diplomatic channels under articles 8 and 9 require that service be effected through official government channels. It is unlikely that the drafters would have put in place these methods of service requiring the direct participation of government officials, while simultaneously permitting the uncertainties of service by mail.

*Nuovo Pignone,* 310 F.3d at 384-85.[2]

---

[2] Plaintiffs cite *Ackermann v. Levine,* 788 F.2d 830 (2d Cir. 1986), which presumed Article 10(a)'s language was merely "careless drafting" and permitted service by mail in the United States to enforce a German court judgment. *Id.* at 838-39. Many other courts have explicitly rejected *Ackermann*'s interpretation of Article 10(a) in favor of the more persuasive reasoning of the other Courts of Appeal cited above. *See, e.g., Uppendahl v. American Honda Motor Co.,* Civ. A. No. 3:03 CV-24-S, 2003 WL 22705294 at *2 (W.D. Ky. Nov. 17, 2003); *Knapp v. Yamaha Motor Corp.,* 60 F. Supp.2d 566, 569-73 (S.D. W.Va. 1999); *Golub v. Isuzu Motors,* 924 F. Supp. 324, 327-28 (D. Ma. 1996); *Brand v. Mazda Motor of America,* 920 F. Supp. 1169, 1172 (D. Kan. 1996); *Arco Elecs. Control Ltd. v. Core Int'l,* 794 F. Supp. 1144, 1147 (S.D. Fla. 1992) (rejecting Israeli corporation's effort to serve U.S. company by mail). Even within the Second Circuit, courts have distinguished *Ackermann* on the grounds that mail service is commonly accepted in the United States. *See Casio Computer Co. v. Sayo,* No. 98-CV-3772 (WK), 2000 WL 1877516, at *28 (S.D.N.Y. Oct. 13, 2000).

Second, plaintiffs ask this Court to excuse their failure to attempt proper service, on the grounds that the defendants learned about the case anyway. Pl. Br. 7. If this argument were valid, a defendant could never move under Fed. R. Civ. P. 12(b)(5) to challenge service, because the motion itself would demonstrate awareness of the lawsuit. That is not the law. It would eviscerate both the FSIA's "strict compliance" requirement and the Hague Convention's "mandatory" coverage. *See supra.* Moreover, in this case it would effectively nullify Israel's sovereign rejection of international service by private process server – an integral part of its ratification of the Hague Convention. *See* Def. Br. 11 (discussing Israel's declaration with respect to Articles 10(b) and (c), which has previously been interpreted to bar service by private process server).

Even setting aside these legal errors, plaintiffs have not come close to serving the Israeli Government Defendants in the manner required by U.S. law. Plaintiffs claim to have served Israel, the IDF and Shin Bet, and the individual defendants in their official capacities, simply by leaving copies of the summons and complaint with security guards or receptionists at entrances to government buildings. *See* Pl. Returns of Service. But as the U.S. Government stated in the *Magness* case, *it* would never accept such service on the United States, its government agencies or its officials, and in fact has objected on this ground in foreign lawsuits. Def. Br. 11-12 (citing U.S. *amicus* brief in *Magness v. Russian Fed'n,* No. 00-20136 (5th Cir.), May 30, 2000, at 22-23).

Further, plaintiffs fail to discuss, much less abide by, this Court's decision emphasizing the difference between serving government employees in their individual versus serving them in their personal capacities. *Doe* Mem. Op. 8-9. Plaintiffs analyze service on the individual defendants in their personal capacity as if they were "instrumentalities" of the state, subject to the service mechanisms of 28 U.S.C. § 1608(b) rather than the Hague Convention rules applicable to all other Israeli individuals. Pl. Br. 10. The § 1608(b) analysis is irrelevant, except as it reveals – as do

5

many other aspects of plaintiffs' papers – that their claim to be pursuing the eleven individual

defendants in their personal capacities is a sham.

This issue aside, plaintiffs have ignored the most basic U.S. rules for serving individual

defendants in their personal capacities. Plaintiffs now effectively concede that they never

"personally served" any of the individual defendants. *See* Pl. Returns of Service (failing

consistently to check relevant box for personal service). Instead, their process server claims to

have left papers for each individual defendant at his "dwelling house or usual place of abode with

a person of suitable age and discretion then residing therein." *Id.* But plaintiffs' brief – and the

returns of service themselves – show that the process server did no such thing. Instead, he merely

left documents at government ministries with whatever security guards, receptionists or other

personnel he happened to encounter. *See* Pl. Br. 9 (documents were delivered "to Defendants'

offices"); Pl. Returns of Service. For example, plaintiffs' process server claims to have left papers

with a *single* individual, one Jacob Shoshany, for all five defendants presently or formerly

affiliated with Israel's defense forces. Similarly, plaintiffs' process server claims to have served

all eleven defendants, in their personal capacities, through the exact same recipients who

purportedly accepted service for these defendants in their official capacity. Even in the United

States, service on government officials in their individual capacities – in actions alleging personal

liability for exceeding the scope of their authority – may not be accomplished by leaving papers at

their government offices. *See, e.g., Simpkins v. Dist. of Col. Gov't,* 108 F.3d 366, 369 (D.C. Cir.

