# APPENDIX OF UNPUBLISHED DECISIONS CITED IN THE ISRAELI GOVERNMENT DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES

**Exhibit 1**  *Doe v. State of Israel,* Civ. A. No. 02-01431, slip op. (D.D.C. Oct. 3, 2003) (Bates, J.)

**Exhibit 2**  *Daventree Ltd. v. Republic of Azerbaijan* Civ. A. No. 02 6356 , slip op. (S.D.N.Y. Oct. 10, 2003)

**Exhibit 3**  *Doe v. Liu Qui,* No. C-02-0672 (EMC), **Magistrate's Report and Recommendation D. Ca. June 11, 2003)**

# EXHIBIT 1

*Doe v. State of Israel,* Civ. A. No. 02-01431,
slip op. (D.D.C. Oct. 3, 2003) (Bates, J.)

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JOHN DOE I, et al.,

      Plaintiffs,

        v.

STATE OF ISRAEL, et al.,

      Defendants.

Civil Action No.  02-1431 (JDB)

ECF

### MEMORANDUM OPINION

      This matter comes before the Court on two related motions to dismiss plaintiffs' complaint.

Plaintiffs include more than two dozen Palestinians and Palestinian-Americans, and scores of

unnamed plaintiffs, living in Israel or the West Bank, who seek damages and injunctive relief

against American and Israeli governmental entities, corporations, religious organizations, and

financial donors for alleged human rights abuses and tortious injuries related to the Israeli-

Palestinian conflict in the Middle East.  Defendants President George W. Bush and Secretary of

State Colin Powell ("federal defendants"), in their official capacities, and defense contractors

Boeing Co., McDonnell Douglas Helicopter Systems, Colt Manufacturing Co., Textron, and Bell

Helicopter, together with present and former officers (collectively "defense contractors"), have

moved to dismiss the claims against them.  Plaintiffs have also sued the State of Israel, Israeli Prime

Minister Ariel Sharon, numerous Israeli cabinet and military officials, and the Israeli Defense

Forces ("Israelis"), as well as the Jewish settlement of Halamish Neve Tzuf, religious congregations

Rinat Yisrael and Christ Lutheran Church, the Neve Tzuf Foundation, the Central Fund for Israel,

the One Israel Fund and several individuals.[1]  Plaintiffs seek compensatory and punitive damages

---

[1]  Because some of the motions filed regarding plaintiffs' claims against these other defendants
are not ripe, they will be addressed in a separate ruling at a future date.

1

for their alleged injuries, and seek to enjoin the federal defendants from providing any further military or economic aid to Israel and to halt military sales and weapons contracts between Israel and the defense contractors.  See Compl. ¶¶ 561-63.  For the reasons stated herein, the Court grants the motions to dismiss of the federal defendants and the defense contractors.

## BACKGROUND

Plaintiffs have filed a sweeping 140-page complaint, with 564 separately enumerated paragraphs, raising a host of common law claims that run the legal gamut from negligence, conversion, trespass, and intentional infliction of emotional distress, to assault, battery, and wrongful death.  They have also asserted claims under the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961 et seq., the Alien Tort Claims Act, 28 U.S.C. § 1350 et seq., and the Torture Victim Protection Act, 28 U.S.C. § 1350 et seq.[2]  Plaintiffs broadly allege a series of violations of international law, including genocide, crimes against humanity, war crimes, extrajudicial killing, torture, false imprisonment, arbitrary arrest and detention, and cruel, inhuman and degrading treatment of Palestinians.  Plaintiffs have also raised violations of the Arms Export Control Act (AECA), 22 U.S.C. § 2751 et seq., and the Foreign Assistance Act (FAA), 22 U.S.C. § 2151 et seq.

Plaintiffs assert that the Israeli defendants "intend[ed] to destroy, in whole or in part, a national, ethnic, racial and/or religious group, constitut[ing] genocide" against Palestinians, Compl. ¶ 427, and "[that] these acts occurred under the direction, encouragement or acquiescence of the Israeli government and military high command."  Id. ¶ 431.  Plaintiffs contend that President Bush and Secretary Powell have "allowed Israel to use United States financed and manufactured weapons to terrorize and collectively punish the entire civilian population based on their ethnicity," id. ¶ 228,

---

[2]  In addition to their complaint, plaintiffs have also filed a separate 150-page package, including several affidavits, delineating their claims.

2

and demand "all military assistance to Israel [be] terminated." Id. ¶ 225. Plaintiffs further contend that the defense contractors "actively participated in Israel's illegal use of [weapons] by modifying the[m]" in order "to provide greater urban assault capabilities," and did so "with knowledge that the weapon and other weapons would be used against a civilian, noncombatant Palestinian population." Id. ¶¶ 46, 48, 57, 59, 63. Plaintiffs claim that President Bush, Secretary Powell, the defense contractors, and the Israelis have acted jointly as "coconspirators or agents . . . through a pattern of racketeering activity [and] have terrorized and intimidated plaintiffs into removing and leaving from their property thus allowing defendant Israel to expand its borders and commercial influence in the region." Id. ¶ 445.

## ANALYSIS

**I.      The Federal Defendants' Motion to Dismiss**

The federal defendants move to dismiss plaintiffs' complaint on a number of justiciability grounds, including lack of a private cause of action under either AECA or FAA, nonjusticiable political questions, and lack of standing.

### A.      Arms Export Control Act and Financial Aid Act

Plaintiffs seek to prevent the United States from providing any further military or economic aid to Israel absent compliance with AECA and FAA, which plaintiffs claim require the President and Secretary of State to report to Congress if any country receiving arms supplied by the United States has misused the arms or has committed human rights abuses. See Compl. ¶¶ 559-563. The federal defendants argue that neither AECA nor FAA provides plaintiffs with a private cause of action, and therefore the Court is without jurisdiction to hear those claims. The Court agrees.

The United States provides aid to Israel in two principal ways, through foreign military financing under 22 U.S.C. § 2763 of AECA, which authorizes appropriations to procure American defense weapons, or through economic support funding under 22 U.S.C. § 2346(a) of FAA, which

3

grants financial aid to purchase other goods and services and generally support economic needs. According to plaintiffs, in 2002 the United States provided nearly $3 billion in such aid to Israel, which plaintiffs contend amounts to 17 percent of all foreign aid disbursed.  Compl. ¶ 219.

AECA provides that "[i]n furtherance of world peace and security and foreign policy of the United States, the President is authorized to control the import and export of defense articles and defense services."  22 U.S.C. § 2778(a)(1).  The Act authorizes sales of defense articles by the United States to "friendly countries," id. § 2751, and authorizes the President to sell munitions from U.S. stocks, enter into military sales contracts with other nations, and provide funds and aid to other countries to make such purchases, id. §§ 2761-63.  AECA also governs the private -- that is, non-governmental -- sale and export of weapons, and authorizes the President to compile the "United States Munitions List," which prohibits the export of such weapons without a license.  Id. §§ 2778(a)(1)-(2), (b)(2).

AECA explicitly implicates the President's role in directing the nation's foreign policy.  "It is the sense of the Congress that all such [military] sales [by the United States government] be approved only when they are consistent with the foreign policy interests of the United States."  Id. § 2751.  "No defense article or defense service shall be sold or leased by the United States Government" unless "the President finds" that the sale "will strengthen the security of the United States and promote world peace."  Id. § 2753(a)(1).

At the heart of plaintiffs' claims against President Bush and Secretary Powell are §§ 2753 and 2754 of AECA.  Covered defense articles must be sold "solely for internal security, for legitimate self-defense, for preventing or hindering the proliferation of weapons of mass destruction."  Id. § 2754.  It is a "prerequisite" under AECA that any arms sold under the Act "will strengthen the security of the United States and promote world peace."  Id. § 2753(a)(1).  No credits or guarantees can be issued to a country that uses the arms sold under the Act for purposes not

4

authorized by the Act, or that violates any agreement entered into pursuant to the Act. Id. §
2753(c)(1)(A). If a country uses arms in an unauthorized manner, or otherwise violates an
agreement entered into under AECA, "[t]he President shall report to the Congress promptly upon
the receipt of information that a violation described in paragraph (1) of this subsection may have
occurred." Id. § 2753(c)(2).

Plaintiffs claim that President Bush has violated this reporting requirement because the
military aid provided to Israel has neither strengthened the security of the United States nor
promoted world peace. Compl. ¶ 223. Similarly, plaintiffs assert that military aid provided to
Israel has not been used for internal security or self defense, "but instead for offensive military
purposes against a civilian Palestinian population in violation of AECA." Id. ¶ 224. Plaintiffs thus
assert that:

> George W. Bush and Colin Powell are in receipt of information that a substantial
> violation of the AECA may have occurred by Israel's use of U.S. military assistance
> against the civilian Palestinian population and are therefore required to promptly
> report the same in writing to Congress. Defendant Bush has not so reported and has
> deprived the Congress of information necessary to fulfill its constitutional role. . . .
> Defendant Bush's failure to suspend American arms sales to Israel or at least report
> to Congress that Israel is in substantial violation of the AECA has allowed Israel to
> use United States financed and manufactured weapons to terrorize and collectively
> punish an entire civilian population based on their ethnicity. Defendant's failure to
> comply with the AECA is the direct and proximate cause of the injuries to persons
> and property suffered by plaintiffs.

Compl. ¶¶ 226-228. Plaintiffs contend that President Bush was obligated under the Act to report to
Congress Israel's violation of section 2753(c)(1)(a), and that all future sales and military aid must
be terminated. Id. ¶ 225.

Similarly, the Foreign Assistance Act authorizes financial assistance to countries through
non-military aid. The FAA "recognizes that . . . the national interests of the United States may
require economic support," authorizing "the President . . . to furnish assistance to countries . . . on
such terms and conditions as he may determine." 22 U.S.C. § 2346(a). The Act also authorizes the

5

President to provide, "on such terms and conditions as the President may determine," financial "assistance to foreign countries in order to enhance the ability of their enforcement personnel to deter terrorists and terrorist groups." Id. § 2349aa. However, assistance under FAA is prohibited to "any country the government of which engages in a consistent pattern of gross violations of internationally recognized human rights." Id. § 2304(a)(2). The Act requires the Secretary of State to submit an annual report to Congress regarding the human rights practices of countries receiving security assistance. Id. § 2304(b). Plaintiffs claim that Secretary Powell's report did not properly contain "information regarding Israel's commission of war crimes and crimes against humanity . . . as well as information regarding Israel's failure to cooperate with and active impeding of the legitimate investigation of the conditions of the Palestinians by international organizations." Compl. ¶ 232.[3]

Plaintiffs attempt to assert a private cause of action against the federal defendants to enforce the reporting provisions of AECA and FAA. However, neither of these statutes creates a substantive private cause of action. "Section 2304 [of the FAA] does not create standing for any taxpayer or any private party to sue for its enforcement . . . [and] was clearly enacted to effect the relationship between Congress and the President over disbursing foreign aid funds in light of an official policy of concern for human rights." Clark v. United States, 609 F. Supp. 1249, 1251 (D. Md. 1985). A reading of the text of these two statutes confirms that they do not create a private cause of action for individuals to sue the President or the Secretary of State. As the Supreme Court recently emphasized:

> [P]rivate rights of action to enforce federal law must be created by Congress. The judicial task is to interpret the statute Congress has passed to determine whether it

---

[3] Although Secretary Powell has in fact filed such a report on practices in Israel, the report apparently does not contain the kind of language or information that plaintiffs believe is needed in order accurately to depict the extent of human rights abuses they claim are occurring in Israel. See http://www.state.gov/g//drl/rls/hrrpt/2001/nea/8262.htm.

6

> displays an intent to create not just a private right but also a private remedy.
> Statutory intent on this latter point is determinative. Without it, a cause of action
> does not exist and courts may not create one.

Alexander v. Sandoval, 532 U.S. 275, 286-87 (2001).

Not only do AECA and FAA lack any distinct provision allowing causes of action, both statutes also manifest Congress's intent that the complex issues surrounding the reporting provisions should be resolved between Congress and the Executive Branch -- not by the courts. See, e.g., 22 U.S.C. § 2753(c)(3)(B) ("Notwithstanding a determination by the President of ineligibility [under AECA] . . . sales and deliveries . . . may be made if the President certifies in writing to the Congress that a termination thereof would have significant adverse impact on United States security, unless the Congress adopts . . . a joint resolution . . . with respect to such ineligibility."); 22 U.S.C. § 2304(a)(2) (under FAA "no security assistance may be provided to any country . . . which engages in a consistent pattern of gross violations of internationally recognized human rights . . . unless the President certifies in writing to the [Congress] that extraordinary circumstances exist warranting provision of such assistance . . ."). In other words, both statutes incorporate mechanisms to allow the political branches to override one another, rather than authorizing the courts to referee. As plaintiffs put it, they "ask of [President Bush and Secretary Powell] only one thing -- obey the law." Pl. Opp. at p. 2. Plaintiffs' gross oversimplification notwithstanding, they have not pointed to any provision within either AECA or FAA that allows for a private cause of action. See Touche Rosse & Co. v. Redington, 442 U.S. 560, 568 (1979) ("the fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person"). Indeed, plaintiffs cannot cite a case that stands for the proposition that either statute permits private individuals to sue the President or Secretary of State. As the only other court looking at this issue has put it:

> The only parties with standing to seek adjudication under Section 2304 [of the FAA] are the executive and legislative branches. One need only read the plain language of the section to reach that conclusion.

Clark, 609 F. Supp. at 1251; see also AT&T v. United States, 307 F.3d 1374, 1377 (Fed. Cir. 2002) (reporting requirement under Defense Department appropriations bill "envisions enforcement, if any, through legislative procedures" and "does not create a cause of action inviting private parties to enforce the provisions in courts"). Accordingly, the Court concludes that it does not have jurisdiction under either AECA or FAA over the claims asserted by plaintiffs against the federal defendants.[4]

Lastly, the Court notes that while plaintiffs have sued President Bush and Secretary Powell in both their official and individual capacities, they have only been served in their official capacities. See Compl. ¶¶ 39-40; Fed'l Defs.' Motion to Dismiss Official Capacity Claims at p. 1 n.1. President Bush and Secretary Powell correctly point out that plaintiffs' remaining claims seek damages -- for RICO violations and common law tort theories of emotional distress, negligence, and negligent infliction of emotional distress -- that can only be asserted against them in their individual capacities. See Kentucky v. Graham, 473 U.S. 159, 165-66 (1985) (distinguishing between claims asserted in official and individual capacities). Monetary claims brought against the President or the Secretary of State in their official capacities are, in effect, actions against the United States, and are viable only to the extent that the United States has waived its sovereign immunity, such as under the Federal Tort Claims Act, 28 U.S.C. § 1346. Plaintiffs concede that these remaining claims must be asserted against President Bush and Secretary Powell in their

---

[4] Indeed, the Court doubts plaintiffs would have standing to raise their claims under AECA or FAA in any event. As the complaint acknowledges, any failure to satisfy the reporting requirements under either Act would directly injure Congress -- not individual private plaintiffs like the Palestinians here. See Compl. ¶ 226 ("Bush has not so reported and deprived Congress of information necessary for Congress to fulfill its constitutional role.") (emphasis added). However, because the Court resolves the federal defendants' motion on lack of jurisdiction and justiciability grounds, it is not necessary to resolve the standing issue as well.

individual capacities.  See Pl. Opp. to Fed'l Defs.' Motion to Dismiss Official Capacity Claims at p.

11 n. 6.  However, plaintiffs request "[l]eave . . . to clarify this in the Complaint and to serve Mr.

Bush and Mr. Powell, individually."  Id.

The Court denies this request.  First, plaintiffs have not even attempted to satisfy

Fed.R.Civ.P. 15, which governs motions to amend.  Second, plaintiffs' complaint explicitly states

that President Bush and Secretary Powell are sued in both their official and individual capacities.

See Compl. ¶¶ 39-40.  In other words, plaintiffs are not seeking leave to amend, but rather are

seeking more time to serve President Bush or Secretary Powell in their individual capacities.  See

Fed.R.Civ.P. 4(i)(2)(B).  Again, plaintiffs have not set forth any justification for their failure to

effect service to date.  Indeed, plaintiffs brought their suit on July 16, 2002, and under Fed.R.Civ.P.

4(m) service must be made within 120 days of filing of a complaint.  Plaintiffs have had well over a

year to serve the federal defendants in their individual capacities, but have failed to do so.  Third,

the Court denies any request to allow plaintiffs an additional opportunity to serve President Bush

and Secretary Powell as futile.  See, e.g., Eveland v. Director of CIA, 843 F.2d 46, 49 (1st Cir. 1988)

(affirming dismissal of RICO claim under the political question doctrine where complaint alleged

RICO conspiracy between Secretary Kissinger and the government of Israel).

**B.**      **Nonjusticiable Political Question**

Even if AECA or FAA created private causes of action, or if plaintiffs could otherwise raise

actionable claims, the Court nevertheless concludes that plaintiffs' claims present nonjusticiable

political questions best left for resolution by the political branches.  At its base, the political

question doctrine is concerned with the separation of powers between the branches of government,

and limits the jurisdiction of the federal courts to "Cases" and "Controversies."  See U.S. Const.

Art. III, § 2; Powell v. McCormack, 395 U.S. 486, 518 (1969); Baker v. Carr, 369 U.S. 186, 210

(1962).  In Baker, the Supreme Court outlined six criteria to determine whether a dispute presented

a nonjusticiable political question:

> Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

369 U.S. at 217; see also Chicago & Southern Airlines v. Waterman S.S. Corp., 333 U.S. 103, 111-

12 (1948).  The presence of any one of these factors indicates the existence of a political question.

Baker, 369 U.S. at 217; Made in the USA Foundation v. United States, 242 F.3d 1300, 1312 (11th

Cir. 2001).  If a claim or issue involves a nonjusticiable political question, courts will not have

subject matter jurisdiction to consider those claims.  See Animal Defense Legal Defense Fund v.

Glickman, 154 F.3d 426, 446 (D.C. Cir. 1998).

Clearly, issues directly impacting United States foreign and military aid to other countries

are distinctly the province of the political branches.  First and foremost, foreign policy is

constitutionally committed to the political branches, and disputes over foreign policy are

nonjusticiable political questions.  Haig v. Agee, 453 U.S. 280, 292 (1981) ("[T]he conduct of

foreign relations . . . [is] exclusively entrusted to the political branches . . . [and] immune from

judicial inquiry or interference."); Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 803 (D.C. Cir.

1984) ("Questions touching on the foreign relations of the United States make up what is likely the

largest class of questions to which the political question doctrine has been applied."); Luftig v.

McNamara, 373 F.2d 664, 665-66 (D.C. Cir. 1967) ("[T]he fundamental division of authority and

10

power established by the Constitution precludes judges from overseeing the conduct of foreign

policy."). Indeed,

> the very nature of executive decisions as to foreign policy is political, not judicial. . . .
> They are decisions of a kind for which the Judiciary has neither aptitude, facilities, nor
> responsibility and have long been held to belong to the domain of political power not
> subject to judicial intrusion or inquiry.

Waterman S.S. Corp., 333 U.S. at 111; see also Crosby v. Nat'l Foreign Trade Council, 530 U.S.

363, 386 (2000) ("the nuances of the foreign policy of the United States . . . are much more the

province of the Executive Branch and Congress than of this Court") (citation omitted); Kucinich v.

Bush, 236 F. Supp. 2d 1, 15 (D.D.C. 2002).

Furthermore, several courts have specifically ruled that challenges to foreign aid to Israel

raise nonjusticiable political questions.  See Dickson v. Ford, 521 F.2d 234, 236 (5th Cir. 1975)

(dismissing as nonjusticiable challenge to statute authorizing military assistance to Israel);

Mahorner v. Bush, 224 F. Supp. 2d 48, 49 (D.D.C. 2002) (rejecting plaintiff's claim for injunctive

relief against military and economic assistance to Israel on political question grounds).  The D.C.

Circuit has also ruled that challenges to military aid to other countries raise nonjusticiable political

questions.  Crockett v. Reagan, 720 F.2d 1355, 1356-57 (D.C. Cir. 1983) (per curiam) (dismissing

challenge to legality of U.S. military aid to El Salvador on political question grounds).  As Judge

Jackson recently explained, lawsuits over foreign aid are especially political in nature:

> [Plaintiff's] complaint raises non-justiciable political questions by attempting to
> curtail Executive Branch discretion in what is essentially a matter of foreign policy.
> Foreign aid, including monetary loans for economic development abroad, is an
> integral component of this country's international relations.  To grant or deny a loan
> to a foreign nation is a decision fraught with foreign policy implications. Congress
> clearly did not confer the power to make such decisions upon aggrieved private
> citizens . . . without regard to the national interest.

Atlantic Tele-Network v. Inter-American Development Bank, 251 F. Supp. 2d 126, 131 (D.D.C.

2003).  In the related context of the "disposition of military power," the D.C. Circuit has stressed:

> It is difficult to think of an area less suited for judicial action . . . . The fundamental division of authority and power established by the Constitution precludes judges from overseeing the conduct of foreign policy or the use and disposition of military power; these matters are plainly the exclusive province of Congress and the Executive.

Luftig, 373 F.2d at 665-66.

Plaintiffs' reliance on Ramirez de Arellano v. Weinberger, 745 F.2d 1500 (D.C. Cir. 1984), and Linder v. Portocarrero, 963 F.2d 332, 336-37 (11th Cir. 1992), is misplaced. In Ramirez, the D.C. Circuit held that the taking by the government of an American's land in Honduras for a military training center did not present a nonjusticiable political question because it did not call into question the legality of the American military presence in Honduras. 745 F.2d at 1515. Similarly, in Linder, the Eleventh Circuit held that the political question doctrine did not bar decision on a claim that alien individuals acting in the United States, as part of a civil war, ordered the torture and summary execution of the plaintiffs' decedent, because there was no direct challenge to United States foreign policy or any need to rule on aspects of the civil war. Unlike the claims asserted in Ramirez and Linder, however, plaintiffs' claims here directly affect United States foreign policy.[5] There is no doubt whatsoever that plaintiffs are attempting to stop the United States from providing foreign and military aid to Israel. Their pleadings make that intent patent: "To be clear, Plaintiffs desperately want the United States to stop providing Israel with the military means to oppress them." Pl. Opp. to Fed'l Defs.' Motion to Dismiss Official Capacity Claims, at p. 3.

---

[5] The ruling in Klinghoffer v. S.N.C. Achille Lauro, 937 F.2d 44, 49-50 (2d Cir. 1991), does not support a different result, even though plaintiffs have asserted tort claims against President Bush and Secretary Powell. There, plaintiffs brought tort claims against the Palestinian Liberation Organization for seizing a cruise liner and murder of a passenger. The court found that the claims did not raise nonjusticiable political questions because tort laws provided clear judicial standards, and no prior political decisions were called into question. In that case, there was no potential for embarrassment from multifarious pronouncements, since the other branches of government believed judicial resolution was appropriate -- which is certainly not the Executive Branch's view here. Id. Nor was there any attempt to stop or delay financial aid in Klinghoffer, which lies at the very heart of plaintiffs' claims here.

Other <u>Baker</u> factors are also at play here. Again, given the undeniably delicate situation in the Middle East, any pronouncements by United States courts regarding foreign economic and military aid may risk embarrassment to the United States government's commitments to Israel -- financial and otherwise. The United States' relationship with Israel presents "an unusual need for unquestioning adherence to a political decision already made" on foreign and military aid, especially in light of the ongoing war on terrorism. <u>See DKT Memorial Fund v. AID</u>, 887 F.2d 275, 291 (D.C. Cir. 1989) (quoting <u>Baker</u>, 369 U.S. at 217). Directly on point to the challenge asserted here, the Fifth Circuit emphasized in <u>Dickson</u> that

> [b]oth the Congress and the President have determined that military and economic assistance to the State of Israel is necessary . . . [and] a determination of whether foreign aid to Israel is necessary . . . is a question uniquely demand[ing] [of a] single-voiced statement of the Government's views.

521 F.2d at 236. Although the Court agrees that the Judiciary "cannot shirk [its constitutional] responsibility merely because a decision may have significant political overtones," <u>Japan Whaling Ass'n v. American Cetacean Soc'y</u>, 478 U.S. 221, 230 (1986), here the intrusion into the domain of the political branch is obvious. As plaintiffs' complaint makes clear, the essence of their claims revolves around Israel's expansion of settlements into the disputed territories of the West Bank, Lebanon and the Gaza Strip. <u>See</u> Compl. ¶ 25 (asserting Israel's "decade long territorial expansion at the expense of plaintiffs and all other Palestinian civilian noncombatants and in violation of international law"); ¶¶ 27-36. It is difficult to conceive of a more sensitive and volatile foreign policy context -- one that cries out for unyielding deference to the political branches -- than Palestinian citizens appealing to United States courts to stop or delay military and financial aid to Israel. This is particularly true in light of the ongoing Iraqi conflict, the Palestinian Intifada, al Qaeda terrorism, and efforts to locate Saddam Hussein and Osama Bin Laden -- all of which exacerbate the trip-wire tensions of the Middle East in general.

Even a sampling of the allegations raised in plaintiffs' complaint underscores the highly contentious political nature of their claims. "Israel is a terrorist state." Compl. ¶ 76. "[T]he United States government has been complicit in and indeed has underwritten with taxpayer funds, Israel's torture, killing and maiming . . . ." Id. ¶ 80. "Israel has . . . encouraged the development of Israeli settlements on Palestinian land confiscated in violation of international law." Id. ¶ 83. "[Israel] ignites and ignores international opprobrium in its pursuit of ever-elusive 'security' goals while brutally occupying as an invader the West Bank and Gaza." Id. ¶ 94. "Israel [runs a] campaign of terror against the Palestinians." Id. ¶ 96. "[T]he United States government has known for at least 24 years that Israel uses torture during interrogations of Palestinians and that the practice was widespread." Id. ¶ 208.  As the D.C. Circuit has stated, "[t]hese are political judgments, 'decisions of a kind for which the judiciary has neither the aptitude, facilities nor responsibility and have long been held to belong in the domain of political power not subject to judicial intrusion.'" People's Mojahedin Org. of Iran v. Dep't of State, 182 F.3d 17, 23 (D.C. Cir. 1999) (quoting Waterman S.S. Corp., 333 U.S. at 111).

The Court concludes that plaintiffs' claims against President Bush and Secretary Powell raise nonjusticiable political questions, and therefore this Court is without subject matter jurisdiction to address them.  Accordingly, the claims against the federal defendants must be dismissed for that reason as well.

## II.    The Defense Contractors' Motion to Dismiss

The Court likewise finds that plaintiffs' claims against the five defense contractors named in their complaint -- Boeing, McDonnell Douglas, Textron, Bell Helicopter, and Colt Manufacturing -- as well as several CEOs of defense contractors, also raise nonjusticiable political questions. Plaintiffs allege that these defense contractors either knew or should have known that the weapons and munitions provided to Israel, under AECA, were not being used for purposes of self-defense,

but rather were being modified and used to harm Palestinians.  <u>See</u> Compl. ¶¶ 45, 48, 56, 63, 67, 82.

As with their claims asserted against the federal defendants, plaintiffs seek to enjoin the defense

contractors from selling or transferring military equipment and arms to Israel until President Bush

and Secretary Powell have reported to Congress under AECA and FAA, and until Israel commits

"not to use such weapons systems directly or indirectly against the Palestinian civilian

noncombatant population."  <u>See</u> Compl. ¶ 562.

     The Court has concluded that claims involving arms sales to Israel -- which occur pursuant

to a sensitive and detailed statutory and regulatory scheme inextricably intertwined with critical

foreign policy decisions -- are nonjusticiable political questions better left to consideration by the

political branches.  Although the Court recognizes that the political question doctrine is typically

invoked by governmental entities or actors, the important role of defense manufacturers in

providing arms and weapons to Israel, particularly in light of the broad, overlapping claims raised

in plaintiffs' complaint, makes application of the doctrine warranted in this context as well.  Indeed,

this is not the first time that courts have employed the political question doctrine as to claims

asserted against defense contractors.  <u>See, e.g.</u>, <u>Bentzlin v. Hughes Aircraft</u>, 833 F. Supp. 1486,

1497 (C.D. Cal. 1993) (action against defense contractors dismissed under political question

doctrine where military personnel killed in a friendly fire accident in Iraq); <u>Zuckerbraun v. General</u>

<u>Dynamics Corp.</u>, 755 F. Supp. 1134, 1141-42 (D. Conn. 1990) (political question cannot be avoided

because claims against defense contractors for wrongful death inevitably touch on military

decisions committed to the executive branch); <u>Nejad v. United States</u>, 724 F. Supp. 753, 755 (C.D.

Cal. 1989) (denying on political question grounds claims for wrongful death against defense

contractors who supplied arms to a naval ship that downed a commercial airliner); <u>cf.</u> <u>Koohi v.</u>

<u>United States</u>, 976 F.2d 1328, 1331 (9th Cir. 1992) (declining to dismiss claims against defense

15

contractor on political question grounds where plaintiff raised design defects in defense system that targeted a civilian aircraft).

The claims here do not involve simple allegations of design defects in a particular weapon; instead, plaintiffs assert sweeping allegations that various, unrelated munitions and weapons systems sold pursuant to detailed arms export regulations have been knowingly modified to allow Israel to conduct war against Palestinians. Arms sales and arms transfers to Israel by the United States are implemented through two primary statutory programs: the Foreign Military Sales Act ("FMSA"), 22 U.S.C. § 2302, authorizes the United States government to sell surplus defense articles to, or procure such articles for, foreign countries, whereas AECA permits defense contractors to sell arms directly to foreign countries under the permission and oversight of the President or Congress. Under both programs, the Department of Defense authorizes the proposed sale, and must abide by the U.S. Munitions List, a congressionally-approved list of military equipment authorized for export to other countries.

Thus, in the context of ongoing United States policy of military and financial support for Israel, the role of the defense contractors in producing and selling arms to Israel is tightly intertwined with United States foreign policy, and hence with plaintiffs' challenges to that policy. The Court would, of necessity, need to adjudicate various considerations about, and even the propriety of, providing arms to Israel if claims against the defense contractor defendants were allowed to go forward. Because arms sales are an integral part of foreign policy, the government's authorization of sales by defense contractors as a means to execute foreign policy cannot be challenged in the courts. Under the detailed scheme of AECA and FMSA, it is not possible (or at least lawful) for defense contractors to sell weapons to Israel of their own volition. See Comm. of U.S. Citizens Living in Nicaragua v. Reagan, 859 F.2d 929, 946 (D.C. Cir. 1988) (despite providing assistance and aid, United States government cannot be liable for military conduct and independent

16

actions of Nicaraguan Contras); United States v. Martinez, 904 F.2d 601 (11th Cir. 1990) (dismissing as a political question claims under AECA that certain defense articles on the U.S. Munitions List were unnecessarily lethal); Karn v. Dep't of State, 925 F. Supp. 1, 2 (D.D.C. 1996) (dismissing challenge to designation of item on U.S. Munitions List as nonjusticiable political question, "a classic example of how courts . . . can become needlessly involved . . . in litigation involving policy decisions within the power of the President or another branch of government").[6] By wading into the thicket of plaintiffs' claims, the Court would entangle itself in questions involving United States policy concerning Israel's self-defense and internal security, matters about which the Court has absolutely no expertise.

Simply put, the defense contractors' actions are, to a considerable degree, dictated by policies set forth by the President and Congress. If the arms sales in question were purely between a private corporation and Israel, the political question doctrine might not be as relevant. Here, however, the United States strictly controls and regulates the sale of arms, and any intrusion into these arms sale agreements would clearly implicate national foreign policy interests. See, e.g., 22 U.S.C. § 2751 (arms sales under AECA shall "be approved only when they are consistent with the foreign policy interests of the United States"; relevant considerations include military requirements, economic and financial status of the foreign country, and the impact of the sales on social and economic development); 22 U.S.C. § 2753(a)(1) (prohibiting defense sales unless "the President finds that furnishing of defense articles . . . to such country or international organization will strengthen the security of the United States and promote world peace"). Issues involving AECA directly impact, if not challenge, United States foreign policy, an area that is hardly the proper province of the courts. Given the backdrop that plaintiffs challenge arms sales to Israel within the highly-charged context of the Middle East, the political nature of plaintiffs' claims cannot be

---

[6] The placement of items on the U.S. Munitions List is explicitly exempt from judicial review. See 22 U.S.C. § 2778(h).

overstated.  Judicial intervention into foreign policy decisions reflected in arms sales by the United

States to a country in such a volatile region of the world would intrude into delicate and complex

political considerations.  Thus, plaintiffs' claims against the defense contractors constitute

nonjusticiable political questions that must be dismissed  as well.

<u>**CONCLUSION**</u>

The Court finds that plaintiffs have not shown that they have a private cause of action under

either the Arms Export Control Act or the Financial Assistance Act.  Plaintiffs' claims against

President Bush and Secretary Powell in their official capacities, as well as the claims against the

defense contractors, are nonjusticiable political questions, and thus the Court lacks subject matter

jurisdiction to consider those claims.  Furthermore, the Court concludes that in light of plaintiffs'

failure personally to serve President Bush or Secretary Powell, all claims against them in their

individual capacities must be dismissed.  Accordingly, the federal defendants' motion to dismiss is

granted and the motion to dismiss filed by the defense contractors is also granted.  A separate order

accompanies this Memorandum Opinion.

Signed this <u>3rd</u> day of October, 2003.

  /s/   John D. Bates<br>JOHN D. BATES<br>United States District Judge

Copies to:

Stanley Cohen
351 Broadway
Suite 300
New York, NY 10013

Maher H. Hanania
Hanania, Khader & Nawash
6066 Leesburg Pike
Suite 101
Falls Church, VA 22041
E-mail: mhanania@hknlaw.com

Jean Engelmayer Kalicki
Arnold & Porter
5555 12th Street, N.W.
Room 1197
Washington, D.C. 20004
E-mail: Jean_Kalicki@aporter.com

Robert Neil Weiner
Arnold & Porter
5555 12th Street, N.W.
Room 1251
Washington, D.C. 20004
E-mail: Robert_Weiner@aporter.com

Ori Lev
Untied States Department of Justice
Civil Division/Federal Programs Branch
Post Office Box 883
Washington, D. C. 20044
E-mail: ori.lev@usdoj.gov

David Bickart
Kaye Scholer
901 15th Street, N.W.
Suite 1100
Washington, D.C. 20005
dbickart@kayescholer.com

Kurt Hamrock
McKenna Long Aldridge LLP
1900 K Street, N.W.
Washington, D.C. 20006
khamrock@mckennalong.com

19

Stephen B. Shapiro
Holland & Knight, LLP
2099 Pennsylvania Avenue, N.W.
Suite 100
Washington, D. C.  20006
E-mail: sshapiro@hklaw.com

**EXHIBIT 2**

*Daventree Ltd. v. Republic of Azerbaijan*
**Civ. A. No. 02 6356 , slip op. (S.D.N.Y. Oct. 10, 2003)**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

DAVENTREE LIMITED, et al.,

                          Plaintiffs,

           v.

REPUBLIC OF AZERBAIJAN, et al.,

                        Defendants.

------------------------------------------------------------x

No. 02 CV 6356 (SHS) (GWG)

**ORDER**

SIDNEY H. STEIN, District Judge:

      On October 3, 2003, the United States of America filed a Suggestion of Immunity, requesting that Prime Minister Ilham Aliyev, the head of government of the Republic of Azerbaijan, receive immunity from suit in the above-captioned action. Under the Head of State doctrine, this Court is required to defer to the Government's Suggestion.

      Consequently, it is hereby ORDERED that all of the claims asserted by Plaintiffs against Prime Minister Ilham Aliyev in the Complaint shall be dismissed without prejudice, and the caption in this action shall hereafter be amended to reflect that he is no longer a defendant.

                    SO ORDERED: 10|10|03

                    Sidney H. Stein
                    United States District Judge

NEW YORK 3131720 (2K)



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**ORIGINAL**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

DAVENTREE LIMITED and     :
AUDIA INVESTMENTS LTD.,
            Plaintiffs,     :

OILY ROCK GROUP, LTD.,     :
            Nominal Plaintiff,

                            :

        v.                  :                    02 Civ. 6356 (SHS)

REPUBLIC OF AZERBAIJAN,     :
STATE PROPERTY COMMITTEE OF
AZERBAIJAN, HEYDAR ALIYEV,   :
ILHAM ALIYEV, NADIR NASIBOV,
BARAT NURIYEV, von MEISS BLUM,   :
HANS BODMER, ROLF SCHMID,
ANDRE WAHRENBERGER,          :
HYPOSWISS SCHWEIZERISCHE
HYPOTHEKEN - und HANDELSBANK,   :
THEODORE HORATH, and
KURT BUCHMANN,               :
            Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x



### SUGGESTION OF IMMUNITY
### SUBMITTED BY THE UNITED STATES OF AMERICA

JAMES B. COMEY
United States Attorney for the
Southern District of New York
33 Whitehall Street, 8th Floor
New York, New York 10004
Tel.: (212) 637-2726

ANDREW D. O'TOOLE (AO-7714)
Assistant United States Attorney

DAVID P. STEWART
Assistant Legal Adviser
ANDREW N. KELLER
Attorney-Adviser
Office of Diplomatic Law and
            Litigation
Office of the Legal Adviser
United States Department of State
Washington, D.C. 20520
            Of Counsel

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

DAVENTREE LIMITED and                      :
AUDIA INVESTMENTS LTD.,

                                           :

       Plaintiffs,

                                           :

OILY ROCK GROUP, LTD.,                     :

                                           :

       Nominal Plaintiff,

       v.                                  :          02 Civ. 6356 (SHS)

REPUBLIC OF AZERBAIJAN,                     :
STATE PROPERTY COMMITTEE OF
AZERBAIJAN, HEYDAR ALIYEV,                  :
ILHAM ALIYEV, NADIR NASIBOV,
BARAT NURIYEV, von MEISS BLUM,             :
HANS BODMER, ROLF SCHMID,
ANDRE WAHRENBERGER,                        :
HYPOSWISS SCHWEIZERISCHE
HYPOTHEKEN - und HANDELSBANK,              :
THEODORE HORATH, and
KURT BUCHMANN,                             :

       Defendants.                         :

- - - - - - - - - - - - - - - - - - - - - - - - - - - x

## SUGGESTION OF IMMUNITY
## SUBMITTED BY THE UNITED STATES OF AMERICA

The United States of America, by its attorney, James B. Comey, United States

Attorney for the Southern District of New York, pursuant to 28 U.S.C. § 517,[1] hereby

respectfully informs the Court of the interest of the United States in the above-captioned action,

and suggests to the Court the immunity of defendant Ilham Aliyev, the sitting Prime Minister of

---

[1]    Pursuant to 28 U.S.C. § 517, "any officer of the Department of Justice may be sent by the Attorney General to any State or district in the United States to attend to the interests of the United States in a suit pending in a court of the United States. . . ."

the Republic of Azerbaijan ("Prime Minister Aliyev").[2]

In support of its interest and suggestion, the United States asserts as follows:

1.     The United States has an interest in this action because plaintiffs' claims against Prime Minister Aliyev raise the question of immunity from the Court's jurisdiction of a head of government. The interest of the United States arises from a determination by the Executive Branch of the Government of the United States, in the implementation of its foreign policy and in the conduct of its international relations, that permitting this action to proceed against Prime Minister Aliyev would be incompatible with the United States' foreign policy interests. As discussed below, this Court must give effect to this determination.

2.     The Legal Adviser of the United States Department of State has informed the Department of Justice that the Government of Azerbaijan requested the Government of the United States to suggest the immunity of Prime Minister Aliyev from this lawsuit. The Legal Adviser has further informed the Department of Justice that the "Department of State recognizes and allows the immunity of Prime Minister Aliyev from this suit." See Letter from William H. Taft, IV to Peter D. Keisler, dated September 24, 2003 (copy annexed as Exhibit 1).

3.     Under customary rules of international law recognized and applied in the United States, and pursuant to this Suggestion of Immunity, Prime Minister Aliyev, as the head

---

[2]     In addition to Prime Minister Aliyev, the Complaint names several other defendants including President Heydar Aliyev, the sitting head of state of Azerbaijan. On March 10, 2003, the Court issued an order dismissing President Heydar Aliyev as a defendant in this action based upon the suggestion of immunity previously submitted by the United States on February 19, 2003. At the time the United States filed its earlier suggestion of immunity, Ilham Aliyev had not yet been appointed to the position of Prime Minister of Azerbaijan. This suggestion of immunity does not address whether any of the other defendants is immune from suit.

of a foreign government, is immune from the Court's jurisdiction in this case. See, e.g., Saltany v. Reagan, 702 F. Supp. 319, 320 (D.D.C. 1988) (suggestion by Executive Branch of Prime Minister Thatcher's immunity conclusive in dismissing suit that alleged British complicity in U.S. air strikes against Libya), aff'd in part and rev'd in part on other grounds, 886 F.2d 438, 441 (D.C. Cir. 1989), cert. denied, 495 U.S. 932 (1990); Restatement (Second) of Foreign Relations Law, §§ 65, 66 (1965) (noting that head of state immunity includes heads of government) .

   4.   The Supreme Court has mandated that the courts of the United States are bound by suggestions of immunity, such as this one, submitted by the Executive Branch. See Republic of Mexico v. Hoffman, 324 U.S. 30, 35-36 (1945); Ex Parte Peru, 318 U.S. 578, 588-89 (1943). In Ex Parte Peru, the Supreme Court, without further review of the Executive Branch's determination of immunity, declared that the Executive Branch's suggestion of immunity "must be accepted by the courts as a conclusive determination by the political arm of the Government" that the courts' retention of jurisdiction would jeopardize the conduct of foreign relations. Ex Parte Peru, 318 U.S. at 589; see also Spacil v. Crowe, 489 F.2d 614, 617 (5th Cir. 1974) ("once the State Department has determined that immunity is warranted, and has submitted that ruling to the court through a suggestion, the matter is for diplomatic rather than judicial resolution"). Accordingly, where, as here, immunity has been recognized by the Executive Branch and a suggestion of immunity is filed, it is the "court's duty" to surrender jurisdiction. See Ex Parte Peru, 318 U.S. at 588; see also Hoffman, 324 U.S. at 35.[3]

_____

   [3]   The conclusive effect of the Executive Branch's suggestion of immunity in this case is not affected by enactment of the Foreign Sovereign Immunities Act (FSIA), 28 U.S.C. §§ 1602 et seq. Prior to the passage of the FSIA, the Executive Branch filed suggestions of immunity with respect to both heads of state and foreign states themselves. The FSIA transferred the determination of the immunity of foreign states from the Executive Branch to the courts. See

5.     The courts of the United States consistently heed the Supreme Court's direction regarding the binding nature of suggestions of immunity submitted by the Executive Branch. See, e.g., Tachiona v. Mugabe, 169 F. Supp. 2d 259, 297 (S.D.N.Y. 2001) (dismissing suit as against President and Foreign Minister of Zimbabwe based upon Suggestion of Immunity filed by the Executive Branch), appeal pending, Dkt. Nos. 03-6033, 03-6043 (XAP) (2d Cir., filed Feb. 13, 2003); Leutwyler v. Queen Rania Al Abdullah, 184 F. Supp. 2d 277, 280 (S.D.N.Y. 2001) (Executive Branch's Suggestion of Immunity on behalf of Queen of Jordan "is entitled to conclusive deference from the courts"); First American Corp., 948 F. Supp. at 1119 (suggestion by Executive Branch of the immunity of Sheikh Zayed of the United Arab Emirates deemed conclusive and required dismissal of claims alleging fraud, conspiracy, and breach of fiduciary duty); Alicog v. Kingdom of Saudi Arabia, 860 F. Supp. 1107, 1119 (D.D.C. 1996) (suggestion by Executive Branch of King Fahd's immunity as head of state of Saudi Arabia held to require dismissal of complaint against King Fahd for false imprisonment and abuse); Lafontant v. Aristide, 844 F. Supp. 128, 132 (E.D.N.Y. 1994) (suggestion by Executive Branch of Haitian President Aristide's immunity held binding on court and required dismissal of case alleging President Aristide ordered murder of plaintiff's husband), appeal dismissed, Dkt. No. 94-6026

---

H.R. Rep. No. 1487, 94th Cong., 2d Sess. 12 (1976), reprinted in 1976 U.S.C.C.A.N. 6604, 6610. The FSIA, however, did not alter Executive Branch authority to suggest head of state immunity, or affect the binding nature of such suggestions of immunity. See, e.g., Abiola v. Abubakar, 267 F. Supp. 2d 907, 915-16 (N.D. Ill. 2003); First American Corp. v. Sheikh Zayed Bin Sultan Al-Nahyan, 948 F. Supp. 1107, 1119 (D.D.C. 1996); see also Gerritsen v. De la Madrid, No. CV 85-5020-PAR, slip op. at 7-9 (C.D. Cal. Feb. 21, 1986) (copy attached as Exhibit 2); Estate of Domingo v. Ferdinand Marcos, et al., No. C82-1055V, slip op. at 3-4 (W.D. Wash. July 14, 1983) (copy attached as Exhibit 3); Kline v. Kaneko, 141 Misc. 2d 787, 787, 535 N.Y.S.2d 303, 305 (Sup. Ct. N.Y. Co. 1988) (enactment of FSIA did not affect binding nature of suggestion of immunity as to wife of head of state).

(2d Cir. 1994); <u>Saltany</u>, 702 F. Supp. at 320 (suggestion by Executive Branch of Prime Minister Thatcher's immunity conclusive in dismissing suit that alleged British complicity in U.S. air strikes against Libya); <u>Gerritsen</u>, slip op. at 7-9 (suit against Mexican President De la Madrid and others for conspiracy to deprive plaintiff of constitutional rights dismissed as against President De la Madrid pursuant to suggestion of immunity); <u>Estate of Domingo</u>, slip op. at 2-4 (action alleging political conspiracy by, among others, then-President Ferdinand Marcos and then-First Lady Imelda Marcos of the Republic of the Philippines dismissed against them pursuant to suggestion of immunity); <u>Anonymous v. Anonymous</u>, 181 A.D.2d 629, 629-30, 581 N.Y.S.2d 776, 777 (1st Dep't 1992) (divorce suit against head of state dismissed pursuant to suggestion of immunity); <u>Guardian F. v. Archdiocese of San Antonio</u>, slip op., Cause No. 93-CI-11345 (Tex. Dist. Ct. 1994) (copy attached as Exhibit 4) (suggestion of immunity required dismissal of suit against Pope John Paul II).

      6.    Judicial deference to the Executive Branch's suggestions of immunity is predicated on compelling considerations arising out of the Executive Branch's authority to conduct foreign affairs under the Constitution. <u>See, e.g.</u>, <u>Spacil</u>, 489 F.2d at 619.   In determining whether and when to recognize and grant head of state immunity, the Executive Branch acts pursuant to the authority expressly vested in the President by Art. II., § 3 of the Constitution to "receive Ambassadors and other public Ministers." U.S. Const. Art. II, § 3.  Such decisions also necessarily implicate the Executive Branch's foreign affairs authority under Art. II, § 2 of the Constitution, as to which the courts have long given the Executive Branch the "utmost deference." <u>See, e.g.</u>, <u>Dep't of the Navy v. Egan</u>, 484 U.S. 518, 529 (1988); <u>Banco Nacional de Cuba v. Sabbatino</u>, 376 U.S. 398, 433 (1964); <u>Isbrandtsen Tankers, Inc. v. President of India</u>, 446

F.2d 1198, 1199-1200 (2d Cir.), cert. denied, 404 U.S. 985 (1971). In light of the authority vested in the Executive Branch by the Constitution and in light of the Executive's expertise and experience in the sensitive area of foreign affairs, courts have recognized that such deference to the Executive Branch's immunity determinations is warranted. As the court in Spacil explained,

> [s]eparation-of-powers principles impel a reluctance in the judiciary to interfere with or embarrass the executive in its constitutional role as the nation's primary organ of international policy.

Id. (citing United States v. Lee, 106 U.S. 196, 209 (1882)); see also Ex Parte Peru, 318 U.S. at 588. Further, the Executive Branch possesses substantial institutional resources to pursue and extensive experience to conduct the country's foreign affairs. See Spacil, 489 F.2d at 619. By comparison, "the judiciary is particularly ill-equipped to second-guess" the Executive Branch's determinations affecting the country's interests. Id. Finally, and "[p]erhaps more importantly, in the chess game that is diplomacy only the executive has a view of the entire board and an understanding of the relationship between isolated moves." Id.

<u>CONCLUSION</u>

For the reasons stated above, the United States respectfully suggests the immunity

of defendant Prime Minister Ilham Aliyev in this action and any related cross-claim.

Dated:      New York, New York
            October 3, 2003


                        Respectfully submitted,

                        JAMES B. COMEY
                        United States Attorney for the
                        Southern District of New York


            By:    _Andrew D. O'Toole_ by Heather
                   ANDREW D. O'TOOLE (AO-7714)
                   Assistant United States Attorney
                   33 Whitehall Street, 8th Floor
                   New York, New York 10004
                   Telephone: (212) 637-2726

                   Attorney for the United States of America

Of counsel:

DAVID P. STEWART
Assistant Legal Adviser
ANDREW N. KELLER
Attorney-Adviser
Office of Diplomatic Law and
        Litigation
Office of the Legal Adviser
United States Department of State
Washington, D.C. 20520
Attorneys for the United States Department of State



Exhibit 1

THE LEGAL ADVISER

DEPARTMENT OF STATE

WASHINGTON

September 24, 2003

Peter D. Keisler
Assistant Attorney General
Civil Division
U.S. Department of Justice
Washington, D.C. 20530

Dear Mr. Keisler:

    <u>Daventree Limited, et al. v. Republic of Azerbaijan,</u>
<u>et al.</u>, Civil Action No. 02 6356, is an action pending in
the United States District Court for the Southern District
of New York.  The suit names Ilham Aliyev, the Prime
Minister of Azerbaijan, as a defendant.

    Prime Minister Aliyev is the sitting head of
government of Azerbaijan.  In light of this status, the
Government of Azerbaijan has requested that the Government
of the United States take all steps necessary to have this
action against Prime Minister Aliyev dismissed.

    The Department of State recognizes and allows the
immunity of Prime Minister Aliyev from this suit.  Under
customary rules of international law, recognized and
applied in the United States, Prime Minister Aliyev is
immune from the jurisdiction of the United States courts in
this case.  Accordingly, the Department of State requests
that the Department of Justice submit to the district court
an appropriate Suggestion of Immunity.

    This letter recognizes the particular importance
attached by the United States to obtaining the prompt
dismissal of the present proceedings against Prime Minister
Aliyev in view of the significant foreign policy
implications of such an action.

                        Sincerely,

                        William H. Taft, IV

cc:  Vincent Garvey, Esq.
     Federal Programs Branch

     Rupa Bhattacharyya, Esq.
     Federal Programs Branch

     Andrew O'Toole, Esq.
     Civil Division
     Southern District of New York

     Heather McShain, Esq.
     Civil Division
     Southern District of New York



Exhibit 2

FEB 20 '94  16:52 No.010 P.16

ENTERE

FEB 21 1906

CLERK, U.S. DISTRICT COU
L DISTRICT OF CALI

FILE

FEB 18 1986

CLERK, U.S. DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
BY                         DEPUTY

RECEIVED

FEB 21 1906

U. S. ATTORNEY
CIVIL DOCKEIS

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

JACK GERRITSEN,

     Plaintiff,

    v.

MIGUEL DE LA MADRID
HURTADO, et. al,

     Defendant.

NO. CV 85-5020-PAR

This action arises out of plaintiff's attempts to distribute leaflets critical of the Mexican government. Plaintiff claims his constititutional rights were violated by defendants' use of threats and force attempting to thwart his activities.  Plaintiff seeks damages and injunctive relief for deprivation of his First and Fourth amendment rights against the following defendants:  Miguel de la Madrid Hurtado, President of Mexico; Javier Escovar y Cordova and Agustin Garcia Lopez Santaolalle, Consuls general of Mexico; Enrique Silva Guzman, Vice Consul; Salvador Uribe, Administrative Assistant of the Mexican consulate; and two Doe defendants.  All defendants are

-1-

1  being sued in their individual and official capacities.
2  Jurisdiction is invoked pursuant to 28 U.S.C. § 1343(3).
3  Defendants move, through the United Mexican States ("UMS"), to
4  dismiss the complaint. Plaintiff has filed a motion to prevent
5  the UMS from appearing as counsel before this court. In
6  addition, the United States Government has filed a suggestion of
7  immunity in favor of President de la Madrid.

8        The complaint alleges that on June 27, 1983, plaintiff
9  was attempting to distribute leaflets in the El Pueblo de la Los
10 Angeles State Historical Park when an agent employed to protect
11 the consulate, Reyes Cortes, confronted him and demanded that he
12 cease. (Complaint ¶ 8). On June 28, 1983, plaintiff again
13 attempted to distribute leaflets and was stopped by Cortes who,
14 in service to the Mexican government, demanded that plaintiff
15 leave the park, broke plaintiff's camera, attempted to confiscate
16 the leaflets, and raised a club in a threatening manner. (Id. ¶
17 9). Later that same day, plaintiff was handcuffed by Cortes and
18 forced to enter the consulate, where defendant Uribe struck
19 plaintiff with his fists and feet. Plaintiff was then held,
20 against his will, in a room in the consulate for two hours of
21 interrogation and threats. (Id. ¶10).

22       On August 5, 1983, plaintiff was shoved down the stairs
23 located outside the northeast corner of the consulate by Uribe.
24 (Id. ¶ 11). On September 20, 1983, while distributing leaflets,
25 plaintiff was restrained by defendant Cordova without his
26 consent. Cordova then "pursued a process" whereby plaintiff was
27 arrested, booked and had his handbills confiscated. (Id. ¶ 12).
28 The arrest report, "incorporated into the complaint, indicates

-2-

1  that the arrest was a "citizen's arrest," and that the Los
2  Angeles  Police  Department  officers  were  only  transporting
3  plaintiff to custody pursuant to Cordova's citizen's arrest and
4  assisting with paperwork. (Complaint, Exh. A, p. 12). On October
5  25, plaintiff was attacked by Uribe to prevent plaintiff from
6  distributing leaflets. (Id. ¶ 13)

7        On June 18, 1984, while distributing leaflets,
8  plaintiff was "pushed" away from the consulate by both diplomatic
9  aide Oscar Mejia, and Uribe. (¶ 14). On July 31, 1984, plaintiff
10 was restrained, for some unknown purpose, by Cordova while
11 distributing leaflets. (¶ 15). On September 14, 1984, plaintiff
12 was handcuffed by an unidentified member of the Mexican
13 consulate, and transported to a remote location of the park,
14 whereupon the agent destroyed the contents of his camera.  (¶
15 16).

16       On June 20, 1985, while plaintiff was peacefully
17 distributing his leaflets, defendant Santaolalla threatened to
18 take "more serious measures against plaintiff." Later that day
19 Uribe threatened plaintiff with a gun. (Id. ¶ 17). On July 17,
20 1985 Uribe struck plaintiff with a sign. (Id. ¶ 18). On the
21 19th Uribe struck plaintiff in the face, and on the 25th, Uribe
22 struck plaintiff with a heavy metal sign. (Id. ¶ 20). On the
23 26th Uribe smashed plaintiff's right foot with his left foot.
24 (Id. ¶ 21).

25       Defendants Santaolalla and Guzman allegedly promoted,
26 encouraged  and  permitted  these  "terrorist"  acts  against
27 plaintiff. In addition they permitted the use of amplified sound
28 from loudspeakers. " (Id. ¶ 22). This sound allegedly violated

-3-

1  plaintiff's communication rights from the hours of 7:00-8:00
2  A.M., five days a week. (Id.).  Plaintiff also alleges that all
3  defendants participated in a conspiracy to deny plaintiff of his
4  speech and press rights. (Id. ¶ 23).

5       On January 7, 1986 plaintiff filed a supplemental
6  declaration to his complaint indicating that on December 18,
7  1985, plaintiff was attempting to distribute leaflets in front of
8  the consulate when Uribe struck plaintiff with a disc-shaped
9  piece of metal.  On December 19, 1985, Uribe allegedly beat
10 defendant with a metal chain, causing defendant to lose
11 consciousness.  The police were summoned, and arrested Uribe for
12 assault with a deadly weapon.  Uribe was set for arraignment on
13 January 16, 1986; however, the court has not been apprised as to
14 the results of that hearing.

15      1. United Mexican States

16      Under Local Rule 2.9.1 no unincorporated association
17 may appear in any action or proceeding pro se.  Although an
18 individual may represent himself without an attorney, that
19 representation may not be delegated to any other person.  Thus,
20 UMS may not appear on behalf of the individuals in this action,
21 and may not appear as attorney of record for the individual
22 defendants.  The individuals may either appear on their own
23 behalf, or obtain counsel admitted to practice in this court.

24      2. Personal Jurisdiction: President de la Madrid

25      The court has inherent power to dismiss an action for
26 lack of subject matter jurisdiction or for failure to state a
27 claim on the merits, where, as in this case, the plaintiff has
28 received notice of the grounds for dismissal, and has filed

-4-

1  lengthy papers in response.  See, e.g., Amfac Mtg. Corp. v.

2  Arizona Mall of Tempe, 583 F.2d 426 (9th Cir. 1978); Sanborn v.

3  U.S., 453 F.Supp. 651, (E.D. Cal. 1978); see also  Wood v.

4  McEwen, 644 F.2d 797, (9th Cir. 1981);  Wong v. Bell, 642 F.2d

5  359 (9th Cir. 1981).

6         In its papers UMS moved to dismiss the action as to

7  President de la Madrid on the ground that the court lacks

8  personal jurisdiction.  Although ordinarily a court may not sua

9  sponte dismiss for lack of personal jurisidiction, that rule is

10 inapplicable where the defendant has:  1) indicated his objection

11 to jurisdiction; and 2) has not appeared by filing a motion or

12 otherwise.  First National Bank of Louisville v. Bezema, 569

13 F.Supp. 818 (S.D. Ind. 1983).  The court's determination of

14 whether it has personal jurisdiction over President Hurtado is

15 governed by the same due process standard applicable to actions

16 generally.  Thos. P. Gonzalez Corp. v. Consejo Nacional, Etc.,

17 614 F.2d 1247 (9th Cir. 1980).

18        Whether a party's contacts are sufficient to permit the

19 court to exercise jurisdiction depends on the facts of the case.

20 The exercise of general jurisdiction is appropriate only when a

21 defendant has "substantial," or "systematic and continuous"

22 contacts with the forum state.  Data Disc, Inc. v. Systems Tech.

23 Assoc., Inc., 557 F.2d 1280, 1287 (9th Cir. 1977).  There is

24 nothing in the record to indicte that President de la Madrid has

25 any contacts with California, and thus the exercise of general

26 jurisdiction is inappropriate.

27        Nor are there any facts in the record that would

28 support limited jurisdiction over the President based on the

-5-

1   nature and quality of his forum contacts in relation to the
2   claims asserted in the complaint. Data Disc requires that three
3   factors be considered: First, whether the nonresident has done
4   some act or consummated some transaction with the forum or
5   performed some act by which he purposefully avails himself of the
6   privilege of conducting activities in the forum, thereby invoking
7   the benefits and protections of its laws; second, the claim must
8   be one which arises out of or results from the defendant's
9   forum-related activities; and third, exercise of jurisdiction
10  must be reasonable. Id. at 1287.

11          Plaintiff alleges only that President de la Madrid
12  participated in a conspiracy to deprive plaintiff of his
13  constitutional rights, from which he argues that jurisdiction is
14  proper because the President allegedly appointed the other
15  defendants and failed properly to supervise their actions.
16  Plaintiff has demonstrated no contacts of President de la Madrid
17  with California; and thus no "purposeful availment" of the
18  benefit of conducting activities in California.  The alleged
19  tortious acts of President Hurtado must have originated outside
20  of California, presumably Mexico.  The UMS is not a defendnat in
21  this case, and it is improper to attribute the contacts of the
22  government, by virtue of the consulate, to the President as an
23  individual, whether he is alleged to be acting in a personal or
24  official capacity.  In these circumstances it is not sufficient
25  for jurisdiction that the act in Mexico imposes a burden on a
26  California resident.  See Thos. P. Gonzalez Corp. 614 F.2d at
27  1253.

28          Nor is the exercise of jurisdiction appropriate because

-6-

1   President de la Madrid has allegedly utilized the mail system to
2   communicate with the consulate.    This is not the kind of
3   purposeful activity which supports jurisdiction. See, Thos P.
4   Gonzalez, 614 F.2d 1247; Peterson v. Kennedy, 771 F.2d 1244 (9th
5   Cir. 1985).    Further, the exercise of jurisdiction in these
6   circumstances would not be reasonable, in light of the potential
7   heavy burden placed on President de la Madrid to appear in
8   California to defend against this action.

9        Because it is inappropriate to assert jurisdiction over
10  the President it is unnecessary to determine if service of
11  process were proper, or to apply the "Act of State" doctrine to
12  bar this action.

13       3.   Suggestion of Immunity

14       On December 15, 1985, the United States, pursuant to 28
15  U.S.C. § 517, filed a "Suggestion of Immunity" in favor of
16  President de la Madrid.    Historically, courts of the United
17  States have been bound by Suggestions of Immunity submitted to
18  the courts by the executive branch.    Ex Parte Republic of Peru,
19  318 U.S. 578, 588-89 (1942); Spacil v. Crowe, 489 F.2d 614, 617
20  (5th Cir. 1974).    However, in 1976 Congress passed the Foreign
21  Sovereign Immunities Act (FSIA), 28 U.S.C. § 1603 et. seq., to
22  make justiciable the question of sovereign immunity of foreign
23  states, thereby freeing the executive branch from the diplomatic
24  pressures involved in granting or denying requests of foreign
25  states for sovereign immunity. Verlindin B.V. v. Central Bank of
26  Nigeria, 461 U.S. 480, (1983).    The FSIA provides the courts of
27  the United States jurisdiction, in limited circumstances, over
28  claims of United States citizens against foreign states, as

1  defined in the Act.

2       The FSIA defines a foreign state in § 1603 as a
3  "political subdivision of a foreign state or an agency or
4  instrumentality of a foreign state." The section as phrased does
5  not refer to individual representatives of foreign governments.
6  Further, the enactment of the FSIA was not intended to affect the
7  power of the State department to assert immunity for diplomatic
8  and consular personnel. See 22 U.S.C. § 254a-e. The State
9  department suggestion of immunity for diplomatic personnel has
10 generally been accepted as conclusive by the courts. See
11 Abdulazia v. Metropolitan Dade County, 741 F.2d 1328 (11th Cir.
12 1984); Carrera v. Carrera, 174 F.2d 496, 497 (D.C. Cir. 1949);
13 see also United States v. Lumumba, 741 F.2d 12, 15 (2nd Cir.1984)
14 ("recognition by the executive branch--not to be second-guessed
15 by the judiciary--is essential to establishing diplomatic
16 status."). Diplomatic status can be conferred after the filing
17 of a lawsuit. Abdulazia, 741 F.2d at 1331, and the State
18 Department has "broad discretion" to classify diplomats. Id.

19      Thus, it is clear that the State Department has the
20 power to confer immunity on the diplomatic representatives of
21 foreign governments. A head of state of a foreign government is
22 indisputably a representative of that state in its dealings with
23 the United States, and it would be within the power of the State
24 Department to grant immunity to a head of state during a visit to
25 the United States. See, Abdulazia at 1330. There is no basis,
26 consistent with the purposes behind the granting of diplomatic
27 immunity, to restrict the State Department from suggesting
28 immunity on behalf of representatives of foreign governments for

-8-

1  actions taken inside the foreign state, when the very same
2  actions would be protected by a grant of immunity if taken inside
3  the United States.  Accordingly, the Suggestion of Immunity
4  offered by the State Department in favor of President de la
5  Madrid is accepted, and the President is dismissed from the
6  action, with prejudice.

7            4. Lack of Subject Matter Jurisdiction.

8        Plaintiff invokes jurisdiction pursuant to 28 U.S.C. §
9  1343.  Jurisdiction over plaintiff's claim for violations of his
10 First and Fourth amendment rights is appropriate only when the
11 deprivation is "under color of state law." This requirement has
12 "consistently been treated as the same thing as the 'state
13 action' required under the Fourteenth Amendment." Rendell-Baker
14 v. Kohn, 457 U.S. 830 (1982).  The Fourteenth Amendment, which
15 prohibits the states from denying federal constitutional rights
16 and which guarantees due process, applies to acts of states, not
17 private persons or entities.  Shelley v. Kraemer, 334 U.S. 1
18 (1948).  Thus, the requirement of state action is both a
19 jurisdictional and substantive requirement.  See, Blum v.
20 Yaretsky, 457 U.S. 991 (1982)(failure of respondents to establish
21 state action was failure to prove violation of rights secured by
22 fourteenth amendment); Jackson v. Metropolitan Edison Co., 419
23 U.S. 345, 349 (1974)(private conduct, "however discriminatory or
24 wrongful," not actionable under the 14th amendment); Public
25 Utilities Commission of the District of Columbia v. Pollack, 343
26 U.S. 451 (1952)(First amendment does not apply to or restrict
27 private persons).

28      The ultimate question in determining whether an alleged

-9-

1  infringement of constitutional rights is actionable is whether

2  the infringement is "fairly attributable to the state."

3  Rendell-Baker v. Kohn, 457 U.S. at 838, citing, Lugar v.

4  Edmondson Oil Co., 457 U.S. 922, 937 (1982).  If the alleged

5  infringement is not state action, there is no jurisdiction and

6  thus, "our inquiry ends." Id.

7      The alleged unconstitutional actions taken against

8  plaintiff were all taken by members of the Mexican consulate or

9  officials of the Mexican government.  Although the individuals

10  were alleged to be acting on behalf of the Mexican government,

11  and thus not strictly as private individuals, they are not

12  alleged to be acting on behalf of a state or territory of the

13  United States, and thus their actions are not attributable to

14  state or federal officials and are not "under color of state

15  law."  See District of Columbia v. Carter, 409 U.S. 418, 421

16  (1973)(civil rights action for violation of Fourth amendment

17  rights against District of Columbia police officer not actionable

18  because District of Columbia is not a state within meaning of

19  Fourth Amendment and neither the District nor its officers are

20  subject to its restrictions); cf. Examining Board v. Flores de

21  Otero, 426 U.S. 572 (1976)(district court has jurisdiction under

22  28 U.S.C. § 1343 of a claim alleging the unconstitutionality of a

23  Puerto Rico statute because the Fifth and Fourteenth amendments

24  apply to Puerto Rico, and territories of the United States are

25  included in § 1343.)

26      The only state involvement for purposes of § 1343 in

27  the incidents upon which the complaint is based occurred when

28  plaintiff was placed under citizen's arrest, and when Uribe was

-10-

1  arrested by the Police Department for allegedly assaulting
2  plaintiff with a deadly weapon in December, 1985.  In the arrest
3  of plaintiff, the signed arrest report clearly indicates that the
4  arrest was purely a "citizen's arrest" and the officers were
5  merely assisting with paperwork and transport.  In addition, it
6  is clear from plaintiff's supplemental declaration that the Los
7  Angeles Police Department assisted plaintiff by placing defendant
8  Uribe under arrest.  The incidents alleged in the complaint do
9  not constitute "significant encouragement," of the alleged
10 deprivations of constitutional rights, such that "choice in law
11 must be deemed to be that of the state," Blum v. Yaretsky, 457
12 U.S. 991, 1003 (1982).

13         Accordingly, for the reasons stated above, President de
14 la Madrid is dismissed from this action with prejudice;
15 plaintiff's complaint is dismissed for lack of subject matter
16 jurisdiction.

17 Dated:  February 5, 1986.

18
19
20                                    Pamela Ann Rymer
21                                    United States District Court
22
23
24
25
26
27
28

-11-



Exhibit 3

FILED IN THE
UNITED STATES DISTICT COURT
Western District of Washington

JUL 14 1983

BRUCE RIFKIN, Clerk
By_____ Deputy

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

ESTATE OF SILME G. DOMINGO,       )
et al.,                           )
                                  )
                Plaintiffs,       )       No. C82-1055V
                                  )
        vs.                       )       ORDER
                                  )
FERDINAND MARCOS, et al.,         )
                                  )
                Defendants.       )
_____ )

        Having heard oral argument and having fully considered the
memoranda and affidavits submitted in connection with the
following motions:  (1) the motion of plaintiffs to vacate and set
aside the Court's order of December 23, 1982, dismissing
plaintiffs' claims against defendants Ferdinand and Imelda Marcos;
(2) the motion of defendant Republic of the Philippines to
dismiss; (3) the motion of defendant Ernesto Querubin to dismiss;
(4) the motion of plaintiffs to disqualify the United States
Attorney; and (5) the motion of the United States government

ORDER - 1

FEB 28 '94   16:26 No.010 P.04

defendants to dismiss, the Court now finds and rules as follows:—

1. Plaintiffs are members of a group opposed to the policies and actions of the regime of Ferdinand Marcos, President of the Republic of the Philippines, and to the alleged policy of the United States of military, economic, political and other support of that regime.

2. Plaintiffs allege:

> "All the defendants have and are engaged in an ongoing conspiracy to silence and disrupt the anti-Marcos opposition. The goal of this conspiracy against the anti-Marcos opposition was and is to infiltrate, monitor, counteract, interfere with, disrupt, and neutralize the anti-Marcos opposition in this country and thus to deprive the opposition of equal protection of the laws and other civil rights."

The American defendants named in the complaint are alleged to have been aware of the alleged activities of Philippine agents against the anti-Marcos opposition in the United States but to have taken no action to halt or to curtail those activities. Allegedly, the United States government defendants have acted to further the objectives of the conspiracy against the anti-Marcos opposition. In addition, certain unnamed United States government defendants are alleged to have participated in the plot to murder Domingo and/or Viernes.

3. The Court has previously dismissed President Marcos and his wife, Imelda Marcos, as defendants pursuant to a Suggestion of Immunity made by the Department of State of the United States.

ORDER — 2

FEB 28 '94   16:27 No.010 P.05

1   Plaintiffs move to vacate and set aside that order on the
2   procedural ground that they were not afforded an opportunity to
3   respond to the United States and on the substantive ground that
4   the Suggestion of Immunity procedure was eliminated by enactment
5   of the Foreign Sovereign Immunities Act ("FSIA"), 28 U.S.C.
6   Sections 1330 et seq.

7       4.   Although the Court finds that the motion to dismiss
8   defendants Marcos was properly noted on the Court's calendar for
9   December 23, 1982, the Court will address de novo the substantive
10  question of the immunity of those defendants.

11      5.   Plaintiffs' principal argument in opposition to the
12  Suggestion of Immunity is that, in enacting the FSIA, Congress
13  intended to eliminate the Suggestion of Immunity procedure.  The
14  legislative history of the Act indicates that Congress had this
15  intention only with respect to foreign states.  House Rep. No.
16  94-1487, 94th Cong., 2nd Sess., U.S. Code Cong. and Admin. News,
17  at 6510 ("House Report").  There is no evidence in the legislative
18  history of the FSIA nor in the FSIA itself that Congress intended
19  to modify the procedure with respect to the immunity of a foreign
20  head of state.

21      6.   Under the FSIA a foreign state is, with certain
22  exceptions, immune from the jurisdiction of the courts of the
23  United States.  28 U.S.C. Section 1604.  The term "foreign state"
24  is defined in Section 1603 as "a political subdivision of a

25

26  ORDER - 3

1   foreign state or an agency or instrumentality of a foreign state."

2       7.  Plaintiffs have cited no reference to the immunity of a

3   foreign head of state in the FSIA or in its legislative history.

4   They nevertheless argue that because the head of a foreign state

5   was historically considered the embodiment of the state itself, a

6   head of state should now be accorded no greater immunity than a

7   state.  There is no evidence, however, that Congress intended to

8   eliminate the Suggestion of Immunity procedure as a means of

9   securing the dismissal of an action against a foreign head of

10  state.

11      8.  The Court finds additional support for this result in the

12  fact that enactment of the FSIA was not to affect the immunity of

13  diplomatic or consular officials.  House Report at 6610.  Those

14  officials enjoy absolute immunity.  It would be illogical to

15  accord a lesser degree of immunity to a foreign head of state than

16  to a diplomat appointed by that head of state.  The Court

17  concludes that it must accede to the Suggestion of Immunity made

18  by the Department of State with respect to defendants Ferdinand

19  Marcos and Imelda Marcos.

20      9.  The Republic of the Philippines has also moved to

21  dismiss.  Its claim of immunity is expressly governed by the FSIA.

22  Plaintiffs contend that the Republic cannot assert a defense of

23  sovereign immunity because of the exception contained in 28 U.S.C.

24  Section 1605(a)(5), which provides as follows:

25      "(a) A foreign state shall not be immune from

26  ORDER - 4

the jurisdiction of courts of the United
States or of the States in any case

... (5) not otherwise encompassed in
paragraph (2) above [pertaining to commercial
activity] in which money damages are sought
against a foreign state for personal injury or
death, or damage to or loss of property,
occurring in the United States and caused by
the tortious act or omission of that foreign
state or of any official or employee of that
foreign state while acting within the scope of
his office or employment;..."

10.   In the Ninth Cause of Action of plaintiffs' complaint
plaintiffs allege that certain of the defendants committed an
assault and battery upon Domingo and Viernes which caused their
deaths.  At no place in plaintiffs' complaint is there an
allegation that the deaths of Domingo and Viernes were caused by
the tortious act of the Republic of the Philippines or by an
official or employee of the Republic of the Philippines while
acting within the scope of his office or employment.  Absent such
an allegation the Republic of the Philippines is immune from the
jurisdiction of the courts of the United States and the motion of
the Republic of the Philippines to dismiss must be granted.  This
Court is without jurisdiction under the FSIA to grant injunctive
relief as against the Republic of the Philippines.

11.   Consul General Ernesto Querubin also moves to dismiss.
He argues that he is immune from suit by virtue of his "consular
immunity."  Querubin claims immunity under two separate consular
treaties.  The first is the Vienna Convention on Consular

ORDER - 5

1  were automatically accorded the immunity enjoyed by Polish

2  consular officials.  That is, defendant does not argue that the

3  most-favored-nation clause is self-executing.  Rather, he argues

4  that he became entitled to the consular immunity of the Polish

5  Consular Convention when the United States accepted the tender by

6  the Philippines of immunity in a note, dated December 6, 1982, in

7  which the United States stated:

8          "In accordance with the provisions of Article
9          I(2) of the 1947 United States-Philippines
            Consular Convention, the request of the
10         Republic of the Philippines is granted on the
            basis of the representations and guarantee of
11         reciprocity set forth in the Embassy's note.
            Accordingly, consular officers of the
12         Philippines will henceforth enjoy reciprocally
            in the United States privileges, exemptions
13         and immunities no less favorable in any
            respect than those that are enjoyed by Polish
14         consular officers in the United States
            pursuant to the 1972 United States-Poland
15         Consular Convention."

16         15.  Plaintiffs' action was filed on September 14, 1982,

17  which was two months prior to the exchange of diplomatic notes

18  granting Philippine consular officials the immunity enjoyed by

19  Polish officials.  Plaintiffs argue that this immunity cannot be

20  conferred retroactively.  They contend that their cause of action

21  against Querubin accrued no later than June 1, 1981, the date upon

22  which Domingo and Viernes were slain.

23         16.  Plaintiffs have cited Arcaya v. Paez, 145 F.Supp. 464,

24  468 (S.D.N.Y. 1956), 244 F.2d 958 (2d Cir. 1957) for the

25  proposition that a consular officer cannot be retroactively

26

ORDER - 7

1   immunized.  Arcaya was a libel action against a Venezuelan consul,

2   who was not immune from suit at the time he was served.

3   Subsequently, the defendant was promoted to the rank of ambassador

4   and became entitled to absolute immunity from suit.  Plaintiff

5   argued that the Venezuelan government could not retroactively

6   immunize defendant for the acts he committed while he was a

7   consular officer.  The court ruled that since defendant was served

8   with process before he was immune, the action against him should

9   not be dismissed.  The court held, however, that the action should

10  be suspended because defendant's promotion to ambassador entitled

11  him to absolute immunity.

12       17.  The absolute immunity of defendant Querubin under the

13  Polish Convention requires the termination of these proceedings as

14  against him.  The action must be dismissed, rather than simply

15  suspended, as against him since even a suspension of the action

16  would be inconsistent with the provision in the Polish Convention

17  that a consular official "shall enjoy immunity from the

18  jurisdiction of the judicial and administrative authorities" of

19  the United States.

20       18.  Plaintiffs also assert that Article I(2) of the U.S.-

21  Philippine Convention does not contemplate absolute immunity

22  because immunity of that character is not "in conformity with

23  modern international usage."  The Court is not, however, persuaded

24  that the U.S.-Poland Consular Convention is in any way contrary to

25

26  ORDER - 8

modern international usage.

19.   The Court finds no merit in the other arguments made by plaintiffs against the absolute immunity of defendant Querubin.

20.   Plaintiffs have moved to disqualify the United States Attorney on the ground that he has a conflict of interest because his investigation of the murders of Domingo and Viernes may uncover evidence which inculpates one or more of the United States government defendants in the present action.  At the hearing held on plaintiffs' motion, the Court granted the United States' request for a waiver of Local Rule 2(d), which requires out-of-the-district counsel to associate local counsel.  At that time, however, the Court indicated that it would be a convenience to all parties and to the Court to have a representative of the United States Attorney's office to be available to attend to such ministerial functions as the acceptance of service of pleadings. In order to avoid even the appearance of a conflict of interest, however, the Court requests counsel for the United States defendants to associate as local counsel an attorney from the Seattle office of some federal agency other than the office of the United States Attorney.

21.   Since neither the Federal Rules of Civil Procedure nor federal practice recognizes John Doe pleadings, the named John Doe defendants one through seventy-five must be dismissed.  Should unknown defendants hereafter be identified, plaintiffs may seek

ORDER - 9

leave to add those parties as parties defendant.

22.   The federal agencies named as defendants, namely, The Federal Bureau of Investigation, the Department of Justice, the Department of State, Naval Intelligence, and Naval Investigative Service are not legal entities. They can neither sue nor be sued. The complaint of the plaintiffs must, therefore, be dismissed as to those defendants.

23.   The named United States government defendants have moved for dismissal of plaintiffs' complaint as against them. The Court is persuaded by the memoranda of authorities filed by those defendants and by the decisions cited therein, that the following rulings must be made with respect to the claims asserted by plaintiffs as against the United States government defendants:

> (1)   With respect to plaintiffs' claims for damages against the United States government defendants in their individual capacities, the Court finds that those defendants do not in their individual capacities have such minimum contacts with the State of Washington as to make them subject to the jurisdiction of this Court under the Long Arm Statute of the

ORDER - 10

1     State of Washington.  The damage claims

2     of plaintiffs against the United States

3     government defendants in their individual

4     capacities must therefore be dismissed.

5    (2) With respect to the other claims by

6     Plaintiffs against the United States

7     government defendants, those claims must

8     be dismissed because the allegations

9     against those defendants in plaintiffs'

10     complaint are lacking in the requisite

11     specificity to enable the defendants to

12     answer to the complaint.  Before any one

13     of the named United States government

14     defendants may be required to defend

15     himself against the charges in

16     plaintiffs' complaint, plaintiffs must as

17     to that defendant allege with

18     particularity the personal involvement of

19     that defendant in the alleged unlawful

20     conduct of which plaintiffs complain.

21    (3) With respect to the claims of the Estates

22     of Silme G. Domingo and Gene A. Viernes

23     for money damages by reason of the

24     wrongful deaths of the decedents, the

25

26

ORDER - 11

actions against the named United States government defendants in their official capacities must be dismissed.  The United States cannot be sued for money damages except and to the extent that it has waived its sovereign immunity.  The United States has waived its sovereign immunity from suits for money damages only by the Federal Tort Claims Act.  In order to commence an action under the Federal Tort Claims Act a claimant must comply strictly with the terms of that act.  One of the provisions of that Act is that prior to the commencement of an action for damages against the United States, the claimant must submit an administrative claim and have that claim ruled upon administratively.  This, the claimants have not done.  Their claims for money damages against the named United States government defendants in their official capacities must therefore be dismissed.

Accordingly, the motion of President Ferdinand E. Marcos and

ORDER - 12

1   Imelda Marcos to dismiss is GRANTED.  The motion of Ernesto
2   Querubin to dismiss is GRANTED.  The motion of the Republic of the
3   Philippines to dismiss is GRANTED.  The motion of the United
4   States government defendants to dismiss is GRANTED in part.  The
5   complaint of plaintiffs as to defendants Federal Bureau of
6   Investigation, Department of Justice, Department of State, Naval
7   Intelligence, Naval Investigative Service, and John Does one
8   through seventy-five, is DISMISSED.

9       Plaintiffs shall have leave to file an amended complaint.
10  That amended complaint must, however, comply with the mandate of
11  Fed. Rules Civ. Proc. 8 that the complaint be a short and plain
12  statement of each of plaintiffs' claims.  The Court will strike an
13  amended complaint that is not in compliance with Rule 8.

14      The Clerk of this Court is instructed to send uncertified
15  copies of this order to all counsel of record.

16      DATED this 14 day of July, 1983.

17

18

19                          United States District Judge

20

21

22

23

24

25

26  ORDER - 13

**Exhibit 4**

CAUSE NO. 93-CI-11345

|  |  |
|---|---|
| GUARDIAN F., INDIVIDUALLY<br>AND AS NEXT FRIEND OF MINOR G.,<br><br>Plaintiff,<br><br>v.<br><br>ARCHDIOCESE OF SAN ANTONIO, et al.,<br><br>Defendants. | IN THE DISTRICT COURT<br><br>225TH JUDICIAL DISTRICT<br><br>BEXAR COUNTY, TEXAS |

ORDER

The United States of America has filed a Suggestion of Immunity in this cause.  The Suggestion indicates that Pope John Paul II, a named defendant, is the sitting head of state of a friendly foreign state, the state of Vatican City.  It further states, and attaches a letter indicating, that the United States Department of State has recognized and allowed the immunity of the Pope from this lawsuit.

The courts of the United States are bound by a Suggestion of Immunity filed by the United States.  When such a Suggestion of Immunity is filed, it is the duty of the Court to surrender jurisdiction.  See, e.g., Republic of Mexico v. Hoffman, 324 U.S. 30, 35-36 (1945); Ex Parte Peru, 318 U.S. 578, 588-89 (1943); LaFontant v. Aristide, ___ F. Supp. ___, 1994 WL 30044, *13 (E.D.N.Y. Jan. 27, 1994); Saltany v. Reagan, 702 F. Supp. 319, 320 (D.D.C. 1988), aff'd in part and rev'd in part on other grounds, 886 F.2d 438, 441 (D.C. Cir. 1989), cert. denied, 495 U.S. 932 (1990); Anonymous v. Anonymous, 581 N.Y.S.2d 776, 777 (N.Y. App. Div. 1992).

Therefore, pursuant to the Suggestion of Immunity submitted

by the United States, and for good cause shown, it is hereby:

ORDERED that the plaintiffs' claim against Pope John Paul, II, is hereby dismissed with prejudice.

Dated: _March 15_, 1994

_[signature]_

DISTRICT JUDGE

- 2 -

## CERTIFICATE OF SERVICE

I, Heather K. McShain, an Assistant United States Attorney for the Southern District of New York, hereby certify that on October 3, 2003, I caused a copy of the foregoing *Suggestion of Immunity Submitted by the United States of America, dated October 2, 2003* to be served by Federal Express upon the following:

Owen C. Pell, Esq.
Christopher M. Curran, Esq.
White & Case ·
1155 Avenue of the Americas
New York, New York 10036-2787

Samuel Rosenthal, Esq.
T. Barry Kingham, Esq.
Joseph D. Puzzurro, Esq.
Curtis, Mallet-Prevost, Colt & Mosle
101 Park Avenue
New York, New York 10178-0061

Frances E. Bivens, Esq.
Davis, Polk & Wardwell
450 Lexington Avenue
New York, New York 10017

Dated:      New York, New York
            October 2, 2003

HEATHER K. MCSHAIN
Assistant United States Attorney
Tel.: (212) 637-2696

# EXHIBIT 3

*Doe v. Liu Qui,* No. C-02-0672 (EMC),
**Magistrate's Report and Recommendation**
D. Ca. June 11, 2003)

1

2

3

4

5                    UNITED STATES DISTRICT COURT

6                    NORTHERN DISTRICT OF CALIFORNIA

7

8    JANE DOE I, *et al.*,                    No. C-02-0672 CW (EMC)
                                              No. C-02-0695 CW (EMC)
9              Plaintiffs,
                                              **REPORT AND RECOMMENDATION**
10        v.                                  **RE:  PLAINTIFFS' MOTION FOR**
                                              **ENTRY OF DEFAULT JUDGMENT**
11   LIU QI, *et al.*,                        **(Docket No. 18, 19)**
                                              **(Docket No. 18)**
12             Defendants.

13   _____/

14   PLAINTIFF A, *et al.*,

15             Plaintiffs,

16        v.

17   XIA DEREN, *et al.*,

18             Defendants.

19   _____/

20

21

22

23

24

25

26

27

28

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>TABLE OF CONTENTS</u>

I.      GENERAL BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

    A.   Jane Doe I, *et al.* v. Liu Qi . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    B.   Plaintiff A, *et al.* v. Xia Deren . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    C.   Response by the U.S. State Department and the PRC . . . . . . . . . . . . . . . . . . . . . . . . . 8

II.     CRITERIA FOR DEFAULT JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

III.    SERVICE OF PROCESS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

IV.     THE ALIEN TORT CLAIMS ACT AND TORTURE VICTIM PROTECTION ACT . . . . . . 16

V.      THE FOREIGN SOVEREIGN IMMUNITY ACT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

    A.   Application of FSIA to Individual Officials . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

    B.   Whether Scope of Authority is Measured by    International or
         Foreign Sovereign's Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    C.   Whether Defendants Acted Within the Scope of
         Their Authority Under Chinese Law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

    D.   FSIA Sovereign Immunity Not Applicable to Defendants Liu and Xia . . . . . . . . . . . . 30

VI.     ACT OF STATE DOCTRINE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

    A.   Background on the Act of State Doctrine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

    B.   Whether Defendants' Conduct Constituted Acts of State . . . . . . . . . . . . . . . . . . . . . . 34

    C.   The *Sabbatino* Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

        1.   Degree of International Consensus . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

        2.   Implications for Foreign Relations . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

        3.   Continued Existence of the Accused Government . . . . . . . . . . . . . . . . . . . . . . 50

        4.   Whether the Foreign State Was Acting in the Public Interest . . . . . . . . . . . . . . 53

        5.   Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

VII.   ANALYSIS OF PLAINTIFF'S HUMAN RIGHTS CLAIMS . . . . . . . . . . . . . . . . . . . . . . . . . 54

    A.   The Torture Claims (TVPA) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

    B.   Standing for Plaintiff B . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

    C.   Legal Sufficiency of the Plaintiffs' Claims of Torture  . . . . . . . . . . . . . . . . . . . . . . 63

        1.   Color of Law or Authority . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

        2.   Acts Rising to the Level of Torture . . . . . . . . . . . . . . . . . . . . . . . . . . 64

            a.   Subjected to Torture While Under the Actor's
                Custody or Physical Control . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 64

            b.   Severe Pain or Suffering . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 65

            c.   Requisite Intent  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 70

        3.   Exhaustion of Local Remedies and Statutes of Limitations . . . . . . . . . . . . . . . . 71

    D.   Cruel, Inhuman or Degrading Treatment (ATCA) . . . . . . . . . . . . . . . . . . . . . . . . . 73

    E.   Arbitrary Detention (ATCA) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 79

        1.   Doe v. Liu . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 81

        2.   Plaintiff A v. Xia . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 83

        3.   Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

VIII.   COMMANDER RESPONSIBILITY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

IX.   CONCLUSION & RECOMMENDATION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

United States District Court

For the Northern District of California

1    Before this Court is a joint motion by the Plaintiffs of two related lawsuits asserting claims under the

2  Alien Tort Claims Act and Torture Victim Protection Act.  The Plaintiffs are  practitioners and supporters

3  of Falun Gong, a spiritual movement in the People's Republic of China (hereinafter referred to as "China"

4  or "PRC").  The Plaintiffs in these two cases have moved for entry of default judgment against two

5  Defendants – local governmental officials of China accused of violating their human rights.  Plaintiffs' joint

6  motion was heard on October 30, 2002.  Extensive post-hearing briefs were submitted by the parties.  For

7  the below reasons, this Court recommends that this motion be **GRANTED IN PART** and that default

8  judgment for declaratory relief entered as to certain claims and **DENIED IN PART** as to the remaining

9  claims which should be dismissed.

10    In summary, the Court finds that Plaintiffs' claims under the Alien Tort Claims Act and Torture

11  Victim Protection Act are not barred by sovereign immunity under the Foreign Sovereign Immunity Act

12  because the alleged conduct cognizable in this suit were not validly authorized under Chinese law.

13  However, justiciability concerns embodied in the act of state doctrine counsel against remedies other than

14  declaratory relief.  Those concerns are driven primarily by the potential impact these suits may have on

15  foreign relations and the fact that the suits are brought against sitting officials and challenge current

16  governmental policies.  The Court also finds that as to the Plaintiffs' specific substantive claims, the Court

17  should enter default judgment against Defendants for declaratory relief on certain claims.  In particular, the

18  Court recommends entry of judgment declaring that certain Plaintiffs were subject to torture, cruel, inhuman

19  and degrading treatment, and arbitrary detention in violation of the Alien Tort Claims Act and Torture

20  Victim Protection Act.  The Court finds that it would not be appropriate to adjudicate the claims relating to

21  broad systemic conduct of the government.  Other claims have not been established on the merits.  The

22  Court recommends the remaining claims be dismissed.

23                              **I.    GENERAL BACKGROUND**

24    Falun Gong is a spiritual practice that blends aspects of Taoism, Buddhism and the meditation

25  techniques of qigong (a traditional martial art) with the teachings of Li Hongzhi, who was forced to leave

26  China under threat of arrest in 1998.  *Liu* Compl. ¶ 1.  Falun Gong has followers in China and

27  internationally.  *Id.*

28

United States District Court
For the Northern District of California

1

United States District Court

For the Northern District of California

1    In July 1999, Chinese President Jiang Zemin and other high ranking officials issued statements

2    declaring Falun Gong to be an illegal organization and orders initiating a widespread governmental

3    crackdown against Falun Gong and its practitioners. *Liu* Compl. ¶ 30.  In October 1999, the People's

4    Congress, the Chinese national legislature, passed a series of laws outlawing "cults," defined to include

5    Falun Gong. *Id.* As a result, according to the Plaintiffs, over 100,000 practitioners have been subjected to

6    some form of "punishment," including arrest and detention in prison facilities, labor camps, and mental

7    hospitals, brutal beatings, starvation, and other forms of torture, including electric shock and nerve-

8    damaging drugs. *Liu* Compl. ¶ 31; *Xia* Compl. ¶ 19.   Plaintiffs allege many have died while in the custody

9    of law enforcement or prison personnel. *Id.*[1]

10   The instant suits seek both an award of damages and equitable relief.

11   **A.    Jane Doe I, *et al.* v. Liu Qi**

12   Between February 1999, before the governmental crackdown began in mid-1999, and early 2003,

13   Defendant Liu Qi (hereinafter referred to as "Liu") served as the mayor of Beijing. *Liu* Compl. ¶ 32.

14   Beijing has been a focal point for the repression and persecution of the Falun Gong. *Id.* As the mayor of

15   Beijing, Liu had authority to formulate all provincial policies and lead the executive branches of the city

16   government, including the Public Security Bureau of Beijing. *Id.* ¶ 35.  The police and other security forces

17   operate under the Public Security Bureau of Beijing. *Id.*

18   In May 2000, Jane Doe I, a citizen of the PRC, went to Beijing's Tiananmen Square to protest the

19   PRC's persecution, arrest, and torture of Falun Gong practitioners. *Liu* Compl. ¶ 13.  Jane Doe I was

20   arrested during the protest and held without charge. *Id.*  For twenty days, she was not allowed to see

21   family members or a lawyer and was beaten and interrogated regularly. *Id.*  On at least one occasion she

22

23    _____

24   [1] The two actions before this Court are not unique.  Other suits have been brought by Falun Gong
     supporters in the United States in an attempt to hold individual officials of the PRC  accountable for alleged
     human rights violations directed against the Falun Gong movement in China. *See* Jacques DeLisle, *Human*

25   *Rights, Civil Wrongs and Foreign Relations: A "Sinical" Look at the Use of U.S. Litigation to Address*
     *Human Rights Abuses Abroad*, 52 DePaul L. Rev. 473, 474-76 (2002). Since July, 2001, Falun Gong

26   supporters have brought at least five actions, including the two here.  An action was brought in New York
     against Zhao Zhifei, the head of the Hubei Provincial Public Security Bureau. *Id.* at 474. Another was brought

27   in Chicago against Zhou Youkang, the Chinese Communist Party Secretary for Sichuan Province. *Id.* at 475.
     A third suit was filed in Hawaii against Ding Guangen, a Chinese Communist Party Politburo member and

28   national deputy chief of the Party Propaganda Department. *Id.* at 476.

**United States District Court**
For the Northern District of California

1   was tortured with electric shocks by needles placed in her body. *Id.* ¶ 14.  When she lost the ability to eat,

2   she was force-fed via a tube placed in her nose, which caused her to cough up blood. *Id.* ¶ 15.  After her

3   release, Jane Doe I was subject to constant surveillance, arrests and interrogation.  She subsequently fled

4   China and presently resides in the United States. *Id.* ¶ 16.

5        In May 2000, Jane Doe II, a citizen of the PRC, was arrested and beaten so severely that she

6   temporarily lost her hearing at a protest in Tiananmen Square.[2] *Liu* Compl. ¶ 18.  She was held without

7   charge for approximately twenty-seven days, during which she was interrogated, regularly beaten to the

8   point of unconsciousness, stripped of her clothing, and force-fed via a tube placed in her nose. *Id.* ¶¶ 18-

9   24.  Suffering further persecution after her release, Jane Doe II fled China and received political asylum in

10  the United States. *Id.* ¶ 25.

11       On November 20, 2001, the following individuals who have joined as plaintiffs herein were

12  arrested in Tiananmen Square during a demonstration in support of the Falun Gong:

13       1.      Helen Petit, a citizen of France, was physically and sexually assaulted by officers during her

14  arrest and interrogation. *Liu* Compl. ¶ 26.  Petit was never advised of any charges and was not allowed to

15  contact her embassy or consult with a lawyer. *Id.*  After being detained for 24 hours or more, Petit was

16  deported back to France. *Id.*

17       2.      Martin Larsson, a citizen of Sweden and a university student in the United States, was

18  interrogated by officers and physically assaulted by four guards when he refused to sign a statement written

19  in Chinese and to allow them to take pictures of him. *Liu* Compl. ¶ 27.  Larsson was never advised of any

20  charges against him and was not allowed to contact his embassy or consult with a lawyer. *Id.*  Larsson was

21  deported to Sweden the following day. *Id.*

22       3.      Leeshai Lemish, a citizen of both Israel and the United States and a university student in the

23  United States, was interrogated and beaten during his 27 hour detention and not allowed to sleep, after

24

25

---

26       [2] Jane Doe II had also previously been arrested in July 1999, when she went to Beijing to appeal to
the People's Republic of China on behalf of arrested Falun Gong practitioners.  She was not told of the charges
27  against her and was refused contact with her family or an attorney.  She was searched and her Falun Gong
books confiscated.  She was taken to a stadium with thousands of other practitioners where guards attempted
28  to force them to renounce their spiritual beliefs.  Jane Doe II was returned to her home town in handcuffs and
detained for three days, without any charges being filed. *Liu* Compl. ¶¶ 17-24.

3

1   which he was placed on a flight to Vancouver. *Liu* Compl. ¶ 28. Lemish was never advised of any

2   charges against him and was not allowed to contact his embassy or consult with a lawyer. *Id.*

3        4.      Roland Odar, a citizen of Sweden, was beaten during his arrest and interrogation, and

4   deported the following day to Sweden. *Liu* Compl. ¶ 29. He was never advised of any charges against

5   him and was not allowed to contact his embassy or consult with a lawyer.

6        On February 7, 2002, Jane Doe I, Jane Doe II, Helene Petit, Martin Larsson, Leeshai Lemish and

7   Roland Odar (hereinafter referred to as the "*Liu* Plaintiffs") filed suit against Defendant Liu for torts

8   committed in violation of international and domestic law including the Torture Victim Protection Act

9   (hereinafter referred to as the "TVPA"), 28 U.S.C. § 1350 note § 1 (2002). The *Liu* Plaintiffs allege this

10  Court has jurisdiction over this action based on the Alien Tort Claims Act (hereinafter referred to as the

11  "ATCA"), 28 U.S.C. §§ 1331, 1350 (2002). The *Liu* Plaintiffs also allege that Defendant Liu planned,

12  instigated, ordered, authorized, or incited police and other security forces to commit the abuses suffered by

13  the *Liu* Plaintiffs, and had command or superior responsibility over, controlled, or aided and abetted such

14  forces in their commission of these abuses. *Liu* Compl. ¶ 2. Thus, Liu knew or reasonably should have

15  known that Beijing police and other security forces were engaged in a pattern and practice of severe human

16  rights abuses against Falun Gong practitioners, and breached his duty, under both international and Chinese

17  law, to investigate, prevent and punish human rights violations committed by members of the police and

18  other security forces under his authority. *Id.* ¶¶ 33-34.

19       The *Liu* Complaint alleges the following claims under the TVPA and/or the ATCA: (1) torture of

20  Plaintiffs Jane Doe I and Jane Doe II particularly; (2) cruel, inhuman or degrading treatment; (3) arbitrary

21  detention; (4) crimes against humanity; and (5) interference with freedom of religion and belief. *Liu* Compl.

22  ¶¶ 39-72. Plaintiffs seek compensatory, punitive and exemplary damages, reasonable attorneys' fees and

23  costs of suit, and other and further relief as the court may deem just and proper. *Id.* ¶ 72.

24       Defendant Liu was personally served with the summons and complaint, and supplemental

25  documents by a process server on February 7, 2002 at the San Francisco International Airport (discussed

26  *infra* Part III).

27       On March 8, 2002, the *Liu* Plaintiffs filed a motion for entry of default. On March 12, 2002, the

28  Clerk of this Court entered Liu's default. On March 14, 2002, Judge Claudia Wilken ordered the *Liu*

United States District Court
For the Northern District of California

4

United States District Court
For the Northern District of California

1    Plaintiffs to file a motion for default judgment within 30 days, and which upon filing of the motion, was to be

2    referred to a Magistrate Judge for a report and recommendation.  On April 11, 2002, the *Liu* Plaintiffs filed

3    this motion for judgment by default.

4    **B.      Plaintiff A, *et al.* v. Xia Deren**

5           Defendant Xia Deren (hereinafter referred to as "Xia") presently serves as Deputy Provincial

6    Governor of the Liao Ning Province.  According to the *Xia* Plaintiffs, this province is known to be one of

7    the most repressive and abusive jurisdictions in China with regard to the arrest and treatment of Falun Gong

8    practitioners.  *Xia* Compl. ¶ 20.  Since President Jiang Zemin's banning order of July 1999, at least 27

9    Falun Gong practitioners have allegedly died from torture inflicted in labor camps and detention centers in

10   Liao Ning Province.  *Id.*  Masanjia Labor Camp, located in the capital of Liao Ning Province, Shenyang

11   City, is purported to be one of the most notorious prison labor camps in the country and is used to

12   incarcerate and torture Falun Gong practitioners.  *Id.*

13          From January 1998 through November 2000, Defendant Xia served as Deputy Mayor of Da Lian

14   City, Liao Ning Province, and then as Deputy Mayor of General Affairs and Member of the Da Lian City

15   Council from November 2000 through May 2001.  *Xia* Compl. ¶ 14.  In May of 2001, he assumed

16   responsibility as Deputy Provincial Governor for Liao Ning Province.  *Id.*  While serving as Deputy Mayor,

17   Deputy Mayor of General Affairs and Member of the Da Lian City Council, Xia exercised general

18   supervisory authority over municipal affairs, including the operation of the law enforcement and correctional

19   systems.  *Id.* ¶ 15.  Xia also served on the general governance body that oversees and directs policy-

20   making and the carrying out of government policies and functions for the affected jurisdiction.  Thus,

21   Defendant Xia played a major policy-making and supervisory role in the policies and practices that were

22   carried out in Da Lian City during that period.  *Id.*  In his present role as Deputy Provincial Governor of

23   Liao Ning Province, Xia manages and supervises the News and Publications Bureau and all operations

24   related to the control of the media, governmental communications, and distribution of government

25   publications and notices.  *Id.* ¶ 16.  Defendant Xia also plays a key part in the general governance body

26   that exercises general jurisdiction, supervision and authority over governmental policies and practices for the

27   Province as whole, including law enforcement and prison management questions, and policies and practices

28

5

1   associated with the governmentally mandated crack-down and persecution of the Falun Gong spiritual

2   movement and its practitioners. *Id.* ¶ 17.

3       Plaintiff A,[3] a 53 year old female, was a citizen and resident of Da Lian City in Liao Ning Province

4   during the period that Xia served as Deputy Mayor of Da Lian City. She was arrested and detained for

5   long periods on two occasions in 1999 and 2000. While in detention, she was subjected to torture, such as

6   being denied food and water, being required to remain standing and handcuffed against the backs of other

7   prisoners for prolonged periods of time, being denied sleep, being denied use of toilet facilities, and being

8   forced to watch the torture of others, including another Falun Gong practitioner who was placed on a rusty

9   torture device called Di Lao. *Xia* Compl. ¶¶ 9, 25.

10      Plaintiff B, a former resident of Liao Ning Province, brings this complaint on behalf of herself and

11  her parent, who still resides in Liao Ning Province and is currently incarcerated in Masanjia Labor Camp.

12  *Xia* Compl. ¶ 10. Plaintiff B's Parent was arrested and detained twice, first in 2000 when the parent was

13  detained for an extended period, and again in 2001. *Id.* At the labor camp, Plaintiff B's Parent has been

14  subjected to physical abuse, torture and highly degrading treatment and punishment, including arbitrary,

15  long-term detention and deprivation of liberty and security of the person. *Id.*

16      In 1999, Plaintiff C, a 39 year old male and former resident of Liao Ning Province, was arrested,

17  detained for a number of days, and brutally beaten by the police with chains and an electric baton when he

18  went to Beijing to support Falun Gong practitioners and protest their repression. *Xia* Compl. ¶ 11. In

19  April 2000, he was arrested a second time in Liao Ning Province and while in detention, beaten and

20  tortured repeatedly. On one occasion when he refused to answer questions, he was beaten to

21  unconsciousness, with blood coming from his mouth and nose, and his foot badly mangled. *Id.* ¶¶ 11, 27.

22  On other occasions, he was hung from water pipes for three days, handcuffed to other prisoners, and not

23  allowed to sleep. *Id.*

24      On February 8, 2002, Plaintiffs A, B, and C (hereinafter referred to as the "*Xia* Plaintiffs") filed suit

25  against Defendant Xia for torts committed in violation of international and domestic law under the ATCA

26  and the TVPA. 28 U.S.C. § 1350. The *Xia* Plaintiffs allege that Defendant Xia's actions led to the abuses

27

28      [3] Plaintiffs filed under fictitious names to protect themselves and family members living in the PRC from governmental reprisals. *Xia* Compl. ¶ 8. The Court permitted the Plaintiffs to file confidential affidavits.

United States District Court
For the Northern District of California

1   inflicted upon them.  They allege that Defendant Xia together with other officials, acted in their official

2   capacity and under color of law, to persecute, punish and intimidate Falun Gong practitioners in violation of

3   international and domestic laws.  *Xia* Compl. ¶ 28.  The suit is styled as a class action but Plaintiffs have

4   never moved to certify the class.

5        Defendant Xia was also personally served with the summons, complaint, and supplemental

6   documents by a process server on February 8, 2002 at the Fremont Hilton Hotel in Newark, California

7   (discussed *infra* Part III).

8        The *Xia* Complaint alleges, *inter alia*, the following claims under the TVPA and/or the ATCA:  (1)

9   torture; (2) genocide; (3) violation of one's right to life; (4) arbitrary arrest and imprisonment; and (5)

10  violation of one's right to freedom of thought, conscience and religion.  *Xia* Compl. ¶¶ 29-35.  The *Xia*

11  Plaintiffs seek compensatory, punitive and exemplary damages; a declaratory judgment confirming the

12  unlawful nature of the pattern and practice of gross violations of human rights that have taken place,

13  injunctive relief prohibiting further unlawful action, reasonable attorneys' fees and costs for this litigation,

14  and other and further relief as the court may deem just and proper.  *Id.* ¶ 36.  Defendant Xia was served

15  but did not enter an appearance.

16       On June 18, 2002, the *Xia* Plaintiffs filed a motion for entry of default.  On June 26, 2002, the

17  Clerk of this Court entered Xia's default.  Having been notified of a related case, the *Liu* case, on June 28,

18  2002, the case was reassigned from Judge Larson to Judge Wilken for all further proceedings.

19       On August 1, 2002, Judge Wilken ordered the *Xia* Plaintiffs to file a motion for default judgment

20  within 30 days, and upon filing of the motion for default judgment, referred the case to this Court for a

21  report and recommendation.  Since the *Xia* case was related to the *Liu* case, both cases were referred to

22  this Court for consolidated hearing.

23       On August 5, 2002, this Court ordered a joint briefing schedule and joint hearing date on the

24  Plaintiffs' motions for default judgment.

25

26

27

28

**C.   Response by the U.S. State Department and the PRC**

On September 27, 2002, at the invitation of this Court, the United States submitted a Statement of Interest and a statement made by the People's Republic of China in response to Plaintiffs' motions for default judgment against Defendants Liu and Xia.

In its Statement of Interest, the United States State Department (hereinafter referred to as "State Department") urged against adjudication of the instant suits. In its letter, the Department expresses the view that:

> In our judgment, adjudication of these multiple lawsuits [challenging the legality of the Chinese government's actions against the Falun Gong] movement, including the cases before Magistrate Chen, is not the best way for the United States to advance the cause for human rights in China. . . .
>
> . . . The Executive Branch has many tools at its disposal to promote adherence to human rights in China, and it will continue to apply these tools within the context of our broader foreign policy interests.
>
> We believe, however, that U.S. *courts* should be cautious when asked to sit in judgment on the acts of foreign officials taken within their own countries pursuant to their government's policy. . . . Such litigation can serve to detract from, or interfere with, the Executive Branch's conduct of foreign policy.
>
> . . . [P]ractical considerations, when coupled with the potentially serious adverse foreign policy consequences that such litigation can generate, would in our view argue in favor of finding the suits non-justiciable.

Letter from William H. Taft, IV to Assistant Attorney Gen. McCallum of September 25, 2002, at 7-8 (emphasis in original).

In its letter transmitted to the Court, the PRC contends, *inter alia*, that the Falun Gong practitioners' lawsuits against Chinese public officials are "unwarranted," as the officials' treatment of Falun Gong practitioners at large is consistent with China's domestic and international legal obligations. Translation of Statement of the Government of the People's Republic of China on "Falun Gong" Unwarranted Lawsuits, September 2002, ¶¶ 1-2 (hereinafter "Translation of China's Statements"). The PRC contends that Falun Gong followers have perpetrated crimes that have brought "extremely grave damages to the Chinese society and people." *Id.* ¶ 1. The PRC argues that Falun Gong in particular was banned after the PRC concluded that it was a "cult" and an "unregistered and illegal organization." *Id.* ¶ 2.

United States District Court
For the Northern District of California

The PRC accuses Falun Gong's founder, Li Hongzhi, and certain practitioners of committing activities that pose a "serious threat to public security." *Id.* ¶ 1.

Furthermore, the PRC contends that the plaintiffs' claims are not justiciable. *Id.* ¶ 3. The PRC posits that none of the exceptions under the Foreign Sovereign Immunity Act ("FSIA") applies to grant the Court jurisdiction over the claims. *Id.* In addition, the PRC contends both that outlawing the Falun Gong and punishing individuals for illegal activities related to the Falun Gong are supported by the Chinese Constitution and laws and thus, constitute acts of state. *Id.* As such, no foreign courts can question them. *Id.* Moreover, adjudication of the "false and unwarranted lawsuits [is] detrimental to China-US relations." *Id.* The PRC specifically accuses Falun Gong organizations based in the United States of "frame-ups" in which they sue Chinese officials who visit the United States in an effort "to obstruct the normal exchanges and cooperation and poison the friendly relations and cooperation between two countries." *Id.* ¶ 4. The PRC concludes with a reiteration of the detrimental effects of adjudication on the common interests of the two nations. *Id.*

## II.   CRITERIA FOR DEFAULT JUDGMENT

Federal Rule of Civil Procedure 55(b)(2) permits a court, following a defendant's default, to enter a final judgment in a case. However, entry of a default judgment is not a matter of right. Its entry is entirely within the court's discretion and may be refused where the court determines no justifiable claim has been alleged or that a default judgment is inappropriate for other reasons. *See Draper v. Coombes*, 792 F.2d 915, 924 (9th Cir. 1986); *Aldabe v. Aldabe*, 616 F.2d 1089, 1092 (9th Cir. 1980).

Where, as here, a default has been entered, the factual allegations of each complaint together with other competent evidence submitted by the moving party are normally taken as true. *See TeleVideo Sys, Inc. v. Heidenthal*, 826 F.2d 915, 917 (9th Cir. 1987); *Danning v. Lavine*, 572 F.2d 1386, 1388 (9th Cir. 1978). However, this Court must still review the facts to insure that the Plaintiffs have properly stated claims for relief. *See Cripps v. Life Ins. Co. of N. Am.*, 980 F.2d 1261, 1267 (9th Cir. 1992) ("necessary facts not contained in the pleadings, and claims which are legally insufficient, are not established by default"); *Apple Computer Inc. v. Micro Team*, 2000 WL 1897354, at *3 n.5 (N.D. Cal. 2000) ("Entry of default judgment is not mandatory upon Plaintiff's request, and the court has discretion to require

1  some proof of the facts that must be established in order to determine liability.") (citing 10A Charles Alan

2  Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2688 (3rd ed. 1998)).

3      In *Eitel v. McCool*, 782 F.2d 1470 (9th Cir. 1986), the Ninth Circuit enumerated seven factors

4  that a court may consider in determining whether to grant default judgment: (1) the merits of the plaintiff's

5  substantive claim; (2) the sufficiency of the complaint; (3) the sum of money at stake in the action; (4) the

6  possibility of prejudice to the plaintiff; (5) the possibility of a dispute concerning material facts; (6) whether

7  the default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil

8  Procedure favoring decision on the merits. *Id.* at 1471-72; *see also Pepsico, Inc. v. Cal. Sec. Cans*, 238

9  F. Supp. 2d 1172, 1174 (C.D. Cal. 2002).

10      The consolidated actions now before this Court are hardly the kind of a garden variety cases in

11  which default judgments are sought. *Cf. e.g., Bd. of Trs. of Sheet Metal Workers v. Gen. Facilities,*

12  *Inc.*, 2003 WL 1790837 (N.D. Cal. 2003) (default judgment in ERISA action against distressed employer

13  to recover unpaid contributions to employee benefit funds) *with* Hon. John M. Walker, Jr., *Domestic*

14  *Adjudication of International Human Rights Violations Under The Alien Tort Statute*, 41 St. Louis U.

15  L.J. 539, 539 (1997) ("It is safe to say that, quantitatively, international human rights law is not a major, or

16  even a minor, component of the business of federal courts: it is a minuscule part of what we do.").  Plaintiffs

17  bring claims under ACTA and TVPA for human rights violations allegedly committed in China and

18  sanctioned by the PRC including, *inter alia*, torture, genocide, crimes against humanity, religious

19  persecution, and arbitrary arrest and imprisonment.  The cases implicate important and consequential issues

20  of sovereign immunity and could impact foreign relations and diplomacy.

21      Accordingly, the nature and gravity of the *Liu* and *Xia* cases mandate the factors that inform the

22  Court's discretion in ruling on a motion to enter default judgment, particularly the merits and justiciability of

23  Plaintiffs' substantive claims, be closely scrutinized. *See Eitel*, 782 F.2d at 1472 (There was no abuse of

24  discretion to deny default judgment where "the district court could have had serious reservations about the

25  merits of Eitel's substantive claim, based upon the pleadings."); *Aldabe*, 616 F.2d at 1092-93 ("Given the

26  lack of merit in appellant's substantive claims, we cannot say that the district court abused its discretion in

27  declining to enter a default judgment in favor of appellant."); *In re Kubick*, 171 B.R. 658, 662 (9th Cir.

28  BAP 1994) ("The court, prior to the entry of a default judgment, has an independent duty to determine the

United States District Court
For the Northern District of California

10

United States District Court
For the Northern District of California

1   sufficiency of a claim, as stated in Rule 55(b)(2) . . ."); *Lewis v. Lynn*, 236 F.3d 766, 767 (5th Cir. 2001)

2   (in constitutional action against prison officials, district court did not abuse its discretion in denying default

3   judgment when plaintiff had no meritorious claim).

4          Given the unusual circumstances and the potential implications of these cases, the Court, in ruling

5   upon Plaintiffs' motion for entry of default judgment, must proceed with great caution. As will be evident,

6   the Court accords greatest weight to the factors that address the merits of the Plaintiffs' substantive claims

7   and the sufficiency of the complaint and evidence supporting their claims. The merits analysis encompasses

8   important immunity and justiciability issues central to this case. That analysis dictates that some but not all

9   claims pertaining to individual Plaintiffs are justiciable and sustainable, but that relief should be limited to

10  declaratory relief. Because justiciability concerns preclude damages and injunctive relief, the *Eitel* factors

11  regarding the sum of money at stake and possible prejudice to the Plaintiffs are irrelevant. Furthermore, as

12  explained below, Plaintiffs' broad claims which involve systemic, class-based allegations and which

13  squarely challenge official PRC policy are inappropriate for adjudication by default in view of the merits, the

14  unreliability of the default process in this context, the disputability of facts material to these broader claims,

15  and the strong policy favoring decision on the merits. Finally, although, as discussed below, personal

16  service was effected on Defendants Liu and Xia, and thus personal jurisdiction was obtained under

17  *Burnham v. Superior Court*, 495 U.S. 604 (1990), there is no evidence that either Defendant has had

18  substantial contact with the United States. Both were served during brief visits to the United States. While

19  human rights suits under the ATCA and TVPA may lie against individuals served while visiting the United

20  States (*see e.g. Kadic v. Karadzic*, 70 F.3d 232 (9th Cir. 1995)), Defendants' situation stands in contrast

21  to that of former officials and dictators who have taken residence in the United States. *See e.g. In re:*

22  *Estate of Ferdinand E. Marcos, Human Rights Litig.* ("*Hilao II*"), 25 F.3d 1467 (9th Cir. 1994);

23  *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980). Thus, while their failure to appear and defend is

24  not entirely excusable, it is less culpable in these circumstances.

25          Finally, it should be noted that default judgments against foreign nations are generally disfavored.

26  *See* Restatement (Third) of Foreign Relations Law § 459 cmt c (1987) ("Default judgments are disfavored,

27  particularly in suits against foreign states.") (hereinafter referred to as "Restatement"). *Cf.* 28 U.S.C. §

28  1608(e) (1994) (default judgment shall not be entered against a foreign state unless claimant establishes

United States District Court
For the Northern District of California

1  right to relief by "evidence satisfactory to the court."). Courts have gone to considerable lengths to allow

2  default judgments against foreign states to be set aside. *See Jackson v. People's Republic of China*, 794

3  F.2d 1490, 1494-96 (11th Cir. 1986) (in action by banks against the PRC for payment of bearer bonds

4  issued by Imperial Chinese Government in 1911, district court properly set aside default judgment for lack

5  of subject matter jurisdiction and where State Department informed the court that permitting the PRC to

6  have its day in court will significantly further United States foreign policy interests); *see also First Fid.*

7  *Bank v. Gov't of Ant. & Barb.*, 877 F.2d 189, 196 (2d. Cir. 1989) (reversing district court's denial of

8  motion to set aside default judgment where there were factual issues as to whether U.N. ambassador had

9  apparent authority to obtain loan and waive governments sovereign immunity); *Carl Marks & Co., Inc. v.*

10  *USSR*, 841 F.2d 26, 27 (2d Cir. 1988) (per curiam) (in action against the Soviet Union to recover on debt

11  instruments issued by the Russian Imperial Government in 1916, district court properly vacated default

12  judgments for lack of jurisdiction). While the suits at bar are nominally brought against two government

13  officials in the PRC, as discussed below, the suits require the Court to assess the legality of practices and

14  policies that allegedly have been sanctioned by the PRC government.

15       The above factors inform the Court's cautious approach in assessing Plaintiffs' motions for entry of

16  default judgment.

17

18                          **III.   SERVICE OF PROCESS**

19       Before addressing the merits, the Court must first turn to the question of personal jurisdiction in the

20  *Liu* case.

21       The Court granted the San Francisco Chinese Chamber of Commerce ("SFCCC") leave to file an

22  *amicus curiae* brief which raised the question of whether service was properly effected on Defendant Liu.

23  The SFCCC submitted a declaration of San Francisco Police Officer Higgins suggesting that Defendant Liu

24  had not in fact been properly served with process. SFCCC *Amicus Curiae* Brief, at 2. Plaintiffs contend

25  that the SFCCC lacks standing to raise the objection. The Court, however, permitted the filing of the brief

26  because it has *sua sponte* power to examine whether service on Defendants was proper given its

27  jurisdictional implications. Moreover, the interests of judicial economy weigh in favor of determining at the

28  outset whether service of process was proper, based on all available information. *Cf. Zhou v. Peng*, 2002

1   WL 1835608 (S.D.N.Y. 2002) (after alleged victims of human rights abuses at Tiananmen Square

2   attempted service on Premier of the PRC, the U.S. State Department submitted a statement of interest

3   arguing that service was inadequate, requiring additional briefing and a separate ruling on this issue).

4        In response to the SFCCC's brief, the *Liu* Plaintiffs submitted declarations and a video clip of the

5   event at the San Francisco International Airport where Defendant Liu is alleged to have been served. From

6   the evidence, it appears that the process server stood about an arms-length away from Defendant Liu as he

7   entered a screening area at the San Francisco airport; the process server held out a copy of the Summons,

8   Complaint and other court papers to the Defendant and said, "Mr. Liu Qi, these are legal documents from

9   the U.S. District Court of California. It's serious." Leining Decl. ¶¶ 4-5 and Video Clip 2. When Mayor

10  Liu turned away without accepting the papers, the server stated, "You can accept them or you do not have

11  to, but you have been formally served by the U.S. District Court of Northern California." Leining Decl. ¶

12  6; Video Clip 3. The server then offered the documents to members of Mayor Liu's entourage, but they

13  were not accepted. Leining Decl. ¶ 8. Since default has already been entered, competent evidence

14  submitted by the Plaintiffs regarding service of process must be taken as true at least where there is no

15  contradictory evidence. *TeleVideo Sys., Inc. v. Heidenthal*, 826 F.2d 915, 917 (9th Cir. 1987).

16       The declaration of San Francisco Police Officer Higgins submitted by the SFCCC is not

17  inconsistent with this evidence. Officer Higgins acknowledged that he was at the back of the group

18  escorting Defendant Liu while Liu was at the front of the group; at the time Higgins heard yelling, his back

19  was turned to the Mayor. Leining Decl. ¶ 7. It appears that the attempted service occurred before Officer

20  Higgins turned his attention to the matter. *Id.* ¶¶ 5-7. Evidently, Officer Higgins was not in a position to

21  view the events that constituted service of process and the fact that he did not see actual service is not

22  inconsistent with the evidence of service submitted by Plaintiffs.

23       The SFCCC argues that *Weiss v. Glemp*, 792 F. Supp. 215 (S.D.N.Y. 1992), in which the court

24  found that a Catholic Cardinal from Poland visiting Albany, New York was not personally served with a

25  defamation suit, is dispositive to the instant case. However, in *Weiss*, the court found that all the process

26  server said to the defendant was "You want this for the . . ." before the priest accompanying the Cardinal

27  said "No, no, no" and deflected the papers. *Id.* at 222. Based upon facts found by the court, the *Weiss*

28  court held:

United States District Court
For the Northern District of California

13

> The Court concludes the attempted service was not effected "in a way reasonably calculated to apprise" Cardinal Glemp, or the persons accompanying him, that service of process was being attempted. The papers proffered by Mrs. Frisch could just as well have been a petition, a leaflet, a protest, or another non-legal document. Because the evidence does not show Cardinal Glemp attempted to evade service, the cases cited by Plaintiff involving defendants determined to evade process are not applicable here.

*Id.* at 225 (citing *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)).

In contrast to *Weiss,* the evidence here establishes that the process server did in fact apprise Defendant Liu that service of process was being effectuated. As noted, the video clip establishes that the server stated, "You can accept them or you do not have to, but you have been formally served by the U.S. District Court of Northern California." Video Clip 3.[4] The Court finds that Plaintiffs' efforts to serve Mayor Liu were "reasonably calculated, under all the circumstances, to apprise [the] interested parties of the pendency of the action." *Mullane*, 339 U.S. at 314.[5]

The Court finds that *Kadic v. Karadzic*, 70 F.3d 232, 246 (2d Cir. 1995), rather than *Weiss*, is on point. In *Kadic*, a process server approached Radovan Karadzic in a Manhattan hotel lobby, called Karadzic's name, and announced the purpose of serving the court papers. The server came within two to

---

[4] The Plaintiffs presented evidence that Defendant Liu speaks fluent English. Eisenbrandt Decl. ¶ 2. Mayor Liu's English fluency has been well-publicized as part of Beijing's campaign to host the 2008 Olympic Games. *See e.g. Olympic Bidding Success Spurs English Language Fever in China,* People's Daily Online, July 29, 2001, *available at* http://english.peopledaily.com.cn/200107/29/eng20010729_76042.html ("On July 13, tens of millions of Chinese viewers were surprised to see 69-year-old Vice-Premier Li Languing, and Liu Qi, mayor of Beijing, speaking in fluent English to the crucial IOC meeting in Moscow, which was broadcast live on China's national TV."); *see also An Interview with Li Honghai from Beijing Citizen Speak English Committee,* Beijing Radio Station, *available at* http://english.21dnn.com/35/2002-4-10/52@195794.htm (quoting the head of this committee, "Leaders of the Municipal Government like Mayor Liu Qi, Vice Mayors Lin Wenyi and Zhang Mao, set an example of learning English for the public.").

[5] The fact that Defendant Liu did not take possession of the court papers is of no import. Where a defendant attempts to avoid service *e.g.* by refusing to take the papers, it is sufficient if the server is in close proximity to the defendant, clearly communicates intent to serve court documents, and makes reasonable efforts to leave the papers with the defendant. *See Errion v. Connell* 236 F.2d 447, 457 (9th Cir. 1956) (service sufficient when sheriff pitched the papers through a hole in defendant's screen door after she spoke with him and ducked behind a door to avoid service); *Novak v. World Bank*, 703 F.2d 1305, 1310 n.14 (D.C. Cir. 1983) (district court erred when it dismissed *sua sponte* for failure to effect service in case where U.S. Marshall refused to serve World Bank: "When a person refuses to accept service, service may be effected by leaving the papers at a location, such as on a table or on the floor, near that person."); *see also* 4 Charles A. Wright & Arthur R. Miller, *Federal Practice & Procedure* §1095 (2d ed. 1987).

United States District Court
For the Northern District of California

1   six feet of Karadzic and attempted to hand him the documents, but was intercepted by security officers, at
2   which point the papers fell to the ground.  *Id.*  The Second Circuit remanded the service issue to the district
3   court with guidance that Fed. R. Civ. P. 4(e)(2)[6] specifically authorizes personal service that comports with
4   the requirements of due process.  *Id.* at 247 (citing *Burnham v. Super. Ct. of Cal.*, 495 U.S. 604
5   (1990)).  The district court, in *Doe v. Karadzic*, 1996 WL 194298 (S.D.N.Y. 1996), found that service
6   was proper.  *Id.* at *2.

7        The key question is whether a party receives sufficient notice of the complaint and action against
8   them.  *United Food & Commercial Workers Union v. Alpha Beta Co.*, 736 F.2d 1371, 1382 (9th Cir.
9   1984); *Chan v. Soc'y Expeditions, Inc.* 39 F.3d 1398, 1404 (9th Cir. 1994); *Cf. Rio Props., Inc. v. Rio
10  Intern. Interlink*, 284 F.3d 1007 (9th Cir. 2002) (permitting email as means of alternative service on
11  foreign Internet corporation).  In this case, the due process requirements Fed. R. Civ. P. 4(e)(2) have been
12  satisfied because the efforts of Plaintiffs' process server were "reasonably certain to inform those affected"
13  of the action.  *Mullane*, 339 U.S. at 315; *see also Henderson v. United States*, 517 U.S. 654, 672
14  (1996) ("core function" of service is to apprise defendant of an action "in a manner and at a time that
15  affords the defendant a fair opportunity to answer the complaint and present defenses and objections.").[7]

16

17

18

---

19  [6]  While service of process is herein analyzed under Rule 4(e)(2), the Court notes that Rule 4 also
    allows for personal service "pursuant to the law of the state in which the district court is located." Fed. R. Civ.
20  P. 4(e)(1). On this point, Cal. Civ. Proc. Code § 413.10 *et seq.* is similarly flexible when a defendant attempts
    to avoid personal service. *See e.g.*, *Khourie, Crew & Jaeger v. Sabek*, 269 Cal. Rptr. 687, 689 (1990) ("It
21  is established that a defendant will not be permitted to defeat service by rendering physical service
    impossible."); *Trujillo v. Trujillo*, 162 P.2d 640, 641-42 (Cal. Ct. App. 1945) (service was sufficient when
22  server clearly communicated the nature of the documents, at which point defendant jumped in his car, drove
    away and caused the documents to be dislodged from his windshield wiper); *In re Ball*, 38 P.2d 411, 412
23  (Cal. Ct. App. 1934) ("We take it that when men are within easy speaking distance of each other and facts
    occur that would convince a reasonable man that personal service of a legal document is being attempted,
24  service cannot be avoided by denying service and moving away without consenting to take the document in
    hand.").

25

26  [7]  Regarding Defendant Xia, Charles Li of San Carlos California declared under penalty of perjury that
    he personally served the defendant with the summons and complaint on February 8, 2002 at the Fremont Hilton
27  Hotel at 39900 Balentine Drive in Newark, California. Summons. Mr. Li declared that he gave the copies to
    the defendant in person, and that an aide then grabbed them and dropped the papers to the floor. *Id.* The
28  undisputed facts establish that service on Defendant Xia was in a manner affording "the defendant a fair
    opportunity to answer the complaint and present defenses and objections." *Henderson*, 517 U.S. at 672; *see
    also Karadzic*, 1996 WL 194298 at *2.

**United States District Court**
For the Northern District of California

1    IV.    **THE ALIEN TORT CLAIMS ACT AND TORTURE VICTIM PROTECTION ACT**

2         The Plaintiffs in both actions bring their claims under the Alien Tort Claims Act ("ATCA"), 28

3    U.S.C. §1350, and Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350 note 2(a)(1).  The ATCA

4    provides that the United States district courts "shall have original jurisdiction of any civil action by an alien

5    for a tort only, committed in violation of the law of nations or a treaty of the United States." *Id.* § 1350.

6    Though created under the Judiciary Act of 1789, the ATCA was little used until the last two decades.

7    Kathryn L. Pryor, *Does The Torture Victim Protection Act Signal the Imminent Demise of the Alien*

8    *Tort Claims Act?*, 29 Va. J. Int'l. L. 969, 974, 978 (1989).

9         In 1980, the Second Circuit held the ATCA conferred jurisdiction and provided a cause of action

10   for an alien attempting to sue a foreign national for the tort of torture committed outside the United States in

11   violation of the law of nations.  *Filartiga v. Pena-Irala*, 630 F.2d 876 (2d Cir. 1980).  In *Filartiga*, Dr.

12   Joel Filartiga and his daughter Dolly, both citizens of Paraguay living in the United States, brought an action

13   against Americo Pena-Irala, the former Inspector General of Police of Paraguay, for allegedly torturing

14   Dolly's brother to death in retaliation for Dr. Filartiga's political activities in Paraguay.  *Id.* at 878.  The

15   Second Circuit held that "deliberate torture perpetrated under color of official authority violates universally

16   accepted norms of the international law of human rights, regardless of the nationality of the parties."  *Id.*  In

17   so doing, the court concluded that the law of nations is not a static body of law, but one that "has evolved

18   and exists among the nations of the world today."  *Id.* at 881.  The court looked to contemporary sources

19   of customary international law, determined by the Supreme Court to include the practices of other

20   countries, treaties, judicial opinions and the works of scholars.  *Id.* at 880 (citing *United States v. Smith*,

21   18 U.S. (5 Wheat.) 154, 160-61 (1820)).

22        Consistent with *Filartiga*, the Ninth Circuit has likewise held that the ATCA provides both federal

23   jurisdiction and a substantive right of action for a "violation of the law of nations." *Alvarez-Machain*, −

24   F.3d − , 2003 WL 21264256 at *5 (9th Cir. June 3, 2003) (*en banc*); *In re Estate of Ferdinand E.*

25   *Marcos, Human Rights Litig. ("Hilao II")*, 25 F.3d 1467, 1475 (9th Cir. 1994).  The international law,

26   allegedly violated, need not provide a specific right to sue.  *Id.*; *Papa v. United States*, 281 F.3d 1004,

27   1013 (9th Cir. 2002).  What is required, in addition to the claim being brought by an alien for a tort, is that

28   the cause of action be based on "violations of specific, universal and obligatory international human rights

16

United States District Court
For the Northern District of California

1  standards which 'confer [] fundamental human rights standards upon all people vis-a-vis their own

2  governments.'" *Hilao II*, 25 F.3d at 1475, *Papa*, 281 F.3d at 1013; (citing *Filartiga*, 630 F.2d at 885-

3  87). *See also Alvarez-Machain*, – F.3d – , 2003 WL 21264256 at \*5; *Martinez v. Los Angeles,* 141

4  F.3d 1373, 1383 (9th Cir. 1998) (applicable norm of international law must be "specific, universal, and

5  obligatory," quoting *Hilao II*). Conduct which violates *jus cogens* – norms of international law that are so

6  fundamental and universally recognized that they are binding on nations even if they do not agree to them –

7  constitutes a violation of the "law of nations." *Siderman de Blake v. Republic of Arg.*, 965 F.2d 699,

8  714-15 (9th Cir. 1992).[8]  Moreover, customary international law, established norms of contemporary

9  international law ascertained *e.g.* by general usage and practice of nations, also constitutes the "law of

10  nations" actionable under the ATCA, even if those norms have not achieved *jus cogens* status. *Alvarez-*

11  *Machain*, – F.3d – , 2003 WL 21264256 at \*6.

12      The Torture Victims Protection Act of 1991 ("TVPA") expressly provides a cause of action for the

13  recourse specific tort of torture. Congress passed the TVPA in response to *Filartiga* and *Tel-Oren v.*

14  *Libyan Arab Republic,* 726 F.2d 774 (D.C. Cir. 1984).[9]  28 U.S.C. § 1350, H.R. Rep. No. 102-367(I);

15  S. Rep. No. 102-249 (II). The TVPA makes clear that a cause of action lies for victims of torture and

16  extrajudicial killings. The TVPA provides in relevant part that "[a]n individual who, under actual or

17  apparent authority, or color of law, of any foreign nation . . . subjects an individual to torture shall, in a civil

18  action, be liable for damages to that individual." 28 U.S.C. § 1350 note 2(a)(1). The purpose of the

19  statute, as stated by both the House and Senate reports, is to unambiguously provide a federal cause of

20  action against the perpetrators of such abuse, as well as to extend a civil remedy to U.S. citizens who may

21  have been tortured abroad. H.R. Rep. No. 102-367, at 3-5; S. Rep. No. 102-249, at 4-5. The

22  legislation carries out the intent of the Convention Against Torture and Other Cruel, Inhuman or Degrading

23  Treatment or Punishment opened for signature February 4, 1985, *available at*

24  ---------

25      [8] The Court notes there is currently one case involving ATCA claims for human rights violations being
   reheard by the Ninth Circuit *en banc*. *Doe v. Unocal*, – F.3d. – 2002 WL 31063976 (9th Cir. 2002),
26  rehearing *en banc* granted, – F.3d. – , 2003 WL 359787 (9th Cir. 2003).

27      [9] In *Tel-Oren*, Judge Bork questioned *Filartiga*'s holding that the ATCA permits suits for violations
   of the law of nations. In his concurring opinion, Judge Bork opined that where international law did not
28  specifically create a cause of action, it was up to Congress to explicitly grant one and that the ATCA did not
   independently create such a cause of action. 726 F.2d at 799.

1  http://193.194.138.190/html/menu3/b/h_cat39.htm (hereinafter referred to as "CAT"), ratified by the U.S.

2  Senate on October 27, 1990, by ensuring that "torturers and death squads will no longer have a safe haven

3  in the United States." S. Rep. No. 102-249, at 4.

4          Before reaching the substantive claims advanced by the Plaintiffs, the Court must address the

5  threshold questions of whether the suit is barred under the Foreign Sovereign Immunity Act and is

6  justiciable under the act of state doctrine.

7

8                          **V.    THE FOREIGN SOVEREIGN IMMUNITY ACT**

9          Congress enacted the Foreign Sovereign Immunity Act (hereinafter referred to as the "FSIA"), 28

10  U.S.C. § 1605 (2002), to guide the U.S. courts in determining when parties can maintain a lawsuit against a

11  foreign state or its entities and agents and to prescribe the circumstances under which a foreign state would

12  lose its sovereign immunity. The FSIA expressly governs the sovereign immunity of foreign governments.

13  *See Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 (1989) ("We think that

14  the text and structure of FSIA demonstrate Congress' intention that the FSIA be the sole basis for

15  obtaining jurisdiction over a foreign state in our courts."); *Phaneuf v. Republic of Indon.*, 106 F.3d 302,

16  304 (9th Cir. 1997) ("The FSIA is the sole basis for subject matter jurisdiction over suits involving foreign

17  states and their agencies and instrumentalities."). The question presented in the instant cases is whether the

18  FSIA sovereign immunity applies to the individual Defendants. Because the issue is jurisdictional and has

19  important implications for foreign relations, the Court addresses the question *sua sponte*.[10]

20          Prior to the enactment of the FSIA, when faced with foreign governments' requests for sovereign

21  immunity, the State Department adhered to the policy announced in the "Tate Letter," a 1952 letter from

22  the State Department's Legal Advisor to the Justice Department that put other nations on notice that the

23  U.S. would follow the restrictive theory of sovereign immunity.[11] *Tachiona v. Mugabe*, 169 F. Supp. 2d

24  _____

25          [10]  Moreover, as discussed below, for the same reasons the Ninth Circuit has held the act of state

26  doctrine may be raised *sua sponte*, the potential implications for foreign relations additionally counsel in favor of permitting the court to inquire into the matter of sovereign immunity *sua sponte. Liu v. Republic of China*, 892 F.2d 1419, 1432 (9th Cir. 1989).

27          [11]  Under the "restrictive" theory of sovereign immunity, a foreign state is "restricted" to suits involving

28  a foreign state's public acts, but not in cases based on commercial or private acts. S. Rep. No. 94-1310, at 9-10.

*United States District Court*
For the Northern District of California

259, 271 (S.D.N.Y. 2001); Restatement (Third) of Foreign Relations Law, Part IV, Chap. 5 Introductory Note, at 392 (1987).  In practice, however, the State Department's immunity determinations often were not based on consistent or coherent standards.  *Mugabe*, 169 F. Supp. 2d at 272.  These "suggestions of immunity" were frequently issued on the basis of the foreign government's political and diplomatic pressures on the Executive Branch, and often yielded inconsistent outcomes.  *Id.*  Moreover, the courts were left without objective rules of law to apply in cases where the foreign state did not request immunity, or the State Department chose not to intervene.  *Id.*; Restatement, at 393.

This growing dissatisfaction with the Tate Letter motivated the passage of the Foreign Sovereign Immunities Act, which was intended to adopt "comprehensive rules governing sovereign immunity" bringing U.S. practice into conformity with many other nations who left sovereign immunity decisions exclusively to the courts.  *Mugabe*, 169 F. Supp. 2d at 272.  Congress strictly limited foreign states' immunity to actions arising from public or governmental acts, removed the State Department's former exclusive and preemptive role in the foreign state immunity process, and transferred "the determination of the sovereign immunity from the executive branch to the judicial branch."  *Id.*

Although the ATCA and TVPA confer jurisdiction and rights of action as discussed above, the FSIA provides that foreign sovereigns are immune from suit unless an enumerated exception applies.  28 U.S.C. §§ 1330, 1602-11 (2002).  If the FSIA applies, it "trumps" the ATCA.  *In re Estate of Ferdinand E. Marcos Human Rights Litig. ("Trajano v. Marcos")*, 978 F.2d 493, 497 (9th Cir. 1992).  The Plaintiffs do not contend that any statutory exception applies here.  Rather, they contend that the FSIA is inapplicable because the Act confers jurisdiction on sovereign entities and applies to *individual* officials of a foreign state only if they are performing official acts within their legal authority.  They contend that the Defendants in the instant case, by engaging in international law violations, acted beyond their authority and

19

United States District Court

For the Northern District of California

1    are thus not entitled to immunity under the FSIA.[12]  For the reasons stated below, the Court concludes that

2    the Defendants are not immune from suit under the FSIA.

3    **A.     Application of FSIA to Individual Officials**

4           The FSIA confers immunity upon foreign states.  A "foreign state" under the Act includes "an

5    agency or instrumentality of a foreign state."  28 U.S.C. § 1603(a).  FSIA defines such "agency or

6    instrumentality" as any entity:

7               (1) which is a separate legal person, corporate or otherwise, and
                (2) which is an organ of a foreign state or political subdivision thereof,
8               or a majority of whose shares or other ownership interest is owned by
                a foreign state or political subdivision thereof, and
9               (3) which is neither a citizen of a State of the United States as defined
                in section 1332(c) and (d) of this title, nor created under the laws of
10              any third country.

11   28 U.S.C. § 1603(b).  Although the FSIA does not on its face explicitly apply to individual officials, the

12   Ninth Circuit has held that the Act applies to foreign officials acting in an official capacity for acts within the

13   scope of their authority.  *Chuidian v. Philippine Nat'l Bank*, 912 F.2d 1095, 1103, 1106-07 (9th Cir.

14

15           [12] None of the parties have raised the issue of diplomatic immunity and it appears to be inapplicable
16   to this case.  *See* 22 U.S.C. § 254a-e (the Diplomatic Relations Act implementing the Vienna Convention on
     Diplomatic Relations and Optional Protocol on Disputes).  Here the State Department did not certify the
17   Defendants as diplomatic agents for the PRC, nor did the State Department indicate as such in its statement
     of interest letter to this Court.  U.S. State Department Office of Protocol, Diplomatic List for Winter/Spring
18   and Fall/Summer 2002, *available at* http://www.state.gov/s/cpr/rls/dpl/2002/11030.htm and
     http://www.state.gov/s/cpr/rls/dpl/2002/12733.htm (last visited March 27, 2003).  Thus, Defendants fail to
19   meet a threshold requirement for diplomatic immunity.  *See United States v. Lumumba*, 741 F.2d 12, 15
     (2d Cir. 1984) (diplomatic immunity is premised upon recognition by the receiving state); *United States v.*
20   *Foutanga Dit Babani Sissoko*, 995 F. Supp. 1469, 1470 (S.D. Fla. 1997) (defendant's status as "special
     advisor" did not entitle him to diplomatic immunity because he has not been submitted to the United States
21   Department of State for certification).  Courts, however, have recognized diplomatic status by the State
     Department made when legal actions were already ongoing.  *Republic of Philippines by Cent. Bank of*
22   *Philippines v. Marcos*, 665 F. Supp. 793, 799 (N.D. Cal. 1987) (diplomatic status conferred on Solicitor
     General of the Philippines after he was subpoenaed); *Abdulaziz v. Metro. Dade County*, 741 F.2d 1328,
23   1329 (11th Cir. 1984) (Saudi Prince and his family obtained diplomatic status after the commencement of
     suit).
24
             This Court is not aware of any cases that have granted diplomatic immunity to local officials from
25   foreign governments that are not in the United States on diplomatic missions.  *See United States v. Enger*,
     472 F. Supp. 490, 506 (D.N.J. 1978) ("full privileges and immunities of diplomatic status have traditionally
26   been reserved to those of acknowledged diplomatic rank, performing diplomatic functions"); *see also*
     *Tabion v. Faris Mufti*, 73 F.3d 535, 536 (4th Cir. 1996) (diplomatic immunity given to First Secretary
27   and later Counselor of the Jordanian Embassy); *Logan v. Dupuis*, 990 F. Supp. 26, 26 (D.D.C. 1997)
     (diplomatic immunity given to the Alternative Representative of Canada at the Permanent Mission of
28   Canada to the Organization of American States); *Fatimeh Ali Aidi v. Amos Yaron*, 672 F. Supp. 516,
     516 (D.D.C. 1987) (diplomatic immunity given to military attache of the Israeli Embassy).

1   1990). Otherwise, "to allow unrestricted suits against individual foreign officials acting in their official

2   capacities . . . would amount to a blanket abrogation of foreign sovereign immunity by allowing litigants to

3   accomplish indirectly what [FISA] barred them from doing directly." *Id.* at 1102.

4       Often the critical question is whether "the officer purports to act as an individual and not as an

5   official." *Chuidian*, 912 F.2d at 1106. *See e.g., Jungquist v. Sheikh Sultan Bin Khalifa Al Nahyan*,

6   115 F.3d 1020 1028 (D.C. Cir. 1997) (personal action not immune); *Doe v. Bolkiah*, 74 F. Supp. 2d

7   969, 974 (D. Haw. 1998) (accord). To determine the answer, the Ninth Circuit considered whether an

8   action against the foreign official is "merely a disguised action against the nation that he or she represents"

9   and thus "'the practical equivalent of a suit against the sovereign directly.'" *Park v. Shin*, 313 F.3d 1138,

10  1144 (9th Cir. 2002) (quoting *Chuidian*, 912 F.2d at 1101). The Court must also ask "whether an action

11  against the official would have the effect of interfering with the sovereignty of the foreign state that employs

12  the official." *Park*, 313 F.3d at 1144 (citing *Hilao II*, 25 F.3d at 1472). Ordinarily, these factors would

13  suggest Defendants Liu and Xia were acting in their official capacities since the Plaintiffs are in effect

14  challenging "a government policy [of repression and mistreatment of Falun Gong] implemented by" the

15  Defendants, not their personal decisions. *Park*, 313 F.3d at 1144. As discussed *infra* Part VI regarding

16  the act of state doctrine, an adverse judgment might, depending on the scope of relief granted, "interfere

17  with the sovereignty or policymaking power" of the PRC. *Id.*

18      However, the cases at bar involve an additional layer of complexity not extant in *Park*. Even if it is

19  assumed that Defendants Liu and Xia acted in their official, as opposed to personal, capacities in carrying

20  out the challenged practices, there is a question whether their acts were validly authorized. *Chuidian* and

21  *Hilao II* require an additional inquiry into whether the defendant official acted within or "outside the scope

22  of his authority." *Hilao II*, 25 F.3d at 1472. If an official acts "completely outside his governmental

23  authority," he or she loses his/her immunity. *Chuidian*, 912 F.2d at 1106 (citing *United States v. Yakima*

24  *Tribal Court*, 806 F.2d 853, 859 (9th Cir. 1986)). Moreover, "[w]here the officer's powers are limited by

25  statute, his actions beyond those limitations are considered individual and not sovereign actions. The officer

26  is not doing the business which the sovereign has empowered him to do." *Chuidian*, 912 F.2d at 1106

27  (citation omitted). The mere fact that acts were conducted under color of law or authority, which may form

28  the basis of state liability by attribution, is not sufficient to clothe the official with sovereign immunity. *Cf.*

United States District Court
For the Northern District of California

21

1 | *Phaneuf*, 106 F.3d at 308 (actual authority necessary to establish "commercial activity" exception to

2 | FSIA); Restatement § 453. If the official does not act "within an *official* mandate," FSIA immunity does

3 | not apply. *Hilao II*, 25 F.3d at 1472 n.8 (emphasis added).[13]

4 | In *Chuidian*, a business owner sued an official of the Philippine government after the defendant

5 | official instructed the Philippine National Bank to dishonor a letter of credit issued to the plaintiff. The court

6 | held that the official was entitled to sovereign immunity under FSIA, because regardless of the propriety of

7 | his personal motivation, his action was within his "statutory mandate" as a member of the Presidential

8 | Commission on Good Government. *Chuidian*, 912 F.2d at 1106-07.

9 | Applying *Chuidian*, the Ninth Circuit in *Trajano* held that President Marcos' daughter, Imee

10 | Marcos-Manotoc, who as National Chairman of the Kabataang Baranggay controlled the police and

11 | military intelligence, was not immune from suit brought by the mother of a victim who was allegedly tortured

12 | and murdered by police and military personnel. The court reasoned that Marcos-Manotoc admitted acting

13 | on her own authority, not on the authority of the Republic of the Philippines. Her acts were not within any

14 | official mandate and, not acts of an agent or instrumentality of a foreign state within the meaning of the

15 | FSIA. *Trajano*, 978 F.2d at 498.

16 | Similarly, in *Hilao II*, the Ninth Circuit held that President Marcos was not immune from suit

17 | charging him with arrests, torture and murders because his actions were "taken without official mandate

18 | pursuant to his own authority." 25 F.3d at 1471. According to the complaint, the alleged actions violated

19 | international law, the constitution, and law of the Philippines. *Id.* The Philippine government confirmed that

20 | Marcos' actions were "in violation of existing law." *Id.* at 1472 (quotations omitted). Since his acts "were

21 |

22 | [13] The fact that the official at the time of suit is a sitting official does not render the official immune under the FSIA. *See Cabiri v. Assasie-Gyimah*, 921 F. Supp. 1189, 1198 (S.D.N.Y. 1996) (defendant was sitting Deputy Chief of National Security for Ghana). While, as noted below, that fact informs the applicability of the act of state doctrine, nothing in the express language of the ATCA, TVPA or FSIA renders such an official automatically immune. Indeed, the legislative history of the TVPA suggests that while the focus may have been on suits against former officials, the Senate and the House only expressed an intent to preserve diplomatic and head of state immunity for individuals. *See* S. Rep. No. 102-249, at 8-9 (1991) (TVPA not intended to override traditional immunity enjoyed by foreign diplomats and heads of state); H.R. Rep. No. 102-367, at 5 (1991) (TVPA does not override the doctrines of diplomatic and head of state immunity). No mention is made in either report to immunize all sitting officials. As noted in the Senate Report, the purpose of the TVPA "is to provide a Federal cause of action against *any* individual who, under actual or apparent authority or under color of law of any foreign nation, subjects any individual to torture or extrajudicial killing." S. Rep. No. 102-249, at 3 (emphasis added).

22

United States District Court

For the Northern District of California

1  not taken within any official mandate," they were not acts of an agency or instrumentality of a foreign state

2  within the meaning of FSIA. *Id.* at 1472; *see also Phaneuf*, 106 F.3d at 306 (Ninth Circuit, citing

3  *Trajano* and *Chuidian*, remanded case to district court to determine whether individual defendant's

4  actions were "within the scope of his authority" and thus immune under FSIA).

5        The question here is whether Defendants Liu and Xia acted within their scope of authority such that

6  they can be deemed to have acted as an agency or instrumentality of the People's Republic of China under

7  the FSIA.

8  **B.     Whether Scope of Authority is Measured by International or Foreign Sovereign's Law**

9        Both the *Liu* and *Xia* Plaintiffs contend that FSIA does not apply to officials who violate

10  international law as established by either *jus cogens* norms or customary international law since any such

11  act would by definition be beyond the scope of the official's proper authority.  However, case law,

12  including that of the Ninth Circuit, establishes that the official's scope of authority for the purposes of FSIA

13  immunity analysis, is measured by the domestic law of the foreign state, not by international law.

14        In *Chuidian,* the issue was whether the individual defendant acted within his "statutory mandate"

15  governing his powers as a member of the Presidential Commission on Good Government.  912 F.2d at

16  1107.  The court noted that as a member of the Commission, under the Philippine Executive Order, he was

17  entitled to investigate possible fraudulent transfers, had the power to prevent payment in aid of his

18  investigation, and to seek an injunction if the bank refused to comply.  *Id.*  In *Hilao II*, Marcos was denied

19  FSIA immunity because his actions were not "official acts pursuant to his authority as President of the

20  Philippines."  25 F.2d at 1471.  Quoting from its earlier decision in *Republic of the Philippines v. Marcos*,

21  862 F.2d 1355, 1362 (9th Cir. 1988) (*en banc*), the court noted that Marcos "was not the state, but the

22  head of the state, bound by the laws that applied to him."  *Id.* at 1471.  In *Trajano*, the pivotal finding in

23  denying Marcos-Manotoc immunity under the FSIA was that she admitted acting on her own authority,

24  "not on the authority of the Republic of the Philippines."  978 F.2d at 498.[14]

25

26

27        [14]  Indeed, Marcos-Manotoc claimed she was not a member of the government or the military at the

28  time of Trajano's murder.  978 F.2d at 498 n.10.

23

United States District Court

For the Northern District of California

1    In each of these cases, the question of whether the official acted within the scope of his authority

2  and pursuant to an "official mandate" turned on an analysis of the official's powers under the domestic law

3  of the foreign state, not international law.[15]  Indeed, if the Plaintiffs herein were correct, there would have

4  been no need for the courts in *Trajano* and *Hilao II* to address the scope of authority under Philippine law

5  since the acts of torture and murder attributable to Marcos and his daughter clearly violated *jus cogens*

6  norms of international law.  According to the Plaintiffs' theory herein, the defendants should have been

7  denied FSIA immunity *per se* without regard to Philippine law.  But the Ninth Circuit did not so hold.

8  Hence, the contention that the scope of authority determinative of FSIA immunity is measured by

9  international law is not supported by current case law.[16]

10    Moreover, there are several reasons why Plaintiffs' theory would appear to be inconsistent with the

11  FSIA and its underlying policies.  First, one of the significant purposes of sovereign immunity is not only to

12  prevent ultimate liability, but to afford immunity from suit.  *See El-Fadl v. Cent. Bank of Jordan*, 75 F.3d

13  668, 671 (D.C. Cir. 1996).  If an official's immunity turned on the ultimate determination of whether he or

14  she violated international law – the basis for the substantive cause of action – immunity could not be

15

16

17    [15]  Other courts are in accord.  *See Jungquist*, 115 F.3d at 1028 (Sheikh Sultan's act not in

18  furtherance of the interests of the sovereign but a personal and private action); *El-Fadl*, 75 F.3d at 671
     (official's activities not personal or private but undertaken only on behalf of governmental bank); *Bolkiah*, 74

19  F. Supp. 2d 969 (Government of Brunei did not empower defendant to run alleged prostitution ring or harem).

20    [16]  The cases cited by the *Liu* and *Xia* Plaintiffs are inapposite.  For the reasons discussed above,
     neither *Hilao II* nor *Trajano* support the Plaintiffs' argument. In *Xuncax v. Gramajo*, 886 F. Supp. 162, 176

21  (D. Mass. 1995), cited by the Plaintiffs, the district court held that the former Minister of Defense of Guatemala
     was not immune under FSIA from suit alleging torture, arbitrary detentions and executions, because the alleged

22  acts "exceed anything that might be considered to have been lawfully within the scope of Gramajo's official
     authority."  The court noted that the government of Guatemala did not allege that the actions were "officially"

23  authorized.  *Id.* at 176 n.10.  In *Cabiri*, also cited by Plaintiffs, the district court held the commander in the
     Ghanian Navy and Deputy Chief of National Security was not immune from suit under FSIA for alleged torture,

24  because defendant did not claim the alleged acts fell within the scope of his authority; he did "not argue that
     such acts are not prohibited by the laws of Ghana."  921 F. Supp. at 1198.  Since the alleged acts of torture

25  fell "beyond the scope of his authority as the Deputy Director of National Security of Ghana," he was not
     immune under the FSIA.  *Id. Granville Gold Trust Switzerland v. Comm. Del Fullimento/Inter Change*

26  *Bank*, 928 F. Supp. 241, 243 (E.D.N.Y. 1996) cited by Plaintiffs is also inapposite.  The court in *Granville*
     *Trust* erroneously assumed that FSIA immunity has no application to claims under the ATCA and TVPA for

27  human rights violations.  It cites no convincing authority for this proposition.  These case simply do not establish
     international law displaces the foreign sovereign's law in assessing the scope of the defendant official's authority

28  for purposes of the FSIA.

United States District Court

For the Northern District of California

1  resolved without adjudicating the merits of the case. This would "frustrate the significance and benefit of

2  entitlement to immunity from suit." *Id.* at 671 (quotations omitted).

3  Second, the Ninth Circuit has held that even violation of *jus cogens* norms of international human

4  rights law do not vitiate FSIA immunity of a foreign sovereign. *Siderman de Blake v. Republic of Arg.*,

5  965 F.2d 699, 717-718 (9th Cir. 1992). Agencies and instrumentalities of the foreign sovereign are

6  immune irrespective of the magnitude of the human rights violations unless one of the exceptions enumerated

7  in FSIA, none of which apply here. Where an official acts in his official capacity within the scope of

8  authority provided under the sovereign's law, a suit against the official is the "practical equivalent of a suit

9  against the sovereign directly." *Chuidian*, 912 F.2d at 1101-02. Thus, permitting suit against such an

10 official would amount to an "abrogation of foreign sovereign immunity by allowing litigants to accomplish

11 indirectly what the Act barred them from doing directly" under *Siderman*.[17] *Id.* at 1102.

12 **C.    Whether Defendants Acted Within the Scope of Their Authority Under Chinese Law**

13 The issue then is whether Defendants Liu and Xia acted within the scope of their authority in

14 carrying out and/or permitting the human rights violations alleged in the Complaints. The *Liu* Plaintiffs

15 submit the Affidavit of Professor Robert C. Berring ("Berring Aff.") to establish that Chinese law prohibits

16 the conduct alleged herein.[18] In particular, Professor Berring describes in his affidavit the provisions of the

17 Chinese constitution and criminal procedure laws which specifically prohibit arbitrary detention, physical

18 abuse and torture of detainees. Berring Aff. ¶¶ 3-8, 9-12. Moreover, the PRC's laws do not authorize

19 physical abuse or detention without due process in implementing its crackdown on Falun Gong. *Id.* ¶¶ 22-

20 24. Defendants' conduct is not authorized by the domestic law of China. *Id.* ¶ 25. Additionally, under

21 Chinese law, those in Defendants' positions have responsibility to prevent police and other security forces

22 under their authority from violating the rights of citizens and visitors. *Id.* ¶¶ 15-21; *Liu* Compl. ¶ 34.

23

24 _____

   [17]   This is not to suggest that a foreign sovereignty and its agencies and instrumentalities including

25 officials acting within their official capacities may not be sued for international human rights violations. FSIA
   allows such suits *e.g.* where the injury occurs "within the United States." 28 U.S.C. § 1605; *see also Letelier*

26 *v. Republic of Chile*, 488 F. Supp. 665, 672 (D. D.C. 1980) (FSIA not bar to action against Chilean officials
   for assassination of Chilean dissident political leader in the United States).

27   [18]   Berring is Interim Dean, Professor of Law, and Head Librarian at Boalt Hall, and is a recognized
   authority on Chinese law. *See e.g.*, Robert C. Berring, *Chinese Law, Trade and the New Century*, 20 Nw.

28 J. Int'l L. & Bus. 425 (2000).

United States District Court
For the Northern District of California

1    The public pronouncement of the PRC is consistent with Professor Berring's conclusions.  In its

2    most recent report to the United Nations Committee Against Torture, the PRC stated that no form of

3    physical violence is tolerated or condoned in the treatment of detained and arrested persons.  *Third*

4    *Periodic Reports of States Parties Due in 1997:  China*, U.N. Comm. Against Torture, 24th Sess., at ¶

5    155, U.N. Doc. CAT/C39/Add.2 (2000).  The report also stated that torture and other cruel, inhuman or

6    degrading treatment or punishment is strictly prohibited.  *Id.* ¶ 158.  Furthermore, as stated in the report,

7    "[i]t is strictly forbidden to use torture in a prison.  No one is ever permitted to torture prisoners under any

8    circumstances or for whatever reason." *Id.* ¶ 29.   In the PRC's letter to this Court, it likewise stated that

9    "[p]rohibition of torture has always been a consistent position of the People's Republic of China."

10   Statement of the Gov't of the P.R.C. on "Falun Gong" Unwarranted Lawsuits, at 3.[19]

11   On the other hand, the Complaints and materials submitted in support of Plaintiffs' motions establish

12   that the alleged conduct of Defendants Liu and Xia is part of a larger campaign by the national government

13   to repress and punish members and supporters of the Falun Gong movement.  As alleged in the *Liu*

14   Complaint:

15           The acts alleged herein against Plaintiffs were carried out in the context
             of a nationwide crackdown against Falun Gong practitioners.  Police
16           and other security forces in Beijing, and throughout the People's
             Republic of China, have engaged in a widespread or systematic
17           campaign against Falun Gong practitioners, marked by a pattern and
             practice of violations . . .
18

19   *Liu* Compl. ¶ 2.  The *Xia* Complaint likewise alleges that the acts complained of were part of "the

20   governmentally mandated policy of repression of Falun Gong practitioners that was adopted and imposed

21   by the highest levels of the national government of China for implementation at all governmental levels." *Xia*

22   Compl. ¶ 15.  It alleges that the National Government commenced the national policy of repression in

23   1999.  *Id.* ¶ 18.  In its condemnation of the repression of the Falun Gong movement, the State Department

24   has recognized the alleged human rights violations as part of the government of the PRC's national policy.

25

26           [19]  Such pronouncements are hardly surprising.  As the Second Circuit observed in *Filartiga v. Pena*,
     virtually no government publicly asserts a right to torture its citizens.  630 F.2d 876, 884 (2d Cir. 1980).
27   Likewise, the Ninth Circuit noted in *Siderman* "that states engage in official torture cannot be doubted, but all
     states believe it is wrong, all that engage in torture deny it, and no state claims a sovereign right to torture its
28   own citizens."  965 F.2d at 717.

United States District Court

For the Northern District of California

1     *See* Letter to McCallum, at 2-3 ("The United States has repeatedly made these concerns known to the

2     Government of the P.R.C. and has called upon it to respect the rights of all its citizens, including Falun Gong

3     practitioners."). While the PRC may publicly deny allegations of human rights violations in regard to its

4     effort to contain or repress the Falun Gong, Plaintiffs' allegations and evidence of widespread systemic

5     abuse, which must be taken as true in the context of the defendants' default, evidences a national policy that

6     belies the government's disclaimer.

7         The legal question presented is therefore whether acts by an official which violate the official laws of

8     the nation but which are authorized by covert unofficial policy of the state may be deemed to be within the

9     official's scope of authority under the FSIA. This appears to be an issue of first impression. A close

10    examination of the Ninth Circuit's analysis in *Chuidian* and the policy considerations which underlie the

11    ATCA and TVPA suggests that such acts are not immunized by the FSIA.

12        In holding that an official shares sovereign immunity with the foreign government when acting within

13    the scope of his governmental authority, the court in *Chuidian* relied upon an analogy to principles in

14    American law which draws a distinction between a suit against a sovereign's employee and a suit against

15    the sovereign itself. 912 F.2d at 1106. *Chuidian* cited *Larson v. Domestic and Foreign Commerce*

16    *Corp.*, 337 U.S. 682 (1949), and *United States v. Yakima Tribal Court*, 806 F.2d 853 (9th Cir. 1986),

17    both of which involved the question of whether suits brought against federal officials to enjoin certain

18    governmental actions could be deemed to be suits against the United States and thus barred by sovereign

19    immunity. *Larson* held that even when the official acts under color of law, where the official's powers "are

20    limited by statute, his actions beyond those limitations are considered individual and not sovereign actions."

21    337 U.S. at 689. In that instance, his actions were *ultra vires* his authority. *Id.* Moreover, when a federal

22    official commits an unconstitutional act, he or she also acts beyond his powers. Although "power has been

23    conferred in form [ ] the grant is lacking in substance because of its constitutional invalidity." *Id.* at 690.

24    *Cf. Ex parte Young*, 209 U.S. 123, 159 (1908) ("the use of the name of the state to enforce an

25    unconstitutional act . . . is a proceeding without the authority of, and one which does not affect, the state in

26    its sovereign or governmental capacity."). Thus, an official enforcing an unconstitutional act is "stripped of

27    his official or representative character and is subjected in his person to the consequences of his individual

28    conduct." *Id.* at 160.

United States District Court

For the Northern District of California

1    The Ninth Circuit subsequently refined *Larson*'s analysis of statutory and regulatory violations in

2 *Yakima Tribal Court*. The court reaffirmed, however, that *ultra vires* actions are not subject to sovereign

3 immunity. Thus, the key in the line of cases relied upon in *Chuidian* in construing the FSIA is whether the

4 official acted within his *legally valid* grant of authority. *Cf. Cabiri*, 921 F. Supp. at 1197 (FSIA does not

5 apply to acts "which exceed the *lawful* boundaries of a defendant's authority") (emphasis added); *Forti v.*

6 *Suarez-Mason*, 672 F. Supp. 1531, 1546 (N.D. Cal. 1987) ("since violations of the law of nations virtually

7 all involve acts practiced, encouraged or condoned by states, defendant's argument would in effect

8 preclude litigation under § 1350 for 'tort[s] . . . committed in violation of the law of nations'") (citation

9 omitted).

10    This interpretation of the FSIA is consistent with Congressional policy embodied in the TVPA. The

11 TVPA provides that an individual who "under actual or apparent authority, or color of law, of any foreign

12 nation" subjects an individual to torture shall be liable for damages to that individual. 28 U.S.C. § 1350

13 note § 2(a). Under the plain wording of the TVPA, an official who engaged in torture may be subject to

14 suit and damages liability even if he or she acted under authority of the foreign nation. 28 U.S.C. § 1350

15 note 2(a). The legislative history of the TVPA indicates that Congress intended to subject individual

16 officials to liability regardless of whether their acts were secretly condemned by the state. Recognizing that

17 "[d]espite universal condemnation of these abuses, many of the world's governments still engage in or

18 tolerate torture of their citizens," the purpose of the TVPA is to provide a remedy for U.S. citizens and

19 aliens for acts "undertaken under color of official authority." H.R. Rep. No. 102-367, at 3-4 *reprinted in*

20 1992 U.S.C.C.A.N. 84, 85-86. TVPA specifically contemplates "some governmental involvement" in the

21 prohibited acts in order for a claim to lie. *Id.* at 5. While TVPA was intended to preserve FSIA immunity

22 for foreign state governmental agencies, it assumes that "sovereign immunity would not generally be an

23 available defense" to a suit against individual officials. *Id.*[20] Moreover, the TVPA and ATCA were seen as

24 consonant. *Id.* at 4 (the TVPA would "enhance the remedy already available under section 1350 . . .

25

26

27    [20] The Senate Report likewise states that the TVPA was not intended to override the FSIA, permitting

28 suits only against individuals. S. Rep. No. 102-249, at 7.

United States District Court

For the Northern District of California

1   [C]laims based on torture or summary executions do not exhaust the list of actions that may appropriately

2   be covered by section 1350").

3   **D.     FSIA Sovereign Immunity Not Applicable to Defendants Liu and Xia**

4           Hence, under the FSIA as interpreted by *Chuidian* and consistent with Congressional policy, an

5   official obtains sovereign immunity as an agency or instrumentality of the state only if he or she acts under a

6   valid and constitutional grant of authority.  Where, as here, the PRC appears to have covertly authorized

7   but publicly disclaimed the alleged human rights violations caused or permitted by Defendants Liu and Xia

8   and asserts that such violations are in fact prohibited by Chinese law, Defendants cannot claim to have

9   acted under to a valid grant of authority for purposes of the FSIA.  The authorities presented by Plaintiffs

10  establish that the alleged conduct for which the Defendants are responsible were inconsistent with Chinese

11  law.  Accordingly, their alleged acts are not acts of an agency or instrumentality of the People's Republic of

12  China within the meaning of the FSIA, and sovereign immunity thereunder does not lie.[21]

13

14                          **VI.     ACT OF STATE DOCTRINE**

15          Having determined the Plaintiffs in both the *Liu* and *Xia* cases have established this Court's

16  jurisdiction and that they are not statutorily barred under the FSIA from asserting claims against the

17  Defendants Liu and Xia under the ATCA and TVPA, this Court must address whether these cases are

18  justiciable in light of their potential implications for foreign relations and separation of powers.  In this

19  context, the justiciability concerns are examined under the act of state doctrine.

20

21

22

23

24

25

26

27  [21] The Senate Report also suggests an additional basis for establishing an individual official acts as an agency of a foreign state.  The Report assumes that the FSIA immunity would extend to an individual if the state "admit[ted] some knowledge or authorization of relevant acts." S. Rep. No. 102-249, at 8.  Presumably, such

28  an admission would imply the official acted under a valid grant of authority.  As noted above, however, the PRC has made no such admission.

**United States District Court**
For the Northern District of California

1  **A.      Background on the Act of State Doctrine**

2          The Court's classic statement of the act of state doctrine was articulated in *Underhill v.*

3  *Hernandez*, 168 U.S. 250 (1887).  In *Underhill*, an American citizen filed a damages action alleging that a

4  Venezuelan military commander – whose government was later recognized by the U.S. – unlawfully

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1   assaulted, coerced and detained him in Venezuela. *Id.* The *Underhill* Court refused to inquire into the

2   deeds of this Venezuelan official, declaring:

3   > Every sovereign State is bound to respect the independence of every
    > other sovereign State, and the courts of one country will not sit in
4   > judgment on the acts of the government of another done within its own
    > territory.  Redress of grievances by reason of such acts must be
5   > obtained through the means open to be availed by sovereign powers as
    > between themselves.

6

7   *Id.* at 252.  *See also Oetjen v. Cent. Leather Co.*, 38 S.Ct. 309, 311 (1918) (after a Mexican general

8   seized hides that were then sold to a Texas company, the Court declined to adjudicate a case brought by

9   the assignee of the original owner, declaring, "To permit the validity of the acts of one sovereign State to be

10  reexamined and perhaps condemned by the courts of another would very certainly 'imperil the amicable

11  relations between governments and vex the peace of nations.'").

12      The leading modern case on the act of state doctrine is *Banco Nacional de Cuba v. Sabbatino*,

13  376 U.S. 398 (1964).  In *Sabbatino*, the plaintiff challenged the taking of property under a controversial

14  principle of customary international law after the Cuban government took property within its own territory.

15  *Id.*  In response to a U.S. reduction in Cuba's sugar quota, which Cuba characterized as an act of political

16  aggression, Cuba nationalized property (sugar) in which America nationals had an interest.  *Id.* at 402-403.

17  In this context, the *Sabbatino* Court declined to adopt a broad and inflexible rule, but rather held:

18  > [W]e decide only that the Judicial Branch will not examine the validity
    > of a taking of property within its own territory by a foreign sovereign
19  > government, extant and recognized by this country at the time of suit, in
    > the absence of a treaty or other unambiguous agreement regarding
20  > controlling legal principles, even if the Complaint alleges that the taking
    > violates customary international law.
21

22  *Id.* at 428.

23      The Court noted that while the act of state doctrine was not mandated by the Constitution, the

24  doctrine nonetheless had "constitutional underpinnings" arising from separation of powers concerns about

25  the competency of the judiciary to make and implement certain decisions in the area of international

26  relations.  *Id.* at 423.  The doctrine arises out of the basic relationships between branches of government

27  enjoined by a separation of powers; it "concerns the competency of dissimilar institutions to make and

28  implement particular kinds of decisions in the area of international relations."  *Id.*  It "expresses the strong

*United States District Court*
For the Northern District of California

31

United States District Court
For the Northern District of California

1   sense of the Judicial Branch that its engagement in the task of passing on the validity of foreign acts of state

2   may hinder rather than further this country's pursuit of goals both for itself and for the community of nations

3   as a whole in the international sphere." *Id.* The doctrine is neither jurisdictional nor constitutionally

4   mandated. Rather, it constitutes a prudential limitation upon the exercise of the court's power to adjudicate

5   the legality of the acts of a foreign state or its agents. The act of state doctrine has been referred to as the

6   "foreign counter part" to the political question doctrine. *Northrop Corp. v. McDonnell Douglas Corp.*,

7   705 F.2d 1030, 1046 (9th Cir. 1983).

8          While *Sabbatino* acknowledged the classic notion that '[t]he conduct of the foreign relations of our

9   government is committed by the Constitution to the Executive and Legislative . . . departments' (citing

10  *Oetjen*, 38 S.Ct. at 311), the Court nonetheless observed that "it cannot of course be thought that 'every

11  case or controversy which touches foreign relations lies beyond judicial cognizance,'" and that "the act of

12  state doctrine . . . does not irrevocably remove from the judiciary the capacity to review the validity of

13  foreign acts of state." 376 U.S. at 423 (citing *Baker v. Carr*, 369 U.S. 186, 211 (1962)). *See Alvarez-*

14  *Machain, supra*, 2003 WL 21264256 at *49 n.7.

15         In sum, the act of state doctrine encompasses two related concerns: respecting the sovereignty of

16  foreign states and the separation of powers in administering foreign affairs of this nation. Balanced against

17  those concerns, however, is the power and duty of the court to exercise its judicial functions. In assessing

18  that balance, *Sabbatino* announced a three-part test for determining when to apply the act of state doctrine:

19              It should be apparent that the greater the degree of codification or
                consensus concerning a particular area of international law, the more
20              appropriate it is for the judiciary to render decisions regarding it, since
                the courts can then focus on the application of an agreed principle to
21              circumstances of fact rather than on the sensitive task of establishing a
                principle not inconsistent with the national interest or with international
22              justice. It is also evident that some aspects of international law touch
                much more sharply on national nerves than do others; the less important
23              the implications of an issue are for our foreign relations, the weaker the
                justification for exclusivity in the political branches. The balance of
24              relevant considerations may also be shifted if the government which
                perpetrated the challenged act of state is no longer in existence, as in
25

26

27

28

32

United States District Court
For the Northern District of California

1    the Bernstein case,[22] for the political interest of this country may, as a
     result, be measurably altered.
2

3    376 U.S. at 428. The Ninth Circuit has further held that the court must additionally consider "whether the

4    foreign state was acting in the public interest." *Liu v. Republic of China*, 892 F.2d 1419, 1432 (9th Cir.

5    1989).

6        In *Sabbatino*, the Court held that the act of state doctrine prohibited a challenge to the validity of a

7    decree of the Government of Cuba expropriating certain property. The Court noted that there was no

8    international consensus upon the limitations on the state's power to expropriate the property of aliens. 376

9    U.S. at 429-30. Although the State Department declined to make any statement one way or the other

10   bearing on the litigation, the Court noted the danger of interfering and embarrassing the Executive Branch

11   should the Court adjudicate the validity of the expropriation decree. *Id.* at 420, 431-33. The Court

12   concluded, "[h]owever offensive to the public policy of this country and its constituent States an

13   expropriation of this kind may be, we conclude that both the national interest and progress toward the goal

14   of establishing the rule of law among nations are best served by maintaining intact the act of state doctrine in

     this realm of its application." *Id.* at 436.
15

16       Normally, the burden of proving acts of state rests on the party asserting the applicability of the

17   doctrine. *Liu,* 892 F.2d at 1432 (citing *Alfred Dunhill of London Inc. v. Republic of Cuba*, 425 U.S.

18   682, 694-95 (1976)). However, where there is a "potential for embarrassing the Executive Branch," the

19   act of state doctrine may be raised *sua sponte. Liu,* 892 F.2d at 1432. Obviously, where, as here, the

20   Defendants have defaulted, the issue is not raised by either party. Instead, it is raised *sua sponte* by this

     Court.
21

22   **B.      Whether Defendants' Conduct Constituted Acts of State**

23

24       [22] The *Bernstein* cases refer to *Bernstein v. Van Heyghen Freres Societe Anonyme*, 163 F.2d 246
     (2d Cir. 1947) and *Bernstein v. N.V. Nederlansche-Amerikaanshe Stomvaart-Maatschappij*, 173 F.2d
25   72 (2d Cir. 1949), which involved suits by a Jewish U.S. resident and former German citizen to recover
     property seized by the Nazi government. The Second Circuit initially dismissed the cases under the act of state
26   doctrine. The State Department's legal advisor then wrote a letter stating its was "the policy of the Executive
     . . . to relieve Americans courts from any restraint upon the exercise of their jurisdiction to pass upon the validity
27   of the acts of Nazi officials." The Second Circuit then reconsidered and ordered the trial court to make a full
     inquiry into the plaintiff's allegations. 210 F.2d 375 (2d Cir. 1954). A so-called "Bernstein letter" refers to
28   situations in which the State Department declares that the Executive Branch does not object to the adjudication
     of a particular controversy.

United States District Court
For the Northern District of California

1    The act of state doctrine presupposes an "act of state." It arises only when the court is required to

2    rule on the legality of an "official act of a foreign sovereign performed within its own territory." *W.S.*

3    *Kirkpatrick & Co. v. Envtl. Tectonics Corp.*, 493 U.S. 400, 405-406 (1990) ("Act of state issues only

4    arise when a court *must decide* – that is, when the outcome of the case turns upon – the effect of official

5    action by a foreign sovereign") (emphasis in original); *Alfred Dunhill of London,* 452 U.S. at 694 (the

6    question is whether "the conduct in question was the public act of those with authority to exercise sovereign

7    powers"); *Liu*, 892 F.2d at 1432 (act of state doctrine implicated "when courts are asked to judge the

8    legality or propriety of public acts committed within a foreign state's own borders"). Official action or a

9    public act constitutes an act of state if it involves "the public and governmental acts of sovereign states," *i.e.,*

10   the "governmental functions of a State." *Alfred Dunhill of London*, 425 U.S. at 695-96; *see Liu*, 892

11   F.2d at 1432 (stating that party asserting act of state doctrine must offer evidence that "the government

12   acted in its sovereign capacity"); *Int'l Ass'n of Machinists & Aerospace Workers v. OPEC*, 649 F.2d

13   1354, 1360 (9th Cir. 1981) ("When the state *qua* state acts in the public interest, its sovereignty is

14   asserted."). Thus, were the suits at bar brought directly against the PRC, the act of state analysis would

15   undoubtedly apply.

16   The instant cases, however, are brought against two officials – the Mayor of Beijing (now a high

17   ranking member of the Chinese Communist Party) and the Deputy Provincial Governor of the Liao Ning

18   Province. The question is whether the alleged conduct of these two individual officials constitutes an act of

19   state.

20   The *Liu* and *Xia* Plaintiffs argue that because their conduct violated customary standards of

21   international law and/or *jus cogens* norms, their acts cannot be deemed to be official acts of the state, and

22   thus the act of state doctrine cannot be invoked. As with the parallel argument made with respect to the

23   FSIA immunity of individual officials, however, this argument is not supported by case law. Whether the

24   acts of individual officials are attributable to the foreign state so as to constitute acts of state turns not on

25   international law, but on domestic law and policy of the foreign state.

26   The act of state doctrine is not rendered inapposite simply because international law or *jus cogens*

27   norms are violated. As the Court noted in *Sabbatino*, "the act of state doctrine is applicable even if

28   international law has been violated." 376 U.S. at 431. The fact that the challenged action of the foreign

34

United States District Court
For the Northern District of California

state violates clear international consensus informs the doctrinal analysis (*i.e.* the first *Sabbatino* factor), not the threshold question of whether there is an act of state. *Id.* at 428. The *Sabbatino* analysis presupposes a violation of international law. The act of state doctrine is not compelled by international law. *Sabbatino*, 376 U.S. at 427. As a corollary, neither is it controlled by international law.

The cases which have addressed whether conduct of individual officials constitutes an act of state have focused on whether the official acted consistent with the foreign state's laws or with approval by the national government, not on whether his or her acts violated international standards. *See Kadic*, 70 F.3d at 250 (doubting whether acts of state official "taken in violation of a nation's fundamental law and wholly unratified by that nation's government" could be properly characterized as an act of state); *Filartiga v. Pena-Irala*, 630 F.2d 876, 889 (2d Cir. 1980) (doubting whether action by a state official "in violation of the Constitution and laws of the Republic of Paraguay, and wholly unratified by that nations government" could properly be characterized as an act of state); *Sharon v. Time, Inc.*, 599 F. Supp. 538, 544 (S.D.N.Y. 1984) (acts of then General Sharon not alleged to have been authorized by the State of Israel, but in fact was alleged to have gone beyond his authority in the campaign in Lebanon and by intentionally misleading national government were not acts of state).

The question is whether, as measured by domestic laws and policies of the foreign state, the acts of the defendant officials in this case are sufficiently attributable to the government of China so as to constitute an act of state. The Ninth Circuit has not had an opportunity to address the paramenters of this question. In *Republic of the Philippines v. Marcos*, 862 F.2d 1355 (9th Cir. 1988) (en banc), the court applied the *Sabbatino* analysis to a RICO suit against former President Marcos and his wife and held, after balancing various factors, including the fact that Marcos had been deposed and that the United States did not oppose adjudication of the suit, that the act of state defense did not bar the suit. *Id.* at 1360-61. Since the Marcoses had at that point in the litigation "offered no evidence whatsoever to support the classification of their acts as acts of state," the court had no occasion to address under what circumstances the acts of an official are sufficient to implicate the act of state doctrine. 862 F.2d at 1361.

In addressing the issue, the Second Circuit indicated that there is no requisite "act of state" where the official's conduct violated the foreign state's fundamental laws and was wholly unratified by the nation's government. *Kadic*, 70 F.3d at 250; *Filartiga*, 630 F.2d at 889. Unlike the facts in *Kadic* and *Filartiga*,

**United States District Court**
For the Northern District of California

1    Defendants' acts, though apparently violative of the state's domestic law, are not "wholly unratified by that

2    nation's government." Indeed, as discussed above, the PRC's alleged repression of the Falun Gong

3    movement and violation of the international human rights of Falun Gong practitioners appears to be

4    consistent with and pursuant to the unofficial policy of the national government.[23]  The question then is

5    whether the analysis of the act of state doctrine applies to such conduct that is violative of domestic law but

6    nonetheless ratified by the national government. This appears to be a question of first impression in this

7    circuit.

8          The language of the Second Circuit's decisions in *Kadic* and *Filartiga* suggest that such conduct

9    may constitute acts of state. In both cases, the court indicated there is no act of state where *both* of two

10   conditions are met:  (1) the conduct violated the fundamental laws of the foreign sovereign and (2) the

11   conduct was "wholly unratified" by the nation's government. *Kadic*, 70 F.3d at 250; *Filartiga*, 630 F.2d

12   at 889.  In the cases at bar, only the first condition is met. The Court concludes the second condition is

13   essential to an act of state.

14         The policy considerations underlying the act of state doctrine are implicated where a public official

15   engages in conduct in executing policy authorized or ratified by the government even if that policy is covert

16   and inconsistent with official law.  The doctrine's concern of affording respect and comity between and

17   among sovereign nations is implicated whenever the official executes the policy of the sovereign.

18   *Underhill*, 168 U.S. at 252. That the government's policy is covert or inconsistent with its domestic law

19   does not gainsay the fact that conduct in execution of that policy is a "governmental act" and the "exercise

20   [of] powers peculiar to sovereigns." *Alfred Dunhill of London*, 425 U.S. at 704.[24]  *Cf.* Restatement §

21   207(c) (1987) (state is responsible for violations of international law resulting from action or inaction by an

22   official "acting within the scope of authority or under color of such authority"). Enactment or issuance of a

23

24         [23]  The acts of the Defendants Liu and Xia in furtherance of national policy as alleged herein contrasts

25   with conduct undertaken for purely private financial gain as in *e.g. Jimenez v. Aristeguieta*, 311 F.2d 547,
     558 (5th Cir. 1962) (dictator's embezzlement and fraud not protected by act of state doctrine).

26         [24]  The situation is analogous to provisions of American law governing governmental liability for the acts
     of public officials.  Under *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978), a

27   municipality may be held liable in damages for acts of its individual officials if those acts are pursuant to a
     custom or policy of the government.  That those acts violate *e.g.* federal statutes or the constitution does not

28   negate the government's liability.  Nor would the fact that those customs or policies were secret and publicly
     disavowed by the government immunize the government from liability.

36

United States District Court
For the Northern District of California

1 "statute, decree, order, or resolution" by the government is one way in which the state exercises its

2 sovereign power. *Alfred Dunhill of London*, 425 U.S. at 694-95. Creation and implementation of policy,

3 even if that policy is covert, is another. *Cf. Timberline Lumber Co. v. Bank of Am.*, 549 F.2d 597, 607

4 (9th Cir. 1977) (expressing hesitancy to "challenge the sovereignty of another nation, the wisdom of its

5 policy, or the integrity or motivation of its action").

6      Moreover, the concerns of the act of state doctrine for the separation of powers,  the desirability

7 of having our government speak with one coherent voice on matters of foreign affairs, and the interest in

8 avoiding conflict with and embarrassment of the Executive Branch are implicated where the conduct at issue

9 is the subject of diplomacy. *Sabbatino*, 376 U.S. at 423, 431-433; *OPEC*, 649 F.2d at 1360.  Despite

10 the PRC's public disclaimer of human rights violations and wrongdoing in its treatment of the Falun Gong

11 movement, the State Department has addressed the issue in its diplomatic communications with China.  As

12 the letter from the State Department filed herein states, "the United States has repeatedly made these

13 concerns known to the Government of the PRC and has called upon it to respect the rights of all its citizens,

14 including Falun Gong practitioners.  Our critical views regarding the PRC Government's abuse and

15 mistreatment of practitioners of the Falun Gong movement are a matter of public record . . ."  Letter from

16 William H. Taft, IV to Assistant Attorney Gen. Robert D. McCallum of Sept. 25, 2002, at 2-3.  The State

17 Department also states that the "Executive Branch has many tools at its disposal to promote adherence to

18 human rights in China, and it will continue to apply those tools within the context of our broader foreign

19 policy interests." *Id.* at 7.  It urges that "U.S. *courts* should be cautious when asked to sit in judgment on

20 the acts of foreign officials taken within their own countries pursuant to their government's policy," and that

21 "[s]uch litigation can serve to detract from, or interfere with, the Executive Branch's conduct of foreign

22 policy." *Id.* at 7-8 (emphasis in original).  Where a foreign state's policy is the specific subject of foreign

23 diplomacy by the State Department, the separation of powers considerations underpinning the act of state

24 doctrine are implicated regardless of whether the subject policy is consistent with the foreign state's

25 domestic laws.

26      The analysis of the act of state doctrine thus diverges from that of FSIA immunity.  In holding the

27 FSIA does not supersede the act of state doctrine, the Ninth Circuit noted that the act of state doctrine

28 addresses different concerns than the doctrine of sovereign immunity. *Liu*, 892 F.2d at 1432; *OPEC*, 649

United States District Court

For the Northern District of California

1   F.2d at 1359-60. The law of sovereign immunity goes to the jurisdiction of the court, whereas the act of

2   state doctrine is prudential. Sovereign immunity is a principle of international law recognized by the United

3   States by statute whereas the act of state doctrine is a domestic legal principle arising from the peculiar role

4   of American courts. *OPEC*, 649 F.2d at 1359. The doctrine "recognizes not only the sovereignty of

5   foreign states, but also the sphere of power of the co-equal branches of our government." *Id.* "The

6   doctrine is meant to facilitate the foreign relations of the United States . . ." *Marcos*, 862 F.2d at 1361.

7   The FSIA embodies the principle of sovereign immunity law under which a public official is stripped of his

8   or her sovereign immunity defense if he or she exceeds the scope of a valid grant of authority (*e.g.* by

9   committing an unconstitutional act or otherwise violating applicable law). However, the policy concerns

10  embodied in the act of state doctrine obtain whenever the official acts pursuant to authority of or ratification

11  by the national government *regardless* of whether those acts comply with official domestic law.

12          Accordingly, this Court finds that in the context of these default proceedings, the evidence

13  establishes that the Defendants' alleged conduct was not "wholly unratified" by the PRC. It was pursuant

14  to policy and therefore constituted acts of state. Hence, the *Sabbatino* analysis applies.

15  **C.      The *Sabbatino* Analysis**

16          As discussed above, the Supreme Court in *Sabbatino* developed a three-factor balancing test to

17  determine whether the act of state doctrine bars suit:

18              [1] [T]he greater the degree of codification or consensus concerning a
                particular area of international law, the more appropriate it is for the
19              judiciary to render decisions
                regarding it . . .
20              [2] [T]he less important the implications of an issue are for our foreign
                relations, the weaker the justification for exclusivity in the political
21              branches.
                [3] The balance of relevant considerations may also be shifted if the
22              government which perpetrated the challenged act of state is no longer in
                existence . . .
23

24  376 U.S. at 428. The Ninth Circuit has also held that the court should consider whether the foreign state

25  was acting in the public interest. *Liu*, 892 F.2d at 1432.

26      **1.      Degree of International Consensus**

27          It is well established that torture constitutes *jus cogens* violations. *Siderman de Blake v.*

28  *Republic of Arg.*, 965 F.2d 699, 714-15 (9th Cir. 1992). As discussed below, the alleged acts of torture,

United States District Court

For the Northern District of California

1   cruel, inhuman or degrading treatment and arbitrary detention which the Court finds actionable violate the

2   law of nations on which a broad degree of international consensus exists.   Moreover, as noted below, the

3   basis for commander responsibility for those acts are also consistent with well recognized international law

4   standards. *See infra,* Part VIII.

5       Accordingly, the first *Sabbatino* factor weighs against the act of state defense.

6       **2.      Implications for Foreign Relations**

7       The second *Sabbatino* factor reflects the "peculiar requirements of successful foreign relations" –

8   that "the United States must speak with one voice and pursue a careful and deliberate foreign policy."

9   *OPEC,* 649 F.2d at 1358.  This is the central factor in the *Sabbatino* analysis and "[t]he 'touchstone' or

10   'crucial element' is the potential for interference with our foreign relations." *Id.* at 1360 (citation omitted);

11   *see also Alfred Dunhill of London,* 425 U.S. at 697 (the "major underpinning of the act of state doctrine"

12   is avoiding court rulings "that might embarrass the Executive Branch of our Government in the conduct of

13   our foreign relations"); *Timberline Lumber,* 549 F.2d at 607 ("The touchstone of *Sabbatino*- the potential

14   for interference with our foreign relations- is the crucial element in determining whether deference should be

15   accorded in any given case."); *Liu,* 892 F.2d at 1432 (accord).

16       In this regard, the views of the State Department, while not "conclusive," are entitled to respectful

17   consideration. *Kadic,* 70 F.3d at 250; *Sharon,* 599 F. Supp. at 552.  The reason is obvious.  Primary

18   responsibility for conducting foreign relations lies with the Executive Branch.  The limited institutional

19   competence of the judiciary to assess the impact upon its rulings upon foreign relations makes second

20   guessing judgments made by the State Department hazardous.  On the other hand, as previously noted, in

21   enacting the FSIA, Congress intended to end to practice of affording total deference to the views of the

22   Executive Branch on whether particular foreign states should be subject to suit on a case by case basis;

23   Congress transferred ultimate responsibility from the executive branch to the judiciary. *See Chuidian,*

24   *supra,* 912 F.2d at 1100; *Letelier v. Republic of Chile,* 488 F. Supp. 665, 670 (D.D.C. 1980).

25   Moreover, in enacting the TVPA, Congress indicated its desire that certain conduct – torture and

26   extrajudicial killings – be amenable to adjudication by the federal courts.

27

28

**United States District Court**
For the Northern District of California

1    As mentioned previously, this Court invited the views of the State Department on the cases at bar.

2    The State Department urged against adjudication of the instant suits.  In its letter, the Department expresses

3    the view that:

4    adjudication of these multiple lawsuits [challenging the legality of the Chinese government's actions against the Falun Gong], including the cases before

5    Magistrate Chen, is not the best way for the United States to advance the cause of human rights in China. . . .

6

7    . . . The Executive Branch has many tools at its disposal to promote adherence to human rights in China, and it will continue to apply these tools within the context of our broader foreign policy interests.

8

9    We believe, however, that U.S. *courts* should be cautious when asked to sit in judgment on the acts of foreign officials taken within their own countries pursuant to their government's policy. . .

10

11   . . . Such litigation can serve to detract from, or interfere with, the Executive Branch's conduct of foreign policy.

12   . . . [P]ractical considerations, when coupled with the potentially serious adverse foreign policy consequences that such litigation can generate, would in our view

13   argue in favor of finding the suits non-justiciable.

14   Letter from William H. Taft, IV to Assistant Attorney Gen. McCallum of  Sept. 25, 2002, at 7-8 (emphasis

15   in original).

16   While the State Department does not describe with any more specificity how adjudication of the

17   instant cases could interefere with the Executive Branch's foreign diplomacy in this matter, "the key inquiry

18   for the court's purpose is whether there will be an impact on the United States' foreign relations, not

19   whether the position adopted by the United States is well-founded or factually accurate." *Sarei v. Rio*

20   *Tinto PLC.*, 221 F. Supp. 2d 1116, 1192 (C.D. Cal. 2002).  *See also id*. at 1181-82 ("[T]he court must

21   accept the statement of foreign policy provided by the executive branch as conclusive of its view of that

22   subject; it may not assess whether the policy articulated is wise or unwise, or whether it is based on

23   misinformation or faulty reasoning.").

24   The Plaintiffs contend that because the Executive Branch has already publicly condemned the

25   PRC's repression of the Falun Gong, an adjudication by this Court finding that government officials

26   committed violations of international human rights and imposing sanctions in the form of relief sought herein

27   (damages and equitable relief) would not interfere with the Executive Branch's foreign diplomacy efforts.

28

40

United States District Court

For the Northern District of California

1    While this fact may well mitigate the potential conflict between coordinate branches of government, it does

2    not eliminate them for two reasons.

3        First, pronouncements or rulings from the different branches may have different implications.  As

4    the Court in *Sabbatino* highlighted,

5            Even if the State Department has proclaimed the impropriety of the
             expropriation, the stamp of approval of its view by a judicial tribunal,
6            however, impartial, might increase any affront . . .  Considerably more
             serious and far-reaching consequences would flow from a judicial
7            finding that international law standards had been met if that
             determination flew in the face of a State Department proclamation to
8            the contrary.

9    376 U.S. at 432.  Even though the cases at bar are proceeding by way of default, that is no guarantee that

10   the Court, in examining the sufficiency of the Complaints and evidence presented, will in fact find an

11   international law violation.  If it does find such violations, as it does herein, the imprimatur of formal findings

12   by a federal court might in some circumstances have foreign policy implications beyond that desired by the

13   Executive Branch.[25]

14       Second and more importantly, although the conclusions of this Court coincide with the Executive

15   Branch's condemnation of the PRC's human rights policy, there may be different approaches to diplomacy

16   in regard thereto.  As past debates over other foreign diplomatic efforts have demonstrated, there are a

17   variety of approaches to changing a foreign state's policy, ranging from *e.g.* "constructive engagement" to

18   economic isolation to threats of war.[26]  Thus, for instance, an order imposing a significant damage award

19

20       [25]  The Court also notes that the fact that the two individual Defendants herein appear to have had little

21   contact with the United States and that personal jurisdiction is based solely on service during their transitory
     physical presence in the United States and the fact that many of the Plaintiffs have little or not substantial ties

22   to the United States could exacerbate tension arising out of these suits.  This assertion of the outer reaches of
     the jurisdiction of the federal judiciary in these cases might appear especially ironic in view of the government's

23   resistance to submission to such international bodies as the International Criminal Court.  *See* Felicity Barringer,
     *"U.S. Stance on War Crimes Court Reopens Rift with Allies,"* S.F. Chron., June 11, 2003, at A8.

24

25       [26]  For instance, while virtually all officials and policy makers condemned South Africa's system of
     apartheid, there was intense debate between those who advocated boycotting and isolating South Africa and

26   those who advocated "constructive engagement" with its government.  Overriding a presidential veto, Congress
     enacted the Comprehensive Anti-Apartheid Act ("CAAA") of 1986, 22 U.S.C. 5001 *et seq.*, which

27   established U.S. policy toward South Africa and imposed substantial sanctions against its white minority
     government, and instituted civil and criminal liability for violations of the Act.  *See e.g., United States v. van*

28   *den Berg,* 5 F.3d 439, 440 (9th Cir. 1993) (discussing the CAAA and its termination by Executive Order in
     1991 after South Africa took steps toward democracy).

United States District Court

For the Northern District of California

1   upon the two defendant officials or issuing an injunction could well conflict with the "tools" alluded to by the

2   State Department which the Executive Branch chooses to apply "within the context of our broader foreign

3   policy interests."

4   　　As noted above, while the views of the State Department are not dispositive, they are entitled to

5   "respectful consideration." *Kadic*, 70 F.3d at 250. The Restatement, after reviewing cases in which the

6   State Department has stated a position on application of the act of state doctrine, concludes: "It seems that

7   if the State Department issues a letter requesting that the courts not review the validity of particular act, such

8   a letter will be highly persuasive if not binding." Restatement at § 443 n.9.[27]

9   　　As an empirical matter, this Court notes that as observed by the court in *Sarei*, "plaintiffs have not

10  cited, and the court has not found, a single case in which a court permitted a lawsuit to proceed in the face

11  of an expression of concern such as that communicated by the State Department here." 221 F. Supp. 2d at

12  1192.[28] The cases involving Cuban expropriations are instructive. When *Sabbatino* was before the

13

14  　　[27] Deference is due to the State Department on issues involving political, rather than legal judgments
for the same reasons that courts are reluctant to second guess the Executive Branch on questions of foreign

15  policy. Thus, the State Department's legal arguments that the court should refrain from exercising jurisdiction
because the alleged acts occurred entirely outside the United States or because personal jurisdiction over the

16  defendants were obtained only by alleged service of process during an official visit is entitled to less weight than
its judgment that the assertion of jurisdiction over these cases could disrupt foreign relations. Indeed, the Court

17  finds that contrary to the Department's legal arguments, it is clear that once personal jurisdiction is properly
asserted, *Filartiga, Kadic, Marcos, Hilao II*, and their progeny establishes that claims may be brought under

18  the ATCA or TVPA for violations of international human rights occurring entirely outside the United States.

19  　　[28] After the hearing, the *Liu* Plaintiffs submitted a supplemental brief arguing that the district court in
*Sarei* rejected application of the act of state doctrine despite the State Department's assertion that the case

20  would interfere with foreign relations. *Liu* Plaintiffs' Post-Hearing Memorandum in Response to Court
Inquiries, at 4-5. The *Sarei* court noted, "The Statement of Interest filed by the Department of State does not

21  directly indicate whether it believes any of the act of state, political question or international comity doctrines
applies. It does clearly express the view, however, that continued adjudication of this lawsuit will negatively

22  impact United States foreign relations with Papua New Guinea." 221 F. Supp. 2d at 1190. The court held
that the act of state doctrine barred environmental tort and racial discrimination claims. *Id.* at 1185-93.

23

24  　　More importantly, in *Sarei*, the district court ultimately barred all claims under the political question
doctrine. *Id.* at 1185-93. The court acknowledged that "the same separation of powers principles that inform

25  the act of state doctrine underlie the political question doctrine" and it characterized the act of state doctrine
as the foreign relations "equivalent" of the political question doctrine. *Id.* at 1196 (citations omitted). Under

26  these circumstances, this Court does not read *Sarei*'s holding as contrary to the recommendation presented
here. Given that plaintiffs' claims in *Sarei* were barred by the political question doctrine, and given the

27  substantial overlap between that doctrine and the act of state doctrine, the *Liu* Plaintiffs' argument amounts to
a distinction without a difference. *Cf. Northrop Corp. v. McDonnell Douglas Corp., supra*, 705 F.2d at

28  1046 ("The act of state doctrine is essentially the foreign counterpart to the political question doctrine. Both
doctrines require courts to defer to the executive or legislative branches of government when those branches
are better equipped to handle a politically sensitive issue. . . Neither doctrine is susceptible to inflexible

42

United States District Court
For the Northern District of California

1    Second Circuit, one of the State Department letters strongly suggested that the act of state doctrine not be

2    applied, and the Second Circuit relied on this letter to affirm the district court's decision not to apply the act

3    of state doctrine. 307 F.2d at 858-859. However, when *Sabbatino* reached the Supreme Court, the

4    Executive Branch reversed course. The Solicitor General urged application of the act of state doctrine.

5    The Court ultimately adopted the Solicitor General's position. 376 U.S. at 430-432.

6           Likewise, in *First Nat'l City Bank v. Banco Nacional de Cuba*, 406 U.S. 759 (1972), the

7    Cuban government seized City Bank branches in Cuba. City Bank retaliated by selling collateral which

8    secured a loan (which exceeded the value of the branches) it had made to the predecessor of the Banco

9    Nacional de Cuba. Cuba sued to recover the excess proceeds and asserted the act of state doctrine as a

10   defense to City Bank's counterclaims. The Second Circuit held that the act of state doctrine barred City

11   Bank's counterclaim. 431 F.2d 394 (2d Cir. 1970). The Supreme Court subsequently remanded the case

12   for reconsideration in light of the State Department's letter that the act of state doctrine should not apply,

13   but the Second Circuit held that notwithstanding the State Department's change of position, *Sabbatino*

14   barred the counterclaim. 442 F.2d 530, 532, 536-38 (2d Cir. 1971). A majority of the Court reversed

15   the Second Circuit, although it presented only fractured reasoning as to why the act of state doctrine should

16   not apply. A three-justice plurality relied upon the State Department's letter and declared that the Court

17   should automatically defer to the Executive's wishes and find the act of state doctrine not applicable. 406

18   U.S. at 769-70.[29]

19          In *Alfred Dunhill of London*, 495 U.S. at 695-706, an action brought by former owners of

20   expropriated Cuban cigar companies against American importers to recover payments for cigar shipments,

21   the court of appeals held that a judgment against the defendant importers was barred by the act of state

22   doctrine. The State Department proclaimed its position that the case did not raise an act of state question.

23

24

25   definition, and both must be applied on a case-by-case basis by balancing a variety of factors.") (citing *OPEC*, 649 F.2d at 1358-59).

26

27   [29] This opinion was authored by Justice Rehnquist, joined by Burger and White. *Id.* at 765-70. Justice Douglas concurred in the result but preferred to rely on equitable considerations. *Id.* at 772. Justice Powell concurred in the result but objected to the *Bernstein* exception. *Id.* at 773 ("I would be uncomfortable with

28   a doctrine which would require the judiciary to receive the Executive's permission before invoking its jurisdiction.").

1  The Supreme Court subsequently reversed, with a four-justice plurality stating that the State Department's

2  argument was persuasive. *Id.* at 695-706. *See also W.S Kirkpatrick & Co.*, 493 U.S. at 403-409

3  (RICO action involving allegations of construction company's bribery payments to Nigerian government,

4  the State Department advised that this case would not interfere in foreign affairs, and Supreme Court held

5  that act of state doctrine did not apply); *Marcos*, 862 F.2d 1355 (en banc) (State Department argues that

6  act of state doctrine not a defense in RICO action against former president of Philippines, Ninth Circuit

7  ruled that the act of state does not bar the suit); *Allied Bank v. Banco Credito Agricola de Cartago*, 757

8  F.2d 516 (2d Cir. 1985) (Second Circuit reversed both its own earlier ruling and that of the district court

9  after State Department filed brief recommending that the act of state doctrine did not bar suit); *Banco*

10  *Nacional de Cuba v. Chase Manhattan Bank*, 658 F.2d 875, 884-85 (2d Cir. 1981) (act of state

11  doctrine held not to apply when Bernstein letter obtained); *Banco Nacional de Cuba v. Chemical Bank*,

12  658 F.2d 903, 911 (2d Cir. 1981) (act of state doctrine defense recognized when Bernstein letter not

13  obtained); *First Nat'l Bank of Boston (Int'l) v. Banco Nacional de Cuba v. Chemical Bank*, 658 F.2d

14  895, 902 (2d Cir. 1981) (act of state doctrine defense recognized when Bernstein letter not obtained);

15  *Sarei*, 221 F. Supp. 2d at 1181 (court affords respectful consideration to the State Department's view that

16  a human rights suit would risk potentially serious adverse impact on foreign relations in applying the act of

17  state doctrine and political question doctrine).

18      In addition, the PRC, through the United States Department of State, submitted a letter to this

19  Court urging this Court not to assert jurisdiction over the instant cases. The PRC asserts in its letter that

20  Falun Gong is not a religious belief or spiritual movement but an "evil cult that seriously endangers the

21  Chinese society and people," and that is has "seriously disrupted the law and order," and endangered social

22  stability by inciting lawless and disruptive acts including sabotage and suicide bombings. Statement of the

23  Gov't of the P.R.C. on "Falun Gong" Unwarranted Lawsuits, at 1-2 (translated). The letter denies

24  allegations of torture and mistreatment and asserts that the U.S. Courts have no jurisdiction over such suits

25  and that such lawsuits are detrimental to China-US relations. In particular the Government contends that

26      If the US courts should entertain the "Falun Gong" trumped-up
        lawsuits, they would send a wrong signal to the "Falun Gong" cult
27      organization and embolden it to initiate more such false, unwarranted
        lawsuits. In that case, it would cause immeasurable interferences to the
28      normal exchanges and cooperation between China and the United

44

United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

> States in all fields, and severely undermine the common interests of the
> two countries.

*Id.* at 6.

This Court cannot assume the veracity of the factual assertions made by the PRC since it is not a party to the suit and because the assertions are not based on competent and admissible evidence (there is no declaration of a competent witness under oath). Accordingly, the Court cannot take judicial notice of the PRC's factual assertions contained in its submission. However, the Court can and does take judicial notice under Fed. R. Evid. 201(b)(2) of the *fact* that the PRC vigorously opposes the assertion of jurisdiction over the instant suits and views such suits as detrimental to the relations between China and the United States. The fact that the foreign state whose policies are at issue objects to the suit informs the second *Sabbatino* factor – the significance to our foreign relations. Given the PRC's position, the posture of the cases at bar stand in stark contrast to the situation in *Hilao II*, where the Philippine government expressly disclaimed any opposition to the suit against its former ruler. *In re Estate of Ferdinand E. Marcos, Human Rights Litig. ("Hilao II")*, 25 F.3d 1467, 1472 (9th Cir. 1994).

Accordingly, the second *Sabbatino* factor generally weighs against justiciability. However, the force of this factor may depend upon the nature of the relief sought. The more intrusive the remedy upon the sovereignty of the foreign state, the more the concerns of the act of state doctrine are implicated. *Cf. Credit Suisse v. U.S. Dist. Ct.*, 130 F.3d 1342, 1347 (9th Cir. 1997) ("Any order from the district court compelling the Banks to transfer or otherwise convey Estate assets would be in direct contravention of the Swiss freeze orders"); *OPEC*, 649 F.2d at 1361 ("The possibility of insult to the OPEC states and of interference with the efforts of the political branches to seek favorable relations with them is apparent from the very nature of this action and the remedy sought" – injunctive relief and damages).

Any injunctive relief which would command the defendant officials to comply with this Court's order in contravention of PRC's practices or policies would obviously be disruptive. Such a direct intrusion into the sovereignty of the PRC risks enormous implications for our foreign relations. Accordingly, though the Complaint in the *Xia* case prays for injunctive relief (without specifying what that relief would be), counsel for the *Xia* Plaintiffs acknowledged at the hearing herein that the Plaintiffs do not seek any injunctive relief against Defendant Xia.

United States District Court
For the Northern District of California

1    A monetary damages award based on the Defendant's acts of state (conduct attributable to the

2  national government of the PRC), while not as intrusive into sovereignty as an injunction, nonetheless

3  constitutes a significant invasion of sovereignty.  Its effect would be similar to the imposition of monetary

4  sanctions against a foreign state's actions.  The Court notes that the imposition of economic sanctions is one

5  of the tools of foreign diplomacy that has often been controversial and the subject of debate and

6  deliberation between the political branches of government.  *See infra* footnote 25 (discussing South

7  Africa); *van den Berg*, 5 F.3d at 440.  That damages are imposed upon individual public officials, rather

8  than directly against the state itself, does not obviate the impact on foreign relations if the basis of the

9  monetary sanctions is the official's implementation of the foreign state's policy.  Not only would such an

10  award effectively impose a sanction against the state's policy, but the risk of personal exposure to monetary

11  sanctions would subject the state's officials to conflicting commands – the official must either violate his or

12  her state's policies or be subjected to damages liability imposed by a United States court.  Such a dilemma

13  risks a substantial degree of interference with the foreign state's administration of government[30] and is thus

14  likely to have substantial implications for foreign diplomacy.

15    In contrast, the request for declaratory relief poses the least threat to foreign relations for several

16  reasons.  First, although the judicial act of declaring a foreign state's policy as violative of international law

17  implicates the act of state doctrine inasmuch as it entails ruling on the legality of an "official act of a foreign

18  sovereign performed within its own territory," it does not command the state or its officials to do anything.

19  *W.S. Kirkpatrick & Co.*, 493 U.S. at 405.

20    Second, in the cases at bar, any such declaration would be generally consistent with the prior

21  public pronouncements of the State Department condemning China's repressive policy toward Falun Gong

22  practitioners.  In its Statement of Interest, the State Department noted its "critical views regarding the PRC

23  Government's abuse and mistreatment of practitioners of the Falun Gong movement are a matter of public

24  record" and are set forth in the Department's annual human rights reports.  Letter from William H. Taft, IV

25

---

26    [30]  It is for similar reasons – the concern of interfering with the administration of government – that
individual public officials are afforded qualified immunity from suit under 42 U.S.C. § 1983.  *See Harlow v.*
27  *Fitzgerald*, 457 U.S. 800, 806 (1980) (purpose of qualified immunity is to protect public officials from "undue
interference with their duties and from potentially disabling threats of liability"); *Anderson v. Creighton*, 483
28  U.S. 635, 638 (1987) (permitting damage suits against individual officials  presents risk that fear of personal
monetary liability will "unduly inhibit officials in the discharge of their duties").

**United States District Court**

For the Northern District of California

1  to Assistant Attorney Gen. McCallum of Sept. 25, 2002, at 3. The most recent report states that "[f]or

2  the past 3 years, the government has waged a severe political, propaganda, and police campaign against the

3  FLG movement. . . . Directives to prevent FLG protests at all costs has resulted in many egregious abuses."

4  Country Reports on Human Rights Practices- 2001, China, United States Dept. of State, March 4, 2002,

5  at 17 (*available at* http://www.state.gov/g/drl/rls/hrrpt/2001/eap/8289pf.htm) The report goes on to state:

> The Government intensified its repression of groups that it determined
> to be "cults," and of the FLG in particular. Various sources report that
> thousands of FLG adherents have been arrested, detained, and
> imprisoned, and that approximately 200 or more FLG adherents have
> died detention since 1999; many of their bodies reportedly bore signs
> of severe beatings or torture or were cremated before relative could
> examine them.
>
> * * *
>
> Police often used excessive force when detaining peaceful FLG
> protesters, including some who were elderly or who were accompanied
> by small children. During the year, there were numerous credible
> reports of abuse and even killings of FLG practitioners by the police
> and other security personnel, including police involvement in beatings,
> detention under extremely harsh conditions, and torture (including
> electric shock and by having hands and feet shackled and linked with
> crossed steel chains). Various sources report that since 1997
> approximately 200 or more FLG adherents have died while in police
> custody.

16  *Id.* at 18, 22.[31] Given the Executive Branch's public and specific condemnation of the People's Republic

17  of China's mistreatment of Falun Gong practitioners, a declaratory judgment would essentially affirm the

18  views of the State Department, thus creating minimal risk of disrupting foreign relations conducted by the

19  Executive Branch.

20  Moreover, a judgment declaring that certain alleged abuses violates international human rights

21  would not directly challenge the legality of China's written law which, as previously discussed and as stated

22  in the People's Republic of China's letter to this Court, already prohibits such mistreatment. *See* Statement

23

24  [31] A State Department spokesperson has also publicly condemned China's repression of Falun Gong
practitioners. *See* Statement of Phillip T. Reeker, Daily Press Briefing, U.S. Dept. of State (August 20, 2001)
25  (*available at* http://www.state.gov/r/pa/prs/dpb/2001.4576pf.htm) ("We have raised with China on many
occasions our concerns about the crackdown on the Falun Gong and reports of torture and mistreatment of
26  detained and imprisoned practitioners, and we are going to continue to raise those issues"). So has the U.S.
delegation to the U.N. Commission on Human Rights. *See* Statement of Ambassador Shirin Tahir-Kheli, U.N.
27  Comm.  on  Human  Rights,  57th  Sess.,  March  30,  2001  (*available  at*
http://www.state.gov/g/drl/rm/2001/1806pf.htm) ("[The U.S. government] should not be silent when the
28  Chinese authorities . . . brutally repress Falun Gong practitioners exercising rights of freedom of belief and
expression").

of the Gov't of the P.R.C. on "Falun Gong" Unwarranted Lawsuits, at 3 (translated) ("Prohibition of torture has always been a consistent position of the People's Republic of China. In 1986, China signed *The Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment*.").

Finally, a declaratory judgment in the instant cases would be based upon a default of two lower level individual officials and not the crucible of an adversarial fact-finding process of trial in which the government itself participated. While this may not lessen the legal effect of a final judgment, a declaratory judgment resulting from such a default may well have lesser implications politically than a judgment based upon formal findings after a contested trial.

Significantly, while the State Department has cautioned this Court against exercising jurisdiction of the cases at bar, it also urges that if this Court does not entirely dismiss the case that it "fashion its final orders in a manner that would minimize the potential injury to the foreign relations of the United States." Letter from William H. Taft, IV to Assistant Attorney Gen. McCallum of Sept. 25, 2002, at 8. For the reasons stated above, limiting relief to declaratory judgment would have such an effect.

### 3. Continued Existence of the Accused Government

The third *Sabbatino* factor clearly weighs in favor of applying the act of state doctrine. Not only does the PRC still exist, but the individual officials named as Defendants herein continue in their significant positions in the PRC, and as alleged, continue to implement the policies in question. The Ninth Circuit has noted the difference between suing a sitting official and one who has been deposed:

> [T]he classification of "act of state" is not a promise to the ruler of any foreign country that his conduct, if challenged by his own country after his fall, may not become the subject of scrutiny in our courts. No estoppel exists insulating a deposed dictator from accounting. . . .
>
> The classification might, it may be supposed, be used to prevent judicial challenge in our courts to many deeds of a dictator in power, at least when it is apparent that sustaining such challenge would bring our country into a hostile confrontation with the dictator. Once deposed, the dictator will find it difficult to deploy the defense successfully. The "balance of considerations" is shifted.

*Marcos, supra,* 862 F.2d at 1360 (citing *Sabbatino*, 376 U.S. at 428). Virtually every case permitting a suit to proceed over the act of state objection advanced by an individual defendant involve former dictators,

48

United States District Court

For the Northern District of California

1  rulers or officials no longer in power.[32] *Id.* at 1361; *Kadic*, 70 F.3d at 250; *Filartigo*, 630 F.2d at 889;

2  *cf.* S. Rep. No. 102-249 ("the FSIA should normally provide no defense to an action taken under the

3  TVPA against a former official"); *Abebe-Jira v. Negewo*, 72 F.3d 844, 848 (11th Cir. 1996) (affirming

4  entry of judgment against defendant local government official who had personally supervised torture and

5  interrogation during 1970s Ethiopian military dictatorship then later worked in Atlanta, and rejecting defense

6  based on the political question doctrine). *But see Tachiona v. Mugabe*, 216 F. Supp. 2d 262 (S.D.N.Y.

7  2002) (TVPA damages award), and 234 F. Supp. 2d 401 (S.D.N.Y. 2002) (ATCA damages award), in

8  which individual defendants were dismissed based on head of state immunity, but *ruling political party* of

9  Zimbabwe held liable for multi-million dollar judgment under TVPA and ATCA for campaign of

10 extrajudicial killing, torture and other human rights abuses.[33] The Plaintiffs have cited no case in which the

11 court has refused to apply the act of state doctrine in a suit against a sitting official charged with

12 implementing current state policy, the legality of which is at issue.

13

14  [32] The *Liu* Plaintiffs cite *Sharon*, 599 F. Supp. 538 (S.D.N.Y. 1984), *Jungquist v. Nahyan*, 940 F.
Supp. 312 (D.D.C. 1996), *rev'd on other grounds*, 115 F.3d 1020 (D.C. Cir. 1997); and *Letelier v. Rep.

15  of Chile*, 488 F. Supp. 665 (D.D.C. 1980) as cases in which the act of state doctrine was found not to bar
suits against sitting officials. These cases are inapposite, however. In *Sharon*, at issue was Ariel Sharon's acts

16  taken in his *former* capacity as Israeli defense minister. Sharon's position at the time of the suit (not described
in the opinion), had nothing to do with the acts previously committed while defense minister. After Sharon

17  resigned as Defense Minister he served as "Minister without Portfolio" in 1983-84, then as Minister of Trade
and Industry in 1984-90.     *See* Israeli Ministry of Foreign Affairs website, *available at*

18  http://www.mfa.gov.il/mfa/go.asp?MFAH00ge0. Moreover, in that case it was Sharon who brought the libel
suit and Time Magazine that asserted an act of state doctrine defense while also taking the contrary position

19  that "Sharon went beyond his authority in the campaign in Lebanon and intentionally misled Prime Minister
Begin and the Cabinet into expanding the war." 599 F. Supp. at 544. The district court rejected Time's act

20  of state defense because it contradicted Time's theory of the case. *See id.* at 544 ("The actions of an official
acting outside the scope of his authority as an agent of the state are simply not acts of state."). In summary,

21  the posture of *Sharon* is distinct from the instant cases. In *Jungquist*, the defendant Crown Prince's position
was found to be unrelated to the conduct in question which was taken solely in his individual capacity. *Letelier*

22  did not involve a suit against an individual official.

23  [33] In *Mugabe*, where the defendants failed to answer, the United States government was permitted
to intervene for the limited purpose of appealing the judgment. 186 F. Supp. 2d 383 (S.D.N.Y 2002). In

24  addition, the State Department submitted a suggestion of immunity based on three arguments: (1) head-of-state
immunity; (2) diplomatic immunity; and (3) personal inviolability attaching to both defendants Mugabe and

25  Mudenge, the president and foreign minister, respectively. 169 F. Supp. 2d 259, 267-68 (S.D. N.Y. 2001),
*reconsideration denied* 186 F. Supp. 2d 383 (S.D.N.Y. 2002). While the State Department argued that

26  permitting the action to proceed against the President and Foreign Minister "would be incompatible with the
United States' foreign policy interests" (169 F. Supp. 2d at 267) the act of state doctrine *per se* was not

27  analyzed. The district court dismissed the three individual defendants (the information minister had not been
properly served), but held that personal inviolability could not be extended through Mugabe and Mudenge to

28  their political party as well. *Id.* at 318.

United States District Court
For the Northern District of California

1     After the hearing on Plaintiffs' motions, the *Xia* Plaintiffs have submitted post-hearing supplemental

2  memoranda indicating that Defendant Liu, subsequent to the filing of this suit, left his post as Mayor of

3  Beijing to accept a promotion to the higher post of Secretary of the Communist Party for the City of

4  Beijing's Municipal Party Committee, a post "more powerful" than the position of Mayor. *Xia* Pls.' Post-

5  Hearing Supp. Mem., at 2. The *Liu* Plaintiffs' argue that Defendant Liu's new status substantially

6  diminishes foreign policy implications of this suit. Notice of Change in Defendant's Status (Feb. 3. 2003);

7  Nathan Decl. Nonetheless, the newspaper article attached as an exhibit to the *Liu* Plaintiffs' Notice

8  describes the Chinese Communist Party Politburo as "the second highest body of power in China." Exh. 1;

9  *see also* Exh. 2 (Politburo is "second highest seat of power")

10    The Court is not convinced that this change materially alters the *Sabbatino* analysis. First,

11  Defendant Liu was the Mayor at the time the suit was filed and for a substantial period during the pendency

12  of this suit. The concern about the disruption of foreign relations stemming from subjecting a sitting official

13  to suit obtains to a large extent even if the official leaves the post during the pendency of the suit. Second,

14  Defendant Liu has left the position of Mayor for a "more powerful" position. While there is a distinction

15  between Chinese Communist Party and the government, and Defendant Liu may no longer be a government

16  official *per se*, Plaintiffs do not seriously dispute that the Chinese Communist Party wields considerable,

17  virtually monopolistic, political power over the mechanisms of government in the PRC. *Cf.* Nathan Decl. ¶

18  6 (acknowledging the Chinese Communist Party's "tight control over government..."); Robert C. Berring,

19  *Chinese Law, Trade and the New Century*, 20 Nw. J. Int'l L. & Bus. 425, 444 (2000) ("The CCP

20  [Chinese Communist Party] still monopolizes power and refuses to accept challenges to its authority. The

21  problems swirling around the Falun Gong sect illustrate this monopoly on power."). In fact, the State

22  Department describes the PRC as "an authoritarian state in which the Chinese Communist Party (CCP) is

23  the paramount source of power. At the national and regional levels, Party members hold almost all top

24  government, police, and military positions. Ultimate authority rests with members of the Politburo."

25  Country Reports on Human Rights Practices – 2001, China, U.S. Dept. of State, March 4, 2001, at 1.

26  Plaintiffs concede that Defendant Liu will assume a "more powerful" position as a high ranking official within

27  the CCP and that "Defendant Liu will continue to exert considerable influence over policies and actions of

28  government at both the local and national levels" *Xia* Pls.' Post-Hearing Supp. Mem., at 3-4. Presumably

1    those policies and actions includes the national policy of repressing the Falun Gong.  Plaintiffs do not

2    contend otherwise.  Thus, Defendant Liu's promotion contrasts sharply to Ferdinand Marcos' status as

3    "deposed dictator."  862 F.2d at 1360.

4         Finally, and most importantly, the essence of the suit at bar is a challenge to the nationally directed

5    policies of Falun Gong repression implemented by Defendants Liu and Xia.  According to the Plaintiffs,

6    these policies are ongoing and transcend the individual defendants.  This is not a case where the existing

7    national government has disavowed the conduct of a former official.  *Cf. Hilao II*, 25 F.3d at 1472 (current

8    Philippine government stated that Marcos' acts were "clearly in violation of existing law").  Given the policy

9    concerns of the act of state doctrine, the risk of interfering with foreign sovereignty and disrupting foreign

10   relations remain largely unaffected by Defendant Liu's change in position.  As such, the third Sabbatino

11   factor weighs in favor of applying the act of state doctrine.

12         **4.      Whether the Foreign State Was Acting in the Public Interest**

13   As noted above, the PRC contends in its letter submitted to this Court that its actions outlawing

14   Falun Gong were taken because of the threat to public health and safety posed by the "cult."  Even if the

15   PRC's purpose in singling out the Falun Gong movement were demonstrated by competent evidence and

16   thus found to be taken in the "public interest," it would be difficult to conclude that the more specific actions

17   allegedly taken in violation of international human rights – *e.g.* torture, cruel, inhuman or degrading treatment

18   and arbitrary detentions – were "in the public interest."  The PRC does not attempt to justify the alleged

19   violations of international human rights.  Rather, it categorically denies that they occurred.  Indeed, the PRC

20   contends that any such violations would be contrary to Chinese law.  Thus, this Court cannot conclude that

21   if alleged violations are proven, they were done "in the public interest."

22

23

24

25

26

27

28

**5.    Summary**

Although the first and fourth *Sabbatino* factor weigh in favor of exercising jurisdiction over the instant case, the second and third factors weigh strongly against it.  As noted above, the touchstone of the act of state doctrine is the risk of interfering with the conduct of foreign relations by coordinate branches of government.  That this suit is brought against sitting officials aggravates that risk.  Hence, the second and third factor coalesce to counsel strongly against assertion of jurisdiction.  However, because the risk of interfering with the Executive Branch is minimal were this Court to enter declaratory judgment, particular if, as discussed below, that judgment is limited to the individual claims brought by the Plaintiffs, the Court concludes that the act of state doctrine bars plaintiffs' claim for damages and injunctive relief but not their claim for declaratory relief.

## VII.    ANALYSIS OF PLAINTIFF'S HUMAN RIGHTS CLAIMS

While the Plaintiffs in both the *Liu* and *Xia* cases have asserted claims of torture under the TVPA and numerous other human rights violations under the ATCA, as explained below, the Court concludes that only certain claims – torture under the TVPA, arbitrary detention under the ATCA, and cruel, inhuman, or degrading treatment under the ATCA are justiciable.

At the outset, it should be emphasized that only claims of the individual Plaintiffs in each case are before the Court.  The *Liu* suit is brought by six individuals.  The *Xia* suit is brought nominally as a class action by three individual lead plaintiffs (one of whom is suing on behalf of her mother who is incarcerated in a prison labor camp).  However, the *Xia* Plaintiffs have never moved to certify the class.  Hence, the human rights claims asserted must be assessed in the context of the nine individuals Plaintiffs before the Court.

Moreover, although the individual Defendant officials have not answered and defaulted, the PRC has filed, through the State Department, a statement in opposition to this court's adjudication of the *Liu* and *Xia* lawsuits.  As noted above, in its opposition letter, the PRC contends, *inter alia*, that the Falun Gong was banned after the PRC concluded that it was a "cult" and an "unregistered and illegal organization," (Translation of China's Statement at ¶ 2), and that its founder, Li Hongzhi, and certain practitioners have committed activities that pose a "serious threat to public security," such as:

•     "[H]arassing and assaulting people who have different views with them,";

1       •     Organizing "many illegal mass gatherings, disrupting and blocking the traffic and

2             provoking and stirring up troubles[,]";

3       •     "[S]tealing state secrets, sabotaging broadcasting, television and other public

4             facilities, intentionally attacking the national satellite facilities and jamming the

5             broadcasting of satellite programs[,]";

6       •     Instigating "self-immolation for the sake of 'ascending to Heaven[,]"; and

7       •     Plotting and committing "train derailing or suicide bombings."

8   *Id.* ¶ 1. Thus, on July 29, 1999, the PRC issued an arrest order for Li Hongzhi. *Id.* ¶ 2. As such, the

9   [overlapping/illegible text: context, the Plaintiffs ... the PRC ... individual claims]

10  rights abuses suffered directly by the individual Plaintiffs while detained by Chinese authorities – torture,

11  cruel, inhuman and degrading treatment, and arbitrary detention. These claims are not dependent upon the

12  legality of the PRC's decision to outlaw the Falun Gong or the bona fides of the PRC's asserted

13  justification for the arrest and detentions of FLG supporters and practitioners. Nor do they depend on facts

14  beyond the individual circumstances of the detention of each individual Plaintiff. As the Plaintiffs assert in

15  their reply to the PRC's filing, at least with respect to these claims, "the lawfulness of Falun Gong is not an

16  issue that needs to be addressed by the Court . . . since the sole question posed by the complaints is

17  whether Defendant officials carried out acts of torture [ ] and other gross human rights violations against the

18  Plaintiffs . . . If they did, the reason they committed the atrocities is irrelevant." Plaintiffs' Motion to Strike

19  the Government of China's Statement, at 2. As explained below, if the Defendants herein committed or are

20  legally responsible for the commission of the acts complained of, such as torture, while the Plaintiffs were

21  detained, any asserted justification for their arrest is legally irrelevant.

22       Second, there are the broader claims asserted by the Plaintiffs which do require assessment of the

23  government's action in outlawing of Falun Gong and the bona fides of the government's purpose. These

24  claims also require determination of facts that extend beyond their circumstances of the individual Plaintiffs.

25       Thus, for instance, the claim of genocide asserted by the *Xia* Plaintiffs requires a factual showing of

26  either large scale or widespread systematic practices on the part of the defendant. Genocide, as defined by

27  the Restatement, is an act committed with the intent to destroy a whole or a part of a national, ethnical,

28  racial, or religious group. Restatement § 702, cmt. d. The International Criminal Tribunal for Yugoslavia

*(side text, vertical:)* United States District Court — For the Northern District of California

United States District Court

For the Northern District of California

1  ("ICTY") held that genocidal intent lies only when "a reasonably substantial number relative to the total

2  population of the group" within a geographic area has been physically destroyed. *Prosecutor v. Sikirica*,

3  Judgement Case No. IT-95-8-T, ¶ 65 (Int'l Crim. Trib. Yugoslavia, Trial Chambers, Sept. 3, 2001)

4  *available at* http://www.un.org/icty/sikirica/judgement/010903r98bis-e.pdf.[34]  Before ratifying the

5  Genocide Convention, the United States Senate made a similar declaration. The Senate declared that

6  genocidal intent lies only when a "substantial number" of victims have been killed.  S. Exec. Rep. No. 94-

7  23, at 1-2, 6, 18 (1976); *see also* David Alonzo-Maizlish, Note, *In Whole or in Part:  Group Rights, the*

8  *Intent Element of Genocide and the "Quantitative Criterion,"* 77 N.Y.U.L. Rev. 1369, 1374 n.16,

9  1385 (2002) (quoting the "substantial number" language in S. Exec. Rep. No. 94-23).[35]

10        The claim of crimes against humanity asserted by the *Liu* Plaintiffs likewise requires finding of facts

11  beyond the circumstances of the individual plaintiffs.  The scope of a defendant's actions is probative of the

12  *actus reus* element of the crime. *Prosecutor v. Akayesu*, Judgment, Case No. ICTR-96-4-T, ¶¶ 568-

13  581 (Int'l Crim. Trib. Rwanda, Trial Chamber I, Sept. 2, 1998) 1998 WL 1782077 (UN ICT

14  (Trial)(Rwa)).  A crime against humanity is specifically defined, in part, as an act committed as part of a

15  "widespread or systematic" attack against a civilian population.  I.C.C. Statute, art. 7, 37 I.L.M. 999, 1004

16  (1998).  The terms widespread and systematic have been defined as follows:

17              The concept "widespread" may be defined as massive, frequent, large
                scale action, carried out collectively with considerable seriousness and
18              directed against a multiplicity of victims.  The concept of "systematic"
                may be defined as thoroughly organised and following a regular pattern
19              on the basis of a common policy involving substantial public or private

20

21    [34]  Thus, for instance the ITCY in *Sikirica* held that two percent of a population in a certain
      geographical area "would hardly qualify as a 'reasonably substantial' part of the . . . population." *Sikirica*, ¶
22    72.

23    [35]  Genocide is a "specific intent offense." *Beanal v. Freeport-McMoran, Inc.*, 969 F. Supp. 362,
      373 (E.D. La. 1997), *aff'd* 197 F.3d 161 (5th Cir. 1999);*Kadic*, 70 F.3d at 244; *see also Xuncax v.*
24    *Gramajo*, 886 F. Supp. 162, 176, 188 (D. Mass. 1995); *Mehinovic v. Vuckovic*, 198 F. Supp. 2d 1322,
      1354-55 (N.D. Ga. 2002); *Sarei*, 221 F. Supp. 2d at 1151; *Presbyterian Church of Sudan v. Talisman*
25    *Energy, Inc.*, 244 F. Supp. 2d 289, 316 (S.D. N.Y 2003).  Thus, the nature and scope of the practice is
      probative of the defendant's *mens rea. Prosecutor v. Akayesu*, Judgment, Case No. ICTR-96-4-T, ¶ 568
26    (Int'l Crim. Trib. Rwanda, Trial Chamber I, Sept. 2, 1998) 1998 WL 1782077 (UN ICT (Trial)(Rwa)). That
      intent may be inferred from, *inter alia*, the number of victims (*Prosecutor v. Sikirica*, Judgment, Case No.
27    IT-95-8-T, ¶¶ 76-90 (Int'l Crim. Trib. Yugoslavia, Trial Chamber, Sept. 3, 2001) *available at*
      http://www.un.org/icty/sikirica/judgement/ 010903r98bis-e.pdf) and the scale of atrocities committed.
28    *Akayesu*, ¶ 523.

1
2

> resources. There is no requirement that this policy must be adopted
> formally as the policy of a state. There must, however, be some kind of
> preconceived plan or policy.

3  *Akayesu*, ¶ 580 (cited the Report on the International Law Commission to the General Assembly, 51 U.N.

4  GAOR Supp. (No 10) at 94, U.N.Doc. A/51/10 (1996)).[36]

5       Moreover, the claims alleging genocide and interference with freedom of religion and belief require

6  an assessment of the government's justification for actions taken against the Falun Gong, including the arrest

7  and detention of their practitioners' and supporters' freedoms. The right to freedom of religion and belief

8  protected under the Universal Declaration of Human Rights and the International Covenant on Civil and

9  Political Rights ("ICCPR") is subject to restrictions that are "necessary to protect public safety, order,

10  health or morals, or the fundamental rights and freedoms of others." General Comment 22 under Article 18

11  of the ICCPR, ¶ 8.[37]  As noted above, the PRC asserts such justification in defense of its official actions

12  outlawing the Falun Gong. *See generally* Translation of China's Statement. Genocide likewise requires a

13  finding that rather than attempting to pursue a legitimate social goal, its perpetrators engage in acts

14  "committed with intent to destroy" the targeted group and causing their physical destruction. Restatement §

15  702 cmt. d; *Kadic*, 70 F.3d at 244; *see also Beanal*, 969 F. Supp. at 373; *Xuncax*, 886 F. Supp. at 188;

16  *Mehinovic*, 198 F. Supp. 2d at 1354-55; *Sarei*, 221 F. Supp. 2d at 1151; *Talisman*, 244 F. Supp. 2d at

17  327.

18       The Court concludes only the first set of narrower claims pertaining to the individual Plaintiffs are

19  appropriate for judgment by default in the instant cases. It does so for several reasons.

20       First, in contrast to claims which require the resolution of specific facts particular to the individual

21  Plaintiffs before the Court, the broader claims which entail findings of systemic and widespread practices

22

23

24      [36] *See also  Prosecutor v. Rutaganda,*39 I.L.M. 557, 571 (Case No. ICTR-96-3-T, May 2000); *Wiwa v. Royal Dutch Petroleum Co.*, 2002 WL 319887, at *10 (S.D.N.Y. Feb. 28, 2002) (citing *Rutaganda*); Darryl Robinson, *Defining "Crimes Against Humanity" at the Rome Conference*, 93 Am. J. Int'l L. 43, 47-52 (1999).

26      [37] *See also Tachiona v. Mugabe*, 234 F. Supp. 2d 401, 428-29 (S.D.N.Y. 2002); Declaration on the Elimination of All Forms of Intolerance and of Discrimination Based on Religion and Belief, art. 1(3), G.A. Res. 55, 35 U.N. GAOR Supp. No. 51; European Convention on Human Rights, Nov. 4, 1950, art. 15(1), 213 U.N.T.S. 221; American Convention on Human Rights, Jan. 7, 1970, art. 12(3), 1144 U.N.T.S. 123; African Charter of Human and Peoples' Rights, June 27, 1981, art. 8, OAU Doc. CAB/LEG/67/3/Rev. 5 (1981).

*(left margin vertical text)* United States District Court — For the Northern District of California

United States District Court

For the Northern District of California

1   greatly enlarges the scope of the factual inquiry that must properly be undertaken; that inquiry would involve

2   facts beyond that to which individual Plaintiffs may competently testify.  Moreover, claims which require a

3   determination into the bona fides, legitimacy and substantiation of the government's purpose in suppressing

4   the Falun Gong would require the Court to delve into what is akin to legislative facts.  It would entail a

5   judicial inquiry well beyond the concrete factual allegations pertaining to the individual claims.

6        While broad factual determinations are not inherently beyond the competence of the Court to

7   adjudicate, the reliability of the process of determining such facts are severely compromised in the cases at

8   bar.  The instant cases are proceeding as default judgments against two mid-level officials who serve at

9   local levels of government.  That these cases are not formally brought against the national government of

10   China, but against two local officials is significant in the context of the default judgment at issue herein.  As

11   previously noted, once a default is entered, the allegations of the complaint together with competent

12   admissible evidence submitted by the moving party are usually treated as true.  *TeleVideo Sys., Inc. v.*

13   *Heidenthal*, 826 F.2d 915, 917-18 (9th Cir. 1987); *Danning v. Lavine*, 572 F.2d 1386, 1388 (9th Cir.

14   1978).  While there normally is good reason for assuming that allegations directed against a defendant are

15   admitted and true if left unanswered and unopposed, there is less reason to do so when the allegations are

16   broad and implicate conduct and policies of others beyond the defendant's control, including in this case

17   those of the national government.  Judgment by default is not a reliable process for determining facts where

18   the defaulting defendants are not in a position to admit facts pertaining to conduct and policy (*e.g.* that of

19   the national government) beyond their control and who have less incentive to defend and controvert

20   allegations directed at others.[38]

21

22   [38]   For instance, in numerous cases cited by the *Xia* Plaintiffs as evidence of abuses suffered by
        potential class members, the arrests and detentions took place in jurisdictions outside Beijing and the Liao Ning
23      Province.  In particular, at least eight alleged torture victims listed in the *Xia* unsworn affidavit may have been
        arrested and detained outside Liao Ning.  The affidavit provides: (1) Wang Youji was arrested and detained
24      in Gonji before being transferred to a Liao Ning facility, (2) Song Jinying was arrested in Paotai and detained
        at Wafangdian, (3) Case 15 was arrested by Heshijiao police, (4) Liu Shan's and Li Zhi's whereabouts are
25      unknown, and (5) Miao Junjie's and Zheng Yuyine's places of arrest were undisclosed.  The *Xia* Plaintiffs also
        rely on the State Department's report on human rights violations in China as evidence of the defendants'
26      wrongdoings.  However, the report merely lists the regions in China where human rights have been violated and
        does not focus specifically on the conduct of government officials in Beijing and Liao Ning.  In addition to
27      describing the conditions in Liao Ning, the report also highlights conditions in Heilongjian, Tianjin, Inner
        Mongolia, Zhejiang, Hebei, Shaanxi, Sichuan, Wuhan, Shanghai, Xinjiang, Guangxi, and Chongqing.  In fact,
28      the report makes no mention of human rights violations in Beijing.

United States District Court
For the Northern District of California

1    Moreover, default judgment is a less reliable process for finding facts where the scope of the facts

2    are beyond that to which the individual plaintiffs are competent to allege and testify.[39]  The possibility of

3    disputes concerning material facts, a factor informing the court's discretion in deciding whether to enter a

4    default judgment (*Eitel, supra*, 782 F.2d at 1471-72) is magnified under these circumstances.  And given

5    the potential unreliability of making broad factual findings by default in these peculiar circumstances, the

6    strong policy favoring a decision on the merits (*Eitel*, 782 F.2d at 1471-72) also counsels against entering

7    default judgment on the broader claims.

8    Furthermore, to the extent adjudication of the broader human rights claims requires an assessment

9    of the PRC's official decision to outlaw the Falun Gong, it implies a direct challenge to official governmental

10

11    [39]  In this respect, the evidence of specific abuses suffered by other individuals is not nearly as reliable
as that pertaining to the named Plaintiffs. The *Xia* Plaintiffs have submitted a document entitle "Additional Un-
12    Notarized Information Compiled by Falun Gong on Persecution, Torture and Execution of Practitioners in
Liaoning Province" cataloging human rights violations suffered by others. It appears to be a summary compiled
13    by unidentified persons through some undefined process, the evidentiary basis of which is unclear. Indeed, it
is not accompanied by any sworn statement as to its authenticity, accuracy, or the other factors which would
14    inform its admissibility as evidence. As such, it is not competent admissible evidence to prove the conduct
described therein.  Fed. R. Evid. 602-603.  Furthermore, the statement contains inadmissible hearsay
15    statements because they are unsworn out-of-court statements taken for the purposes of substantiating the *Xia*
Plaintiffs' various claims of human rights violations. They do not fall within any hearsay exception categories
16    provided under Fed. R. Evid. 803-804. *See Webb v. Lewis*, 44 F.3d 1387, 1390-93 (9th Cir. 1994)
(amended opinion) (statement taken by social worker trained to elicit descriptions of sexual abuse was
17    inadmissible hearsay lacking guarantees of trustworthiness), *cert. denied*, 514 U.S. 1128 (1995); *see also
Idaho v. Wright*, 497 U.S. 805, 826-27 (1990); *Padilla v. Terhune*, 309 F.3d 614, 620 (9th Cir. 2002);
18    *United States v. Valdez-Soto*, 31 F.3d 1467, 1471 (9th Cir. 1994), *cert. denied*, 514 U.S. 1113 (1995);
*Larez v. City of Los Angeles*, 946 F.2d 630, 643 n.6 (9th Cir. 1991) (uncorroborated unsworn statement);
19    *Hal Roach Studios, Inc. v. Richard Feiner and Co., Inc.*, 896 F.2d 1542, 1552 (9th Cir. 1989); *Bulthius
v. Rexall Corp.*, 789 F.2d 1315, 1316 (9th Cir. 1985) (the court did not abuse its discretionary power by
20    excluding unsworn affidavits prepared specifically to support a party's case by individuals who arguably have
an interest in the outcome); *United States v. Satterfield*, 572 F.2d 687, 691 (9th Cir. 1978); *Jackson v.
21    Bache & Co., Inc.*, 381 F. Supp. 71, 100 n.1 (N.D. Cal. 1974).

22    The Plaintiffs also rely on reports such as an annual human rights report issued by the U.S. State
Department which finds human rights violations by the government of China directed *inter alia* at the Falun
23    Gong practitioners. The State Department's annual human rights reports have been held to fall within the public
records exception to the hearsay rule under Fed. R. Evid. 803(8), and is thus admissible. *See Bridgeway
24    Corp. v. Citibank*, 201 F.3d 134, 143-44 (2d Cir. 2000); *see also Bank Melli Iran v. Pahlavi*, 58 F.3d
1406, 1411 (9th Cir. 1995) (relying on the annual reports in granting summary judgment on the issue of the
25    fairness of Iranian courts), *cert. denied*, 516 U.S. 989 (1995); *Canales Martinez v. Dow Chem. Co.*, 219
F. Supp. 2d 719, 735, 737, 740 (E.D. La. 2002) (relying on annual reports on the fairness of the courts in
26    Costa Rica, Honduras, and the Republic of Philippines in deciding whether those courts can provide an
adequate form for the plaintiff's claims). The annual human rights reports have also been found to be
27    trustworthy. *See Bridgeway*, 201 F.3d at 144. While the reports may be admissible evidence, they do not
provide the same quality of evidence as the specific and direct evidence substantiating the particular abuses
28    allegedly suffered by the individual Plaintiffs. The report has greater probative value in establishing as a general
matter the scope and nature of human rights violations in China.

1   policy of the PRC.  As discussed above (*see* Section V, *supra*), such a challenge would, in substance,

2   constitute the practical equivalence of a suit against the government of China, even though the suits are

3   brought nominally against individual officials.  *See Park v. Shin*, 313 F.3d at 1144.  As such, these claims

4   fall more squarely within the bar of the FSIA than suits challenging conduct unauthorized by official law of

5   the foreign sovereignty.

6        Finally, to the extent the Court is required to pass on the legality and propriety of actions officially

7   sanctioned and justified by the government of the PRC, such an adjudication implicates core concerns

8   underpinning the act of state doctrine.  As discussed above (*see* Section VI, *supra*), although the Court

9   concludes that even unofficial and publicly disclaimed policy (*e.g.* of torture) of the foreign state constitutes

10  an "act of state" raising justiciability problems, the act of state doctrine is even more squarely implicated

11  were the court required to rule on the legality of an "*official* act of a foreign sovereign performed within its

12  own territory." *W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp., Int'l*, 493 U.S. 400, 405-06

13  (1990) (emphasis added). *See Liu v. Republic. of China*, 892 F.2d 1419, 1432 (9th Cir. 1989) (act of

14  state doctrine implicated "when courts are asked to judge the legality or propriety of public acts committed

15  within a foreign state's own borders"). *Cf. Beanal v. Freeport-McMoran, Inc.*, 197 F.3d 161, 167 (5th

16  Cir. 1999) ("the argument to abstain from interfering in a sovereign's environmental practices [alleged to

17  inflict human rights violations and genocide] carries persuasive force especially when the alleged

18  environmental torts and abuses occur within the sovereign's borders and do not affect neighboring

19  countries").

20       Plaintiffs appear to implicitly acknowledge the difficulties that would inhere in the Court's

21  adjudication of the lawfulness of PRC's decision to outlaw Falun Gong and the reasons for the alleged

22  commission of human rights violations.  As noted above, the Plaintiffs have stated that "the lawfulness of the

23  Falun Gong spiritual movement and the activities of its practitioners and supporters in China need not be a

24  matter of concern to this Court, and is not a valid basis for challenging this litigation."  Plaintiffs' Motion to

25  Strike the Government of China's Statements, at 2; *see also Liu* Plaintiffs' Response to Statements by

26  United States Department of State and Government of the People's Republic of China, at 1-2, 13; *Xia*

27  Plaintiffs' Reply to the State Department's Statement of Interest and Statement by the Government of

28  China in Response to Questions Posed by the Court, at 5 (hereinafter "*Xia* Plaintiffs' Reply to State

United States District Court

For the Northern District of California

1   Department's Statement"). Moreover, Plaintiffs posit that "[t]he justifications for the Chinese government's

2   prohibition of Falun Gong provided in China's Statements are immaterial to the case." *Liu* Plaintiff's

3   Response to China's Statements, at 13. They also state that "the reason they committed the atrocities is

4   irrelevant, and need not be considered as material to adjudication of the causes of action that have been

5   presented." Plaintiffs' Motion to Strike, at 2. The Court agrees with these statements insofar as they relate

6   to claims of torture, arbitrary detention, and cruel and inhuman treatment. The Court does not agree,

7   however, that the other broader human rights claims would not require such an adjudication.

8        The above concerns counsel in favor of adjudicating only the individualized human rights claims of

9   torture, cruel, inhuman, and degrading treatment, and arbitrary detention of the individual Plaintiffs.

10  Accordingly, the Court below analyzes these three claims.

11  **A.    The Torture Claims (TVPA)**

12       The *Xia* Plaintiffs and two of the *Liu* Plaintiffs allege they were subject to torture and thus assert

13  claims under the TVPA. Plaintiffs' allegations are sufficient to state claims of torture within the meaning of

14  these laws. The TVPA defines torture as follows:

15           (1) the term 'torture' means any act, directed against an individual in the
16           offender's custody or physical control, by which severe pain or suffering
             (other than pain or suffering arising only from or inherent in, or incidental to,
17           lawful sanctions), whether physical or mental, is intentionally inflicted on that
             individual for such purposes as obtaining from that individual or a third
18           person information or a confession, punishing that individual for an act that
             individual or a third person has committed or is suspected of having
19           committed, intimidating or coercing that individual or a third person, or for
             any reason based on discrimination of any kind; and

20           (2) mental pain or suffering refers to prolonged mental harm caused by or
21           resulting from–
             (A) the intentional infliction or threatened infliction of severe physical pain or
22           suffering;
             (B) the administration or application, or threatened administration or
23           application, of mind altering substances or other procedures calculated to
             disrupt profoundly the senses or the personality;
24           (C) the threat of imminent death; or
             (D) the threat that another individual will imminently be subjected to death,
25           severe physical pain or suffering, or the administration or application of
             mind altering substances or other procedures calculated to disrupt
26           profoundly the senses or personality."

27

28

28 U.S.C. § 1350 note § 3(b). The TVPA's definition of torture mirrors that of the United Nations Convention Against Torture, etc. ("CAT"), previously mentioned in Part IV, *supra*. The Convention, which has been ratified by the United States,[40] defines torture as follows:

> For the purposes of this Convention, the term 'torture' means any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions.

*Available at* http://193.194.138.190/html/menu3/b/h_cat39.htm. *See also* Restatement § 702 cmt. g (1987) (quoting the same definition of torture).

A threshold issue of standing must be addressed with respect to one Plaintiff. *Xia* Plaintiff B does not allege that she is a victim of torture herself. Rather, she seeks relief for the harm that has been inflicted on her parent, who is currently incarcerated in the Masanjia Labor Camp in Liao Ning Province. As such, she must establish her standing to sue under the TVPA.

**B.     Standing for Plaintiff B**

There are two bases for standing under the TVPA: (1) where the plaintiff is a direct victim of the alleged torture and (2) where the plaintiff brings a claim on behalf of a deceased tortured victim. H.R. Rep. No. 102-367(III) *reprinted* in *1992 U.S.C.C.A.N.* 84, 87; S. Rep. 102-249(IV)(C). The House Report provides that the TVPA "authorizes the Federal courts to hear cases brought by or on behalf of a victim of any individual who subjects a person to torture or extrajudicial killing." H.R. Rep. No. 102-367(III) *reprinted* in *1992 U.S.C.C.A.N.* at 87. Similarly, the Senate Report provides that the TVPA "permits suit by the victim or the victim's legal representative or a beneficiary in a wrongful death action." S. Rep. 102-249(IV)(C).

---

[40] *Li v. Ashcroft*, 312 F.3d. 1094, 1102 (9th Cir. 2002) ("The United States signed the Convention on April 18, 1988, and the Senate ratified it on October 27, 1990. . . . The Convention became binding on the United States in November of 1994 after President Clinton delivered the ratifying documents to the United Nations. . . .") (citations omitted).

1    The Ninth Circuit has not ruled on the second basis for standing, *i.e.* to sue on behalf of tortured

2    victims.[41]  Regarding suits brought on behalf of others, two district court cases – *Cabello v. Fernandez-*

3    *Larios* and *Xuncax v. Gramajo* – suggest that the TVPA allows only claims brought on behalf of

4    deceased torture victims.  The court in *Cabello* provided that "[the legislature] intended to allow the

5    surviving legal representative of a *deceased* torture victim to recover on behalf of the victim's estate."

6    *Cabello v. Fernandez-Larios,* 205 F. Supp. 2d 1325, 1334-1335 (S.D. Fla. 2002) (emphasis added).

7    Similarly, in *Xuncax*, the court provided that "under either federal or state law, [the] plaintiffs cannot

8    recover on behalf of their relatives for . . . torture." *Xuncax,* 886 F. Supp. at 192.  Plaintiffs herein have

9    not cited any persuasive authority to the contrary.

10       Accordingly, the Court concludes that absent a ruling from the Ninth Circuit holding to the contrary,

11   *Xia* Plaintiff B has no standing to bring an action for torture on behalf of her parent.  Her parent was not

12   subject to an extrajudicial killing, and Plaintiff B herself does not allege she is a torture victim.

13   **C.    Legal Sufficiency of the Plaintiffs' Claims of Torture**

14       The facts offered by the remaining plaintiffs who assert torture claims – Does I and II and Plaintiffs

15   A and C – sufficiently support their claims of torture under the TVPA.  To establish a cause of action for

16   torture under the TVPA, each plaintiff must show the following:  (1) that the defendant acted "under actual

17   or apparent authority, or color of law," (2) that the defendant subjected the plaintiff to torture, (3) that the

18   plaintiff has exhausted "adequate and available remedies," and (4) that the ten-year statute of limitations has

19   not run.  28 U.S.C. § 1350 note § 2.

20

21

22

23

24

25

26

---

27     [41]  In *Doe v. Unocal Corp.,* the Ninth Circuit held that where the action is not a class action, the
       plaintiff cannot recover damages based on injury to another (2002 WL 31063976 at *16), but as discussed
28     *infra* footnote 7, *en banc* review is now pending in that case so the earlier ruling was withdrawn. 2003 WL
       359787.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1      **1.**    **Color of Law or Authority**

2      Each plaintiff must first establish that governmental actors carried out the alleged torture.  28 U.S.C.

3 § 1350 note § 2.  With regards to the phrase "under actual or apparent authority, or color of law," the

4 House Report provides that "the plaintiff must establish some governmental involvement in the torture to

5 prove a claim."  H.R. Rep No. 102-367(III) *reprinted* in *1992 U.S.C.C.A.N.* at 87.  The TVPA bars suits

6 brought against "purely private groups." *Id.*

7      Both complaints provide that PRC police and security forces conducted the torture.  *Liu* Compl. ¶¶

8 13-24 & *Xia* Compl. ¶¶ 9, 11.  The acts were committed under color of authority.  Furthermore, as

9 discussed under Section VIII on Commander Responsibility, both Defendants Liu and Xia can be held

10 responsible for their subordinates' conduct under both American and international law principles on

11 commander responsibility.  As such, the facts pleaded properly support a finding of governmental

12 involvement in each plaintiff's alleged torture.

13      **2.**    **Acts Rising to the Level of Torture**

14      After establishing the state actor requirement, the plaintiffs must show that they were  subjected to

15 acts rising to the level of torture.  As noted above, the TVPA defines torture as:

16              [A]ny act, directed against an individual in the offender's custody or
              physical pain or suffering . . ., is intentionally
17              inflicted on that individual for such purposes as obtaining . . .
              information or a confession, punishing that individual . . ., intimidating or
18              coercing that individual or a third person, or for . . . discrimination of
              any kind.

19

20 28 U.S.C. § 1350  note § 3(b)(1).

21      Does I and II and Plaintiffs A and C have each offered facts sufficient to support a finding of acts

22 rising to the level of torture.

23      **a.  Subjected to Torture While Under the Actor's Custody or Physical Control**

24      For an act to constitute torture, it must first be conducted while the plaintiff was under "the

25 offender's custody or physical control."  28 U.S.C. § 1350 note § 3(b)(1).  Both complaints herein provide

26 that PRC police and security forces conducted the alleged torture during the plaintiffs' arrests and

27 detentions. *Liu* Compl. ¶¶ 13-25 & *Xia* Compl. ¶¶ 9-11, 25-27.  Therefore, the first element of torture is

28 met.

United States District Court

For the Northern District of California

### b.  Severe Pain or Suffering

In order to constitute "torture" under the TVPA, the alleged acts must inflict "severe" pain or suffering. 28 U.S.C. § 1350, note § 3(b)(1). The TVPA definition borrows extensively from the 1984 United Nations Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *supra* ("CAT"). *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 92 (D.C. Cir. 2002). "The severity requirement is crucial to ensuring that the conduct proscribed by the Convention and the TVPA is sufficiently extreme and outrageous to warrant the universal condemnation that the term 'torture' both connotes and invokes." *Id.* "'[O]nly acts of a certain gravity shall be considered to constitute torture.'" *Id.* (citation omitted). Accordingly, "[n]ot all police brutality, not every instance of excessive force used against prisoners, is torture" under the TVPA. *Id.* at 93 (emphasis in original). Rather the term is "'usually reserved for extreme, deliberate and unusually cruel practices, for example, sustained systematic beating, application of electric currents to sensitive parts of the body, and tying up or hanging in positions that cause extreme pain.'" *Simpson v. Socialist People's Libyan Arab Jamahiriya*, 326 F.3d 230, 234 (D.C. Cir. 2003) (*quoting Price*, 294 F.3d at 92-93). The crucial issues is the degree of pain and suffering the torturer intended to and actually did inflict – "[t]he more intense, lasting, or heinous the agony, the more likely it is to be torture." *Price*, 294 F.3d at 92.

The Ninth Circuit has not yet addressed the contours of the definition of torture under the TVPA. It has, however, in the context of persons seeking relief from deportation, interpreted the "torture" under the Foreign Affairs Reform and Restructuring Act of 1988 ("FARRA") which implements CAT. *See Li v. Ashcroft*, 312 F.3d 1094, 1103 (9th Cir. 2002); *Al-Saher v. INS*, 268 F.3d 1143, 1147 (9th Cir. 2001). *See also Wang v. Ashcroft*, 320 F.3d 130, 133 (2d Cir. 2003). FARRA prohibits deportation or extradition of an individual where there are substantial grounds for believing the individual would be in danger of being subjected to torture. 8 U.S.C. § 1231. Because the TVPA definition of torture borrows extensively from CAT and thus the two statutes may be read *in pari materia*, the courts' interpretation and application of torture under CAT informs the interpretation of torture under the TVPA.[42]

_____

[42]  Justice Department regulations interpreting the Foreign Affairs Reform and Restructuring Act of 1988 defines torture similarly to the TVPA. It requires, *inter alia*, the intentional infliction of "severe pain or suffering, whether physical or mental." 8 C.F.R. § 208.18(a)(1). It is "an extreme form of cruel and inhuman treatment." 8 C.F.R. § 208.18(a)(5).

In *Al-Saher*, the Ninth Circuit found that the petitioner, a native and citizen of Iraq seeking asylum in the United States, had been subject to torture in Iraq where he had been subjected to sustained beatings for a month during his first arrest, during which time he was tied and blindfolded and beaten by attackers' hands, feet and a thick electrical cable. 268 F.3d at 1145, 1147. During a second arrest, he was subjected to severe beatings and burned with cigarettes over an 8 to 10 day period. *Id.* The court concluded "[t]hese actions were specifically intended by officials to inflict severe physical pain on Al-Saher." Id. at 1147.

In contrast, in *Li v. Ashcroft*, the Ninth Circuit held that a petitioner seeking asylum had not established torture when she was forced to endure a pregnancy examination which lasted half an hour at the village birth control department. 312 F.3d at 1103. The court found the examination was not an "extreme form of cruel, inhuman treatment." *Id.*

In *Wang,* the Second Circuit held that the petitioner, who deserted the Chinese military, had not proven a likelihood that he would be subject to torture if returned based on a previous escape attempt in which he was captured, beaten, kicked and punched unconscious. *Wang*, 320 F.3d at 136, 144. Although the decision was based primarily on the lack of systemic evidence suggesting likelihood of torture, the court characterized the beating as "a deviant practice carried out by one rogue military official."

In *Abebe-Jira v. Negewo*, 72 F.3d 844, 845 (11th Cir. 1996), the Eleventh Circuit held that detaining the victim, forcing her to undress, binding her legs and arms, and whipping her on the legs and back with wire and threatening her with death constituted torture.

In order to establish torture, the plaintiff must establish facts and details specific enough to permit the court to assess the severity of the mistreatment. In *Price*, the D.C. Circuit ruled the plaintiff's general allegations that prison guards "kick[ed], club[bed], and beat" the plaintiff was sufficiently detailed to determine whether the severity requirements for torture had been met. *Price*, 214 F.3d at 93. There was no information about the frequency, duration and parts of the body at which the beatings were aimed. *Id.* Nor was there information about weapons used to carry them out. *Id.* The court remanded the case to permit the plaintiff to amend the complaint. *Id.* at 94. *See Beanal v. Freeport-McMoran, Inc.*, 197 F.3d 161, 166 (5th Cir. 1999) (plaintiffs asserting torture claims to provide "adequate factual specificity as to what had happened.").

United States District Court
For the Northern District of California

1    A number of lower court cases have addressed the contours of torture actionable under the TVPA.
2  The district court in *Daliberti v. Republic of Iraq* found that "direct attacks on a person and . . .
3  deprivation of basic human necessities [alleged by the victim] are *more than* enough to meet the definition
4  of 'torture' in the Torture Victims Protection Act." 97 F. Supp. 2d 38, 45 (D.D.C. 2000) (emphasis
5  added). The plaintiff in *Daliberti* alleged that he was confined for up to eleven days without lights,
6  windows, water, a toilet, and a bed. *Id.* On one occasion, prison guards also stripped him naked,
7  blindfolded him, and threatened him with electrocution by placing wires on his testicles. *Id.*

8    Two years later, the same district court found that being "held for fourteen months in cruel, inhuman
9  conditions, denied sufficient food and water, subjected to constant and deliberate demoralization, physically
10  beaten, possibly subjected to gruesome physical torture, and denied essential medical treatment" was
11  torture. *Surette v. Islamic Republic of Iran*, 231 F. Supp. 2d 260, 264 (D. D.C. 2002).

12    In *Mehinovic v. Vuckovic*, the court found that the plaintiff's allegations sufficiently support a
13  finding of physical and mental torture under the TVPA. 198 F. Supp. 2d 1322, 1346 (N.D. Ga. 2002).
14  The plaintiffs in *Mehinovic* alleged that Bosnian Serb police officers subjected them to repeated "kicks and
15  blows to the face, genitals, and other areas" until they almost lose consciousness. *Id.* at 1345. During the
16  course of the physical beating, each plaintiff sustained either broken ribs or broken fingers. *Id.* at 1346.
17  One plaintiff was also forced to play a "game of horse" in which a soldier rode on the plaintiff's back while
18  hitting the plaintiff on the head with a baton. *Id.* Another plaintiff was hung upside until he almost lost
19  consciousness. *Id.*

20    In *Cronin v. Islamic Republic of Iran*, 283 F. Supp. 2d 222 (D.D.C. 2002), the plaintiff was
21  tortured for purposes of FSIA where terrorists inflicted severe pain on plaintiff over a four-day period in
22  order to force him to confess to being an Israeli spy. *Id.* at 233-34 (citing TVPA). Plaintiff, who was
23  already being treated for a painful bowel obstruction when he was kidnapped from a hospital, was gashed
24  in the head by a rifle butt, was repeatedly kicked and punched severely, and was forced to witness others
25  being savagely beaten. *Id.* at 226-28. The beatings compounded his medical condition so that he could
26  not stand, sit or even drink water, causing him to be near death from dehydration. *Id.*

27    In order to establish mental (in contrast to physical) torture, the TVPA requires a showing of
28  "prolonged" mental harm that is caused by the threat that either the victim or another will be imminently

65

United States District Court

For the Northern District of California

1  subjected to death or severe physical pain or suffering.  28 U.S.C. § 1350 note § 3(b)(2).  The TVPA

2  does not define the length of time required for a finding of "prolonged" mental harm.  The *Mehinovic*

3  complaint alleged that the plaintiffs "feared that they would be killed by [the defendant] during the beatings

4  he inflicted or during games of 'Russian roulette'" and that "each plaintiff continues to suffer long-term

5  psychological harm as a result of the ordeals they suffered at the hands of the defendant and others."  198

6  F. Supp. 2d at 1346.

7        While the precise contours of "torture" under the TVPA may be ill-defined, the statutory and

8  regulatory definitions expressed in the TVPA, CAT and FARRA, together with the interpretive case law

9  discussed above, make clear that while a single instance of "garden variety" excessive force may not

10  constitute torture, sustained systematic beatings or use of particularly heinous acts such as electrical shock

11  or other weapons or methods designed to inflict agony does constitute torture.  As the court in *Price* noted,

12  the court must assess the intensity, duration and heinousness of the agony inflicted.  *Price*, 294 F.3d at 93.

13        Applied to the cases at bar, Does I and II and Plaintiffs A and C have all provided specific

14  descriptions of acts that exceed "garden variety" excessive force.  They each have alleged facts showing

15  sustained beatings over a lengthy period.  Some have alleged, in addition, heinous methods of inflicting

16  agony.

17        In particular, both Does I and II specifically allege that severe mental and physical harm resulted

18  from their brutal treatment by Beijing police forces and prison guards.  *Liu* Compl. ¶¶ 13-25.  Doe I

19  sustained at least 20 days of physical beatings during which she was also subjected to "electric shocks

20  through needles placed in her body."  *Id.* ¶¶ 13-15.  Each session lasted at least three hours.  *Id.* ¶¶ 13-15.

21  During one of the brutal sessions, she sustained head injuries so severe that the guards had to drag her out

22  of the interrogation room to her cell.  *Id.* ¶¶ 14.  The severe beating caused her to lose the ability to eat.

23  *Id.* ¶ 15.

24        Beijing security forces subjected Doe II to a similar course of brutality during her 32-day detention.

25  *Liu* Compl. ¶¶ 17-25.  When Doe II was arrested at a peaceful demonstration, "[p]olice officers

26  repeatedly slapped her in the face and on her ears, causing her to temporarily lose her hearing."  *Id.* ¶ 18.

27  They also kicked her with their boots as they transported her to the detention center.  *Id.*  At the detention

28  center, she was physically beaten and kicked in the head and chest until she lost consciousness.  *Id.* ¶ 20.

United States District Court

For the Northern District of California

1   At one point, "four female officers pulled her hair and hit her head against the floor." *Id.* While she was

2   unconscious, she was stripped naked. *Id.* Upon regaining her consciousness, she was subjected to more

3   physical beating. "Several guards took her into another room, tied her down to a bed, and began

4   interrogating her." *Id.* ¶ 21. She further alleges that when she refused to answer, they "pumped liquid" into

5   a tube that was inserted through her nose, causing her "severe pain." *Id.* On one occasion, a guard

6   allowed one of her cellmates to beat her severely in exchange for a reduced sentence. *Id.* ¶ 24. Her

7   injuries from that beating was so severe that the guard had to stop the beating after twenty minutes and even

8   felt "obliged to remove her from the cell." *Id.* ¶ 24. The severe physical beatings left her body marred with

9   "purple and black bruises." *Id.* ¶ 22. In addition to the physical brutality, Beijing prison officials also

10  subjected her to mental torture. She was forced to witness the guards' severe mistreatment of a close

11  friend. *Id.* ¶ 20. Her "friend was sexually assaulted in her friend's vaginal area, causing the friend to

12  hemorrhage" and deprived of medical treatment. *Id.*

13      Like the *Liu* Plaintiffs, *Xia* Plaintiffs A and C have also alleged facts that are legally sufficient to

14  support a finding of severe pain and suffering. In fact, Plaintiffs A and C's ordeal spanned over a longer

15  period of time than the ordeal of Does I and II. Like the plaintiff in *Daliberti*, the *Xia* Plaintiffs sustained

16  direct attacks and were deprived of basic necessities for long periods of time. *Xia* Plaintiff A alleges that

17  she was arrested twice and detained for a total of 104 days following the arrests. Confidential Affidavits of

18  *Xia* Plaintiffs. During her detention, she was handcuffed back-to-back with other prisoners, and physically

19  beaten. On one occasion, she was deprived of food, water, sleep, and the use of toilet facilities for three

20  days and two nights. *Id.* As a result, she was forced to defecate on herself and "endure[d] the filth" on her

21  body. *Id.* She was also placed on a torture device called "Di Lao," which is "a torture device for capital

22  criminals that had not been use[d] since the Cultural Revolution." *Id.* Plaintiff A further states that the

23  "rusted torture instruments" were used to grind the detainees' wrists and ankles until the detainees bled. *Id.*

24  The guards also sealed her mouth with adhesive tape to prevent her from reciting Falun Gong beliefs while

25  she was on the Di Lao. *Id.*

26      Like Plaintiff A, Plaintiff C was also physically beaten by the Liao Ning Province police during two

27  periods of detention totaling 78 days. Confidential Affidavits of *Xia* Plaintiffs. On at least one occasion,

28  prison guards brutally beat him with an electric baton, a leather belt, and iron chains until he bled and until

1 he lost consciousness. Confidential Affidavits of *Xia* Plaintiffs & *Xia* Compl. ¶ 11.  On other occasions, he

2 was "hung from water pipes for three days, handcuffed to other prisoners and not allowed to sleep." *Xia*

3 Compl. ¶ 27.  The beatings left his foot badly mangled. *Id.* ¶ 11.  After his release, Plaintiff C was

4 continuously harassed by local police officers who threatened to send him to a labor camp.  Confidential

5 Affidavits of *Xia* Plaintiffs.  Thus, he was forced to leave his home and go into hiding. *Id.*

6          In sum, all four plaintiffs have sufficiently alleged facts establishing the severe pain or suffering

7 requirement for torture.

8                    **c.   Requisite Intent**

9          The last element that each plaintiff must establish is intent.  28 U.S.C. § 1350  note § 3(b)(1).  The

10 TVPA requires that the offender acted for such purposes as obtaining information, intimidation, punishment

11 or discrimination.  28 U.S.C. § 1350 note § 3(b).  The D.C. Circuit in *Price* explained that the list of

12 purposes was included to illustrate "the common motivations that cause individuals to engage in torture."

13 294 F.3d at 93.  The purpose of the intent requirement is to eliminate claims based on "haphazard" acts.

14 *Id.*

15          In both cases, the arresting officers and prison guards are alleged to have acted, at the very least,

16 for such purposes as obtaining information, intimidation, punishment, or discrimination.   In the *Liu* case,

17 Does I and II were arrested and detained *because* of their support of the Falun Gong practice. *Liu*

18 Compl. ¶¶ 13-25.  In the *Xia* case, Defendant Xia issued directives and orders calling for the targeting,

19 intimidation and punishment of Falun Gong practitioners as "hateful group acting against the best interests of

20 Chinese society." *Xia* Compl. ¶ 23.  According to the complaint, Plaintiff A was arrested, detained, and

21 tortured for "her participation in the Falun Gong spiritual movement, and her belief and practice in Falun

22 Gong related associations, observances and activities." *Id.* ¶ 9.  Plaintiff C was arrested and detained

23 because the Liao Ning Province police suspected that he was a Falun Gong practitioner.  The *Xia*

24 Complaint also alleges that "[p]olice questioned him as to whether he practiced Falun Gong and brutally

25 beat him with an electric baton" when he refused to answer. *Xia* Compl. ¶ 27.  When he refused to

26 denounce the practice of Falun Gong, he was "hung from water pipes for three day, handcuffed to other

27 prisoners and not allowed to sleep." *Id.* ¶ 27.  As such, the facts as plead support a finding that the

28 government officials in both cases acted with the requisite intent to intimidate, punish and discriminate

1  against these individuals as the basis of their practice or support of Falun Gong. At the very least, the

2  allegations establish these were not merely haphazard acts.

3       In sum, the facts offered by Does I and II and Plaintiffs A and C sufficiently support a finding that

4  they have been subjected to acts rising to the level of torture.

5       **3.    Exhaustion of Local Remedies and Statutes of Limitations**

6       In addition to requiring that the alleged acts come within the definition for torture, the TVPA also

7  has two procedural requirements:  (1) exhaustion of local remedies, and (2) commencement of an action

8  within the statute of limitations period. 28 U.S.C. § 1350 note 2(b-c). Regarding exhaustion of remedies,

9  the TVPA provides that the court "shall decline to hear a claim under this section if the claimant has not

10 exhausted adequate and available remedies in the place in which the conduct giving rise to the claim

11 occurred." 28 U.S.C. § 1350 note 2(b). However, this requirement is not jurisdictional. The responding

12 party "has the burden of raising the nonexhaustion of remedies as an affirmative defense and must show that

13 domestic remedies exist that the claimant did not use." *Hilao v. Estate of Marcos ("Hilao III")*, 103

14 F.3d 767, 778, n.5 (9th Cir. 1996) (quoting S. Rep. No. 102-249, at 9-10). By defaulting, neither

15 defendant in the cases at bar has raised the affirmative defense of non-exhaustion. Moreover, even had the

16 defense been properly raised, exhaustion may be excused where the plaintiff demonstrates that the local

17 remedies are "ineffective, . . . inadequate, or obviously futile." *Id.; see Mehinovic v. Vuckovic*, 198 F.

18 Supp. 2d 1322, 1347, n.30 (N.D. Ga. 2002) (accord). As to the second procedural requirement, the

19 TVPA provides: "No action shall be maintained under this section unless it is commenced within 10 years

20 after the cause of action arose." 28 U.S.C. § 1350(c).

21      The facts offered in both complaints are sufficient to establish their compliance with both procedural

22 requirements. First as to exhaustion of local remedies, the *Liu* Plaintiffs allege that "[i]n light of the

23 repressive actions and policies of the People's Republic of China described above, and the control exerted

24 over the Chinese judiciary by its executive authorities, there are no adequate and available remedies for

25 Plaintiffs' claims in the People's Republic of China," and that the government has issued an ordinance

26 prohibiting attorneys from engaging in legal advocacy on behalf of petitioners and that those making

27 allegations against the government could suffer "serious reprisals." *Liu* Compl. ¶ 38. Specifically, Does I

28 and II allege that they were arrested after they tried to appeal to the Beijing Government on behalf of Falun

United States District Court
For the Northern District of California

69

United States District Court

For the Northern District of California

1   Gong practitioners who have been arrested, detained and tortured. *Liu* Compl. ¶¶ 13, 17.  Both of the

2   Does have fled the PRC to escape further persecution. *Liu* Compl. ¶¶ 16, 25.

3          As for the *Xia* Plaintiffs, they allege that they cannot exhaust local remedies because of the risk of

4   further persecution.  Their complaint notes:

5                   [A]lphabetic designations have been used to substitute for the specific
                identities of the individually named plaintiffs in order to protect them and
6                   their families, some of whom remain within the jurisdiction of China,
                from reprisal, as a very real and substantial risk exists that the
7                   Government of China would seek to inflict punishment or coercion on
                the [p]laintiffs and/or their families as a result of their filing this lawsuit
8                   and bringing public exposure and criticism to the government's policies
                and practices regarding the intimidation of Falun Gong practitioners and
9                   the government's efforts to terminate the Falun Gong movement.

10

11  *Xia* Compl. ¶ 8.  Exhaustion of remedies would have been ineffective and futile.

12         Regarding the statue of limitations, both actions are brought well within the statute of limitations

13  period.  The acts of torture alleged by the plaintiffs in both cases first took place in 1999. *Liu* Compl. ¶¶ 9-

14  11 & *Xia* Compl. ¶¶ 13, 14.  As such, the ten-year limitations period does not run until 2009.  Thus, both

    actions are not time-barred.

15
           In sum, the facts offered by Does I and II in the *Liu* action and Plaintiffs A and C in the *Xia* action
16
    sufficiently support their claims of torture under the TVPA. *Xia* Plaintiff B, however, has failed to state a
17
    claim on behalf of both herself and her parent.
18
    **D.     Cruel, Inhuman or Degrading Treatment (ATCA)**
19
           Does I and II and the four non-Chinese *Liu* Plaintiffs contend that their treatment constitutes cruel,
20
    inhuman, or degrading treatment in violation of the ATCA.  Because torture is at the extreme end of the
21
    continuum of conduct which is cruel, inhuman or degrading *(Mehinovic v. Vuckovic*, 198 F. Supp. 2d
22
    1322, 1348 & n.33 (N.D. Ga. 2002), (quoting Restatement § 702, Reporters' Note 5)), this Court's
23
    finding that Does I and II were subject to torture obviates their ATCA claims in this regard.  The Court
24
    therefore addresses the claims of the other four *Liu* Plaintiffs.
25
           The Ninth Circuit has held that to determine whether a tort in violation of the law of nations has
26
    been committed under the ATCA, the court must decide "'[1] whether there is an applicable norm of
27
    international law [proscribing such a tort] . . . recognized by the United States . . . and [2] whether [that
28

1 │ tort] was violated in [this] particular case.'" *Martinez v. City of Los Angeles,* 141 F.3d 1373, 1383 (9th
2 │ Cir. 1998), (quoting *Trajano v. Marcos,* 978 F.2d 493, 502 (9th Cir. 1992)). The applicable norm of
3 │ international law must be "'specific, universal, and obligatory.'" *Id.* at 1383 (quoting *Hilao II,* 25 F.3d at
4 │ 1467). If the alleged conduct violates "well-established, universally recognized norms of international law"
5 │ a claim may be stated under the ATCA. *Filartiga,* 630 F.2d at 888. In determining norms of international
6 │ law, the court may look to court decisions, the work of jurists and the usage of nations. *Martinez,* 141
7 │ F.3d at 1383-84.[43]

8 │   "Cruel, inhuman, or degrading treatment" has been condemned by numerous sources of
9 │ international law. *See* Restatement § 702(d). *See also* Universal Declaration of Human Rights, Dec. 10,
10 │ 1948, art. 5, G.A. Res. 217A(III), 3 U.N. GAOR Supp. No. 16, U.N. Doc. A/810 (1948); United
11 │ Nations Convention Against Torture, etc., art. 16, S. Treaty Doc. No. 100-20, 23 I.L.M. 1027 (1984);
12 │ International Covenant on Civil and Political Rights, March 23, 1976, art. 7, 999 U.N.T.S. 171 [hereinafter
13 │ "ICCPR"]; *Forti v. Suarez-Mason,* 694 F. Supp. 707, 712 (N.D. Cal. 1988); *Xuncax v. Gramajo,* 886
14 │ F. Supp. 162, 187 (D. Mass. 1995); *Wiwa v. Royal Dutch Petroleum Co.,* 2002 WL 319887, at *8
15 │ (S.D.N.Y. 2002); *Mehinovic v. Vuckovic,* 198 F. Supp. 2d 1322, 1348 (N.D. Ga. 2002). The courts
16 │ have thus held there is a clear international prohibition against cruel, inhuman or degrading treatment. *See*
17 │ *Tachiaona v. Mugabe,* 216 F. Supp. 2d 262, 281 (S.D.N.Y. 2002); *Mehinovic,* 198 F. Supp. 2d at
18 │ 1348; *Estate of Cabello,* 157 F. Supp. at 1360-61; *Jama v. I.N.S.,* 22 F. Supp. 2d 353, 363 (D.N.J.
19 │ 1998); *Xuncax v. Gramajo* 886 F. Supp. 162, 187 (D.Mass. 1995); *Forti,* 694 F. Supp. at 711.

20 │   The question is whether the prohibition on cruel, inhuman and degrading treatment "possesses the
21 │ requisite elements of universality and specificity to constitute a recognized proscription under the customary
22 │ law of nations." *Tachiona v. Mugabe,* 234 F. Supp. 2d 401, 435 (S.D.N.Y. 2002). There does not
23 │ appear to be a specific standard for determining what constitutes such treatment. International law merely
24 │ provides that "cruel, inhumane, or degrading treatment" encompasses acts falling short of torture. *See*
25 │ *Mehinovic,* 198 F. Supp.2d at 1348 (cruel, inhuman or degrading treatment defined as including "acts
26 │
27 │
28 │

*Left margin (vertical):* **United States District Court** For the Northern District of California

---

[43] Within the Ninth Circuit TVPA and ATCA have the same ten-year statute of limitations. *Deutsch v. Turner Corp.,* 324 F.3d 692, 717 (9th Cir. 2003); *Papa,* 281 F.3d at 1013. Plaintiffs' claims are well within the statute of limitations since none of the alleged wrongdoing occurred prior to 1999.

1  which inflict mental or physical suffering, anguish, humiliation, fear and debasement, which do not rise to the

2  level of 'torture' or do not have the same purposes as 'torture.'"), *see also* Restatement § 702, Reporters'

3  Note 5. In fact, the authorities provided by the Plaintiffs in their supplemental briefs merely illustrate the

4  array of acts that courts around the world have found to be cruel, inhuman or degrading. *See* Aff. of

5  International Law Scholars on the Status of Torture, Cruel, Inhuman or Degrading Treatment, Crimes

6  Against Humanity, and Arbitrary Detention under International Law ["IL Aff."], ¶¶ 18-29. None of the

7  international decisions cited by the Plaintiffs provides a specific standard for parsing out acts that are cruel,

8  inhuman or degrading from acts that are not.

9       The courts have diverged in their approach to the question as to whether the prohibition on cruel,

10  inhuman, or degrading treatment is sufficiently specific to be actionable under the ATCA. In *Forti*, the

11  court held that there was no clear universally accepted guidance as to what constitutes such treatment. 694

12  F. Supp. at 712. The *Forti* court explained, "Absent some definition of what constitutes 'cruel, inhuman or

13  degrading treatment' this Court has no way of determining what alleged treatment is actionable, and what is

14  not." *Id*. at 712.

15       In contrast, the court in *Xuncax*, while acknowledging the complex definitional problem of this tort,

16  reasoned that "[i]t is not necessary for every aspect of what might comprise a standard . . . be fully defined

17  and universally agreed before a given action meriting the label is clearly proscribed under international law .

18  . ." 886 F. Supp. at 187. The focus, under *Xuncax*, is on the specific conduct at issue, and the question

19  under the ATCA is whether that conduct is universally condemned as cruel, inhuman, or degrading. *See*

20  *Eastman Kodak Co. v. Kavlin*, 978 F. Supp. 1078, 1093 (S.D. Fla. 1997) (issue is whether "the

21  international community would . . . agree that *that specific conduct* amounted to" a violation of customary

22  international law) (emphasis in original).

23       This Court is persuaded that the *Xuncax* approach is correct. As the authorities cited above

24  demonstrate, nearly every case addressing the question subsequent to *Forti* has held that conduct

25  sufficiently egregious may be found to constitute cruel, inhuman or degrading treatment under the ATCA.

26  Moreover, subsequent to *Forti*, the United States ratified the International Covenant of Civil and Political

27  Rights which prohibits, *inter alia*, "cruel, inhuman or degrading treatment or punishment." *Estate of*

28

United States District Court

For the Northern District of California

1  *Cabello,* 157 F. Supp. at 1361. The fact that there may be doubt at the margins – a fact that inheres in any

2  definition – does not negate the essence and application of that definition in clear cases.

3  The Court therefore examines the allegations of each of the four non-Chinese plaintiffs in *Liu* to

4  determine whether their alleged treatment is sufficiently severe so as to violate universally accepted norms

5  prohibiting cruel, inhuman or degrading treatment. As previously noted, Plaintiffs Larsson, Lemish, and

6  Odar allege that they were subjected to one day of incarceration and interrogation during which they were

7  pushed, shoved, hit, and placed in a chokehold. *Liu* Compl., ¶¶ 26-29. Plaintiff Petit alleges that a police

8  office attempted to force his hand into her vagina while several other officers pinned her down. *Id.* ¶ 26.

9  The allegations of specific conduct must be compared with existing authorities on international law

10  to determine whether the specific conduct alleged violated universally established norms. Plaintiffs submit

11  an affidavit of international scholars to establish such norms were violated here. However, none of the

12  international decisions referenced in the Plaintiffs' affidavit supports a finding of cruel, inhuman or degrading

13  treatment here. Affidavit of Int'l Scholars No. 1. The international cases before the United Nations Human

14  Rights Commission, the Inter-American Commission on Human Rights, the European Court of Human

15  Rights, and the African Commission on Human and Peoples' Rights cited therein described detention

16  conditions and abuses far more severe than those alleged here.

17  For example, the United Nations Human Rights Committee has deemed the following conditions

18  cruel, inhuman or degrading treatment: (1) an ex-convict abducted after serving his two-year prison term

19  and his whereabouts cannot be ascertained, *see e.g. Tshishimbi v. Zaire*, Communication No. 542/1993,

20  U.N. Doc. CCPR/C/53/D/542/1993 ¶¶ 1-2.1 (1996); (2) a pre-trial detainee developed bronchitis after

21  being confined for at least six days in a 25 square meter cell with up to 30 other detainees, deprived of food

22  and sanitary facilities, and forced to sleep on the concrete floor without any covering or clothing, *Mukong*

23  *v. Cameroon*, Communication No. 458/1991, U.N. Doc. CCPR/C/51/D/458/1991 ¶¶ 2.2-2.3 (1994);

24  (3) a death row inmate confined in a cell that was filthy and infested with roaches, flies, and rats, and often,

25  he was confined without natural lighting and ventilation for up to 24 hours at a time, deprived of necessary

26  medical treatment, forced to sleep on the concrete floor, and physically beaten to the point that he required

27  stitches, *Henry v. Trinidad and Tobago*, Communication No. 752/1997, U.N. Doc.

28  CCPR/C/64/D/752/1997, ¶¶ 1.1-2.4 (1999); (4) a death row inmate subjected to at least two weeks of

confinement with only one or two meals a day and sometimes without water, as well as beatings that

resulted in serious physical injuries, such as fractured bones, *Hylton v. Jamaica*, Communication No.

407/1990, U.N. Doc. CCPR/C/51/D/407/1990, ¶¶ 2.6-2.7 (1994); and (5) a death row inmate subjected

to regular physical beatings with clubs, batons, and electric wires that resulted in serious injuries and loss of

consciousness, *Linton v. Jamaica*, Communication No. 255/1987, U.N. Doc. CCPR/C/46/D/255/1987,

¶¶ 2.1, 2.4 (1992).

The Inter-American Commission on Human Rights has deemed the following to constitute cruel,

inhuman or degrading treatment: (1) a pre-trial detainee confined for 23 hours in a cell infested with flies

and maggots that was pervaded by foul odor, and who was deprived of food, lighting, and ventilation and

was left to bleed from serious injuries that resulted from being beaten with batons, *McKenzie v. Jamaica*,

Case No. 12.023, ¶¶ 85-90 (2000), 1999 IACHR 918; and (2) a mentally ill prisoner subjected to regular

physical beatings that on one occasion result in a visible head wound, *Congo v. Ecuador*, Case No.

11.427, ¶ 9 (1998), 1998 IACHR 475.

Cases before the European Court of Human Rights and Fundamental Freedoms involved similarly

severe conditions: (1) a pre-trial detainee confined for approximately four days in sub-zero temperatures

without bed or blankets and who was fed only bread and water and subjected to electric shocks and

physical beatings, *Tekin v.Turkey*, 31 E.H.R.R. 95, ¶ 9 (2001); (2) a pre-trial detainee confined for up to

two days and subjected to punches and kicks on the head, to the kidneys, right arm and upper leg, *Ribitsch*

*v. Austria*, 21 E.H.R.R. 573, 575, ¶ 12 (1996); and (3) a pre-trial detainee subjected to beatings with

batons and abuses that resulted in bruises all over his body that are up to 5 cm in diameter, *Assenov v.*

*Bulgaria*, 28 E.H.R.R. 652, 663, ¶¶ 10-11 (1998).

Cases examined by the African Commission on Human and Peoples' Rights also involved such

conditions as: (1) a pre-trial detainee confined for 147 days during which he was chained to the floor, not

allowed to bathe, and fed only twice a day, *Media Rights Agenda v. Nigeria*, Comm. No. 224/98, ¶ 40

(2000); and (2) a pre-trial detainee confined for approximately two weeks during which he was subjected

to unsanitary conditions, denied necessary medical attention, and physically beaten, *Huri-Laws v. Nigeria*,

Comm. No. 225/98, ¶¶ 5-9 (2000).

74

United States District Court
For the Northern District of California

1   United States courts have likewise found cruel, inhuman, or degrading treatment where severe

2   mistreatment has been involved.  *See Xuncax*, 886 F. Supp. at 187 (victims forced to witness the torture or

3   severe mistreatment of an immediate relative, watch soldiers ransack one's home and threatening one's

4   family, be subjected to bombings and grenade attacks); *Jama*, 22 F. Supp. at 358 (detainees not permitted

5   to sleep under brights lights 24 hours a day, lived in filth and constant smell of human waste, being packed

6   in rooms with twenty to forty detainees, beaten, deprived of privacy, subjected to degrading comments

7   from guards and sexual abuse); *Mugabe*, 216 F. Supp. 2d at 281-82 (victims subjected to being

8   repeatedly hit on the head with the butt of a gun, set on fire, being repeatedly attacked and threatened with

9   death); *Mehinovic*, 198 F. Supp. 2d at 1348-49 (victims beaten and humiliated in front of others by *e.g.*

10  having a crescent carved into the forehead, forced to lick own blood off police station walls); *Wiwa v.*

11  *Royal Dutch Petroleum Co.*, 2002 WL 319887, at *8 (S.D.N.Y. 2002) (victims were forced into exile

12  due to credible threat of physical harm, had to bribe defendant to gain a relative's freedom, were beaten,

13  and had property destroyed in the course of a village ransacking).

14      Without diminishing the mistreatment allegedly suffered by Plaintiffs Larsson, Lemish, and Odar,

15  their treatment pales in comparison to the acts which have been found by various courts and international

16  authorities to constituted cruel, inhuman or degrading treatment.[44]  Simply put, a review of the authorities

17

18      [44] The Plaintiffs urge that finding cruel, inhuman or degrading treatment could be consistent with the
19  Senate's ratifications of both the CAT and the ICCPR which reflects its intent to incorporate the constitutional
    test for cruel and unusual treatment or punishment prohibited by the Firth, Eighth, or Fourteenth Amendment.
    *See Cabello*, 157 F. Supp. 2d at 1361. *See* CAT, 136 Cong. Rec. S10091, S10093 (July 19, 1990) (Text
20  of Resolution Ratification); *see also* 138 Cong. Rec. S4781, S4783 (identical reservation amended to the
    ICCPR).  As such, the Plaintiffs assert that the actions of the PRC security forces should be evaluated
21  according to Constitutional standards for cruel and unusual punishment. Supp. MPA in Support of Motion for
    Default Judgment, at 29 (September 4, 2002). The conduct alleged by Plaintiffs Larsson, Lemish, and Odar,
22  would appear to establish a *prima facie* due process violation applicable to pretrial detainees. *See Hudson*
    *v. McMillian*, 503 U.S. 1, 5 (1992) (whether force applied to detainee is unconstitutional turns on "'whether
23  the measure taken inflicted unnecessary and wanton pain and suffering" and whether "force was applied in a
    good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing
24  harm'") (quoting *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986)); *LaMaire v. Maass*, 12 F.3d 1444, 1454
    (9th Cir. 1993) (court must examine need for application of force, relationship between need and amount of
25  force used, threat to officials, efforts to temper severity of force, and extent of injuries to detainee).

26      However, in ratifying the ICCPR, the Senate's expressed reservation states that "Art. 7 [prohibiting
    cruel, inhuman, or degrading treatment] shall not extend beyond protections of the 5th, 8th and 14th
27  Amendments of the U.S. Constitution." *Mugabe*, 234 F. Supp. 2d at 439 n. 151. Thus, it would appear that
    the Senate intended that U.S. constitutional standards set the outermost limit to the interpretation of the ICCRP
28  and not necessarily state its equivalent.

75

United States District Court

For the Northern District of California

1  discussed above does not establish that the specific conduct alleged by these plaintiffs is universally

2  prohibited by the international community as a whole.

3       On the other hand, the sexual abuse suffered by Plaintiff Petit is different.  The United Nations

4  Committee Against Torture's Initial Report specifically lists sexual abuse as a cruel act.  *See* IL Aff. #1,

5  Para. 29.  *See Jama*, 22 F. Supp. 2d at 358-59 (sexual favors sought of female plaintiffs, including some

6  being forced to submit to sexual assault as a precondition for contacting their lawyers by telephone, and

7  male and female detainees subject to inappropriate touching).

8       Accordingly, Plaintiff Petit has stated a claim for cruel, inhuman or degrading treatment in violation

9  of the ATCA.  Plaintiffs Larsson, Lemish, and Odar have not.

10  **E.**    **Arbitrary Detention (ATCA)**

11       Each of the Plaintiffs in the *Liu* and *Xia* cases assert claims that they were subject to arbitrary

12  arrests and detention in violation of the ATCA.  The Ninth Circuit has held as a general proposition that the

13  required norm of international law applicable under the ATCA be "specific, universal, and obligatory"

14  (*Hilao II*, 25 F.3d at 1475) is satisfied with respect to the right to be free of arbitrary arrest and detention.

15  In *Alvarez-Machain*, 2003 WL 21264256 at *12, the Ninth Circuit held "there exists a clear and

16  universally reorganized norm prohibiting arbitrary arrest and detention."  *See Martinez v. City of Los*

17  *Angeles*, 141 F.3d 1373, 1384 (9th Cir. 1998) ("there is a clear international prohibition against arbitrary

18  arrest and detention.") (citing the Universal Declaration of Human Rights ("Universal Declaration"), art. 9,

19  the International Covenant on Civil and Political Rights ("ICCPR"), art. 9, and the fact that at least 119

20  national constitutions recognize the right to be free from arbitrary detention) (other citations omitted).

21

22  _____

23       In any event, irrespective of the Senate's interpretation, the constitutional standards of one nation is not

24  necessarily determinative of standards to be followed by the international community as a whole.  *See Cohen v. Hartman*, 634 F.2d 318, 319 (5th Cir. 1981); *see also United States v. Smith*, 18 U.S. (5 Wheat) 153,

25  160-61 (1820); *Carmichael v. United Techs. Corp.*, 835 F.2d 109, 113 (5th Cir. 1988); *Beanal*, 197 F.3d at 165.  While one nation's practices may inform the question as to the existence of an internationally accepted

26  standard, only those domestic standards rising to the level of customary usage and practice of the international community can constitute "the law of nations" under the ATCA.  *Beanal*, 197 F.3d at 165.  The instant case

27  represents the converse of the dissents' position in *Alvarez-Machain* that the challenged conduct, transborder kidnapping of a Mexican national at the behest of the DEA, was authorized by the United States and thus could

28  not violate the ATCA irrespective of international legal norms.  2003 WL 21264256 at *39 (O'Scannlain dissenting).

United States District Court

For the Northern District of California

1    The Ninth Circuit has endorsed the definition of arbitrary detention contained in the Restatement §

2 702 cmt. h.  The Restatement provides detention is arbitrary "if it is not pursuant to law; it may be arbitrary

3 also if it is incompatible with the principles of justice or with the dignity of the human person." *Alvarez-*

4 *Machain*, 2003 WL 21264256 at *14, quoting *Martinez*, 141 F.3d at 1384 (quoting the Restatement §

5 702 cmt. h).  The Restatement further provides that detention is arbitrary if "it is not accompanied by notice

6 of charges; if the person detained is not given early opportunity to communicate with family or to consult

7 counsel; or is not brought to trial within a reasonable time."  Restatement at § 702 cmt. h.  *See also*

8 *Mehinovic*, 198 F. Supp. 2d at 1349 (plaintiffs were detained without ever being advised of any charges,

9 were not brought before any court or tried for any offense, and detentions were not made pursuant to any

10 law); *WIWA v. Royal Dutch Petroleum Co.*, 2002 WL 319887 at *7 (detention is arbitrary when person

11 is detained without warrant or articulable suspicion, is not apprised of charges, and is not brought to trial).

12    While the Ninth Circuit has held that a detention need not be "prolonged" in order to be arbitrary,

13 *Alvarez-Machain*, 2003 WL 21264256 at *13, a number of courts have given substantial weight to the

14 length of the detention in assessing its arbitrariness.  As Judge Jensen noted in *Forti v. Suarez-Mason*

15 ("*Forti I*"), the international consensus is especially clear on the illegality of "prolonged" arbitrary

16 detentions, noting that the Restatement makes express reference to "prolonged arbitrary detention."  672 F.

17 Supp. 1531, 1541 (N.D. Cal. 1987), *see also Mehinovic v. Vockovic*, 198 F. Supp. 2d 1322 1349

18 (N.D. Ga. 2002 and cases cited in *Eastman Kodak Co. v. Kavlin*, 978 F. Supp. 1078, 1094 (S.D. Fla.

19 1997).  Logically, the fact that a detention is prolonged may determine whether the detention is

20 "incompatible with the principles of justice or with the dignity of the human person" or whether the detainee

21 was given a sufficiently "early opportunity to communicate with family or to consult counsel."  Restatement

22 § 702 cmt.h.

23    Under the Restatement as interpreted by *Alvarez-Machain* and *Martinez*, the first step in the

24 analysis is to determine whether the detention was pursuant to law.  In *Martinez*, for instance, the plaintiff

25 was arrested in Mexico at the behest of the Los Angeles Police Department pursuant to "an apparently

26 valid Mexican arrest warrant."  141 F.3d at 1384.  In *Alvarez-Machain*, the plaintiff was abducted from

27 Mexico and brought into the United States without legal authority under Mexican law.  2003 WL

28

77

United States District Court
For the Northern District of California

1    21264256 at *1.  *Cf. Eastman Kodak Co.*, 978 F. Supp. at 1080-81 (individual imprisoned as a result of

2    corruption and conspiracy to commit extortion).

3         Even if the arrest is made pursuant to law, it may be arbitrary if "incompatible with the principles of

4    justice or with the dignity of the human person." *Martinez*, 141 F.3d at 1384 (*quoting* the Restatement §

5    702 cmt. h).  In this regard, along with the factors referred to in the Restatement § 702 cmt. h (*e.g.* failure

6    to notify detainee of charges, permit an early opportunity to communicate with family or consult with

7    counsel), the conditions of confinement may be a factor.  Where the detainee is subject to torture, courts

8    have found the detention arbitrary.  *See. e.g. Xuncax*, 886 F. Supp. at 169-70; *Paul v. Avril*, 901 F.

9    Supp. 330, 335 (S.D. Fla. 1994).  Even if the conduct is short of torture, at least one court has found that

10   inhuman conditions beyond the "run-of-the-mill due process violations," such as when the conditions of

11   confinement are "horrendous by any contemporary standard of human decency," support a finding of

12   arbitrary detention.  *Eastman Kodak Co.*, 978 F. Supp. at 1094 (detainee forced to share filthy cell with

13   murderers, drug dealers and AIDS patients, and left without food, blanket or protection from inmates

14   committing murder in his presence).

15        Applying these standards to the cases at bar, the Court finds that the majority of the individual

16   Plaintiffs have stated claims for arbitrary detention even if it is assumed *arguendo* that there was a legal

17   basis for their arrest.  Many suffered prolonged detention without being charged  and without an

18   opportunity to see family or obtain counsel.  They were also detained under cruel or tortuous conditions.

19        **1.    Doe v. Liu**

20        In the *Liu* case, Doe I was held to twenty days without being charged or being given an opportunity

21   to see a family member or lawyer.  *Liu* Compl., ¶ 13.  *Cf. County of Riverside v. McLaughlin*, 500 U.S.

22   44, 56-58 (1991) (under U.S. law, persons arrested without a warrant must be brought before a judicial

23   officer for a probable cause hearing within 48 hours).  As previously noted, she was subject to torture.  Her

24   confinement was prolonged under these circumstances.  *Cf. Eastman Kodak Co.*, 978 F. Supp. at 1094

25   (detention of eight or ten days can be sufficiently "substantial" so as to be constitute prolonged detention

26   under adverse conditions of detention); *Mehinovic, supra,* 198 F. Supp. 2d at 1349 (detention of plaintiff

27   for one month during which he was subject to repeated beatings constituted arbitrary detention).  Doe I's

28   detention was arbitrary.

United States District Court

For the Northern District of California

1    Doe II was detained in 1999 for three days without being advised of any charges and was refused

2 any opportunity to contact family or legal counsel. *Liu* Compl. ¶ 17.  In 2000, she was detained in Beijing

3 for eleven days without charge or being tried for any offense. *Id.* ¶¶ 18-23.  Her request to see any

4 attorney was refused (and she was taunted for making the request) (*Id.* ¶ 23) and, as noted above, was

5 subjected to torture as well as made to witness the beatings and sexual assault of others. *Id.* ¶ 20.  She

6 was then returned to her home town where she was detained for another fifteen day period. *Id.* ¶ 24.  Her

7 confinement of nearly a month without charge or opportunity to see an attorney and under condition of

8 torture was prolonged.  Her detention was arbitrary.

9    Plaintiff Petit was detained for approximately 24 hours. *Liu* Compl. ¶ 26.  She was not advised of

10 any charges, nor was she permitted to contact her embassy or consult with legal counsel. *Id.*  As noted

11 above, she was made to suffer cruel, inhuman and degrading treatment during the confinement. *Id.*  While

12 the conditions of confinement were degrading and exceeded the bounds of decency, Plaintiffs have

13 presented no authorities which establish and that absent proof that the detention was not pursuant to law, a

14 detention of 24 hours can constitute an arbitrary detention.  As noted above, even under United States

15 constitutional law, such a period of detention is not necessarily unlawful. *County of Riverside, supra.*

16 Plaintiffs have not established a universal norm rendering her detention arbitrary.

17    Plaintiff Larsson was held for a day without being informed of charges or being permitted access to

18 legal counsel or to contact his Embassy.  He was struck and pushed several times but did not suffer any

19 serious injury. *Liu* Compl. ¶ 27.  His detention was not prolonged because as noted above, there does not

20 appear to be a universal norm requiring the bringing charges within 24 hours or mandating that not being

21 able to consult with counsel within 24 hours constitutes deprivation of "an early opportunity" to consult with

22 counsel. *Cf. Martinez*, 141 F.3d at 1384 (fact that plaintiff was brought before a judge within 72 hours

23 militating against finding of arbitrary detention).  Nor was Plaintiff Larsson subject to inhuman conditions

24 that exceed the "run-of-the-mill due process violations," (*Eastman Kodak Co.*, 978 F. Supp. at 1094)

25 sufficient to render his confinement violative of a universally accepted norm of international law.  He has not

26 established an arbitrary detention in violation of the ATCA.

27

28

79

United States District Court

For the Northern District of California

1      Plaintiffs Lemish and Odar were detained for similar periods of time and under similar conditions as

2 that suffered by Plaintiff Larsson. *Liu* Compl. ¶¶ 28-29. They therefore also fail to establish a claim under

3 the ATCA of arbitrary detention.[45]

4     **2.**     **Plaintiff A v. Xia**

5      Plaintiff A was detained in 1999 for 49 days. She was charged with "disrupting social order." *Liu*

6 Compl. ¶ 33. As discussed above, she was subject to torture and inhuman treatment during her detention.

7 In 2000, she was detained for an additional 55 days and charged of being "suspected of converting back

8 the converted Falun Gong practitioners." Confidential Affidavit. It appears she was never brought to trial.

9 Although her arrest was arguably pursuant to color of law, her detentions were prolonged and at least the

10 first was under inhuman conditions inconsistent with human dignity. She was therefore subjected to

11 arbitrary detention.

12      Plaintiff C was arrested in 1999 and detained for 13 days during which he was subject to torture

13 including being subjected to an electric baton, leather belt and iron chains. Confidential Affidavit. In 2000,

14 he was detained for more than fifteen days and again was tortured by being beaten with an electric baton,

15 forced to hang by handcuffs from a water pipe for three days, and deprived of sleep. It does not appear

16 that he was ever brought to trial. The length and tortuous conditions of confinement establish he was

17 subjected to arbitrary detention.

18

19

20

21

22

23

24

25

26

27

28

---

[45] Unlike *Alvarez-Machain*, the Complaint in *Liu* does not establish that the arrests (as opposed to the detention and conditions thereof) of Larsson, Lemish and Odar were without authority under Chinese law.

3.    **Conclusion**

Doe I and Doe II in the *Liu* case and Plaintiff A and Plaintiff C in the *Xia* case have established

claims for arbitrary detention under the ATCA. The other individual plaintiffs have not.[46]

### VIII.    COMMANDER RESPONSIBILITY

The Plaintiffs in both the *Liu* and *Xia* cases do not contend that the Defendants in each case – the

then Mayor of Beijing and the Deputy Provincial Governor of Liao Ning Province – directly engaged in the

alleged conduct. Instead, both sets of Plaintiffs allege that the Defendants were legally responsible for the

actions taken by security forces under their control.

The *Liu* Plaintiffs allege that Beijing police and other security forces under Defendant Liu's

management, command, and supervisory authority engaged in widespread detention and torture of Falun

Gong practitioners. *Liu* Compl. ¶¶ 32-34. The Plaintiffs allege that Defendant Liu as Mayor "planned,

instigated, ordered, authorized, or incited police and other security forces to commit the abuses suffered by

Plaintiffs, and had command or superior responsibility over, controlled, or aided and abetted such forces in

their commission of such abuses." *Id.* ¶ 37. The *Liu* Complaint alleges that: (1) the city of Beijing has

been a focal point of the repression and persecution of Falun Gong practitioners since 1999; (2) the police

and other security forces have repeatedly detained and tortured practitioners participating in assemblies and

demonstrations; and (3) such abuses have been widely reported. *Id.* ¶ 32. Importantly, the *Liu* Complaint

alleges that "Defendant Liu knew or reasonably should have known that Beijing police and other security

---

[46]  The *Xia* Plaintiffs have also failed to establish two other claims: (1) that Defendant Xia violated their right to life, as defined by Article 6 of the ICCPR; and (2) that Defendant Xia violated their protected rights under customary international law of human rights. First, the plaintiffs lack standing to assert a right to life claim. Claims of deprivation of the right to life are predicated on actions resulting in the taking of human life. General Comment 14 under Article 6 of the ICCPR. The plaintiffs initially asserted this claim as part of a class action on behalf of over 100 Falun Gong practitioners who have alleged died from torture. *See Xia* Compl. ¶ 32. However, the class was never certified. Because all of the individual plaintiffs are still living, they have no cause of action for deprivation of the right to life. Second, the plaintiffs allege that in addition to having causes of action under the ATCA for violations of treaty-based law of nations on torture, genocide, arbitrary detention, religious persecution, and deprivation of the right to life, they also have causes of action under customary international law of human rights for the same atrocities. *See Xia* Compl. ¶ 35. The plaintiffs, however, provide no additional authorities to support their customary international law claims independent of the argument that the allegations violate the law of nations under the ATCA. As such, the claims are redundant with the more specific ATCA claims.

81

United States District Court
For the Northern District of California

1  forces were engaged in a pattern or practice of severe human rights abuses against Falun Gong

2  practitioners." *Id.* ¶ 33.

3      In *Xia*, Plaintiffs allege that Defendant Xia, as Deputy Mayor, Deputy Mayor of General Affairs

4  and Member of the City Council of Da Lain City, exercised general supervisory authority over the

5  operation of the law enforcement and correctional systems and the carrying out of the government's policy

6  of repression of Falun Gong practitioners. *Xia* Compl. ¶ 15. Plaintiffs also allege that as Deputy Provincial

7  Governor of Liao Ning Province, where there has been widespread crack down upon the Falun Gong,

8  Defendant Xia played a "key part of the general governance body made up of the highest level officials"

9  that exercises supervision and authority over law enforcement and prison management. *Id.* ¶ 17. The *Xia*

10 Complaint alleges that the Liao Ning Province: (1) is known to be one of the most repressive and abusive

11 jurisdictions in China as regards to its arrest and treatment of Falun Gong practitioners; (2) has one of the

12 highest death tolls of Falun Gong detainees (27 since July 20, 1999); (3) and is the site of the most

13 notorious prison labor camps in the country used to incarcerate and torture Falun Gong practitioners – 470

14 practitioners were alleged to have been detained in June of 2000. *Id.* ¶ 20. According to the *Xia*

15 Complaint, Defendant Xia actively participated in the general governing councils of Da Lian City and Liao

16 Ning Province which actively carried out the policy of repression. *Id.* ¶ 23. Plaintiff's injuries are alleged to

17 have been the direct result of the actions of the Defendant and those with whom he acted in concert. *Id.* ¶

18 28. Although the *Xia* Complaint alludes to Defendant Xia's acting in concert with and conspiring with

19 others, the only operative facts alleged pertain to his role in the governance of subordinates who conducted

20 the claimed abuses. In this regard, the Complaint against Defendant Xia differs from that against Defendant

21 Liu in that Liu is alleged to have acted essentially as a chief or sole commander of the subordinate forces

22 and Xia is alleged to have acted only as part of a governing council or group under which subordinates

23 carried out repressive policies.

24     Thus, the gist of the assertion of Defendants' liability in both cases is their exercise of superior or

25 command authority over police and security forces who carried out the alleged abuses. The Ninth Circuit,

26 in *Hilao III*, addressed similar claims against President Marcos, and held:

27          The principle of command responsibility that holds a superior
            responsible for the actions of subordinates appears to be well accepted
28          in U.S. and international law in connection with acts committed in

82

wartime, as the Supreme Court's opinion in *In re Yamashita*, 327 U.S. 1, 14-16 (1946), indicates . . .

103 F.3d at 777. In *In re Yamashita*, the Court held that the military governor of the Philippines and commander of the Japanese forces had an affirmative duty to take such measures within his power to protect prisoners of war and the civilian population. 327 U.S. at 14-16. In *Hilao III*, the Ninth Circuit cited the Protocol to the Geneva Conventions of August 12, 1949 (hereinafter referred to as the "Geneva Convention Protocol") and the Statute of the International Tribunal for the Prosecution of Persons Responsible for Serious Violations of International Humanitarian Law Committed in the Territory of the Former Yugoslavia (hereinafter referred to as the "Former Yugoslavia Statute") as additional evidence of international law principles.   In Article 86(2), the Geneva Convention Protocol states that "the fact that a breach of the Conventions or of this Protocol was committed by a subordinate does not absolve his superiors from penal [or] disciplinary responsibility . . . if they knew, or had information which should have enabled them to conclude in the circumstances at the time, that he was committing or was going to commit such a breach, and if they did not take all feasible measures within their power to prevent or repress the breach." *Hilao III*, 103 F.3d at 777 (citing the Geneva Convention Protocol, 16 I.L.M. 1391, 1429 (1977)).  The Ninth Circuit cited the Former Yugoslavia Statute as stating that the fact that a human rights violation was committed "by a subordinate does not relieve . . . [the] superior of criminal responsibility if he knew or had reason to know that the subordinate was about to commit such acts or had done so and the superior failed to take the necessary and reasonable measures to prevent such acts or to punish the perpetrators thereof." *Hilao III*, 103 F.3d at 777 (citing the Former Yugoslavia Statute, art. 7(3), 32 I.L.M. 1159, 1192-94 (1993)).  The Ninth Circuit also cited with approval *Paul v. Avril*, which held the former military ruler of Haiti responsible for arbitrary detention and torture committed by those "acting under his instructions, authority, and control and acting within the scope of authority granted by him." 901 F. Supp. 330, 335 (S.D. Fla. 1994).[47]

---

[47]  The evolution of the doctrine of command responsibility as an international principle after WWI is described in detail by the International Court in *Prosecutor v. Delalic*, No. IT-96-21-T, 1998 WL 2013972, ¶¶ 333-43 (U.N. I.C.T. (Yug.)), *available at* http://www.un.org/icty/celebici/trialc2ljudgement/cel-tj981116e.pdf.

United States District Court
For the Northern District of California

1    Similarly, in a suit against the Director of the Salvadoran National Guard and El Salvador's Minister

2    of Defense brought by survivors of churchwomen tortured and murdered by the Salvador National

3    Guardsmen, the Eleventh Circuit endorsed the command responsibility doctrine. *Ford v. Garcia*, 289

4    F.3d 1283, 1288-89 (11th Cir. 2002). The court held that the essential elements of such responsibility are:

5    "(1) the existence of a superior-subordinate relationship between the commander and the perpetrator of the

6    crime; (2) that the commander knew or should have known, owing to the circumstances at the time, that his

7    subordinates had committed, were committing, or planned to commit acts violative of the law of war; and

8    (3) that the commander failed to prevent the commission of the crimes, or failed to punish the subordinates

9    after the commission of the crimes." 289 F.3d at 1288. *See also* Statute of the International Tribunal for

10   Rwanda, U.N. SCOR, 49th Sess., art. 6(3), U.N. Doc. S/Res/955 (1994) (superior criminally responsible

11   "if he or she knew or had reason to know that the subordinate was about to commit such acts or had done

12   so and the superior failed to take the necessary and reasonable measures to prevent such acts or to punish

13   the perpetrators thereof.").

14   While these cases and statutes have involved war or war-like contexts, the Ninth Circuit noted that

15   the "United States has moved toward recognizing similar 'command responsibility' for torture that occurs in

16   peacetime, perhaps because the goal of international law regarding the treatment of non-combatants in

17   wartime – "to protect civilian populations and prisoners . . . from brutality, is similar to the goal of

18   international human-rights law." *Hilao III,* 103 F.3d at 777 (quoting *In re Yamashita*, 327 U.S. at 15).

19   The *Hilao III* court noted that the legislative history of the TVPA supports application of the doctrine, as

20   the Senate expressly recognized responsibility for "anyone with higher authority who authorized, tolerated

21   or knowingly ignored those acts . . ." *Id.* (quoting S. Rep. No. 102-249, at 9). The Senate Report

22   specifically refers to *In Re Yamashita* in which the Court held the commander responsible for war crimes

23   which "he knew or should have known they were going on but failed to prevent or punish them." The

24   Senate thus implicitly endorsed the application of command responsibility to acts of torture and extrajudicial

25   killings whether committed by military or civilian forces. S. Rep. No. 102-249 at 9. Notably, the text of

26   the TVPA does not limit its applicability to acts of military officials or the context of war. *Id.*

27   Similarly, the statutes of the International Criminal Tribunal for Former Yugoslavia and Rwanda

28   applied the doctrine of commander responsibility to civilian superiors as well as military commanders. In

interpreting the Statute of the International Tribunal for Rwanda, the International Court in *Prosecutor v. Kayishema & Ruzindana*, after noting that the principle of command responsibility is "firmly established in international law" and constitutes a "principle of customary international law," held that the doctrine of superior responsibility embodied in the authorizing statute extends beyond military commanders to "encompass political leaders and other civilian superiors in positions of authority." No. 95-1, 1999 WL 33268309 ¶¶ 209, 213-16 (U.N. I.C.T (Trial)(Rwanda))(citation omitted) *available at* http://www.ictr.org. "The crucial question [is] not the civilian status of the accused, but of the degree of authority he exercised over his subordinates." *Id.* ¶ 216. The International Court reached the same conclusion in interpreting the statute applicable to human rights violations in the former Yugoslavia. *Delalic*, 1998 WL 2013972, ¶ 363 (principle of superior responsibility "extends not only to military commanders but also to individuals in non-military positions of superior authority").

Defendants Liu and Xia meet the standard for commander responsibility. The *Liu* Plaintiffs clearly allege a superior-subordinate relationship between Defendant Liu and the police and other security forces which allegedly committed the human rights violations claimed herein. As Mayor of Beijing, the *Liu* Plaintiffs allege that Defendant Liu held the "power not only to formulate all important provincial policies and policy decision, but also to supervise, direct and lead the executive branch of the city government, which includes the operation of the Public Security Bureau of Beijing, under which the police operate, and other security forces." *Liu* Compl. ¶ 35. He had the authority to appoint, remove, and punish staff members in the state administrative organs and to manage public security and supervision within his administrative area. *Id.* According to the *Liu* Complaint, the Beijing police and jail security forces acted under his management, command, and supervisory authority. The doctrine of command responsibility applies to a superior who "exercised effective control, whether that control be *de jure* or *de facto.*" *Kayishema & Ruzindana*, 1999 WL 33268309, ¶ 222. What is required is "the material ability to prevent and punish the commission of these offences." *Delalic*, 1999 WL 2013972, ¶ 378. Defendant Liu was a "superior" or "commander" within the meaning of the doctrine.

The circumstances of Defendant Xia's authority is more complicated. The essence of the allegations in the *Xia* Complaint is that Xia, Deputy Mayor and Member of the City Council of Da Lian

United States District Court
For the Northern District of California

1  City and Deputy Provincial Governor for Liao Ning Province, served on general governance bodies that

2  supervised the policies and allegedly illegal practices. *Xia* Compl. ¶¶ 15-17. The *Xia* Plaintiffs contend

3  that they suffered injuries as a result of the actions of the Defendant and other municipal, provincial and

4  national government officials "with whom he acted in concert" and "with whom he conspired." *Id.* ¶¶ 24,

5  28. Thus, the *Xia* Complaint does not appear to allege that Defendant Xia had lone authority to authorize

6  the conduct at issue; rather, his authority was shared collectively with others through governing bodies.

7  While international law does not appear to be as well established on this point, the recent decisions of the

8  International Tribunals in Rwanda and Former Yugoslavia have held, based on precedent dating back to

9  the Second World War, that the degree of "effective control" needed to apply the doctrine of command

10  responsibility is flexible. Not only does it encompass *de facto* as well as *de jure* powers, it extends to

11  situations where the commander has less than absolute power. It applies where the commander has a

12  degree of "influence" not amounting to "formal powers of command." *Delalic*, 1998 WL 2013972, ¶ 375;

13  *Kayishema & Ruzindana*, 1999 WL 33268306, ¶ 220. For instance, the International Tribunal in *Delalic*

14  pointed to precedent in which commanders have been held responsible for war crimes committed by troops

15  not formally under their command and where the Defendant played an integral part of the command

16  structure by meeting with concentration camp commanders or the governing cabinet. *Id.* ¶¶ 372, 374, 376.

17  As the Tribunal noted, the Tokyo Tribunal convicted Foreign Minister Koki Hirota on the basis of

18  command responsibility for war crimes although he lacked the domestic legal authority to repress the crimes

19  in question because the tribunal found "Hirota derelict in his duty in not 'insisting' before the cabinet that

20  immediate action be taken to put an end to the crimes." *Id.* at 376. The tribunal found powers of

21  persuasion rather than formal authority to order sufficient to establish commander responsibility. *Id.*[48] In

22  this case, it is alleged that Defendant Xia possessed similar authority as a high ranking municipal and

23  provincial official who "actively participated" in the governing bodies that supervised the acts of repression

24  and "played a major policy-making and supervisory role in the policies and practices that were carried out

25  in Da Lian City." *Xia* Compl. ¶ 15.

26

27  [48] To hold otherwise would make little sense. The fact that command is shared by more than one official should not obviate the doctrine of command responsibility *per se*, lest responsibility could never be

28  imputed to members of a governing body which authorized human rights violations.

United States District Court
For the Northern District of California

1    The doctrine of aiding and abetting applicable under the ATCA, and presumably under the TVPA

2  which was intended to supplement and enhance remedies under the ATCA, reinforces this conclusion.

3  *Mehinovic*, 198 F. Supp. 2d at 1355 ("United States courts have recognized that principles of accomplice

4  liability apply under the ATCA to those who assist others in the commission of torts that violate customary

5  international law."); *see also* S.Rep. No. 249-102, at 8-9 and n.16 (TVPA Senate report states that statute

6  is intended to apply to those who "ordered, abetted, or assisted" in the violation); *Wiwa*, 2002 WL

7  319887 at *16 ("[T]he Court finds that the language and legislative history of the TVPA supports liability

8  for aiders and abettors of torture and extrajudicial killings."). As noted above, the *Xia* Complaint in effect

9  alleges that Defendant Xia actively encouraged repressive acts directed at Falun Gong practitioners and

10  "played a major policy-making and supervisory role in the policies and practices that were carried out in Da

11  Lian City." *Xia* Compl. ¶¶ 15, 16, 23.

12    The facts alleged also establish that Defendants Liu and Xia knew or should have known of the

13  human rights violations committed by the police and security forces. Both complaints allege that the

14  patterns of repression and abuse were widespread, pervasive, and widely reported, and that both

15  Defendants actively encouraged and incited the crackdown on Falun Gong supporters. *See Liu* Compl. ¶¶

16  32-37; *Xia* Compl. ¶¶ 14-24, 28. Under these circumstances, it may be inferred that both defendants

17  either "knew or should have known"of the human rights violations committed by their subordinate police

18  and security forces. *Ford*, 289 F.3d at 1288; *see* S. Rep. No. 102-249, at 9 ("'command responsibility'

19  is shown by evidence of a pervasive pattern and practice of torture . . .'"); *cf. Xuncax v. Gramajo*, 886 F.

20  Supp. 162, 171-73, 174-75 (D. Mass. 1995) (defendant was aware of and supported widespread acts of

21  brutality committed by personnel under his command).[49]

22

23    [49] It should be noted that in *Hilao III*, the court rejected defendant's challenge to the jury instruction

24  which permitted a finding liability if, *inter alia*, "Marcos knew of such conduct by the military and failed to use his power to prevent it." 103 F.3d at 776. While the Ninth Circuit therefore did not have occasion to rule on

25  whether commander liability could be predicated on the more expansive "should have known" standard, as discussed above, the court's reasoning and the sources upon which it relied – Protocol to the Geneva

26  Conventions, Statute of the International Tribunal re Former Yugoslavia, and *In Re Yamashita* – establish the broader basis for liability. Significantly, it does so in the context of establishing *criminal* liability. *A fortirorari*,

27  at least as broad a standard should apply in the context of establishing *civil* liability. Such a result would be in accord with the Eleventh Circuit's decision in *Ford*. *See* 289 F.3d at 1288.

28

United States District Court
For the Northern District of California

1    Finally, the allegations of both complaints, taken as a whole, establish that Defendants Liu and Xia

2    failed to take "all feasible measures within their power" to prevent the alleged abuses. *Hilao III*, 103 F.3d

3    at 777 *(quoting* Protocol to the Geneva Conventions of August 12, 1949, 16 I.L.M. 1391); *see* Rome

4    Statute of the International Criminal Court, art 28(1)(b) and (2)(c), July 12, 1999, U.N. Doc. A/CONF.

5    183/9th (failure to take "all necessary and reasonable measures" within their powers to prevent violations);

6    Statute of International Tribunal for Former Yugoslavia, U.N. SCOR, 48th Sess., at art. 7(3), U.N. Doc.

7    S/RES/827 (1993)(accord) *available at* http://www.un.org/icty/legaldoc/index.htm; Statute of International

8    Tribunal for Rwanda, U.N. SCOR, 49th Sess., at art. 6(3), U.N. Doc. S/RES/955 (1994)(accord)

9    *available at* http://www.ictr.org; *see also Ford*, 289 F.3d at 1288-89 (failure to prevent commission of

10   crimes or punish subordinates after commission). The Plaintiffs allege that Defendants Liu and Xia, rather

11   than taking steps to prevent the repressive acts, actively encourage and incited the repression of Falun

12   Gong supporters.

13   Accordingly, command responsibility under both American and international law principles, may be

14   imposed upon Defendants Liu and Xia.

15

16

---

17   To be sure, at least one source of international law – the Rome Statute of the International Criminal

18   Court (as amended on Nov. 10, 1998 and July 12, 1999) – draws a distinction between the imposition of criminal liability upon a "military commander or person effectively acting as military commander" and all other

19   "superior and subordinate relationships." As to military commanders, liability may be established where the commander or person "either knew or, owing to the circumstances at the time, should have known that the

20   forces were committing or about to commit such crimes." Art. 28(a), July 17, 1998, U.N. Doc A/Conf. 183/9th, 17 I.L.M. 999, 1017. As to others, liability requires that the "superior either knew, or consciously

21   disregarded information which clearly indicated, that the subordinates were committing or about to commit such crimes" and that the concerned activities "were within the effective responsibility and control of the superior."

22   *Id.* at art. 28(2)(a-b). Again, even if a distinction is drawn between military commanders and civilian superiors in the context of criminal liability, logic suggests that the imposition of civil liability may proceed on a broader

23   theory of responsibility. In any event, the distinction between "should have known" and "conscious disregard" in the context of the instant cases is immaterial given the breadth of the allegations made against the two

24   defendants herein; either standard is met. Furthermore, since the police and security forces involved in the alleged repression and abuses are arguably paramilitary-like organizations, defendants could well be deemed

25   to be person "effectively acting as a military commander" under Article 28(a).

26   Finally, although the Senate Report on the TVPA refers to command liability for those who "authorized, tolerated or knowingly ignored" abuses – language which might suggest a higher standard of liability, it also

27   endorses the *In re Yamashita* standard of command responsibility where the commander "knew or should have known" of the abuses. S. Rep. No. 102-249, at 9. It appears that Senate did not intend any difference

28   in its use of varying descriptions of the standard for command responsibility.

88

United States District Court
For the Northern District of California

## IX.   CONCLUSION & RECOMMENDATION

Considering all the factors established in *Eitel v. McCool, supra,* which inform the Court's discretion in deciding whether to enter default judgments, particularly the analysis of the merits, consideration of justiciability concerns and the unusual posture of these cases, this Court recommends that default judgments be entered declaring that Defendants Liu and Xia are responsible respectively for violations of the rights of (1) Doe I and Doe II in *Liu* and Plaintiff A and Plaintiff C in *Xia* to be free from torture; (2) Ms. Petit in *Liu* to be free from cruel, inhuman, or degrading treatment; and (3) Doe I and Doe II in *Liu* and Plaintiff A and Plaintiff C in *Xia* to be free from arbitrary detention.  In all other respects, the Plaintiffs' motions for entry of default judgment should be **DENIED** and the remaining claims be dismissed.

Dated:  June 11, 2003

/s/
EDWARD M. CHEN
United States Magistrate Judge

89