**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

JOHN DOE I, et al.,


Plaintiffs,

v.

STATE OF ISRAEL, et al.,


Defendants.

Civil Action No.  02-1431 (JDB)

<u>MEMORANDUM OPINION</u>

Plaintiffs, an assortment of anonymous Palestinians living in Israel or the West Bank, or more recently in the United States, filed this action on July 18, 2002.  Most plaintiffs are either U.S. citizens or permanent resident aliens.  The defendants were initially divided into four groups:  (1) the collective "federal defendants," consisting of the President and Secretary of State;[1] (2) the collective "Israeli defendants";[2] (3) an assortment of American defense contractors

---

[1]Specifically, President George W. Bush and former Secretary of State Colin Powell, both of whom were sued in both their individual and official capacities.

[2]The Israeli defendants consist of the State of Israel itself, as well as its government officials and military entities as follows:  Prime Minister Ariel Sharon (individually and in his official capacity

1

and manufacturers, collectively referred to as the "contractor defendants"; and (4) the collective

"settler defendants."[3]   On October 3, 2003, this Court granted the motions to dismiss filed by the

federal defendants and the contractor defendants, concluding that plaintiffs had asked this Court

to decide a nonjusticiable political question.  See Doe v. State of Israel, No. 02-01431, slip op. at

15 (D.D.C. Oct. 3, 2003) (stating that "claims involving arms sales to Israel -- which occur

pursuant to a sensitive and detailed statutory and regulatory scheme inextricably intertwined with

critical foreign policy decisions -- are nonjusticiable political questions better left to

consideration by the political branches") (hereinafter "Doe Mem. Op.").  Hence, the remaining

claims are those against the Israeli and settler defendants.

Now before the Court are motions to dismiss filed by the Israeli defendants and three of

the settler defendants ("Rinat defendants") -- Congregation Rinat Yisrael ("Rinat Congregation");

Rabbi Yosef Adler ("Adler"); and Mr. Arnon Hiller ("Hiller").  For the reasons discussed below,

---

as former Israeli Minister of Defense), Natan Sharanski (individually and in his official capacity
as Israeli Minister of Construction and Housing), Binyamin Ben Eliezer (individually and in his
capacity as Israeli Minister of Defense), Shimon Peres (individually and in his capacity as Israeli
Minister of Foreign Affairs), Uzi Landau (individually and in his capacity as Israeli Minister of
Internal Security), Meir Sheetrit (individually and as Israeli Minister of Justice), The Israeli
General Security Service ("Shin Bet"), Avi Dichter (head of Shin Bet), Israeli Defense Forces
("IDF"), Lieutenant General Shaul Mofaz (individually and as Chief of the General Staff), Major
General Amos Gilad (individually and as the IDF Coordinator of Government Activities in
Judea, Samaria and Gaza), Major General Aharon Ze'evi Farkash (individually and as IDF
Director of Military Intelligence), Amos Yaron (individually and in his capacity as Secretary
General of the Defense Ministry, and also as former Brigadier General and Commandant of IDF
forces in Beirut, Lebanon), and one hundred anonymous members of the Israeli military ("Moes
1-100").

[3]The settler defendants are:  Halamish/Neve Tzuf Settlement, Neve Tzuf Foundation (a.k.a.
Keren Neve Tzuf), Christ Lutheran Church, Central Fund for Israel, One Israel Fund,
Congregation Rinat Yisrael, Rabbi Yosef Adler, Arnon Hiller, Joav Merrick, Ruth Kohn, and Jay
Marcus.

the Court will grant these motions and dismiss the action against all defendants.[4]

## FACTUAL BACKGROUND

### 1.  Israeli Defendants

The named defendants in this case include the sovereign State of Israel, as well as the Israeli General Security Service ("Shin Bet") and the Israeli military ("Israeli Defense Forces" or "IDF").  Plaintiffs also name an assortment of individuals employed as high-ranking officials within the Israeli government, including Prime Minister Ariel Sharon.  See Compl. at 12-15.

The complaint exceeds 140 pages and includes nearly 600 paragraphs, broadly alleging that plaintiffs, or their loved ones, have been personally and financially injured by the actions of the Israeli defendants -- and those acting under their command or policies -- regarding settlement activities in the West Bank.  See Compl. at 70-109.  Plaintiffs have sued the individual Israeli defendants in both their official and personal capacities, alleging that those officials acted outside the scope of their official authority on behalf of the state.  See Compl. at 12-15.  Plaintiffs also allege that those officials are derivatively liable for the actions of the settler defendants, and further allege that the named officials had command responsibility for the actions of subordinate governmental employees who either acted pursuant to unofficial national policy or without proper supervision by the Israeli defendants.  See, e.g., Compl. at 3.  Violations of various international laws and conventions are also alleged.  See Compl. at 109-12.

The complaint seeks punitive and treble damages, compensatory damages and injunctive relief, for causes of action allegedly arising under the Alien Tort Claims Act ("ATCA"), the

---

[4]Several of the remaining settler defendants have not been served, although two (One Israel Fund and Ruth Kohn) have filed a motion to dismiss.  The Court concludes that several of the grounds for dismissal apply equally to the other settler defendants.

Torture Victims Protection Act ("TVPA"), the Racketeering Influenced Corrupt Organizations

Act ("RICO"), customary international law, assorted international conventions and agreements,

and the tort laws of various American states.  See Compl. at 109-39.  Specifically, plaintiffs

identify the following claims:  genocide, Compl. at 112; crimes against humanity, Compl. at 113;

war crimes, including intentional killing, torture, inhumane treatment, and destruction of property

without military necessity, Compl. at 114; conspiracy to commit racketeering activities in

coordination with the American government, based upon the predicate offenses of murder,

attempted murder, kidnaping, threat of murder, and arson, Compl. at 115-16; conspiracy to

commit racketeering activities with settler defendants and the Rinat defendants through the

predicate offenses of attempted murder, threat of murder, arson, and extortion, Compl. at 118-20;

extrajudicial killing, Compl. at 121; torture, Compl. at 123; arbitrary arrest and detention, Compl.

at 124; cruel, inhuman, and degrading treatment, Compl. at 125; wrongful death, Compl. at 126;

battery, Compl. at 128; false imprisonment, Compl. at 129; assault, Compl. at 130; intentional

infliction of emotional distress, Compl. at 131; negligent infliction of emotional distress, Compl.

at 132; trespass, Compl. at 134; and conversion, Compl. at 136.

The complaint is an amalgam of personal anecdotes describing the individual plaintiffs'

suffering as the result of what they characterize as human rights violations.  See Compl. at 70-

108.  All of the alleged human rights violations occurred in the West Bank or on Israeli soil.

According to the complaint, however, injuries and harms have been suffered within the United

States.  For example, plaintiff Jane Doe II lives in South Carolina.  Compl. at 108.  She alleges

negligent and intentional infliction of emotional distress, caused when she learned, from a

television news report that she watched in the United States, that her childhood home in the West

Bank had been destroyed by a rocket fired by Israeli forces, killing two of her sisters and injuring

her niece and nephew.  Compl. at 108-09.  Other plaintiffs claim that the destruction of their

livelihoods and property in the West Bank has caused them to suffer financial harm, which has

impacted them within the United States.  The majority of plaintiffs claim that, after returning to

the United States, they continued to suffer residual pain and suffering from injuries inflicted

abroad by the Israeli or settler defendants.

Plaintiffs begin by stating that "Israel is a terrorist state" and describing the Jewish

settlements in the West Bank as "non or quasi governmental terrorist organizations."  Compl. at

22 ¶ 76.  Plaintiffs further assert that "[f]or decades, the United States government . . . has turned

a blind eye to the outrages perpetrated by Israel and its agents against American citizens because

the victims were of Palestinian descent," thereby "allow[ing Israel] to torture and kill American

citizens with impunity."  Compl. at 23 ¶ 81.  The complaint claims that the land in the West Bank

is Palestinian land, and charges that Israel has confiscated that land by encouraging its citizens to

develop settlements on the land, which, according to plaintiffs, violates international law.  See

Compl. at 23 ¶ 83.  The complaint also chronicles plaintiffs' perspective of how the Israeli-

Palestinian conflict evolved, and why it persists.  See Compl. at 22-70.

## 2.  The Rinat Defendants

Rinat Congregation is a religious corporation that is organized under the laws of New

Jersey and is located in Teaneck, New Jersey.  Rinat Def.'s Mem. Supp. Mot. Dismiss at 2.  It

maintains a website that is accessible twenty-four hours a day from any location that has a viable

internet connection and has not blocked the website.  See Pl.'s Mem. Opp'n to Rinat Def.'s Mot.

Dismiss at 23.  The Rinat website provides information about its ideology -- including its support

5

of the Israeli people regarding the ongoing Israeli-Palestinian conflict -- and allows visitors to join an e-mail list, submit contact information, provide financial support, volunteer their services, and submit suggestions.  Id. at 23-24.  The site also contains links to other sites that accept contributions.  Id. at 25.  One of the causes to which a visitor can contribute money is called "Israel Action," which plaintiffs characterize as the Israeli settlement movement.  Id.  According to plaintiffs, contributions made through the Rinat website are funneled to other settler defendants, particularly the Halamish/Neve Tzuf Settlement.  Id. at 25.

Defendant Adler is the spiritual leader of Rinat Congregation, and defendant Hiller is its former president.  Rinat Def.'s Mem. Supp. Mot. Dismiss at 2.  Both reside in New Jersey.  None of the Rinat defendants is located in or operated from the District of Columbia ("the District").  Rinat Def.'s Reply Mem. Supp. Mot. Dismiss at 18.  Plaintiffs do not allege that the Rinat defendants frequently are present in the District for either business or pleasure, or have conducted any fund-raising activity in the District; nor do they allege that District residents have made contributions, or that any contributions have originated from the District.

The allegations against the Rinat defendants take two forms:  (1) violations of RICO under 18 U.S.C. §§ 1962(b)-(d), brought by plaintiff John Doe II; and (2) a host of common law tort claims arising under the laws of various states (battery, assault, intentional infliction of emotional distress, negligent infliction of emotional distress, negligence per se, trespass, and conversion).  See Compl. at 118-21, 128, 130-36.  All claims rest on plaintiffs' assertion that the Rinat defendants actively solicited financial contributions that were applied to purchase various types of protective gear that was, in turn, used in the West Bank by Israeli settlers.  Compl. at 119-20 ¶ 465.  Plaintiffs allege that the settlement activities have caused them to suffer physical,

emotional, or financial injury because:  (1) the financial interest or personal property was located in the West Bank; (2) the plaintiffs themselves were located in the West Bank; or (3) the actions taken by the settlers in the West Bank harmed a close relative located there, and upon learning of this harm, a plaintiff suffered injury in the United States.  See, e.g., Compl. at 5-12.

The RICO claims against the Rinat defendants are asserted only by plaintiff John Doe II. Compl. at 118-21.  He is an American citizen who resides in New Jersey.  Compl. at 5-6 ¶ 8.  He owned land in the West Bank from which he claims he was driven by the "threats and coercion" of the settler defendants.  Id.; see also id. at 71-74; Pl.'s Mem. Opp'n to Rinat Def.'s Mot. Dismiss at 20.  He alleges that the settler defendants pointed guns at him, threatened to shoot him if he did not leave, set fire to property, and destroyed his olive groves.  Compl. at 5-6 ¶ 8; id. at 71-74, 118-21.  His complaint states that the settler defendants engaged in a pattern of racketeering activity -- including the predicate offenses of attempted murder, threat of murder, arson, and extortion -- to drive him from his land, and that the Rinat defendants facilitated this pattern of racketeering activity through their financial contributions.  Compl. at 119-20 ¶ 465.