1997) (Secretary of Department of Health and Human Services, against whom *Bivens* claim was

brought, had to be served as individual rather than as federal officer); *Deutsch v. U.S. Dep't of

Justice,* 881 F. Supp. 49, 52 (D.D.C. 1995), *aff'd,* 93 F.3d 986 (D.C. Cir. 1996) (*Bivens* complaint

must be either delivered personally to individual prison officers or left at their residences; service

6

on Attorney General and U.S. Attorney, pursuant to rules for serving officials in their official capacity, did "not obviate the requirement of personal service … where the action is against a federal official in his … individual capacity").

Fifteen months after filing this case, four months after the Israeli Government Defendants identified the flaws in their purported service, six weeks after this Court faulted plaintiffs for failing to attempt proper service on U.S. government officials, their request for yet more time to cure their very basic mistakes falls flat. Plaintiffs have far exceeded any reasonable limits on judicial patience. *Cf. Doe* Mem. Op. 9 (denying as "futile" plaintiffs' request for a further chance to serve President Bush and Secretary Powell individually, in light of other fatal flaws in their claims). The Court should dismiss this case because of plaintiffs' failure to effect proper service.

## II.    PLAINTIFFS HAVE DEMONSTRATED NO BASIS FOR ABROGATING THE IMMUNITY OF THE ISRAELI GOVERNMENT DEFENDANTS

Fidelity to both precedent and logic suffers further when plaintiffs seek to evade the sovereign immunity extended to the Israeli Government Defendants under the FSIA.  For example, plaintiffs claim that Israeli settlements constitute "commercial activity," Pl. Br. 24-26, at the same time they assert that those settlements embody a national policy of "territorial expansion."  Compl. ¶ 96.  They claim that sovereign immunity does not cover the individual defendants because their alleged acts *could not* have been undertaken in the official capacities, Pl. Br. 12-16.  At the same time, they assert again and again that they have sued these individuals in *both* their *official* and their personal capacities.  Compl. ¶¶ 26-38. 477.  These missteps of logic, coupled with the pervasive miscitation of authority, reinforce yet again the political, rather than legal nature of plaintiffs' claims.

7

**A.     The Exceptions to the FSIA Do Not Apply to the Claims Against Israel, the IDF and Shin Bet, and the Individuals Sued in Their Official Capacities**

Plaintiffs attempt to recast this lawsuit as one based upon "private real estate development" by the Israeli Government Defendants, and thus based on acts "in connection with a commercial activity" under 28 U.S.C. § 1605(a)(2). Pl. Br. 24-26. The Court will scour the Complaint in vain for any suggestion of commercial activity, or for that matter, for the word "commercial." Indeed, the crux of plaintiffs' claims is that they or their relatives were injured in the course of Israeli *military and security* operations in certain West Bank cities, following the "Second Intifada" in 2002 and the proliferation of suicide bombings of Israeli civilians. No case, anywhere, has suggested that such military activities are "the type of actions by which a private party engages in 'trade and traffic or commerce." *Republic of Argentina v. Weltover, Inc.,* 504 U.S. 607, 614 (1992); *see also* Def. Br. 17-18.

Even if this case did arise from a "commercial activity," plaintiffs would have to show a "direct effect" in the United States from alleged misconduct in Israel, the West Bank or Southern Lebanon. Their attempt to do so is frivolous. Plaintiffs concede that they or their relatives sustained their immediate injuries overseas. But, plaintiffs assert, some of the injured parties continued to suffer pain and financial loss after they returned to the United States, and the relatives of those killed or injured abroad suffered emotional distress in the United States. Pl. Br. 27-29. If this position were right, sovereign immunity would be hollow indeed. A plaintiff injured abroad could frustrate the FSIA simply by coming here, or by telling a friend or relative here what happened. The law is not so witless. Indeed, the D.C. Circuit, in controlling authority, has rejected this argument. *See, e.g., Soudevar v. Islamic Republic of Iran,* 67 Fed. Appx. 614, 618-19, 2003 WL 21401768 (D.C. Cir. June 10, 2003) ("a mere financial loss by a resident of the United States does not constitute a 'direct effect' in the United States"); *Princz v. Fed. Republic of*

*Germany,* 26 F.3d 1166, 1173 (D.C. Cir. 1994), *cert. denied,* 513 U.S. 1121 (1995) ("The

lingering effects of a personal injury suffered overseas can not be sufficient to satisfy the direct

effect requirement of the FSIA."); *Zedan v. Kingdom of Saudi Arabia,* 849 F.2d 1511, 1514 (D.C.

Cir. 1988) (financial hardship in United States was not direct effect of failure to honor contract in

Saudi Arabia). There is no intimation in any of these cases, nor in the many supporting district

court decisions from this Circuit,[3] that the FSIA analysis somehow turned on the length of time

between the injury and the injured party's return to the U.S., as plaintiffs suggest. Pl. Br. 27-28.[4]

    Because both the torts and the immediate injuries alleged occurred thousands of miles

away, the "tortious act" exception to the FSIA likewise does not apply. 28 U.S.C. § 1605(a)(5).