Like his fellow tort plaintiffs, John Doe II claims that the Rinat defendants "knowingly provided funds specifically earmarked for materials that are used by the Settlement to illegally terrorize neighboring property owners and confiscate their land and are coconspirators in the illegal acts of the enterprise."  Compl. at 21 ¶ 74; see also id. at 33 ¶¶ 110-12; id. at 118 ¶ 456 (incorporating allegations as applicable to John Doe II).  None of the materials for which the Rinat defendants' contributions were "earmarked" consisted of offensive or aggressive equipment; rather, the materials were all in the nature of protective and defensive equipment. See Compl. at 33 ¶ 111 (stating that "these are not merely general contributions of funds, but

rather are earmarked specifically for various military purposes, including dozens of bullet proof

vests and body armor, night-vision goggles, armored jeeps and ambulances, floodlights, ballistic

helmets, communications equipment, gun cabinets, generators, and even security fence repairs").

John Doe II even goes so far as to assert that the ". . . Rinat defendants in essence filled orders for

paramilitary equipment -- orders provided by the Halamish . . . by soliciting others through its

interactive Internet site . . . with the knowledge that the Halamish Settlement violates

international law and its existence is maintained by threats and coercion of the civilian

Palestinian population . . . ."  Pl.'s Mem. Opp'n to Rinat Def.'s Mot. Dismiss at 14.

The multiple tort plaintiffs make identical allegations against the Rinat defendants,

incorporating the same language asserted in John Doe II's complaint.  However, the tort plaintiffs

make claims of derivative liability for state tort law violations and do not allege RICO violations.

See Compl. at 128 ¶ 510 (incorporating in the battery claim all allegations from the preceding

500 paragraphs of the complaint); id. at 130 ¶ 520 (same with respect to assault claim); id. at 131

¶ 525 (same with respect to intentional infliction of emotional distress claim); id. at 132 ¶ 532

(same with respect to negligent infliction of emotional distress claim); id. at 134 ¶ 542 (same

with respect to negligence per se claim); id. at 135 ¶ 547 (same with respect to trespass claim);

id. at 136 ¶ 552 (same with respect to conversion claim).  It is undisputed that the Rinat

defendants themselves did not assault, batter, trespass, convert, or commit negligence per se;

rather, the theory of liability is derivative and stems from civil conspiracy and aiding-abetting

themes.[5]  See Pl.'s Mem. Opp'n to Rinat Def.'s Mot. Dismiss at 26-29.

---

[5]This is far from clear in the complaint itself, which uses the same boilerplate language with
respect to each common law tort allegation and states, for example, that the "[a]bove named
defendants intentionally committed acts which resulted in harmful or offensive contact with

## LEGAL STANDARD

In accordance with the more relaxed standards that apply to pleadings at the motion to dismiss stage, plaintiffs' factual allegations must be taken as true.  Kowal v. MCI Comm. Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1989).  A complaint is sufficient to satisfy the liberal pleading requirements of Fed. R. Civ. P. 8(a) so long as it gives the defendants fair notice of what the claims are, and makes clear the grounds upon which those claims rest.  Boim v. Quranic Literacy Inst., 291 F.3d 1000, 1008 (7th Cir. 2002) (citing Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit, 507 U.S. 163, 168 (1993)).  A court may not grant the motions to dismiss "'unless it appears beyond doubt that the plaintiff[s] can prove no set of facts in support of [their] claim which would entitle [them] to relief.'"  BCCI Holdings (Luxembourg), Societe Anonyme v. Khalil, 20 F. Supp. 2d 1, 5 (D.C. Cir. 1997) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)).

In this posture, the Court must draw all favorable inferences in plaintiffs' favor, Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), and must construe the complaint as a whole, Boim, 291 F.3d at 1008 (citing Pokuta v. Trans World Airlines, Inc., 191 F.3d 834, 839 (7th Cir. 1999)).  But this standard does not mandate blind and absolute deference.  The Court is not required to accept as true those legal conclusions or inferences drawn by plaintiffs that are not supported by the facts recited in the complaint.  Kowal, 16 F.3d at 1276.  Moreover, plaintiffs may not amend their complaint through their opposition papers.  Calvetti v. Antcliff, 346 F. Supp. 2d 92, 107 (D.D.C. 2004); see also Arbitraje Casa de Cambio, S.A. de C.V. v. United States Postal Serv.,

---

plaintiffs' persons.  Plaintiffs did not consent to the contact, which caused injury, damage, loss or harm to plaintiffs."  See, e.g., Compl. at 128 ¶ 511.  Plaintiffs clarify their position somewhat in their opposition papers.  See Pl.'s Mem. Opp'n to Rinat Def.'s Mot. Dismiss at 26-29.

297 F. Supp. 2d 165, 170 (D.D.C. 2003).  Thus, the Court will not consider facts included in, or

legal inferences arising from, the opposition papers if they are absent from the complaint.

## ANALYSIS

The Court will first consider plaintiffs' claims against the Israeli defendants, addressing

the following issues:  (1) adequacy of service of process on Israeli defendants under the Foreign

Sovereign Immunities Act ("FSIA") and the Hague Convention; (2) immunity under the FSIA of

the Israeli government defendants and the individual Israeli defendants sued in their official

capacities; (3) head of state immunity as to defendant Sharon; (4) personal jurisdiction over the

individual Israeli defendants in their personal capacities; (5) justiciability concerns under the

political question and act of state doctrines; and (6) RICO's applicability to the conduct of the

Israeli defendants.  Then, the Court will consider the claims against the Rinat defendants,

specifically plaintiffs' substantive claims under the RICO statute and personal jurisdiction over

the Rinat defendants.  The Court does not reach the merits of the common law tort claims against

either the Israeli defendants or the Rinat defendants.

## I.  THE ISRAELI DEFENDANTS

### A.  Service of Process Under the FSIA and Hague Convention

Section 1608(a) of the FSIA enumerates four methods through which a "foreign state or

political subdivision of a foreign state" may be served.  28 U.S.C. § 1608(a).  The provisions of

the FSIA also govern "instrumentalities" of the foreign sovereign.  28 U.S.C. § 1608(b).  The

State of Israel itself, and the IDF, are considered a "foreign state" under FSIA and thus fall within

the ambit of § 1608(a).  Transaero, Inc. v. La Fuerza Aerea Boliviana, 30 F.3d 148, 153 (1994)

(holding that "armed forces of a foreign sovereign are as a rule so closely bound up with the

10

structure of the state that they must in all cases be considered as the 'foreign state' itself").  Shin

Bet is also part of the "foreign state" of Israel because its "core functions" are governmental, not

commercial.  See Roeder v. Islamic Republic of Iran, 333 F.3d 228, 234 (D.C. Cir. 2003).  As

detailed below, plaintiffs have failed properly to serve the State of Israel, the IDF, and Shin Bet

(collectively "the Israeli government defendants") under § 1608(a).  The Court assumes that the

individual Israeli defendants are covered by the more liberal requirements of § 1608(b) for

purposes of the claims against them in their official capacities, under which they have been

properly served in their official capacities.  The claims against the individual Israeli defendants in

their personal capacities, however, are governed by the Hague Convention, under which plaintiffs

have failed to effect proper service.

        In the D.C. Circuit, the methods set forth in § 1608(a) are the sole channels through

which service may properly be effected on a foreign sovereign.  See Transaero, 30 F.3d at 154.

Those four methods are:  (1) delivery of a copy of the summons and complaint pursuant to the

terms of a preexisting arrangement between the plaintiff and the foreign sovereign; (2) delivery

pursuant to any applicable international convention concerning service of judicial documents; (3)

dispatch of a copy of the summons, complaint, and notice of suit, properly translated, through a

mail delivery mechanism that requires a signed receipt (the clerk of the court must address and

send such materials directly to the primary official of the foreign sovereign's foreign affairs

ministry); or (4) dispatch of two copies of the summons, complaint, and notice of suit to the

Secretary of State (who will then forward one copy of the materials through the proper

diplomatic channels to the foreign sovereign), if service has not been effected within thirty days

of plaintiff's attempts pursuant to the other methods.  See 28 U.S.C. § 1608(a)(1)-(4).

A plaintiff does not have the privilege to choose from among these four methods.  The

plain language of § 1608(a) makes clear that the FSIA lists the methods in descending order of

preference; a plaintiff may only attempt service through the second method, for example, if

service through the first method is unavailable or has proven unsuccessful.  The requirements of

§ 1608(a) are applied strictly.  <u>Transaero</u>, 30 F.3d at 153-54.  In this case, there is no hint of a

special arrangement existing between the Israeli defendants and plaintiffs.  Although plaintiffs'

counsel contends that he "requested" that the Israeli defendants waive FSIA service, there is no

allegation that they agreed to do so.  Thus, § 1608(a)(1) does not apply.

There is, however, an applicable international convention that governs service of process,

in accordance with § 1608(a)(2) -- the Hague Convention, under which service must be effected

through a central repository.  <u>See</u> Hague Convention on the Service Abroad of Judicial and

Extra-Judicial Documents in Civil or Commercial Matters, Nov. 15, 1965, art. 3, 20 U.S.T. 361,

658 U.N.T.S. 163 (hereinafter "Hague Convention"); <u>see also</u> <u>Volkswagenwerk</u>

<u>Aktiengesellschaft v. Schlunk</u>, 486 U.S. 694, 698 (1988).  Each signatory has established a nerve

center, which receives the papers and then effects service on the named party unless such service

would offend the nation's sovereignty or security.  <u>See</u> Hague Convention, arts. 3, 5, 15.  Israel's

designated nerve center is its Directorate of Courts.  <u>See</u> Israel's Decls. & Reservs. to the Hague

Convention, <u>available</u> <u>at</u> http://hcch.net/ index_en.php?act=conventions.statusprint &cid=17 (last

visited October 21, 2005).  Here, the record is devoid of any assertion that plaintiffs attempted to

effect service through Israel's Directorate of Courts.  Neither substantial compliance with §

1608(a)'s requirements nor actual notice of the suit excuses plaintiffs' deviation from the section's

mandates.  <u>Transaero</u>, 30 F.3d at 153-54.  Because plaintiffs have not effectuated service

pursuant to § 1608(a)(2), the methods in §§ 1608(a)(3) and (a)(4) are not available to them, and the suit against the Israeli government defendants fails for want of proper service.