As previously discussed, this exception requires that both the tortious act and the injury to plaintiff

occur in the United States. *See* Def. Br. 19 (citing cases).[5] Plaintiffs' efforts to identify *some* tort

in the United States are flimsy: for example, they suggest that the Israeli Government Defendants

inflicted emotional distress on Jane Doe I when she viewed television news reports of Israel's acts

overseas. Pl. Br. 30. No case anywhere has adopted such a theory, and for good reason. If it held,

---

[3] *See, e.g., Gulf Res. America v. Republic of Congo,* 276 F. Supp.2d 20, 26 (D.D.C. 2003) ("the fact than an American individual ... suffers some financial loss from a foreign tort cannot ... suffice to trigger the exception"); *Keller v. Transportes Aereos Militaries Ecuadorianos,* 601 F. Supp. 787, 789-90 (D.D.C. 1985) (dismissing wrongful death action because injuries to decedent's relatives, as a result of his death in Ecuadorian plane crash, were not a "direct effect in the United States"); *Upton v. Empire of Iran,* 459 F. Supp. 264, 266 (D.D.C. 1978), *aff'd,* 607 F.2d 494 (D.C. Cir. 1979) (dismissing action by survivors of individuals killed in Iran).

[4] Plaintiffs' effort to posit even more attenuated effects in the United States, such as effects on the economy from diminution in U.S. exports or travel to Palestinian areas, Pl. Br. 27, is equally unavailing. The law is clear that such remote effects are "simply 'ripples' of events commenced and concluded entirely overseas," *Gulf Res.,* 276 F. Supp.2d at 27, and as such fall far short of the requirement that effects follow as an "immediate consequence" of defendants activity, with "no intervening element[s]." *Croesus EMTR Master Fund L.P. v. Federative Republic of Brazil,* 212 F. Supp.2d 30, 35-36 (D.D.C. 2002) (Bates, J.) (quotations omitted).

[5] As with the commercial activity exception, the noncommercial tort exception may not be invoked simply because alleged torts overseas may have had residual effects in the United States. *See Argentine Republic v. Amerada Hess Shipping Corp.,* 488 U.S. 428, 441 (1989) (§ 1605(a)(5) covers only torts occurring within the territorial jurisdiction of the United States"); *Frolova v. USSR,* 761 F.2d 370, 379 (7th Cir. 1985) (noting "explicit legislative history" requiring that both the tortious act and the injury "occur in the United States").

the prevalence of U.S. news reports from around the world could extinguish the sovereign immunity of most foreign states for acts having no other connection to the United States.

## B.   Plaintiffs Cannot Challenge the Immunity of Foreign Officials Sued in Their Individual Capacities

Plaintiffs argue that the individual Israeli defendants, whom they purport to sue in both official and personal capacities, could never enjoy immunity because the acts allegedly committed by soldiers or security officers under their control *by definition* fall outside the scope of legitimate authority. Pl. Br. 12-16.  As noted, plaintiffs are the ones who alleged in the first place that these individuals acted in their official capacities.  But that issue aside, as shown in Sections I *supra* and III *infra*, plaintiffs have neither served nor established personal jurisdiction over these defendants in their personal capacities.  This Court previously dismissed all claims brought against President Bush and Secretary of State Powell in their personal capacity because plaintiffs had failed to distinguish between their official and individual positions. *Doe* Mem. Op. 8-9.  The same result is warranted here, and it renders moot the issue – addressed in Defendants' opening brief – whether sovereign immunity protects foreign officials charged with command responsibility, as part of their jobs, for others who allegedly exceeded their authority. Def. Br. 19-23.

## C.   Head of State Immunity for Prime Minister Sharon is Mandated by the Law

Plaintiffs ask this Court to ignore long-settled law and override the State Department's binding invocation of head of state immunity for Prime Minister Ariel Sharon. Again, plaintiffs' principal ground for this request – that the FSIA displaced the State Department's role as authoritative determiner of head of state immunity, leaving that issue open for judicial determination, Pl. Br. 21-22 – contravenes established precedent. *See, e.g., Plaintiffs A, B, C, D, E, F vs. Jiang Zemin,* 282 F. Supp.2d 875, 881 (2003) ("The pre-1976 suggestion of immunity

10

procedure thus survives the statute's enactment with respect to heads of state.  The Court must defer to the United State's suggestion of immunity"); *Tachiona v. Mugabe*, 169 F. Supp.2d 259, 296-97 (S.D.N.Y. 2001) ("the FSIA does not serve to abrogate the State Department's decisive role in the recognition of Head-of-State immunity"); *Leutwyler v. Office of Her Majesty Queen Rania Al-Abdullah*, 184 F. Supp.2d 277, 280 (S.D.N.Y. 2001) ("Executive Branch decision [on head of state immunity] is entitled to conclusive deference from the courts."); *First American Corp. v. Al-Nahyan*, 948 F. Supp. 1107, 1119 (D.D.C. 1996) (enactment of the FSIA in no way limited "the power of the State Department, on behalf of the President as Chief Executive, to assert immunity for heads of state); *Lafontant v. Aristide*, 844 F. Supp. 128, 137 (E.D.N.Y. 1984) ("the pre-1976 suggestion of immunity procedure survives the FSIA with respect to heads-of-state").