With respect to the suits against the individual Israeli defendants in their official capacities, the analysis is slightly more complex.  The FSIA's protections are construed to apply to an individual acting in an official capacity on behalf of the state.  See El Fadl v. Cent. Bank of Jordan, 75 F.3d 668, 671 (D.C. Cir. 1996); accord Velasco v. Indonesia, 370 F.3d 392, 398 (4th Cir. 2004); Keller v. Cent. Bank of Nigeria, 277 F.3d 811, 815 (6th. Cir. 2002).  The D.C. Circuit authority on this point involved an officer of an instrumentality of the foreign state.  El Fadl, 75 F.3d 668 (addressing whether FSIA protects a foreign bank officer if the foreign bank is an "instrumentality" of the sovereign).  There, the court held that such an individual could qualify as an "instrumentality" under § 1608(b) of the FSIA.  It is unclear whether that decision rested on the status of the officer as an individual, or whether it rested on the fact that the individual was an officer of *an instrumentality* rather than an officer of the *foreign state*.  Because the court began from a broad recognition that "[a]n individual can qualify as an 'agency or instrumentality of a foreign state,'" id. at 671 (citation omitted), this Court will treat the individual Israeli defendants as "instrumentalities" covered by § 1608(b) rather than § 1608(a).

The service requirements of § 1608(b) are less stringent than those of § 1608(a), and can be satisfied by "technically faulty service" as long as the defendants receive adequate notice of the suit and are not prejudiced.  See Transaero, 30 F.3d at 154; see also Straub v. Green, 38 F.3d 448, 453 (9th Cir. 1994); B.P. Int'l, Inc. v. Kingdom of Sweden, 281 F. Supp. 2d 73, 84 (D.D.C. 2003).  Here, the individual Israeli defendants have actual notice of the suit, as evidenced by the motions and replies that they have filed, and they do not appear to have been prejudiced by

13

plaintiffs' faulty service.  Notwithstanding proper service, however, for the many reasons detailed

in subsequent sections of this opinion, the claims against the individual Israeli defendants in their

official capacities ultimately fail.

As to the claims against the individual Israeli defendants in their personal capacities,

plaintiffs were required to comply with the mandates of the Hague Convention, which, when it

applies, is recognized as the only acceptable way to serve foreign citizens.  See Societe Nationale

Industrielle Aerospatiale v. United States Dist. Ct., 482 U.S. 522, 534 n.15 (1987).  Plaintiffs

served the individual Israeli defendants in their personal capacities in exactly the same way that

they served them in their official capacities -- by leaving copies of papers with random

employees at the individual defendants' places of employment.  See Israeli Def.'s Reply Mem. at

5-6.  This is plainly insufficient under the provisions of the Hague Convention.  Plaintiffs

nonetheless assert that Israeli defendants were "obligated," under Fed. R. Civ. P. 4, to waive the

service requirements of the FSIA.  Pl.'s Mem. Opp'n to Israeli Def.'s Mot. Dismiss at 7-8.  But

the Hague Convention is a treaty; as such, it necessarily "pre-empts inconsistent methods of

service prescribed by . . . [subordinate] law in all cases to which it applies."  Volkswagenwerk

Aktiengesellschaft, 486 U.S. at 699.  Hence, plaintiffs' argument that colorable compliance with

Rule 4 is enough to perfect service must fail -- Rule 4 does not preempt the requirements of the

Hague Convention merely because those requirements may be costly or burdensome.  Cf. Bybee

v. Oper Der Standt Bonn, 899 F. Supp. 1217, 1221-1222 (S.D.N.Y. 1997).

Even if any personal service had taken place, it would not satisfy the Hague Convention

under the circumstances of this case.  The Hague Convention allows for personal service only if

the receiving nation has not objected.  See Hague Convention, arts. 10(b)-(c).  When it ratified

14

the Hague Convention, Israel explicitly stated that, with respect to Articles 10(b) and 10(c) of the Convention, it would only effect service through the Directorate of Courts.  See Israel's Decls. & Reservs. to the Hague Convention, available at http://hcch.net/ index_en.php?act= conventions.statusprint&cid=17 (last visited October 21, 2005).  This reservation constitutes an explicit objection to service by other means.

Plaintiffs nonetheless cling to the language of Article 10(a), which states that the Convention "shall not interfere with . . . the freedom to send judicial documents, by postal channels, directly to persons abroad."  Hague Convention, art. 10(a).  But courts diverge regarding whether the word "send" has the same meaning as "serve," and the provision has been interpreted by several courts to mean only that subsequent judicial papers, following proper service, may be forwarded directly to individuals through the mail.  See, e.g., Nuovo Pignone SpA v. Storman Asia M/V, 310 F.3d 374, 383-84 (5th Cir. 2002); Bankston v. Toyota Motor Corp., 889 F.2d 172, 173-74 (8th Cir. 1989); Gallagher v. Mazda Motor of Am., 781 F. Supp. 1079, 1081 (E.D. Pa. 1992).  But see Brockmeyer v. May, 383 F.3d 798, 802 (9th Cir. 2004); Ackermann v. Levine, 788 F.2d 830 (2d Cir. 1986).  In any event, Article 10(a) does not create an affirmative right to utilize this postal method of personal service; it simply does not prohibit it.  Brockmeyer, 383 F.3d at 804.  A court must still look to the internal law of the receiving nation, under which the type of service contemplated by Article 10(a) -- if any -- must be permitted.  See id.  Plaintiffs have never so much as suggested that this type of service is recognized under internal Israeli law.

Therefore, Articles 10(a)-(c) of the Hague Convention are not service options with respect to the individual Israeli defendants in their personal capacities.  Under the strict mandates

of the FSIA, plaintiffs were required to comply with the service requirements set forth in Articles 3-6 of the Hague Convention by serving their papers through the Israeli Directorate of Courts.  At this juncture, three years after plaintiffs filed this action and two years after the Israeli defendants raised these service deficiencies, the Court is not inclined to give plaintiffs an opportunity to cure defective service.  Proper service was never attempted and, in any event, ultimately would be futile for the reasons discussed in other sections of this opinion.

## B.  FSIA Immunity of Israeli Defendants

The FSIA grants immunity to foreign sovereigns, ministries of foreign sovereigns, and officials acting on behalf of foreign sovereigns.  Hence, FSIA immunity protects the Israeli government defendants, see Transaero, 30 F.3d at 153, as well as the individual Israeli defendants in their official capacities.  The FSIA is the sole method of obtaining subject matter jurisdiction over foreign sovereigns.  Saudi Arabia v. Nelson, 507 U.S. 349, 356 (1993); Argentine Republic v. Amerada Hess Shipping Corp., 488 U.S. 428, 443 (1989).  The statute sets forth certain exceptions to its strong presumption of immunity.  See 28 U.S.C. § 1605.  If the foreign sovereign's conduct falls within an FSIA exception, only then will a United States court have subject matter jurisdiction.  Republic of Austria v. Altmann, 541 U.S. 677, 681 (2004); Verlinden B.V. v. Cent. Bank of Nigeria, 461 U.S. 480, 488-89 (1983).  Plaintiffs tentatively suggest that three exceptions "may" apply here:  (1) the Israeli defendants have waived their sovereign immunity, either explicitly or implicitly, see 28 U.S.C. § 1605(a)(1); (2) the Israeli defendants have conducted "commercial activity outside of the United States which has an effect within the United States," Pl.'s Mem. Opp'n to Israeli Def.'s Mot. Dismiss at 24-27; see 28 U.S.C. § 1605(a)(2); and (3) the Israeli defendants have "commit[ted] tortious acts that cause[d] injury

within the United States," Pl.'s Mem. Opp'n to Israeli Def.'s Mot. Dismiss at 30; <u>see</u> 28 U.S.C. §
1605(a)(5).  None of plaintiffs' arguments can be sustained.

**1.  FSIA Immunity of Individual Israeli Defendants**

At the outset, the Court must examine plaintiffs' claims against the individual Israeli
defendants in order to determine whether those defendants are entitled to FSIA immunity -- <u>i.e.</u>,
the Court must consider whether plaintiffs have properly alleged that these defendants were
acting outside the scope of their authority.  It is appropriate to consider whether the actions
against the individual Israeli defendants in their personal capacities are merely "disguised actions
against the [State of Israel itself]."  <u>Park</u>, 313 F.3d at 1144.  The Court is mindful that foreign
sovereigns are legal fictions to the extent that they can only act through their individual officers.
<u>See</u> <u>Transaero</u>, 30 F.3d at 153 (stating that "[a]ny government of reasonable complexity must act
through men organized into offices and departments").  A suit against an individual officer of a
nation who has acted on behalf of that nation is the functional equivalent of a suit against the
state itself.  <u>See</u>, <u>e.g.</u>, <u>Park</u>, 313 F.3d at 1144.  In contrast, suits against officers in their personal
capacities must pertain to private action -- that is, to actions that exceed the scope of authority
vested in that official so that the official cannot be said to have acted on behalf of the state.  <u>See</u>
<u>El Fadl</u>, 75 F.3d at 671.

Plaintiffs do not present legitimate claims against the individual Israeli defendants in their
personal capacities.  To begin with, plaintiffs challenge the conduct of the Israeli occupation
activities in the West Bank -- something that is an official policy of the sovereign State of Israel.
Indeed, plaintiffs make exactly the same allegations against the individual Israeli defendants in
their personal capacities as they do against them in their official capacities; there is no assertion

that the individual Israeli defendants acted out of personal gain or for private motivation.  All

allegations stem from actions taken on behalf of the state and, in essence, the personal capacity

suits amount to suits against the officers for being Israeli government officials.  See El Fadl, 75

F.3d at 671.  Plaintiffs have also "served" the individual Israeli defendants in exactly the same

way with respect to both the official and personal capacity suits -- by delivering identical papers

to the same employees at the individual Israeli defendants' respective offices.  See Israeli Def.'s

Reply Mem. at 5, 6.  The Court must also consider whether the suit against the individual Israeli

defendants would interfere with the sovereignty of Israel.  See Park, 313 F.3d at 1144.  Based on

the justiciability concerns addressed below, and the unique global circumstances from which this

case stems, the Court answers that question in the affirmative.  The suits against the individual

Israeli defendants in their personal capacities are actually nothing more than redundant suits

against Israel.  The failure to sufficiently allege *ultra vires* action on the part of the individual

Israeli defendants means that those defendants remain within the FSIA's protective umbrella

unless a specific exemption applies.

## 2.  Implicit Waiver of Immunity Under § 1605(a)(1) Based on *Jus Cogens* Violations

Plaintiffs first argue that the Israeli defendants have committed violations of *jus cogens*

international law principles, and that such behavior implicitly waives FSIA immunity.  Some

courts have held that *jus cogens* violations function to strip immunity because FSIA protections

only apply to actions taken within the scope of the defendants' official authority.  See Chuidian v.

Philippine Nat'l Bank, 912 F.2d 1045, 1106 (9th Cir. 1990); Hilao v. Estate of Marcos, 25 F.3d

1467, 1472 (9th Cir. 1994).  However, no court has squarely confronted the question posed here:

does the Israeli policy regarding the volatile Israeli-Palestinian conflict violate *jus cogens*

18

principles?  For reasons subsequently discussed in this opinion, the question is nonjusticiable.