No case supports plaintiffs' argument that the Court may disregard the State Department's invocation of immunity because plaintiffs claim violations of *jus cogens* norms.  Pl. Br. 22. Several cases confirming the State Department's decisive role involved alleged violations of *jus cogens* principles.  *See, e.g., Jiang Zemin*, 282 F. Supp.2d at 883 (explicitly rejecting request for a *jus cogens* exception to head of state immunity); *Tachiona*, 169 F. Supp.2d at 297 (confirming head of state immunity despite plaintiffs' claims of *jus cogens* violations including torture).  By contrast, the one case plaintiffs cite to support "piercing Defendant Sharon's immunity," Pl. Br. 22, did not even *address* head of state immunity.  *See Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1361 (9th Cir. 1988) (en banc), *cert. denied*, 490 U.S. 1035 (1989).

Nor is there authority for the notion that head of state immunity cannot cover the acts of a sitting Prime Minister performed before he assumed office.  Pl. Br. 22.  The essential purpose of head of state immunity is to assure that a recognized leader is a "representative of his nation"

11

entitled to the dignity of that office, who "must be able to freely perform [his] duties at home and abroad without the threat of civil or criminal liability in a foreign legal system." *Lafontant,* 844 F. Supp. at 132; *see also Tachiona,* 169 F. Supp.2d at 29 (noting the need for universal policies "designed to safeguard that heads-of-state abroad be accorded the mutual respect and personal dignity to which their status entitles them," and to avoid the "potential for harm to diplomatic relations ... [from claims] that essentially entail branding a foreign ruler with the ignominy of answering personal accusations of heinous crimes"). These concerns are applicable to suits against sitting heads of state or government, *regardless* of whether the acts at issue in the suit occurred during or prior to the defendant's tenure as leader of his nation. *See Daventree Ltd. v. Republic of Azerbaijan*, Civ. A. No. 02 6356, slip op. (S.D.N.Y. Oct. 10, 2003) (submitted herewith) (dismissing suit against then-Prime Minister Aliyev of Azerbaijan, based on State Department Suggestion of Immunity, even though claims arose from events prior to his taking office).[6]

Finally, the suggestion that Prime Minister Sharon somehow waived his immunity as head of state, by initiating a defamation claim in the U.S. some twenty years ago (long before he ever became head of state), makes no sense. Pl. Br. 23-24. Not surprisingly, the cases plaintiffs cite do not so hold. *Paul v. Avril,* 812 F. Supp. 207 (S.D. Fla. 1993), and *In re Doe,* 860 F.2d 40 (2d Cir. 1988), merely state the unexceptional proposition that a *state* may waive the immunity of its former leaders. That did not happen here. The other cases plaintiffs cite purportedly to show that "immunity can be waived by suing on claims arising from the same underlying subject matter," Pl.

---

[6] *Jones v. Clinton,* 869 F. Supp. 690, 698 (E.D. Ark. 1994), *aff'd and rev'd in part,* 72 F.3d 1354 (8th Cir. 1996), *aff'd,* 520 U.S. 681 (1997), is far afield from this case. That decision addressed the amenability of a U.S. President to a domestic lawsuit under U.S. law. It did not implicate concerns regarding international comity, foreign policy, the rights of sovereign nations, or the exposure of U.S. Presidents to suits abroad, which underlie head of state immunity.

12

Br. 23, did not involve head of state immunity at all.  They do not address whether a private

citizen could personally waive a *future* immunity that properly belongs to his sovereign state to

protect its sitting head of government.  No case holds, or even intimates, that he could do so.

## III.    PLAINTIFFS CANNOT ESTABLISH JURISDICTION OVER THE ISRAELI OFFICIALS SUED IN THEIR PERSONAL CAPACITIES

Plaintiffs would have this Court ignore both the requirements of D.C. law for exercising

personal jurisdiction over individual nonresidents, and the Court's own prior opinion in this case

enforcing the critical distinction between suits against government officials as representatives of

their office and those in their personal capacities.  Again, the law is so clear as to expose the

misuse of this forum for political ends.

To begin with, there is no jurisdiction over the individual Israeli defendants under either

the D.C. general jurisdiction statute or the D.C. long-arm statute.  The general jurisdiction statute,

D.C. Code § 13-422 (2001), authorizes jurisdiction in any cause of action over natural personals

who are "domiciled in ... or maintain[] [their] principal place of business in the District of

Columbia."  Although plaintiffs weakly assert that the Court "may" have general jurisdiction, Pl.

Br. 44, it is undisputed that none of the eleven individuals either resides or is principally employed

in the United States, much less within the District.  *See Dickson v. United States,* 831 F. Supp.

893, 897 (D.D.C. 1993) (dismissing suit against CIA officials in their personal capacities where

plaintiff neither alleged personal residence nor principal place of business in the District).