But even assuming that the Israeli defendants have engaged in *jus cogens* violations, plaintiffs still cannot state a claim under § 1605(a)(1) because their argument is foreclosed by controlling precedent.  *Jus cogens* violations, without more, do not constitute an implied waiver of FSIA immunity.  Princz v. Fed. Republic of Germany, 26 F.3d 1166, 1173-75 (D.C. Cir. 1994); accord Smith v. Socialist People's Libyan Arab Jamahiriya, 101 F.3d 239, 242-45 (2d Cir. 1997).  Section 1605(a)(1) is construed narrowly; the judiciary is not to re-draft the FSIA so as to force an exception that Congress did not craft.  See Princz, 26 F.3d at 1173; Smith, 101 F.3d at 242-45.  An implicit waiver under this provision requires that the foreign sovereign "hav[e] at some point indicated its amenability to suit," and that it have subjectively intended to do so. Princz, 26 F.3d at 1174; see Smith, 101 F.3d at 243 n.2.  The record is barren of any indication that Israel has either indicated its amenability to suit or intended to do so.  To the contrary, the Israeli defendants have consistently and vigorously contested the Court's jurisdiction over them.

### 3.  "Commercial Activity" Exception

Plaintiffs also contend  that the actions of the Israeli defendants fall within the "commercial activity" exception to the FSIA.  This exception strips a foreign sovereign of immunity if it has engaged in "an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States." 28 U.S.C. § 1605(a)(2).  Plaintiffs characterize the Israeli defendants' actions in the West Bank as tantamount to "private real estate development."  Pl.'s Mem. Opp'n to Israeli Def.'s Mot. Dismiss at 24-25.  According to plaintiffs, these activities have a direct effect in the United States because:  (1) many plaintiffs immediately returned to the United States, bringing

with them their personal and financial hardships; (2) these plaintiffs received publicly-funded

medical assistance in the United States; (3) the American economy and exports have been

negatively impacted; (4) at least one plaintiff was physically present in the United States when

she learned that her family members had died or been injured; and (5) plaintiffs are unable to

travel from the United States to the Israeli-Palestinian region.  Id. at 27.

Although the Court is sympathetic, these arguments are legally infirm.  To begin with, the

complaint fails to allege any commercial activity within the FSIA exception.  For a foreign

sovereign to be engaged in a "commercial activity," that sovereign must have taken action of a

type that a private actor would employ as a means of engaging in commerce.  Argentina v.

Weltover, 504 U.S. 607, 614 (1992); see also Nelson, 507 U.S. at 360, 362.  The motivation

behind the action need not be economic.  See 28 U.S.C. § 1603(d).  The analysis focuses on

whether the distinct action -- not a broad characterization thereof -- is commercial, rather than

sovereign.  Nelson, 507 U.S. at 349-50; Rong v. Liaoning Provincial Gov't, 362 F. Supp. 2d 83,

92 (D.D.C. 2005).  Here, plaintiffs challenge actions that were taken pursuant to Israeli national

policy.  Whether territorial expansion or national defense, the settlement activities are only

possible by virtue of the fact that the actors are infused with the force and power of the Israeli

government.  Private entities cannot engage in these activities.  The complaint may allege that the

Israeli government has taken actions akin to "sovereign expropriation," but such actions neither

constitute the type of actions in which private actors engage nor amount to market transactions.

See Rong, 362 F. Supp. 2d at 96.  Indeed, the D.C. Circuit has refused to classify as commercial

other governmental activities that have a more evident economic character, see Mwani v. Bin

Laden, 417 F.3d 1, 16-17 (D.C. Cir. 2005) (refusing to hold that Afghanistan's harboring of

20

terrorist camps for profit constitutes commercial activity), and are more easily accomplished by

private players, see Cicippio v. Islamic Republic of Iran, 30 F.3d 164, 168 (D.C. Cir. 1994)

(refusing to recognize kidnaping for ransom as a commercial activity).

   The harms that plaintiffs allege also have not caused a direct effect in the United States.

The requisite direct effect under § 1605(a)(2) must result "as an immediate consequence of the

defendant's . . . activity."  Weltover, 504 U.S. at 618 (quoting Tex. Trading & Milling Corp. v.

Fed. Republic of Nigeria, 647 F.2d 300, 311 (2d Cir. 1981)).  There can be no intervening

elements, and the effect must "flow[] in a straight line without deviation or interruption" from the

defendants' activity.  Princz, 26 F.3d at 1172.  For this reason, courts ordinarily do not find direct

effects in cases that concern injuries suffered on foreign soil by plaintiffs who subsequently

returned to the United States.  Id.; see also Zedan v. Kingdom of Saudi Arabia, 849 F.2d 1511,

1514 (D.C. Cir. 1988).  The harms alleged to have befallen the individual plaintiffs here are too

dislocated -- the immediate harm, in all cases, is the harm suffered in the West Bank.  Regardless

of how quickly plaintiffs returned to the United States, any harm suffered here was merely a

continuation of, and removed from, the harm incurred abroad.  Such a ripple-effect is simply not

contemplated by the statute.  See Virtual Countries, Inc. v. Republic of S. Africa, 300 F.3d 230,

237 (2d Cir. 2002) (quoting United World Trade, Inc. v. Mangyshlakneff Oil Prod. Ass'n, 33

F.3d 1232, 1238 (10th Cir. 1994)).  Indeed, even plaintiff Jane Doe II, who suffered emotional

distress on American soil, has not properly alleged a legally cognizable direct effect under §

1605(a)(2).  Rather, the direct effect is still the injury and loss of life inflicted upon Jane Doe II's

relatives overseas.  Any emotional distress suffered in the United States is derivative.  To hold

otherwise would enable the commercial exception to swallow the general FSIA rule.  Princz, 26

F.3d at 1173; Antares Aircraft L.P. v. Fed. Republic of Nigeria, 999 F.2d 33, 36 (2d Cir. 1993).

As for financial harms, there is no allegation that any assets or funds that became unavailable to plaintiffs as a result of the Israeli defendants' actions were ever scheduled to be paid to the plaintiffs in the United States. Recently, the D.C. Circuit held that Saudi Arabia's termination of government benefits did not have a direct effect in the United States because the plaintiffs failed to show that they were to receive the funds in the United States. Peterson v. Royal Kingdom of Saudi Arabia, 416 F.3d 83, 90 (D.C. Cir. 2005); Goodman Holdings v. Rafidain Bank, 26 F.3d 1143, 1146 (D.C. Cir. 1994) (stating that because "[no] United States location was designated as the 'place of performance' where money was 'supposed' to have been paid [to the plaintiffs]," an Iraqi bank's decision not to honor letters of credit had no direct effect in the United States); see also Weltover, 504 U.S. at 618-19 (finding that a direct effect resulted when Argentina rescheduled the maturity dates of bonds because the payees had previously designated accounts within the United States to receive the payments). Here, plaintiffs have not alleged that any properties or funds of which they have been deprived were payable within the United States.

Similarly, the injuries allegedly inflicted upon the American public and the American economy are entirely too far removed. A multitude of intervening events separate the actions of the Israeli defendants in the West Bank from any reduction in American exports, from any generalized harm to the American economy, and from any impact on the wallets of the American taxpayers. See Voest-Alpine Trading USA Corp. v. Bank of China, 142 F.3d 887, 894 n.10  (5th Cir. 1998) (stating that § 1605(a)(2) "does not permit jurisdiction over foreign states whose acts cause only speculative, generalized, immeasurable, and ultimately unverifiable effects in the

United States" (citing Weltover, 504 U.S. at 618)).  Plaintiffs have not shown, moreover, that any

impacts are more than negligible.  See Weltover, 504 U.S. at 618 (stating that jurisdiction may

not be predicated under § 1605(a)(2) based "on purely trivial effects in the United States").

Because plaintiffs have articulated neither a legally recognized commercial activity nor a direct

effect in the United States, the commercial activity exception does not operate to strip the Israeli

defendants of FSIA immunity.

### 4.  "Tortious Act" Exception

Plaintiffs' final attempt to pierce the FSIA immunity of the Israeli defendants is the

"tortious acts" exception under § 1605(a)(5).  This exception removes the cloak of immunity if

> money damages are sought against a foreign state for personal
> injury or death, or damage to or loss of property, occurring in the
> United States and caused by the tortious act or omission of that
> foreign state or of any official or employee of that foreign state
> while acting within the scope of his office or employment.

28 U.S.C. § 1605(a)(5).  But plaintiffs allege no tort that occurred on American soil.  To be sure,

plaintiff Jane Doe II alleges that she suffered emotional distress when she learned, from a

television report that she watched in the United States, that her family members were killed in the

West Bank.  However, both the tort and the injury must occur on United States territory.  See

Persinger v. Islamic Republic of Iran, 729 F.2d 835, 836-37 (D.C. Cir. 1984).  Plaintiffs have

failed to suggest that the Israeli defendants committed any tort on United States soil, and hence

the "tortious acts" exception under § 1605(a)(5) does not apply.

### C.  Personal Jurisdiction Over Individual Israeli Defendants

Plaintiffs have also failed to allege sufficient facts to establish personal jurisdiction over

the individual Israeli defendants.  Personal jurisdiction requires that the individual Israeli

defendants have sufficient minimum contacts with the District of Columbia, see Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945), which may exist in two forms: (1) general contacts that are "continuous and systematic," such that the forum has jurisdiction over any matter involving the defendant, see Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S. 408, 415-16 (1984); and (2) specific contacts that give rise to the actual claims against the defendant, see D.C. CODE ANN. § 13-423(b). The complaint does not allege facts sufficient to support a finding of general jurisdiction over any of the Israeli defendants. To the contrary, the complaint establishes that the individual Israeli defendants live abroad, acted abroad, and are employed abroad. Thus, if personal jurisdiction exists here at all, it must exist based on specific contacts.

The District of Columbia "long-arm statute" is the starting point for a specific contacts analysis, and authorizes jurisdiction if the defendant: (1) has "transacted any business" in the district, or (2) has caused tortious injury in the district by "an act or omission outside the district if the defendant regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered," in the district. D.C. CODE ANN. §§ 13-423(a)(1), (a)(3). The complaint is entirely devoid of any allegation that the individual Israeli defendants have "transacted any business" in the district. Section 13-423(a)(1) does not require physical presence in the district, see, e.g., Mwani, 417 F.3d at 12-13; see also Calder v. Jones, 465 U.S. 783, 788-90 (1984), but it does, by its plain language, require a business transaction that has some minimal nexus to the district, see § 13-423(a)(1). Such a nexus does not surface anywhere in plaintiffs' complaint.

The complaint also fails to allege facts that would support personal jurisdiction under § 13-423(a)(3). No plaintiff who suffered harm on American soil claims to reside in the District of

Columbia, or to have suffered any harm here.  Even if, as plaintiffs urge, the proper inquiry

focuses on the United States generally, rather than the District of Columbia specifically, see Pl.'s

Mem. Opp'n to Israeli Def.'s Mot. Dismiss at 30 & n.52, plaintiffs have not proffered facts

sufficient to show that the individual Israeli defendants satisfy the tortious harm provision.  For

example, the complaint contains no alleged "persistent course of conduct" in the United States,

nor is there any allegation that the individual Israeli defendants "derive substantial revenue from

goods used or consumed" in the United States.  Section 13-423(a)(3) requires not just tortious

harm on American soil, but an additional link to the individual Israeli defendants.

Furthermore, the D.C. long-arm statute only goes as far as the Due Process Clause will

permit.  Helmer v. Doletskaya, 393 F.3d 201, 205 (D.C. Cir. 2004).  The Due Process Clause

requires that the exercise of personal jurisdiction be consistent with "traditional notions of fair

play and substantial justice."  Int'l Shoe, 326 U.S. at 316.  At the very least, it must have been

reasonable for the individual Israeli defendants to anticipate that they could be made to account

for their actions in a United States court.  World-Wide Volkswagen Corp. v. Woodson, 444 U.S.