The D.C. long-arm statute requires that the claim arise from "tortious injury in the District

of Columbia" by a nonresident who "regularly does or solicits business, engages in any other

persistent course of conduct, or derives substantial revenue from goods used or consumed, or

services rendered, in the District of Columbia."  D.C. Code § 13-423(a)(4).  Although plaintiffs

13

speculate that some of the individual defendants may have "engaged in a persistent course of conduct with the District and the United States," Pl. Br. 44, plaintiffs cannot meet the *threshold* requirement of having suffered a "tortious injury in the District of Columbia." As previously discussed, the Complaint specifically alleges direct injury to each of the plaintiffs or their decedents in Israel, the West Bank or Southern Lebanon, not in the District. Def. Br. 18 n.6. The best theory plaintiffs can come up with now, to posit a direct tortious injury *anywhere* in the United States, is that two women in the U.S. suffered emotional distress in learning of the deaths or injuries of their relatives in the Middle East. Pl.. Br. 30. Accepting this argument would render the long-arm statute meaningless. An injured party could create personal jurisdiction simply by telling someone in the District about acts committed elsewhere. No case has allowed that. Moreover, the D.C. Circuit has rejected plaintiffs' back-up theory – that the long-arm statute "perhaps" may be satisfied when a U.S. citizen continues to suffer physical and economic effects of their overseas injuries after their return to the United States, Pl. Br. 44. *See Gandal v. Telemundo Group, Inc.,* 997 F.2d 1561, 1565 (D.C. Cir. 1993) (return to the United States after overseas injury does not satisfy long-arm statute); *see also Upton v. Empire of Iran,* 459 F. Supp. 264, 266 (D.D.C. 1978), *aff'd,* 607 F.2d 494 (D.C. Cir. 1979) ("[C]ausing injury to American citizens abroad is insufficient to satisfy the requirements of the District of Columbia long-arm statute."). Once again, plaintiffs neglect to inform the Court of this controlling authority.

Plaintiffs also attempt to bypass the D.C. long-arm statute by invoking a federal "effects test" for jurisdiction over nonresidents whose activities outside the forum were "calculated to cause and did cause injurious effects to plaintiffs in the forum state." *Midland v. F. Hoffman-Laroche, Ltd. (In re Vitamins Antitrust Litig.),* 270 F. Supp.2d 15, 32 (D.D.C. 2003). Pl. Br. 34. This argument is specious. First, even as plaintiffs formulate the test, the acts have to be

14

"calculated" to cause injury here, that is, the defendant must have "'purposefully directed' his activities at residents of the forum." *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472 (1985). That standard may have been satisfied when Libyan terrorists deliberately blew up a Pan Am flight en route to the United States. *See Rein v. Socialist People's Libyan Arab Jamahiriya,* 995 F. Supp.2d 325, 330 (E.D.N.Y. 1998), *aff'd in relevant part,* 162 F.3d 748 (2d Cir. 1998), *cert. denied,* 527 U.S. 1003 (1999). But it cannot be satisfied here. The accusations in the Complaint are sweeping and vitriolic, but nowhere do plaintiffs allege that the Israeli soldiers or police personnel who purportedly harmed plaintiffs or their relatives singled them out because they were American citizens, nor even *knew* at the outset that they had any connection to the United States.[7] Moreover, this theory still does not excuse plaintiffs from establishing – indeed it is predicated on – "injurious effects to plaintiffs in the forum state," *Midland,* 270 F. Supp.2d at 32, which do not exist here.[8]

Plaintiffs' misbegotten jurisdictional theories also cannot begin to justify discovery into the individual defendants' contacts with the forum or even with the United States as a whole. Pl. Br. 46-47. Although a showing of such contacts would be *necessary* to satisfy the second prong of the D.C. long arm statute (a "persistent course of conduct" in the District) or to meet constitutional minimum contacts requirements, it would not be *sufficient* for specific jurisdiction. Discovery

---

[7] At most, plaintiffs aver that Israeli guards *disregarded* two plaintiffs' claims of U.S. connections, in pursuing allegedly tortious activity they had begun independent of that knowledge. Pl Br. 36.

[8] For the reasons discussed in Defendants' opening brief, plaintiffs also cannot meet the heightened pleading requirements for establishing jurisdiction through the acts of alleged co-conspirators rather than through personal acts of the defendants. Plaintiffs have done no more than vent hysterical theories about a conspiracy "to drive the Palestinian population from the Palestinian territories" and to "expand the territory of Israel by killing or removing Palestinians" through heinous means. Pl. Br. 39. Moreover, the only overt acts they allege within the United States in support of the alleged conspiracy involve supposed fundraising by a particular Israeli settlement on its own behalf. Pl. Br. 42. Plaintiffs have made no effort to link the individual Israeli defendants to such fundraising, nor to articulate how the alleged injuries from such a fundraising "conspiracy" arguably occurred in the District or anywhere in the United States.

15

should not be permitted where the results apparently would be futile. *See, e.g., Caribbean Broad. Sys. v. Cable & Wireless PLC,* 148 F.3d 1080, 1090 (D.C. Cir. 1998) ("'it is reasonable for a court ... to expect the plaintiff to show a colorable basis for jurisdiction before subjecting the defendant to intrusive and burdensome discovery'") (citation omitted).