286, 297 (1980).  They must have "purposefully availed" themselves, in some way, of the

benefits and protections of American laws.  Hanson v. Denckla, 357 U.S. 235, 253 (1958).  The

complaint simply does not allege contacts that rise to the level demanded by the Constitution.

For many of the same reasons discussed above in connection with the "commercial

activity" FSIA exception, basing personal jurisdiction on the harms suffered by plaintiffs would

offend due process.  The complaint nowhere suggests that the individual Israeli defendants

"purposefully availed" themselves of the benefits and protections of American laws.  See

Hanson, 357 U.S. at 253.  Any connections between the challenged conduct and the United

25

States are fortuitous.  Ironically, the most illustrative example of this deficiency is also the closest that plaintiffs come to pleading adequate contacts -- Jane Doe II learned, through a television report, that her relatives, who lived abroad, had been killed or injured on foreign soil by the actions of foreign actors.  Any nexus between the actions of the Israeli actors and the United States is tenuous.  Plaintiffs would have this Court unravel the concept of personal jurisdiction through a framework that would permit personal jurisdiction whenever modern technology facilitates contact.  But plaintiffs have given the Court no basis to find that the requirements of the Due Process Clause, or the District of Columbia long-arm statute, are even colorably satisfied.

Plaintiffs alternatively argue that personal jurisdiction exists under the federal long-arm statute embodied in Fed. R. Civ. P. 4(k)(2).  Like the District of Columbia long-arm statute, the federal long-arm statute surfaces for the first time in plaintiffs' opposition papers.  Even so, it only authorizes personal service "[i]f the exercise of jurisdiction is consistent with the Constitution and laws of the United States."  Fed. R. Civ. P. 4(k)(2).  Because the Court has found that the claims against the individual Israeli defendants are actually disguised claims against Israel, and therefore there is no subject matter jurisdiction under the FSIA, exercising personal jurisdiction in this case would be inconsistent with United States law.  Moreover, it would violate the Constitution because the contacts alleged do not satisfy due process.

Plaintiffs next argue creatively that personal jurisdiction exists under the effects doctrine.  But that doctrine is reserved for "unabashedly malignant actions."  See GTE New Media Servs., Inc. v. BellSouth Corp., 199 F.3d 1343, 1349 (D.C. Cir. 2000).  It has been invoked in cases involving severe, even devastating, effects on the United States.  See Mwani, 417 F.3d at 4

26

(invoking the effects doctrine to justify personal jurisdiction over foreign terrorists in action

brought by family members of victims killed when United States Embassy in Kenya was

bombed); Rein v. Socialist People's Libyan Arab Jamahiriya, 995 F. Supp. 2d 325, 330

(E.D.N.Y. 1998) (invoking the effects test for Libyan terrorists who used explosives to destroy an

American commercial flight to the United States).  Here, again, any harms suffered by or in the

United States as a result of the actions challenged by plaintiffs were neither devastating nor

severe -- if felt at all, they are barely noticeable.

 The effects doctrine requires that the defendants have intended that their actions cause

injury in the United States.  See, e.g., Mwani, 417 F.3d at 4; GTE New Media, 199 F.3d at 1343;

Midland v. F. Hoffman Laroche, Ltd., 270 F. Supp. 2d 15, 32 (D.D.C. 2003).  Although the

complaint is nearly 150 pages long, it nowhere suggests that any Israeli actors intended to cause

any damage or suffering within the United States.  Indeed, the complaint alleges a conspiracy

between the Israeli actors and two high-ranking American executive officials, which undercuts

any assertion that the actions of the Israeli actors were "purposefully directed" to cause harm in

the United States.  Burger King Corp. v. Rudzewicz, 471 U.S. 462, 472 (1985) (citing Keeton v.

Hustler Magazine, 465 U.S. 770, 774 (1984)).

 At most, the complaint alleges that the Israeli actors may have directed their alleged

actions at the Palestinian people generally or at individual plaintiffs of Arab/Palestinian descent.

But there is no suggestion that the Israeli actors knew, for example, that an injured Palestinian

had family members located in the United States, who would learn of the injury and suffer

distress in America as a result.  The complaint may allege that Israeli actors were indifferent to

the fact that plaintiffs held dual citizenship as Americans, but this falls short of the mark.  The

effects doctrine is therefore not a viable option for personal jurisdiction here.  Nor will the Court

hinge a finding of personal jurisdiction on a theory of civil conspiracy.  For the reasons discussed

below in connection with the RICO claims against the Rinat defendants, plaintiffs have failed to

adequately allege any civil conspiracy or RICO claim; the Court's due process concerns,

moreover, apply here with equal force.

**D.  Head of State Immunity as to Defendant Sharon**

       When the Executive Branch concludes that a recognized leader of a foreign sovereign

should be immune from the jurisdiction of American courts, that conclusion is determinative.

See Ye v. Zemin, 383 F.3d 620, 625-27 (7th Cir. 2004); Tachiona v. United States, 386 F.3d 205,

221 (2d Cir. 2004); cf. Ex Parte Republic of Peru, 318 U.S. 578, 589 (1943); Compania Espanola

de Navegacion Maritima, S.A. v. The Navemar, 303 U.S. 68, 74 (1938).  The decision to grant or

deny immunity to the leader of a foreign sovereign undoubtedly has significant implications for

this country's foreign policy efforts.  Ye, 383 F.3d at 627 (citing Republic of Mexico v. Hoffman,

324 U.S. 30, 35 (1945)); see Enahoro v. Abubakar, 408 F.3d 877, 892 (7th Cir. 2005).  "Just as

the FSIA is the Legislative Branch's determination that a nation should be immune from suit in

the courts of this country, the immunity of foreign leaders remains the province of the Executive

Branch."  Ye, 383 F.3d at 627.  When, as here, the Executive has filed a Suggestion of Immunity

as to a recognized head of a foreign state, the jurisdiction of the Judicial Branch immediately

ceases.  See, e.g., El-Hadad v. Embassy of United Arab Emirates, 69 F. Supp. 2d 69, 82 n.10

(D.D.C. 1999); Flatow v. Islamic Republic of Iran, 999 F. Supp. 1, 24 (D.D.C. 1998).  Defendant

Sharon is the recognized head of state for Israel, and based on the June 11, 2003 Suggestion of

Immunity submitted to this Court, he is entitled to immunity under the head-of-state doctrine.

Plaintiffs disjointedly argue that he waived his head of state immunity more than twenty years ago, before taking office, through the filing of a defamation claim in a United States court.  See Pl.'s Mem. Opp'n to Israeli Def.'s Mot. Dismiss at 23-24.  Not only is this argument unsupported by the case law, but it is entirely irrelevant -- the filing of a Suggestion of Immunity ends the court's inquiry.  See, e.g., First Am. Corp. v. Al-Nahyan, 948 F. Supp. 1107, 1119 (D.D.C. 1996).

## E.  Justiciability and Prudential Concerns

Even were there personal jurisdiction and subject matter jurisdiction under FSIA, this case nonetheless could not proceed because it is replete with nonjusticiable political questions. Moreover, the Court would abstain from exercising jurisdiction because of prudential concerns embodied in the act of state doctrine.

### 1.  Political Question Doctrine

The political question doctrine is a natural outgrowth of fidelity to the concept of separation of powers.  It is based upon respect for the pronouncements of coordinate branches of government that are better equipped and properly intended to consider issues of a distinctly political nature.  See Doe Mem. Op. at 9.  The Supreme Court has enumerated six situations that constitute political questions, over which there is no jurisdiction to proceed.  Baker v. Carr, 369 U.S. 186, 210, 217 (1962); Hwang Geum Joo v. Japan, 413 F.3d 45, 48 (D.C. Cir. 2005).  The six categories of nonjusticiable political questions are:

> . . . [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving [the issue]; or [3] the impossibility of deciding the issue without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of

> government; or [5] an unusual need for unquestioning adherence to
> a political decision already made; or [6] the potentiality of
> embarrassment from multifarious pronouncements by various
> departments on one question.

Baker, 369 U.S. at 217; see also Chicago & S. Airlines v. Waterman S.S. Corp., 333 U.S. 103,

111-12 (1948).  Most of these categories are pertinent to the instant case.

The first Baker factor is undeniably implicated here.  It is hard to conceive of an issue

more quintessentially political in nature than the ongoing Israeli-Palestinian conflict, which has

raged on the world stage with devastation on both sides for decades.  The region of the Middle

East specifically, and the entire global community generally, is sharply divided concerning these

tensions; American foreign policy has come under attack as a result.  This Court has previously

observed that "foreign policy is constitutionally committed to the political branches, and disputes

over foreign policy are nonjusticiable political questions."  Doe Mem. Op. at 10 (citing Haig v.

Agee, 453 U.S. 280, 292 (1981); Tel-Oren v. Libyan Arab Republic, 726 F.2d 774, 803 (D.C.

Cir. 1984); Luftig v. McNamara, 373 F.2d 664, 665-66 (D.C. Cir. 1967)).

Plaintiffs would have this Court adjudicate the rights and liabilities of the Palestinian and

Israeli people, making determinations on such issues as to whom the land in the West Bank

actually belongs.  Plaintiffs ask this Court to declare that Israel's self-defense policies are

tantamount to terrorism, Compl. at 22 ¶ 76, racketeering, Compl. at 118-20, or some other form

of illegal activity.  The Court can do none of this.  Whether plaintiffs dress their claims in the

garb of RICO or other federal statutes, or the tort laws of various states, the character of those

claims is, at its core, the same:  peculiarly volatile, undeniably political, and ultimately

nonjusticiable.  A ruling on any of these issues would draw the Court into the foreign affairs of

the United States, thereby interfering with the sole province of the Executive Branch.  See Doe

Mem. Op. at 10.  Our government's foreign relations are "committed by the Constitution to the

Executive and Legislative -- 'the political' -- Departments of the Government, and the propriety

of what may be done in the exercise of this political power is not subject to judicial inquiry or

decision."  Oetjen v. Cent. Leather Co., 246 U.S. 297, 302 (1918).

This case also implicates the third, fourth, and sixth Baker categories.  The RICO claims

against Israeli defendants, which would require this Court to make a predicate finding on what is

certainly a political question, are a particularly good example.  The Court cannot find that

plaintiffs state a RICO claim unless the Court implicitly determines that the Israeli settlement

activities are illegal or tortious.  That, as discussed above, is a foreign relations determination to

be made by the Executive or Legislative Branches, and the Court would usurp the roles of those

coordinate branches if it were to intrude.  Such a conclusion would also implicitly condemn

American foreign policy by suggesting that the support of Israel is wrongful.  Conclusions like

these present a potential for discord between the branches that further demonstrates the

impropriety of a judicial decision on these quintessential political issues.

Plaintiffs' state common law tort claims also illustrate that this case is nonjusticiable.

Those claims implicate the second and third Baker categories.  At first blush, it might appear that

plaintiffs only seek redress for suffering or some other vindication of their rights, but "[t]his

argument begs the question."  Schneider v. Kissinger, 310 F. Supp. 2d 251, 260 (D.D.C. 2004).