Plaintiffs certainly cannot bootstrap their way to jurisdictional discovery by citing news clips that for the most part on their face involve the individual defendants' official visits to the United States, Pl. Br. 45-46, because such contacts are irrelevant to the jurisdictional inquiry here. *See, e.g., Pollack v. Meese,* 737 F. Supp. 663, 666 (D.D.C. 1990) ("The law is clear that a persistent course of conduct may be deemed to constitute the transaction of business for the assertion of personal jurisdiction *only if that persistent conduct is undertaken in that person's individual capacity* rather than an official capacity conducting business for his employer.") (emphasis added). This distinction between official and personal contacts is particularly critical where the purpose of the foreign officials' visit to the United States is to meet in D.C. with their counterparts in the U.S. government.[9] To hold otherwise – subjecting foreign officials to personal suit in the District solely because they came here on official business to meet with U.S. federal officials – could chill the practice of international diplomacy. If other countries adopted plaintiffs' logic, for example, it would leave Secretary of State Powell vulnerable to personal suit in dozens of countries around the world simply because he has traveled widely on the United States' business.

---

[9] Plaintiffs have identified no authority for their proposition that the "government contacts" exception to the D.C. long-arm statute should be limited to U.S. citizens. Pl. Br. 34 n.55. Indeed, authority in this jurisdiction, which plaintiffs fail to cite, holds just the opposite. *See, e.g., Dooley v. United Techn. Corp.,* 803 F. Supp. 428, 435 n.4 (D.D.C. 1992) (rejecting assertion that government contacts exception does not apply to foreign parties); *see also Stabilisierungsfonds Fur Wein v. Kaiser Stuhl Wine Distribs. Pty. Ltd,* 647 F. 2d 200, 205 n.11 (D.C. Cir. 1981) (applying government contracts exception to Australian wine company).

16

Plaintiffs' insistence to the contrary – that Israeli officials may be sued in their personal capacities solely because they visited the United States as representatives of their government, Pl. Br. 32, illustrates again their refusal to follow (or even cite) this Court's opinion distinguishing between suits against officials in their personal and their official capacity.[10]  Essentially, for personal jurisdiction as for service, plaintiffs try to have it both ways.  They seek to circumvent the defenses available in official capacity suits by purportedly suing individual defendants as private citizens, but at the same time seek to circumvent the procedural requirements for suing private individuals by relying on their public positions and their public acts.  The Court should not countenance such manipulations.

In any event, even clearly personal visits to the United States would have limited relevance for this case, where plaintiffs have not even tried to suggest any connection between such visits and the alleged tortious activity overseas.  *See Burnett v. Al Baraka Inv. & Dev. Corp.,* Civ. A. No. 02-1616, 2003 WL 2003 WL 22683337 at *10 (D.D.C. Nov. 14, 2003) (dismissing personal capacity claims against Saudi Arabia's Prince Sultan where plaintiffs "have not indicated … [how] speaking engagements, or an American education, might have been connected with their cause of action").

---

[10] Another example is plaintiffs' invocation of FSIA cases to suggest that this Court may disregard the absence of D.C. contacts for private individuals and instead aggregate all their contacts with the United States. Pl. Br. 31 n.52. These arguments are completely inconsistent with plaintiffs' strident insistence that the FSIA is wholly inapplicable to their claims against the individual defendants in their personal capacities.

## IV.    THIS SUIT IS NOT JUSTICIABLE

### A.    This Case Raises Highly Sensitive Political Questions Appropriately Reserved for the Executive Branch

Although plaintiffs characterize this action as an "ordinary tort suit," Pl. Br. 51, it is clearly anything but. Allegations regarding injuries to particular individuals are merely a launching pad for a political screed. Plaintiffs seek to establish that the Israeli government, including its core ministries and its most senior leaders, have adopted broad policies and practices plaintiffs deem "genocide, crimes against humanity, war crimes" and other sweeping violations of international law. Pl. Br. 6, 12; Compl. ¶¶ 427, 432, 437. Plaintiffs ask this Court to make fundamental determinations whether "the creation and expansion of Jewish settlements" are legitimate, Pl. Br. 20, whether the exercise of military power by Israeli forces is proper, whether Israel has a "discernable military or security objective" in the West Bank, whether it has engaged in legitimate self defense, and whether it has "use[d] ordinary or reasonable care" to avoid civilian injuries. Def. Br. 32 (quoting various allegations in the Complaint). And plaintiffs ask this Court to make liability findings under a theory of "command responsibility" that would entail intrusive inquiry into the command structure and rules of engagement of Israeli military forces, as well as the communications among field officers, their immediate superiors, and their commanders all the way up the line. Def. Br. 44.