The legality or propriety of the Israeli defendants' actions in the West Bank directly weighs on

whether plaintiffs' injuries are redressable under the law.  Again, this would require the Court to

characterize the ongoing armed conflict in the West Bank as either "genocide," Compl. at 112, or

self-defense, <u>see</u> Fed. Def.'s Mot. Dismiss at 37-39.  Such a predicate policy determination is

plainly reserved to the political branches of government, and the Court is simply not equipped

with "judicially discoverable or manageable standards" for resolving a question of this nature.

<u>See</u> <u>Schneider</u>, 310 F. Supp. at 261-63; <u>see</u> <u>also</u> Fed. Def.'s Mot. Dismiss at 37-39.

### B.  Act of State Doctrine

A close cousin of the political question doctrine, the act of state doctrine prevents a court

from deciding a case "when the outcome turns upon the legality or illegality . . . of official action

by a foreign sovereign performed within its own territory."  <u>Owens v. Republic of Sudan</u>, 374 F.

Supp. 2d 1, 26 (D.D.C. 2005) (quoting <u>Riggs Nat'l Corp. & Subsidiaries v. Comm'r of IRS</u>, 163

F.3d 1363, 1367 (D.C. Cir. 1999)).  While the political question doctrine is based on

constitutional separation of powers concerns, <u>see</u> <u>Doe</u> Mem. Op. at 9, the act of state doctrine is

based on prudential separation of powers concerns, <u>see</u> <u>Siderman de Blake</u>, 965 F.2d 699, 707

(9th Cir. 1992), as well as notions of sovereign respect and intergovernmental comity, <u>see</u> <u>Rong</u>,

362 F. Supp. 2d at 99 n.12.  It reflects the judiciary's reluctance to complicate foreign affairs by

validating or invalidating the actions of foreign sovereigns.  <u>Owens</u>, 374 F. Supp. 2d at 26

(quoting <u>W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp.</u>, 493 U.S. 400, 404 (1990)).  The

doctrine is implicated "when the outcome of a case turns upon [] the effect of official action by a

foreign sovereign."  <u>Abu Ali v. Ashcroft</u>, 350 F. Supp. 2d 28, 57-58 (D.D.C. 2004) (citing <u>W.S.</u>

<u>Kirkpatrick</u>, 493 U.S. at 407-10).  When it applies, the act of state doctrine is a rule of law that

requires courts to presume that actions taken within a foreign sovereign's own territory are valid.

<u>World Wide Minerals, Ltd. v. Republic of Kazakhstan</u>, 296 F.3d 1154, 1165 (D.C. Cir. 2002).

Three factors must be considered in order to determine whether the act of state doctrine

should be invoked here:  (1) the degree to which consensus has been reached regarding a particular area of international law; (2) the potential significance of any implications that the issue may have on the foreign relations of the United States; and (3) whether there has been a regime change removing from power the government that perpetrated the act of state.  <u>Sabbatino</u>, 376 U.S. at 427-28.  The first factor requires little attention, as it is undeniable that the Israeli-Palestinian conflict has sharply divided the world -- the only consensus is that the situation is regrettable.  Likewise, the third factor is also easily disposed of -- Israel has not, since the time that the challenged acts of state took place, experienced a regime change.  The heart of <u>Sabbatino</u>, and the core of the analysis here, is the second factor -- the potential for interference with the foreign relations of the United States.  <u>See</u> <u>Int'l Ass'n of Machinists v. OPEC</u>, 649 F.2d 1354, 1360 (9th Cir. 1981).

The actions challenged by plaintiffs are classic acts of state.  <u>See</u> <u>Underhill v. Hernandez</u>, 168 U.S. 250, 254 (1897).  Tort challenges brought against foreign military officials for such alleged harms as unlawful detention during a political revolution implore the courts to "'declare invalid' and deny 'legal effect to acts of a military commander representing the . . . government.'" <u>Abu Ali</u>, 350 F. Supp. 2d at 58 (quoting <u>W.S. Kirkpatrick</u>, 493 U.S. at 405).  Plaintiffs do not challenge the actions of third-parties in procuring the alleged unlawful acts, <u>see</u> <u>Abu Ali</u>, 350 F. Supp. 2d at 58-59; <u>see also</u> <u>W.S. Kirkpatrick</u>, 493 U.S. at 406-07; rather, they ask this Court directly to declare that they were treated illegally by Israeli defendants on Israeli soil.  Such a determination would offend notions of international comity and sovereignty.  <u>See</u> <u>World Wide Minerals</u>, 296 F.3d at 1165-66.  Indeed, "'[t]o permit the validity of the acts of [Israel] to be reexamined and perhaps condemned by the courts of [the United States] would very certainly

33

imperil the amicable relations between [those] governments and vex the peace of nations.'" Sabbatino, 376 U.S. at 415 (quoting Oetjen, 246 U.S. at 303-04).

Similarly, the federal courts have long recognized that the exploitation of natural resources and land within a nation's own borders[6] is, by legal definition, an act of state.  See Sabbatino, 376 U.S. at 428; World Wide Minerals, 296 F.3d at 1165; Riggs Nat'l Corp. v. Comm'r of IRS, 163 F.3d 1363, 1367 (D.C. Cir. 1999).  Even if, as plaintiffs allege, the Israeli defendants have taken land or possessions for the use of Israel and its people, such actions are only possible by virtue of the fact that the Israeli defendants are vested with the powers and resources of the Israeli government.  See Alfred Dunhill v. Republic of Cuba, 425 U.S. 682, 701-04 (1976); see also Roe v. Unocal Corp., 70 F. Supp. 2d 1073, 1079 (C.D. Cal. 1999).  It is of no moment that some plaintiffs are United States citizens.  See Sabbatino, 376 U.S. at 424-25.  The acts challenged are those of the Israeli state, through individual actors carrying out the mandate of the state for its benefit.

Plaintiffs' claims would require the Court to adjudicate sensitive issues of a political nature that would offend notions of international comity.  The fact that plaintiffs have alleged *jus cogens* violations does not change things.  Within our territorial borders, the law of the United States is paramount, under which the law of nations does not preempt the act of state doctrine even if the conduct at issue allegedly violates international law.  Sabbatino, 376 U.S. at 422 (recognizing that United States courts will apply international law as part of its own law when a

---

[6]The analysis is essentially unchanged by plaintiffs' argument that the challenged actions did not occur within the borders of Israel.  That argument also raises a political question -- the Court is not competent to adjudicate whether the West Bank, in dispute for decades, belongs to the Israelis or the Palestinians.

case presents an appropriate circumstance in which to do so, but "the public law of nations can

hardly dictate to a country which is in theory wronged how to treat that wrong within its domestic

borders").  Plaintiffs' complaint is littered with issues that the political question and act of state

doctrines shield from judicial review.

## F.  Extraterritorial Application of RICO

Plaintiff John Doe II has alleged RICO violations against the Israeli defendants.[7]

Although he seeks to apply RICO to foreign defendants and foreign actions, he never addresses

whether RICO applies extraterritorially at all, an issue this Circuit has not yet had occasion to

reach.  See AGS Int'l Servs S.A. v. Newmont USA Ltd., 346 F. Supp. 2d 64 (D.D.C. 2004)

(declining to consider whether RICO applies extraterritorially because court lacked personal

jurisdiction over the defendants); BCCI Holdings (Luxembourg), Societe Anonyme v. Khalil, 20

F. Supp. 2d 1, 5-6 (D.D.C. 1997) (declining to decide whether RICO applies extraterritorially

because the case actually called for a domestic application of the statute).

RICO does not indicate whether it is limited to the domestic borders of the United States.

See Pl.'s Mem. Opp'n to Rinat Def.'s Mot. Dismiss at 5; see also N.S. Fin. Corp. v. Al-Turki, 100

F.3d 1046, 1051 (2d Cir. 1996).  The question is thus one of statutory interpretation.  Courts

diverge regarding whether RICO applies extraterritorially at all.  Compare John Doe I v. Unocal

Corp., 395 F.3d 932 (9th Cir. 2002) (holding that RICO may apply extraterritorially), with Jose

v. M/V Fir Grove, 801 F. Supp. 349 (D. Or. 1991) (declining to apply RICO to extraterritorial

---

[7]The complaint identifies only John Doe II as the plaintiff for these RICO claims.  Compl. at 118.
However, plaintiff uses boilerplate language that suggests, through the use of plural nouns, that
multiple plaintiffs are claiming RICO violations.  Id. at 119-20.  The Court interprets this as
careless editing.

labor practices).  Those courts that have answered in the affirmative have not reached a clear

consensus regarding the legal test to use.  Compare, e.g., United States v. Noriega, 746 F. Supp.

1506, 1516-17 (S.D. Fla. 1990) (finding that RICO applies to extraterritorial narcotic-trafficking

conduct if the racketeering activities produce, or are intended to produce, effects within the

United States), with N.S. Fin., 100 F.3d at 1052 (declining to specify a test for extraterritorial

application of RICO).  Courts agree, however, that the key consideration is congressional intent.

See, e.g., N.S. Fin., 110 F.3d at 1052; Jose, 801 F. Supp. at 355; Noriega, 746 F. Supp. at 1516.

        The Court concludes that Congress intended RICO to apply extraterritorially, but not to

cases like this one.  RICO was certainly meant to sweep broadly.  See S. Rep. No. 91-617, p. 76

(1969) (stating that "the attack [on organized crime] must take place on all available fronts").

Congress sought to eradicate the substantial and detrimental economic consequences that plague

the United States as a result of organized crime activity.  See RICO Statement of Findings and

Purpose, Pub. L. No. 91-452, 84 Stat. 922 (1970), 91st Cong., 2d Sess., reprinted in 1970 U.S.

Code Cong. & Admin. News 1073, 1073.  Inferentially, Congress also sought to eradicate the

effects of such activity on our domestic security.  See Noriega, 746 F. Supp. at 1517.  As the

example has been framed, the United States surely would exercise jurisdiction to "prosecute a

person standing in Canada who fires a bullet across the border which strikes a second person

standing in the United States."  Id. at 1512-13.  Many modern criminal organizations have an

international infrastructure, and the crimes (as well as their effects) transcend national borders.

Activities traditionally associated with organized crime, such as wire fraud and money

laundering, may originate from a different continent than the ultimate place of impact of the

crime, and intermediate actors may be located in yet a third place.  The nationality of the criminal

enterprise or the locus of the racketeering activity alone, then, should not limit RICO's grasp. See id. at 1517. Rather, it appears that Congress focused on the character of the activity -- things in the nature of classic organized crime -- and the substantial, deleterious effects that such activity has on the United States. Thus, RICO encompasses activities like drug-trafficking, as the Noriega court determined, but may not encompass activities like labor violations, as the Jose court determined.

As the notes following § 1961 state, RICO is to be "liberally construed to effectuate its remedial purpose." Pub. L. No. 91-452, § 904(a), 84 Stat. 947; U.S. v. Kaye, 556 F.2d 855, 859 (7th Cir. 1977). But it may not be transformed into an avenue through which to litigate the political crises of the global community. The activity at issue must, at minimum, produce or be intended to produce effects in this country. Noriega, 746 F. Supp. at 1517. Even under this generous construction of the statute, the Israeli defendants' actions are not capable of being shoe-horned into a legally cognizable wrong. There is no indication that Congress ever contemplated that RICO would lay the foundation for individual citizens to invalidate a foreign sovereign's internal policies and national security during a persistent armed conflict. And even if such evidence did exist, it still would not support an extraterritorial application of RICO to solely personal harms suffered overseas that only marginally -- and tangentially -- impact American commerce.