Plaintiffs simply ignore the Court's prior opinion in this case, which recognized that Plaintiffs had presented "highly contentious political ... claims" in a uniquely "sensitive and volatile foreign policy context." *Doe* Mem. Op. 13-14. By contrast, plaintiffs provide at least the courtesy of acknowledging the Executive Branch's determination that adjudication of the "appropriateness of Israeli actions undertaken in the midst of an ongoing armed conflict abroad that the United States (through its political branches) is attempting to resolve ... would intrude

18

upon the foreign policy prerogatives of the political branches." Fed. Defendants' Motion to Dismiss at 37.[11]  But then plaintiffs beknight themselves as better judges of that issue than those actually responsible for conducting the foreign affairs of the United States.  And although plaintiffs acknowledge the U.S. government's position, they ignore the legal consequences that flow from it.  Thus, plaintiffs rely on *Kadic v. Karadzic,* 70 F.3d 232 (2d Cir. 1995), for the proposition that human rights allegations may be heard in U.S. court without triggering political question concerns.  Pl. Br. 48.  But there, the U.S. Government had "expressly disclaimed any concern that the political question doctrine should be invoked to prevent litigation of these lawsuits."  70 F.3d at 250.  The case thus supports the central point here – that the judiciary should defer to the Executive Branch in cases that may "present difficulties that implicate sensitive matters of diplomacy historically reserved to the jurisdiction of the political branches."  *Id.* at 249.

Plaintiffs' invocation of State Department human rights reports, Pl. Br. 53, also proves rather than disproves the Israeli Government Defendants' point.  Whatever the accuracy or inaccuracy of these reports, they clearly show that the State Department is actively engaged in detailed and ongoing review of human rights issues, to assist the President and Secretary of State in making delicate and nuanced judgments about complex issues of U.S. foreign policy.  That the Department has undertaken that review highlights the dangers of interposing an additional process, disconnected from the apparatus of foreign policy and dependent upon fact-finding where the power to subpoena documents and interrogate witnesses is delegated to private members of the Bar, answerable only to their clients.  A recent ATCA case against Chinese officials rejected just

---

[11] Unlike other ACTA cases, the U.S. government was a party in this case, and the Executive Branch therefore has stated its views already in briefs filed with the Court.  There is thus no need to solicit additional input from the State Department, as courts have done in some other ATCA cases, although the Israeli Government Defendants would not object to such a solicitation.

the argument plaintiffs offer here, recognizing the potential conflict between coordinate branches

of government even though the State Department had condemned the conduct at issue:

> First, pronouncements or rulings from the different branches may have
> different implications. ... [T]he imprimatur of formal findings by a federal
> court might in some circumstances have foreign policy implications beyond
> that desired by the Executive Branch.
>
> Second and more importantly, ... there may be different approaches to
> diplomacy in regard to [the PRC's human rights policy]. As past debates
> over other foreign diplomatic efforts have demonstrated, there are a variety
> of approaches to changing a foreign state's policy .... Thus, for instance, an
> order imposing a significant damage award upon the two defendant officials
> or issuing an injunction could well conflict with the 'tools' alluded to by the
> State Department which the Executive Branch chooses to apply 'within the
> context of our broader foreign policy interests.'

*Doe v. Liu Qi*, No. C-02-0672 CW (EMC), Magistrate's Report and Recommendation (N.D. Ca.

June 11, 2003), at 40-42 (submitted herewith).

In other words, the Executive Branch – not plaintiffs -- can best judge whether this case

will harm the conduct of foreign affairs.   Here, the Executive Branch has spoken.   As several

courts have now observed, "plaintiffs have not cited, and the court has not found, a single case in

which a court permitted a lawsuit to proceed in the face of an expression of concern such as that

communicated by the [Executive Branch] here." *Sarei v. Rio Tinto PLC*, 221 F. Supp.2d 1116,

1192 (C.D. Cal. 2002); *Liu Qi, supra*, at 42.   As this Court's prior opinion strongly suggests, this

is not the case to break such new ground.

### B.    The Act of State Doctrine Applies

Plaintiffs present two arguments why it purportedly would be inappropriate for this Court

to invoke the act of state doctrine to bar their claims.   First, they contend that "most of the

incidents complained of" were not within Israel's own borders, but in the West Bank or Southern

Lebanon.   Pl. Br. 54.   Again, plaintiffs fail to keep their arguments straight.   Their Complaint

20

alleges that injuries caused by individual Israeli soldiers or security officers were the result of broad policies, decisions and practices determined at senior levels of the Israeli government.[12] If there were such alleged policies, decisions and practices, they necessarily would have originated at the seat of Israel's government. In other words, this case would require the Court to adjudicate core acts or decisions of a foreign sovereign and its representatives within its own borders. That is precisely what the act of state doctrine was designed to prevent. *See generally Jimenez v. Aristeguieta,* 311 F.2d 547, 557 (5th Cir. 1962), *cert. denied,* 373 U.S. 914 (1963) (defining the doctrine as "essentially the principle that conduct of one independent government cannot be questioned by the courts of another").

Second, plaintiffs argue that the act of state doctrine can not bar adjudication of acts allegedly outside the scope of proper authority, such as violations of *jus cogens* norms. Pl. Br. 55. In other words, plaintiffs claim that they have complete control over when the act of state doctrine applies. All they have to do is ratchet up their claims, make reckless and rancorous accusations, and Israel's sovereign rights evaporate. That is not the law. As was held in *Liu Qi,* "the act of state doctrine is not rendered inapposite" simply because plaintiffs allege violations of international law or *jus cogens* norms. *Liu Qi, supra* at 34 (citing *Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 431 (1964)).