Notions of comity further support the conclusion that asserting extraterritorial jurisdiction in this particular case would be unreasonable. See Third Restatement of Foreign Relations Law of the United States § 403(2). The factors used to assess reasonableness include: (1) the degree of conflict with foreign law or policy; (2) the extent to which enforcement by either state can be

expected to achieve compliance; (3) the relative significance of effects on the United States as compared with those elsewhere; (4) the extent to which there is an explicit purpose to harm or affect American commerce; and (5) the forseeability of such an effect.  See Timberlane Lumber Co. v. Bank of Am., 549 F.2d 597, 614 (9th Cir. 1976) (stating that the strengths of the United States must be weighed against the interests of other nations under these factors in order to justify an assertion of extraterritorial antitrust authority); Jose, 801 F. Supp. at 355 (applying Timberlane factors to the issue of whether RICO applies extraterritorially).

As the Court has already explained, exercising jurisdiction over this case would greatly intrude on the Executive Branch's exclusive authority over this nation's foreign affairs.  It is also highly unlikely that applying RICO would affect the way that the Israeli defendants treat John Doe II, or other Palestinians, in the future -- a decision by this Court will not cause a broad shift in Israeli policy.  Thus, enforcement of RICO here cannot be said to effectuate compliance with RICO in the future.  Moreover, the primary and significant effects of the Israeli defendants' actions are felt abroad, not in the United States; indeed, any effect on American commerce has been negligible, unforeseeable, and unintended.  Hence, no relevant factor counsels in favor of applying RICO extraterritorially.

## II.  THE RINAT DEFENDANTS

## A.  Extraterritorial Application of RICO

Plaintiff John Doe II bases his civil RICO claims against the Rinat defendants on 18 U.S.C. §§ 1962(b), (c), and (d).[8]  Compl. at 118-20.  He seeks to hold the Rinat defendants

---

[8]Section 1962(b) makes it illegal for "any person through a pattern of racketeering activity . . . to acquire or maintain, directly or indirectly, any interest in or control of any enterprise which is engaged in, or the activities of which affect, interstate or foreign commerce."  Section 1962(c)

accountable for the actions of the settler defendants and Israeli defendants in the West Bank, based upon the Rinat defendants' own actions on American soil.  See Pl.'s Mem. Opp'n to Rinat Def.'s Mot. Dismiss at 13.  The § 1962(c) claim essentially alleges that, by engaging in fund-raising and contribution activities within the United States, the Rinat defendants participated in the alleged conduct against John Doe II in the West Bank, which would not have been possible but for those activities.  Id. at 14, 15, 20.  Under § 1962(b), plaintiff claims that the Rinat defendants have acquired an interest in an enterprise by way of the confiscated land in the West Bank.  Compl. at 118-20.  The Rinat defendants allegedly participated in a "pattern of racketeering activity" -- actions taken by the settler defendants and the Israeli defendants in the West Bank -- through their fund-raising and contribution activities.  See Pl.'s Mem. Opp'n to Rinat Def.'s Mot. Dismiss at 7; Compl. at 119-20 ¶ 465.  Under § 1962(d), plaintiff claims that the Rinat defendants committed an overt act in furtherance of a conspiracy by providing financial contributions to the settler defendants.  See Compl. at 118-20.  Plaintiff concedes that most effects of the Rinat defendants' activities occurred overseas.  Pl.'s Mem. Opp'n to Rinat Def.'s Mot. Dismiss at 6.

Although plaintiff John Doe II and the Rinat defendants have proceeded upon the assumption that these claims invoke an extraterritorial application of RICO, that initial inquiry must be addressed.  See Envtl. Def. Fund v. Massey, 980 F.2d 528, 532 (D.C. Cir. 1993); see also Khalil, 20 F. Supp. 2d at 506.  Plaintiff claims that "major aspects of the conspiracy

_____

makes it illegal for any person to engage, either directly or indirectly, in the conduct of an enterprise's affairs through a "pattern of racketeering activity" if that enterprise, or its activities, affect foreign or interstate commerce.  The conspiracy provision, § 1962(d), provides for liability when a person conspires to violate other sub-sections of § 1962.

occurred in the United States and that the conduct of the [Rinat] defendants in the United States directly caused the loss of John Doe II's land."  Pl.'s Mem. Opp'n to Rinat Def.'s Mot. Dismiss at 7.  Putting aside for the moment any doubts about the substantive adequacy of such boilerplate assertions, this statement actually calls for a domestic application of RICO.  Plaintiff John Doe II is an American citizen, seeking to hold the Rinat defendants -- all of whom are American citizens -- responsible for fund-raising and contribution efforts in the United States that allegedly caused his injuries.  Thus, the conduct at issue, and the location of the actors who engaged in that conduct, is domestic.  Moreover, plaintiff's RICO claim fails because the complaint does not satisfy the substantive elements of the statute.

### A. "Racketeering Activity" Under §§ 1962(b), (c), and (d)[9]

The language of § 1961(1)(A), which defines "racketeering activity" for purposes of RICO as "any act or threat *involving* murder, kidnapping, gambling, arson, robbery, bribery, [or] extortion" (emphasis added),[10] may be broad enough to encompass the acts of the Rinat

---

[9]Under § 1962(d), racketeering activity need not actually take place, although there must be a conspiracy to engage in activities that, if carried out, would constitute racketeering.  For the reasons discussed in this section, none of the activities that plaintiff has alleged are contemplated by § 1961(1), and hence any conspiracy to engage in such activities is not a conspiracy to engage in racketeering.

[10]Plaintiff also directs the Court to § 1961(1)(B), defining "racketeering activity" as "any act which is indictable under . . . [18 U.S.C. § 1951]."  Section § 1951(a) provides for liability of "whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section."  The complaint does not satisfy the plain language of this provision -- it claims that he was deprived of his real property, which is not suited to "movement" in commerce.  Moreover, the Rinat defendants are not accused of robbery or extortion; they are accused of making possible the acts allegedly committed by the Israeli defendants and the settler defendants.

defendants.  Plaintiff never alleges that the Rinat defendants themselves engaged in any of the specific predicate offenses listed in § 1961(1), but only that they facilitated those offenses, which were directly carried out by Israeli defendants and settler defendants in the West Bank.  If "involving" were given its broadest construction, then plaintiff's allegations that the Rinat defendants' fund-raising and contribution efforts made the alleged "racketeering activity" in the West Bank possible might be sufficient.  But the Court declines to adopt such an expansive interpretation because it would impose limitless liability under RICO.  Under plaintiff's approach, a single nefarious act in a chain of events would impose liability upon one who merely donated money.  In essence, RICO would be converted into a global tort statute with no boundaries.  Although Congress intended RICO to have a broad reach, the Court will not so lightly imply an intent that RICO should constitute an omnipresent blanket of liability that could chill a wide range of economic and First Amendment activity.

The Seventh Circuit's decision in <u>Boim</u> strongly supports this conclusion.  <u>See</u> 291 F.3d 1000.  Both cases concern landmark legislation that was intended reach broadly, and both statutes use the word "involve."  The <u>Boim</u> plaintiffs, like John Doe II, were American citizens alleging harm that resulted from "terrorist" activity in the same region of the world.  The <u>Boim</u> defendants, like the Rinat defendants, were accused of furthering that activity through fund-raising and financial contributions.  Finally, both the <u>Boim</u> defendants and the Rinat defendants are entities with legitimate purposes:  in <u>Boim</u>, the defendants provided humanitarian aid, and here, the Rinat defendants provide religious and spiritual guidance.  The Seventh Circuit held in <u>Boim</u> that even though the word "involve" indicates that Congress intended that plaintiffs "recover from anyone along the causal chain of terrorism," it is not enough that defendants

contributed, through funding, to the conduct abroad because "[t]o say that funding *simpliciter* constitutes an act of terrorism is to give the statute an almost unlimited reach.  Any act which turns out to facilitate terrorism, however remote that act may be from actual violence and regardless of the actor's intent, could be construed to 'involve' terrorism."  291 F.3d at 1011.  At minimum, a plaintiff must show knowledge of, or an intent to further, the recipient's violent criminal acts.  Id.

Plaintiff John Doe II claims that the Rinat defendants knew of the settler defendants' activities in the West Bank, and provided funds "specifically earmarked" to help with those settlement activities.  See, e.g., Compl. at 21 ¶ 74; Pl.'s Mem. Opp'n to Rinat Def.'s Mot. to Dismiss at 14, 18-19.  Yet plaintiff acknowledges that these funds were "earmarked" only for the purchase of protective equipment designed to *deflect or prevent* harm.  See Compl. at 33 ¶ 111.  Plaintiff pleads no specific facts to support a finding that the Rinat defendants themselves engaged in racketeering activity, or that they knew -- or intended -- that settler defendants or Israeli defendants would engage in arson, robbery, murder, or other menacing activity contemplated by § 1961(1).  The sole allegation is that they provided funds to the settler defendants, which were then used to buy materials like bullet-proof vests, helmets, and ambulances.  It cannot fairly be said that the conduct of the Rinat defendants in helping the settler defendants to acquire these materials sufficiently "involve[d]" racketeering activity.  Neither Rinat Congregation, nor the State of Israel, is designated a "terrorist organization" by the federal government.  In Boim, one of the defendants -- Hamas -- was at the time, and remains today, a designated terrorist organization, yet even under that more compelling set of circumstances, mere

fund-raising and contribution activities alone were held not to be legally actionable.[11]

Finally, the justiciability concerns discussed above also operate here.  John Doe II asserts that the Rinat defendants "knowingly provided funds specifically earmarked for materials that are used by the Settlement to illegally terrorize neighboring property owners and confiscate their land and are coconspirators in the illegal acts of the enterprise."  Compl. at 21 ¶ 74.  Again, the Court is asked implicitly to find that the Israeli occupation and settlement efforts constitute "racketeering activity" and "illegal acts," which would require the Court to adjudicate the legality and propriety of the ongoing Israeli-Palestinian conflict.  This would draw the Court into nonjusticiable political questions and issues protected by the act of state doctrine.

### 2.  Other Infirmities Regarding the RICO Claims

In any event, the RICO claims ultimately fail because they suffer from other legal insufficiencies.  The complaint's broad and vague assertions simply recite legal conclusions and regurgitate the RICO elements without directing the Court to specific facts.[12]  Plaintiff has attempted to cure these deficiencies in his opposition papers, but the Court is not obligated to accept as true those facts that surface for the first time in opposition papers.  See Kowal, 16 F.3d at 1276.  The complaint is replete with legal conclusions that simply mirror statutory language without providing any real information.

To begin with, plaintiff has failed clearly to allege a criminal enterprise as required under

---

[11]Plaintiff has asked to amend his complaint so as to include a claim under the Anti-Terrorism Act, 18 U.S.C. § 2333, which is the statute at issue in Boim.  The Court denies that request because Boim demonstrates that any claim under § 2333 would ultimately fail; hence, any amendment would be futile.  See Foman v. Davis, 371 U.S. 178, 182 (1962).