Although the existence of *jus cogens* norms may be relevant to the first *Sabbatino* factor, "the degree of codification or consensus concerning a particular area of international law," it is the second factor, the "implications of an issue ... for our foreign relations," *Sabbatino,* 376 U.S. at 428, that is the "touchstone" or "crucial element" in act of state analysis. *Int'l Ass'n of Machinists*

---

[12] *See, e.g.,* Compl. ¶¶ 178, 185, 194, 423, 431 (alleging "systematic patterns," "official policy at the highest levels," "secret procedures" and "pattern and practice," all of them "under the direction, encouragement or acquiescence of the Israeli government and military high command").

*v. OPEC,* 649 F.2d 1354, 1360 (9th Cir. 1981), *cert. denied,* 454 U.S. 1163 (1982). As the Court of Appeals for the Ninth Circuit has held, the act of state doctrine is essentially another iteration of the political question doctrine, requiring "courts to defer to the executive or legislative branches of government when those branches are better equipped to handle a politically sensitive issue." *Northrop Corp. v. McDonnell Douglas Corp.,* 705 F.2d 1030, 1046 (9th Cir.), *cert. denied,* 464 U.S. 849 (1983). For purposes of the second *Sabbatino* factor, "[w]here a foreign state's policy is the specific subject of foreign diplomacy by the State Department, the separation of powers considerations underlying the act of state doctrine are implicated *regardless of whether the subject policy is consistent with the foreign state's laws,"* and therefore regardless of whether the alleged misconduct was or was not within the scope of proper authority. *Liu Qi, supra* at 37 (emphasis added). If the Executive Branch has deemed the suit potentially harmful to its ability to freely conduct foreign relations, as it has here, the second *Sabbatino* factor is satisfied.

Once again, plaintiffs simply ignore the inconvenient fact that the Executive Branch here has stated that judicial inquiry regarding the legitimacy of Israel's military actions would interfere with the foreign policy of the United States. That was true in *none* of the cases plaintiffs cite. In *Kadic,* as previously discussed, the Executive Branch had "expressly disclaimed any concern" about the impact on U.S. foreign relations of a private suit against Radovan Karadzic, 70 F.3d at 250, not surprising given the U.S. Government's own efforts to bring him to justice before an international war crimes tribunal at the Hague.[13] In *Jimenez,* the issue of Executive Branch intervention never even arose, because the case involved no allegations against a foreign state or its leaders, but rather extradition proceedings against one former official for crimes

---

[13] The *Kadic* court's broader musings on the act of state doctrine were in any event pure dicta, because the court explicitly found that the "doctrine is not before us on appeal," having never been raised before the district court. 70 F.3d at 250.

22

(embezzlement and receipt of stolen goods) that on their face were motivated by his purely "private financial benefit." 311 F.2d at 557. Finally, in *Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 244 F. Supp.2d 289 (S.D.N.Y. 2003), because the U.S. Government had already declared Sudan to be a "state sponsor of terrorism," there was no reason to suspect – and the Executive Branch had never suggested – that adjudicating plaintiff's claims would interfere with U.S. policy or embarrass foreign relations. *Id.* at 346. Indeed, by stripping nations like Sudan and Iraq of their sovereign immunity under § 1605(a)(7) of the FSIA, the Executive Branch has already signaled that the use of civil court proceedings against such terrorist states is a permissible "instrument of foreign policy," so traditional act of state concerns are not implicated by permitting such private claims to proceed. *Daliberti v. Republic of Iraq*, 97 F. Supp.2d 38, 55 (D.D.C. 2000).

In this case, where the Executive Branch has expressly urged the Court not to proceed with adjudication of claims regarding the appropriateness of Israel's military activities, where this Court has found that the issues arise in a "difficult and volatile foreign policy context," and where the Court has noted the "highly contentious political nature" of plaintiffs' papers, *Doe* Mem. Op. 14, the wisdom embodied in the act of state doctrine has special force. Judicial restraint is appropriate. The Court should decline plaintiffs' urging to enter this foreign policy fray.

## CONCLUSION

This is a political case with no legal basis at all. Plaintiffs advance claims that a court should not resolve, and name defendants whom they never served. They conjure theories of jurisdiction that no court has accepted, and disregard immunities that Congress expressly mandated. The Court should end this case now and dismiss the claims against the Israeli Government Defendants.

23

Dated: December 10, 2003                Respectfully submitted,

                                        S/Robert N. Weiner
                                        Robert N. Weiner (D.C. Bar No. 298133)
                                        Jean E. Kalicki (D.C. Bar No. 427679)
                                        ARNOLD & PORTER
                                        555 Twelfth Street, N.W.
                                        Washington, D.C. 20004-1206
                                        Tel: (202) 942-5000
                                        Fax: (202) 942-5999
                                        Attorneys for the Israeli Government Defendants