[12]Hence, the complaint does not enable this Court to identify the contours and substance of the RICO claims, nor does it give the Rinat defendants proper notice of the allegations against them.

§ 1962(b) and § 1962(c).  Plaintiff sometimes identifies the criminal enterprise as an association in fact between the settler defendants, Israeli defendants, and Rinat defendants, see Compl. at 118 ¶ 458; at other times, plaintiff claims the criminal enterprise is his land in the West Bank, id. at 119 ¶ 461; Pl.'s Mem. Opp'n to Rinat Def.'s Mot. Dismiss at 9, or the "illegal occupation of the land [in the West Bank]," see Pl.'s Mem. Opp'n to Rinat Def.'s Mot. Dismiss at 18, 19.  Such a moving target is too indefinite for the Rinat defendants properly to defend against.  The existence of an enterprise must be shown through facts that allege (1) a common purpose among the participants, (2) organization, and (3) continuity.  United States v. Richardson, 167 F.3d 621, 625 (D.C. Cir. 2000).  The most palpable deficiency here is the lack of any inference of "organization."  It is not enough for a group of individuals to commit acts enumerated by § 1961(1); plaintiff must assert that those individuals were organized together in some way, and that there was a structure to the association.  See United States v. Turkette, 452 U.S. 576, 583 (1981); United States v. Perholtz, 842 F.2d 343, 363 (D.C. Cir. 1988).  The complaint never links the Israeli defendants to the settler defendants or to the Rinat defendants through allegations of common orders or control.

    The closest plaintiff comes is his allegation that the Rinat defendants "filled orders for paramilitary equipment" for the settler defendants, based on a list of items provided by the settler defendants.  See Pl.'s Mem. Opp'n to Rinat Def.'s Mot. Dismiss at 19.  Of course, this allegation only appears in plaintiff's opposition papers, and is wholly unsupported by the complaint; thus, the Court is not required to accept it as true.  See Calvetti, 346 F. Supp. 2 at 107.  Plaintiff's complaint never explains how the several groups of defendants associated or operated together, or were otherwise organized into an enterprise with a shared decision-making infrastructure.  See

44

<u>Dodd v. Infinity Travel</u>, 90 F. Supp. 2d 115, 117 (D.D.C. 2000). Plaintiff's allegations are, standing alone, insufficient to show that the "organization" element for a criminal enterprise under RICO is satisfied.

As for the conspiracy claim under § 1962(d), plaintiff must show a subjective agreement on the part of the Rinat defendants to further the predicate acts allegedly carried out by the settler defendants and the Israeli defendants. <u>See</u> <u>Salinas v. United States</u>, 522 U.S. 52, 63-65 (1997). But the complaint never provides specific facts to suggest that the Rinat defendants knew that such predicate acts were occurring, that the exact settler defendants receiving their donations were committing these acts, or that their contributions might be used to commit these acts. The complaint uses the word "knowingly" as a bare, conclusory assertion, but without sufficient allegations of basic awareness, there is not adequate pleading of subjective agreement or intent. There is never any minimal demonstration or objectively sufficient allegation of the subjective agreement that is necessary to form a conspiracy actionable under § 1962(d).

**B. Personal Jurisdiction Over the Rinat Defendants**

If plaintiffs could state a colorable RICO claim, then the nationwide service of process provision in RICO, <u>see</u> 18 U.S.C. § 1965(b), might have been available to provide personal jurisdiction over the Rinat defendants.[13] Absent a basis for jurisdiction under RICO, however, plaintiffs must satisfy the traditional personal jurisdiction analysis under the District of Columbia long-arm statute and due process, which the Court finds that plaintiffs have failed to do.

---

[13]Because the RICO claims will be dismissed, the Court will not exercise pendent jurisdiction over the state tort law claims standing alone. <u>See</u>, <u>e.g.</u>, <u>Network Prospect v. Corp. for Pub. Broad.</u>, 561 F.2d 963, 970 (D.C. Cir. 1977); <u>Covad Comm. Co. v. Bell Atlantic Corp.</u>, 201 F. Supp. 2d 123, 135 (D.D.C. 2002).

As discussed earlier, the District of Columbia long-arm statute allows for personal jurisdiction over defendants that have either (1) "transacted any business" in the District, or (2) caused tortious injury in the District by "an act or omission outside the district if the defendant regularly does or solicits business, engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed, or services rendered," in the District. D.C. CODE ANN. §§ 13-423(a)(1), (a)(3). Plaintiffs never allege that the Rinat defendants physically conducted business within the District of Columbia, but that alone is not fatal under § 13-423(a). See Mwani, 417 F.3d at 12-13. Nonetheless, plaintiffs have not characterized the Rinat defendants' actions in a way that comes within the literal language of §§ 13-423(a)(1) or (a)(3).

Plaintiffs make much of the fact that the Rinat defendants operate a website accessible from within the District of Columbia that has fund-raising capability and provides a forum for the exchange of contact information. They argue that the website is sufficient to establish minimum contacts consistent with due process, but the Court is not convinced. The complaint is devoid of any alleged interaction that suggests defendants have "purposefully availed" themselves of the benefits or protections of District of Columbia law, see Int'l Shoe, 326 at 316, or that they have entangled themselves with the District of Columbia in a way that makes it foreseeable that they could be haled into court here, World-Wide Volkswagen, 444 U.S. 286 at 297. The complaint never asserts that donations were made from within the District of Columbia, were solicited here, or were made by District of Columbia residents. Plaintiffs allege no harm to District of Columbia residents, and assert no impact upon the District of Columbia at all.

Instead, plaintiffs urge an expansive interpretation of personal jurisdiction that has not been embraced by the federal courts. See GTE New Media, 199 F.3d at 1350 (stating that

"[p]ersonal jurisdiction surely cannot be based solely on the ability of District residents to access the defendants' websites, for this does not by itself show any persistent course of conduct by the defendants in the District . . . .  Indeed, under this view, personal jurisdiction in Internet-related cases would almost always be found in any forum in the country").  A website accessible by computers in the District of Columbia, or by District of Columbia residents, is not purposeful availment; rather, it is merely an unavoidable side-effect of modern internet technology. Although personal jurisdiction may be based *in part* on a defendant's maintenance of a website that, in conjunction with other contacts with the District of Columbia, supports an inference of purposeful availment, see Heroes Inc. v. Heroes Found., 958 F. Supp 1, 5 (D.D.C. 1996) (declining to decide whether the defendant's maintenance of a website, without more, would be sufficient to establish minimum contacts), such facts are not present here.

Plaintiffs claim that, because the Rinat website is highly "interactive," they were not required to assert other facts to support a finding of minimum contacts.  In GTE New Media, the D.C. Circuit distinguished between "passive" and "interactive" websites, and stated that the former will not, without more, support personal jurisdiction.  See 199 F.3d at 1348.  Although the Rinat website accepts donations, facilitates communication, and supports the exchange of contact information, the Court is not convinced that it is the type of "interactive" website envisioned by the D.C. Circuit in GTE New Media.  See Gorman v. Ameritrade Holding Corp., 293 F.3d 506, 512-14 & n.5 (D.C. Cir. 2002).  Rather, the Rinat website is more akin to the "essentially passive" website at issue in GTE New Media than it is to the "interactive" website at issue in Gorman.  See 293 F.3d at 512-14 & n.5.  Unlike the Gorman website, the Rinat website does not allow individuals to enter into contracts, open accounts, or otherwise transact business

online through the website.  The website targets a local congregation in New Jersey, is intended to reach a limited audience with a shared ideology in that community, and is no more "interactive" than any basic website -- it is not the virtual equivalent of being present in the District of Columbia, as was the website in <u>Gorman</u>.

Plaintiffs will not be given an opportunity to conduct jurisdictional discovery, which is intended to supplement, not substitute for, initial jurisdictional allegations.  <u>GTE New Media</u>, 199 F.3d at 1351; <u>see</u> <u>Caribbean Broad. Sys., Ltd. v. Cable & Wireless PLC</u>, 148 F.3d 1080, 1089 (D.C. Cir. 1998).  A plaintiff must, at minimum, allege some facts upon which jurisdiction could be found after discovery is completed.  Here, the initial jurisdictional allegations are patently inadequate.  Indeed, plaintiffs' arguments regarding the website as a basis for personal jurisdiction do not even surface in the complaint, but rather make their debut in plaintiffs' opposition papers.  Jurisdictional discovery might have been appropriate had plaintiffs shown that the Rinat defendants interacted with the District of Columbia in some way, but were unable to conclusively establish personal jurisdiction.  <u>See</u> <u>Crane v. Carr</u>, 814 F.2d 758, 764 (D.C. Cir. 1987).  However, plaintiffs have made no such showing.  The website was established in New Jersey and is maintained in New Jersey, by an entity located in and organized under the laws of New Jersey, and is no more "interactive" than any other modern website.  The allegation that the website is accessible within the District of Columbia fails to differentiate the Rinat website from the virtually infinite number of websites operated from locations around the globe.  Thus, plaintiffs are not entitled to jurisdictional discovery, and on the basis of the facts before the

Court, personal jurisdiction over the Rinat defendants is lacking.[14]

## CONCLUSION

For the foregoing reasons, the motions of the Rinat defendants and the Israeli defendants will be granted, and plaintiffs' action will be dismissed.  A separate order will be issued on this date.

    /s/     John D. Bates           
JOHN D. BATES
United States District Judge

Dated:   November 10, 2005

Copies to:
Maher H. Hanania
HANANIA & KHADER
6066 Leesburg Pike
Suite 101
Falls Church, VA 22041-2220
(703) 778-2400
Email: hananialaw@yahoo.com
    *Counsel for Plaintiffs*

Jean Engelmayer Kalicki
ARNOLD & PORTER, LLP
555 12th Street, NW
Room 1197
Washington, DC 20004-1206
(202) 942-5000
Fax: (202) 942-5999
Email: Jean_Kalicki@aporter.com
Robert Neil Weiner
ARNOLD & PORTER
555 12th Street, NW
Room 1251
Washington, DC 20004-1200

---

[14]Jurisdictional discovery must be formally requested.  See, e.g., Second Amendment Found. v. United States Conf. of Mayors, 274 F.3d 521, 525 (D.C. Cir. 2001).  Neither plaintiffs' opposition papers nor anything else in the record reflect such a request.

(202) 942-5855
Fax: (202) 942-5999
Email: robert_weiner@aporter.com
Ori Lev
UNITED STATES DEPARTMENT OF JUSTICE
Civil Division/Federal Programs Branch
P.O. Box 883
Washington, DC 20044
(202) 514-2395
Fax: (202) 318-7589
Email: ori.lev@usdoj.gov

David O. Bickart
KAYE SCHOLER LLP
901 15th Street, NW
Suite 1100
Washington, DC 20005-2329
(202) 682-3503
Fax: (202) 414-0310
Email: dbickart@kayescholer.com

Kurt J. Hamrock
MCKENNA LONG & ALDRIDGE LLP
1900 K Street, N.W.
Washington, DC 20006-0110
(202) 496-7500
Fax: (202) 496-7756
Email: khamrock@mckennalong.com

Stephen B. Shapiro
HOLLAND & KNIGHT LLP
2099 Pennsylvania Avenue, NW
Suite 100
Washington, DC 20006
(202) 955-3000
        *Counsel for defendants and interested parties*